# EXHIBIT K

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

BLAKE LIVELY,

Plaintiff,

v.

24-cv-10049 (LJL)
25-cv-00449 (LJL)
25-cv-00779 (LJL)

WAYFARER STUDIOS LLC, *et al.*,

Defendants.

Conference

------------------------------x

New York, N.Y.
February 3, 2025
11:00 a.m.

Before:

HON. LEWIS J. LIMAN,

District Judge

APPEARANCES

MANATT, PHELPS & PHILLIPS
Attorneys for Plaintiff/Counter-Defendant
BY: ESRA ACIKALIN HUDSON
STEPHANIE A. ROESER
and
WILLKIE FARR & GALLAGHER LLP
Attorneys for Plaintiff/Counter-Defendant
BY: MICHAEL GOTTLIEB
AARON E. NATHAN
KRISTIN BENDER

QUINN EMANUEL URQUHART & SULLIVAN
Attorneys for Plaintiffs Jones and Jonesworks
BY: KRISTIN TAHLER
NICHOLAS INNS

MEISTER SEELIG & FEIN PLLC
Attorneys for Defendants/Counter-Plaintiffs
BY: BRIAN FRIEDMAN
SUMMER BENSON
KEVIN A. FRITZ
MITCHELL SCHUSTER

APPEARANCES (Continued)

BOIES SCHILLER FLEXNER LLP
Attorneys for Defendants/Counter-Plaintiffs Sloane and Vision PR
BY: SIGRID S. McCAWLEY
ANDREW VILLACASTIN

(Case called)

THE DEPUTY CLERK: Starting with counsel for plaintiffs, please state your appearance for the record.

MR. GOTTLIEB: Good morning, your Honor. Mike Gottlieb from Willkie Farr & Gallagher, on behalf of Ms. Lively in the *Lively v. Wayfarer* action, and on behalf of Ms. Lively and Mr. Reynolds on the *Wayfarer v. Lively* action.

I'm joined in the court today by my colleagues Aaron Nathan and Kristin Binder, also from Willkie Farr & Gallagher.

THE COURT: Good morning.

MS. HUDSON: Good morning, your Honor. Esra Hudson, of Manatt, Phelps & Phillips representing the same parties as Mr. Gottlieb. I am joined here today by Stephanie Roeser, also of Manat, Phelps & Phillips.

THE COURT: Good morning.

MS. McCAWLEY: Sigrid McCawley from Boies, Schiller & Flexner. I have here with me my partner Andrew Villacastin. We are here on behalf of Leslie Sloane and Vision PR?

THE COURT: Good morning.

And the defense table, plaintiff in the other action.

MR. FRIEDMAN: Thank you, your Honor.

Brian Friedman, on behalf of Wayfarer Studios LLC, Justin Baldoni, Jamey Heath, Steve Sarowitz, It Ends With Us Movie LLC, Melissa Nathan, Agency Group PR, LLC, Jennifer Abel in the *Lively v. Wayfarer* matter.

In the *Wayfarer v. Lively* matter, Wayfarer Studios, Justin Baldoni, Jamey Heath, It Ends With Us Movie LLC, Melissa Nathan, Jennifer Abel Steve Sarowitz.

And in the Stephanie *Jones v. Jennifer Abel* matter, we represent Jennifer Abel, Melissa Nathan, Justin Baldoni and Wayfarer Studios LLC.

I am joined by my colleague from my firm, Summer Benson.

THE COURT: Good morning.

MR. SCHUSTER: Good morning, your Honor. Mitchell Schuster, from Meister Seelig & Fein, on behalf of the same parties as Mr. Friedman and Ms. Benson I am here with my partner Kevin Fritz.

THE COURT: Good morning.

MR. SCHUSTER: Good morning.

THE COURT: Do we have counsel for Ms. Jones in 25 Civ. 779?

MS. TAHLER: Yes, your Honor. Good morning. Kristin Tahler from Quinn Emanuel, representing Ms. Jones and Jonesworks, and I'm here with my colleague Nicholas Inns.

THE COURT: Good morning.

Any other counsel who have not identified themselves who are making an appearance?

Okay. So we are here for an initial conference.

I have got the case management plan in 24 Civ. 10049

and 25 Civ. 449, the *Lively v. Wayfarer Studios* matter, and the *Wayfarer Studios v. Lively* matter. Those two matters are consolidated with one another.

I have also asked the parties in *Jones v. Abel* to appear today. That matter has been assigned to me as related. It has not been consolidated, but one matter for discussion is whether the discovery in the several matters should be cross-designated to achieve efficiency purposes and whether the discovery schedule in the *Jones v. Abel* matter should be the same as the discovery schedule in the two consolidated matters.

What I would like to do is hear first from the plaintiff in the *Lively v. Wayfarer Studios* matter; then from plaintiff in the *Wayfarer Studios v. Lively* matter.

Then I will hear from the parties in the *Jones v. Abel* matter.

In particular, I am not asking for the parties to repeat what's in the lengthy pleadings in front of me, which have been aired repeatedly. What I am asking the parties to do is to tell me the information I need in order to manage this case; in other words, what type of discovery is expected, why I should agree to the case management plan that has been submitted by the parties, legal issues that the parties anticipate arising, issues with respect to discovery that the parties anticipate arising.

Then I have been informed that the defendants in the

*Wayfarer Studios* matter had planned to move against the complaint in *Wayfarer Studios v. Lively*. That complaint has now been superseded by an amended complaint. I would like to know whether the defendant in this matter, who is the plaintiff in the Lively matter has a present intention to move against the amended complaint or to answer it.

With respect to *Wayfarer Studios v. Lively*, I note that at least one new defendant has been added, the New York Times. It would be of interest to me, first of all, what the status is, whether the New York Times has been served; and, second, how the naming of the New York Times relates to the action that I'm aware of that has been filed in California.

The parties are free to raise any other matters in front of me, but let me hear from you first, Mr. Gottlieb. Then I will hear from counsel for Wayfarer Studios.

MR. GOTTLIEB: Thank you, your Honor.

I will try to address all those points, but if I miss one I am sure the Court will remind me.

Let me start -- and I gather the Court only wants to address the scheduling issues now, and defer discussion of the Rule 3.6 issues to a later point in the hearing.

THE COURT: You have to make a motion under Rule 3.6. You are welcome to raise any of those issues. I would like them to be raised at the end, and I will hear from you and from your adversary.

MR. GOTTLIEB: Thank you, your Honor.

So with respect to the schedule, we think that the schedule that the parties submitted to the Court unfortunately is no longer workable. We met and conferred in a 26(f) conference in good faith on January 30, and the parties submitted a joint schedule to the Court that evening, which is the Docket No. 49 proposed schedule that the Court references.

Among other things, in our meet-and-confer we discussed all the various dates required to be put into that schedule, including a date for amending complaints, and we had a discussion about extending that default date with the Wayfarer parties and ultimately recommended a date that was longer.

Counsel for the Wayfarer parties did not tell us during this meet-and-confer that they were planning the next day to file an amended complaint, which they did the next day. That not only added significant amount of new materials, including a 168-page compendium of materials as Exhibit A, but it includes a new defendant that to our knowledge has not been served and that did not have an opportunity to participate in the 26(f) conference in an action that's already been consolidated by this Court.

Those adjustments have significant effects potentially on the consolidation of the cases because the New York Times may have its own views on whether the cases should be

consolidated or not. There is authority, of course, for deconsolidating cases once they have been consolidated. We are not asking for that at this time but simply saying that there is now a new additional defendant that has its own interests, that a media defendant, an institutional defendant, will have a perspective that is likely to be very different from the perspective of the other parties in the case thus far. So the Court may have a reason in its exercise of discretion, once the Times is served and once the Times appears, to make a different ruling with respect to consolidation.

With respect to the schedule itself, we expect that the Times will have its own views on those scheduling questions that the parties met and conferred on.

And so we think that by itself warrants going through the process of serving the new defendant and then allowing the parties to meet and confer again and providing a new report following that 26(f) conference to be able to provide a schedule that works for all parties recommended to this Court.

But given that the Wayfarer defendants or plaintiffs in that action have added a new defendant, we had been contemplating amending our own complaint in the Lively action and we're thinking about that on the timeline that had been laid out by the proposed schedule.

Now that a new defendant has been added and we think the schedule has to be reconfigured based on that anyway, our

plan is to just go ahead and amend our complaint now. We have two weeks essentially until February 14 as the operative date that our amendment as of right is due given the answers of the entity defendants in the *Lively v. Wayfarer* case.

We intend to add both claims and parties to our complaint. We think, given that, the most efficient course of action, given that the matters still remain consolidated, would be for us to go ahead and amend on or before the 14th and then allow for service to take place.

Then all of the parties can again have a 26(f) conference and produce a new operative schedule to the Court. We are cognizant that this Court set a trial date, and we think that that trial date can stay on the schedule. We think that we can provide a schedule once all of the operative and necessary parties are before the Court, a schedule that will work. We are very eager to get discovery started in this case, but we don't think it is fair or efficient to try to set that schedule in motion without the relevant parties sitting at the table.

So fundamentally that is our position. The action of amending to add a new party sort of requires us to redo the 26(f) conference and come to the Court with a new proposed schedule that will allow for an efficient management of these proceedings.

THE COURT: So let me ask you a couple of questions.

One obvious one is why should I do that?

You've got a complaint that you are prosecuting. You have a complaint that you are defending against. If I disagree with you, it would mean you would get on with the business of serving your initial disclosures, you get on with the business of serving your initial requests for production and your interrogatories, and at least the case is able to move forward. That doesn't mean that you can't serve second requests for documents or amend your initial disclosures, but at least we get going.

As to the New York Times, it's not unusual for parties to be added in. I would hear from the New York Times once they have been served and make an appearance. It may result in the case management plan being changed, but at least the parties can get going.

MR. GOTTLIEB: I think the difference between those sort of typical situations your Honor is describing and this one is that in this situation the 26(f) conference was held while the defendants knew they were filing this amended complaint the very next day and deprived us of an opportunity to even consider what effect that might have on the schedule or changes we might like to ask for with respect to the dates in the 26(f) conference.

We would like an opportunity to be able to have that discussion, the parties, in order to have an efficient schedule

to manage the matter. We would like an opportunity to be able to understand in that case what the Times intends to do, if they intend to move against the complaint.

There are defendants in the *Wayfarer v. Lively* case that have indicated that they intend to move to stay discovery in that case in line with the motions to dismiss that they expect. It would be --

THE COURT: Sorry. Say is that again. What did you just say?

MR. GOTTLIEB: In the *Wayfarer v. Lively* case there are parties that have indicated that their intent is to move to stay discovery. I will let those parties speak for themselves here, but in conjunction with motions to dismiss that are expected to be filed in that case.

I'm simply suggesting that the net effect of all of those actions is the actual parties against whom party discovery may proceed may be affected by the positions that are taken as well as the parties that we intend to add by next Friday.

What I am suggesting, your Honor, is that those parties have a right to be heard and they may have their own views on whether party discovery should be stayed. They may have motions that they want to make as against the complaint, and we just think, while discovery can move forward right now, between now and next Friday, it just seems far more efficient

to let us go ahead and amend the complaint, add those new parties, and give those new parties as defendants an opportunity to advise the Court of their position as to whether they intend to move to dismiss whether they intend to move to stay discovery or the like.

THE COURT: If I follow your suggestion, new parties will be added by next Friday. Then they will be served presumably quickly, not the 90 days.

How quickly do you anticipate that they would be served?

MR. GOTTLIEB: As we did when we filed our initial complaint, we would ask those defendants through their counsel whether they would accept service immediately. If they declined to accept service immediately, we would begin to attempt to serve the next day, which is exactly what we did in the action in December.

THE COURT: And then they would presumably have time to get counsel, to decide whether to appear.

That's going to add what, another 30 days on to the timetable?

MR. GOTTLIEB: It may, your Honor. I have reason to think that it won't, given that there's currently sort of one set of lawyers representing all of the defendants in this action. But we do think that the parties and claims we intend to add may have an effect on issues with respect to

representation in the case. That is another one of the reasons why we think it would be most efficient to allow us to just complete that amendment by next Friday before making decisions about the discovery timeline in the case.

THE COURT: So maybe be a little bit more concrete with me.

You are a party already to this. You are asking for an extension of time to submit a revised case management plan until what date?

MR. GOTTLIEB: I would suggest, your Honor, that we set that date as -- sorry. I'm just trying to get my calendar in front of me.

THE COURT: Take your time if you want to look at your calendar.

MR. GOTTLIEB: So, your Honor, 21 days after the 14th would be March 7. We are happy to try to effectuate service faster than that.

Of course, as I just stated, our intent would be on the day we file the amended complaint to try to get service just accepted. But 21 days post the 14th would be March 7, which would be sort of I think a reasonable default date for the holding of the 26(f) following the amended complaint. That would allow all parties to participate.

THE COURT: With the notion that maybe by March 11 you would submit to me a revised case management plan?

MR. GOTTLIEB: Correct, your Honor.

THE COURT: Okay.

I will hear from your adversaries with respect to that. I am going to want to know right now what discovery you anticipate taking, what questions and issues you anticipate arising.

Before I get to that, two other questions for you which relate to the amended complaint, whether you currently have a plan to move against that on behalf of your clients or to answer.

A second question has to do with the answers. Your client has made affirmative claims in the complaint against Wayfarer Studios, some of which your client has alleged. Maybe much of it would also take the form of counterclaims to the claims of Wayfarer Studios.

I'm sure, Mr. Gottlieb, you have given thought, when it comes time to answer, whether to plead those as counterclaims or whether to just stand on the complaint and how the mechanics will work.

MR. GOTTLIEB: So we have given thought to that.

To answer the first question, we do plan to move against the amended complaint. We submitted a letter on the prior complaint. We intend to submit -- or if you would like us to submit a letter, but our intent is for both Ms. Lively and for Mr. Reynolds to move to dismiss that complaint.

As for the forms of the affirmative claims and which of them would be appropriate counterclaims, I am not sure we're all the way there yet and sort of through that. It is a large complaint, an amended complaint that was just filed.

I think the answer is some of them will properly rest upon the complaint, and some of them, assuming that the amended complaint were to survive a motion to dismiss, some of them would be properly pled as counterclaims.

So I think we will have to see as we get there, but our plan is to move to dismiss as to both of our clients against the amended complaint.

THE COURT: Okay. Should I set a deadline right now for you to make your motion, and when would you like to make your motion?

MR. GOTTLIEB: We are comfortable with the standard motion to dismiss requirements, your Honor.

THE COURT: Okay. So that's 21 days?

MR. GOTTLIEB: Yes, your Honor.

THE COURT: All right.

What issues do you currently contemplate with respect to discovery?

You indicate that it's going to be broad.

MR. GOTTLIEB: Yes. I think part of is that is going to depend on how various issues with respect to the moving defendants in the Wayfarer action are handled. There are

significant components of discovery in that action that may never come into the case, depending on how the Court resolves motions to dismiss, particularly issues relating to, for example, the defamation cause of action which brings with it an entire set of fact and legal issues that are not present in many of the other claims in the case.

So I think some of the question of how discovery shakes out is going to depend on the resolution of those legal issues in the Wayfarer action.

Types of discovery I think are not going to be a secret or surprising. I mean, there will be numerous depositions that will take place of the parties, of course. There will be significant third-party discovery around the communications that were made from the underlying sexual harassment and retaliation claims, as well as the false-light claims that we have alleged and the contractual claims that we have alleged.

We think that that discovery will involve the typical types of discovery requests that one would expect in contractual, sexual harassment, retaliation claims, and will also include significant discovery relating to the manner in which the defendants used the media and used their relationships with the media in order to shape and push forward the retaliation claim that's been alleged in the complaint.

That will include communications between the

defendants and their agents with media entities. That will include communications between the defendants and contractors. It will include discovery over financial records of individuals who may have been paid in exchange for taking certain positions in public and the manner in which they were paid.

Those are the kinds of discovery issues we intend to explore in this case.

THE COURT: Have the parties discussed an appropriate protective order with respect to discovery?

MR. GOTTLIEB: We discussed in a meet-and-confer a protective order. We haven't yet exchanged drafts of that protective order, but we're planning to do so shortly after the meet-and-confer. So we expect to be exchanging a draft of a protective order with the defendants after this conference.

We do believe that there will be provisions in a protective order that will be appropriate in this case, just given the nature of the allegations and the high-profile aspect of the dispute and some of the individuals who will be involved.

It is a case involving a significant number of high-profile individuals on both sides of the V as well as third parties. In particular, addressing interests and needs of third parties and third-party privacy is going to be very important in this case.

So we expect to seek protections under a Rule 26(c)

protective order that we believe will be very important, particularly in a case where there's been a significant amount of providing of materials and leaking of materials to the media in this case.

We believe there is significant precedent from the Second Circuit and the Southern District that addresses this risk particularly in the context of third-party discovery. This is another reason, by the way, why allowing for us to go ahead and amend the complaint and get all the parties involved before we move forward with discovery makes a lot of sense here, because these issues are going to be of considerable importance to anyone who is a party and likely will govern the interests of third parties in discovery.

But, in any event, to circle back to the question, we do intend to propose a protective order in this case. We are working up a draft of it to exchange with the defendants and get their position on it, and we would like to, of course, get the position of all parties.

THE COURT: Is there any reason, if I agree to your proposal to hold off on the case management plan until March 11, why the work on the protective order can't proceed and a proposed protective order be submitted to the Court let's say by no later than March 11?

I mean, it would seem to me that, with the people you already represent and with the people that your adversary

already represents, we've got a number of high-profile people involved in the case. You each know of the third parties who are going to have interests that you are going to want to protect. You haven't revealed to me who's going to be named in your amended complaint, but you already got a lot of high-profile people.

MR. GOTTLIEB: I wasn't suggesting going longer than that, your Honor. So, yes, I think March 11 would be a date that we would very easily meet or perhaps even provide one in advance of that.

THE COURT: One of the topics that I will want to make sure is being considered by you and by your adversary is the sharing of discovery with the parties in *Jones v. Abel*.

From my glance at the captions, it appears that the main party who is in *Jones v. Abel* but not otherwise in this litigation is Jones and Jonesworks. Given their relationship to the parties, one would think that expanding the protective order to them wouldn't be much of an issue, but I will hear from them.

MR. GOTTLIEB: We obviously can't speak for Ms. Jones on that, your Honor. But so far as we are concerned, we are happy to work with both the defendants and all parties to all of these actions in fashioning a protective order if that is more efficient for the Court.

THE COURT: Anything else I should hear from you other

than the issues that you've raised with respect to pretrial publicity?

MR. GOTTLIEB: No, your Honor.

THE COURT: Okay. I will hear from anybody else who wants to be heard from in *Lively v. Wayfarer Studios*.

On plaintiff's side anybody else. No?

All right. On the defendants' side, *Lively v. Wayfarer Studios*, on the plaintiffs' side on *Wayfarer Studios v. Lively*?

MR. FRIEDMAN: Thank you, your Honor. Brian Friedman.

First and foremost, we would like to move the case along as quickly as possible and think that the order that we had agreed to works notwithstanding the amendment of the complaint. The reason why is adding the New York Times into this action seemed to just make it simpler to have everyone in one place and for judicial ease that having everybody together seemed to be a more efficient way to deal with case management.

THE COURT: What is the status of the California case, and what are your plans with respect to the California case against the New York Times?

MR. FRIEDMAN: The plan is to dismiss that case without prejudice today now that they have been added to this case and to try and get them served today so we can move this along as quickly as possible. And we would like to move it along as quickly as possible. We don't think that the amended

complaint changes the core issues at all in the case.

THE COURT: What have you added in the amended complaint that was not in the original complaint besides adding the New York Times and the defamation claim against the New York Times?

MR. FRIEDMAN: The only thing from a cause of action or claim point of view that's been added were against the New York Times for promissory fraud and breach of implied fact contract against the New York Times. And that's based on information that we recently received regarding the metadata of when the New York Times was involved.

Those are the only new claims that have been added, and they only relate to the New York Times. There are no new claims that have been added as it retes to the parties that already existed in the matters before you.

THE COURT: Okay.

MR. FRIEDMAN: So we think that we could proceed forward and move forward and do it an efficient process. There's no reason to wait at all.

I don't know, frankly, who the additional parties are that are going to be added by counsel that just suggested that. So I don't know whether they would need separate counsel or they would be represented by us with appropriate conflict waivers or otherwise.

I could answer that if I knew that and contacted them

and would be able to respond to that, and we would move that along quickly. But I don't think that changes at all the core discovery and the core information that's needed to obtain, which I believe that everybody is kind of aware of what's needed in the case and what types of discovery will exist.

THE COURT: How far along did the New York Times case in California get?

Was there a case management plan in that or any activity?

MR. FRIEDMAN: No. There was actually no activity at all. They had not been served. There was some telephone calls that were made, but they had not been served in the California action at all.

After seeing kind of your case management order and just for the efficiency of the case, it kind of made no sense to be doing this on different coasts and with different courts. It seemed that so many of the issues are going to be so similar that to have it all in one proceeding in front of your Honor would make the most sense.

THE COURT: Okay. I interrupted you. You were going to talk about the nature of the discovery and discovery issues.

MR. FRIEDMAN: I think the nature of discovery is, you know, I mean, is quite clear. I mean, there's documents that we need that we are not privy to. There are documents that were exchanged between Ms. Jones and her company, Leslie Sloane

and Vision PR, and the Lively and Reynolds parties. There are documents that are going to be needed, there are depositions that are going to be needed in that respect.

As a matter of fact, we made a request to take Ms. Lively's deposition as soon as possible. We don't need necessarily documents for that deposition, you know, at a date that's sufficient for her. We would like to be able to take her deposition in the case. We don't think we need any documents for that deposition. For other depositions, it's going to be important to understand some of the other documents that we don't have and that are in the possession of the other parties that we are unaware of.

But for case efficiency sake and for moving this along, we would really urge the Court to allow discovery to take place and move forward, in part because the harms are actually being suffered and have been suffered since the New York Times article came out.

There's been a number of projects, to the hundreds of millions of dollars, lost by Wayfarer. There have been significant damages from Tag PR and Melissa Nathan losing clients. You know, as the Court knows, when things hit the press and especially hit the New York Times, people sometimes react before there is a judicial determination as to who's right or who's wrong.

These parties are suffering greatly. So it's so

important from our client's perspective of having future business of having a future livelihood that they have a right to move forward as quickly as possible.

We don't think there's any prejudice whatsoever in not moving forward. We don't think there's any prejudice to the other side in starting that discovery now and moving that along.

Again, if counsel is willing to represent who the new parties were and the new claims were, you know, I can work as early as today and find out whether that party could be represented by us legally and ethically with a conflict waiver, or, alternatively, whether we needed to get separate counsel.

But if it's a party that needs to get separate counsel, obviously they are going to take whatever time they need to get separate counsel. I am just concerned that that process in and of itself could delay the proceeding.

THE COURT: One reason for at least extending the initial deadlines in the case management plan does have to do with efficiency. You are going to get document requests, no doubt, from the other side, and you are going to get document requests from the New York Times.

The New York Times is not going to be prejudiced by whatever it is that the Lively parties have asked for. They are going to have the right to demand documents even if Lively hasn't demanded those documents.

If I agreed with what you have suggested, then you may have to do the same document review twice. The same thing goes for the other side, for every party that is involved, even if it's just documents, there's some inefficiency to doing a document review twice.

That is not to say depositions. Depositions are not going to go forward until we know who the parties are in the case, because I am not going to have depositions done twice unless there's some very good reason for that.

MR. FRIEDMAN: We are happy to work 24 hours a day seven days a week to make sure that those documents are produced timely and right away. We're not delaying this in any way. So even though it might require more effort on our side, we are more than willing to do that.

THE COURT: Okay. All right.

Do you want to address your views with respect to an appropriate protective order and timeline for an appropriate protective order. There's going to need to be something like that in place before documents start to be exchanged.

MR. FRIEDMAN: Sure.

We received a draft protective order, counsel discussed on the phone. We could review that today. We could provide comments as early as tomorrow to that and would agree to an appropriate protective order that makes sense for the case and be prepared right away to enter into one.

THE COURT: Okay. All right. Thank you.

Let me hear from anybody else on the plaintiffs' side in Wayfarer Studios and defendants' side in the Lively matter.

MR. FRIEDMAN: Thank you, your Honor.

MS. McCAWLEY: Judge, Sigrid McCawley. I just want to reiterate, we received --

THE COURT: Remind me. You represent?

MS. McCAWLEY: I represent Leslie Sloane and Vision PR.

THE COURT: Okay.

MS. McCAWLEY: We received the amended complaint on Friday night. We submitted a letter to your Honor on Thursday, not knowing that they were going to amend the complaint. We still intend to move to dismiss that complaint, so we are happy --

THE COURT: What are you going to move against, and what are you --

MS. McCAWLEY: There are three claims against my clients Leslie Sloane and Vision PR. Two of those are not actionable under New York law, which we contend would apply, but even under California law are not valid.

THE COURT: Which are those?

MS. McCAWLEY: That's the false-light invasion-of-privacy claim as well as the civil extortion claim.

As to the defamation claim, four of the five

plaintiffs don't even allege statements in the complaint against my client or her company that she owns. So there are significant deficits in even the amended complaint after having a shot to clean that up that have not been cleaned up.

So at this point we are in a position where we want to, you know, be moving to dismiss quite quickly because we don't believe they should have been dragged into this case to begin with.

This was really a case about their crisis PR management company making statements about burying people and destroying people. My client and her company simply have been dragged in as a finger pointing mechanism. We want to make sure we get them out as quickly as possible. So we would like the opportunity to move to dismiss based on those legal deficiencies in the amended complaint.

THE COURT: Okay.

How soon do you plan to move to dismiss?

Will you move to dismiss within the timetable permitted by the federal rules as against the amended complaint, or do you need more time?

MS. McCAWLEY: No, we will, your Honor. In fact, we may do it ahead of schedule. That is our intent, is to get that motion to dismiss before the court as quickly as we can to have that resolution.

THE COURT: Okay. I don't hear you saying that you

are moving for a stay of discovery as against your clients.

Are you?

MS. McCAWLEY: We did discuss that the meet-and-confer, your Honor, because again I contend that my client and her company never should have been dragged into this. So them being subject to the full-scale discovery that is going to be in this case seems inherently unfair.

But, of course, I wanted to allow the Court the opportunity to submit the motion to dismiss. As you know, the standard under New York law contemplates the Court having an opportunity to look at that motion to dismiss before making that determination on a stay.

So we would like to lay out that information for the Court, but that is one of the things we contemplate, because we believe it would be inherently unfair for our client and her, you know, her female-run company to have to be dragged in through this significant and very expensive discovery in this case when we don't contend that they have any viable legal claims against her.

THE COURT: What significant prejudice would you suffer by having to serve initial disclosures and requests for production and interrogatories?

Those seem to me to be fairly standard. There may be some legal expense, but that's always going to be the case.

MS. McCAWLEY: Sure. That's fair, your Honor. I just

think the difference is really on the receiving end, of course, because there is always a difference -- you know, certainly as a third party she may be subject to some discovery in this case, and we will certainly cooperate in that regard to the fullest extent.

However, you know, as the Court well knows, there is a vast difference between being a party -- she has to be present here today have counsel here today, you know, and for all of the hearings upcoming, when we contend that when the Court sees our motion to dismiss we believe that you will very readily, after reviewing that amended complaint, realize the significant deficits in how it's pled, and we will hopefully be able to get her dismissed as a defendant in the case.

THE COURT: All right.

MS. McCAWLEY: Thank you, your Honor.

THE COURT: Anybody else on the defendant's side in the Wayfarer matter?

All right. Let me now hear from the parties in *Jones v. Abel*.

Counsel for Jones.

MS. TAHLER: Good morning, your Honor. We agree that there are efficiencies here in terms of discovery proceeding together in the cases.

We were not a part of the meet-and-confer that the Lively and the Baldoni parties had last week, and so we have

begun a meet-and-confer on dates, but haven't agreed to dates on our end. So the idea of there being a collective discussion among all of the related parties as suggested by the Lively parties makes sense to us as well.

THE COURT: Okay. All right.

Anything further?

MS. TAHLER: No, your Honor.

THE COURT: Okay.

For Abel in *Jones v. Abel*?

MR. FRIEDMAN: On behalf of the Abel parties, your Honor, Brian Friedman. As the Court --

THE COURT: Before you speak, let me ask one other question to counsel for Jones.

MR. FRIEDMAN: Sure.

THE COURT: So I assume that you have seen and had the opportunity to review the case management plan that was submitted by the parties in *Lively v. Wayfarer* and *Wayfarer v. Lively*?

MS. TAHLER: Yes, we have, your Honor.

THE COURT: And do you see any challenges on behalf of your clients being able to work with that case management plan?

MS. TAHLER: Largely, your Honor, through the pretrial discovery the dates are pretty workable. There are a few dates that we would suggest modifications of simply because of the dates that our motion to dismiss, assuming that they will move

to dismiss and our opposition will be due, that we would want to move back a little bit.

THE COURT: Say that again. Which dates?

MS. TAHLER: So, for example, the initial requests for production shall be served by March 5. As we read the calendar, our opposition to a motion to dismiss from then would be due on March 4, so we would ask that that be pushed back until March 10 just so those two dates wouldn't align.

And then for initial disclosures, on this schedule it was February 13. We would ask that that be pushed back to February 18, just to give us a little bit more time as well, since we were, our case was just removed last week.

But the place where we significantly diverge is when we get into pretrial and trial, because although there are some issues of similar factual with respect to parties -- or, excuse me, with respect to individuals and companies, the issues in the case, both factual and legal, are very different than those involving the Baldoni and the Lively parties. So we would suggest that our trial and pretrial should come after the Baldoni and Lively parties.

THE COURT: Okay.

Let me hear from counsel for Abel.

I should say in response to that last comment that no motion has been made to me to consolidate *Jones v. Abel* for trial purposes, and I have not *sua sponte* come to a conclusion

that they should be consolidated for trial purposes. In fact,, from my first glance, what I had anticipated is that the *Jones v. Abel* trial, if there is a trial, would take place after *Lively v. Wayfarer* and *Wayfarer v. Lively*, but if there is a motion, I would consider that obviously with an open mind.

Okay.

MS. TAHLER: Thank you, your Honor. I was just responding to the rest of the dates on the --

THE COURT: I appreciate it.

MS. TAHLER: Thank you.

MR. FRIEDMAN: Thank you, your Honor.

Brian Friedman, on behalf of Jennifer Abel, which is also a woman-owned company, along with Melissa Nathan's Tag company, The Agency Group.

I do want to stress something that you might not know, your Honor, which is that Ms. Jones and Jonesworks filed in the Supreme Court in New York. They had that case, which has been now removed. They immediately conducted discovery in that case.

As a matter of fact, they served subpoenas in that case. And even though we removed the case, apparently there were significant responses to those subpoenas, which I don't know whether we've seen them or not. I know that something came over the e-mail this morning but I haven't looked at it closely. Cocounsel may be aware of what that is and what that

isn't.

But the Jones parties and Jonesworks were very eager to move quickly and start discovery very quickly and in fact got responses to discovery. So to come into this court and say we should wait and we should not do discovery, go to the back of the bus, and there is no reason for us to be involved, and this is a different case feels disingenuous and feels inappropriate in light of the fact that they have initiated the discovery, already moved forward with it.

We are ready to respond and ready to move forward with the discovery. The problem is, you know -- truly, I say this with all sincerity, my clients are devastated financially and emotionally and need the case to move as quickly as it can within the justice that your Honor sees. But it's just a fact that you should know that the Jones party and the Jonesworks has already issued multiple subpoenas and already received documents in connection with that.

So obviously they felt that important to do. And we feel it important to do that too and move the case along and not wait.

So I just wanted to raise that issue with you, your Honor.

THE COURT: Mr. Gottlieb, I will give you a chance to be heard since your adversary, just by the way things have lined up, had two shots.

MR. GOTTLIEB: Thank you, your Honor.

Just a few point.

One is the discussion that you had with my friend about what's changed in the amended complaint. One of the complications with the amended complaint is that they have appended this 168-page exhibit that is a lengthy factual narrative that contains, as best as we can tell, sort of a day-by-day recitation of their view of what happened. This is Docket No. 50-1.

That actually --

THE COURT: Are you going to move to strike that?

MR. GOTTLIEB: That is what I am getting to, your Honor. We haven't yet decided, but we may need to move to strike document 50-1 in large part because there's no mechanism we think for us to admit or deny the allegations in it.

They are raising defamation claims where their pleading burden on an actual malice standard requires a significant amount of specificity in terms of the allegations that they are making. So we anticipate moving to strike Docket 50-1, and that does affect a bunch of other things in terms of the timing of how discovery may line up, and the motion --

THE COURT: Let me interrupt you for a second and just ask your adversary.

I mean, the way the federal rules work is that, as the plaintiff, you can attach an instrument to a complaint. For

example, you can attach a contract if you're suing on a contract.

But the law in the circuit is pretty clear that you can't just attach a factual narrative for the reasons that Mr. Gottlieb has identified, which is that there's no mechanism for responding to the factual narrative that's attached.

Frankly, it is not even clear that Rule 11 applies to the attachment as opposed to the body of the pleadings itself.

So what is the purpose of that attachment?

MR. FRIEDMAN: Your Honor, the purpose of the attachment, your Honor, was to make sure that -- frankly, it was almost -- to make sure that all of the text messages and all of the information was provided that formed the basis for the underlying claims.

That was the purpose of putting that forth, so there would actually be the documents that we had. It is going to make discovery much easier, because we're putting it all out there and have nothing to hide at all.

THE COURT: Well, I mean, that is actually almost exactly what the federal rules are designed to prevent as I understand them.

You can quote an e-mail or text message in the body of a complaint, but you can't then just attach the stuff that the moving party, the defendant on a motion to dismiss, can then refer to the documents to the extent that they're integral.

But you can't just give me a complaint and then give me a whole bunch of documents.

MR. FRIEDMAN: It is not a whole bunch of documents. It is actually a timeline that is incorporated in the complaint as an attachment. Whether it was put in the body of the attachment, where some of it already is, or whether it was separated as an attachment and then incorporated by reference, we are happy, if your Honor wishes to, include it in the body, but it feels like it serves the same purpose.

THE COURT: Well, I mean, that would be a second amended complaint, and I am not going to express a view with respect to that. I am just asking my questions.

All right. Mr. Gottlieb?

MR. GOTTLIEB: I don't believe what Mr. Friedman has just described is accurate.

If you just take one example as I am standing here, your Honor, pages 80 to 81 of this document contain some images but then contain lengthy paragraph explanations that are in someone's voice. Whose voice I don't know, because it doesn't say in this document, so there's no way for us to even articulate how to respond to the speaker, what the factual allegations are.

I do think the rules require these kinds of allegations or messages to be put in the paragraph allegations of the complaint for the precise reason that we have an

opportunity to admit them or to deny them or to make a Rule 11 motion based on them.

We do intend to file that motion to strike, your Honor. We are happy to make that motion orally now, but we are also happy to submit a letter motion to the Court as quickly as we can when this hearing is done.

I think one thing Mr. Friedman didn't mention is that he uploaded this complaint and this attachment to a website that he created. I think that the reason that it was created was for the purpose of this case.

One of the things we plan to take discovery on is who created that website, who funded it, who was involved in devising it.

One of the reasons we've raised Rule 3.6 objections is because there are significant amounts of material, including just firsthand attorney narrative it appears, throughout this document that are being portrayed as, you know, just recitation of facts that are going out there into the world.

So we will make that motion promptly on the docket, your Honor.

I just want to respond to the suggestion that we're trying to delay the discovery in this case. We are very eager to have discovery start, both third-party and party discovery in this case. What we do not want to have happen is to have things done twice.

In the meet-and-confer that we had with the parties, Mr. Friedman just sort of announced in the middle of it that he intended to take Ms. Lively's deposition immediately, tomorrow, from now until eternity, some claims like that.

THE COURT: I don't think that's going to happen, but I also don't think that you are going to be the one to choose who takes Ms. Lively's deposition.

Do you disagree with that?

MR. GOTTLIEB: Your Honor, I think that discussions about that are entirely premature because we don't have a notice for the deposition yet.

THE COURT: Okay.

MR. GOTTLIEB: So we haven't even had an opportunity to make an objection that we may or may not have. The point being --

THE COURT: You've got my preliminary views both on whether Ms. Lively's deposition is going to be taken before there's some documents exchanged and with respect to whether Ms. Lively gets to choose her interrogator.

MR. GOTTLIEB: I understand that, your Honor. That was not the point that we were trying to make in that meet-and-confer.

But, in any event, look, we would love for Mr. Friedman to take Ms. Lively's deposition blind, without documents. That would be great for us. The problem is there

are other parties who are going to be want to participate in that deposition, and she is not going to sit for a deposition more than once, just like his clients aren't going to sit for a deposition more than once.

THE COURT: I guess I should say that if the parties all agree that a deposition can be taken without documents I am not going to stand in the way.

Go ahead.

MR. GOTTLIEB: Sure, your Honor.

My point is that we don't want a deposition to be taken more than once.

So then with respect to the ongoing harm that Mr. Friedman mentioned with respect to his clients, that is the same issue that we have with respect to our clients, your Honor.

Our clients have been subject since August to -- Ms. Lively in particular since August has been subject to an ongoing campaign of retaliation for reporting sexual harassment. It has been devastating to her, as laid out in our complaint. It continues to this day being weaponized by the defendants and their agents.

That harm has made our client very eager to move forward with the discovery in this case and to have her day in court. All we're trying to do is to put an orderly, efficient process around that so it can take place in a way that meets

the Court's schedule and has the appropriate respect for third parties.

THE COURT: All right. Thank you.

Give me one moment to look at the case management plan. I do want to make two rulings before I do that on the case management plan.

First of all, I am going to order that the parties submit a proposed protective order no later than March 11, 2025 for the Court's review.

If there are competing forms of the proposed protective order, those are to be submitted by March 11, 2025, with legal authority supporting each sides' position.

With respect to the motion to strike, the motion to strike can be made as soon as the defendant in the *Wayfarer v. Lively* matter wants to make it. It must be made within the time period permitted by the Federal Rules of Civil Procedure. It also must be made by way of formal motion rather than by letter motion.

With respect to letter motions, the parties should follow my individual practices, which limit the types of letter motions that can be made without leave of the Court.

Give me one moment on the case management plan.

MR. FRIEDMAN: Also, your Honor, when you have one moment, I just want to be heard as to what was just stated, if possible.

THE COURT: If it's brief.

MR. FRIEDMAN: Very brief.

THE COURT: Okay.

MR. FRIEDMAN: I just wanted to say that with respect to the website, only public available documents that can be downloaded by anyone exist on that website.

THE COURT: All right. I am going to hear from Mr. Gottlieb regarding pretrial publicity in a moment.

I am going to adopt the case management plan submitted at 49-1 in *Lively v. Wayfarer Studios* and *Wayfarer Studios v. Lively* with the following changes:

Initial disclosures will be due on February 18 and not on February 13.

Initial requests for production of documents will be due on March 14, 2025.

Interrogatories pursuant to Rule 33.3(a) will be due on March 14, 2025.

I am going to adopt the rest of the case management plan as originally submitted in those two matters without prejudice to an application to amend the case management plan by any party under Rule 16 and after the filing of the amended pleadings by the Lively parties and also on application by the New York Times once they are served and appear in the case.

So that's my ruling with respect to that.

With respect to *Jones v. Abel*, I am going to adopt as

the case management plan the case management plan and scheduling order in *Lively v. Wayfarer Studios* and *Wayfarer Studios v. Lively* with the exception that I am not adopting the date for the proposed joint pretrial order, and I am not adopting the deadline with respect to summary judgment. Those deadlines will be discussed at a postdiscovery status conference.

Finally, with respect to the postdiscovery status conference in both matters, give me one moment.

THE COURT: October 21, 2025 at 10:00 a.m. works for the Court. That will be a conference that will be held in the consolidated matter as well as in *Jones v. Abel*.

The parties had previously indicated the deadlines on which they plan to file their motions to dismiss. Those are the deadlines that are set forth in Federal Rules of Civil Procedure. The responses to the motions to dismiss will be due on the deadlines under the Federal Rules of Civil Procedure.

Under my individual practices, the default page numbers as set forth in the local rules apply, unless the parties mutually reach an agreement to the contrary. So you can meet and confer with respect to additional pages. If you reach an agreement, that agreement will apply.

If a party is not happy with the default page limits or with deadlines for filings, they will have to apply to me by letter motion.

Okay. Mr. Gottlieb, you wish to be heard with respect to pretrial publicity.

MR. GOTTLIEB: Thank you, your Honor.

In this Court's January 27 order it asked the parties to be prepared to address the letter motion about pretrial publicity.

The basis for our motion is encompassed in the letter that we submitted at Docket No. 17 as well as No. 38 in the Lively case and numbers 43 and 27 in the Wayfarer case.

The issue in our view is relatively straightforward. It is that the conduct that Mr. Friedman has been engaged in since December has been in direct violation of New York Rules of Professional Conduct 3.6, particularly 3.6(a), which applies to statements made by lawyers who are participating in litigation of a matter and prohibits extrajudicial statements that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter.

We believe we have laid out in our letters why the statements that Mr. Friedman has made violate that provision. We believe we have also laid out in our letters why the statements do not fall within the exception provided at Rule 3.6(d), which does provide for responses that a lawyer can make that shall be limited to such information as is necessary to

mitigate recent adverse publicity.

Mr. Friedman has acted in direct contravention of Rule 3.6 to date by making inflammatory extrajudicial comments regarding Ms. Lively and her character as well as her motives for entering into this litigation and conduct within the litigation.

He has made that to the media across the country in different sectors. We have provided a list of his public statements at Docket No. 17-2, and his statements have been reposted or circulated hundreds of times, perhaps more, to publications all around the world.

The statements also include not just sort of press releases that Mr. Friedman has sent out to the media, but appearances that Mr. Friedman has made shows, including shows hosed by his former client, Megyn Kelly, and threats to establish a website, which has since been established, that he claimed would quash Ms. Lively's claims.

The website is now a reality. While we agree that the only things we've seen posted to that website to date are the pleadings in this case, one of those two pleadings, the exhibit, we believe was intended to convey information that they weren't willing to put into the verified complaint that they have filed with this Court, but instead attached as an exhibit as a lengthy factual narrative.

We put Mr. Friedman on notice of his ethical

obligations no later than December 23 in the letter that we put on the docket at Docket 17-3, when we sent him the letter reminding him of his ethical obligations in connection with the initial statement that he provided to the New York Times on December 21, and in that letter we also notified him that he was liable for claims of defamation that our client had, and as well was a material fact witness in this case as a result of the statements that he has made and conduct in which he was engaged back in August, all of which is laid out at Docket No. 17-3.

Really the only response that Wayfarer's counsel has offered in Docket No. 27 is that their efforts are not prejudicial and that essentially we started it with the New York Times article that they've cited.

But those arguments should be rejected out of hand. We briefed this and addressed this in our papers, but Rule 3.6 is a specific rule that governs extrajudicial statements by counsel, by lawyers, it is a rule directed at lawyers.

They have not made any allegation that there were any extrajudicial statements by lawyers in the New York Times article for starters. But, in any event, they don't dispute that they have been out regularly in the press making attorney statements addressing the factual allegations in this case, attacking the character of Ms. Lively, using words that describe her motives, her character, describing the complaint

as being filed for PR purposes only, and the like.

As we've explained in our letter motions, that assertion is both incorrect on its face, and it would gut the purpose of Rule 3.6(d) because it would simply allow an attorney, once somebody else has said something, to sort of speak on and on and on in any way they wanted to rather than to the limitations that are provided by Rule 3.6(d).

Contrary to Mr. Friedman's public statements, we have not requested a gag order in this case. What we have requested in our initial letter in Docket 17 at page 3 is that the Court should exercise control over its docket to avoid improper conduct by counsel, and we cited a case, *Hice v. Lemon*, from the Eastern District of New York, in which the Court, following extensive media engagement by one of the counsel, adopted Rule 3.6 as an order of the court applicable to all counsel of record and noticing that violations of it would be punished under Rule 16(f) of the Federal Rules of Civil Procedure.

Although we cited that Eastern District case, there are also Southern District cases that stand for the same proposition. There is a case *In Re General Motors LLC*, which is 2015 WL 4522778, from 2015, holding the same proposition.

Another case, *Munoz v. City of New York*, which is 2013 WL 1953180, an S.D.N.Y. case from 2013, and then *Laugier v. City of New York*, 2014 WL 6655283, in 2014, all of which adopted 3.6 as a rule of conduct for attorneys participating in

the case.

That is really all we are asking for here, is that this Court adopt Rule 3.6 as a rule of conduct going forward and instruct that all of the counsel that have appeared before this Court must follow Rule 3.6 going forward, and that it would be enforceable via Rule 16(f) if not followed going forward.

THE COURT: So why isn't the harm that you identify sufficiently addressed by the combination of the following:

Number one, with studious attention by the Court at the request of the parties to the requirements with respect to filing, and particularly making appropriate motions to strike. And the Court does have sanction power if it looks like the Court's docket is being abused for the purpose not of litigating but of improperly disseminating information that would prejudice a jury.

Number two, as Judge Furman noted in *Munoz*, appropriate voir dire of the jury when the jury is impaneled. And, as Judge Furman also noted in *Munoz*, the handling of any ethical complaints by the appropriate body, which would be the ethical authorities in New York and whichever other ethical bodies are appropriate.

MR. GOTTLIEB: So I think, taking those in reverse order, the reason why just relying on ethical complaints to the bar doesn't really work in this case is because you have

attorneys from multiple, different jurisdictions, including Mr. Friedman, who is the attorney that we have addressed this to, is appearing in this court pro hac vice. So I think there is a special need in this case to clarify the rule that will govern the extrajudicial statements, given the conduct of the attorneys in this case thus far, going forward.

It makes it different from a typical case where you have, for example, the U.S. Attorney's Office and the Federal Defenders office that are regularly appearing before this Court, and it is obvious what bar organizations would be able to resolve those kinds of complaints, whereas here it is a little bit tricky.

We think that filing motions to strike and sanctions power are, of course, remedies that are available, but they are remedies that can't unring the bell once you have statements that sort of ricochet out through the media, both through traditional and social media.

We are in the process in this case of trying to trace how far some of these statements have reached, but they are into the thousands upon thousands when they're repeated on TikTok and other social media platforms. It's very difficult to unring that bell when the attorney is specifically targeting the sort of way that the public is consuming information about a particular case and doing it in a way that is directly attacking the character, integrity, truthfulness of a witness

without being subjected to the kind of tests that are provided in the adversarial system, which is through cross-examination and the rules that govern the Federal Rules of Civil Procedure.

So I think that same answer applies to what Judge Furman wrote about using voir dire questions as well, which is it is very hard to unring the bell if you don't have any limitations on what the attorney is allowed to go out and say about the case in public.

That's why New York has Rule 3.6 in the first place, is because those rules are clearly not sufficient to cabin in the behavior of attorney conduct in every case. One would hope they would be, but they are not in every case, and that's why Rule 3.6 imposes the limitations that it does.

THE COURT: Give me an example of one statement that you are particularly concerned about, one or two statements.

MR. GOTTLIEB: Sure.

So we have laid out these statements at document 17-2. One example is a statement on January 7, where Mr. Friedman is, I think it is a press statement that was released, and this one was printed in People.

And he says: "we are releasing all of the evidence which will show a pattern of bullying and threats to take over the movie. None of this will come as a surprise because, consistent with her past behavior, Blake Lively used other people to communicate those threats and bullied her way to get

whatever she wanted. We have all the receipts and more."

Which is making a statement about the witness's character, but also characterizing the evidence that he intended to release, which, as we pointed out in our papers, is a one-sided presentation of evidence filled with attorney testimony in it.

There's a series of statements from December 21 through December 28 in which he makes false representations about the conduct of his own clients and that we have laid out in the papers.

There is a statement that he made on his client's show, the Megyn Kelly Show, also on January 7, where he claims that evidence is being planted. He says, "Unlike any other case I've handled" -- sorry. I'm searching for the right quote here.

He says: "Blake Lively, if she was sexually harassed to such a degree in this film and in this situation, you know, she wouldn't have returned to the film. It's very clear what's being planted. There's evidence for all those points. There are text messages for all these points."

He continues in a statement -- sorry. Above is where he said: "Blake Lively was no victim. She was in control. She was in power. She took over the film. She used the allegations of sexual harassment, she used these allegations to bully and to try and leverage her position so she could be the

de facto director in this case."

THE COURT: Isn't that in fact exactly what's stated in his complaint?

MR. GOTTLIEB: No, I don't think so, your Honor. Especially the statements, there are statements from before he even had a complaint that was filed. So the answer would be no. But I think that --

THE COURT: The vouching for this is unlike any other case, I get your point on that.

MR. GOTTLIEB: Yes.

I think also, your Honor, there is a mechanism by which attorneys can make statements about the allegations in the complaint without making statements about the character of the opposing parties.

Those usually include words like "as alleged in the complaint" or "as we have said at paragraph" whatever of the complaint. An attorney can make a statement to explain why their allegations are correct or why their allegations are false, but the point of Rule 3.6 is that you are not supposed to launch attacks on the other party's character, which is exactly what is being done here, once you have a matter that is in litigation and once you have invoked the jurisdiction of a court to hear the dispute.

He is also making representations about the state of the evidence. In each of these he's making representations

about the state of the evidence that is a representation about materials that are subject to discovery and materials that, when he makes those statements out to the media and releases material in a one-sided fashion, we don't have an opportunity to rebut it.

The only way we have an opportunity to rebut it is for us to then go out and make competing statements in the media. That's precisely what Rule 3.6 is defined to avoid.

The best example of that is at pages 6 through 7 of document 17-2, when Mr. Friedman took a video clip that is a video depicting one of the allegations from Ms. Lively's complaint. He released that video publicly to a number of outlets, and then he made comments about what he believes the video proves or doesn't prove, that precise factual allegation that is at issue in Ms. Lively's complaint that they are responding to through the press by releasing the underlying evidence that's supposed to be provided in discovery, and then making comments about his opinion and his views about what the video does or does not show.

The only way we can respond to that, given that there's no opportunity for us to yet respond to that in court, is for us to then go out into the media and give our own views and our own take on that evidence.

That is exactly the kind of arms race to the media when you have a disputed factual matter in court that's

supposed to be resolved here in court. It's not supposed to be resolved out in the press with the lawyers going on shows arguing about a piece of evidence that is likely to go before a jury at trial in this case at the end of discovery.

So that's particularly concerning to us. If there's no guardrails in place, it basically means that throughout the conduct of this case, we all have to do our work in this case and then we have to go out on shows arguing against each other about what a particular document or text message or video means.

We think rule 3.6 is clearly designed to stop that type of process when you have a case being litigated in New York.

THE COURT: Do you have any issue with respect to Mr. Friedman creating a website if it was limited just to the filings in this case, making available to the public for free what members of the public otherwise might have to pay a fee to the Court system for?

MR. GOTTLIEB: Not at all. We have no problem with that. Our objection is to the exhibit to the complaint that they have attached, which we will address in a motion to strike. But we have no objection to Mr. Friedman creating a website and putting publicly filed pleadings or motion papers out on that.

We understand that to be a not uncommon practice, and

we don't have an objection to that under Rule 3.6.

THE COURT: All right.

Mr. Friedman?

MR. FRIEDMAN: Thank you, your Honor.

First, let me say that what is conspicuously missing from the argument that you just heard is that for months before any filing was made in this case, the New York Times, giving 12 hours' notice, having had months of working with counsel and others put out an article that completely devastated --

THE COURT: You don't have evidence that Mr. Gottlieb was the one who was making those statements or a lawyer. I understand the argument that those are the rules. You have some latitude to respond to the New York Times article, but that only gets you so far.

MR. FRIEDMAN: I agree with your Honor. But the point is that they have very pointedly used the press, and the New York Times used the lawyers to make sure that what they were doing was appropriate and above board. I do want --

THE COURT: That's a disputed issue in the case as I understand it, correct?

MR. FRIEDMAN: I think it is a disputed issue in the case, but we know it to be a fact.

THE COURT: What ends up being facts are things that either the jury finds as facts or the Court finds as facts. It is not a party's assertion that something happens to be a fact.

That's not the way courts of law work.

MR. FRIEDMAN: I completely respect that.

This has not been a one-way street in this case at all. I can walk through statements made by Ms. Lively's attorneys that have the same force and effect.

"On December 31, Wayfarer and its associates had violated federal and California state law by retaliating against her for reporting sexual harassment and workplace safety concerns."

"The actress/producer's attorneys said in a statement in a federal complaint Ms. Lively has brought this litigation in New York, where much of the relevant activities described in the complaint took place, but we reserve right to pursue further action in venues and jurisdictions appropriate by law."

On January 2, "Nothing in this lawsuit changes anything about the claims advanced by Ms. Lively. We look forward to addressing each and every one of those allegations in Court. We encourage people to read Ms. Lively's complaint in its entirety."

On January 6, "This is not a feud arising from creative differences or a he said/she said situation. Her lawyers state" --

THE COURT: That is exactly the point, which is that you could have said, Listen, I encourage the parties to review our pleadings in this case. Look at our pleadings. You will

see they tell a very different story. But you went a little bit further than that.

MR. FRIEDMAN: Can I just read something else that they said on January 6:

"And their response to the lawsuit was to launch more attacks against Ms. Lively since the filing. They said sexual harassment and retaliation are illegal in every workplace and every industry, a classic tactic to distract from allegations of this type of misconduct is to blame the victim by suggesting they invited the conduct, brought it on themselves, misunderstood the intentions or even lied," Ms. Lively's team wrote.

"Another classic tactic is to reverse the victim and offender and suggest the offender is actually the victim. These concepts normalize and trivialize allegations of serious misconduct." And it goes on.

I can keep reading from January 6.

THE COURT: Maybe you are convincing me that I should adopt as an order of the Court that the lawyers are required to comply with Rule 3.6, which is the relief that is being sought.

MR. FRIEDMAN: I am actually in agreement with that relief. We want to comply with Rule 3.6. We have no objection to that. The way this showed itself today was a gag order on me not being allowed to speak to the media at all.

But I do want to just raise one other issue, an issue

where they said, "A woman speaks up with concrete evidence of sexual harassment and retaliation and the abuser attempts to turn the tables on the victim. This is what experts call DARVO -- deny, attack reverse, victim, offender."

"Wayfarer has opted to use these resources of its billionaire cofounder to issue media statements, launch meritless lawsuits, threaten litigation."

And it just goes on and on. This has not been a one-way street. There are pages of this. I don't mean to waste your Honor's time, but I certainly would stipulate to the professional rules of conduct and certainly want to abide by that. My grave concern is that my client suffered hundreds of millions of dollars in prejudice as a result of actions they were blindsided by.

THE COURT: You know, both sides are saying that they suffered hundreds of millions of dollars in damages. I hear what you are saying. I also hear what they are saying.

Although I was hesitant when I came on the bench to adopt Rule 3.6 as an order of the Court, since you both are agreeing to it, I am going to adopt it as an order of the Court.

I was hesitant to adopt it and I still am adopting it with some reluctance, because while it is my expectation that the parties will comply with their ethical obligations, I don't expect this case and I wouldn't want this case to devolve into

satellite litigation over the comments of a lawyer. Both have said a lot in the pleadings that you've got in front of the Court. That gives I think the public plenty to feast upon.

So I will adopt 3.6 as an order of the Court on the consent of the parties.

MR. FRIEDMAN: One final comment.

Not to sound like a four-year-old fighting a four-year-old with the "they started it," but, you know, in these kinds of cases, once someone says something, it becomes fact. There's no way to fight against it. You start to lose things immediately without the ability to have the Court's adjudication. This was not started by us, your Honor.

THE COURT: So one of the things that I had also contemplated was accelerating the date of the trial from the date that I had previously disseminated and which I have now set as an order of the Court.

I am not going to do that because I am convinced that the parties need the time for discovery. But if it turns out that this ends up being litigated in the press in a way that would prejudice the opportunity of the parties to a fair trial, one of the tools that the Court does have available to it is to accelerate the date of the trial, so that's something that is out there. I don't want to do that.

But we are sticking to the trial date that I set so that there will come a time when, unless this case is settled,

a jury will speak on the issues that you both have raised. Then you will deal with the jury verdict.

3.6 will apply.

MR. FRIEDMAN: I appreciate that. The unfortunate thing is damage is done before a jury speaks.

THE COURT: That's the reason why you each have sued.

I get it.

MR. FRIEDMAN: Thank you, your Honor.

THE COURT: Okay.

Is there anything else from the Lively parties?

MR. GOTTLIEB: No, your Honor.

THE COURT: Anything else from the Sloane parties?

MS. McCAWLEY: No, your Honor. Thank you.

THE COURT: Okay.

Anything else from Wayfarer?

MR. FRIEDMAN: No, your Honor. I think you made clear about who has the right to choose their own lawyer for depositions, so we're fine.

THE COURT: If there becomes an issue with respect to that, meet and confer and then you can raise it with the Court.

Anything further from Jones and Jonesworks?

MS. TAHLER: No, your Honor. Thank you.

THE COURT: Okay. Have a good day, everybody.

(Adjourned)