# EXHIBIT O-1



## LEGISLATIVE
## INTENT SERVICE, INC.

712 Main Street, Suite 200, Woodland, CA 95695
(530) 666-1917 • Fax (530) 668-5866 • www.legintent.com

---

### <u>Reviewing these documents is as *easy* as . . .</u>

1. Want to see your documents *immediately*?  **Open** the left-side bookmark icon pictured below and go to any document listed.



2. See the (blue citations) in our Report?  They link you *directly* to the document being cited.  ***Try it!***

3. The following links will help you to quickly understand the documents, and how to use them:

   - Points and Authorities
   - Research Aids and Policies

---

**LEGISLATIVE**
**INTENT SERVICE, INC.**

712 Main Street, Suite 200, Woodland, CA 95695
(530) 666-1917 • Fax (530) 668-5866 • www.legintent.com

## LEGISLATIVE HISTORY REPORT AND ANALYSIS

Re:     **Assembly Bill 933 (Aguiar-Curry & Ward – 2023)**
        Chapter 670, Statutes of 2023

        Our File No.:  40148

The legislative history of the above-referenced bill is documented by materials[♦]
itemized in one declaration.   We discuss **Civil Code section 47.1** later in this
report.

**ASSEMBLY BILL 933 (AGUIAR-CURRY & WARD – 2023)**
**CHAPTER 670, STATUTES OF 2023**

As enacted in 2023, Assembly Bill 933, a single-section bill, added Civil Code
section 47.1 only, relating to privileged communications and incidents of sexual
assault, harassment or discrimination.  (See Exhibit #1d)  Assembly Bill 933 was
introduced on February 14, 2023, by Assemblymembers Cecilia Aguiar-Curry and
Chris Ward as lead authors at the request of co-sponsors California Employment
Lawyers Association and Equal Rights Advocates.  (See Exhibits #1a and #8, page
1)

Assembly Bill 933 was assigned to the Assembly and Senate Committees on
Judiciary where policy issues raised by the bill were considered.  (See Exhibits #3
and #6)  Two amendments were made to Assembly Bill 933.  (See Exhibits #1b,
#1c and #2)  Subsequent to legislative approval, Governor Gavin Newsom signed
the bill on October 10, 2023, and it was recorded by the Secretary of State on that
same day as Chapter 670 of the Statutes of 2023.  (See Exhibits #1d and #2)

The Third Reading analysis prepared by the Office of Senate Floor Analyses
described Assembly Bill 933 as last amended on May 25, 2023:

---

[♦] For information on document numbers, research policies, request for judicial notice and more,
please visit www.legintent.com and click on "**Research Aids & Policies**" and "**Points and
Authorities**" at the bottom of the page.

**DIGEST**:  This bill makes privileged, and therefore excluded from the category of communications that can constitute defamation, a communication made by an individual, without malice, regarding an incident of sexual assault, harassment, or discrimination, and authorizes a prevailing defendant in a defamation action arising from such a privileged communication to recover reasonable attorney fees, costs, and other specified relief.
(See Exhibit #8, page 1)

A "Fact Sheet" prepared for the Office of Assemblymember Aguiar-Curry included the following background on the measure:

An act of sexual assault is committed every 68 seconds.  Sexual violence affects people of every gender identity, age, and sexual orientation and is, unfortunately, common.  According to the Centers for Disease Control and Prevention (CDC), over half of women and nearly 1 in 3 men have experienced sexual violence in their lives.  Sexual violence often impacts people early in life.  Of people who experience sexual violence, more than 4 in 5 female survivors, and 71% of male survivors were raped before the age of 25.

The #MeToo movement gave many assault and harassment survivors the opportunity to bravely join countless others in sharing their stories on a national platform in solidarity.  The movement unveiled a predatory culture that persists across all sectors of employment and society.  While survivors courageously came forward, many were served with defamation lawsuits by those who abused them.

Strategic Lawsuits Against Public Participation (SLAPP) are increasingly being used as a weapon to threaten, silence, intimidate, and dissuade survivors of sexual assault, harassment, and discrimination from speaking out against their abusers and exposing predators.  The threat of having to engage in years of litigation, relive the personal trauma of abuse in court, and take on the burden of responding to an expensive, resource-draining SLAPP suit further harms survivors and causes a chilling effect that discourages others from coming forward to share their experience.  In fact, the financial burden of defending against a defamation suit is one of the main reasons these suits tend to evoke so much fear in survivors.[]
(See Exhibit #10a, page 1)

The Concurrence in Senate Amendments analysis noted the following sponsor comment in favor of Assembly Bill 933:

> AB 933 will ensure survivors of sexual assault, harassment, and discrimination are adequately protected from defamation lawsuits by clarifying that claims made in good faith are a form of protected speech.  In doing so, the bill would make it harder for perpetrators to retaliate against survivors with legal threats and intimidation.  The protections in this bill will help encourage survivors to speak their truth and expose the behavior of those who harmed them.  This bill also provides relief to survivors in the form of reasonable attorneys' fees and damages for successfully defending themselves against these retaliatory lawsuits.
> (See Exhibit #9, page 3)

In addition to the sponsors, support for the measure as last amended came from such entities as the California Anti-SLAPP Project, the California Partnership to End Domestic Violence, the Consumer Attorneys of California, and Women's Foundation California, among others.  (See Exhibit #8, pages 5 and 6)  There was no listed opposition to the bill at this time.  (Id.)

A careful review of each of the amended versions of the bill is very helpful in obtaining a full understanding of legislative intent.  (See Exhibit #1)  It is important to note that section numbers can change throughout the Legislature's consideration of a bill's proposals, so the topic and not the section number must be reviewed.  This can be especially true where one is focusing on particular language; contrasting that enacted with the unsuccessful proposals can afford insight as to the intended meaning.  Your review of each version of the bill should provide you with insight as to the development of the language of interest to you as the bill proceeded through the Legislature.  (Id.)

The committee file contains materials documenting the consideration given the proposal while in the Legislature and provides insight into amendments taken to the initial proposal and into the negotiations that resulted in the final version of Assembly Bill 933.  (See Exhibit #4)

**Civil Code section 47.1:**

The introduced version of Assembly Bill 933 first proposed to amend Civil Code section 47 and to add Civil Code section 47.1.  (See Exhibit #1a)  On March 22, 2023, the Assembly deleted the proposal to amend section 47 and instead moved some of the language to new section 47.1 along with other changes.  (See Exhibit #1b)

In the second and final amended version of the bill, the Senate added subsections (6) and (7) to subdivision (d).  (See Exhibit #1c)  No further changes were made, and the bill was enacted into law.  (See Exhibit #1d)

Your careful review of the documents enclosed may reveal helpful discussion on the issue before you.  You should also be able to draw some conclusions based upon the assumption that the language was intended to be consistent with the overall goal of the legislation.  Thus, if you are unable to find specific discussion regarding your research question, the analyses contained in the legislative bill files enclosed herewith may provide you with an arguable assessment of the goals and purpose that could be applicable to your particular situation.

At this time we are still trying to gain access to the file maintained by Assemblymember Aguiar-Curry.  We are working diligently to access this file and will provide it to you as soon as possible.

Governor Newsom's file is currently unavailable because, in general, a sitting Governor does not release his chaptered bill file.  If you wish to receive his post-enrollment file on Assembly Bill 933 once he leaves office, please contact our office at that time.

Any analysis provided in this report is based upon the nature and extent of your request to us, as well as a brief review of the enclosed documents.  As such, it must be considered tentative in nature.  A more conclusive statement of the impact of the legislative history in your case would be dependent upon a complete understanding of all of the factual issues involved and the applicable legal principles.

We appreciate the opportunity to provide this assistance and hope that these efforts will be of value to you.

Prepared by:  Anna Maria Bereczky-Anderson, Attorney at Law/lks; File no.: 40148
W:\Worldox\WDOCS\WORKPROD\05832\60556\00248980.DOC

Page 4 of 4

**LEGISLATIVE
INTENT SERVICE, INC.**

712 Main Street, Suite 200, Woodland, CA 95695
(530) 666-1917 • Fax (530) 668-5866 • www.legintent.com

---

### DECLARATION OF JENNY S. LILLGE

I, Jenny S. Lillge, declare:

I am an attorney licensed to practice in California, State Bar No. 265046, and am employed by Legislative Intent Service, Inc., a company specializing in researching the history and intent of legislation.

Under my direction and the direction of other attorneys on staff, the research staff of Legislative Intent Service, Inc. undertook to locate and obtain all documents relevant to the enactment of Assembly Bill 933 of 2023.  Assembly Bill 933 was approved by the Legislature and was enacted as Chapter 670 of the Statutes of 2023.

The following list identifies all documents obtained by the staff of Legislative Intent Service, Inc. on Assembly Bill 933 of 2023.  All listed documents have been forwarded with this Declaration except as otherwise noted in this Declaration.  All documents gathered by Legislative Intent Service, Inc. and all copies forwarded with this Declaration are true and correct copies of the originals located by Legislative Intent Service, Inc.  In compiling this collection, the staff of Legislative Intent Service, Inc. operated under directions to locate and obtain all available material on the bill.

ASSEMBLY BILL 933 OF 2023:

1. All versions of Assembly Bill 933 (Aguiar-Curry-2023);
2. Procedural history of Assembly Bill 933 from the February 9, 2024, *Assembly Weekly History*;
3. Analysis of Assembly Bill 933 prepared for the Assembly Committee on Judiciary;
4. Material from the legislative bill file of the Assembly Committee on Judiciary on Assembly Bill 933;
5. Third Reading analysis of Assembly Bill 933 prepared by the Assembly Committee on Judiciary;
6. Analysis of Assembly Bill 933 prepared for the Senate Committee on Judiciary;
7. Material from the legislative bill file of the Senate Committee on Judiciary on Assembly Bill 933=

8. Third Reading analysis of Assembly Bill 933 prepared by the Office of Senate Floor Analyses;

9. Concurrence in Senate Amendments analysis of Assembly Bill 933 prepared by the Assembly Committee on Judiciary;

10. Documents from Assemblymember Aguiar-Curry's office on Assembly Bill 933, as follows:
   a. Fact Sheet,
   b. Press release titled, "Assemblymembers Aguiar-Curry & Ward Bill to Prevent Weaponized Defamation Lawsuits Against Survivors of Abuse Passes Assembly Judiciary Committee," March 22, 2023,
   c. Assemblymembers' Aguiar-Curry & Ward Legislation to Protect Survivors of Sexual Assault, Harassment, and Discrimination from Weaponized Defamation Lawsuits Signed by Governor," October 10, 2023;

11. Post-enrollment documents regarding Assembly Bill 933; - (Governor Newsom's legislative files are under restricted access and are not available to the public.);

12. Press Release issued by the Office of the Governor on October 10, 2023 to announce that Assembly Bill 933 had been signed;

13. Excerpt regarding Assembly Bill 933 from the 2023-2024 *Bill Summary*, prepared by the Assembly Committee on Judiciary;

14. Excerpt regarding Assembly Bill 933 from the 2023-24 *Legislative Bill Summaries*, prepared by the Senate Committee on Judiciary;

15. Comment entitled, "Retaliatory Defamation Suits: The Legal Silencing of the #MeToo Movement," *Tulane Law Review Online,* Vol. 94, March, 2000;

16. Press releases from the Equal Rights Advocates regarding Assembly Bill 933, as follows:
   a. March 24, 2023,
   b. October 11, 2023.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 9th day of March, 2025 at Woodland, California.

_____

JENNY S. LILLGE

CALIFORNIA LEGISLATURE—2023–24 REGULAR SESSION

# ASSEMBLY BILL                               No. 933

## Introduced by Assembly Members Aguiar-Curry and Ward
(Principal coauthor: Senator Skinner)

February 14, 2023

An act to amend Section 47 of, and to add Section 47.1 to, the Civil Code, relating to privileged communications.

### LEGISLATIVE COUNSEL'S DIGEST

AB 933, as introduced, Aguiar-Curry. Privileged communications: complaint of sexual assault, harassment, or discrimination.

Existing law provides that libel is a false and unprivileged written publication that injures the reputation and that slander is a false and unprivileged publication, orally uttered, that injures the reputation, as specified. Existing law makes certain publications and communications privileged and therefore protected from civil action, including complaints of sexual harassment by an employee, without malice, to an employer based on credible evidence and communications between the employer and interested persons regarding a complaint of sexual harassment.

This bill would include among those privileged communications a communication made by a complainant, without malice, regarding a complaint of sexual assault, harassment, or discrimination, as defined, and would specify the attorney's fees and damages available to a prevailing defendant in any defamation action brought against that defendant for making that communication.

Vote: majority. Appropriation: no. Fiscal committee: no. State-mandated local program: no.

99



LEGISLATIVE INTENT SERVICE, INC.   (530) 666-1917

**LIS - 1a**

**AB 933**                    — 2 —

*The people of the State of California do enact as follows:*

SECTION 1.   Section 47 of the Civil Code is amended to read:

47.   A privileged publication or broadcast is one made:

(a)  In the proper discharge of an official duty.

(b)  In any (1) legislative proceeding, (2) judicial proceeding, (3) in any other official proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law and reviewable pursuant to Chapter 2 (commencing with Section 1084) of Title 1 of Part 3 of the Code of Civil Procedure, except as follows:

(1)  An allegation or averment contained in any pleading or affidavit filed in an action for marital dissolution or legal separation made of or concerning a person by or against whom no affirmative relief is prayed in the action shall not be a privileged publication or broadcast as to the person making the allegation or averment within the meaning of this section unless the pleading is verified or affidavit sworn to, and is made without malice, by one having reasonable and probable cause for believing the truth of the allegation or averment and unless the allegation or averment is material and relevant to the issues in the action.

(2)  This subdivision does not make privileged any communication made in furtherance of an act of intentional destruction or alteration of physical evidence undertaken for the purpose of depriving a party to litigation of the use of that evidence, whether or not the content of the communication is the subject of a subsequent publication or broadcast which is privileged pursuant to this section. As used in this paragraph, "physical evidence" means evidence specified in Section 250 of the Evidence Code or evidence that is property of any type specified in Chapter 14 (commencing with Section 2031.010) of Title 4 of Part 4 of the Code of Civil Procedure.

(3)  This subdivision does not make privileged any communication made in a judicial proceeding knowingly concealing the existence of an insurance policy or policies.

(4)  A recorded lis pendens is not a privileged publication unless it identifies an action previously filed with a court of competent jurisdiction which affects the title or right of possession of real property, as authorized or required by law.

LEGISLATIVE INTENT SERVICE, INC.   (530) 666-1917

99

— 3 —                          **AB 933**

(5) This subdivision does not make privileged any communication between a person and a law enforcement agency in which the person makes a false report that another person has committed, or is in the act of committing, a criminal act or is engaged in an activity requiring law enforcement intervention, knowing that the report is false, or with reckless disregard for the truth or falsity of the report.

(c) In a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information. This subdivision applies to and includes a communication concerning the job performance or qualifications of an applicant for employment, based upon credible evidence, made without malice, by a current or former employer of the applicant to, and upon request of, one whom the employer reasonably believes is a prospective employer of the applicant. This subdivision applies to and includes a complaint of sexual harassment by an employee, without malice, to an employer based upon credible evidence and communications between the employer and interested persons, without malice, regarding a complaint of sexual harassment. This subdivision authorizes a current or former employer, or the employer's agent, to answer, without malice, whether or not the employer would rehire a current or former employee and whether the decision to not rehire is based upon the employer's determination that the former employee engaged in sexual harassment. This subdivision does not apply to a communication concerning the speech or activities of an applicant for employment if the speech or activities are constitutionally protected, or otherwise protected by Section 527.3 of the Code of Civil Procedure or any other provision of law.

(d) (1) By a fair and true report in, or a communication to, a public journal, of (A) a judicial, (B) legislative, or (C) other public official proceeding, or (D) of anything said in the course thereof, or (E) of a verified charge or complaint made by any person to a public official, upon which complaint a warrant has been issued.

(2) Paragraph (1) does not make privileged any communication to a public journal that does any of the following:

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917



**AB 933** — 4 —

(A) Violates Rule 5-120 of the State Bar Rules of Professional Conduct.

(B) Breaches a court order.

(C) Violates a requirement of confidentiality imposed by law.

(e) By a fair and true report of (1) the proceedings of a public meeting, if the meeting was lawfully convened for a lawful purpose and open to the public, or (2) the publication of the matter complained of was for the public benefit.

*(f) (1) A communication made by a complainant, without malice, regarding a complaint of sexual assault, harassment, or discrimination.*

*(2) For purposes of this subdivision, "a complaint of sexual assault, harassment, or discrimination" means factual information related to a complaint of sexual assault, harassment, or discrimination experienced by the complainant, including, but not limited to, any of the following:*

*(A) An act of sexual assault.*

*(B) An act of sexual harassment, as defined in Section 51.9.*

*(C) An act of workplace harassment or discrimination, failure to prevent an act of workplace harassment or discrimination, aiding, abetting, inciting, compelling, or coercing an act of workplace harassment or discrimination, or an act of retaliation against a person for reporting or opposing workplace harassment or discrimination, as described in subdivisions (a), (h), (i), (j), and (k) of Section 12940 of the Government Code.*

*(D) An act of harassment or discrimination, or an act of retaliation against a person for reporting harassment or discrimination, by the owner of a housing accommodation, as described in Section 12955 of the Government Code.*

*(E) An act of sexual harassment, as defined in Sections 212.5 and 66262.5 of the Education Code.*

*(3) This subdivision shall only apply to any complainant that has, or at any time had, a reasonable basis to file a complaint of sexual assault, harassment, or discrimination, whether the complaint is, or was, filed or not.*

SEC. 2. Section 47.1 is added to the Civil Code, to read:

47.1. A prevailing defendant in any defamation action brought against that defendant for making a communication that is privileged under subdivision (f) of Section 47 shall be entitled to their reasonable attorney's fees and costs for successfully defending

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917



themselves in such litigation, plus treble damages for any harm caused to them by the defamation action against them, in addition to punitive damages available under Section 3294 or any other relief otherwise permitted by law.

O

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

AMENDED IN ASSEMBLY MARCH 22, 2023

CALIFORNIA LEGISLATURE—2023–24 REGULAR SESSION

# ASSEMBLY BILL No. 933

**Introduced by Assembly Members Aguiar-Curry and Ward**
(Principal coauthor: Senator Skinner)

February 14, 2023

An act ~~to amend Section 47 of, and~~ to add Section 47.1 ~~to,~~ *to* the Civil Code, relating to privileged communications.

LEGISLATIVE COUNSEL'S DIGEST

AB 933, as amended, Aguiar-Curry. Privileged communications: ~~complaint~~ *incident* of sexual assault, harassment, or discrimination.

Existing law provides that libel is a false and unprivileged written publication that injures the reputation and that slander is a false and unprivileged publication, orally uttered, that injures the reputation, as specified. Existing law makes certain publications and communications privileged and therefore protected from civil action, including complaints of sexual harassment by an employee, without malice, to an employer based on credible evidence and communications between the employer and interested persons regarding a complaint of sexual harassment.

This bill would include among those privileged communications a communication made by ~~a complainant,~~ *an individual,* without malice, regarding ~~a complaint~~ *an incident* of sexual assault, harassment, or discrimination, as defined, and would specify the attorney's fees and damages available to a prevailing defendant in any defamation action brought against that defendant for making that communication.

Vote: majority. Appropriation: no. Fiscal committee: no. State-mandated local program: no.

98

**LIS - 1b**

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

**AB 933** — 2 —

*The people of the State of California do enact as follows:*

SECTION 1. Section 47 of the Civil Code is amended to read:

47. A privileged publication or broadcast is one made:

(a) In the proper discharge of an official duty.

(b) In any (1) legislative proceeding, (2) judicial proceeding, (3) in any other official proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law and reviewable pursuant to Chapter 2 (commencing with Section 1084) of Title 1 of Part 3 of the Code of Civil Procedure, except as follows:

(1) An allegation or averment contained in any pleading or affidavit filed in an action for marital dissolution or legal separation made of or concerning a person by or against whom no affirmative relief is prayed in the action shall not be a privileged publication or broadcast as to the person making the allegation or averment within the meaning of this section unless the pleading is verified or affidavit sworn to, and is made without malice, by one having reasonable and probable cause for believing the truth of the allegation or averment and unless the allegation or averment is material and relevant to the issues in the action.

(2) This subdivision does not make privileged any communication made in furtherance of an act of intentional destruction or alteration of physical evidence undertaken for the purpose of depriving a party to litigation of the use of that evidence, whether or not the content of the communication is the subject of a subsequent publication or broadcast which is privileged pursuant to this section. As used in this paragraph, "physical evidence" means evidence specified in Section 250 of the Evidence Code or evidence that is property of any type specified in Chapter 14 (commencing with Section 2031.010) of Title 4 of Part 4 of the Code of Civil Procedure.

(3) This subdivision does not make privileged any communication made in a judicial proceeding knowingly concealing the existence of an insurance policy or policies.

(4) A recorded lis pendens is not a privileged publication unless it identifies an action previously filed with a court of competent jurisdiction which affects the title or right of possession of real property, as authorized or required by law.



LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

**AB 933**

(5) This subdivision does not make privileged any communication between a person and a law enforcement agency in which the person makes a false report that another person has committed, or is in the act of committing, a criminal act or is engaged in an activity requiring law enforcement intervention, knowing that the report is false, or with reckless disregard for the truth or falsity of the report.

(c) In a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information. This subdivision applies to and includes a communication concerning the job performance or qualifications of an applicant for employment, based upon credible evidence, made without malice, by a current or former employer of the applicant to, and upon request of, one whom the employer reasonably believes is a prospective employer of the applicant. This subdivision applies to and includes a complaint of sexual harassment by an employee, without malice, to an employer based upon credible evidence and communications between the employer and interested persons, without malice, regarding a complaint of sexual harassment. This subdivision authorizes a current or former employer, or the employer's agent, to answer, without malice, whether or not the employer would rehire a current or former employee and whether the decision to not rehire is based upon the employer's determination that the former employee engaged in sexual harassment. This subdivision does not apply to a communication concerning the speech or activities of an applicant for employment if the speech or activities are constitutionally protected, or otherwise protected by Section 527.3 of the Code of Civil Procedure or any other provision of law.

(d) (1) By a fair and true report in, or a communication to, a public journal, of (A) a judicial, (B) legislative, or (C) other public official proceeding, or (D) of anything said in the course thereof, or (E) of a verified charge or complaint made by any person to a public official, upon which complaint a warrant has been issued.

(2) Paragraph (1) does not make privileged any communication to a public journal that does any of the following:

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

**AB 933** — 4 —

(A) Violates Rule 5-120 of the State Bar Rules of Professional Conduct.

(B) Breaches a court order.

(C) Violates a requirement of confidentiality imposed by law.

(e) By a fair and true report of (1) the proceedings of a public meeting, if the meeting was lawfully convened for a lawful purpose and open to the public, or (2) the publication of the matter complained of was for the public benefit.

(f) (1) A communication made by a complainant, without malice, regarding a complaint of sexual assault, harassment, or discrimination.

(2) For purposes of this subdivision, "a complaint of sexual assault, harassment, or discrimination" means factual information related to a complaint of sexual assault, harassment, or discrimination experienced by the complainant, including, but not limited to, any of the following:

(A) An act of sexual assault.

(B) An act of sexual harassment, as defined in Section 51.9.

(C) An act of workplace harassment or discrimination, failure to prevent an act of workplace harassment or discrimination, aiding, abetting, inciting, compelling, or coercing an act of workplace harassment or discrimination, or an act of retaliation against a person for reporting or opposing workplace harassment or discrimination, as described in subdivisions (a), (h), (i), (j), and (k) of Section 12940 of the Government Code.

(D) An act of harassment or discrimination, or an act of retaliation against a person for reporting harassment or discrimination, by the owner of a housing accommodation, as described in Section 12955 of the Government Code.

(E) An act of sexual harassment, as defined in Sections 212.5 and 66262.5 of the Education Code.

(3) This subdivision shall only apply to any complainant that has, or at any time had, a reasonable basis to file a complaint of sexual assault, harassment, or discrimination, whether the complaint is, or was, filed or not.

SEC. 2.

*SECTION 1.*   Section 47.1 is added to the Civil Code, to read:

47.1.   *(a) A communication made by an individual, without malice, regarding an incident of sexual assault, harassment, or discrimination is privileged under Section 47.*



98

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

— 5 —   **AB 933**

A

*(b) A* prevailing defendant in any defamation action brought against that defendant for making a communication that is privileged under ~~subdivision (f) of Section 47~~ *this section* shall be entitled to their reasonable attorney's fees and costs for successfully defending themselves in ~~such~~ *the* litigation, plus treble damages for any harm caused to them by the defamation action against them, in addition to punitive damages available under Section 3294 or any other relief otherwise permitted by law.

*(c) This section shall only apply to an individual that has, or at any time had, a reasonable basis to file a complaint of sexual assault, harassment, or discrimination, whether the complaint is, or was, filed or not.*

*(d) For the purposes of this section, "communication" means factual information related to an incident of sexual assault, harassment, or discrimination experienced by the individual making the communication, including, but not limited to, any of the following:*

*(1) An act of sexual assault.*

*(2) An act of sexual harassment, as described in Section 51.9.*

*(3) An act of workplace harassment or discrimination, failure to prevent an act of workplace harassment or discrimination, aiding, abetting, inciting, compelling, or coercing an act of workplace harassment or discrimination, or an act of retaliation against a person for reporting or opposing workplace harassment or discrimination, as described in subdivision (a), (h), (i), (j), or (k) of Section 12940 of the Government Code.*

*(4) An act of harassment or discrimination, or an act of retaliation against a person for reporting harassment or discrimination, by the owner of a housing accommodation, as described in Section 12955 of the Government Code.*

*(5) An act of sexual harassment, as defined in Sections 212.5 and 66262.5 of the Education Code.*

O

98



LEGISLATIVE INTENT SERVICE, INC.   (530) 666-1917

AMENDED IN SENATE MAY 25, 2023

AMENDED IN ASSEMBLY MARCH 22, 2023

CALIFORNIA LEGISLATURE—2023–24 REGULAR SESSION

# ASSEMBLY BILL                    No. 933

**Introduced by Assembly Members Aguiar-Curry and Ward**
(Principal coauthor: Senator Skinner)
*(Coauthors: Assembly Members Addis, Boerner, Cervantes, Friedman, Stephanie Nguyen, Luz Rivas, Blanca Rubio, Schiavo, Waldron, and Wilson)*

February 14, 2023

An act to add Section 47.1 to the Civil Code, relating to privileged communications.

LEGISLATIVE COUNSEL'S DIGEST

AB 933, as amended, Aguiar-Curry. Privileged communications: incident of sexual assault, harassment, or discrimination.

Existing law provides that libel is a false and unprivileged written publication that injures the reputation and that slander is a false and unprivileged publication, orally uttered, that injures the reputation, as specified. Existing law makes certain publications and communications privileged and therefore protected from civil action, including complaints of sexual harassment by an employee, without malice, to an employer based on credible evidence and communications between the employer and interested persons regarding a complaint of sexual harassment.

This bill would include among those privileged communications a communication made by an individual, without malice, regarding an incident of sexual assault, harassment, or discrimination, as defined,

97



LEGISLATIVE INTENT SERVICE, INC.   (530) 666-1917

**AB 933** — 2 —

and would specify the attorney's fees and damages available to a prevailing defendant in any defamation action brought against that defendant for making that communication.

Vote: majority. Appropriation: no. Fiscal committee: no. State-mandated local program: no.

*The people of the State of California do enact as follows:*

SECTION 1.  Section 47.1 is added to the Civil Code, to read:

47.1.  (a) A communication made by an individual, without malice, regarding an incident of sexual assault, harassment, or discrimination is privileged under Section 47.

(b) A prevailing defendant in any defamation action brought against that defendant for making a communication that is privileged under this section shall be entitled to their reasonable attorney's fees and costs for successfully defending themselves in the litigation, plus treble damages for any harm caused to them by the defamation action against them, in addition to punitive damages available under Section 3294 or any other relief otherwise permitted by law.

(c) This section shall only apply to an individual that has, or at any time had, a reasonable basis to file a complaint of sexual assault, harassment, or discrimination, whether the complaint is, or was, filed or not.

(d) For the purposes of this section, "communication" means factual information related to an incident of sexual assault, harassment, or discrimination experienced by the individual making the communication, including, but not limited to, any of the following:

(1) An act of sexual assault.

(2) An act of sexual harassment, as described in Section 51.9.

(3) An act of workplace harassment or discrimination, failure to prevent an act of workplace harassment or discrimination, aiding, abetting, inciting, compelling, or coercing an act of workplace harassment or discrimination, or an act of retaliation against a person for reporting or opposing workplace harassment or discrimination, as described in subdivision (a), (h), (i), (j), or (k) of Section 12940 of the Government Code.

(4) An act of harassment or discrimination, or an act of retaliation against a person for reporting harassment or

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917



— 3 —                              **AB 933**

discrimination, by the owner of a housing accommodation, as described in Section 12955 of the Government Code.

(5) An act of sexual harassment, as defined in Sections 212.5 and 66262.5 of the Education Code.

*(6) An act of harassment or discrimination, or an act of retaliation against a person for reporting harassment or discrimination, based on any of the protected classes enumerated in Sections 220, 221.51, and 66270 of the Education Code.*

*(7) An act of cyber sexual bullying, as defined in Section 48900 of the Education Code.*

O

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917



STATE OF CALIFORNIA
AUTHENTICATED
ELECTRONIC LEGAL MATERIAL

**Assembly Bill No. 933**

CHAPTER 670

An act to add Section 47.1 to the Civil Code, relating to privileged communications.

[Approved by Governor October 10, 2023. Filed with Secretary
of State October 10, 2023.]

LEGISLATIVE COUNSEL'S DIGEST

AB 933, Aguiar-Curry. Privileged communications: incident of sexual assault, harassment, or discrimination.

Existing law provides that libel is a false and unprivileged written publication that injures the reputation and that slander is a false and unprivileged publication, orally uttered, that injures the reputation, as specified. Existing law makes certain publications and communications privileged and therefore protected from civil action, including complaints of sexual harassment by an employee, without malice, to an employer based on credible evidence and communications between the employer and interested persons regarding a complaint of sexual harassment.

This bill would include among those privileged communications a communication made by an individual, without malice, regarding an incident of sexual assault, harassment, or discrimination, as defined, and would specify the attorney's fees and damages available to a prevailing defendant in any defamation action brought against that defendant for making that communication.

*The people of the State of California do enact as follows:*

SECTION 1.  Section 47.1 is added to the Civil Code, to read:

47.1.  (a) A communication made by an individual, without malice, regarding an incident of sexual assault, harassment, or discrimination is privileged under Section 47.

(b) A prevailing defendant in any defamation action brought against that defendant for making a communication that is privileged under this section shall be entitled to their reasonable attorney's fees and costs for successfully defending themselves in the litigation, plus treble damages for any harm caused to them by the defamation action against them, in addition to punitive damages available under Section 3294 or any other relief otherwise permitted by law.

(c) This section shall only apply to an individual that has, or at any time had, a reasonable basis to file a complaint of sexual assault, harassment, or discrimination, whether the complaint is, or was, filed or not.

95

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917



**LIS - 1d**

**Ch. 670** — 2 —

(d) For the purposes of this section, "communication" means factual information related to an incident of sexual assault, harassment, or discrimination experienced by the individual making the communication, including, but not limited to, any of the following:

(1) An act of sexual assault.

(2) An act of sexual harassment, as described in Section 51.9.

(3) An act of workplace harassment or discrimination, failure to prevent an act of workplace harassment or discrimination, aiding, abetting, inciting, compelling, or coercing an act of workplace harassment or discrimination, or an act of retaliation against a person for reporting or opposing workplace harassment or discrimination, as described in subdivision (a), (h), (i), (j), or (k) of Section 12940 of the Government Code.

(4) An act of harassment or discrimination, or an act of retaliation against a person for reporting harassment or discrimination, by the owner of a housing accommodation, as described in Section 12955 of the Government Code.

(5) An act of sexual harassment, as defined in Sections 212.5 and 66262.5 of the Education Code.

(6) An act of harassment or discrimination, or an act of retaliation against a person for reporting harassment or discrimination, based on any of the protected classes enumerated in Sections 220, 221.51, and 66270 of the Education Code.

(7) An act of cyber sexual bullying, as defined in Section 48900 of the Education Code.

O

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917



**DO NOT DISCARD:** This is the last complete history of first−year bills

No. 6

CALIFORNIA LEGISLATURE

AT  SACRAMENTO

2023−24  REGULAR SESSION

# ASSEMBLY WEEKLY HISTORY

**COMMENCING WITH AB 1 AND ENDING WITH AB 2289**

**FRIDAY, FEBRUARY 9, 2024**



HON. ROBERT RIVAS
*Speaker*

HON. JIM WOOD
*Speaker pro Tempore*

HON. CECILIA M. AGUIAR−CURRY
*Majority Leader*

HON. STEPHANIE NGUYEN
*Assistant Speaker pro Tempore*

HON. JAMES GALLAGHER
*Republican Leader*

————

Assembly Convened December 5, 2022

————

*Compiled Under the Direction of*
SUE PARKER
*Chief Clerk*

STEVEN SEPULVEDA
*History Clerk*

KATE BOURNE
*Assistant History Clerk*

LEGISLATIVE INTENT SERVICE, INC.    (530)  666-1917



ASSEMBLY WEEKLY HISTORY
FRIDAY, FEBRUARY 9, 2024

A.B. No.  933—Aguiar–Curry and Ward (Principal coauthor: Senator Skinner)
(Coauthors: Addis, Boerner, Cervantes, Friedman, Stephanie Nguyen,
Luz Rivas, Blanca Rubio, Schiavo, Waldron, and Wilson).

An act to add Section 47.1 to the Civil Code, relating to privileged communications.

**2023**

Feb.    14—Read first time.  To print.
Feb.    15—From printer.  May be heard in committee  March  17.
Mar.     2—Referred to Com. on JUD.
Mar.    21—From committee: Amend, and do pass as amended. (Ayes  8. Noes  0.)
(March  21).
Mar.    22—Read second time and amended.  Ordered returned to second reading.
Mar.    23—Read second time. Ordered to third reading.
Apr.    20—Read third time. Passed. Ordered to the Senate. (Ayes 60. Noes  2. Page
1264.)
Apr.    20—In Senate.  Read first time.  To Com. on RLS. for assignment.
May    17—Referred to Com. on  JUD.
May    25—From committee chair, with author's amendments:  Amend, and re–refer to
committee.  Read second time, amended, and re–referred to Com. on  JUD.
Jun.    14—From committee:  Do pass. (Ayes  8. Noes  1.) (June  13).
Jun.    15—Read second time. Ordered to third reading.
Sep.     6—Read third time. Passed. Ordered to the Assembly. (Ayes 31. Noes  5. Page
2388.).
Sep.     6—In Assembly.   Concurrence in Senate amendments pending.   May be
considered on or after September  8 pursuant to Assembly Rule 77.
Sep.     7—Assembly Rule 77 suspended. (Page 3011.)
Sep.    11—Senate amendments concurred in. To Engrossing and Enrolling. (Ayes 64.
Noes  0. Page 3196.).
Sep.    15—Enrolled and presented to the Governor at  4 p.m.
Oct.    10—Approved by the Governor.
Oct.    10—Chaptered by Secretary of State − Chapter 670, Statutes of 2023.

LEGISLATIVE INTENT SERVICE, INC.    (530)  666-1917



Date of Hearing:  March 21, 2023

ASSEMBLY COMMITTEE ON JUDICIARY
Brian Maienschein, Chair
AB 933 (Aguiar-Curry and Ward) – As Introduced February 14, 2023

As Proposed to be Amended

**SUBJECT**:  PRIVILEGED COMMUNICATIONS: COMPLAINT OF SEXUAL ASSAULT, HARASSMENT, OR DISCRIMINATION

**KEY ISSUE**:  SHOULD A COMMUNICATION ABOUT AN INCIDENT OF SEXUAL ASSAULT, HARASSMENT, OR DISCRIMINATION MADE WITHOUT MALICE BY AN INDIVIDUAL WHO EXPERIENCED THE ASSAULT, HARASSMENT, OR DISCRIMINATION BE A PRIVILEGED COMMUNICATION FOR PURPOSES OF A DEFAMATION ACTION?

### SYNOPSIS

*In 2017, the #MeToo movement arrived at the Capitol's doorstep. As the Legislature faced a reckoning on how to curb a pervasive culture of sexual assault and harassment, one female lobbyist in particular made headlines. In December 2017, Pamela Lopez, a long time lobbyist and member of the Capitol community, publicly accused Assemblymember Matt Dababneh of sexually assaulting her during an event in Las Vegas. After initiating a formal complaint process with the Assembly, Lopez gave a press conference detailing the incident and identifying Assemblymember Dababneh. In August 2018, Dababneh sued Lopez for both her complaint to the Assembly and the subsequent press conference, claiming both defamation and intentional infliction of emotional distress. Looking at the protections provided under Civil Code Section 47, the trial court ultimately held in Lopez's favor on the claim relating to her complaint to the Assembly, but found that her statements to the press did not benefit from the same privilege and thus, Lopez was potentially vulnerable to Dababneh's claim of defamation and intentional infliction of emotional distress. While Lopez was ultimately successful on appeal, where the court held that her statements to the press did, in fact, fall under the privilege provided under Civil Code section 47, the initial trial decision nonetheless highlighted a concern for many who experience sexual assault and harassment.*

*This bill, while arguably codifying existing law, would also potentially help curb any unnecessary, and ultimately unsuccessful, litigation against individuals who choose to come forward with their stories of sexual assault and harassment. The bill expands the privileges already encompassed in Section 47 of the Civil Code to include communications made by an individual who has experienced an incident of sexual assault, harassment, or discrimination, regardless of whether or not they have filed any formal complaint regarding the same. Additionally, the bill would provide significant remedies for successful defendants in defamation claims. As currently in print, the bill risks misinterpretation that the privilege only extends to communications made in the form of a formal complaint. In order to avoid this potential confusion, the author proposes various clarifying amendments. The amendments are incorporated into the summary of the bill, below, and explained in the analysis. This bill is co-sponsored by the California Employment Lawyers Association (CELA) and Equal Rights Advocates (ERA). It is supported by a coalition of workplace and women's rights advocates. There is no opposition currently on file.*



**SUMMARY**:  Makes specified forms of communication regarding sexual assault, harassment, or discrimination, privileged communications for purposes of a defamation action. Specifically, **this bill**:

1)  Protects as privileged, a communication regarding an incident of sexual assault, harassment, or discrimination made without malice.

2)  Limits application of the bill's provisions to any individual that has, or at any time had, a reasonable basis to file a complaint of sexual assault, harassment, or discrimination, whether the complaint is, or was, filed or not.

3)  Authorizes a prevailing defendant in any defamation action brought against that defendant for making a communication that is privileged under the provisions of this bill to recover the following:

    a)  Reasonable attorney's fees and costs;

    b)  Treble damages for any harm caused to them by the defamation action against them;

    c)  Punitive damages;

    d)  Any other relief permitted by law.

4)  Defines a "communication" as any factual information regarding an incident of sexual assault, harassment, or discrimination, experienced by the individual making the communication, including but not limited to, any of the following:

    a)  An act of sexual assault;

    b)  An act of sexual harassment;

    c)  An act of workplace harassment or discrimination, failure to prevent an act of workplace harassment or discrimination, aiding, abetting, inciting, compelling, or coercing an act of workplace harassment or discrimination, or an act of retaliation against a person for reporting or opposing workplace harassment or discrimination;

    d)  An act of harassment or discrimination, or an act of retaliation against a person for reporting harassment or discrimination, by the owner of a housing accommodation;

    e)  An act of sexual harassment as defined by identified sections of the Education code.

**EXISTING LAW**:

1)  Defines "libel" as a false and unprivileged written publication that causes injury, while defining "slander" as a false and unprivileged oral communication that causes injury. Defines "defamation" to include either libel or slander. (Civil Code Sections 44 to 46.)

2)  Protects, as a privileged publication, a communication made without malice to an interested person by one who is also interested, or by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication



LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

to be innocent, or who is requested by the person interested to give the information. (Civil Code Section 47 (c).)

3) Protects, as a privileged publication, any statement made by a current and former employer concerning the job performance or qualifications of an applicant for employment, when those statements are based upon credible evidence and made without malice at the request of a prospective employer of the applicant. Specifies that this provision authorizes a current or former employer to answer whether or not the employer would rehire the current or former employee. (*Id.*)

4) Defines "malice" for purposes of defamation law to mean a defamatory publication that is either motivated by hatred or ill will towards the plaintiff, or where the defendant lacked reasonable grounds for believing the truth of the publication and therefore acted in reckless disregard of the plaintiff's rights. (*Schep v. Capitol One N.A.* (2017)12 Cal.App.5th 1331; *Taus v. Loftus* (2007) 40 Cal 4th 683; *see also* California Civil Instructions (CACI) 1723.)

**FISCAL EFFECT**:  As currently in print this bill is keyed non-fiscal.

**COMMENTS**:  In 2017, the #MeToo movement arrived at the Capitol's doorstep. As the Legislature faced a reckoning on how to curb a pervasive culture of sexual assault and harassment, one female lobbyist in particular made headlines. In December 2017, Pamela Lopez, a long time lobbyist and member of the Capitol community, publicly accused Assemblymember Matt Dababneh of sexually assaulting her during an event in Las Vegas. After initiating a formal complaint process with the Assembly, Lopez gave a press conference detailing the incident and identifying Assemblymember Dababneh. Multiple media sources immediately reported on Lopez's account. In August 2018, Dababneh sued Lopez for both her complaint to the Assembly and the subsequent press conference, claiming both defamation and intentional infliction of emotional distress. In October, Lopez filed an anti-SLAPP motion, arguing that both her complaint to the Assembly and the press conference were protected by California's anti-SLAPP statute. Looking at the protections provided under Civil Code Section 47, the trial court ultimately held in Lopez's favor on the claim relating to her complaint to the Assembly, but that her statements to the press did not benefit from the same privilege and thus, Lopez was potentially vulnerable to Dababneh's claim of defamation and intentional infliction of emotional distress. While Lopez was ultimately successful on appeal, where the court held that her statements to the press did, in fact, fall under the privilege provided under Civil Code section 47, the initial trial decision nonetheless highlighted a concern for many who experience sexual assault and harassment. As stated by the author:

> Strategic Lawsuits Against Public Participation (SLAPP) are increasingly being used as a weapon to threaten, silence, intimidate, and dissuade survivors of sexual assault, harassment, and discrimination from speaking out against their abusers and exposing predators. AB 933 expands protections for speech made by a survivor, without malice, about their own experience of sexual assault, harassment, or discrimination. This bill would make it harder for perpetrators to retaliate against survivors with legal threats and intimidation, but does not apply to unfounded claims. The protections in this bill will help encourage survivors to speak their truth and expose the behavior of those who harmed them.  In addition, AB 933 helps take the burden off of survivors by providing reasonable attorneys' fees and damages if they successfully defend themselves against meritless lawsuits.

LEGISLATIVE INTENT SERVICE, INC.   (530) 666-1917

***Privileged Communication and the Definition of Malice***:  At common law, libel and slander were strict liability torts: the state of mind of the speaker or writer was not relevant, so the plaintiff only needed to show that there was a defamatory statement that caused reputational harm to the plaintiff and that the statement was "published" – which simply meant that it reached one person other than the defamed plaintiff. At common law, falsity was not a required element of the tort of defamation; however, the defendant could raise truth as a complete defense. While this may seem like a distinction without a difference – a defendant is liable for false statements in either case – the significance of the distinction lays in which party bears the burden of proof. As an element of the tort, the burden is on the plaintiff to show that the statement is false; as a defense, the burden is on the defendant to show that the statement is true. As codified in the California Civil Code, however, falsity is effectively an element, because defamation is defined as any "false and unprivileged publication" which defames (i.e. injures the reputation of) the plaintiff. The Civil Code does not define what an "unprivileged" publication means, but rather lists a number of "privileged publications" in Civil Code Section 47. Presumably an "unprivileged publication" is anything not listed in Section 47 or not expressly privileged in some other statute.

Under subdivision (c) of Section 47, a communication is privileged only if it is made "without malice." For purposes of defamation law, malice means publishing a false and defamatory statement knowing it to be false or with reckless disregard of whether that statement is true or false. (See *New York Times Co. v. Sullivan* (1964) 376 U.S. 254.) California courts have adopted a definition that effectively combines this definition, in the disjunctive, with the more popular meanings of "malice" as requiring some ill intent. For example, the California jury instructions for Civil Code Section 47 (c) define malice as requiring either (1) that the statement evinces "hatred or ill-will toward the plaintiff" or (2) "that [the defendant] had no reasonable grounds for believing the truth of the statement." (CACI 1723, citing *Taus v. Loftus 40 Cal 4th 683 (2007);* see also *Schep v. Capitol One N.A.* (2017) 12 Cal.App.5th 1331, 1337.)

***This bill,*** while arguably codifying existing law as evidenced by Lopez's ultimate success on appeal, would also potentially help curb any unnecessary, and ultimately unsuccessful, litigation against individuals who choose to come forward with their stories of sexual assault and harassment. The bill expands the privileges already encompassed in Section 47 of the Civil Code to include communications made by an individual who has experienced an incident of sexual assault, harassment, or discrimination, regardless of whether or not they have filed any formal complaint regarding the same. The protections proposed by the bill would apply to individuals who, after relaying any factual statement, whether in the form of a formal complaint or a statement outside a formal proceeding such as to a media outlet, is sued for defamation. The bill only applies to a statement by an individual who has experienced sexual harassment, assault, or discrimination. That is to say that the *perpetrator* of an incident of sexual harassment, assault, or discrimination would *not* be covered by the expanded protections.

Additionally, the bill provides significant remedies for successful defendants in defamation claims. By extending the protection of privilege provided by existing Section 47 to explicitly include true statements made by an individual who has experienced sexual harassment, assault, or discrimination about that incident, the bill likely functions to dissuade litigation against those who have made the difficult decision to come forward about their experiences. By doing so, this bill would also have the potential side effect of encouraging survivors of sexual assault, harassment, or discrimination to come forward with information regarding their experiences and help protect other individuals who may face similar situations. Further, a perpetrator who would

LEGISLATIVE INTENT SERVICE, INC.    (530)  666-1917

otherwise opt to silence survivors by targeting them with litigation may be further dissuaded from filing a defamation claim due to the significant potential damages and penalties provided by this bill.

***Author's amendments.*** Existing Section 47 deals almost entirely with incidents where a formal complaint has been filed, be it with a court or an employer. Considering the intent of this bill is to ensure that an individual who has experienced sexual assault, harassment, or discrimination, is able to speak freely about the incident, regardless of who the recipient of the communication may be, adding this protection through a new code section may be more appropriate. As such, the author proposes to move the language currently found at Section 47(f) to novel section 47.1(a). Additionally, in order to further avoid any potential confusion, the author proposes amending the bill to alter the language of "complainant" and "complaint," to "individual" and "incident." The author has also proposed various technical and clarifying changes. The result is as follows:

**SEC. 2.** Section 47.1 is added to the Civil Code, to read:

*47.1(a) A communication made by an individual, without malice, regarding an incident of sexual assault, harassment, or discrimination is privileged under Section 47.*

*(b) A prevailing defendant in any defamation action brought against that defendant for making a communication that is privileged under this section shall be entitled to their reasonable attorney's fees and costs for successfully defending themselves in the litigation, plus treble damages for any harm caused to them by the defamation action against them, in addition to punitive damages available under Section 3294 or any other relief otherwise permitted by law.*

*(c) This section shall only apply to an individual that has, or at any time had, a reasonable basis to file a complaint of sexual assault, harassment, or discrimination, whether the complaint is, or was, filed or not.*

*(d) For the purposes of this section, "communication" means factual information related to an incident of sexual assault, harassment, or discrimination experienced by the individual making the communication, including, but not limited to, any of the following:*

*(1) An act of sexual assault.*

*(2) An act of sexual harassment, as described in Section 51.9.*

*(3) An act of workplace harassment or discrimination, failure to prevent an act of workplace harassment or discrimination, aiding, abetting, inciting, compelling, or coercing an act of workplace harassment or discrimination, or an act of retaliation against a person for reporting or opposing workplace harassment or discrimination, as described in subdivision (a), (h), (i), (j), or (k) of Section 1940 of the Government Code.*

*(4) An act of harassment or discrimination, or an act of retaliation against a person for reporting harassment or discrimination, by the owner of a housing accommodation, as described in Section 12955 of the Government Code.*

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917



*(5) An act of sexual harassment, as defined in Sections 212.5 and 66262.5 of the Education Code.*

**ARGUMENTS IN SUPPORT**:  This measure is supported and sponsored by the California Employment Lawyers Association (CELA) and Equal Rights Advocates (ERA). In support of the measure, they write:

AB 933 will ensure survivors of sexual assault, harassment, and discrimination are adequately protected from defamation lawsuits by clarifying that claims made in good faith are a form of protected speech. In doing so, the bill would make it harder for perpetrators to retaliate against survivors with legal threats and intimidation. The protections in this bill will help encourage survivors to speak their truth and expose the behavior of those who harmed them. This bill also provides relief to survivors in the form of reasonable attorneys' fees and damages for successfully defending themselves against these retaliatory lawsuits.

**REGISTERED SUPPORT / OPPOSITION**:

**Support**

California Employment Lawyers' Association (co-sponsor)
Equal Rights Advocates (co-sponsor)
9to5
CA Work & Family Coalition
Consumer Attorneys of California
Legal Aid At Work
Mujeres Unidas Y Activas
National Council of Jewish Women (NCJW) CA
Santa Clara County Wage Theft Coalition
Valor California /Valorus
Work Equity
Worksafe

**Opposition**

None on file

**Analysis Prepared by**:  Manuela Boucher-de la Cadena / JUD. / (916) 319-2334

LEGISLATIVE INTENT SERVICE, INC.   (530)  666-1917

Date of Hearing:  March 21, 2023

<div align="center">

ASSEMBLY COMMITTEE ON JUDICIARY
Brian Maienschein, Chair
AB 933 (Aguiar-Curry and Ward) – As Introduced February 14, 2023

As Proposed to be Amended

</div>

**SUBJECT**:  PRIVILEGED COMMUNICATIONS: COMPLAINT OF SEXUAL ASSAULT, HARASSMENT, OR DISCRIMINATION

**KEY ISSUE**:  SHOULD A COMMUNICATION ABOUT AN INCIDENT OF SEXUAL ASSAULT, HARASSMENT, OR DISCRIMINATION MADE WITHOUT MALICE BY AN INDIVIDUAL WHO EXPERIENCED THE ASSAULT, HARASSMENT, OR DISCRIMINATION BE A PRIVILEGED COMMUNICATION FOR PURPOSES OF A DEFAMATION ACTION?

<div align="center">

**SYNOPSIS**

</div>

*In 2017, the #MeToo movement arrived at the Capitol's doorstep. As the Legislature faced a reckoning on how to curb a pervasive culture of sexual assault and harassment, one female lobbyist in particular made headlines. In December 2017, Pamela Lopez, a long time lobbyist and member of the Capitol community, publicly accused Assemblymember Matt Dababneh of sexually assaulting her during an event in Las Vegas. After initiating a formal complaint process with the Assembly, Lopez gave a press conference detailing the incident and identifying Assemblymember Dababneh. In August 2018, Dababneh sued Lopez for both her complaint to the Assembly and the subsequent press conference, claiming both defamation and intentional infliction of emotional distress. Looking at the protections provided under Civil Code Section 47, the trial court ultimately held in Lopez's favor on the claim relating to her complaint to the Assembly, but found that her statements to the press did not benefit from the same privilege and thus, Lopez was potentially vulnerable to Dababneh's claim of defamation and intentional infliction of emotional distress. While Lopez was ultimately successful on appeal, where the court held that her statements to the press did, in fact, fall under the privilege provided under Civil Code section 47, the initial trial decision nonetheless highlighted a concern for many who experience sexual assault and harassment.*

*This bill, while arguably codifying existing law, would also potentially help curb any unnecessary, and ultimately unsuccessful, litigation against individuals who choose to come forward with their stories of sexual assault and harassment. The bill expands the privileges already encompassed in Section 47 of the Civil Code to include communications made by an individual who has experienced an incident of sexual assault, harassment, or discrimination, regardless of whether or not they have filed any formal complaint regarding the same. Additionally, the bill would provide significant remedies for successful defendants in defamation claims. As currently in print, the bill risks misinterpretation that the privilege only extends to communications made in the form of a formal complaint. In order to avoid this potential confusion, the author proposes various clarifying amendments. The amendments are incorporated into the summary of the bill, below, and explained in the analysis. This bill is co-sponsored by the California Employment Lawyers Association (CELA) and Equal Rights Advocates (ERA). It is supported by a coalition of workplace and women's rights advocates. There is no opposition currently on file.*



<div align="right">

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

</div>

<div align="center">

**LIS - 4**

</div>

<div align="right">

AP - 1

</div>

**SUMMARY**: Makes specified forms of communication regarding sexual assault, harassment, or discrimination, privileged communications for purposes of a defamation action. Specifically, **this bill**:

1) Protects as privileged, a communication regarding an incident of sexual assault, harassment, or discrimination made without malice.

2) Limits application of the bill's provisions to any individual that has, or at any time had, a reasonable basis to file a complaint of sexual assault, harassment, or discrimination, whether the complaint is, or was, filed or not.

3) Authorizes a prevailing defendant in any defamation action brought against that defendant for making a communication that is privileged under the provisions of this bill to recover the following:

   a) Reasonable attorney's fees and costs;

   b) Treble damages for any harm caused to them by the defamation action against them;

   c) Punitive damages;

   d) Any other relief permitted by law.

4) Defines a "communication" as any factual information regarding an incident of sexual assault, harassment, or discrimination, experienced by the individual making the communication, including but not limited to, any of the following:

   a) An act of sexual assault;

   b) An act of sexual harassment;

   c) An act of workplace harassment or discrimination, failure to prevent an act of workplace harassment or discrimination, aiding, abetting, inciting, compelling, or coercing an act of workplace harassment or discrimination, or an act of retaliation against a person for reporting or opposing workplace harassment or discrimination;

   d) An act of harassment or discrimination, or an act of retaliation against a person for reporting harassment or discrimination, by the owner of a housing accommodation;

   e) An act of sexual harassment as defined by identified sections of the Education code.

**EXISTING LAW**:

1) Defines "libel" as a false and unprivileged written publication that causes injury, while defining "slander" as a false and unprivileged oral communication that causes injury. Defines "defamation" to include either libel or slander. (Civil Code Sections 44 to 46.)

2) Protects, as a privileged publication, a communication made without malice to an interested person by one who is also interested, or by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication

(530) 666-1917    LEGISLATIVE INTENT SERVICE, INC.

AP - 2

to be innocent, or who is requested by the person interested to give the information. (Civil Code Section 47 (c).)

3) Protects, as a privileged publication, any statement made by a current and former employer concerning the job performance or qualifications of an applicant for employment, when those statements are based upon credible evidence and made without malice at the request of a prospective employer of the applicant. Specifies that this provision authorizes a current or former employer to answer whether or not the employer would rehire the current or former employee. (*Id.*)

4) Defines "malice" for purposes of defamation law to mean a defamatory publication that is either motivated by hatred or ill will towards the plaintiff, or where the defendant lacked reasonable grounds for believing the truth of the publication and therefore acted in reckless disregard of the plaintiff's rights. (*Schep v. Capitol One N.A.* (2017)12 Cal.App.5th 1331; *Taus v. Loftus* (2007) 40 Cal 4th 683; *see also* California Civil Instructions (CACI) 1723.)

**FISCAL EFFECT**:  As currently in print this bill is keyed non-fiscal.

**COMMENTS**:  In 2017, the #MeToo movement arrived at the Capitol's doorstep. As the Legislature faced a reckoning on how to curb a pervasive culture of sexual assault and harassment, one female lobbyist in particular made headlines. In December 2017, Pamela Lopez, a long time lobbyist and member of the Capitol community, publicly accused Assemblymember Matt Dababneh of sexually assaulting her during an event in Las Vegas. After initiating a formal complaint process with the Assembly, Lopez gave a press conference detailing the incident and identifying Assemblymember Dababneh. Multiple media sources immediately reported on Lopez's account. In August 2018, Dababneh sued Lopez for both her complaint to the Assembly and the subsequent press conference, claiming both defamation and intentional infliction of emotional distress. In October, Lopez filed an anti-SLAPP motion, arguing that both her complaint to the Assembly and the press conference were protected by California's anti-SLAPP statute. Looking at the protections provided under Civil Code Section 47, the trial court ultimately held in Lopez's favor on the claim relating to her complaint to the Assembly, but that her statements to the press did not benefit from the same privilege and thus, Lopez was potentially vulnerable to Dababneh's claim of defamation and intentional infliction of emotional distress. While Lopez was ultimately successful on appeal, where the court held that her statements to the press did, in fact, fall under the privilege provided under Civil Code section 47, the initial trial decision nonetheless highlighted a concern for many who experience sexual assault and harassment. As stated by the author:

> Strategic Lawsuits Against Public Participation (SLAPP) are increasingly being used as a weapon to threaten, silence, intimidate, and dissuade survivors of sexual assault, harassment, and discrimination from speaking out against their abusers and exposing predators. AB 933 expands protections for speech made by a survivor, without malice, about their own experience of sexual assault, harassment, or discrimination. This bill would make it harder for perpetrators to retaliate against survivors with legal threats and intimidation, but does not apply to unfounded claims. The protections in this bill will help encourage survivors to speak their truth and expose the behavior of those who harmed them.  In addition, AB 933 helps take the burden off of survivors by providing reasonable attorneys' fees and damages if they successfully defend themselves against meritless lawsuits.

(530) 666-1917   LEGISLATIVE INTENT SERVICE, INC.

AP - 3

***Privileged Communication and the Definition of Malice***:  At common law, libel and slander were strict liability torts: the state of mind of the speaker or writer was not relevant, so the plaintiff only needed to show that there was a defamatory statement that caused reputational harm to the plaintiff and that the statement was "published" – which simply meant that it reached one person other than the defamed plaintiff. At common law, falsity was not a required element of the tort of defamation; however, the defendant could raise truth as a complete defense. While this may seem like a distinction without a difference – a defendant is liable for false statements in either case – the significance of the distinction lays in which party bears the burden of proof. As an element of the tort, the burden is on the plaintiff to show that the statement is false; as a defense, the burden is on the defendant to show that the statement is true. As codified in the California Civil Code, however, falsity is effectively an element, because defamation is defined as any "false and unprivileged publication" which defames (i.e. injures the reputation of) the plaintiff. The Civil Code does not define what an "unprivileged" publication means, but rather lists a number of "privileged publications" in Civil Code Section 47. Presumably an "unprivileged publication" is anything not listed in Section 47 or not expressly privileged in some other statute.

Under subdivision (c) of Section 47, a communication is privileged only if it is made "without malice." For purposes of defamation law, malice means publishing a false and defamatory statement knowing it to be false or with reckless disregard of whether that statement is true or false. (See *New York Times Co. v. Sullivan* (1964) 376 U.S. 254.) California courts have adopted a definition that effectively combines this definition, in the disjunctive, with the more popular meanings of "malice" as requiring some ill intent. For example, the California jury instructions for Civil Code Section 47 (c) define malice as requiring either (1) that the statement evinces "hatred or ill-will toward the plaintiff" or (2) "that [the defendant] had no reasonable grounds for believing the truth of the statement." (CACI 1723, citing *Taus v. Loftus 40 Cal 4th 683 (2007);* see also *Schep v. Capitol One N.A.* (2017) 12 Cal.App.5th 1331, 1337.)

***This bill,*** while arguably codifying existing law as evidenced by Lopez's ultimate success on appeal, would also potentially help curb any unnecessary, and ultimately unsuccessful, litigation against individuals who choose to come forward with their stories of sexual assault and harassment. The bill expands the privileges already encompassed in Section 47 of the Civil Code to include communications made by an individual who has experienced an incident of sexual assault, harassment, or discrimination, regardless of whether or not they have filed any formal complaint regarding the same. The protections proposed by the bill would apply to individuals who, after relaying any factual statement, whether in the form of a formal complaint or a statement outside a formal proceeding such as to a media outlet, is sued for defamation. The bill only applies to a statement by an individual who has experienced sexual harassment, assault, or discrimination. That is to say that the *perpetrator* of an incident of sexual harassment, assault, or discrimination would *not* be covered by the expanded protections.

Additionally, the bill provides significant remedies for successful defendants in defamation claims. By extending the protection of privilege provided by existing Section 47 to explicitly include true statements made by an individual who has experienced sexual harassment, assault, or discrimination about that incident, the bill likely functions to dissuade litigation against those who have made the difficult decision to come forward about their experiences. By doing so, this bill would also have the potential side effect of encouraging survivors of sexual assault, harassment, or discrimination to come forward with information regarding their experiences and help protect other individuals who may face similar situations. Further, a perpetrator who would

otherwise opt to silence survivors by targeting them with litigation may be further dissuaded from filing a defamation claim due to the significant potential damages and penalties provided by this bill.

***Author's amendments.*** Existing Section 47 deals almost entirely with incidents where a formal complaint has been filed, be it with a court or an employer. Considering the intent of this bill is to ensure that an individual who has experienced sexual assault, harassment, or discrimination, is able to speak freely about the incident, regardless of who the recipient of the communication may be, adding this protection through a new code section may be more appropriate. As such, the author proposes to move the language currently found at Section 47(f) to novel section 47.1(a). Additionally, in order to further avoid any potential confusion, the author proposes amending the bill to alter the language of "complainant" and "complaint," to "individual" and "incident." The author has also proposed various technical and clarifying changes. The result is as follows:

SEC. 2. Section 47.1 is added to the Civil Code, to read:

*47.1(a) A communication made by an individual, without malice, regarding an incident of sexual assault, harassment, or discrimination is privileged under Section 47.*

*(b) A prevailing defendant in any defamation action brought against that defendant for making a communication that is privileged under this section shall be entitled to their reasonable attorney's fees and costs for successfully defending themselves in the litigation, plus treble damages for any harm caused to them by the defamation action against them, in addition to punitive damages available under Section 3294 or any other relief otherwise permitted by law.*

*(c) This section shall only apply to an individual that has, or at any time had, a reasonable basis to file a complaint of sexual assault, harassment, or discrimination, whether the complaint is, or was, filed or not.*

*(d) For the purposes of this section, "communication" means factual information related to an incident of sexual assault, harassment, or discrimination experienced by the individual making the communication, including, but not limited to, any of the following:*

*(1) An act of sexual assault.*

*(2) An act of sexual harassment, as described in Section 51.9.*

*(3) An act of workplace harassment or discrimination, failure to prevent an act of workplace harassment or discrimination, aiding, abetting, inciting, compelling, or coercing an act of workplace harassment or discrimination, or an act of retaliation against a person for reporting or opposing workplace harassment or discrimination, as described in subdivision (a), (h), (i), (j), or (k) of Section 1940 of the Government Code.*

*(4) An act of harassment or discrimination, or an act of retaliation against a person for reporting harassment or discrimination, by the owner of a housing accommodation, as described in Section 12955 of the Government Code.*

(530) 666-1917    LEGISLATIVE INTENT SERVICE, INC.

*(5) An act of sexual harassment, as defined in Sections 212.5 and 66262.5 of the Education Code.*

**ARGUMENTS IN SUPPORT**:  This measure is supported and sponsored by the California Employment Lawyers Association (CELA) and Equal Rights Advocates (ERA). In support of the measure, they write:

> AB 933 will ensure survivors of sexual assault, harassment, and discrimination are adequately protected from defamation lawsuits by clarifying that claims made in good faith are a form of protected speech. In doing so, the bill would make it harder for perpetrators to retaliate against survivors with legal threats and intimidation. The protections in this bill will help encourage survivors to speak their truth and expose the behavior of those who harmed them. This bill also provides relief to survivors in the form of reasonable attorneys' fees and damages for successfully defending themselves against these retaliatory lawsuits.

**REGISTERED SUPPORT / OPPOSITION**:

**Support**

California Employment Lawyers' Association (co-sponsor)
Equal Rights Advocates (co-sponsor)
9to5
CA Work & Family Coalition
Consumer Attorneys of California
Legal Aid At Work
Mujeres Unidas Y Activas
National Council of Jewish Women (NCJW) CA
Santa Clara County Wage Theft Coalition
Valor California /Valorus
Work Equity
Worksafe

**Opposition**

None on file

**Analysis Prepared by**:  Manuela Boucher-de la Cadena / JUD. / (916) 319-2334

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

AP - 6

 

March 14, 2023

The Honorable Cecilia Aguiar-Curry
California State Assembly
1021 O Street, Suite 6350
Sacramento, CA 95814

**RE: AB 933 (Aguiar-Curry and Ward) Protecting Survivors from Weaponized Defamation Lawsuits - SPONSOR & SUPPORT**

Dear Assemblymember Aguiar-Curry,

The California Employment Lawyers Association ("CELA") and Equal Rights Advocates ("ERA") are proud to sponsor AB 933 (Aguiar-Curry and Ward): Protecting Survivors from Weaponized Defamation Lawsuits. AB 933 will expand protections against retaliatory defamation lawsuits for survivors of sexual assault, harassment, or discrimination who speak out about their own experience.

In the wake of the #MeToo movement, many assault and harassment survivors have been inspired to bravely join countless others in sharing their stories more publicly. In doing so, the movement unveiled a predatory culture that is pervasive across all sectors of employment and society. However, while survivors courageously came forward, there has been a concerning influx of defamation lawsuits by those who abused them.[1]

These frivolous and retaliatory lawsuits, also known as Strategic Lawsuits Against Public Participation (SLAPP), are increasingly being used as a weapon to threaten, silence, intimidate, and dissuade survivors from speaking out against their abusers. The threat of having to engage in years of litigation, relive the personal trauma of abuse in court, and take on the burden of responding to an expensive, resource-draining SLAPP suit further harms survivors and causes a chilling effect that discourages others from coming forward to share their experience. In fact, the financial burden of defending against a defamation suit is one of the main reasons these suits tend to evoke so much fear in survivors.[2] As

---

[1] The Increasing Complexity of Defamation Law in #MeToo Era Lawsuits (2021), https://www.loubar.org/UserFiles/files/bar-briefs/2021/6-June/Bar%20Briefs_June'21_Defamation%20Law%20in%20MeToo_Abrams_p22.pdf
[2] Retaliatory Defamation Suits: The Legal Silencing of the #MeToo Movement (2020), https://www.tulanelawreview.org/tlronline/retaliatorydefamation

(530) 666-1917   LEGISLATIVE INTENT SERVICE, INC.



1

AP - 7

news coverage of this abusive litigation tactic increases, our organizations are regularly contacted by workers, students, and others who are too fearful to speak out about sexual harassment and violence they have experienced for fear of being hit with a retaliatory defamation suit. Even if they will ultimately prevail against such an attack, survivors are often unable to take on the cost and emotional toll of such lengthy and costly litigation.

Existing law makes certain publications and speech—including complaints of sexual harassment—privileged and protected from civil defamation actions. However, these protections are limited, leaving survivors potentially open to defamation lawsuits if they engage in certain forms of speech, and therefore exposed to extended, costly, and retraumatizing legal proceedings.

AB 933 will ensure survivors of sexual assault, harassment, and discrimination are adequately protected from defamation lawsuits by clarifying that claims made in good faith are a form of protected speech. In doing so, the bill would make it harder for perpetrators to retaliate against survivors with legal threats and intimidation. The protections in this bill will help encourage survivors to speak their truth and expose the behavior of those who harmed them. This bill also provides relief to survivors in the form of reasonable attorneys' fees and damages for successfully defending themselves against these retaliatory lawsuits.

For all of the foregoing reasons, our organizations are proud to co-sponsor AB 933 and thank you for your leadership on this important measure. Should you have any questions regarding this letter, please contact either of our organizations at the emails provided below.


Respectfully submitted,

MARIKO YOSHIHARA
CELA Legislative Counsel and Policy Director
mariko@cela.org


JESSICA STENDER
Equal Rights Advocates Policy Director & Deputy Legal Director
jstender@equalrights.org

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

2

AP - 8



**ELENI KOUNALAKIS**
LIEUTENANT GOVERNOR

August 30, 2023

The Honorable Cecilia Aguiar-Curry
Assembly Speaker pro Tempore
California State Assembly
1021 O Street, Suite 8320
Sacramento, California 95814

**Re: Assembly Bill 933 (Aguiar-Curry and Ward) - SUPPORT**

Dear Assemblymember Aguiar-Curry:

I am proud to **support Assembly Bill (AB) 933**, which will expand protections against retaliatory defamation lawsuits for survivors of sexual assault, harassment, or discrimination who speak out about their own experience.

In recent years, defamation lawsuits have been weaponized against survivors of sexual assault, harassment, and discrimination who share their experience publicly. These retaliatory lawsuits, known as Strategic Lawsuits Against Public Participation (SLAPP), subject survivors to extended, costly, and painful legal proceedings while being intended to intimidate, silence, and dissuade survivors from speaking out against their abusers.

Existing law makes certain publications and speech—including complaints of sexual harassment—privileged and protected from civil defamation actions. However, these protections are limited, leaving survivors potentially open to defamation lawsuits if they engage in certain forms of speech, and therefore exposed to extended, costly, and retraumatizing legal proceedings.

AB 933 will ensure survivors of sexual assault, harassment, and discrimination are adequately protected from retaliatory defamation lawsuits by clarifying that claims made in good faith are a form of protected speech. In doing so, the bill would make it harder for perpetrators to retaliate against survivors with legal threats and intimidation. This bill also provides relief to survivors in the form of reasonable attorneys' fees and damages for successfully defending themselves against these retaliatory lawsuits.

For these reasons, I am proud to support AB 933. Should you have any questions regarding my support of this legislation, please do not hesitate to contact Genesis Gonzalez, Legislative Affairs Specialist, at genesis.gonzalez@ltg.ca.gov or call (916) 445-8994.

Sincerely,

Ambassador Eleni Kounalakis (RET.)
Lieutenant Governor

cc: Assemblymember Chris Ward



LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

**LEADERSHIP
TEAM
2022 – 2023**

**Sandi Gabe**
President
—
**Roli Wendorf**
Chief Financial Officer
—
**Tracey Clark**
Secretary
—
**Karen Vanderwerken**
AAUW Fund
—
**Carol Holzgrafe**
Branch Support
—
**Sharyn Siebert**
Branch Support
—
**Dawn Johnson**
Communications
—
**Stormy Miller Sabia**
Diversity, Equity, and Inclusion
—
**Marsha Swails**
Membership
—
**Janice Lee**
Program
—
**Kathleen Harper**
Public Policy

**Dianne Owens**
Governance/
Parliamentarian
—
**Julika Barrett**
Office Manager



of California

June 5, 2023

Honorable Tom Umberg, Chair
Senate Judiciary Committee
1021 O Street, Suite 3240
Sacramento, California 95814

**Subject:   AB 933 (Aguiar-Curry and Ward) Protecting Survivors from
Weaponized Defamation Lawsuits - SUPPORT**

Dear Chair Umberg:

On behalf of the American Association of University Women California
(AAUW CA), this letter is to express our support for AB 933 (Aguiar-Curry),
which will provide greater protections against retaliatory defamation lawsuits
for survivors of sexual assault, harassment, or discrimination who speak out
about their own experience.

AAUW CA is a leading organization advocating equity for women and girls.
Our membership includes more than 9,000 California women in 118 branches
throughout the state – with another 2,500 members at large.  Social justice,
including the freedom for survivors to come forward to speak against their
abusers without fear of retaliation, is an essential tenet of our organization.

The #MeToo movement provided a platform for assault and harassment
survivors to share their stories, enabling an important step in their healing
process.   While a predatory culture has existed in all sectors of employment
and society, this movement provided an environment for those who have
suffered harassment, assaults, coercion and intimidation by employers,
colleagues, acquaintances, and strangers.  Unfortunately, retaliatory
defamation lawsuits have been used to misdirect public attention and
ruthlessly intimidate survivors.

These retaliatory lawsuits, also known as Strategic Lawsuits Against Public
Participation (SLAPP), are increasingly being used as a weapon to threaten,
silence, intimidate, and dissuade survivors from speaking out against their
abusers. These suits threaten survivors with potentially years of litigation and
force them to constantly relive their experience.

LEGISLATIVE INTENT SERVICE, INC.    (530)  666-1917

AP - 10



AB 933
Page Two

For those unable to afford legal representation, SLAPP suits silence survivors who have come forward, and those who consider sharing their abuse.

AB 933 will protect survivors of sexual assault, harassment, and discrimination from retaliatory defamation lawsuits by clarifying that claims made in good faith are a form of protected speech.  In doing so, the bill would make it harder for perpetrators to retaliate against survivors with legal threats and intimidation. The protections in this bill will help encourage survivors to speak their truth and expose the behavior of those who harmed them. This bill also provides relief to survivors in the form of reasonable attorneys' fees and damages for successfully defending themselves against these retaliatory lawsuits.

For these reasons, we are proud to support AB 933, and encourage your strong support and an "Aye" vote for this measure.  Should you have any questions about our position on this legislation, please do not hesitate to contact our advocate, Kathy Van Osten, at 916-605-9293 or at kvanosten@mvmstrategy.com.

Sincerely,

Kathleen M. Harper

Kathi Harper
Public Policy Chair
AAUW CA

Cc:    Members, Senate Judiciary Committee
       Assemblymembers Cecelia Aguiar-Curry and Chris Ward
       Allison Meredith, Consultant, Senate Judiciary Committee
       Morgan Branch, Senate Republican Consultant



LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

AP - 11

     

 

March 14, 2023



The Honorable Cecilia Aguiar-Curry
California State Assembly
1021 O Street, Suite 6350
Sacramento, CA 95814

**RE: AB 933 (Aguiar-Curry and Ward) Protecting Survivors from Weaponized Defamation Lawsuits - SUPPORT**

Dear Assemblymember Aguiar-Curry,

The undersigned organizations write in strong support of AB 933 (Aguiar-Curry and Ward): Protecting Survivors from Weaponized Defamation Lawsuits. AB 933 will expand protections against retaliatory defamation lawsuits for survivors of sexual assault, harassment, or discrimination who speak out about their own experience.

In the wake of the #MeToo movement, many assault and harassment survivors have been inspired to bravely join countless others in sharing their stories more publicly. In doing so, the movement unveiled a predatory culture that is pervasive across all sectors of employment and society. However, while survivors courageously came forward, there has been a concerning influx of defamation lawsuits by those who abused them.

These frivolous and retaliatory lawsuits, also known as Strategic Lawsuits Against Public Participation (SLAPP), are increasingly being used as a weapon to threaten, silence, intimidate, and dissuade survivors from speaking out against their abusers. The threat of having to engage in years of litigation, relive the personal trauma of abuse in court, and take on the burden of responding to an expensive, resource-draining SLAPP suit further harms survivors and causes a chilling effect that discourages others from coming forward to share their experience.

Existing law makes certain publications and speech—including complaints of sexual harassment—privileged and protected from civil defamation actions. However, these protections are limited, leaving survivors potentially open to defamation lawsuits if they engage in certain forms of speech, and therefore exposed to extended, costly, and retraumatizing legal proceedings.

AB 933 will ensure survivors of sexual assault, harassment, and discrimination are adequately protected from retaliatory defamation lawsuits by clarifying that claims made in good faith are a form of protected speech. In doing so, the bill would make it harder for perpetrators to retaliate against survivors with legal threats and

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917



AP - 12

intimidation. The protections in this bill will help encourage survivors to speak their truth and expose the behavior of those who harmed them. This bill also provides relief to survivors in the form of reasonable attorneys' fees and damages for successfully defending themselves against these retaliatory lawsuits.

For all of the foregoing reasons, our organizations are proud to support AB 933.

Respectfully submitted,

9to5

California Work & Family Coalition

Consumer Attorneys of California

Legal Aid at Work

Mujeres Unidas y Activas

National Council of Jewish Women California

Santa Clara County Wage Theft Coalition

ValorUS

Work Equity

Worksafe

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

AP - 13

## REPORTS OF STANDING COMMITTEES
### Committee on Judiciary

¶   [t8]   Date of Hearing: March 21, 2023 (_fr)

¶ Mr. Speaker: Your Committee on Judiciary reports:

¶ AB            360         (10-0)
  AB            933          (8-0)

(fl) With the recommendation: Amend, and do pass as amended.

_____ , Chair (_fr)
MAIENSCHEIN

¶ Above bills ordered to second reading.

CODE:     13

LEGISLATIVE INTENT SERVICE, INC.   (530) 666-1917

03/15/23  01:59 PM
RN 23 12376  PAGE 1
Substantive

21173

## AMENDMENTS TO ASSEMBLY BILL NO. 933

### Amendment 1
In the title, in line 1, strike out "to amend Section 47 of, and"

### Amendment 2
In the title, in line 1, strike out "to," and insert:

to

### Amendment 3
On page 2, strike out lines 1 to 37, inclusive, and strike out page 3, on page 4, strike out lines 1 to 35, inclusive, in line 36, strike out "SEC. 2." and insert:

SECTION 1.

### Amendment 4
On page 4, in line 37, after "47.1." insert:

(a) A communication made by an individual, without malice, regarding an incident of sexual assault, harassment, or discrimination is privileged under Section 47.

### Amendment 5
On page 4, in line 37, strike out "A" and insert:

(b) A

### Amendment 6
On page 4, in line 39, strike out "subdivision (f) of Section 47" and insert:

this section

### Amendment 7
On page 5, in line 1, strike out "such" and insert:

the



AP - 15

03/15/23  01:59 PM
RN 23 12376  PAGE 2
Substantive

21173

## Amendment 8

On page 5, below line 4, insert:

(c) This section shall only apply to an individual that has, or at any time had, a reasonable basis to file a complaint of sexual assault, harassment, or discrimination, whether the complaint is, or was, filed or not.

(d) For the purposes of this section, "communication" means factual information related to an incident of sexual assault, harassment, or discrimination experienced by the individual making the communication, including, but not limited to, any of the following:

(1) An act of sexual assault.

(2) An act of sexual harassment, as described in Section 51.9.

(3) An act of workplace harassment or discrimination, failure to prevent an act of workplace harassment or discrimination, aiding, abetting, inciting, compelling, or coercing an act of workplace harassment or discrimination, or an act of retaliation against a person for reporting or opposing workplace harassment or discrimination, as described in subdivision (a), (h), (i), (j), or (k) of Section 12940 of the Government Code.

(4) An act of harassment or discrimination, or an act of retaliation against a person for reporting harassment or discrimination, by the owner of a housing accommodation, as described in Section 12955 of the Government Code.

(5) An act of sexual harassment, as defined in Sections 212.5 and 66262.5 of the Education Code.

- 0 -



LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

AP - 16

# PROPOSED AMENDMENTS

**RN 23 12376 06**
**03/15/23 01:59 PM**
**SUBSTANTIVE**

PROPOSED AMENDMENTS TO ASSEMBLY BILL NO. 933

CALIFORNIA LEGISLATURE—2023–24 REGULAR SESSION

## ASSEMBLY BILL                                    No. 933

---

**Introduced by Assembly Members Aguiar-Curry and Ward**
(Principal coauthor: Senator Skinner)

February 14, 2023

---



An act ~~to amend Section 47 of, and~~ to add Section 47.1 ~~to,~~ *to* the Civil Code, relating to privileged communications.

| **Amendments 1 & 2**

### LEGISLATIVE COUNSEL'S DIGEST

AB 933, as introduced, Aguiar-Curry. Privileged communications: ~~complaint~~ *incident* of sexual assault, harassment, or discrimination.

Existing law provides that libel is a false and unprivileged written publication that injures the reputation and that slander is a false and unprivileged publication, orally uttered, that injures the reputation, as specified. Existing law makes certain publications and communications privileged and therefore protected from civil action, including complaints of sexual harassment by an employee, without malice, to an employer based on credible evidence and communications between the employer and interested persons regarding a complaint of sexual harassment.

This bill would include among those privileged communications a communication made by ~~a complainant,~~ *an individual,* without malice, regarding ~~a complaint~~ *an incident* of sexual assault, harassment, or discrimination, as defined, and would specify the attorney's fees and damages available to a prevailing defendant in any defamation action brought against that defendant for making that communication.

Vote: majority. Appropriation: no. Fiscal committee: no. State-mandated local program: no.



**PROPOSED AMENDMENTS**                    RN 23 12376 06 03/15/23

AP - 17

**PROPOSED AMENDMENTS**

AB 933                                        — 2 —

**RN 23 12376 06**
**03/15/23 01:59 PM**
**SUBSTANTIVE**

*The people of the State of California do enact as follows:*

Page 2

**Amendment 3**

~~SECTION 1.   Section 47 of the Civil Code is amended to read:~~
~~47.   A privileged publication or broadcast is one made:~~
~~(a)  In the proper discharge of an official duty.~~
~~(b)  In any (1) legislative proceeding, (2) judicial proceeding, (3) in any other official proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law and reviewable pursuant to Chapter 2 (commencing with Section 1084) of Title 1 of Part 3 of the Code of Civil Procedure, except as follows:~~
~~(1) An allegation or averment contained in any pleading or affidavit filed in an action for marital dissolution or legal separation made of or concerning a person by or against whom no affirmative relief is prayed in the action shall not be a privileged publication or broadcast as to the person making the allegation or averment within the meaning of this section unless the pleading is verified or affidavit sworn to, and is made without malice, by one having reasonable and probable cause for believing the truth of the allegation or averment and unless the allegation or averment is material and relevant to the issues in the action.~~
~~(2) This subdivision does not make privileged any communication made in furtherance of an act of intentional destruction or alteration of physical evidence undertaken for the purpose of depriving a party to litigation of the use of that evidence, whether or not the content of the communication is the subject of a subsequent publication or broadcast which is privileged pursuant to this section. As used in this paragraph, "physical evidence" means evidence specified in Section 250 of the Evidence Code or evidence that is property of any type specified in Chapter 14 (commencing with Section 2031.010) of Title 4 of Part 4 of the Code of Civil Procedure.~~
~~(3) This subdivision does not make privileged any communication made in a judicial proceeding knowingly concealing the existence of an insurance policy or policies.~~
~~(4) A recorded lis pendens is not a privileged publication unless it identifies an action previously filed with a court of competent jurisdiction which affects the title or right of possession of real property, as authorized or required by law.~~

**PROPOSED AMENDMENTS**                        **RN 23 12376 06** ~~03/15/23~~

AP - 18

PROPOSED AMENDMENTS

RN 23 12376 06
03/15/23 01:59 PM
SUBSTANTIVE

— 3 —                                AB 933

Page 3

(5) This subdivision does not make privileged any communication between a person and a law enforcement agency in which the person makes a false report that another person has committed, or is in the act of committing, a criminal act or is engaged in an activity requiring law enforcement intervention, knowing that the report is false, or with reckless disregard for the truth or falsity of the report.

(c) In a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information. This subdivision applies to and includes a communication concerning the job performance or qualifications of an applicant for employment, based upon credible evidence, made without malice, by a current or former employer of the applicant to, and upon request of, one whom the employer reasonably believes is a prospective employer of the applicant. This subdivision applies to and includes a complaint of sexual harassment by an employee, without malice, to an employer based upon credible evidence and communications between the employer and interested persons, without malice, regarding a complaint of sexual harassment. This subdivision authorizes a current or former employer, or the employer's agent, to answer, without malice, whether or not the employer would rehire a current or former employee and whether the decision to not rehire is based upon the employer's determination that the former employee engaged in sexual harassment. This subdivision does not apply to a communication concerning the speech or activities of an applicant for employment if the speech or activities are constitutionally protected, or otherwise protected by Section 527.3 of the Code of Civil Procedure or any other provision of law.

(d) (1) By a fair and true report in, or a communication to, a public journal, of (A) a judicial, (B) legislative, or (C) other public official proceeding, or (D) of anything said in the course thereof, or (E) of a verified charge or complaint made by any person to a public official, upon which complaint a warrant has been issued.

(2) Paragraph (1) does not make privileged any communication to a public journal that does any of the following:

99



LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

PROPOSED AMENDMENTS                          RN 23 12376 06  03/15/23

AP - 19

PROPOSED AMENDMENTS

RN 23 12376 06
03/15/23 01:59 PM
SUBSTANTIVE

AB 933      —4—

Page 4

(A) Violates Rule 5-120 of the State Bar Rules of Professional Conduct.

(B) Breaches a court order.

(C) Violates a requirement of confidentiality imposed by law.

(e) By a fair and true report of (1) the proceedings of a public meeting, if the meeting was lawfully convened for a lawful purpose and open to the public, or (2) the publication of the matter complained of was for the public benefit.

(f) (1) A communication made by a complainant, without malice, regarding a complaint of sexual assault, harassment, or discrimination.

(2) For purposes of this subdivision, "a complaint of sexual assault, harassment, or discrimination" means factual information related to a complaint of sexual assault, harassment, or discrimination experienced by the complainant, including, but not limited to, any of the following:

(A) An act of sexual assault.

(B) An act of sexual harassment, as defined in Section 51.9.

(C) An act of workplace harassment or discrimination, failure to prevent an act of workplace harassment or discrimination, aiding, abetting, inciting, compelling, or coercing an act of workplace harassment or discrimination, or an act of retaliation against a person for reporting or opposing workplace harassment or discrimination, as described in subdivisions (a), (h), (i), (j), and (k) of Section 12940 of the Government Code.

(D) An act of harassment or discrimination, or an act of retaliation against a person for reporting harassment or discrimination, by the owner of a housing accommodation, as described in Section 12955 of the Government Code.

(E) An act of sexual harassment, as defined in Sections 212.5 and 66262.5 of the Education Code.

(3) This subdivision shall only apply to any complainant that has, or at any time had, a reasonable basis to file a complaint of sexual assault, harassment, or discrimination, whether the complaint is, or was, filed or not.

SEC. 2.

+    *SECTION 1.*    Section 47.1 is added to the Civil Code, to read:

47.1.    *(a) A communication made by an individual, without malice, regarding an incident of sexual assault, harassment, or discrimination is privileged under Section 47.*

**Amendments 4 & 5**



LEGISLATIVE INTENT SERVICE, INC.   (530) 666-1917

99

**PROPOSED AMENDMENTS**

— 5 —                         AB 933

RN 23 12376 06
03/15/23 01:59 PM
**SUBSTANTIVE**

A

*(b) A* prevailing defendant in any defamation action brought against that defendant for making a communication that is privileged under ~~subdivision (f) of Section 47~~ *this section* shall be entitled to their reasonable attorney's fees and costs for successfully defending themselves in ~~such~~ *the* litigation, plus treble damages for any harm caused to them by the defamation action against them, in addition to punitive damages available under Section 3294 or any other relief otherwise permitted by law.

*(c) This section shall only apply to an individual that has, or at any time had, a reasonable basis to file a complaint of sexual assault, harassment, or discrimination, whether the complaint is, or was, filed or not.*

*(d) For the purposes of this section, "communication" means factual information related to an incident of sexual assault, harassment, or discrimination experienced by the individual making the communication, including, but not limited to, any of the following:*

*(1) An act of sexual assault.*

*(2) An act of sexual harassment, as described in Section 51.9.*

*(3) An act of workplace harassment or discrimination, failure to prevent an act of workplace harassment or discrimination, aiding, abetting, inciting, compelling, or coercing an act of workplace harassment or discrimination, or an act of retaliation against a person for reporting or opposing workplace harassment or discrimination, as described in subdivision (a), (h), (i), (j), or (k) of Section 12940 of the Government Code.*

*(4) An act of harassment or discrimination, or an act of retaliation against a person for reporting harassment or discrimination, by the owner of a housing accommodation, as described in Section 12955 of the Government Code.*

*(5) An act of sexual harassment, as defined in Sections 212.5 and 66262.5 of the Education Code.*

Page 4

Page 5

Amendment 6

Amendment 7

Amendment 8

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

O

99

**PROPOSED AMENDMENTS**

RN 23 12376 06

AP - 21

## ASSEMBLY JUDICIARY COMMITTEE
## MANDATORY INFORMATION WORKSHEET

### *****IMPORTANT NOTE*****

This form must be fully completed no later than **seven (7) calendar days** after it is initially sent to the author's office. If the bill has been set for hearing and a completed worksheet and all other requested information about the bill has not been timely received by the Committee, the Committee shall consider the failure to provide the requested information to be an author's reset.

Please return completed worksheets to the Committee by email to the following:

grant.silva@asm.ca.gov **(Judiciary Committee)**
daryl.thomas@asm.ca.gov **(Republican Counsel)**

**AUTHOR'S AMENDMENTS:** At least **eleven (11) calendar days** prior to the hearing (two Fridays before the hearing date) at which the bill is scheduled to be heard, the following must be emailed to the Committee: the secured PDF version of the amendments in Legislative Counsel form; and one copy of Legislative Counsel's in-context version of the amendments. Failure to comply with these requirements may result in an author's reset.

**ASSEMBLY JUDICIARY COMMITTEE, 1020 N Street (LOB), Room 104**

**Bill Number: AB 933**               **Author:  Aguiar-Curry**

**Author's staff person:    Rita Durgin**

1.    Please describe *in detail* the problem or deficiency in existing law that the bill seeks to address. This description may be used in the Committee's analysis.

An act of sexual assault is committed every 68 seconds. Sexual violence affects people of every gender identity, age, and sexual orientation and is, unfortunately, common. According to the Centers for Disease Control and Prevention (CDC), over half of women and nearly 1 in 3 men have experienced sexual violence in their lives. Sexual violence often impacts people early in life. Of people who experience sexual violence, more than 4 in 5 female survivors, and 71% of male survivors were raped before the age of 25. The #MeToo movement gave many assault and harassment survivors the opportunity to bravely join countless others in sharing their stories on a national platform in solidarity. The movement unveiled a predatory culture that persists across all sectors of employment and society. While survivors courageously came forward, many were served with defamation lawsuits by those who abused them.

Retaliatory lawsuits also known as Strategic Lawsuits Against Public Participation (SLAPP) are increasingly being used as a weapon to threaten, silence, intimidate, and dissuade survivors of sexual assault, harassment, and discrimination from speaking out against their abusers and exposing predators.

LEGISLATIVE INTENT SERVICE, INC.    (530)  666-1917



AP - 22

The threat of having to engage in years of litigation, relive the personal trauma of abuse in court, and take on the burden of responding to an expensive, resource-draining SLAPP suit further harms survivors and causes a chilling effect that discourages others from coming forward to share their experience. In fact, the financial burden of defending against a defamation suit is one of the main reasons these suits tend to evoke so much fear in survivors.

Existing law makes certain publications and speech—including complaints of sexual harassment—privileged and protected from civil defamation actions. However, these protections are limited, leaving survivors potentially open to defamation lawsuits if they engage in certain forms of speech. The right to speak out must be protected in order to provide survivors with a safe outlet to report and communicate their truth, and protect others from such abuse, without fear of legal retaliation.

AB 933 protects survivors of sexual assault, harassment, and discrimination from defamation lawsuits by clarifying that claims made in good faith are a form of protected speech. This bill also provides relief to survivors in the form of reasonable attorneys' fees and damages for successfully defending themselves against meritless lawsuits.

2.    Please provide a statement of the author's purpose for the bill, which may be used in the Committee's analysis, including a description *in detail* of how the bill resolves the problem identified above.

Strategic Lawsuits Against Public Participation (SLAPP) are increasingly being used as a weapon to threaten, silence, intimidate, and dissuade survivors of sexual assault, harassment, and discrimination from speaking out against their abusers and exposing predators. AB 933 expands protections for speech made by a survivor, without malice, about their own experience of sexual assault, harassment, or discrimination. This bill would make it harder for perpetrators to retaliate against survivors with legal threats and intimidation, but does not apply to unfounded claims. The protections in this bill will help encourage survivors to speak their truth and expose the behavior of those who harmed them. In addition, AB 933 helps take the burden off of survivors by providing reasonable attorneys' fees and damages if they successfully defend themselves against meritless lawsuits.

3.    Who is the sponsor of the bill? If there is no sponsor, what person or entity requested that the bill be introduced? Please provide the name, telephone number, and email address of any sponsor or other person who may be contacted by the Committee for information regarding the bill.

**CA Employment Lawyers Association (co-sponsor)**
Mariko Yoshihara, Esq.
Legislative Counsel & Policy Director

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

**Equal Rights Advocates (co-sponsor)**
Jessica Stender –Policy Director and Deputy Legal Director

4.    Would this bill have an impact (positive or negative) on the ability of underserved and marginalized communities to access the justice system? If so, please explain why it would likely have such an impact and what the likely impact would be.

This bill would have a positive impact on the ability of marginalized communities to access the justice system. The weaponization of defamation suits has a chilling effect on a survivor's willingness to report their experiences and seek justice because they cannot afford the costs associated with defamation lawsuits. This bill could help encourage members of these communities to report their experiences and hold perpetrators of sexual harassment and abuse accountable through the justice system.

5.    Please identify similar legislation that has been introduced during this legislative session, or in any prior legislative session covered by the LIS system. Please include the bill number and year, a summary of the bill's contents, and the disposition of each bill.

**AB 2770 (Irwin, 2018)** codified California defamation case law as it relates to allegations of workplace sexual harassment, making it explicit in statute that:
(1) employees who report sexual harassment to their employer are not liable for any resulting injury to the alleged harasser's reputation, so long as the communication is made based on credible evidence and without malice;
(2) communications between employers and anyone with an interest in a sexual harassment complaint, such as victims and witnesses, are not liable for any resulting damage to the alleged harassers reputation, as long as the communication is made without malice; and,
(3) former employers are not liable for any resulting injury to a former employee's reputation if, in response to inquiries from prospective employers, the former employers indicate that they would not rehire the former employee based on a determination that the former employee engaged in sexual harassment, so long as the statement is made without malice.
**Signed into law - Chapter 82, Statutes of 2018.**

6.    Please identify any similar federal legislation (see http://thomas.loc.gov/home/thomas2.html) and any similar legislation in other states.

HB 2836: RIGHT TO SPEAK YOUR TRUTH ACT, Author: Rep. Mary Beth Canty. Illinois General Assembly - Bill Status for HB2836 (ilga.gov)

7.    Please identify all relevant state and federal statutes and all state and/or federal court decisions.

## Chilling Effect of Defamation Lawsuits:

- **Mitchell v. Fujitec Am., Inc., 518 F. Supp. 3d 1073, 1086 (S.D. Ohio 2021)**
"McKenzie notes the chilling effect that could arise with regard to reporting of sexual harassment, should those who report such allegations face potential liability for defamation." Id. at 1086.

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917



AP - 24

"The Court concedes that this result is troubling in at least one regard. As McKenzie notes in her Motion, there is a strong public policy in favor of reporting workplace misconduct. **The pleading rule reflected above, as she also notes, could have a chilling effect** on such reporting. Essentially, any time a sexual harassment claim includes objectively verifiable facts (e.g., "Employee A inappropriately touched me at the office party"), and the accused person disputes those facts in his or her complaint in an objectively verifiable way (e.g., "I was never even in the same room as my accuser at that party"), that appears to be enough to survive dismissal. In such cases, the plaintiff's allegation, if believed, necessarily entails that the defendant is lying, which under Ohio law deprives that person of the qualified privilege. See Gintert, 2007 WL 4376178, at *6 (holding that qualified privilege would not apply if a sexual harassment allegation is false). Id. at 1094.

- **AB 2770 CA Bill Analysis, Senate Judiciary Committee., 6/12/2018**
  In support of AB 2770, the American Association of University Women of California writes: "We agree that too often perpetrators file unwarranted lawsuits against victims and employers for statements made during sexual harassment investigations, and that the expense and hardships created by those lawsuits have a chilling effect on victims' willingness to come forward. We applaud the goal of AB 2770 to protect those communications from lawsuits."

- **Wilcoxon v. Red Clay Consol. Sch. Dist. Bd. of Educ., 437 F. Supp. 2d 235, 248 (D. Del. 2006)** "Defendant Freebery contends that the defamation claim must be dismissed quickly as a matter of public policy to avoid a chilling effect on other sexual harassment claims. In other words, defendant Freebery proposes that the continued subjection to a defamation claim concerning her publication of plaintiff's alleged sexual harassment will discourage others who have been sexually harassed from reporting the incident. See Vickers v. Abbott Lab., 308 Ill.App.3d 393, 241 Ill.Dec. 698, 719 N.E.2d 1101, 1109 (1999) (stating qualified privilege in the defamation context protects the victims, witnesses, and investigators of sexual harassment, and if no privilege existed, victims would be "handcuffed" by the fear of defamation liability). Wilcoxon v. Red Clay Consol. Sch. Dist. Bd. of Educ., 437 F. Supp. 2d 235, 248 (D. Del. 2006)

- **Dodds v. Am. Broad. Co., 145 F.3d 1053, 1064 (9th Cir. 1998)** "[W]e continue to believe that the Newton test requiring a clear and convincing showing of subjective or actual intent strikes the proper balance between protecting victims of defamation and protecting against the possible chilling effect that results from overly broad applications of our defamation laws."

- **Vickers v. Abbott Lab'ys, 308 Ill. App. 3d 393, 402–03 (1999)** "A recent United States Supreme Court decision governing sexual harassment in the workplace has made clear that there is a compelling interest in ridding workplaces of sexual harassment, and specifically an obligation of employers to " 'take all steps necessary to prevent sexual harassment from occurring' " and " 'to establish a complaint procedure designed to encourage victims of harassment to come forward.' " Faragher v. City of Boca Raton, 524 U.S. 775, 806, 118 S.Ct. 2275, 2292, 141 L.Ed.2d 662, 688 (1998), quoting 29 C.F.R. § 1604.11(f) (1997). The qualified privilege in the defamation context promotes this social policy and provides protection for the victims, witnesses and investigators of sexual harassment. If no privilege existed, then victims of harassment and companies with a goal of preventing harassment would be "handcuffed" by a fear of defamation liability. See Thomas v. Petrulis, 125 Ill.App.3d 415, 421–22, 80 Ill.Dec. 713, 465 N.E.2d 1059 (1984) (finding that "important policy considerations weigh in favor of *403 protecting the statements in an EEOC charge with an absolute privilege").

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917



AP - 25

8. Are the issues addressed by the bill the subject of pending litigation? If yes, please identify the case or cases (by name and number, if possible) and indicate the location and status of the pending litigation and how the bill would affect the pending litigation. Please also provide any relevant documents and any other relevant information you have about the litigation.

We are not aware of impacts to any pending litigation.

9. Have there been any informational hearings on the subject matter of the bill? If so, when? Please attach all information distributed by the Committee that held the hearing.

In 2017, the Assembly Rules Subcommittee held a series of hearings regarding how the Assembly handles sexual misconduct and harassment.

- California Assembly Targets Itself On Sexual Misconduct - capradio.org
- California Assembly hearing on sexual harassment policies leaves unanswered questions - Los Angeles Times (latimes.com)

10. Please describe all amendments the author currently wishes to make before this bill is heard in Committee. (Please recall that amendments must be emailed to the Committee in Leg Counsel form at least 11 calendar days before the bill is to be heard.)

No author amendments are planned at this time.

11. Please summarize any studies, reports, statistics or other evidence showing that the problem exists and that the bill will properly address the problem. Please also attach copies of all such evidence and/or state where such material is available for reference by Committee counsel.

- How Abusers Use the Courts Against Their Victims - The Atlantic This article cites a 2017 report from Georgia's Domestic Violence Fatality Review Project, which tracks domestic-violence-related deaths in the state, "Although there is little data on the frequency of harassing court filings, sometimes referred to as vexatious litigation, use of the court to harass victims of intimate partner violence and stalking appears to be commonplace."

- We Support Kesha's Fight for Justice: Survivors Should Not be Carved Out of Legal Protections - National Women's Law Center (nwlc.org) This article states: Survivors already face steep emotional and financial costs as a result of sexual violence, including an estimated lifetime cost of over $120,000 (please see attached report) due to medical expenses, lost productivity, and lost wages and benefits. Being forced to defend against a long and expensive retaliatory defamation lawsuit only exacerbates these tremendous costs.
- NWLC Leads Amicus Brief Supporting Kesha in Defamation Lawsuit Filed by Her Abuser Dr. Luke - National Women's Law Center. This amicus brief is on behalf of 35 other organizations to the New York Court of Appeals in *Gottwald v.*

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

AP - 26

*Sebert* in support of singer-songwriter Kesha, who has been sued for defamation by Dr. Luke, her former producer who sexually abused her.

- <u>Dababneh v. Lopez, No. C088848 (Please see attached case)</u>
  The Lopez decision includes citations to all of the relevant statutes and cases.
  Note: this decision is unpublished. The main relevant statutes are:
  - California Civil Code 47: Privileged Communications
  - California Code of Civil Procedure 425.16: Anti-SLAPP

- **Monetary expenses:** the costs of being sued in a defamation suit are dramatic for survivors of sexual assault and harassment. (Jamie R. Abrams, <u>The Increasing Complexity of Defamation Law in #MeToo Era Lawsuits</u> (June 2021) In fact, the financial burden of defending against a defamation suit is one of the main reasons these suits tend to evoke so much fear in survivors. (*Chelsey N. Whynot,* <u>Retaliatory Defamation Suits: The Legal Silencing of the #MeToo Movement</u> (2020)) Legal costs can be extremely high: one #MeToo accuser/defendant in a defamation suit reported spending $30,000 in her own defense. (Jamie R. Abrams, <u>The Increasing Complexity of Defamation Law in #MeToo Era Lawsuits</u> (June 2021)

- **Psychological re-traumatization:** survivors are often forced to endure lengthy and costly discovery. Discovery can entail a number of personal and invasive requests, including requiring the survivor to sit for a deposition during which [they] will be interrogated about matters relevant to the case, having the survivor answer questions relating to the case in writing via interrogatories and requests for admission, obligating the survivor to sift through all documentation [they] ha[ve] that is relevant to the case. (Nicole Ligon, Protecting Women's Voices: Preventing Retaliatory Defamation Claims in the #MeToo Context, 94 St. John's L Rev 961, 965 (2022).

- **Disincentives survivors from speaking out:** Individuals accused of sexual misconduct are increasingly using defamation suits to silence survivors from speaking out. The increase in retaliatory defamation suits has had a chilling effect on survivor's ability to report, and experts in the field are concerned that this influx against survivors "will further discourage reporting".
  This fear (victim blaming, stigmatization, and officials not taking their accusations seriously, among others) can keep survivors from coming forward. (*Chelsey N. Whynot,* <u>Retaliatory Defamation Suits: The Legal Silencing of the #MeToo Movement</u> (2020))

- **Retaliatory defamation suits are particularly common on college campuses**
  - In recent years, defamation lawsuits have been used as a tool to respond to claims of Title IX violations on college campuses and there has been an escalation in defamation lawsuits in response to Title IX allegations. (Tyler Kingkade, As More College Students Say "Me Too," Accused Men Are Suing for Defamation, BUZZFEED NEWS (Dec. 5,



LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

2017), https://www.buzzfeednews.com/ article/tylerkingkade/as-more-college-students-say-me-too-accused-men-are-suing/.)

- o According to research from news reports and court documents (Mother Jones, 'She Said, He Sued' (Feb. 2020), at least 100 defamation suits have been filed against accusers of sexual misconduct since 2014. The increasing number of defamation lawsuits are being filed with the purpose of fully threaten sexual assault survivors, which means that survivors are even further disincentivized to come forward with allegations.

- **Suiting Up**
  - o In the past six years, there have been at least 100 lawsuits in the United States in which a person accused of abuse or sexual misconduct has sued their alleged victim for defamation, based on our review of news articles, legal databases, and records gathered from attorneys. Nearly half of the suits were filed since the MeToo hashtag went viral in October 2017. Prior to that, most cases involved college students or faculty protesting campus sexual misconduct investigations. Plaintiffs in the more recent cases include seven celebrities, five politicians, three CEOs, and one former White House aide.

12.  Please list all groups, agencies or persons that have contacted you in support or in opposition to the bill.  Please attach copies of all letters of support and opposition. Please be aware that all support and opposition letters must be received by the Committee no later than seven (7) calendar days prior to the hearing in order to be reflected in the analysis.  Furthermore, only those letters which clearly indicate "Support" or "Oppose" to the current version of the bill or resolution are required to be noted in the Committee analysis.

     **CA Employment Lawyers Association (co-sponsor)**
     **Equal Rights Advocates (co-sponsor)**
     **Work Equity**
     **Pamela Lopez**
     **Professor Victoria Burke**

13.  Please describe any concerns that you anticipate may be raised in opposition to your bill, and state your response to those concerns.

     **We are not aware of any opposition at this time.**

14.  Please list the name, organization, telephone number, and email address of all witnesses that you anticipate will testify in support or opposition to the bill.  (Please note that the time restraints may require the Committee to limit the number of testifying witnesses.  Additional witnesses may identify themselves for the record.)

     **CA Employment Lawyers Association (co-sponsor)**
     Mariko Yoshihara, Esq.
     Legislative Counsel & Policy Director



LEGISLATIVE INTENT SERVICE, INC.   (530) 666-1917

AP - 28

**Equal Rights Advocates (co-sponsor)**
Jessica Stender –Policy Director and Deputy Legal Director


**Please complete this worksheet to the best of your ability and provide responses that are as detailed as possible.  Remember to email the completed worksheet—along with all supporting documentation and letters of support and opposition— to the email addresses on the first page of this worksheet. Thank you for your assistance.**



LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

AP - 29

**Assembly Committee Rollcalls**

## Judiciary

Date of Hearing: March 21, 2023

| BILL NO. | AB 690 | AB 875 | AB 933 | AB 954 |
|---|---|---|---|---|
| ACTION VOTED ON | Do pass and re-refer to Cmte on Appr., Rec. Consent | Do pass and re-refer to Cmte on Appr., Rec. Consent | Do pass as amended | Do pass as amended and re-refer to Cmte on Hum. S. |
| | Aye : No | Aye : No | Aye : No | Aye : No |
| Maienschein, Chair | X : | X : | X : | X : |
| Essayli, V. Chair | X : | X : | Not Voting | Not Voting |
| Connolly | X : | X : | X : | X : |
| Dixon | X : | X : | Not Voting | Not Voting |
| Haney | X : | X : | X : | X : |
| Kalra | X : | X : | X : | X : |
| Pacheco | X : | X : | X : | X : |
| Papan | X : | X : | X : | X : |
| Reyes | X : | X : | X : | X : |
| Robert Rivas | X : | X : | X : | X : |
| Sanchez | X : | X : | Not Voting | Not Voting |
| | Ayes : 11<br>Noes : 0 | Ayes : 11<br>Noes : 0 | Ayes : 8<br>Noes : 0 | Ayes : 8<br>Noes : 0 |

RECEIVED: _____

_Brian Maienschein_

_____, CHAIR

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

AP - 30

**AB 933**
Page 1

ASSEMBLY THIRD READING
AB 933 (Aguiar-Curry and Ward)
As Amended  March 22, 2023
Majority vote

## SUMMARY

Makes specified forms of communication regarding sexual assault, harassment, or discrimination, privileged communications for purposes of a defamation action.

### Major Provisions

1) Protects as privileged, a communication regarding an incident of sexual assault, harassment, or discrimination made without malice.

2) Limits application of this bill's provisions to any individual that has, or at any time had, a reasonable basis to file a complaint of sexual assault, harassment, or discrimination, whether the complaint is, or was, filed or not.

3) Authorizes a prevailing defendant in any defamation action brought against that defendant for making a communication that is privileged under the provisions of this bill to recover the following:

   a) Reasonable attorney's fees and costs;

   b) Treble damages for any harm caused to them by the defamation action against them;

   c) Punitive damages;

   d) Any other relief permitted by law.

4) Defines a "communication" as any factual information regarding an incident of sexual assault, harassment, or discrimination, experienced by the individual making the communication, including but not limited to, any of the following:

   a) An act of sexual assault;

   b) An act of sexual harassment;

   c) An act of workplace harassment or discrimination, failure to prevent an act of workplace harassment or discrimination, aiding, abetting, inciting, compelling, or coercing an act of workplace harassment or discrimination, or an act of retaliation against a person for reporting or opposing workplace harassment or discrimination;

   d) An act of harassment or discrimination, or an act of retaliation against a person for reporting harassment or discrimination, by the owner of a housing accommodation;

   e) An act of sexual harassment as defined by identified sections of the Education code.

<div style="text-align:right">(530) 666-1917    LEGISLATIVE INTENT SERVICE, INC.</div>



## COMMENTS

In 2017, the #MeToo movement arrived at the Capitol's doorstep. As the Legislature faced a reckoning on how to curb a pervasive culture of sexual assault and harassment, one female lobbyist in particular made headlines. In December 2017, Pamela Lopez, a long time lobbyist and member of the Capitol community, publicly accused Assemblymember Matt Dababneh of sexually assaulting her during an event in Las Vegas. After initiating a formal complaint process with the Assembly, Lopez gave a press conference detailing the incident and identifying Assemblymember Dababneh. Multiple media sources immediately reported on Lopez's account. In August 2018, Dababneh sued Lopez for both her complaint to the Assembly and the subsequent press conference, claiming both defamation and intentional infliction of emotional distress. In October, Lopez filed an anti-SLAPP motion, arguing that both her complaint to the Assembly and the press conference were protected by California's anti-SLAPP statute. Looking at the protections provided under Civil Code Section 47, the trial court ultimately held in Lopez's favor on the claim relating to her complaint to the Assembly, but that her statements to the press did not benefit from the same privilege and thus, Lopez was potentially vulnerable to Dababneh's claim of defamation and intentional infliction of emotional distress. While Lopez was ultimately successful on appeal, where the court held that her statements to the press did, in fact, fall under the privilege provided under Civil Code section 47, the initial trial decision nonetheless highlighted a concern for many who experience sexual assault and harassment.

*Privileged Communication and the Definition of Malice*: At common law, libel and slander were strict liability torts: the state of mind of the speaker or writer was not relevant, so the plaintiff only needed to show that there was a defamatory statement that caused reputational harm to the plaintiff and that the statement was "published" – which simply meant that it reached one person other than the defamed plaintiff. At common law, falsity was not a required element of the tort of defamation; however, the defendant could raise truth as a complete defense. While this may seem like a distinction without a difference – a defendant is liable for false statements in either case – the significance of the distinction lays in which party bears the burden of proof. As an element of the tort, the burden is on the plaintiff to show that the statement is false; as a defense, the burden is on the defendant to show that the statement is true. As codified in the California Civil Code, however, falsity is effectively an element, because defamation is defined as any "false and unprivileged publication" which defames (i.e. injures the reputation of) the plaintiff. The Civil Code does not define what an "unprivileged" publication means, but rather lists a number of "privileged publications" in Civil Code Section 47. Presumably an "unprivileged publication" is anything not listed in Section 47 or not expressly privileged in some other statute.

Under Civil Code Section Section 47(c), a communication is privileged only if it is made "without malice." For purposes of defamation law, malice means publishing a false and defamatory statement knowing it to be false or with reckless disregard of whether that statement is true or false. (See *New York Times Co. v. Sullivan* (1964) 376 U.S. 254.) California courts have adopted a definition that effectively combines this definition, in the disjunctive, with the more popular meanings of "malice" as requiring some ill intent. For example, the California jury instructions for Civil Code Section 47(c) define malice as requiring either 1) that the statement evinces "hatred or ill-will toward the plaintiff" or 2) "that [the defendant] had no reasonable grounds for believing the truth of the statement." (CACI 1723, citing *Taus v. Loftus 40 Cal 4th 683 (2007);* see also *Schep v. Capitol One N.A.* (2017) 12 Cal.App.5th 1331, 1337.)

(530) 666-1917    LEGISLATIVE INTENT SERVICE, INC.



*This bill,* while arguably codifying existing law as evidenced by Lopez's ultimate success on appeal, would also potentially help curb any unnecessary, and ultimately unsuccessful, litigation against individuals who choose to come forward with their stories of sexual assault and harassment. The bill expands the privileges already encompassed in Section 47 of the Civil Code to include communications made by an individual who has experienced an incident of sexual assault, harassment, or discrimination, regardless of whether or not they have filed any formal complaint regarding the same. The protections proposed by the bill would apply to individuals who, after relaying any factual statement, whether in the form of a formal complaint or a statement outside a formal proceeding such as to a media outlet, is sued for defamation. The bill only applies to a statement by an individual who has experienced sexual harassment, assault, or discrimination. That is to say that the *perpetrator* of an incident of sexual harassment, assault, or discrimination would *not* be covered by the expanded protections.

Additionally, the bill provides significant remedies for successful defendants in defamation claims. By extending the protection of privilege provided by existing Section 47 to explicitly include true statements made by an individual who has experienced sexual harassment, assault, or discrimination about that incident, the bill likely functions to dissuade litigation against those who have made the difficult decision to come forward about their experiences. By doing so, this bill would also have the potential side effect of encouraging survivors of sexual assault, harassment, or discrimination to come forward with information regarding their experiences and help protect other individuals who may face similar situations. Further, a perpetrator who would otherwise opt to silence survivors by targeting them with litigation may be further dissuaded from filing a defamation claim due to the significant potential damages and penalties provided by this bill.

**According to the Author**

> Strategic Lawsuits Against Public Participation (SLAPP) are increasingly being used as a weapon to threaten, silence, intimidate, and dissuade survivors of sexual assault, harassment, and discrimination from speaking out against their abusers and exposing predators. AB 933 expands protections for speech made by a survivor, without malice, about their own experience of sexual assault, harassment, or discrimination. This bill would make it harder for perpetrators to retaliate against survivors with legal threats and intimidation, but does not apply to unfounded claims. The protections in this bill will help encourage survivors to speak their truth and expose the behavior of those who harmed them. In addition, AB 933 helps take the burden off of survivors by providing reasonable attorneys' fees and damages if they successfully defend themselves against meritless lawsuits.

**Arguments in Support**

This measure is supported and sponsored by the California Employment Lawyers Association (CELA) and Equal Rights Advocates (ERA). In support of the measure, they write:

> AB 933 will ensure survivors of sexual assault, harassment, and discrimination are adequately protected from defamation lawsuits by clarifying that claims made in good faith are a form of protected speech. In doing so, the bill would make it harder for perpetrators to retaliate against survivors with legal threats and intimidation. The protections in this bill will help encourage survivors to speak their truth and expose the behavior of those who harmed

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917



**AB 933**
Page  4

them. This bill also provides relief to survivors in the form of reasonable attorneys' fees and damages for successfully defending themselves against these retaliatory lawsuits.

**Arguments in Opposition**
None on file

## FISCAL COMMENTS

None

## VOTES

**ASM JUDICIARY:  8-0-3**
**YES:**  Maienschein, Connolly, Haney, Kalra, Pacheco, Papan, Reyes, Robert Rivas
**ABS, ABST OR NV:**  Essayli, Dixon, Sanchez

## UPDATED

VERSION: March 22, 2023

CONSULTANT:  Manuela Boucher-de la Cadena / JUD. / (916) 319-2334          FN: 0000158



LEGISLATIVE INTENT SERVICE, INC.    (530)  666-1917

**SENATE JUDICIARY COMMITTEE**
Senator Thomas Umberg, Chair
2023-2024 Regular Session

AB 933 (Aguiar-Curry)
Version: May 25, 2023
Hearing Date: June 13, 2023
Fiscal: No
Urgency: No
AWM

### SUBJECT

Privileged communications: incident of sexual assault, harassment, or discrimination

### DIGEST

This bill makes privileged, and therefore excluded from the category of communications that can constitute defamation, a communication made by an individual, without malice, regarding an incident of sexual assault, harassment, or discrimination, and authorizes a prevailing defendant in a defamation action arising from such a privileged communication to recover reasonable attorney fees, costs, and other specified relief.

### EXECUTIVE SUMMARY

Defamation can cause real harm to the targets of false statements. The tort of defamation, however, is frequently abused by persons who use the legal system as a means of chilling legitimate speech and political activity; such suits are known as strategic lawsuits against public participation, or "SLAPP" suits. Plaintiffs in SLAPP suits bring defamation, and similar claims, not because they expect to win, but because they know that the cost and burden of defending a lawsuit can wear down and silence critics, particularly when the critic is an individual without the resources to defend against a lawsuit. SLAPP suits also serve as a warning to other potential critics: stay silent, or you could be next. In recognition of the harm SLAPP suits inflict on free speech and public debate, California has a strong anti-SLAPP statute that allows the targets of SLAPP suits to have the case dismissed early on in the proceeding and recover attorney fees and costs.

Unfortunately, current defamation law does not expressly privilege conversations relating to allegations of sexual assault, abuse, or discrimination, leaving victims of these offenses open to retaliatory defamation claims that cannot easily be dispensed with through an anti-SLAPP motion. In one high-profile instance involving the Legislature, former Assemblymember Matt Dababneh was accused of extreme sexual



LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

AB 933 (Aguiar-Curry)
Page 2 of 11

harassment by a lobbyist; an explicit description of the allegations is set forth in the second paragraph of Part 3 of this analysis. After resigning from the Legislature and shortly before the allegations were substantiated by an independent investigator, Dababneh filed a defamation suit against his accuser. His accuser ultimately prevailed on her anti-SLAPP motion to strike, but only after appealing the case to the Court of Appeal, which held that her statements to the media in connection with her complaint to the Legislature were privileged as statements in connection with a Legislature proceeding. Most victims, however, will not make their complaints to the Legislature and thus may be left open to SLAPP defamation claims when they speak to members of the public or the media about their allegations.

This bill seeks to disincentivize and make it more difficult for abusers and discriminators to file retaliatory defamation claims against their accusers. First, the bill creates a conditional privilege for communications made by an individual regarding an incident of sexual assault, harassment, or discrimination, as defined, provided that the statement was made without malice and the person had a reasonable basis to file a complaint of sexual assault, harassment, or discrimination (whether or not a complaint was actually filed). Second, the bill permits a prevailing defendant in a defamation action brought against the defendant for making such privileged communications to recover reasonable attorney fees and costs, in addition to other damages that are already available at law. Together, these measures are intended to provide protection for victims of sexual assault, harassment, and discrimination.

This bill is sponsored by the California Employment Lawyers Association and Equal Rights Advocates, and is supported by 9to5, the American Association of University Women – California , the American Association of University Women San Jose, the California Anti-SLAPP Project, the California Partnership to End Domestic Violence, the California Work & Family Coalition, Caring Across Generations, the Child Care Law Center, Consumer Attorneys of California, GRACE – End Child Poverty in California, Legal Aid at Work, the Lutheran Office of Public Policy – California, Media Alliance, Mujeres Unidas y Activas, the National Council of Jewish Women California, Parent Voices California, the Santa Clara County Wage Theft Coalition, ValorUS, Women's Foundation California, Work Equity, and Worksafe. There is no known opposition.

<div align="center"><u>**PROPOSED CHANGES TO THE LAW**</u></div>

Existing law:

1)  Provides that "defamation" is effected by either libel or slander, and defines those terms as follows:
    a)  "Libel" is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes them to be shunned or avoided, or which has a tendency to injure him in his occupation.

(530) 666-1917    LEGISLATIVE INTENT SERVICE, INC.



AB 933 (Aguiar-Curry)
Page 3 of 11

  b) "Slander" is a false and unprivileged publication, orally uttered, and also communications by radio or any mechanical or other means which causes actual damage to a person, including through specifically enumerated damaging allegations such as charging a person with crime or their qualifications with respect to their profession. (Civ. Code, §§ 44-46.)

2) Provides that specified publications are "privileged," including:
  a) A publication or broadcast made in the proper discharge of an official duty.
  b) A publication or broadcast made in any legislative or judicial proceeding.
  c) A communication made without malice to an interested person by one who is also interested, or by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or who is requested by the person interested to give the information; this includes a complaint of sexual harassment by an employee, without malice, to an employer based upon credible evidence and communications between the employer and interested persons, without malice, regarding a complaint of sexual harassment.
  d) A fair and true report in, or a communication to, a public journal regarding a judicial, legislative, or other public or official proceeding, as specified. (Civ. Code, § 47.)

3) Defines "malice," where the absence of malice is necessary to render a publication privileged, to mean that the speaker "(1) was motivated by hatred or ill will toward the plaintiff, or (2) lacked reasonable grounds for [their] belief in the truth of the publication and therefore acted in reckless disregard of the" subject's rights. (*Schep v. Capital One, N.A.* (2017) 12 Cal.App.5th 1331, 1337 (internal quotation marks omitted).)

4) Establishes the anti-SLAPP statute, which provides that a cause of action against a person arising from any act of that person in furtherance of that person's right of petition or free speech under the United States or California Constitutions in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.
  a) A defendant who prevails on an anti-SLAPP motion to strike is entitled to recover attorney fees and costs, with specified exemptions; if the court finds that an anti-SLAPP motion was frivolous or solely intended to cause delay, the court shall award costs and reasonable attorney fees to the prevailing plaintiff.
  b) An "act in furtherance of a person's right of petition or free speech" under the state and federal Constitutions includes (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by

LEGISLATIVE INTENT SERVICE, INC. (530) 666-1917

AB 933 (Aguiar-Curry)
Page 4 of 11

> a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest. (Code Civ. Proc., § 425.16.)

This bill:

1) Defines "communication" as factual information related to an incident of sexual assault, harassment, or discrimination experienced by the individual making the communication, including, but not limited to, any of the following:
    a) An act of sexual assault.
    b) An act of sexual harassment, as defined in Civil Code section 51.9.
    c) An act of workplace harassment or discrimination; failure to prevent an act of workplace harassment or discrimination; aiding, abetting, inciting, compelling, or coercing an act of workplace harassment or discrimination; or an act of retaliation against a person for reporting or opposing workplace harassment or discrimination, as set forth in subdivision (a), (h), (i), (j), or (k) of Government Code section 12940.
    d) An act of harassment or discrimination, or an act of retaliation against a person for reporting harassment or discrimination, by the owner of a housing accommodation, as described in Government Code section 12955.
    e) An act of harassment or discrimination, or an act of retaliation against a person for reporting an act of harassment or discrimination, based on any of the protected classes enumerated in Education Code sections 220, 221.51, or 66270.
    f) An act of sexual harassment or cyber sexual bullying, as defined in Education Code sections 212.5, 48900, or 66262.5.

2) Provides that a communication made by an individual, without malice, regarding an incident of sexual assault, harassment, or discrimination is privileged.

3) Authorizes a prevailing defendant in any defamation action brought against that defendant for making a communication that is privileged under 2) shall be entitled to their reasonable attorney fees and costs for successfully defending themselves in the action, plus treble damages for any harm caused to them by the defamation action against them, in addition to punitive damages as permitted under Civil Code section 3294 and any other relief otherwise permitted by law.

4) Provides that 1)-3) apply only to an individual that has, or at any time had, a reasonable basis to file a complaint of sexual assault, harassment, or discrimination, whether the complaint is, or was, filed or not.

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

AB 933 (Aguiar-Curry)
Page 5 of 11

**COMMENTS**

1.  Author's comment

According to the author:

> Strategic Lawsuits Against Public Participation (SLAPP) are increasingly being used as a weapon to threaten, silence, intimidate, and dissuade survivors of sexual assault, harassment, and discrimination from speaking out against their abusers and exposing predators. AB 933 expands protections for speech made by a survivor, without malice, about their own experience of sexual assault, harassment, or discrimination. This bill would make it harder for perpetrators to retaliate against survivors with legal threats and intimidation, but does not apply to unfounded claims. The protections in this bill will help encourage survivors to speak their truth and expose the behavior of those who harmed them. In addition, AB 933 helps take the burden off of survivors by providing reasonable attorneys' fees and damages if they successfully defend themselves against meritless lawsuits.

2.  Defamation, SLAPP suits, and the anti-SLAPP process

The tort of defamation is, broadly speaking, making a false statement orally (slander) or in writing (libel) about another person that causes harm to that person.[1] "The *sine qua non* of discovery for defamation is the existence of a falsehood," which, when coupled with harm, results in statements that fall outside of First Amendment protection.[2] "The elements of a defamation claim are (1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes special damage."[3] With respect to prong (4), statute defines which communications are "privileged," leading to the negative implication that communications not included are unprivileged.[4] Over the years, the Legislature has added to the list of privileged communications to further public policy goals; privileged statements include a "fair and true report" to the media about ongoing judicial and legislative proceedings,[5] and an employee's report or complaint of sexual harassment based on credible evidence and made without malice.[6]

---

[1] Civ. Code, §§ 45-47.

[2] *Baker v. Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 259-260 (internal quotation marks and alterations omitted).

[3] *Laker v. Board of Trustees of California State University* (2019) 32 Cal.App.5th 745, 763 (internal quotation marks omitted).

[4] Civ. Code, § 47.

[5] *Id.*, § 47(d).

[6] *Id.*, § 47(c); *see* AB 2270 (Irwin, Ch. 82, Stats. 2018). The statute establishes that some statements are absolutely privileged—such as statements made in any judicial or legislative proceeding—while others are conditionally privileged, based on whether the speaker acted with malice. (Civ. Code, § 47; *see Schep v.*



LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

AB 933 (Aguiar-Curry)
Page 6 of 11

Defamation suits can serve the vital purpose of allowing a person harmed by the false statements of another to be compensated for that harm.[7] Unfortunately, the tort of defamation is also a frequent tool of persons who would chill legitimate speech in the form of SLAPP suits.[8] In a SLAPP suit, the plaintiff filed the lawsuit not because they expect to win—indeed, winning is not the point—but to use the cost and emotional toll of a lawsuit to (1) bully the defendant into silence or retaliate for speaking out against the plaintiff, and (2) intimidate others who might speak out, thereby chilling additional legitimate speech.[9]

California enacted its anti-SLAPP suit in response to "a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and the petition for the redress of grievances."[10] The anti-SLAPP statute should "be construed broadly" to serve the goals of encouraging participation in matters of public significance and ensuring that participation is not chilled through abuse of the judicial process.[11]

As explained by the California Supreme Court:

> The anti-SLAPP statute's core provision authorizes defendants to file a special motion to strike a cause of action against a person arising from the petition or speech activities of that person in connection with a public issue. Such motions shall be granted unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim. The analysis of an anti-SLAPP motion proceeds in two steps: First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. If the court finds such a showing has been made, it then must consider whether the plaintiff has demonstrated a probability of prevailing on the claim. At this second step of the analysis, a trial court considers the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based in evaluating the plaintiff's probability of success. The court accepts as true the evidence favorable to the plaintiff and evaluates the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of

---

*Capital One, N.A.* (2019) 12 Cal.App.5th 1331, 1337.) This bill establishes a conditional, not an absolute, privilege.

[7] *E.g., Carroll v. Trump* (1:20-cv-07311).

[8] *E.g.,* Pring & Canan, SLAPPs: Getting Sued for Speaking Out (1996), p. 217; *Last Week Tonight with John Oliver*, "SLAPP Suits" (HBO, originally aired Nov. 10, 2019), *available at* https://www.youtube.com/watch?v=UN8bJb8biZU. All links in this analysis are current as of June 8, 2023.

[9] Pring & Canan, *supra*, at pp. 8-9.

[10] Code Civ. Proc., § 425.16(a).

[11] *Ibid.; e.g., Barry v. State Bar of California* (2017) 2 Cal.5th 318, 321.

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

AB 933 (Aguiar-Curry)
Page 7 of 11

> law. Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute is a SLAPP, subject to being stricken under the statute.[12]

When an anti-SLAPP motion is filed in a defamation suit, the second prong of the anti-SLAPP inquiry requires an examination of whether the statements at issue were privileged.[13] If the defendant establishes that the statements were privileged, then the plaintiff cannot satisfy all of the elements of the defamation claim and therefore cannot establish a likelihood of success on the merits of the claim, and the anti-SLAPP motion should be granted.[14]

### 3.   #MeToo and retaliatory SLAPP suits

Tarana Burke founded the #MeToo movement in 2006; the movement became widespread in 2017, when Alyssa Milano suggested that everyone who has been sexually harassed or assaulted write "me too" in response, and millions of people did.[15] This viral moment coincided with other high-profile allegations of abuse by powerful individuals and systematic institutional failures to protect victims or punish abusers.[16] Sadly, but perhaps predictably, many persons accused of sexual abuse or harassment turned around and filed defamation claims against their accusers.[17] Numerous legal commenters have written about the increase in defamation suits being used to silence people making allegations of sexual abuse or harassment, and the chilling effect it has on others who might otherwise come forward.[18]

The Legislature is no stranger to the #MeToo movement.[19] Among the lawmakers accused of sexual misconduct is former Assemblymember Matt Dababneh. Pamela Lopez, a lobbyist, filed a complaint with the Legislature alleging that Dababneh "forced her into a Las Vegas hotel suite bathroom during a party in 2016, masturbated in front of her and urged her to touch him."[20] An independent investigator hired by the

---

[12] *Barry*, *supra*, 2 Cal.5th at p. 321 (internal citations, quotation marks, and alterations omitted).

[13] *E.g.*, *Laker*, *supra*, 32 Cal.App.5th at pp. 768-769.

[14] *Ibid.*

[15] Weisbrot, *The Impact of the #MeToo Movement on Defamation Claims Against Survivors* (2020) 23 CUNY L.Rev. 332, 332.

[16] *Ibid.*

[17] *E.g.*, Pauly, *She Said, He Sued*, Mother Jones (Mar./Apr. 2020).

[18] *E.g.*, Weisbrot, *supra*; Ligon, *Protecting Women's Voices: Preventing Retaliatory Claims in the #MeToo Context* (2021) 94 St. J. L. Rev. 961; Whynot, *Retaliatory Defamation Suits: The Legal Silencing of the #MeToo Movement* (2020) 94 Tul. L. Rev. Online 1; Leader, *A "SLAPP" in the Face of Free Speech: Protecting Survivors' Rights to Speak Up in the "Me Too" Era* (2019) 17 First Am. Law Rev. 441.

[19] *E.g.*, Mason, *Female lawmakers, staffers and lobbyists speak out on 'pervasive' harassment in California's Capitol*, L.A. Times (Oct. 17, 2017), *available at* https://www.latimes.com/politics/la-pol-ca-women-harassment-capitol-20171017-story.html.

[20] Mason, *Legislative investigation substantiates complaint against ex-Assemblyman Matt Dababneh*, LA Times (Aug. 27, 2018), *available at* https://www.latimes.com/politics/la-pol-ca-matt-dababneh-investigation-20180827-story.html.

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917



AB 933 (Aguiar-Curry)
Page 8 of 11

Assembly Rules Committee substantiated Lopez's claim.[21] Dababneh resigned prior to the findings and filed a defamation claim against Lopez.[22] The lawsuit alleged that the statements Lopez made in her claim to the Legislature, and to the press in connection with that claim, were defamatory.[23] Lopez filed an anti-SLAPP motion to strike, which the trial court granted with respect to her statements to the Legislature, but not to the press.[24] Lopez appealed the ruling and the Court of Appeal, in an unpublished opinion, held that the trial court erred in finding that Lopez's statements to the press were not privileged under the "fair and true reporting privilege" contained in Civil Code section 47(d).[25]

4.    This bill clarifies that a communication made without malice about an incident of sexual assault, harassment, or discrimination is privileged

Lopez ultimately prevailed on her anti-SLAPP motion because her complaint was filed with the Legislature, so it fell under the statutory privilege for statements made in connection with legislative and judicial proceedings. Most perpetrators of sexual abuse, harassment, and discrimination, however, are not legislative or judicial officers or employees, so most victims will not have this privilege available to them. As such, most victims will remain vulnerable to the silencing effect of SLAPP suits filed in response to claims of sexual abuse, harassment, and discrimination.

This bill is intended to prevent SLAPP suits against actual victims of sexual abuse, harassment, and discrimination, both to protect the victims who come forward and to provide victims who are considering coming forward with greater assurances that they will not be the target of a baseless revenge suit.

First, the bill creates a conditional privilege for communications made regarding an incident of sexual assault, harassment, or discrimination. The bill defines these categories with cross-references to existing statutes, to ensure that the scope of the statements is clear. The privilege itself is conditioned on two factors: the communication must be made without malice, and can be made only by an individual who has, or at any time had, a reasonable basis to file a complaint of sexual assault, harassment, or discrimination, whether or not the complaint was filed. By making the privilege conditional on the presence of a good faith claim, rather than absolute, the bill ensures that false, defamatory allegations will not be privileged.

Second, the bill allows a prevailing defendant in a defamation suit arising from communications that are privileged under the bill to recover reasonable attorney fees and costs for the costs of defending the suit, as well as (1) treble damages in any claims

_____

[21] *Ibid.*
[22] *Ibid.*
[23] *Dababneh v. Lopez* (Oct. 1, 2021, C08848) [nonpub. opn.] 2021 WL 4487407, *1.
[24] *Ibid.*
[25] *Id.* at pp. *12-14.

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

AB 933 (Aguiar-Curry)
Page 9 of 11

the defendant may have had against the plaintiff, and (2) any other damages already authorized by law, including punitive damages. These provisions provide a level of protection for defendants in baseless defamation suits that cannot be disposed of in an anti-SLAPP motion to strike. A court considering an anti-SLAPP motion to strike must take the plaintiff's version of the evidence as true, so a plaintiff could likely overcome the privilege at the anti-SLAPP stage with a declaration stating that the defendant's allegations of sexual abuse, harassment, or discrimination were false. Under current law, a defamation defendant generally has no further means to recover costs or attorney fees if it turns out that the plaintiff was lying—so even if the defendant prevails, the victory may be hollow because of the crushing legal fees they had to incur. This bill adds a layer of protection by giving the defendant a second chance, after they prevail, to recover the reasonable attorney fees and costs they were forced to expend in defending themselves against a retaliatory defamation suit. Ideally, however, this bill's fee-shifting provisions will deter SLAPP suits against the victims of sexual abuse, harassment, and discrimination before they are filed.

According to the California Employment Lawyers Association and Equal Rights Advocates, the sponsors of the bill:

> The threat of having to engage in years of litigation, relive the personal trauma of abuse in court, and take on the burden of responding to an expensive, resource draining SLAPP suit further harms survivors and causes a chilling effect that discourages others from coming forward to share their experience. In fact, the financial burden of defending against a defamation suit is one of the main reasons those suits tend to evoke so much fear in survivors. As news coverage of this abusive litigation tactic increases, our organizations are regularly contacted by workers, students, and others who are too fearful to speak out about sexual harassment and violence they have experienced for fear of being hit with a retaliatory defamation suit. Even if they will ultimately prevail against such an attack, survivors are often unable to take on the cost and emotional toll of such lengthy and costly litigation…
>
> AB 933 will ensure survivors of sexual assault, harassment, and discrimination are adequately protected from defamation lawsuits by clarifying that claims made in good faith are a form of protected speech. In doing so, the bill would make it harder for perpetrators to retaliate against survivors with legal threats and intimidation. The protections in this bill will help encourage survivors to speak their truth and expose the behavior of those who harmed them. This bill also provides relief to survivors in the form of reasonable attorneys' fees and damages for successfully defending themselves against these retaliatory lawsuits.

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917




AB 933 (Aguiar-Curry)
Page 10 of 11

## SUPPORT

California Employment Lawyers Association (co-sponsor)
Equal Rights Advocates (co-sponsor)
9to5
American Association of University Women – California
American Association of University Women San Jose
California Anti-SLAPP Project
California Partnership to End Domestic Violence
California Work & Family Coalition
Caring Across Generations
Child Care Law Center
Consumer Attorneys of California
GRACE – End Child Poverty in California
Legal Aid at Work
Lutheran Office of Public Policy – California
Media Alliance
Mujeres Unidas y Activas
National Council of Jewish Women California
Parent Voices, California
Santa Clara County Wage Theft Coalition
ValorUS
Women's Foundation California
Work Equity
Worksafe

## OPPOSITION

None known

## RELATED LEGISLATION

Pending Legislation: None known.

Prior Legislation:

AB 1775 (Jones-Sawyer, Ch. 327, Stats. 2020) provided that a communication between a
person and a law enforcement agency in which the person makes a false report that
another person has committed, or is in the act of committing, a criminal act or is
engaged in an activity requiring law enforcement intervention, knowing that the report
is false, or with reckless disregard for the truth or falsity of the report, is not privileged
for purposes of a libel or slander action.

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917



AB 933 (Aguiar-Curry)
Page 11 of 11

AB 2770 (Irwin, Ch. 82, Stats. 2018) clarified that (1) employees who report sexual harassment to their employer are not liable for any resulting injury to the alleged harasser's reputation, so long as the communication is made based on credible evidence and without malice; (2) communications between employers and anyone with an interest in a sexual harassment complaint, such as victims and witnesses, are not liable for any resulting damage to the alleged harassers reputation, as long as the communication is made without malice; and (3) former employers are not liable for any resulting injury to a former employee's reputation if, in response to inquiries from prospective employers, the former employers indicate that they would not rehire the former employee based on a determination that the former employee engaged in sexual harassment, so long as the statement is made without malice.

## PRIOR VOTES:

Assembly Floor (Ayes 60, Noes 2)
Assembly Judiciary Committee (Ayes 8, Noes 0)


**************



LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917



SENATE COMMITTEE ON JUDICIARY
Thomas J. Umberg, Chair
**BACKGROUND INFORMATION REQUEST**

Please complete and return **this form and all supporting materials** (including all support/opposition letters) **within seven (7) calendar days of receipt of this background information request form**. **A bill cannot be heard if a completed worksheet and all supplemental materials are not provided to the Committee.**

**Letters** can be submitted via the Portal, directly to the Committee via email (sjud.fax@sen.ca.gov), by fax ((916) 403-7394), or by mail. The Author's office is responsible for ensuring the Committee receives letters in a timely matter. Letters are due the Tuesday before the Tuesday hearing at 12p.m. Letters received after the deadline may not be reflected in the Committee's analysis. **Please see our website for more details on our letter policy:** https://sjud.senate.ca.gov/content/senate-judiciary-committee-policy-support-and-opposition-letters

Please e-mail this completed background information request form and any attachments to:
- Erica Porter (Erica.Porter@sen.ca.gov), Senate Judiciary Committee Assistant
- Morgan Branch (Morgan.Branch@sen.ca.gov), Republican Policy Unit

**Measure:** AB 933

**Author:** Aguiar-Curry

**Subject:** Privileged communications: complaint of sexual assault, harassment, or discrimination.

**Legislative staff person:** Rita Durgin

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

1. **Please provide the author's statement regarding this bill. The statement should be no more than 500 words and can be edited down. The author's statement may be quoted verbatim or paraphrased into the analysis.**

Strategic Lawsuits Against Public Participation (SLAPP) are increasingly being used as a weapon to threaten, silence, intimidate, and dissuade survivors of sexual assault, harassment, and discrimination from speaking out against their abusers and exposing predators. AB 933 expands protections for speech made by a survivor, without malice, about their own experience of sexual assault, harassment, or discrimination. This bill would make it harder for perpetrators to retaliate against survivors with legal threats and intimidation, but does not apply to unfounded claims. The protections in this bill will help encourage survivors to speak their truth and expose the behavior of those who harmed them.  In addition, AB 933 helps take the burden off of survivors by providing reasonable attorneys' fees and damages if they successfully defend themselves against meritless lawsuits.



LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

2. Origin of the bill:

    **a. Is there a sponsor of the bill?** Yes

    **b. If so, what person, organization, or governmental entity requested introduction? Please provide contact information.**

        **CA Employment Lawyers Association (co-sponsor)**
        Mariko Yoshihara, Esq.
        Legislative Counsel & Policy Director
        (916) 340-5084
        mariko@cela.org

        **Equal Rights Advocates (co-sponsor)**
        Jessica Stender –Policy Director and Deputy Legal Director
        415-575-2394
        jstender@equalrights.org

    **c. What is the origin or genesis of the bill?**

- Dababneh v. Lopez, No. C088848 (Please see attached case)
  The Lopez decision includes citations to all of the relevant statutes and cases. Note: this decision is unpublished. The main relevant statutes are:

  - California Civil Code 47: Privileged Communications
  - California Code of Civil Procedure 425.16: Anti-SLAPP
  - 

In December 2017, Pamela Lopez, a long time lobbyist and member of the Capitol community, publicly accused Assemblymember Matt Dababneh of sexually assaulting her during an event in Las Vegas. After initiating a formal complaint process with the Assembly, Lopez gave a press conference detailing the incident and identifying Assemblymember Dababneh. In August 2018, Dababneh sued Lopez for both her complaint to the Assembly and the subsequent press conference, claiming both defamation and intentional infliction of emotional distress. Looking at the protections provided under Civil Code Section 47, the trial court ultimately held in Lopez's favor on the claim relating to her complaint to the Assembly, but found that her statements to the press did not benefit from the same privilege and thus, Lopez was potentially vulnerable to Dababneh's claim of defamation and intentional infliction of emotional distress. While Lopez was ultimately successful on appeal, where the court held that her statements to the press did, in fact, fall under the privilege provided under Civil Code section 47, the initial trial decision nonetheless highlighted a concern for many who experience sexual assault and harassment.

    **d. Has a similar bill been introduced in this or any previous legislative session? If so, please identify the bill number and year.**

    **AB 2770 (Irwin, 2018)** codified California defamation case law as it relates to allegations of workplace sexual harassment, making it explicit in statute that:

    (1) employees who report sexual harassment to their employer are not liable for any resulting injury to the alleged harasser's reputation, so long as the communication is made based on credible evidence and without malice;

    (2) communications between employers and anyone with an interest in a sexual harassment complaint, such as victims and witnesses, are not liable for any resulting

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917



SP - 2

damage to the alleged harassers reputation, as long as the communication is made without malice; and,

(3) former employers are not liable for any resulting injury to a former employee's reputation if, in response to inquiries from prospective employers, the former employers indicate that they would not rehire the former employee based on a determination that the former employee engaged in sexual harassment, so long as the statement is made without malice. **Signed into law - Chapter 82, Statutes of 2018.**

e. **Has there been an interim committee report or informational hearing on the bill or its subject matter? If so, please identify the report or informational hearing and attach any related information.**

In 2017, the Assembly Rules Subcommittee held a series of hearings regarding how the Assembly handles sexual misconduct and harassment.

- [California Assembly Targets Itself On Sexual Misconduct - capradio.org](#)
- [California Assembly hearing on sexual harassment policies leaves unanswered questions - Los Angeles Times (latimes.com)](#)

3. **Please describe in detail existing law on this issue. Please identify and describe any relevant state and/or federal court decisions.**

Existing law makes certain publications and speech—including complaints of sexual harassment—privileged and protected from civil defamation actions. However, these protections are limited, leaving survivors potentially open to defamation lawsuits if they engage in certain forms of speech. The right to speak out must be protected in order to provide survivors with a safe outlet to report and communicate their truth, and protect others from such abuse, without fear of legal retaliation.

<u>**Chilling Effect of Defamation Lawsuits:**</u>

- **Mitchell v. Fujitec Am., Inc., 518 F. Supp. 3d 1073, 1086 (S.D. Ohio 2021)**
  "McKenzie notes the chilling effect that could arise with regard to reporting of sexual harassment, should those who report such allegations face potential liability for defamation." Id. at 1086.

  "The Court concedes that this result is troubling in at least one regard. As McKenzie notes in her Motion, there is a strong public policy in favor of reporting workplace misconduct. **The pleading rule reflected above, as she also notes, could have a chilling effect** on such reporting. Essentially, any time a sexual harassment claim includes objectively verifiable facts (e.g., "Employee A inappropriately touched me at the office party"), and the accused person disputes those facts in his or her complaint in an objectively verifiable way (e.g., "I was never even in the same room as my accuser at that party"), that appears to be enough to survive dismissal. In such cases, the plaintiff's allegation, if believed, necessarily entails that the defendant is lying, which under Ohio law deprives that person of the qualified privilege. See Gintert, 2007 WL 4376178, at *6 (holding that qualified privilege would not apply if a sexual harassment allegation is false). Id. at 1094.

- **AB 2770 (Irwin) Statutes of 2018**



LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

This bill codified California defamation case law as it related to allegations of workplace sexual harassment, making it explicit in statute that: (1) employees who report sexual harassment to their employer are not liable for any resulting injury to the alleged harasser's reputation, so long as the communication is made based on credible evidence and without malice; (2) communications between employers and anyone with an interest in a sexual harassment complaint, such as victims and witnesses, are not liable for any resulting damage to the alleged harassers reputation, as long as the communication is made without malice; and (3) former employers are not liable for any resulting injury to a former employee's reputation if, in response to inquiries from prospective employers, the former employers indicate that they would not rehire the former employee based on a determination that the former employee engaged in sexual harassment, so long as the statement is made without malice.

**CA Bill Analysis, Senate Judiciary Committee., 6/12/2018** In support of AB 2770, the American Association of University Women of California writes: "We agree that too often perpetrators file unwarranted lawsuits against victims and employers for statements made during sexual harassment investigations, and that the expense and hardships created by those lawsuits have a chilling effect on victims' willingness to come forward. We applaud the goal of AB 2770 to protect those communications from lawsuits."

- **Wilcoxon v. Red Clay Consol. Sch. Dist. Bd. of Educ., 437 F. Supp. 2d 235, 248 (D. Del. 2006)** "Defendant Freebery contends that the defamation claim must be dismissed quickly as a matter of public policy to avoid a chilling effect on other sexual harassment claims. In other words, defendant Freebery proposes that the continued subjection to a defamation claim concerning her publication of plaintiff's alleged sexual harassment will discourage others who have been sexually harassed from reporting the incident. See Vickers v. Abbott Lab., 308 Ill.App.3d 393, 241 Ill.Dec. 698, 719 N.E.2d 1101, 1109 (1999) (stating qualified privilege in the defamation context protects the victims, witnesses, and investigators of sexual harassment, and if no privilege existed, victims would be "handcuffed" by the fear of defamation liability). Wilcoxon v. Red Clay Consol. Sch. Dist. Bd. of Educ., 437 F. Supp. 2d 235, 248 (D. Del. 2006)

- **Dodds v. Am. Broad. Co., 145 F.3d 1053, 1064 (9th Cir. 1998)** "[W]e continue to believe that the Newton test requiring a clear and convincing showing of subjective or actual intent strikes the proper balance between protecting victims of defamation and protecting against the possible chilling effect that results from overly broad applications of our defamation laws."

- **Vickers v. Abbott Lab'ys, 308 Ill. App. 3d 393, 402–03 (1999)** "A recent United States Supreme Court decision governing sexual harassment in the workplace has made clear that there is a compelling interest in ridding workplaces of sexual harassment, and specifically an obligation of employers to " 'take all steps necessary to prevent sexual harassment from occurring' " and " 'to establish a complaint procedure designed to encourage victims of harassment to come forward.' " Faragher v. City of Boca Raton, 524 U.S. 775, 806, 118 S.Ct. 2275, 2292, 141 L.Ed.2d 662, 688 (1998), quoting 29 C.F.R. § 1604.11(f) (1997). The qualified privilege in the defamation context promotes this social policy and provides protection for the victims, witnesses and investigators of sexual harassment. If no privilege existed, then victims of harassment and companies with a goal of preventing harassment would be "handcuffed" by a fear of defamation liability. See Thomas v. Petrulis, 125 Ill.App.3d 415, 421–22, 80 Ill.Dec. 713, 465 N.E.2d 1059 (1984)



LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

(finding that "important policy considerations weigh in favor of *403 protecting the statements in an EEOC charge with an absolute privilege").

4. **What is the problem or deficiency in current law that this bill seeks to remedy? Please describe in detail.**

Strategic Lawsuits Against Public Participation (SLAPP) are increasingly being used as a weapon to threaten, silence, intimidate, and dissuade survivors of sexual assault, harassment, and discrimination from speaking out against their abusers and exposing predators. AB 933 expands protections for speech made by a survivor, without malice, about their own experience of sexual assault, harassment, or discrimination. This bill would make it harder for perpetrators to retaliate against survivors with legal threats and intimidation, but does not apply to unfounded claims. The protections in this bill will help encourage survivors to speak their truth and expose the behavior of those who harmed them. In addition, AB 933 helps take the burden off of survivors by providing reasonable attorneys' fees and damages if they successfully defend themselves against meritless lawsuits.

5. **What does your bill do? Please describe in detail.**

First, the bill would make privileged any communications between employers and "interested persons" regarding a complaint of sexual harassment, including, for example, statements made, without malice, in the course of an investigation of sexual harassment. Arguably, communications made in the course of an investigation of sexual harassment – an investigation that the employer is required to conduct under the Fair Employment and Housing Act – would already be deemed privileged so long as the statements were made without malice and based on a credible allegation.

Second, where existing law makes privileged an employer's answer to the question of whether or not the employer would rehire the employee, this bill would specify that this provision would include an employer's answer to the question of whether the decision to *not* rehire the employee is based upon the employer's determination that the employee had engaged in sexual harassment. Again, this answer, to be protected from a defamation action, must be made without malice. This provision of the bill is arguably a clarification of existing law. That is, existing law already allows an employer to comment on an employee's job performance and to state whether or not the employer would rehire the employee. Nothing in existing law expressly limits the contents or subject matter of these statements, thus an employer's discussion of an employee job performance might well include whether or not the employee engaged in sexual harassment. However, this bill will make it clear that such statements are privileged communications within the meaning of Civil Code Section 47 (c).

Third, this bill makes a substantial change to existing law by making an employee's complaint of sexual harassment that is made to the employer a privileged communication. Existing law applies only to the statements of *employers*, not to those of *employees*. (Although one could argue that an employee's complaint of sexual harassment to an employer could be construed as privileged under general protection under Section 47 (c) of non-malicious communications to an "interested" person.) Nonetheless, this provision of the bill is prompted by the reasonable concern that a victim of sexual harassment could face the added burden of





LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

SP - 5

enduring a defamation claim by the sexual harasser.  Indeed, the letter of support submitted by the Chamber of Commerce cites cases in which alleged harassers have sued victims for defamation

6.  **Please summarize any studies, reports, statistics, or other evidence showing that the problem exists and that the bill will address the problem. Please provide a copy of the study or a link to the study.**

- How Abusers Use the Courts Against Their Victims - The Atlantic This article cites a 2017 report from Georgia's Domestic Violence Fatality Review Project, which tracks domestic-violence-related deaths in the state, "Although there is little data on the frequency of harassing court filings, sometimes referred to as vexatious litigation, use of the court to harass victims of intimate partner violence and stalking appears to be commonplace."

- We Support Kesha's Fight for Justice: Survivors Should Not be Carved Out of Legal Protections - National Women's Law Center (nwlc.org) This article states: Survivors already face steep emotional and financial costs as a result of sexual violence, including an estimated lifetime cost of over $120,000 (please see attached report) due to medical expenses, lost productivity, and lost wages and benefits. Being forced to defend against a long and expensive retaliatory defamation lawsuit only exacerbates these tremendous costs.
- NWLC Leads Amicus Brief Supporting Kesha in Defamation Lawsuit Filed by Her Abuser Dr. Luke - National Women's Law Center. This amicus brief is on behalf of 35 other organizations to the New York Court of Appeals in *Gottwald v. Sebert* in support of singer-songwriter Kesha, who has been sued for defamation by Dr. Luke, her former producer who sexually abused her.

- Dababneh v. Lopez, No. C088848 (Please see attached case)
  The Lopez decision includes citations to all of the relevant statutes and cases. Note: this decision is unpublished. The main relevant statutes are:
    - California Civil Code 47: Privileged Communications
    - California Code of Civil Procedure 425.16: Anti-SLAPP

- **Monetary expenses:** the costs of being sued in a defamation suit are dramatic for survivors of sexual assault and harassment. (Jamie R. Abrams, The Increasing Complexity of Defamation Law in #MeToo Era Lawsuits (June 2021) In fact, the financial burden of defending against a defamation suit is one of the main reasons these suits tend to evoke so much fear in survivors. (*Chelsey N. Whynot,* Retaliatory Defamation Suits: The Legal Silencing of the #MeToo Movement (2020)) Legal costs can be extremely high: one #MeToo accuser/defendant in a defamation suit reported spending $30,000 in her own defense. (Jamie R. Abrams, The Increasing Complexity of Defamation Law in #MeToo Era Lawsuits (June 2021)

- **Psychological re-traumatization:** survivors are often forced to endure lengthy and costly discovery. Discovery can entail a number of personal and invasive requests, including requiring the survivor to sit for a deposition during which [they] will be interrogated about matters relevant to the case, having the survivor answer questions relating to the case in writing via interrogatories and requests for admission, obligating the survivor to sift through all documentation [they] ha[ve] that is relevant to the case. (Nicole Ligon,



LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

Protecting Women's Voices: Preventing Retaliatory Defamation Claims in the #MeToo Context, 94 St. John's L Rev 961, 965 (2022).

- **Disincentives survivors from speaking out:** Individuals accused of sexual misconduct are increasingly using defamation suits to silence survivors from speaking out. The increase in retaliatory defamation suits has had a chilling effect on survivor's ability to report, and experts in the field are concerned that this influx against survivors "will further discourage reporting". This fear (victim blaming, stigmatization, and officials not taking their accusations seriously, among others) can keep survivors from coming forward. (*Chelsey N. Whynot,* Retaliatory Defamation Suits: The Legal Silencing of the #MeToo Movement (2020))

- **Retaliatory defamation suits are particularly common on college campuses**
    - In recent years, defamation lawsuits have been used as a tool to respond to claims of Title IX violations on college campuses and there has been an escalation in defamation lawsuits in response to Title IX allegations. (Tyler Kingkade, As More College Students Say "Me Too," Accused Men Are Suing for Defamation, BUZZFEED NEWS (Dec. 5, 2017), https://www.buzzfeednews.com/ article/tylerkingkade/as-more-college-students-say-me-too-accused-men-are-suing/.)

    - According to research from news reports and court documents (Mother Jones, 'She Said, He Sued' (Feb. 2020), at least 100 defamation suits have been filed against accusers of sexual misconduct since 2014. The increasing number of defamation lawsuits are being filed with the purpose of fully threaten sexual assault survivors, which means that survivors are even further disincentivized to come forward with allegations.

- **Suiting Up**
    - In the past six years, there have been at least 100 lawsuits in the United States in which a person accused of abuse or sexual misconduct has sued their alleged victim for defamation, based on our review of news articles, legal databases, and records gathered from attorneys. Nearly half of the suits were filed since the MeToo hashtag went viral in October 2017. Prior to that, most cases involved college students or faculty protesting campus sexual misconduct investigations. Plaintiffs in the more recent cases include seven celebrities, five politicians, three CEOs, and one former White House aide.

7. **Please identify similar or related federal legislation or statutes and any bills or existing laws you are aware of in other states.**

   HB 2836: RIGHT TO SPEAK YOUR TRUTH ACT, Author: Rep. Mary Beth Canty. Illinois General Assembly - Bill Status for HB2836 (ilga.gov)

8. **Are the issues addressed by the bill the subject of pending litigation? If yes, please indicate the case citation and include relevant documents.**

   We are not aware of impacts to any pending litigation.



LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

SP - 7

9. **Please identify any potential concerns regarding the bill, describe those concerns, and state your response to those concerns, which may be quoted verbatim or paraphrased into the analysis.**

We have no concerns at this time aside from amending the bill.

10. **Please list all formal support and opposition.**

**Support**
American Insurance Association
California Ambulance Association
California Apartment Association
California Association for Health Services at Home
California Association of Winegrape Growers
California Bankers Association
California Business Properties Association
California Farm Bureau Federation
California Chamber of Commerce
California Hospital Association
California Manufactures and Technology Association
California Restaurant Association
California Retailers Association
California Special Districts Association
Cerritos Chamber of Commerce
Chambers of Commerce Alliance of Ventura and Santa Barbara Counties
Civil Justice Association of California
El Dorado Hills Chamber of Commerce
Gateway Chamber Alliance
Greater Coachella Valley Chamber of Commerce
Lodi Chamber of Commerce
Long Beach Area Chamber of Commerce
Murrieta Chamber of Commerce
North Orange County Chamber of Commerce
Official Police Garages of California
Oxnard Chamber of Commerce
Rancho Cordova Chamber of Commerce
San Gabriel Valley Economic Partnership
Santa Maria Valley Chamber of Commerce
Simi Valley Chamber of Commerce
Southwest California Legislative Council
The Chamber of the Santa Barbara Region
Tulare Chamber of Commerce
Wildomar Chamber of Commerce
Wine Institute

**Opposition:**

None on file



LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

11. **Please send the Committee your support and opposition letters via e-mail. The Author's office is responsible for ensuring the Committee receives letters in a timely matter. Our letter deadline is the Tuesday before the Tuesday hearing at 12 p.m. Letters received after the deadline may not be reflected in the Committee's analysis. Please see our website regarding our letter policies.**

12. Please list the witnesses you plan to have testify. The Committee allows two witnesses in support, two witnesses in opposition, and two minutes of testimony for each witness.

> **CA Employment Lawyers Association (co-sponsor)**
> Mariko Yoshihara, Esq.
> Legislative Counsel & Policy Director
> (916) 340-5084
> mariko@cela.org
>
> **Equal Rights Advocates (co-sponsor)**
> Jessica Stender –Policy Director and Deputy Legal Director
> 415-575-2394
> jstender@equalrights.org

13. **Do you plan to amend your bill?** Yes, please see attachment.

14. **If you do plan to amend your bill, please explain the substance of the amendments.**

<u>COMMITTEE POLICY ON AUTHOR'S AMENDMENTS</u>

- Please do not wait until your amendments are in Legislative Counsel Form to inform the Committee of your intent to amend your bill. **Tell the Committee IMMEDIATELY if you plan to amend your bill.**

- Amendment due dates are included in the email you received. Amendments must be in Legislative Counsel form and must include the authors' signature-either on the amendments or as an attachment. **Please email your amendments to Erica Porter and the counsel assigned to your bill.**

- If the amendment deadline is not met by the author, the bill will be put over to allow the Committee members and members of the public to have sufficient time to review an analysis that reflects the amended version of the bill. **The author will be responsible for obtaining any necessary rule waivers to hear the bill at a subsequent hearing.**

==Please e-mail this form to erica.porter@sen.ca.gov (651-4113) and morgan.branch@sen.ca.gov (651-1501). Again, your bill will not be set if the Committee does not receive a completed background sheet.==



LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

# HHS Public Access

Author manuscript

*Am J Prev Med*. Author manuscript; available in PMC 2017 June 01.

Published in final edited form as:
*Am J Prev Med*. 2017 June ; 52(6): 691–701. doi:10.1016/j.amepre.2016.11.014.

# Lifetime Economic Burden of Rape Among U.S. Adults

**Cora Peterson, PhD**, **Sarah DeGue, PhD**, **Curtis Florence, PhD**, and **Colby N. Lokey, MS**
National Center for Injury Prevention and Control, Centers for Disease Control and Prevention, Atlanta, Georgia

## Abstract

**Introduction—**This study estimated the per-victim U.S. lifetime cost of rape.

**Methods—**Data from previous studies was combined with current administrative data and 2011 U.S. National Intimate Partner and Sexual Violence Survey data in a mathematical model. Rape was defined as any lifetime completed or attempted forced penetration or alcohol- or drug-facilitated penetration, measured among adults not currently institutionalized. Costs included attributable impaired health, lost productivity, and criminal justice costs from the societal perspective. Average age at first rape was assumed to be 18 years. Future costs were discounted by 3%. The main outcome measures were the average per-victim (female and male) and total population discounted lifetime cost of rape. Secondary outcome measures were marginal outcome probabilities among victims (e.g., suicide attempt) and perpetrators (e.g., incarceration) and associated costs. Analysis was conducted in 2016.

**Results—**The estimated lifetime cost of rape was $122,461 per victim, or a population economic burden of nearly $3.1 trillion (2014 U.S. dollars) over victims' lifetimes, based on data indicating >25 million U.S. adults have been raped. This estimate included $1.2 trillion (39% of total) in medical costs; $1.6 trillion (52%) in lost work productivity among victims and perpetrators; $234 billion (8%) in criminal justice activities; and $36 billion (1%) in other costs, including victim property loss or damage. Government sources pay an estimated $1 trillion (32%) of the lifetime economic burden.

**Conclusions—**Preventing sexual violence could avoid substantial costs for victims, perpetrators, healthcare payers, employers, and government payers. These findings can inform evaluations of interventions to reduce sexual violence.

Address correspondence to: Sarah DeGue, PhD, Mailstop F-64, 4770 Buford Highway, CDC National Center for Injury Prevention and Control, Atlanta GA 30341. hci2@cdc.gov.

Cora Peterson led the study design and interpretation of results, conducted data analysis, drafted and edited the manuscript, and approved the final manuscript as submitted. Sarah DeGue conceptualized the study design, led a literature review to inform the analyses, assisted with interpretation of results, edited the manuscript, and approved the final manuscript as submitted. Curtis Florence assisted with the study design and interpretation of results, edited the manuscript, and approved the final manuscript as submitted. Colby Lokey assisted with the study design and interpretation of results, assisted with a literature review to inform the analyses, edited the manuscript, and approved the final manuscript as submitted.

No financial disclosures were reported by the authors of this paper.

**SUPPLEMENTAL MATERIAL**

Supplemental materials associated with this article can be found in the online version at http://dx.doi.org/10.1016/j.amepre.2016.11.014

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917



SP - 10

## INTRODUCTION

An estimated 19.3% of U.S. women and 1.7% of men have been raped during their lifetime.[1] Sexual violence victimization is associated with poor short- and long-term physical and mental health outcomes.[2,3]

Few studies have quantified the per-victim lifetime economic cost of sexual violence, which at a minimum includes victims' impaired health, as well as lost productivity and criminal justice activities. A per-victim cost here refers to the value of a person entirely avoiding a particular exposure. Previous studies have estimated related cost dimensions—such as cost per sexual assault incident[4–8]—but largely have not accounted for victims' long-term health. The aim of this study was to use data from previous studies with current administrative and sexual violence surveillance data to estimate the per-victim U.S. lifetime cost and total population economic burden of rape among adults not currently institutionalized.

## METHODS

Study information reported according to Consolidated Health Economic Evaluation Reporting Standards.[9] Model inputs included the number of U.S. adult (aged ≥18 years) women and men with any lifetime (including childhood) and past 12–month incidence of rape; selected attributable—or marginal—health and other outcomes associated with rape from administrative data and previous studies (hereafter, reference studies); and the marginal cost of those outcomes. Marginal outcome refers to the proportion of victims with an outcome beyond the proportion among non-victims, and is used to calculate the attributable cost of rape. Medical, lost work productivity, and criminal justice costs were included. The main outcome measures were:

1.    lifetime cost of rape per victim; and

2.    lifetime cost of rape in the U.S. population (or economic burden) of currently non-institutionalized adults (hereafter, U.S. population), calculated as the lifetime cost per victim multiplied by the population number of victims.

This analysis used a lifetime time horizon from the societal perspective. Previous studies of lifetime per-person health costs have identified a meaningful age of inception—for example, age 6 years for nonfatal child maltreatment[10] (estimated cost: $210,012 as 2010 U.S. dollars [USD], or $225,408 as 2014 USD[11]) and age 24 years for smoking[12] (estimated cost: $220,000 for men and $106,000 for women as 2000 USD, or $292,010 and $139,119 as 2014 USD[11]). The authors did not find a robust estimated average age of first rape among victims, although it is known that the age of first completed rape was <18 years for 42% of female victims (and <25 years for 80% of female victims) and <10 years for 25% of male victims.[13] The present model assessed lifetime unit costs assuming an average age of first rape victimization of 18 years. Costs incurred after the first year were discounted by 3%[14] and presented as 2014 USD, inflated using selected indices.[11,15] The analysis was conducted in 2016 and used publicly available data.

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917



### Definition and Prevalence of Rape

The economic burden estimate is based on the estimated number of currently non-institutionalized men and women who reported having been raped at some point during their lives in the 2011 U.S. National Intimate Partner and Sexual Violence Survey (NISVS)[1] (data collection, January–December 2011) where rape was defined as completed or attempted penetration of the victim through the use or threats of physical force or when the victim was drunk, high, drugged, or passed out and unable to consent (Table 1).

### Outcomes and Unit Costs

Rape outcomes, identified through a targeted literature search, were included based on reference studies' representativeness (Appendix Table 1, available online). National studies and meta-analyses addressing both male and female victims were prioritized. Outcomes had to be reported in a way that facilitated calculation of victims' marginal probability of the outcome; for example, the outcome prevalence among non-victims and an AOR of the relationship between the outcome and respondents' experience of rape.[44] Studies that assessed outcomes among adult (i.e., aged ≥18 years) respondents and aligned with the NISVS rape definition were prioritized. Unit costs represented the attributable cost of analyzed outcomes, based on direct comparison of affected and unaffected individuals (Appendix Table 2, available online). Comprehensive lifetime unit costs that included both medical care and lost work productivity were prioritized. Where only annual unit costs were available, lifetime costs were estimated by multiplying the annual cost over the age range of respondents in the cost reference study (Appendix Table 3, available online), bounded by the average assumed age at first rape victimization (i.e., 18 years) and current life expectancy (i.e., 79 years).[45] The cost of prevention efforts was excluded.

Average annual data from the 2010–2014 U.S. National Crime Victimization Survey indicated 10.9% ($n = 18,012/165,034$ survey weighted) of attempted or completed rape victimizations (including male and female victims) involved victim property loss or damage, valued at an average $219 per affected victim (Table 1) (U.S. Department of Justice, Bureau of Justice Statistics, personal communication, 2015).

Among attempted or completed rape victimizations (N=216,570 surveyed weighted) from annual average 1995–2014 National Crime Victimization Survey data, 5.3% of victims were treated for nonfatal injuries in a doctor's office, 12.1% in an emergency department, and 1.0% as inpatients (Table 1) (U.S. Department of Justice, Bureau of Justice Statistics, personal communication, 2015). Unit costs were estimated payment for a doctor's visit[16] and the discounted lifetime medical cost associated with an emergency department visit or hospital admission for sexual assault (Pacific Institute for Research and Evaluation, personal communication, 2016) (Table 1). In 2011, there were an estimated 18 murders associated with rape crimes (Appendix Table 1, available online).[17] Unit costs were based on an estimated lifetime cost of medical care and lost productivity due to homicide.[18]

Data from a national sample of women (N=3,031 respondents) indicated that 4.8% of completed penetration rape victims experienced rape-related pregnancy (Table 1).[19] Among a small sample of rape-related pregnancies (N=34), 11.3% resulted in spontaneous abortion,

*Am J Prev Med*. Author manuscript; available in PMC 2017 June 01.

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

Peterson et al.

Page 4

50.0% in medically assisted abortion, 32.3% of women kept the baby, and 5.9% of women gave the baby up for adoption.[19] Unit costs were estimated payments for medical treatment for spontaneous abortion,[23] medically assisted abortion,[22] pregnancy and delivery,[20] and the public payer cost of adoption from age 0 to 18 years (i.e., social services)[21] applied to the estimated proportion of women with rape-related pregnancy by outcome among those with lifetime experience of completed penetration rape among all women victims of attempted and completed rape in 2011 NISVS ($n$=13,826,000/23,305,000, or 59%) (Table 1).[1]

Female victims of intimate partner rape aged ≥18 years (N=322,230 victimizations, survey weighted) documented in the National Violence Against Women Survey was calculated as an average 3.6 productive days missed per victim (Appendix Table 2 [available online] provides calculations).[46] This number of days was multiplied by an estimated U.S. population (aged ≥15 years) daily production value[24] to estimate the value of short-term lost productivity due to rape ($516 in 2014 USD) (Table 1).

Funding for victims' services through the criminal justice system at the federal, state, and local levels—including U.S. Department of Justice grants and Violence Against Women Act (Title IV, P.L. 103-322)[47] funding—are comprehensively included in the criminal justice estimates through a top-down accounting approach (Appendix reports calculation details, available online). This approach was deemed the best use of available data, but means the authors could not identify the cost of individual victim services (e.g., rape kit processing). Although previous studies have estimated the cost of annual victim services for two state governments,[5,8] it was determined infeasible to comprehensively and accurately assess the proportion of victims accessing services and the cost of response (as opposed to prevention) services per victim using a bottom-up accounting approach.

A meta-analysis of studies published in 1980–2008 indicated significantly higher observed prevalence of mental health outcomes—anxiety, depression, eating disorder, post-traumatic stress disorder, and suicide attempt—among adolescent and adult respondents with lifetime (primarily childhood) experience of sexual abuse (Table 1).[2] The proportion of nonfatal suicide attempts requiring medical care was estimated using data for men (59.0% of attempts) and women (31.1% of attempts) in a separate national sample study of adolescent rape victims.[29] Unit costs were estimated lost work productivity and medical costs for anxiety disorder,[25] major depressive disorder,[26] eating disorders,[27] post-traumatic stress disorder,[25,28] and medically serious nonfatal suicide attempts[18,30] (Table 1).

The 2005 Behavioral Risk Factor Surveillance System survey indicated significantly higher observed prevalence of excess alcohol and tobacco use among adults (aged ≥18 years, N=115,030 respondents) with lifetime experience of unwanted attempted or completed sex (Table 1).[3] Unit costs were attributable estimated lost work productivity and medical costs for excess alcohol use[31,32] and smoking[12] (Table 1). The 1990–1992 National Comorbidity Survey documented significantly higher prevalence of drug problems among adults (aged ≥15 years, N=5,877 respondents) who were raped or molested during childhood or adolescence (Table 1),[33] supporting other research among a national sample of women.[48,49] Unit costs were estimated lost productivity and medical costs[34,35] (Table 1).

LEGISLATIVE INTENT SERVICE, INC.   (530) 666-1917

SP - 13

The 2005 Behavioral Risk Factor Surveillance System data indicated significantly higher observed prevalence of asthma and joint conditions among sexual violence victims (Table 1).[3] Unit costs were estimated lost work productivity and medical payments for asthma[36] and joint pain[39] (Table 1). Kentucky Women's Health Registry data indicated significantly higher observed prevalence of cervical cancer among women (aged ≥15 years, N=4,732 respondents) with lifetime forced sexual experiences (Table 1).[37] Unit costs were estimated medical payments[38] and lost productivity[38] attributable to cancer, assigned among the estimated number of women with lifetime completed penetration rape in 2011 U.S. NISVS ($n$=13,826,000) (Table 1). A U.S. health plan study indicated a higher observed prevalence of sexually transmitted infections among adults (aged ≥19 years, N=9,323 respondents) who experienced attempted or completed rape during childhood or adolescence (age ≤ 18 years)[40] (Table 1). Unit cost were estimated medical costs[41,42] and lost work productivity[43] (Table 1).

An attribution method was used to estimate the per-victim discounted lifetime average criminal justice cost associated with sexual violence among total annual U.S. government criminal justice spending (Table 2 and Appendix [available online]).[50] Lost productivity due to incarceration is the annual production value of the U.S. non-institutional population multiplied by the average estimated number of years sexual violence perpetrators are incarcerated (Tables 1 and 2, Appendix [available online]).

### Analysis

The marginal probability of selected outcomes was multiplied by associated unit costs to estimate the per-person lifetime cost of rape, separately for men and women. The sex-specific, per-person estimated cost of rape was multiplied by the estimated number of men and women with lifetime experience of rape to estimate the total U.S. lifetime burden of rape. Government costs were assessed as the sum of criminal justice and adoption costs, plus the estimated government share of all medical spending (i.e., 59.8%).[63]

## RESULTS

The present-value, per-victim estimated lifetime cost of rape was $122,461, or $3.1 trillion for all victims, based given new information about victim outcomes or unit on 23 million U.S. women and 2 million men with costs. Barring substantial changes to the per-victim cost lifetime experience of rape (Table 1).

## DISCUSSION

The per-victim lifetime cost of rape ($122,461) can be interpreted as the cost averted for each potential victim who avoids rape. The per-victim estimate could change given new information about victim outcomes or unit costs. Barring substantial changes to the per-victim cost estimate, the lifetime economic burden of rape estimate ($3.1 trillion) will remain relatively stable; this estimate reflects the per-victim cost multiplied by the number of U.S. adults with lifetime experience of rape, and such a large population experiences modest incremental demographic changes. The estimated number of victims with rape experience in the past 12 months had a minor impact on the economic burden through the

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917



criminal justice and fatalities estimates. The economic burden represents costs over victims' lifetimes. Though the authors do not know what proportion of victims in the previous 12 months (an estimated 1,929,000 women1 and 219,000 men [unpublished data]) were first-time victimizations, applying this study's per-victim cost estimate to that annual number of victims yields an approximate annual economic burden of $263 billion.

The per-victim estimate is the minimal identifiable cost of rape. This study did not include non-monetary elements, sometimes presented as intangible costs—a monetized version of victims' pain and suffering.[4,8] Previous studies have estimated the per-offense cost of rape and sexual assault to be $87,000 (1993 USD) to $240,776 (2008 USD) (or approximately $130,775 to $263,772 as 2014 USD[11]), of which 80% to 95% were intangible costs.[4–6,8] Recognizing victims' pain and suffering is unquestionably important, but must be weighed against the conceptual and computational challenges of monetizing pain and suffering.[64] Costs to victims' and perpetrators' friends and families, and costs of other forms of sexual violence (e.g., being made to penetrate or sexual coercion) were not included. NISVS estimates do not include the currently institutionalized population, though would capture experiences among the previously institutionalized. Health outcomes that could be linked to specific attributable costs were included, though activity limitations, gastrointestinal symptoms, high cholesterol, HIV risk factors, non-specific pain, overweight, and urinary problems have higher prevalence among sexual violence victims.[3,65,66] Many lost productivity unit estimates included only employed respondents, and valued respondents' productivity using the human capital approach (i.e., lost wages). This approach, though commonly used, undervalues lost productivity overall and undervalues female losses, in particular, because women are often paid less than men. Many lost productivity estimates did not include mortality. Long-term lost productivity among rape victims not diagnosed with any of the analyzed outcomes was not included.

Discounting assumed victims' age at first rape was 18 years, which underestimates/overestimates costs among victims with first rape at age <18 years/> 18 years. If one instead applies the average age of rape victimizations among adolescents and adults—27 years[67]—the estimated cost per victim decreases modestly to $119,277, with a population economic burden still exceeding $3 trillion. Too few reference study estimates included measures of dispersion for a meaningful probabilistic sensitivity analysis (Appendix Tables 1 and 2, available online). Based on available data, the authors have not included the medical cost of follow-up visits for sexually transmitted infection testing that takes place after an initial medical visit for rape treatment. Identifiable double counting of costs includes the following: HIV costs appear in both sexually transmitted infection and illicit drug use unit costs, and some costs for anxiety and drug and alcohol dependence are included in the depression unit cost (Appendix Tables 1 and 2, available online). Substance use constitutes approximately a quarter of the per-victim cost; crime costs are a major component of contributing unit costs for substance abuse, and a small portion (<1%) of those unit costs included research and prevention activities related to alcohol and drugs.[12,31,32,34,35] Some reference studies focused on outcomes exclusively among adults who experienced childhood rape (Appendix Table 1, available online). The cost of some lifetime experiences was inferred from available annual cost data (Appendix Table 3, available online), which implicitly assumes an accurate

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

distribution of patients at all stages of a particular outcome (i.e., acute, recurring, remission) in reference studies' annual estimates.

## Limitations

This study is notably limited by inexact timelines related to rape occurrence during victims' lifetimes, number of rape incidents per victim, number of victims per perpetrator, onset of attributable health outcomes, and treatment of those outcomes. This study's estimates are per victim, rather than per victimization, which certainly underestimates consequences among some victims and the acute costs associated with victimization.[68] Another major limitation is that this study assumed that rape is the cause of victims' higher observed prevalence of health-related conditions, although the status of these conditions as risk factors for, correlates with, or outcomes of sexual violence is complex.[69] Future analysis of longitudinal data identifying sexual violence and health outcomes might address these issues, along with issues related to timing of rape exposure and the effects of multiple victimizations.

## CONCLUSIONS

Despite limitations, this study's economic burden estimate included more comprehensive information on victims' lifetime mental and physical health than previous estimates. This study incorporated new national surveillance data from NISVS indicating rape affects many times more individuals than other sources have suggested previously. These findings can inform evaluations of interventions to prevent sexual violence, identifying cost-effective approaches to eliminate rape and its substantial impact on public health.

## Supplementary Material

Refer to Web version on PubMed Central for supplementary material.

## Acknowledgments

Authors acknowledge Michelle Berlin, Kathryn McCollister, and Manon Ruben for their contributions to a literature review of the health consequences and costs of sexual violence victimization conducted to support this study through Centers for Disease Control and Prevention contract 200-2012-F-53476 to Quality Resource Systems Inc. Authors acknowledge Jenna Truman and Lynn Langton at the U.S. Department of Justice, Bureau of Justice Statistics, for assistance with data from the National Crime Victimization Survey. Authors acknowledge Bruce A. Lawrence at the Pacific Institute for Research and Evaluation for unpublished cost estimates of medical treatment (emergency department and hospitalization) for rape.

The findings and conclusions in this report are those of the authors and do not necessarily represent the official position of the Centers for Disease Control and Prevention.

## References

1. Breiding MJ, Smith SG, Basile KC, Walters ML, Chen J, Merrick MT. Prevalence and characteristics of sexual violence, stalking, and intimate partner violence victimization— National Intimate Partner and Sexual Violence Survey, United States 2011. MMWR Surveill Summ. 2014; 63(8):1–18.

2. Chen LP, Murad MH, Paras ML, et al. Sexual abuse and lifetime diagnosis of psychiatric disorders: systematic review and meta-analysis. Mayo Clin Proc. 2010; 85(7):618–629. http://dx.doi.org/10.4065/mcp.2009.0583. [PubMed: 20458101]



3. Smith SG, Breiding MJ. Chronic disease and health behaviours linked to experiences of non-consensual sex among women and men. Public Health. 2011; 125(9):653–659. http://dx.doi.org/10.1016/j.puhe.2011. [PubMed: 21855097]

4. McCollister KE, French MT, Fang H. The cost of crime to society: new crime-specific estimates for policy and program evaluation. Drug Alcohol Depend. 2010; 108(1-2):98–109. http://dx.doi.org/10.1016/j.drugalcdep.2009.12.002. [PubMed: 20071107]

5. Miller, T., Taylor, D., Sheppard, M. Costs of Sexual Violence in Minnesota. St Paul, MN: Minnesota Department of Health; 2007.

6. Miller, TR., Cohen, MA., Wiersema, B. Victim Costs and Consequences: A New Look. Washington, DC: National Institute of Justice, Office of Justice Programs, U.S. Department of Justice; 1996.

7. Miller TR, Cohen MA, Rossman SB. Victim costs of violent crime and resulting injuries. Health Aff (Millwood). 1993; 12(4):186–197. http://dx.doi.org/10.1377/hlthaff.12.4.186.

8. Yang J, Miller TR, Zhang N, LeHew B, Peek-Asa C. Incidence and cost of sexual violence in Iowa. Am J Prev Med. 2014; 47(2):198–202. http://dx.doi.org/10.1016/j.amepre.2014.04.005. [PubMed: 24930620]

9. Husereau D, Drummond M, Petrou S, et al. Consolidated Health Economic Evaluation Reporting Standards (CHEERS)—explanation and elaboration: a report of the ISPOR Health Economic Evaluation Publication Guidelines Good Reporting Practices Task Force. Value Health. 2013; 16(2):231–250. http://dx.doi.org/10.1016/j.jval.2013.02.002. [PubMed: 23538175]

10. Fang X, Brown DS, Florence CS, Mercy JA. The economic burden of child maltreatment in the United States and implications for prevention. Child Abuse Negl. 2012; 36(2):156–165. http://dx.doi.org/10.1016/chiabu.2011.10.006. [PubMed: 22300910]

11. U.S. Bureau of Economic Analysis. [December 28, 2015] Table 1.1.4: Price indexes for gross domestic product. www.bea.gov/itable/. Published December 22, 2015

12. Sloan, F., Ostermann, J., Picone, G., Conover, C., Taylor, D. The Price of Smoking. Cambridge, MA: MIT Press; 2004.

13. Black, MC., Basile, KC., Breiding, MJ., et al. The National Intimate Partner and Sexual Violence Survey (NISVS) 2010 Summary Report. Atlanta, GA: National Center for Injury Prevention and Control, CDC; 2011.

14. Gold M. Panel on cost-effectiveness in health and medicine. Med Care. 1996; 34(12(suppl)):DS197–D199. [PubMed: 8969326]

15. U.S. Bureau of Economic Analysis. [December 28 2015] Table 2.5.4: Price indexes for personal consumption expenditures by function. www.bea.gov/itable/. Published August 6 2015

16. Machlin, SR., Adams, SA. Statistical Brief #484: Expenses for Office-Based Physician Visits by Specialty, 2013. Rockville, MD: Agency for Healthcare Research and Quality; 2015.

17. U.S. Federal Bureau of Investigation. Table 12. Expanded homicide data—murder circumstances 2009–2013. Washington, DC: U.S. Department of Justice; 2013.

18. Centers for Disease Control and Prevention (CDC). Web-based Injury Statistics Query and Reporting System (WISQARS), cost of injury reports 2010, both sexes, all ages, United States. www.cdc.gov/injury/wisqars/index.html Published 2010

19. Holmes MM, Resnick HS, Kilpatrick DG, Best CL. Rape-related pregnancy: estimates and descriptive characteristics from a national sample of women. Am J Obstet Gynecol. 1996; 175(2):320–324. http://dx.doi.org/10.1016/S0002-9378(96)70141-2. [PubMed: 8765248]

20. Truven Health Analytics. The Cost of Having a Baby in the United States. Ann Arbor, MI: Truven Health Analytics; 2013.

21. Barth R, Chung K, Wildfire J, Shenyang G. A comparison of the governmental costs of long-term foster care and adoption. Soc Serv Rev. 2006; 80(1):127–158. http://dx.doi.org/10.1086/499339.

22. Jerman J, Jones RK. Secondary measures of access to abortion services in the United States 2011 and 2012 gestational age limits, cost, and harassment. Womens Health Issues. 2014; 24(4):e419–e424. http://dx.doi.org/10.1016/j.whi.2014.05.002. [PubMed: 24981401]

23. Jerman J, Jones RK. Secondary measures of access to abortion services in the United States 2011 and 2012: gestational age limits, cost, and harassment. Womens Health Issues. 2014; 24(4):e419–e424. http://dx.doi.org/10.1016/j.whi.2014.05.002. [PubMed: 24981401]

Author Manuscript

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917



SP - 17

Peterson et al.                                                                                                                Page 9

24. Grosse SD, Krueger KV, Mvundura M. Economic productivity by age and sex: 2007 estimates for the United States. Med Care. 2009; 47(7(suppl 1)):S94–S103. http://dx.doi.org/10.1097/MLR.0b013e31819c9571. [PubMed: 19536021]

25. Greenberg PE, Sisitsky T, Kessler RC, et al. The economic burden of anxiety disorders in the 1990s. J Clin Psychiatry. 1999; 60(7):427–435. http://dx.doi.org/10.4088/JCP.v60n0702. [PubMed: 10453795]

26. Greenberg PE, Fournier AA, Sisitsky T, Pike CT, Kessler RC. The economic burden of adults with major depressive disorder in the United States (2005 and 2010). J Clin Psychiatry. 2015; 76(2):155–162. http://dx.doi.org/10.4088/JCP.14m09298. [PubMed: 25742202]

27. Samnaliev M, Noh HL, Sonneville KR, Austin SB. The economic burden of eating disorders and related mental health comorbidities: an exploratory analysis using the U.S. Medical Expenditures Panel Survey. Prev Med Rep. 2015; 2:32–34. http://dx.doi.org/10.1016/j.pmedr.2014. [PubMed: 26844048]

28. Ivanova JI, Birnbaum HG, Chen L, et al. Cost of post-traumatic stress disorder vs major depressive disorder among patients covered by medicaid or private insurance. Am J Manag Care. 2011; 17(8):e314–e323. [PubMed: 21851139]

29. Tomasula JL, Anderson LM, Littleton HL, Riley-Tillman TC. The association between sexual assault and suicidal activity in a national sample. Sch Psychol Q. 2012; 27(2):109–119. http://dx.doi.org/10.1037/a0029162. [PubMed: 22774785]

30. Corso PS, Mercy JA, Simon TR, Finkelstein EA, Miller TR. Medical costs and productivity losses due to interpersonal and self-directed violence in the United States. Am J Prev Med. 2007; 32(6):474–482. http://dx.doi.org/10.1016/j.amepre.2007.02.010. [PubMed: 17533062]

31. Sacks JJ, Gonzales KR, Bouchery EE, Tomedi LE, Brewer RD. 2010 national and state costs of excessive alcohol consumption. Am J Prev Med. 2015; 49(5):e73–e79. http://dx.doi.org/10.1016/j.amepre.2015.05.031. [PubMed: 26477807]

32. Bouchery EE, Harwood HJ, Sacks JJ, Simon CJ, Brewer RD. Economic costs of excessive alcohol consumption in the U.S., 2006. Am J Prev Med. 2011; 41(5):516–524. http://dx.doi.org/10.1016/j.amepre.2011.06.045. [PubMed: 22011424]

33. Molnar BE, Buka SL, Kessler RC. Child sexual abuse and subsequent psychopathology: results from the National Comorbidity Survey. Am J Public Health. 2001; 91(5):753–760. http://dx.doi.org/10.2105/AJPH.91.5.753. [PubMed: 11344883]

34. U.S. Department of Justice. The economic impact of illicit drug use on American Society. Washington, DC: National Drug Intelligence Center; 2011.

35. U.S. DHHS. Results from the 2007 National Survey on Drug Use and Health: national findings (NSDUH Series H-34, DHHS Publication No SMA 08-4343. Rockville, MD: Substance Abuse and Mental Health Services Administration, Office of Applied Studies; 2009.

36. Barnett SB, Nurmagambetov TA. Costs of asthma in the United States 2002-2007. J Allergy Clin Immunol. 2011; 127(1):145–152. http://dx.doi.org/10.1016/j.jaci.2010.10.020. [PubMed: 21211649]

37. Coker AL, Hopenhayn C, DeSimone CP, Bush HM, Crofford L. Violence against women raises risk of cervical cancer. J Womens Health (Larchmt). 2009; 18(8):1179–1185. http://dx.doi.org/10.1089/jwh.2008.1048. [PubMed: 19630537]

38. Ekwueme DU, Yabroff KR, Guy GP Jr. Medical costs and productivity losses of cancer survivors—United States 2008-2011. MMWR Morb Mortal Wkly Rep. 2014; 63(23):505–510. [PubMed: 24918485]

39. Gaskin, D., Richard, R. Appendix C: The economic costs of pain in the United States. Washington, DC: IOM Committee on Advancing Pain Research, Care, and Education; 2011. Relieving Pain in America: a blueprint for transforming prevention, care, education, and research.

40. Hillis SD, Anda RF, Felitti VJ, Nordenberg D, Marchbanks PA. Adverse childhood experiences and sexually transmitted diseases in men and women: a retrospective study. Pediatrics. 2000; 106(1):E11. http://dx.doi.org/10.1542/peds.106.1.e11. [PubMed: 10878180]

41. Owusu-Edusei K Jr, Chesson HW, Gift TL, et al. The estimated direct medical cost of selected sexually transmitted infections in the United States, 2008. Sex Transm Dis. 2013; 40(3):197–201. http://dx.doi.org/10.1097/OLQ.0b013e318285c6d2. [PubMed: 23403600]



SP - 18

42. Chesson HW, Ekwueme DU, Saraiya M, Watson M, Lowy DR, Markowitz LE. Estimates of the annual direct medical costs of the prevention and treatment of disease associated with human papil-lomavirus in the United States. Vaccine. 2012; 30(42):6016–6019. http://dx.doi.org/10.1016/j.vaccine.2012.07.056. [PubMed: 22867718]

43. Owusu-Edusei K Jr, Roby TM, Chesson HW, Gift TL. Productivity costs of nonviral sexually transmissible infections among patients who miss work to seek medical care: evidence from claims data. Sex Health. 2013; 10(5):434–437. http://dx.doi.org/10.1071/SH13021. [PubMed: 23987746]

44. Zhang J, Yu KF. What';s the relative risk? A method of correcting the odds ratio in cohort studies of common outcomes. JAMA. 1998; 280(19):1690–1691. http://dx.doi.org/10.1001/jama.280.19.1690. [PubMed: 9832001]

45. Xu J, Murphy SL, Kochanek KD, Bastian BA. Deaths: final data for 2013. Natl Vital Stat Rep. 2016; 64(2):1–119. [PubMed: 26905861]

46. Centers for Disease Control and Prevention (CDC). Costs of Intimate Partner Violence Against Women in the United States. Atlanta, GA: CDC; 2003.

47. Laney, G. Violence Against Women Act: History and Federal Funding (RL30871. Washington, DC: U.S. Congressional Research Service; 2010.

48. Kilpatrick, DG., Resnick, HS., Ruggiero, KJ., Conoscenti, LM., McCauley, JM. Drug-facilitated, incapacitated, and forcible rape: a national study, NIJ 219181. Washington, DC: National Institute of Justice; 2007.

49. Zinzow HM, Resnick HS, McCauley JL, Amstadter AB, Ruggiero KJ, Kilpatrick DG. Prevalence and risk of psychiatric disorders as a function of variant rape histories: results from a national survey of women. Soc Psychiatry Psychiatr Epidemiol. 2012; 47(6):893–902. Supplemental analysis received from authors November 2015. [PubMed: 21603967]

50. U.S. Department of Justice. Justice Expenditure and Employment Extracts, NCJ 248628. Washington, DC: U.S. Department of Justice; 2015. Table 1. Percent distribution of expenditure for the justice system by type of government, fiscal 2012.

51. U.S. Federal Bureau of Investigation. Crime in the United States 2013. Washington, DC: U.S. Department of Justice; 2013. Table 29. Estimated number of arrests, Rape—revised definition.

52. U.S. Department of Justice. Correctional populations in the United States, 2013, NCJ 248479. Washington, DC: U.S. Department of Justice; 2014. Table 1. Estimated number of persons supervised by adult correctional systems, by correctional status, 2000, 2005, and 2010–2013.

53. U.S. Department of Justice. Felony defendants in large urban counties, 2009—statistical tables, NCJ 243777. Washington, DC: U.S. Department of Justice; 2013. Table 21. Adjudication outcome for felony defendants in the 75 largest counties, by most serious arrest charge.

54. U.S. Department of Justice. Probation and parole in the United States, 2013, NCJ 248029. Washington, DC: U.S. Department of Justice; 2014. Table 3. Rate of probation exits, by type of exit, 2008–2013.

55. U.S. Department of Justice. Profile of jail inmates, NCJ 201932. Washington, DC: U.S. Department of Justice; 2004. Table 6. Length of sentence and time expected to be served of inmates sentenced to jail, by offense, 2002.

56. U.S. Department of Justice. Bureau of Justice Statistics, state court sentencing of convicted felons, statistical tables, NCJ 217995. Washington, DC: U.S. Department of Justice; 2007. Table 1.3. Mean state prison sentence and estimated time to be served in prison, by offenses, 2004.

57. U.S. Department of Justice. Survey of inmates in state correctional facilities. Bureau of Justice Statistics, National Prisoner Statistics Program, National Corrections Reporting Program. Washington, DC: U.S. Department of Justice; 2014. Table 14. Estimated sentenced prisoners under state jurisdiction, by offense and sex, race, and Hispanic origin, December 31, 2012.

58. U.S. Department of Justice. Compendium of Federal Justice Statistics, NCJ 210299. Available through Sourcebook of Criminal Justice Statistics Online. Washington, DC: U.S. Department of Justice; 2003. Table 6.58.2003. Time served to first release by Federal prisoners by offense, United States.

59. U.S. Department of Justice. Federal Bureau of Prisons, State of the Bureau. Available through Sourcebook of Criminal Justice Statistics Online. Washington, DC: U.S. Department of Justice;

*Am J Prev Med.* Author manuscript; available in PMC 2017 June 01.



2003. Table 6.0023.2013. Prisoners under the jurisdiction of the Federal Bureau of Prisons by adjudication status, type of offense, and sentence length, selected years 1990-2013.

60. U.S. Department of Justice. Probation and Parole in the United States, NCJ 248029. Washington, DC: U.S. Department of Justice; 2014. Table 6. Rate of parole exits, by type of exit, 2008–2013.

61. U.S. Federal Bureau of Investigation. Crime in the United States 2013. Washington, DC: U.S. Department of Justice; 2013. Table 7. Offense analysis: Rape—revised definition.

62. U.S. Federal Bureau of Investigation. Crime in the United States 2013. Washington, DC: U.S. Department of Justice; 2013. Table 25. Percent of offenses cleared by arrest or exceptional means, rape—revised definition.

63. Woolhandler S, Himmelstein DU. Paying for national health insurance—and not getting it. Health Aff (Millwood). 2002; 21:88–98. http://dx.doi.org/10.1377/hlthaff.21.4.88. [PubMed: 12117155]

64. Day, T., McKenna, K., Bowlus, A. The economic costs of violence against women: an evaluation of the literature expert brief compiled in preparation for the Secretary-General's in-depth study on all forms of violence against women. New York City NY: United Nations; 2005.

65. Link CL, Lutfey KE, Steers WD, McKinlay JB. Is abuse causally related to urologic symptoms? Results from the Boston Area Community Health (BACH) Survey. Eur Urol. 2007; 52(2):397–406. http://dx.doi.org/10.1016/j.eururo.2007.03.024. [PubMed: 17383083]

66. Paras ML, Murad MH, Chen LP. Sexual abuse and lifetime diagnosis of somatic disorders: a systematic review and meta-analysis. JAMA. 2009; 302(5):550–561. http://dx.doi.org/10.1001/jama.2009.1091. [PubMed: 19654389]

67. U.S. Department of Justice. Age Patterns of Victims of Serious Violent Crime, July 1997, NCJ-162031. Washington, DC: U.S. Department of Justice; 1997.

68. Tjaden, P., Thoennes, N. Full report of the prevalence, incidence, and consequences of violence against women: findings from the National Violence Against Women Survey. Washington, DC: U.S. Department of Justice; http://dx.doi.org/10.1037/e514172006-001

69. Kilpatrick DG, Acierno R, Resnick HS, Saunders BE, Best CL. A 2-year longitudinal analysis of the relationships between violent assault and substance use in women. J Consult Clin Psychol. 1997; 65(5):834–847. http://dx.doi.org/10.1037/0022-006X.65.5.834. [PubMed: 9337502]

*Am J Prev Med*. Author manuscript; available in PMC 2017 June 01.

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917



SP - 20

Peterson et al.

*Am J Prev Med* Author manuscript; available in PMC 2017 June 01.

**Table 1**

Estimated Marginal Outcomes, Lifetime Unit Costs, Lifetime Cost Per Victim, and Economic Burden of Rape (2014 USD)

| Measure | Marginal outcome among victims[a] Women | Men | Marginal lifetime cost per outcome,[b] $ | Lifetime cost[c] Per victim, $ Women | Men | Population, $ | % of total |
|---|---|---|---|---|---|---|---|
| **Total** | | | | | | | |
| Victims[d] (n) and total cost | 23,305,000[1] | 1,971,000[1] | 122,461 | 122,278 | 124,631 | 3,095,330,073,080 | 100.00 |
| Medical cost | | | 48,029 | 48,180 | 46,235 | 1,213,974,631,140 | 39.2 |
| Lost productivity cost | | | 63,744 | 63,475 | 66,924 | 1,611,187,780,921 | 52.1 |
| Criminal justice cost | | | 9,250 | 9,194 | 9,918 | 233,815,164,644 | 7.6 |
| Other[e] | | | 1,438 | 1,428 | 1,554 | 36,352,496,375 | 1.2 |
| Government cost as % of total | | | 38,848 | 38,900 | 38,230 | 981,911,926,278 | 31.7 |
| **Acute outcomes** | | | | | | | |
| Victim property loss/damage | 10.9%[f] | | 219[f] | 24 | 24 | 604,283,163 | <0.1 |
| Injuries treated by location | | | | 520 | 520 | 13,155,970,329 | 0.4 |
| Doctor's office | 5.3%[f] | | 168[16] | 9 | 9 | 226,955,738 | <0.1 |
| ED treat-and- release | 12.1%[f] | | 2,251[g] | 272 | 272 | 6,866,148,670 | 0.2 |
| Hospitalization | 1.0%[f] | | 24,481[g] | 240 | 240 | 6,062,865,922 | 0.2 |
| Victim fatalities | | | | 14 | 14 | 359,334,461 | <0.1 |
| Medical | 0.001%[17] | | 11,707[18] | 0.10 | 0.10 | 2,517,150 | <0.1 |
| Lost productivity | 0.001%[17] | | 1,659,520[18] | 14 | 14 | 356,817,311 | <0.1 |
| Rape-related pregnancy[h] | | | | 445 | 0 | 10,367,598,401 | 0.3 |
| Birth | 0.9%[19] | NA | 15,867[20] | 147 | 0 | 3,431,432,651 | 0.1 |
| Adoption | 0.2%[19] | NA | 168,758[21] | 286 | 0 | 6,666,421,130 | 0.2 |
| Medical abortion | 1.4%[19] | NA | 518[22] | 7 | 0 | 173,312,428 | 0.0 |
| Spontaneous abortion | 0.3%[19] | NA | 1,275[23] | 4 | 0 | 96,432,192 | 0.0 |
| Victim lost productivity | 100.0%[i] | 100.0%[i] | 516[24] | 516 | 516 | 13,030,592,521 | 0.4 |
| **Long-term outcomes** | | | | | | | |

 LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

SP - 21

Author Manuscript    Author Manuscript    Author Manuscript    Author Manuscript

Peterson et al.

Am J Prev Med Author manuscript; available in PMC 2017 June 01.

| Measure | Marginal outcome among victims[a] | | Marginal lifetime cost per outcome,[b] $ | Lifetime cost[c] | | | |
| | Women | Men | | Per victim, $ | | Population, $ | % of total |
| | | | | Women | Men | | |
|---|---|---|---|---|---|---|---|
| Victim mental health | | | | 77,665 | 78,861 | 1,965,406,362,728 | 63.5 |
| Anxiety disorder | 1.3%[2] | | 83,542 | 1,020 | 1,020 | 25,791,864,322 | 0.8 |
| Medical | | | 79,967[25] | 904 | 904 | 22,860,475,943 | 0.7 |
| Lost productivity | | | 9,089[25] | 116 | 116 | 2,931,388,379 | 0.1 |
| Depression | 19.7%[2] | | 328,788 | 64,647 | 64,647 | 1,634,024,259,549 | 52.8 |
| Medical | | | 153,906[26] | 30,261 | 30,261 | 764,887,830,138 | 24.7 |
| Lost productivity | | | 174,882[26] | 34,386 | 34,386 | 869,136,429,410 | 28.1 |
| Eating disorder | 9.4%[2] | | 32,766 | 3,077 | 3,077 | 77,778,861,049 | 2.5 |
| Medical | | | 32,766[27] | 3,077 | 3,077 | 77,778,861,049 | 2.5 |
| Lost productivity | | | 0[27] | 0 | 0 | 0 | <0.1 |
| Posttraumatic stress disorder | 18.6%[2] | | 40,841 | 7,587 | 7,587 | 191,756,565,087 | 6.2 |
| Medical | | | 31,753[28] | 5,898 | 5,898 | 149,083,858,363 | 4.8 |
| Lost productivity | | | 9,089[26] | 1,688 | 1,688 | 42,672,706,724 | 1.4 |
| Medically-serious nonfatal suicide attempt | 7.7%[2,29] | 14.6%[2,29] | 17,362 | 1,333 | 2,529 | 36,054,812,721 | 1.2 |
| Medical | | | 7,872[18,30] | 604 | 1,147 | 16,347,640,605 | 0.5 |
| Lost productivity | | | 9,490[18,30] | 729 | 1,382 | 19,707,172,117 | 0.6 |
| Victim substance use | | | | 31,485 | 36,224 | 805,146,485,847 | 26.0 |
| Alcohol abuse | 2.8%[3] | 5.5%[3] | 19,897 | 563 | 1,101 | 15,285,251,989 | 0.5 |
| Medical | | | 2,261[31,32] | 64 | 125 | 1,736,713,691 | 0.1 |
| Lost productivity | | | 14,312[31,32] | 405 | 792 | 10,994,807,039 | 0.4 |
| Other | | | 3,324 | 94 | 184 | 2,553,731,259 | 0.1 |
| Illicit drug use | 10.4%[33] | 11.4%[33] | 237,532 | 24,784 | 27,058 | 630,917,593,872 | 20.4 |
| Medical | | | 14,491[34,35] | 1,512 | 1,651 | 38,491,321,100 | 1.2 |
| Lost productivity | | | 147,380[34,35] | 15,378 | 16,788 | 391,463,096,543 | 12.6 |
| Other | | | 75,660[34,35] | 7,894 | 8,619 | 200,963,176,229 | 6.5 |
| Smoking | 9.1%[3] | 11.9%[3] | 67,653 | 6,138 | 8,065 | 158,943,639,986 | 5.1 |

SP - 22

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

Peterson et al.

*Am J Prev Med* Author manuscript; available in PMC 2017 June 01.

| Measure | Marginal outcome among victims[a] | | Marginal lifetime cost per outcome,[b] $ | Lifetime cost[c] | | | |
|---|---|---|---|---|---|---|---|
| | | | | Per victim, $ | | | |
| | Women | Men | | Women | Men | Population, $ | % of total |
| Medical | | | 4,545[12] | 412 | 542 | 10,678,757,676 | 0.3 |
| Lost productivity | | | 51,816[12] | 4,701 | 6,177 | 121,736,821,488 | 3.9 |
| Other | | | 11,291[12] | 1,024 | 1,346 | 26,528,060,823 | 0.9 |
| Victim physical health | | | | 5,435 | 2,298 | 131,181,518,249 | 4.2 |
| Asthma | 4.2%[3] | 1.6%[3] | 76,556 | 3,232 | 1,246 | 77,785,654,262 | 2.5 |
| Medical | | | 70,141[36] | 2,961 | 1,142 | 71,267,682,087 | 2.3 |
| Lost productivity | | | 6,415[36] | 271 | 104 | 6,517,972,175 | 0.2 |
| Cervical cancer[j] | 1.6%[37] | NA | 66,589 | 1,086 | 0 | 25,308,935,016 | 0.8 |
| Medical | | | 47,380[38] | 773 | 0 | 18,007,793,710 | 0.6 |
| Lost productivity | | | 19,210[38] | 313 | 0 | 7,301,141,305 | 0.2 |
| Joint conditions | 7.3%[3] | 6.7%[3] | 14,570 | 1,065 | 972 | 26,733,335,689 | 0.9 |
| Medical | | | 13,614[39] | 995 | 908 | 24,980,459,288 | 0.8 |
| Lost productivity | | | 955[39] | 70 | 64 | 1,752,876,400 | 0.1 |
| Sexually transmitted infections | 4.6%[40] | 7.1%[40] | 1,116 | 51 | 80 | 1,353,593,282 | <0.1 |
| Medical | | | 819[41,42] | 38 | 58 | 993,572,740 | <0.1 |
| Lost productivity | | | 297[43] | 14 | 21 | 360,020,542 | 0.0 |
| Convicted perpetrators | | | | 6,175 | 6,175 | 156,077,927,380 | 5.0 |
| Criminal justice | 1.4%[k] | | 93,105[k] | 1,300 | 1,300 | 32,851,988,414 | 1.1 |
| Lost productivity | 1.4%[k] | | 349,233[24] | 4,875 | 4,875 | 123,225,938,966 | 4.0 |

*Note:* Cited references were the basis for marginal probabilities and costs demonstrated in this table. Appendix and Appendix Tables 1–3 (available online) demonstrate how data as reported in reference studies were used to calculate data as presented in this table. Costs are 2014 USD.

[a] Combined marginal outcomes for men and women reflect estimates from studies that controlled for victim sex but did not report final results by sex (Appendix Table 1 has details, available online).

[b] Marginal costs without references are calculated from other data in the table, for example, category sums.

[c] Per victim cost is marginal probability multiplied by marginal cost. Population cost by outcome is the number of victims by sex multiplied by the per-victim cost. Total per-victim by sex and total population costs are the sum of all per-victim by sex and population costs by outcome.

[d] Details of reference studies reported in Appendix Table 1 (outcomes); Appendix Table 2 (costs); Appendix Table 3 (discounted cost calculations) (available online).



LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

Peterson et al.

[e] Includes victim property damage/loss, adoption costs, "other" costs attributable to smoking and alcohol abuse (Appendix Table 3 has details, available online).

[f] Unpublished data from the U.S. Department of Justice.

[g] Unpublished data from Pacific Institute for Research and Evaluation.

[h] Marginal probability represents the estimated probability of each rape-related pregnancy outcome among all female victims with lifetime experience of attempted and completed rape, calculated using the proportion of female attempted and completed rape victims that experienced completed penetration rape from 2011 U.S. NISVS (survey-weighted 13,826,000/23,305,000 female victims, or 59%).[1] Marginal outcome presented in this way for consistency with other measures in this table. Supporting calculations demonstrated in Appendix Table 1 (available online).

[i] Assumed.

[j] Marginal probability represents the estimated probability of cervical cancer among all female victims with lifetime experience of attempted and completed rape, calculated as with (g).[1]

[k] See Table 2.

DOJ, U.S. Department of Justice; ED, emergency department; IFHP, International Federation of Health Plans; NA, not applicable; NISVS, U.S. National Intimate Partner and Sexual Violence Survey; SAMHSA, Substance Abuse and Mental Health Services Administration; WISQARS, Web-based Injury Statistics Query and Reporting System; USD, U.S. dollars.



LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

SP - 24

Author Manuscript     Author Manuscript     Author Manuscript     Author Manuscript

Peterson et al. — Page 16

**Table 2**

Details of Estimated Criminal Justice Costs (2012 USD)

| Measure | Input | Unit cost[a] | Attributable to sexual violence | | |
|---|---|---|---|---|---|
| | | | Proportion of total | Annual cost | Per convicted perpetrator lifetime cost |
| Annual rape victims, n | | | | | 90,130[b] |
| Women | 1,929,000[1] | | | | |
| Men | 219,000[c] | | | | |
| Total U.S. Government justice system annual spending, $ | 265,160,340,000[50] | | | 2,702,590,946[b] | |
| Police protection annual spending, $ | 126,434,125,000[50] | | | | |
| Annual arrests, All offenses, n | 11,205,833[51] | 11,283[b] | 0.2%[b] | 237,019,565[b] | |
| Annual arrests, Rape offense, n | 21,007[51] | | | | |
| Judicial and legal annual spending, $ | 57,935,169,000[50] | | | | |
| Annual arrests, All offenses, n | 11,205,833[51] | 5,170[b] | 0.2%[b] | 108,608,088[b] | |
| Annual arrests, Rape offense, n | 21,007[51] | | | | |
| Corrections annual spending, $ | 80,791,046,000[50] | 11,641[b] | | 2,356,963,293[d] | |
| Total corrections population, n[e] | 6,940,500[5] | | | | |
| Corrections spending per sexual violence perpetrator, $ | | 78,603[f] | | | |
| Total estimated corrections duration per sexual violence perpetrator, years, M[g] | 7.4[b] | | | | |
| Proportion of rape perpetrators sentenced to[h]: | | | | | |
| Probation, % | 8[53] | | | | |
| Probation term served, all offenses, years, M | 1.8[54] | | | | |
| Jail, % | 5[53] | | | | |
| Jail term served, sexual assault offense, years, M | 2.2[55] | | | | |
| Prison, % | 84[53] | | | | |
| Prison term served, state and federal, years, M[i] | 6.4[b] | | | | |
| State prison term, rape offense, years, M | 6.6[56] | | | | |
| Annual state prisoners, rape offense, n | 160,900[57] | | | | |

*Am J Prev Med*. Author manuscript; available in PMC 2017 June 01.

LEGISLATIVE INTENT SERVICE, INC.   (530) 666-1917



SP - 25

Peterson et al.                                                                                                                                         Page 17

| Measure | Input | Unit cost[a] | Attributable to sexual violence | | |
|---|---|---|---|---|---|
| | | | Proportion of total | Annual cost | Per convicted perpetrator lifetime cost |
| Federal prison term, sex offense, years, M | 4.5[58] | | | | |
| Annual federal prisoners, sex offense, n | 13,524[59] | | | | |
| Term served on parole, all offenses, years, M[j] | 1.8[60] | | | | |
| Discount rate for annual spending after Year 1, % | 3.0[k] | | | | |
| Estimated proportion of victims that have a perpetrator convicted, %[l] | 1.4[b] | | | | |
| Annual offenses known to law enforcement, forcible rape, n | 108,612[61] | | | | |
| Annual offenses known, rape, as % of 2010 rape victims reported in NISVS[m] | 5.4[b] | | | | |
| Annual cleared offenses, rape, as % of known offenses | 41[62] | | | | |
| Annual offenses resulting in conviction, forcible rape, as % of annual cleared offenses | 68[53] | | | | |

*Note:* Costs are 2012 USD.

[a] Unit cost refers to per offense or person in the corrections population.

[b] Calculated from data elsewhere in the table.

[c] Unpublished NISVS 2010–2012 data from the U.S. Centers for Disease Control and Prevention.

[d] Annual cost of corrections spending attributable to sexual violence refers to the lifetime discounted cost of convicted perpetrators that annually enter the corrections system, calculated as the discounted lifetime cost of corrections per perpetrator ($78,603) multiplied by the estimated number of sexual violence perpetrators that are convicted (1.4% of 1,929,000 + 219,000).

[e] Total corrections population refers to individuals in prison, jail, probation, parole.

[f] Corrections spending per sexual violence perpetrator calculated as average annual spending per person in the corrections population (i.e., $11,641) multiplied by the total estimated corrections duration per sexual violence perpetrator (i.e., 7.4 years), with annual costs after the first year discounted to present value by 3%.

[g] Total estimated corrections duration per sexual violence perpetrator calculated as the sum of parole, prison, and probation terms.

[h] Sentence type does not sum to 100% (excludes 3% of convicted perpetrators not sentenced to incarceration or probation; no further disposition data available).

[i] Combined state and federal prison term served calculated as the average term served in state and federal prison weighted by the number of prisoners at the state and federal level.

[j] Parole defined in source as a period of conditional supervised release in the community following a prison term.

[k] Assumed.

[l] Proportion of rape perpetrators that are convicted calculated as the estimated proportion of total rape offenses known to law enforcement annually (i.e., 5.4%) multiplied by the number of cleared forcible rape offenses annually (i.e., 41%), multiplied by the proportion of forcible rape offenses resulting in a conviction annually (i.e., 68%).

Author Manuscript    Author Manuscript    Author Manuscript    Author Manuscript



LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

SP - 26

Author Manuscript    Author Manuscript    Author Manuscript    Author Manuscript

[m]Estimated proportion of annual rape offenses known to law enforcement calculated as the number of annual forcible rape offenses known to law enforcement (i.e., 108,612) divided by the estimated annual number of rape victims (i.e., 1,929,000 + 219,000).

DOJ, U.S. Department of Justice; FBI, U.S. Federal Bureau of Investigation; NISVS, National Intimate Partner and Sexual Violence Survey; USD, U.S. dollars.

Peterson et al.

*Am J Prev Med* Author manuscript; available in PMC 2017 June 01.

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

Filed 10/1/21  Dababneh v. Lopez CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| MATTHEW DABABNEH, | C088848 |
| Plaintiff and Respondent, | (Super. Ct. No. 34-2018-00238699-CU-DF-GDS) |
| v. | |
| PAMELA LOPEZ, | |
| Defendant and Appellant. | |

In a letter complaint to the chair of the California Assembly Rules Committee, Pamela Lopez reported that Assembly member Matthew Dababneh pushed her into a bathroom at a 2016 party in Las Vegas, blocked the door, and masturbated while urging her to touch him.  On the same day she mailed the letter, Lopez called a press conference to announce that she had submitted the complaint to the Assembly, described the incident and stated that she had spoken to friends privately about it at the time.  Also on the same day, the Los Angeles Times published an article entitled "California assemblyman accused of forcing lobbyist into bathroom and masturbating."  In the article, Lopez

1



LEGISLATIVE INTENT SERVICE, INC.   (530)  666-1917

provided more detail about the incident, including that Dababneh said he could not believe what he had just done.  Dababneh resigned from the Legislature at the beginning of January 2018.

Dababneh sued Lopez for defamation and intentional infliction of emotional distress, alleging that she made knowingly false public statements.  Lopez brought a special motion to strike Dababneh's complaint under Code of Civil Procedure section 425.16, California's anti-SLAPP law.[1]  The trial judge denied the motion, ruling that Lopez's statements to the press were not privileged.

We conclude that Lopez's statements to the press regarding her report to the Legislature come within the privilege set forth in Civil Code section 47, subdivision (d), for a "fair and true report" of a "legislative" proceeding, and accordingly cannot provide a basis for an action for defamation or intentional infliction of emotional distress.[2]  The trial court's order is reversed with directions to grant the special motion to strike.

## FACTUAL AND PROCEDURAL BACKGROUND

In a letter dated December 4, 2017, to Ken Cooley, the chair of the Assembly Rules Committee, Lopez stated:  "I am writing to report that I was sexually assaulted by Assembly Member Dababneh."

Lopez continued:  "It is not my intention to report every detail of what happened in this letter, but here is a brief description.  [¶]  On January 16, 2016, Mr. Dababneh and I were two of the many invited guests at a party to celebrate two mutual friends who were planning to get married.  Most of the guests in attendance were political professionals,

---

[1]  "SLAPP is an acronym for 'strategic lawsuit against public participation.' " (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 732, fn. 1.)

[2]  Undesignated statutory references are to the Civil Code.

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

including many colleagues and associates I have known for years.  I should have had no reason to fear for my safety.  When I went to the bathroom after being at the party for a few hours, I felt the weight of a body push me into the restroom.  I heard the door slam behind us.  When I turned around, I saw that it was Matt Dababneh.  He stood blocking the door and began to masturbate and move toward me, urging me to touch him.  It was a terrifying experience.  During the time he blocked me in that room, my instincts were focused on escaping without any physical contact and in a way that would not cause a scene.  Before the ordeal ended, he told me not to tell anyone."

"Although a number of press reports have placed this event in Sacramento, it actually occurred at a private venue inside a Las Vegas Hotel.  I went along with the assumption that it happened in Sacramento because I realized that correcting this assumption would likely have led to the identification of Mr. Dababneh and I was not ready to take this step."

Lopez stated that she decided to name Dababneh after members of an Assembly subcommittee, including Cooley, encouraged women to come forward.

A week earlier, on November 27, 2017, Cooley spoke at a hearing of the Assembly Subcommittee on Harassment, Discrimination, and Retaliation Prevention and Response.  Cooley stated that "[t]he Assembly strongly encourages all individuals to report any incidents of harassment, discrimination, or retaliation.  I hear--I understand that people are afraid to report, but this is the area where we need to go where it can be brought forward.  Ultimately, this institution needs to set a tone that this is just--it is unacceptable--and that if people see it or encounter it, they need to say something."

At the hearing, Cooley described the process under the Assembly sexual harassment policy wherein a complaint, verbal or in writing, could be submitted to various government officials, including any member of the Rules Committee.  When a complaint is received, the matter is assessed.  The Assembly provides all parties due process and aims to reach reasonable conclusions based on the evidence collected.  The

LEGISLATIVE INTENT SERVICE, INC.   (530) 666-1917



SP - 30

Assembly has a duty to investigate and take corrective action. When a policy violation is alleged, the chief administrative officer of the Assembly and the human resources director will review the facts to determine next steps. This can include investigation by an independent attorney or by the human resources staff. The investigator interviews witnesses and gathers facts to determine if the allegation is substantiated. If the allegation is substantiated, corrective measures are taken depending on the seriousness of the violation from verbal counseling to suspension without pay, demotion, or additional training. The final step is to inform the complainant of the outcome of the investigation, but not provide specific information on the corrective measures.

The same day that Lopez submitted the letter to the Assembly, she gave a press conference. Lopez stated at the outset: "I'm here to announce that this morning I submitted a report to the Assembly Rules Committee identifying that I was sexually assaulted in January of 2016 by Assembly Member Matt Dababneh."

At the press conference, Lopez further described the circumstances that she said made her come forward, including that Cooley "urged women who have been sexually harassed within the California political community to step forward and speak to the legislature and seek redress through their processes" and "[t]his is a moment of collective action. Many women have stepped forward and said, 'Me too. I've been sexually harassed,' or, 'I've been sexually assaulted in my workplace.' And it's taken courage for them to do that."

At the press conference Lopez was asked, "Could you just confirm where the incident happened? I believe in the letter to Ken Cooley it was in Las Vegas. Can you tell us after that happened, did you speak to anyone around you -- to anyone around you about it after that?"

Lopez answered: "Yes. The event occurred at a celebration, a friend's celebration of a wedding in Las Vegas. And I did speak to friends privately after that. I was hurt and scared, and so I reached out to the people who love me, some of my closest friends and

4

LEGISLATIVE INTENT SERVICE, INC.   (530) 666-1917

family members, and talked about my experience with them.  [¶]  I was also terrified of being shunned or retaliated against if the Capitol community knew what happened to me. So I -- I made my closest friends and loved ones swear -- swear to secrecy."

Lopez was asked, "And I know you've been through this, but if you can just kind of recap what happened that day."  Lopez responded:  "Yes.  I was celebrating a wedding with friends.  I had no reason to think that I was unsafe.  It was a wonderful, festive event.  And I went to the restroom and I felt a body, a large body, rush up behind me, use the weight of their body to push me into the restroom, and I heard the door slam behind us.  [¶]  I spun around and realized that I was face to face with Matt Dababneh, and that he had very quickly exposed himself and begun masturbating.  I started backing up, and he moved toward me while he was masturbating, and in explicit terms told me to touch his genitals while he was masturbating.  [¶]  And I remember thinking, Oh, my God. What do I do?  What do I do?  I thought:  Make it very clear that I do not want to be here, and that there is no misunderstanding.  And so I said several times 'No, I will not touch you.  No, I will not touch you.' "

On the same day as the press conference, the Los Angeles Times published an article titled "California assemblyman accused of forcing lobbyist into bathroom and masturbating."  (<https://www.latimes.com/politics/la-pol-ca-matt-dababneh-harassment-20171204-story.html> [as of Sept. 30, 2021].)  The article began:  "Sacramento lobbyist Pamela Lopez has claimed that, in 2016, Democratic Assemblyman Matt Dababneh followed her into a bathroom, masturbated in front of her and urged her to touch him. Dababneh has strongly denied the allegation.  [¶]  'It was Matt Dababneh,' Lopez told the Times in a November interview.  [¶]  Lopez jolted the California political world seven weeks ago when she first shared her account of an encounter in Las Vegas, joining more than 140 women as they denounced in an open letter a 'pervasive' culture of sexual harassment and misconduct in the state Capitol.  [¶]  Lopez had not publicly accused

5

(530)  666-1917          LEGISLATIVE INTENT SERVICE, INC.

Dababneh until Monday, when she formally filed a complaint with the Assembly and named him at a news conference."

The article reported that Lopez described the encounter with Dababneh as follows: "Lopez said she felt a large body following her into a single-use bathroom. She said it was Dababneh, who is more than 6 feet tall and sturdily built. [¶] 'The weight of that body was pushing me into the restroom. I heard the door slam behind me,' Lopez said. 'I spun around and by the time I had gotten myself spun around, I saw that I was facing Matt Dababneh and he had unzipped his pants and exposed himself and had begun to masturbate.' [¶] Lopez said she backed away from him, her mind racing with the realization of what was happening. 'The panic was just immense,' she said. [¶] Lopez said Dababneh demanded that she touch his genitals.

" 'I remember thinking, at the very least, make it very clear you don't want to be here,' she said. 'Don't say anything to allow him to misinterpret your refusal as you being shy or coquettish.' [¶] She said she stated firmly she would not touch him, and repeated it multiple times. She said he then asked her to touch him elsewhere, even just rest her arm on him. Lopez said she interpreted the request as a type of attempted negotiation. Again, she refused. She said that Dababneh then ejaculated into the toilet. The whole encounter lasted less than five minutes, Lopez said.

"Lopez said that Dababneh immediately expressed regret and disbelief. She said he told her, 'I can't believe I just did that.' [¶] Lopez said she pointed him toward the door. She said that, as he exited, Dababneh told her not to say anything. She said she turned the request back on him, raising her voice: 'Don't *you* tell anyone this happened.' "

On June 25, 2018, the chief administrative officer informed Lopez by letter that an independent attorney had investigated her allegations, interviewing 52 witnesses and Lopez, and made factual findings in a confidential report substantiating that it was more likely than not the facts Lopez alleged did occur. This conduct was found to violate the

6

Assembly policy against sexual harassment.  Dababneh appealed and, on August 24, 2018, Cooley informed Lopez that, after a thorough review and evaluation, the appeal was denied.[3]

On August 14, 2018, Dababneh filed a complaint for defamation and intentional infliction of emotional distress arising out of Lopez's accusation of sexual assault. Dababneh alleged that "on or about December 4, 2017, Lopez filed a false complaint with the California State Assembly, in which she alleged that, on the evening of January 16, 2016, while at the friends' party, Dababneh pushed Lopez into a bathroom and masturbated in front of her while urging her to touch him."  Dababneh further alleged that, "on the same day, December 4, 2017, Lopez conducted a news conference in Sacramento, at which she made the same false allegations against Dababneh.  In the news conference, Lopez again fabricated that Dababneh followed her into a restroom, exposed himself, masturbated, and asked her to touch him."

In Dababneh's cause of action for defamation, he alleged that Lopez "made false and defamatory statements about Plaintiff including that Plaintiff pushed her into a bathroom, masturbated in front of her and urged her to touch him.  [¶]  . . . Those statements were false and known to Lopez to be false when made.  The statements were made publicly and in a variety of ways, including to various news media and in a press conference on December 4, 2017 held at K Street Consulting in Sacramento.  These false statements were published and re-published to the general public."  Dababneh alleged

_____

[3] We deferred ruling on Dababneh's request for judicial notice of documents from a writ proceeding he instituted to require the Assembly to set aside its decision.  We now deny the request.  These documents were not presented to the trial court and are irrelevant to the issues on appeal.  (See *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3; *Cassidy v. California Bd. of Accountancy* (2013) 220 Cal.App.4th 620, 625-626.)

LEGISLATIVE INTENT SERVICE, INC.    (530)  666-1917

that Lopez "acted maliciously, with knowledge that the statements in the press conference and complaint filed with the California State Assembly were false." Dababneh's cause of action for intentional infliction of emotional distress incorporated the facts alleged in his defamation claim and did not allege additional facts giving rise to his claim of emotional distress.

On October 25, 2018, Lopez filed an anti-SLAPP motion under section 425.16 of the Code of Civil Procedure.  Lopez argued that the "two instances of speech" alleged in Dababneh's complaint—Lopez's written complaint to the Assembly and the press conference—were absolutely protected under subdivision (e)(1) and (2) of Code of Civil Procedure section 425.16.  Lopez further argued that her speech was related to an issue of public concern, i.e., exposure and eradication of sexual misconduct, within the meaning of subdivision (e)(3) of Code of Civil Procedure section 425.16.  Lopez also contended that Dababneh could not establish a probability of prevailing on his claim that Lopez's statements were false and unprivileged under Civil Code section 47, subdivisions (b), (c) and (d).

In opposition, Dababneh submitted a declaration stating that none of the conduct Lopez described occurred and the claims she made, including in statements to the press, were categorically false.  Dababneh argued that Lopez's statements at the press conference and in the Los Angeles Times article were not privileged under any subdivision of section 47.  Dababneh further contended that Lopez's anti-SLAPP motion should be denied because he could demonstrate a likelihood that he could prevail on his defamation claim because Lopez knowingly made false statements that he sexually assaulted her.

On December 6, 2018, the trial court conducted a hearing on Lopez's anti-SLAPP motion and took the matter under submission.  On January 16, 2019, the court issued a ruling.  The court noted that Dababneh appeared to concede that Lopez's statements to the Assembly and the press alleged in his complaint arose from activity protected by the

8

LEGISLATIVE INTENT SERVICE, INC.    (530)  666-1917

anti-SLAPP statute.  The court observed that Lopez's statements to the press were "at the very least" on a matter of particular public interest—sexual harassment in the workplace—and concerned a public figure.  The court also noted that Lopez's letter to the Assembly was submitted to a legislative body.  The court concluded that "[t]herefore, the primary question presented here is whether Plaintiff has presented evidence sufficient to support a judgment in his favor" on either or both of his claims of defamation and intentional infliction of emotional distress.

The trial court found that Dababneh, as a public figure, was required to prove that a defamatory statement was made with " 'actual malice,' " i.e., that Lopez knew that her statements that Dababneh assaulted her were false or she made them with reckless disregard whether they were true or not.  The court concluded that establishing Lopez knew her statements were false "is essentially one and the same" as establishing that they were false.  "Thus, in this case, a finding of 'falsity' includes a finding of 'actual malice.' "

The trial court noted that Dababneh submitted a declaration swearing that he never used the restroom and never masturbated in front of Lopez.  Reasoning that "the matter comes down to a credibility determination" as to whether Dababneh or Lopez is telling the truth, the court found that Dababneh's declaration, which the court said it must accept as true in ruling on an anti-SLAPP motion, was sufficient evidence alone to support a finding that Dababneh had a probability of establishing that Lopez's statements were false.

The court rejected Lopez's contention that her statements at the press conference fell within the protection of section 47, subdivision (b), for statements made in a legislative proceeding.  The court concluded Lopez's complaint letter qualified for this privilege but the press conference did not.

The court also disagreed with Lopez that her statements to the press were privileged under section 47, subdivision (d), as a "fair and true" report in a

9

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

communication to a public journal of a legislative proceeding.  The court noted that the privilege also applies to accurate descriptions of the allegations in a complaint filed in a civil lawsuit regardless of the truth of the allegations, if it is clear the complaint is being described.  The court concluded the privilege did not apply because Lopez's statements to the press did not describe a legislative proceeding, i.e., the Assembly's revision of its sexual harassment policy, but rather her allegations of sexual assault.  Further, the trial court reasoned that publication of the contents of preliminary pleadings such as a complaint before any judicial action had been taken were not privileged, in order to discourage a scheme to file a complaint to publicize its contents and then drop the action.

Finally, the trial court found that Lopez's statements did not qualify for the limited common interest privilege "which applies only to communications made without malice," because Dababneh had "presented sufficient evidence to demonstrate a probability of success on his claims, which requires a showing of malice."

Thus, the court granted Lopez's anti-SLAPP motion as to her complaint to the Assembly but denied the motion regarding her statements to the press.

## DISCUSSION

### *Anti-SLAPP Statute*

Code of Civil Procedure section 425.16, subdivision (b)(1), provides that a cause of action arising from any act "in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue" is subject to a special motion to strike "unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."

Code of Civil Procedure, section 425.16, subdivision (e), defines the phrase " 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' " to include "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or

10

(530) 666-1917     LEGISLATIVE INTENT SERVICE, INC.

any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

Application of the anti-SLAPP statute involves a two-step process:  " 'First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. . . .  If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim.' [Citation.]" (*Taus v. Loftus* (2007) 40 Cal.4th 683, 712; *Burrill v. Nair* (2013) 217 Cal.App.4th 357, 378 (*Burrill*), disapproved on another ground in *Baral v. Schnitt* (2016) 1 Cal.5th 376, 396, fn. 11.)  We review the trial court's ruling denying Lopez's anti-SLAPP motion de novo.  (*Burrill, supra*, 217 Cal.App.4th at p. 382.)

Dababneh does not dispute that the statements alleged in his complaint constituted protected activity under Code of Civil Procedure section 425.16.  Further, there is no dispute that Lopez's complaint to the Assembly is privileged under Civil Code section 47, subdivision (b).[4]  Thus, this appeal concerns only the second prong of the anti-SLAPP analysis and Lopez's statements to the press.

---

[4]  (See *Hagberg v. California Federal Bank* (2004) 32 Cal.4th 350, 363-364 (*Hagberg*) ["section 47[, subdivision ](b) privilege applies to complaints to governmental agencies requesting the agency investigate or remedy wrongdoing"]; *Cruey v. Gannett Co.* (1998) 64 Cal.App.4th 356, 368 [§ 47, subd. (b), [cl. ](3) applies to employee's sexual harassment complaint to Equal Employment Opportunity Commission].)

11

(530)  666-1917    LEGISLATIVE INTENT SERVICE, INC.

We first consider whether Lopez's statements to the press and in the article were privileged under section 47, subdivision (b), clause (1), the legislative proceeding privilege, and/or subdivision (d), the fair and true reporting privilege. On that issue, "[d]efendants bear the burden of proving the privilege's applicability. [Citation.]" (*Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 278 (*Hawran*); *Laker v. Board of Trustees of California State University* (2019) 32 Cal.App.5th 745, 769.) But Dababneh "retains the burden to show, under the second step of the anti-SLAPP analysis, that he has a probability of prevailing on the merits of the claim." (*Laker, supra*, 32 Cal.App.5th at p. 769.) A plaintiff cannot establish a probability of prevailing if a privilege precludes liability on a defamation claim. (*Ibid.*) Thus, if a challenged statement is privileged, the trial court should grant the anti-SLAPP motion. (*Ibid.*; see also *Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1065.)

Because there is no factual dispute over the content of the statements Lopez made at the press conference and in the Los Angeles Times article, whether the privilege is applicable is a question of law. (*Hawran, supra*, 209 Cal.App.4th at pp. 278-279.)

<center>*Legislative Proceeding Privilege*</center>

Section 47, subdivision (b), provides that a "privileged publication" is one made "[i]n any (1) legislative proceeding, (2) judicial proceeding, (3) in any other official proceeding authorized by law . . . ." Construing section 47, subdivision (b) privilege in the context of a judicial proceeding, the California Supreme Court has held that the privilege "applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 212 (*Silberg*).)

Lopez acknowledges that "the litigation privilege does not always apply to statements made about litigation to the general public through the press." Indeed, in *Argentieri v. Zuckerberg* (2017) 8 Cal.App.5th 768 (*Argentieri*), the court held there must

<center>12</center>

(530) 666-1917    LEGISLATIVE INTENT SERVICE, INC.

be "sufficient nexus between the statement and the litigation. Specifically, the statement must 'achieve the objects of the litigation,' which requires that it 'be connected with, or have some logical relation to the action.' " (*Id.* at p. 785; *Silberg, supra*, 50 Cal.3d at pp. 219-220.) "It therefore must 'function as a *necessary or useful step in the litigation process* and . . . serve its purposes.' [Citation.] 'This is a very different thing from saying that the communication's *content* need only be related in some way to the subject matter of the litigation . . . .' [Citation.]" (*Argentieri, supra*, 8 Cal.App.5th at pp. 785-786.)

In *Argentieri*, Facebook and its founder, Mark Zuckerberg, brought a malicious prosecution action against, among others, Paul Argentieri, an attorney for Paul Ceglia, whose suit contending he had entered into a written contract with Zuckerberg giving Ceglia an 84 percent ownership interest in Facebook was dismissed as a fraud on the court and because Ceglia had spoliated evidence. (*Argentieri, supra*, 8 Cal.App.5th at pp. 772-773.) General counsel for Facebook e-mailed a release to the press stating that attorneys for Ceglia pursued his suit knowing that it was based on forged documents. (*Ibid.*) After the malicious prosecution action was dismissed against Argentieri, he sued claiming he was defamed by the e-mail. (*Id.* at p. 773.) Argentieri's suit was dismissed on an anti-SLAPP motion. (*Ibid.*) The trial court based its decision in part on a determination that the e-mail was covered by the litigation privilege under section 47, subdivision (b). (*Argentieri, supra*, 8 Cal.App.5th at p. 779.)

The appellate court disagreed, finding that the e-mailed press release was not a "useful step" in the malicious prosecution action. (*Argentieri, supra*, 8 Cal.App.5th at p. 786.) The court rejected the defendants' argument that the press release furthered the goal of the lawsuit to "set the public record straight" regarding Ceglia's fraud and to hold his lawyers accountable. (*Ibid.*) The court characterized this argument as "nothing more than saying they wanted the world to know their view of the dispute—which does not further the litigation *itself.*" (*Id.* at pp. 786-787.)

13

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

We find a parallel with Lopez's press conference to announce her complaint to the Assembly. As described above, Lopez's complaint set in motion a process which led to an investigation by an independent attorney, who interviewed witnesses and submitted a report that Lopez's claims were more likely than not substantiated. Dababneh appealed and the Assembly denied the appeal. Lopez's press conference was not a "useful step" in this process. Rather, the press conference served to let the world know of her complaint to the Assembly naming Dababneh, as well as highlight the significance and circumstances of her decision to speak out as part of the "Me Too" movement, which did not further the Assembly's process of assessing, investigating and reaching a determination on Lopez's sexual harassment complaint.

In *Hawran, supra*, 209 Cal.App.4th 256, the court expressed a similar view regarding a press release a company issued after an internal investigation implicating its chief financial officer in mishandling research and development of a diagnostic test for Down syndrome, which led the Securities and Exchange Commission (SEC) to commence an investigation. (*Id.* at pp. 263-264.) When the chief financial officer sued alleging defamation and other causes of action, the defendants brought an anti-SLAPP motion, arguing in part that the press release was absolutely privileged under section 47, subdivision (b), i.e., statements made in an official proceeding. (*Hawran, supra*, 209 Cal.App.4th at p. 265.)

The *Hawran* court said, "[i]t is questionable whether a press release so widely disseminated to the public at large . . . can meet the requirements of the official proceeding privilege." (*Hawran, supra*, 209 Cal.App.4th at p. 283.) The court cited *Rothman v. Jackson* (1996) 49 Cal.App.4th 1134, in which the court declined to apply the litigation privilege in section 47, subdivision (b), to press conferences or press releases, "explaining that the ' "connection or logical relation" which a communication must bear to litigation in order for the privilege to apply, is a *functional* connection,' i.e., the communication must 'function as a necessary or useful step in the litigation process and

14

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

must serve its purposes' [citation] and 'cannot be satisfied by communications which only serve interests that happen to parallel or complement a party's interests in the litigation,' including vindication in the court of public opinion [citation]." (*Hawran, supra*, 209 Cal.App.4th at p. 283.)

Lopez, however, argues that subdivision (b), clause (1) of section 47 regarding statements made in legislative proceedings is broader than the litigation privilege found in section (b), clause (2). Lopez principally relies on *Scott v. McDonnell Douglas Corp.* (1974) 37 Cal.App.3d 277 (*Scott*). In *Scott*, the city manager of Santa Monica alleged that the defendants published letters containing defamatory statements about his character and performance at city council proceedings. (*Id.* at pp. 282-284.)

The *Scott* court noted that, under the legislative proceeding privilege codified in section 47, "[a]bsolute immunity attaches to statements made before a legislative body, and the existence of malice on the part of the declarant will not defeat the privilege [citation] when it is shown that the statement which is alleged to be defamatory bears some connection to the work of the legislative body." (*Scott, supra*, 37 Cal.App.3d at p. 285.) The court said: "In the instant case, the allegedly defamatory statements have a clear connection with the work of the legislative body (the Santa Monica City Council) in that they relate to the retention of an employee whose appointment and removal, as well as continuing review of his performance and qualifications, were the responsibility of the city council. The reading of the letters at the city council meeting was privileged, as was the distribution of copies of the letters to members of the audience (including the press) attending the council meeting." (*Id.* at pp. 285-286, fn. omitted.)

The court did not apply the legislative proceeding privilege to certain statements made outside the council chambers. Rather, the court found that these particular statements were not libelous, because " 'it is settled law that mere expression of opinion or severe criticism is not libelous, even though it adversely reflects on the fitness of an individual for public office.' [Citation.]" (*Scott, supra*, 37 Cal.App.3d at p. 290.)

15

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

The *Scott* court also addressed the principle that the section 47 privilege applies to statements made to achieve the objective of the relevant proceeding and offered this statement on how the legislative proceedings privilege operates differently. "[W]e recognize that the immunity historically afforded to legislators does not impose a restriction that the statements made by a member of a legislative body are protected only if they are directed toward achieving the object of the legislation. Rather, the rule appears well settled that the general immunity afforded legislators extends to all that is spoken or done in the course of legislative proceedings. [Citation.]" (*Scott, supra*, 37 Cal.App.3d at p. 288.) "The immunity attaches also to interested members of the public who wish to address themselves to matters pending before a legislative body. [Citations.] Since we hold that the statements made and copies of the letters distributed at the city council meeting were privileged, plaintiff's predication of liability upon their utterance and/or distribution *at that* time must fail." (*Ibid.*)

In sum, *Scott* does not address the legislative proceeding privilege outside of the proceedings themselves, including statements made at a press conference, as here, to inform the public of a complaint submitted to the Legislature. Rather, *Scott* stands for the principle that the legislative proceeding privilege is interpreted broadly to statements by legislators and members of the public who wish to address matters before the legislative body. The privilege applies not just to statements directly related to the proceeding but all that is spoken or occurs during the proceeding. (*People ex rel. Harris v. Rizzo* (2013) 214 Cal.App.4th 921, 944 ["Civil Code section 47 subdivision (b)[, clause ](1) declares as absolutely privileged any publication made in any legislative proceeding"]; but see *Frisk v. Merrihew* (1974) 42 Cal.App.3d 319, 324 ["What has been said relative to judicial proceedings is applicable with equal force to other official proceedings authorized by law, such as the school board meeting in question. Thus, the determinative issue in this case is not whether the defamation took place on a privileged occasion, but

16

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

whether the defamatory statement was made to achieve the object of the meeting convened to discuss the school budget"].)

Lopez also cites *Cayley v. Nunn* (1987) 190 Cal.App.3d 300 (*Cayley*), which involved the application of the litigation privilege to a dispute between neighbors about a height variance sought by the Nunns from the city council to add a bedroom over the garage and opposed by the Cayleys because they claimed it would block their view. (*Id.* at p. 302.) The Cayleys sued the Nunns alleging they circulated petitions presented to the city council to evidence neighborhood support for their position and in doing so made slanderous comments to potential signers that the Cayleys had tapped the Nunns' telephone. (*Ibid.*)

The *Cayley* court held that the litigation privilege applies to city council proceedings, citing *Scott*. (*Cayley, supra*, 190 Cal.App.3d at p. 303.) The court continued that "communications made prior to legal action itself are privileged if they have some logical connection to the suit and are made to achieve the objects of the litigation." (*Id.* at pp. 303-304.) The privilege applies outside the courtroom and embraces preliminary conversations that "are in some way related to or connected to the pending or contemplated action." (*Id.* at p. 304.) To accomplish the purpose of the privilege and as an adjunct to the right of access to judicial and quasi-judicial proceedings, private parties and interested persons must be able to confer, marshal evidence and prepare materials for presentation in the proceeding " ' "unchilled by the thought of subsequent judicial action against such participants; *provided always, of course, that such preliminary meetings, conduct and activities are directed toward the achievement of the objects of the litigation or other proceedings. . . .*" ' " (*Ibid.*, italics added.)

The court concluded "it is clear that the alleged slanderous statements were made during preliminary conversations while defendants were marshalling evidence and preparing for their presentation at the city council meeting. Therefore, defendants'

17

(530) 666-1917    LEGISLATIVE INTENT SERVICE, INC.

statements cannot be considered irrelevant to the proceedings and they were directed toward the achievement of the objects of the proceeding." (*Cayley, supra,* 190 Cal.App.3d at p. 304; see also *Dean v. Friends of Pine Meadow* (2018) 21 Cal.App.5th 91, 107-108 [" ' "The privilege extends beyond statements made in the proceedings, and includes statements made to initiate official action" ' "]; *1-800 Contacts, Inc. v. Steinberg* (2003) 107 Cal.App.4th 568, 586-587 ["the 'litigation privilege' as statutorily applied to legislative proceedings" applied because "the entire thrust of [defendant's] activity was to enable the enactment of legislation, by soliciting other interested parties to pursue it, and assisting them with information and expertise"].)

*Cayley* does not aid Lopez.  To the contrary, the case undermines Lopez's position that the legislative proceeding privilege is broader than the litigation privilege.  *Cayley* applied the litigation privilege to proceedings before a legislative body (the city council) and adhered to the requirement that a privileged communication must be directed toward the achievement of the object of the litigation or other proceeding.  (*Cayley, supra,* 190 Cal.App.3d at p. 304.)  Moreover, *Cayley* involved marshaling evidence and preparing for a presentation to the city council, not announcing to the press after the fact that a complaint had been submitted to a legislative body.

Lopez places great emphasis on broad statements in *Cayley* that "[t]o partake in the privilege a publication need not be pertinent, relevant or material in a technical sense to any issue in the proceedings.  [Citations.]  The privilege is denied to any participant in legal proceedings only when the matter is so palpably irrelevant to the subject matter that no reasonable man can doubt its irrelevancy and impropriety.  [Citation.]" (*Cayley, supra,* 190 Cal.App.3d at p. 304.)  However, in *Nguyen v. Proton Technology Corp.* (1999) 69 Cal.App.4th 140, the court said:  "Whatever the pre-*Silberg* merits of these expansive views, we think they are clearly outdated in view of the limitations quoted from that case." (*Id.* at p. 149, fn. omitted.)

18

(530) 666-1917   LEGISLATIVE INTENT SERVICE, INC.

We conclude that Lopez's statements to the press were not privileged under section 47, subdivision (b), because they were not made to achieve the objective of her sexual harassment complaint submitted to the Assembly, but rather to announce her complaint to the public and publicize her view of the dispute.

*Fair and True Reporting Privilege*

We come to a different conclusion regarding the privilege under section 47, subdivision (d)(1), which provides in relevant part that a privileged publication includes one made "[b]y a fair and true report in, or a communication to, a public journal, of (A) a judicial, (B) legislative, or (C) other public official proceeding, or (D) of anything said in the course thereof . . . ."  The privilege extends "to both a fair and true report in and a communication to a public journal concerning judicial, legislative or other public proceedings." (*J-M Manufacturing Co., Inc. v. Phillips & Cohen LLP* (2016) 247 Cal.App.4th 87, 97 (*J-M Manufacturing*).)  As with the privilege under section 47, subdivision (b), the fair and true reporting privilege "forecloses a plaintiff from showing a probability of prevailing on the merits" in opposition to an anti-SLAPP motion. (*Argentieri, supra*, 8 Cal.App.5th at p. 787; *J-M Manufacturing, supra*, 247 Cal.App.4th at p. 98.)

However, "[u]nlike the litigation privilege, the fair and true reporting privilege pertains specifically to communications to the press, and it requires that the report be fair and true, not that it actually further the underlying [proceeding]." (*Argentieri, supra*, 8 Cal.App.5th at p. 787; *Sipple v. Foundation for Nat. Progress* (1999) 71 Cal.App.4th 226, 241-242 (*Sipple*).)

" 'The privilege applies if the substance of the publication or broadcast captures the gist or sting of the statements made in the official proceedings.' [Citation.]" (*Burrill, supra*, 217 Cal.App.4th at p. 398.)  " '[T]he publication is to be measured by the natural and probable effect it would have on the mind of the average reader [citations].  The standard of interpretation to be used in testing alleged defamatory language is how those

19

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917



in the community where the matter was published would reasonably understand it [citation]. In determining whether the report was fair and true, the article [or broadcast] must be regarded from the standpoint of persons whose function is to give the public a fair report of what has taken place. The report is not to be judged by the standard of accuracy that would be adopted if it were the report of a professional law reporter or a trained lawyer [citation].' [Citation.]" (*Ibid.*; *Argentieri, supra*, 8 Cal.App.5th at p. 787; *J-M Manufacturing, supra*, 247 Cal.App.4th at p. 100.)

"In evaluating the effect a publication has on the average reader, the challenged language must be viewed in context to determine whether, applying a 'totality of the circumstances' test, it is reasonably susceptible to the defamatory meaning alleged by the plaintiff: ' "[A] defamatory meaning must be found, if at all, in a reading of the publication as a whole." [Citation.] "This is a rule of reason. Defamation actions cannot be based on snippets taken out of context." ' " (*J-M Manufacturing, supra*, 247 Cal.App.4th at p. 100; *McClatchy Newspapers, Inc. v. Superior Court* (1987) 189 Cal.App.3d 961, 975-976 (*McClatchy*) [the defendant "does not have to justify every word of the alleged defamatory material that is published," defendant's "responsibility lies in ensuring that the 'gist or sting' of the report—its very substance—is accurately conveyed"].) " 'Only if the deviation is of such a "substantial character" that it "produce[s] a different effect" on the reader will the privilege be suspended. [Citation.] News articles, in other words, need only convey the substance of the proceedings on which they report, as measured by the impact on the average reader.' [Citation.]" (*Carver v. Bonds* (2005) 135 Cal.App.4th 328, 351-352; *Argentieri, supra*, 8 Cal.App.5th at p. 790.)

" 'The fair report privilege is required because of the public's need for information to fulfill its supervisory role over government. Thus, reports of official proceedings are not privileged "merely to satisfy the curiosity of individuals," but to tell them how their government is performing.' " (*McClatchy, supra*, 189 Cal.App.3d at p. 975.) Courts

20

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

have liberally construed the fair and true reporting privilege. (*Sipple, supra*, 71 Cal.App.4th at pp. 240-241; *J-M Manufacturing, supra*, 247 Cal.App.4th at p. 101; *Healthsmart Pacific, Inc. v. Kabateck* (2016) 7 Cal.App.5th 416, 431 (*Healthsmart*).)

We conclude that the fair and true reporting privilege applies to Lopez's press conference and to the statements attributed to her in the Los Angeles Times article. As Lopez stated at the beginning of the press conference, the purpose of the conference was to announce that she had submitted a complaint to the Assembly Rules Committee that she was sexually assaulted by Dababneh. The facts of that assault that Lopez related at the press conference are substantively the same as in her letter to the committee: at a pre-wedding party at a Las Vegas hotel, Dababneh pushed Lopez into a restroom, blocked the door, and masturbated while urging her to touch him. At the press conference, Lopez related her initial reluctance to name Dababneh and the circumstances that overcame that reluctance, including urging by the committee chair, Cooley, and other legislators for her to come forward and promising a fair process if she did. Lopez's complaint also stated that she was stepping forward because Cooley encouraged her to do so.

Similarly, the Los Angeles Times article begins with the news item that Lopez had named Dababneh in a complaint to the Assembly ("Lopez had not publicly accused Dababneh until Monday, when she formally filed a complaint with the Assembly and named him at a news conference") and reported her allegations in the complaint ("Sacramento Lobbyist Pamela Lopez has claimed that, in 2016, Democratic Assemblyman Matt Dababneh followed her into a bathroom, masturbated in front of her and urged her to touch him.") In the article, Lopez described that circumstances and events that led her to submit a complaint to the Assembly, a subject also referenced in her complaint.

In sum, the gist and sting of Lopez's statements at the press conference and in the article are substantively the same as the allegations in her complaint to the Assembly. The average reader would reasonably interpret Lopez's statements to the press as

21

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

conveying that she had named Dababneh in a complaint alleging that he had forced her to watch him masturbate.  Moreover, Lopez's statements at the press conference and in the article about her complaint included an explanation why she overcame her reluctance to report Dababneh to the Assembly, thereby informing the public " 'how their government is performing.' " (*McClatchy, supra*, 189 Cal.App.3d at p. 975.)

Dababneh counters that " 'gist and sting' " cases are inapposite because he "does not contend that Lopez described the Report inaccurately" in statements to the press. Dababneh argues that "Lopez told the press that Dababneh had assaulted her *as a fact independent of the Report*."  Dababneh cites *Healthsmart,* in which the court said "[a]n attorney may not . . . make defamatory allegations in a complaint and then report the same alleged facts, *as facts*, to the media with impunity." (*Healthsmart, supra*, 7 Cal.App.5th at p. 435.)  "[S]tatements are privileged if they are fair and true reports *about the proceedings* or of what was *said in the proceedings.*  [Citations.]  There is thus a critical difference between communicating to the media what is alleged in the complaint and communicating the alleged facts without reference to the complaint." (*Ibid.*)  "The issue is whether the average viewer or listener of the media reports would understand the . . . statements as communications about the [underlying] complaint (which would be privileged) or as facts (which would not)." (*Id.* at pp. 435-436.)

We find that Lopez's statements to the press were not made as statements of fact without reference to her complaint to the Assembly and the average reader would understand her statements to refer to her complaint.  *Healthsmart*, in fact, is instructive. Dababneh argues, for example, that a "passing reference" to Lopez's complaint in the Los Angeles Times article "is separated by a dozen paragraphs from Lopez's lengthy narrative about the assault."  In *Healthsmart*, the defendant's initial statement in a television news report referred to "a conspiracy among the hospitals and doctors that 'we allege in the complaint,' " but "his subsequent statements do not mention the complaint or allegations . . . ." (*Healthsmart, supra*, 7 Cal.App.5th at p. 436.)  Noting that the news

<div align="center">22</div>

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

reporter referred to the defendant as the attorney for the plaintiff in the underlying lawsuit and the report included background references to the suit, the court concluded that "[t]he average person watching the report in its entirety would reasonably understand that [defendant's attorney] was referring to the allegations in the lawsuit he filed on [his client's] behalf. Although some statements, when viewed in isolation, could be understood to communicate the allegedly defamatory matter as facts, not mere allegations of facts, when the media reports are viewed in their entirety and in the context in which they were made, the only reasonable conclusion is that the statements refer to allegations made in the [underlying] complaint." (*Ibid.*)

In this instance, both the press conference and the news article begin with a reference to Lopez's complaint to the Assembly that Dababneh sexually assaulted her. As mentioned, Lopez stated at the outset that the purpose of the press conference was to announce her sexual assault allegations against Dababneh. The headline of the article summarized its substance as "California assemblyman accused of forcing lobbyist into bathroom and masturbating." Lopez's complaint to the Assembly, the press conference and the publication of the article all occurred on the same day. The publication of the article—as indicated by its headline and introductory paragraph—was triggered by Lopez's complaint to the Assembly. As in *Healthsmart*, when Lopez's statements to the press are viewed in their entirety and in the context in which they were made, these statements would reasonably be understood to refer to the allegations in her complaint to the Assembly.

There is a marked contrast between the present circumstances and those in *Hawran* where the court found the fair and true reporting privilege did not apply to a press release. (*Hawran, supra*, 209 Cal.App.4th at p. 280.) In that case, the press release announced the completion of an internal investigation by a corporation's special litigation committee, summarized its conclusions, listed remedial measures, announced the termination or resignation of various officers (including Hawran), identified new interim

(530) 666-1917    LEGISLATIVE INTENT SERVICE, INC.

SP - 50

officers, and referred to a future presentation to the SEC.  (*Ibid.*)  The court found the "press release does not mention the subject SEC investigation, much less 'capture[ ] [its] substance, . . . "gist" or "sting" . . . .' [Citation.]"  (*Ibid.*)  The press release, including the alleged defamatory allegations about Hawran's resignation and denial of wrongdoing, did not "report on, summarize or describe the SEC proceeding," its history, or any statements made in the course of an SEC proceeding or investigation.  (*Id.* at p. 281.)  The press release simply reported the results and consequences of the company's internal investigation.  (*Ibid.*)  Though the release referred to a presentation to the SEC, it did not describe the presentation.  (*Ibid.*)  The court concluded that nothing in the release "gives us the 'gist' of the SEC's charges, if any, or the proceedings before it."  (*Ibid.*)

Here, Lopez's complaint to the Assembly is the focus of her press conference and the Los Angeles Times article and, as Dababneh concedes, the gist or sting of that complaint is accurately described in her statements to the press on both occasions.  (See *Argentieri, supra*, 8 Cal.App.5th at pp. 789-790.)

Dababneh also contends the fair and true reporting privilege should be rejected because "Lopez's press statements added numerous 'material facts,' including that Dababneh had 'expressed regret and disbelief' afterwards and that Lopez had told friends about the assault immediately after it happened."[5]  We disagree.  Assuming arguendo that

---

[5]  Dababneh also cites to the fact section of his brief where he referred to Lopez stating at the press conference that "Dababneh had sexually harassed and abused other women." Dababneh, however, failed to allege in his complaint that Lopez defamed him by false statements to the press that he sexually harassed other women.  "On review of a special motion to strike pursuant to [Code of Civil Procedure] section 425.16, we must take the complaint as it is.  [Citation.]"  (*Jackson v. Mayweather* (2017) 10 Cal.App.5th 1240, 1263 [where plaintiff contended in opposition to anti-SLAPP motion that defendant defamed her in a radio interview by a false statement that she had had an abortion, "whatever possible merit that claim may have, [plaintiff] failed to include it in her complaint"].)

24

(530) 666-1917   LEGISLATIVE INTENT SERVICE, INC.

these are "material facts," Lopez stated in her letter of complaint to the Assembly that "[i]t is not my intention to report every detail of what happened," and provided a "brief description." In other words, the allegations in the complaint were not presented as a detailed description of the alleged assault. We find the additional details of the assault communicated to the press do not change the gist or sting of the allegations of complaint and are therefore privileged.[6]

In *Sipple,* the plaintiff contended that " 'most of the statements in the article—and all of the most damaging ones—are simply absent from the court proceedings.' " (*Sipple, supra*, 71 Cal.App.4th at p. 245.) The court found "[t]he article, although it expands on specific incidents of abuse, does not change the gist or sting of the courtroom statements or the complexion of the affair." (*Ibid.*) Likewise here, Lopez's statements to the press, including that Dababneh expressed regret after the assault and that she disclosed the assault to friends at the time it happened, expand on the brief description of the incident in Lopez's complaint to the Assembly but do not alter the gist or sting of her allegations.

---

[6] Dababneh cites *Lyon v. Fairweather* (1923) 63 Cal.App. 194, 197-198, for the proposition that the "fair report privilege [is] inapplicable to [an] article which included paragraphs that 'do not purport to state any fact or facts developed in the judicial proceeding which the article purports to report.' " However, in *Handelsman v. San Francisco Chronicle* (1970) 11 Cal.App.3d 381, the court cited *Lyon* as stating the "well recognized principle that an alleged libelous article must be considered in its entirety . . . ." (*Id.* at p. 388; *Lyon, supra*, 63 Cal.App. at p. 197.) *Handelsman* also stated the "well recognized rule" that a report "substantially in accord" with the alleged defamatory matter in a judicial complaint is entitled to the fair and true reporting privilege. (*Handelsman, supra*, 11 Cal.App.3d at p. 386.) A report that captures "the gist, the sting" of the libelous charge, as measured "by the natural and probable effect it would have on the mind of the average reader" is a fair and true report. (*Id.* at p. 387.)

25

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

Because Lopez's statements to the press were absolutely privileged under section 47, subdivision (d), Dababneh cannot establish a probability of prevailing on his defamation claim.[7] (*J-M Manufacturing, supra*, 247 Cal.App.4th at p. 98.)

*Intentional Infliction of Emotional Distress*

The collapse of Dababneh's defamation claim spells the demise of his claim for intentional infliction of emotional distress, which arises from Lopez's statements regarding the alleged sexual assault.  (*Gilbert v. Sykes* (2007) 147 Cal.App.4th 13, 34.) "As the state Supreme Court observed, ' "to allow an independent cause of action for the intentional infliction of emotional distress, based on the same acts which would not support a defamation action, would allow plaintiffs to do indirectly what they could not do directly.  It would also render meaningless any defense of truth or privilege." ' " (*Ibid.*, quoting *Fellows v. National Enquirer, Inc.* (1986) 42 Cal.3d 234, 245; see also *Flynn v. Higham* (1983) 149 Cal.App.3d 677, 682; *Lerette v. Dean Witter Organization, Inc.* (1976) 60 Cal.App.3d 573, 579.)

_____

[7]  Because we hold the absolute privilege applies, we have no occasion to consider whether the statements were made with actual malice or the *Noerr-Pennington* doctrine applies and do not address the parties' arguments on these issues. (*Healthsmart, supra*, 7 Cal.App.5th at p. 437.)

26

LEGISLATIVE INTENT SERVICE, INC.    (530)  666-1917

## DISPOSITION

The trial court's order is reversed.  The cause is remanded to the trial court with directions to grant Lopez's special motion to strike and to conduct further proceedings in accordance with Code of Civil Procedure section 425.16.  Lopez shall recover her costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

                              _____/s/_____
                              RAYE, P. J.

We concur:

_____/s/_____
ROBIE, J.

_____/s/_____
MAURO, J.

27

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917



SP - 54



**ELENI KOUNALAKIS**
LIEUTENANT GOVERNOR

August 30, 2023

The Honorable Cecilia Aguiar-Curry
Assembly Speaker pro Tempore
California State Assembly
1021 O Street, Suite 8320
Sacramento, California 95814

**Re: Assembly Bill 933 (Aguiar-Curry and Ward) - SUPPORT**

Dear Assemblymember Aguiar-Curry:

I am proud to **support Assembly Bill (AB) 933**, which will expand protections against retaliatory defamation lawsuits for survivors of sexual assault, harassment, or discrimination who speak out about their own experience.

In recent years, defamation lawsuits have been weaponized against survivors of sexual assault, harassment, and discrimination who share their experience publicly. These retaliatory lawsuits, known as Strategic Lawsuits Against Public Participation (SLAPP), subject survivors to extended, costly, and painful legal proceedings while being intended to intimidate, silence, and dissuade survivors from speaking out against their abusers.

Existing law makes certain publications and speech—including complaints of sexual harassment—privileged and protected from civil defamation actions. However, these protections are limited, leaving survivors potentially open to defamation lawsuits if they engage in certain forms of speech, and therefore exposed to extended, costly, and retraumatizing legal proceedings.

AB 933 will ensure survivors of sexual assault, harassment, and discrimination are adequately protected from retaliatory defamation lawsuits by clarifying that claims made in good faith are a form of protected speech. In doing so, the bill would make it harder for perpetrators to retaliate against survivors with legal threats and intimidation. This bill also provides relief to survivors in the form of reasonable attorneys' fees and damages for successfully defending themselves against these retaliatory lawsuits.

For these reasons, I am proud to support AB 933. Should you have any questions regarding my support of this legislation, please do not hesitate to contact Genesis Gonzalez, Legislative Affairs Specialist, at genesis.gonzalez@ltg.ca.gov or call (916) 445-8994.

Sincerely,

Ambassador Eleni Kounalakis (RET.)
Lieutenant Governor

cc: Assemblymember Chris Ward

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

SP - 55

**LEADERSHIP
TEAM
2023 – 2024**

**Sandi Gabe**
President
—
**Kathy Ford**
Chief Financial Officer
—
**Tracey Clark**
Secretary
—
**Karen Vanderwerken**
AAUW Fund
—
**Sharyn Siebert**
Branch Support
—
**Dawn Johnson**
Communications
—
**Charmen Goehring**
President-elect
Diversity, Equity and Inclusion
—
**Sigrid Moranz**
Leadership Development
—
**Marsha Swails**
Membership
—
**Amy Hom**
Public Policy Co-chair
—
**Melissa Maceyko**
Public Policy Co-chair

**Shauna Ruyle**
**Gov Trek**
—
**Mary Isaac**
Tech Trek
—
**Lana Widman**
Speech Trek

**Dianne Owens**
Governance/
Parliamentarian
—
**Julika Barrett**
Office Manager



August  23, 2023

***Floor Alert***

Memo To:    Members of the Senate

From:        Amy Hom, Public Policy Co-Chair
                 Melissa Maceyko, Public Policy Co-Chair
                 American Association of University Women California
                 (AAUW CA)

Re:            **AB 933 (Aguiar-Curry and Ward) Protecting Survivors
                 from Weaponized Defamation Lawsuits – SUPPORT**

On behalf of the American Association of University Women California (AAUW CA), this letter is to express our support for AB 933 (Aguiar-Curry), which will provide greater protections against retaliatory defamation lawsuits for survivors of sexual assault, harassment, or discrimination who speak out about their own experience.

AAUW CA is a leading organization advocating equity for women and girls. Our membership includes more than 9,000 California women in 118 branches throughout the state – with another 2,500 members at large.  Social justice, including the freedom for survivors to come forward to speak against their abusers without fear of retaliation, is an essential tenet of our organization.

The #MeToo movement provided a platform for assault and harassment survivors to share their stories, enabling an important step in their healing process.   While a predatory culture has existed in all sectors of employment and society, this movement provided an environment for those who have suffered harassment, assaults, coercion and intimidation by employers, colleagues, acquaintances, and strangers.  Unfortunately, retaliatory defamation lawsuits have been used to misdirect public attention and ruthlessly intimidate survivors.

These retaliatory lawsuits, also known as Strategic Lawsuits Against Public Participation (SLAPP), are increasingly being used as a weapon to threaten, silence, intimidate, and dissuade survivors from speaking out against their abusers. These suits threaten survivors with potentially years of litigation and force them to constantly relive their experience.



LEGISLATIVE INTENT SERVICE, INC.    (530)  666-1917



Page Two
AB 933

For those unable to afford legal representation, SLAPP suits silence survivors who have come forward, and those who consider sharing their abuse.

AB 933 will protect survivors of sexual assault, harassment, and discrimination from retaliatory defamation lawsuits by clarifying that claims made in good faith are a form of protected speech.  In doing so, the bill would make it harder for perpetrators to retaliate against survivors with legal threats and intimidation. The protections in this bill will help encourage survivors to speak their truth and expose the behavior of those who harmed them. This bill also provides relief to survivors in the form of reasonable attorneys' fees and damages for successfully defending themselves against these retaliatory lawsuits.

For these reasons, we are proud to support AB 933, and encourage your "Aye" vote for this measure.  Should you have any questions about our position on this legislation, please do not hesitate to contact our advocate, Kathy Van Osten, at 916-605-9293 or at kvanosten@mvmstrategy.com.

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917



**LEADERSHIP
TEAM
2022 – 2023**

**Sandi Gabe**
President
—
**Roli Wendorf**
Chief Financial Officer
—
**Tracey Clark**
Secretary
—
**Karen Vanderwerken**
AAUW Fund
—
**Carol Holzgrafe**
Branch Support
—
**Sharyn Siebert**
Branch Support
—
**Dawn Johnson**
Communications
—
**Stormy Miller Sabia**
Diversity, Equity, and Inclusion
—
**Marsha Swails**
Membership
—
**Janice Lee**
Program
—
**Kathleen Harper**
Public Policy

**Dianne Owens**
Governance/
Parliamentarian
—
**Julika Barrett**
Office Manager

June 5, 2023

Honorable Tom Umberg, Chair
Senate Judiciary Committee
1021 O Street, Suite 3240
Sacramento, California 95814

**Subject:   AB 933 (Aguiar-Curry and Ward) Protecting Survivors from
Weaponized Defamation Lawsuits - SUPPORT**

Dear Chair Umberg:

On behalf of the American Association of University Women California (AAUW CA), this letter is to express our support for AB 933 (Aguiar-Curry), which will provide greater protections against retaliatory defamation lawsuits for survivors of sexual assault, harassment, or discrimination who speak out about their own experience.

AAUW CA is a leading organization advocating equity for women and girls. Our membership includes more than 9,000 California women in 118 branches throughout the state – with another 2,500 members at large.  Social justice, including the freedom for survivors to come forward to speak against their abusers without fear of retaliation, is an essential tenet of our organization.

The #MeToo movement provided a platform for assault and harassment survivors to share their stories, enabling an important step in their healing process.   While a predatory culture has existed in all sectors of employment and society, this movement provided an environment for those who have suffered harassment, assaults, coercion and intimidation by employers, colleagues, acquaintances, and strangers.  Unfortunately, retaliatory defamation lawsuits have been used to misdirect public attention and ruthlessly intimidate survivors.

These retaliatory lawsuits, also known as Strategic Lawsuits Against Public Participation (SLAPP), are increasingly being used as a weapon to threaten, silence, intimidate, and dissuade survivors from speaking out against their abusers. These suits threaten survivors with potentially years of litigation and force them to constantly relive their experience.

(530)  666-1917

LEGISLATIVE INTENT SERVICE, INC.



AB 933
Page Two

For those unable to afford legal representation, SLAPP suits silence survivors who have come forward, and those who consider sharing their abuse.

AB 933 will protect survivors of sexual assault, harassment, and discrimination from retaliatory defamation lawsuits by clarifying that claims made in good faith are a form of protected speech.  In doing so, the bill would make it harder for perpetrators to retaliate against survivors with legal threats and intimidation. The protections in this bill will help encourage survivors to speak their truth and expose the behavior of those who harmed them. This bill also provides relief to survivors in the form of reasonable attorneys' fees and damages for successfully defending themselves against these retaliatory lawsuits.

For these reasons, we are proud to support AB 933, and encourage your strong support and an "Aye" vote for this measure.  Should you have any questions about our position on this legislation, please do not hesitate to contact our advocate, Kathy Van Osten, at 916-605-9293 or at kvanosten@mvmstrategy.com.

Sincerely,

*Kathleen M. Harper*

Kathi Harper
Public Policy Chair
AAUW CA

Cc:     Members, Senate Judiciary Committee
        Assemblymembers Cecelia Aguiar-Curry and Chris Ward
        Allison Meredith, Consultant, Senate Judiciary Committee
        Morgan Branch, Senate Republican Consultant

LEGISLATIVE INTENT SERVICE, INC.     (530)  666-1917



*AAUW advances equity among women and girls through advocacy, education, and research.*

San Jose Inc. (CA) Branch

1 June, 2023

The Honorable Thomas J. Umberg
1021 O Street, Suite 6350
Sacramento, California  95814
Chair, Senate Judiciary Committee

**Re:  AB 933 (Aguiar-Curry and Ward) Protecting Survivors from Weaponized Defamation Lawsuits - SUPPORT**

I am writing on behalf of American Association of University Women (AAUW) San Jose, which is part of a national organization that has been advocating for gender equity since 1881, to express our strong support for AB 933.

As you know, the #MeToo movement has brought to light the pervasive culture of sexual harassment and assault across all sectors of employment and society. While this movement has inspired many survivors to bravely share their experiences publicly, we have seen an alarming increase in the use of Strategic Lawsuits Against Public Participation (SLAPP) by abusers to silence and intimidate survivors.

Existing protections against civil defamation actions are limited and leave survivors vulnerable to expensive and traumatic legal proceedings. AB 933 would expand these protections by clarifying that claims made in good faith are a form of protected speech and providing for reasonable attorneys' fees and damages to survivors who successfully defend themselves against these retaliatory lawsuits. This would make it harder for perpetrators to retaliate against survivors with legal threats and intimidation and empower survivors to speak their truth and expose the behavior of those who harmed them.

Thank you for your consideration of our SUPPORT position on AB 933 and for your attention to this critical issue. Please include AAUW San Jose on your list of supporters and contact us at publicpolicy@aauwsanjose.org with additional questions.

Sincerely,
Ashley Dargert

Member of AAUW San Jose Public Policy Committee

LEGISLATIVE INTENT SERVICE, INC.    (530)  666-1917

 

June 5, 2023

The Honorable Thomas J. Umberg
Chair, Senate Committee on Judiciary
1021 O Street, Suite 3240
Sacramento, California  95814
sjud.fax@sen.ca.gov
cc:  Meredith, Allison <Allison.Meredith@sen.ca.gov>

Subject:  AB 933 (Aguiar-Curry and Ward)
          Protecting Survivors from Weaponized Defamation Lawsuits - SUPPORT

Dear Senator Umberg:

The California Anti-SLAPP Project and the Media Alliance write in strong support of AB 933, which will expand protections against retaliatory defamation lawsuits for survivors of sexual assault, harassment, or discrimination who speak out about their own experience.

Such retaliatory lawsuits, also known as Strategic Lawsuits Against Public Participation (SLAPPs), are increasingly being used as a weapon to threaten, silence, intimidate, and dissuade survivors of sexual abuse from speaking out against their abusers.

AB 933 will protect survivors of sexual assault, harassment, and discrimination from retaliatory defamation lawsuits by clarifying that claims made in good faith are a form of protected speech. In doing so, the bill would make it harder for perpetrators to retaliate against survivors with legal threats and intimidation.  The protections in this bill will help encourage survivors to speak their truth and expose the behavior of those who harmed them.

Thank you for your consideration of our SUPPORT position on AB 933.  Please include the California Anti-SLAPP Project and the Media Alliance on your list of supporters and contact us at mg@casp.net with additional questions.

Sincerely,
/s/
Mark Goldowitz
Director
California Anti-SLAPP Project

Tracy Rosenberg

Tracy Rosenberg
Executive Director
Media Alliance

LEGISLATIVE INTENT SERVICE, INC.    (530)  666-1917



SP - 61

 

June 5, 2023

The Honorable Thomas J. Umberg
Chair, Senate Committee on Judiciary
1021 O Street, Suite 3240
Sacramento, California  95814
sjud.fax@sen.ca.gov
cc:  Meredith, Allison <Allison.Meredith@sen.ca.gov>

Subject:  AB 933 (Aguiar-Curry and Ward)
          Protecting Survivors from Weaponized Defamation Lawsuits - SUPPORT

Dear Senator Umberg:

The California Anti-SLAPP Project and the Media Alliance write in strong support of AB 933, which will expand protections against retaliatory defamation lawsuits for survivors of sexual assault, harassment, or discrimination who speak out about their own experience.

Such retaliatory lawsuits, also known as Strategic Lawsuits Against Public Participation (SLAPPs), are increasingly being used as a weapon to threaten, silence, intimidate, and dissuade survivors of sexual abuse from speaking out against their abusers.

AB 933 will protect survivors of sexual assault, harassment, and discrimination from retaliatory defamation lawsuits by clarifying that claims made in good faith are a form of protected speech. In doing so, the bill would make it harder for perpetrators to retaliate against survivors with legal threats and intimidation.  The protections in this bill will help encourage survivors to speak their truth and expose the behavior of those who harmed them.

Thank you for your consideration of our SUPPORT position on AB 933.  Please include the California Anti-SLAPP Project and the Media Alliance on your list of supporters and contact us at mg@casp.net with additional questions.

Sincerely,
/s/
Mark Goldowitz
Director
California Anti-SLAPP Project

Tracy Rosenberg
Executive Director
Media Alliance

(530)  666-1917       LEGISLATIVE INTENT SERVICE, INC.



SP - 62

     

   

   





June 5, 2023

Senator Thomas J. Umberg, Chair
California Senate Judiciary Committee
1021 O Street, Room 3240
Sacramento, CA 95814

**RE: AB 933 (Aguiar-Curry and Ward) Protecting Survivors from Weaponized Defamation Lawsuits - SUPPORT**

Dear Chair Umberg,

The undersigned organizations write in strong support of AB 933 (Aguiar-Curry and Ward): Protecting Survivors from Weaponized Defamation Lawsuits. AB 933 will expand protections against retaliatory defamation lawsuits for survivors of sexual assault, harassment, or discrimination who speak out about their own experience.

In the wake of the #MeToo movement, many assault and harassment survivors have been inspired to bravely join countless others in sharing their stories more publicly. In doing so, the movement unveiled a predatory culture that is pervasive across all sectors of employment and society. However, while survivors courageously came forward, there has been a concerning influx of defamation lawsuits by those who abused them.

These frivolous and retaliatory lawsuits, also known as Strategic Lawsuits Against Public Participation (SLAPP), are increasingly being used as a weapon to threaten, silence, intimidate, and dissuade survivors from speaking out against their abusers. The threat of having to engage in years of litigation, relive the personal trauma of abuse in court, and take on the burden of responding to an expensive, resource-draining SLAPP suit further harms survivors and causes a chilling effect that discourages others from coming forward to share their experience.

Existing law makes certain publications and speech—including complaints of sexual harassment—privileged

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

and protected from civil defamation actions. However, these protections are limited, leaving survivors potentially open to defamation lawsuits if they engage in certain forms of speech, and therefore exposed to extended, costly, and retraumatizing legal proceedings.

AB 933 will ensure survivors of sexual assault, harassment, and discrimination are adequately protected from retaliatory defamation lawsuits by clarifying that claims made in good faith are a form of protected speech. In doing so, the bill would make it harder for perpetrators to retaliate against survivors with legal threats and intimidation. The protections in this bill will help encourage survivors to speak their truth and expose the behavior of those who harmed them. This bill also provides relief to survivors in the form of reasonable attorneys' fees and damages for successfully defending themselves against these retaliatory lawsuits.

For all of the foregoing reasons, our organizations are proud to support AB 933 and we strongly urge your "aye" vote when the bill is before you in the Senate Judiciary Committee.

Respectfully submitted,

9to5

California Work & Family Coalition

California Partnership to End Domestic Violence

Caring Across Generations

Child Care Law Center

Consumer Attorneys of California

GRACE - End Child Poverty in California

Legal Aid at Work

Lutheran Office of Public Policy-California

Mujeres Unidas y Activas

National Council of Jewish Women California

Parent Voices, California

Santa Clara County Wage Theft Coalition

ValorUS

Women's Foundation California

Work Equity

Worksafe

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

 

March 14, 2023

The Honorable Cecilia Aguiar-Curry
California State Assembly
1021 O Street, Suite 6350
Sacramento, CA 95814

**RE: AB 933 (Aguiar-Curry and Ward) Protecting Survivors from Weaponized Defamation Lawsuits - SPONSOR & SUPPORT**

Dear Assemblymember Aguiar-Curry,

The California Employment Lawyers Association ("CELA") and Equal Rights Advocates ("ERA") are proud to sponsor AB 933 (Aguiar-Curry and Ward): Protecting Survivors from Weaponized Defamation Lawsuits. AB 933 will expand protections against retaliatory defamation lawsuits for survivors of sexual assault, harassment, or discrimination who speak out about their own experience.

In the wake of the #MeToo movement, many assault and harassment survivors have been inspired to bravely join countless others in sharing their stories more publicly. In doing so, the movement unveiled a predatory culture that is pervasive across all sectors of employment and society. However, while survivors courageously came forward, there has been a concerning influx of defamation lawsuits by those who abused them.[1]

These frivolous and retaliatory lawsuits, also known as Strategic Lawsuits Against Public Participation (SLAPP), are increasingly being used as a weapon to threaten, silence, intimidate, and dissuade survivors from speaking out against their abusers. The threat of having to engage in years of litigation, relive the personal trauma of abuse in court, and take on the burden of responding to an expensive, resource-draining SLAPP suit further harms survivors and causes a chilling effect that discourages others from coming forward to share their experience. In fact, the financial burden of defending against a defamation suit is one of the main reasons these suits tend to evoke so much fear in survivors.[2] As

---

[1] The Increasing Complexity of Defamation Law in #MeToo Era Lawsuits (2021), https://www.loubar.org/UserFiles/files/bar-briefs/2021/6-June/Bar%20Briefs_June'21_Defamation%20Law%20in%20MeToo_Abrams_p22.pdf
[2] Retaliatory Defamation Suits: The Legal Silencing of the #MeToo Movement (2020), https://www.tulanelawreview.org/tlronline/retaliatorydefamation

1

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917



news coverage of this abusive litigation tactic increases, our organizations are regularly contacted by workers, students, and others who are too fearful to speak out about sexual harassment and violence they have experienced for fear of being hit with a retaliatory defamation suit. Even if they will ultimately prevail against such an attack, survivors are often unable to take on the cost and emotional toll of such lengthy and costly litigation.

Existing law makes certain publications and speech—including complaints of sexual harassment—privileged and protected from civil defamation actions. However, these protections are limited, leaving survivors potentially open to defamation lawsuits if they engage in certain forms of speech, and therefore exposed to extended, costly, and retraumatizing legal proceedings.

AB 933 will ensure survivors of sexual assault, harassment, and discrimination are adequately protected from defamation lawsuits by clarifying that claims made in good faith are a form of protected speech. In doing so, the bill would make it harder for perpetrators to retaliate against survivors with legal threats and intimidation. The protections in this bill will help encourage survivors to speak their truth and expose the behavior of those who harmed them. This bill also provides relief to survivors in the form of reasonable attorneys' fees and damages for successfully defending themselves against these retaliatory lawsuits.

For all of the foregoing reasons, our organizations are proud to co-sponsor AB 933 and thank you for your leadership on this important measure. Should you have any questions regarding this letter, please contact either of our organizations at the emails provided below.

Respectfully submitted,

MARIKO YOSHIHARA
CELA Legislative Counsel and Policy Director
mariko@cela.org

JESSICA STENDER
Equal Rights Advocates Policy Director & Deputy Legal Director
jstender@equalrights.org

2



*AAUW advances equity among women and girls*
*through advocacy, education, and research.*

San Jose Inc. (CA) Branch

6 May, 2023

The Honorable Cecilia Aguiar-Curry
Assemblymember, California State Assembly
1021 O Street, Suite 6350
Sacramento, California  95814

**Subject:  AB 933 (Aguiar-Curry and Ward) Protecting Survivors from Weaponized Defamation Lawsuits - SUPPORT**

Dear Assemblymember Aguiar-Curry:

I am writing on behalf of American Association of University Women (AAUW) San Jose, which is part of a national organization that has been advocating for gender equity since 1881, to express our strong support for AB 933.

As you know, the #MeToo movement has brought to light the pervasive culture of sexual harassment and assault across all sectors of employment and society. While this movement has inspired many survivors to bravely share their experiences publicly, we have seen an alarming increase in the use of Strategic Lawsuits Against Public Participation (SLAPP) by abusers to silence and intimidate survivors.

Existing protections against civil defamation actions are limited and leave survivors vulnerable to expensive and traumatic legal proceedings. AB 933 would expand these protections by clarifying that claims made in good faith are a form of protected speech and providing for reasonable attorneys' fees and damages to survivors who successfully defend themselves against these retaliatory lawsuits. This would make it harder for perpetrators to retaliate against survivors with legal threats and intimidation and empower survivors to speak their truth and expose the behavior of those who harmed them.

Thank you for your consideration of our SUPPORT position on AB 933 and for your attention to this critical issue. Please include AAUW San Jose on your list of supporters and contact us at publicpolicy@aauwsanjose.org with additional questions.

Sincerely,
Ashley Dargert

Member of AAUW San Jose Public Policy Committee

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

**LEADERSHIP
TEAM
2022 – 2023**

**Sandi Gabe**
President
—
**Roli Wendorf**
Chief Financial Officer
—
**Tracey Clark**
Secretary
—
**Karen Vanderwerken**
AAUW Fund
—
**Carol Holzgrafe**
Branch Support
—
**Sharyn Siebert**
Branch Support
—
**Dawn Johnson**
Communications
—
**Stormy Miller Sabia**
Diversity, Equity, and Inclusion
—
**Marsha Swails**
Membership
—
**Janice Lee**
Program
—
**Kathleen Harper**
Public Policy

**Dianne Owens**
Governance/
Parliamentarian
—
**Julika Barrett**
Office Manager

June 5, 2023

Honorable Tom Umberg, Chair
Senate Judiciary Committee
1021 O Street, Suite 3240
Sacramento, California 95814

**Subject:  AB 933 (Aguiar-Curry and Ward) Protecting Survivors from Weaponized Defamation Lawsuits - SUPPORT**

Dear Chair Umberg:

On behalf of the American Association of University Women California (AAUW CA), this letter is to express our support for AB 933 (Aguiar-Curry), which will provide greater protections against retaliatory defamation lawsuits for survivors of sexual assault, harassment, or discrimination who speak out about their own experience.

AAUW CA is a leading organization advocating equity for women and girls. Our membership includes more than 9,000 California women in 118 branches throughout the state – with another 2,500 members at large.  Social justice, including the freedom for survivors to come forward to speak against their abusers without fear of retaliation, is an essential tenet of our organization.

The #MeToo movement provided a platform for assault and harassment survivors to share their stories, enabling an important step in their healing process.   While a predatory culture has existed in all sectors of employment and society, this movement provided an environment for those who have suffered harassment, assaults, coercion and intimidation by employers, colleagues, acquaintances, and strangers.  Unfortunately, retaliatory defamation lawsuits have been used to misdirect public attention and ruthlessly intimidate survivors.

These retaliatory lawsuits, also known as Strategic Lawsuits Against Public Participation (SLAPP), are increasingly being used as a weapon to threaten, silence, intimidate, and dissuade survivors from speaking out against their abusers. These suits threaten survivors with potentially years of litigation and force them to constantly relive their experience.

LEGISLATIVE INTENT SERVICE, INC.    (530)  666-1917





AB 933
Page Two

For those unable to afford legal representation, SLAPP suits silence survivors who have come forward, and those who consider sharing their abuse.

AB 933 will protect survivors of sexual assault, harassment, and discrimination from retaliatory defamation lawsuits by clarifying that claims made in good faith are a form of protected speech. In doing so, the bill would make it harder for perpetrators to retaliate against survivors with legal threats and intimidation. The protections in this bill will help encourage survivors to speak their truth and expose the behavior of those who harmed them. This bill also provides relief to survivors in the form of reasonable attorneys' fees and damages for successfully defending themselves against these retaliatory lawsuits.

For these reasons, we are proud to support AB 933, and encourage your strong support and an "Aye" vote for this measure. Should you have any questions about our position on this legislation, please do not hesitate to contact our advocate, Kathy Van Osten, at 916-605-9293 or at kvanosten@mvmstrategy.com.

Sincerely,

Kathleen M. Harper

Kathi Harper
Public Policy Chair
AAUW CA

Cc:    Members, Senate Judiciary Committee
       Assemblymembers Cecelia Aguiar-Curry and Chris Ward
       Allison Meredith, Consultant, Senate Judiciary Committee
       Morgan Branch, Senate Republican Consultant

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

   

 



March 14, 2023

The Honorable Cecilia Aguiar-Curry
California State Assembly
1021 O Street, Suite 6350
Sacramento, CA 95814

**RE: AB 933 (Aguiar-Curry and Ward) Protecting Survivors from Weaponized Defamation Lawsuits - SUPPORT**

Dear Assemblymember Aguiar-Curry,

The undersigned organizations write in strong support of AB 933 (Aguiar-Curry and Ward): Protecting Survivors from Weaponized Defamation Lawsuits. AB 933 will expand protections against retaliatory defamation lawsuits for survivors of sexual assault, harassment, or discrimination who speak out about their own experience.

In the wake of the #MeToo movement, many assault and harassment survivors have been inspired to bravely join countless others in sharing their stories more publicly. In doing so, the movement unveiled a predatory culture that is pervasive across all sectors of employment and society. However, while survivors courageously came forward, there has been a concerning influx of defamation lawsuits by those who abused them.

These frivolous and retaliatory lawsuits, also known as Strategic Lawsuits Against Public Participation (SLAPP), are increasingly being used as a weapon to threaten, silence, intimidate, and dissuade survivors from speaking out against their abusers. The threat of having to engage in years of litigation, relive the personal trauma of abuse in court, and take on the burden of responding to an expensive, resource-draining SLAPP suit further harms survivors and causes a chilling effect that discourages others from coming forward to share their experience.

Existing law makes certain publications and speech—including complaints of sexual harassment—privileged and protected from civil defamation actions. However, these protections are limited, leaving survivors potentially open to defamation lawsuits if they engage in certain forms of speech, and therefore exposed to extended, costly, and retraumatizing legal proceedings.

AB 933 will ensure survivors of sexual assault, harassment, and discrimination are adequately protected from retaliatory defamation lawsuits by clarifying that claims made in good faith are a form of protected speech. In doing so, the bill would make it harder for perpetrators to retaliate against survivors with legal threats and

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

intimidation. The protections in this bill will help encourage survivors to speak their truth and expose the behavior of those who harmed them. This bill also provides relief to survivors in the form of reasonable attorneys' fees and damages for successfully defending themselves against these retaliatory lawsuits.

For all of the foregoing reasons, our organizations are proud to support AB 933.

Respectfully submitted,

9to5

California Work & Family Coalition

Consumer Attorneys of California

Legal Aid at Work

Mujeres Unidas y Activas

National Council of Jewish Women California

Santa Clara County Wage Theft Coalition

ValorUS

Work Equity

Worksafe

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

     

   

   



June 5, 2023

Senator Thomas J. Umberg, Chair
California Senate Judiciary Committee
1021 O Street, Room 3240
Sacramento, CA 95814

**RE: AB 933 (Aguiar-Curry and Ward) Protecting Survivors from Weaponized Defamation Lawsuits - SUPPORT**

Dear Chair Umberg,

The undersigned organizations write in strong support of AB 933 (Aguiar-Curry and Ward): Protecting Survivors from Weaponized Defamation Lawsuits. AB 933 will expand protections against retaliatory defamation lawsuits for survivors of sexual assault, harassment, or discrimination who speak out about their own experience.

In the wake of the #MeToo movement, many assault and harassment survivors have been inspired to bravely join countless others in sharing their stories more publicly. In doing so, the movement unveiled a predatory culture that is pervasive across all sectors of employment and society. However, while survivors courageously came forward, there has been a concerning influx of defamation lawsuits by those who abused them.

These frivolous and retaliatory lawsuits, also known as Strategic Lawsuits Against Public Participation (SLAPP), are increasingly being used as a weapon to threaten, silence, intimidate, and dissuade survivors from speaking out against their abusers. The threat of having to engage in years of litigation, relive the personal trauma of abuse in court, and take on the burden of responding to an expensive, resource-draining SLAPP suit further harms survivors and causes a chilling effect that discourages others from coming forward to share their experience.

Existing law makes certain publications and speech—including complaints of sexual harassment—privileged



LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

and protected from civil defamation actions. However, these protections are limited, leaving survivors potentially open to defamation lawsuits if they engage in certain forms of speech, and therefore exposed to extended, costly, and retraumatizing legal proceedings.

AB 933 will ensure survivors of sexual assault, harassment, and discrimination are adequately protected from retaliatory defamation lawsuits by clarifying that claims made in good faith are a form of protected speech. In doing so, the bill would make it harder for perpetrators to retaliate against survivors with legal threats and intimidation. The protections in this bill will help encourage survivors to speak their truth and expose the behavior of those who harmed them. This bill also provides relief to survivors in the form of reasonable attorneys' fees and damages for successfully defending themselves against these retaliatory lawsuits.

For all of the foregoing reasons, our organizations are proud to support AB 933 and we strongly urge your "aye" vote when the bill is before you in the Senate Judiciary Committee.

Respectfully submitted,

9to5

California Work & Family Coalition

California Partnership to End Domestic Violence

Caring Across Generations

Child Care Law Center

Consumer Attorneys of California

GRACE - End Child Poverty in California

Legal Aid at Work

Lutheran Office of Public Policy-California

Mujeres Unidas y Activas

National Council of Jewish Women California

Parent Voices, California

Santa Clara County Wage Theft Coalition

ValorUS

Women's Foundation California

Work Equity

Worksafe

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917




June 5, 2023

Senator Thomas J. Umberg, Chair
California Senate Judiciary Committee
1021 O Street, Room 3240
Sacramento, CA 95814

**RE: AB 933 (Aguiar-Curry and Ward) Protecting Survivors from Weaponized Defamation Lawsuits - SPONSOR & SUPPORT**

Dear Senator Umberg,

The California Employment Lawyers Association ("CELA") and Equal Rights Advocates ("ERA") are proud to sponsor AB 933 (Aguiar-Curry and Ward): Protecting Survivors from Weaponized Defamation Lawsuits. AB 933 will expand protections against retaliatory defamation lawsuits for survivors of sexual assault, harassment, or discrimination who speak out about their own experience.

In the wake of the #MeToo movement, many assault and harassment survivors have been inspired to bravely join countless others in sharing their stories more publicly. In doing so, the movement unveiled a predatory culture that is pervasive across all sectors of employment and society. However, while survivors courageously came forward, there has been a concerning influx of defamation lawsuits by those who abused them.[1]

These frivolous and retaliatory lawsuits, also known as Strategic Lawsuits Against Public Participation (SLAPP), are increasingly being used as a weapon to threaten, silence, intimidate, and dissuade survivors from speaking out against their abusers. The threat of having to engage in years of litigation, relive the personal trauma of abuse in court, and take on the burden of responding to an expensive, resource-draining SLAPP suit further harms survivors and causes a chilling effect that discourages others from coming forward to share their experience. In fact, the financial burden of defending against a defamation suit is one of the main reasons these suits tend to evoke so much fear in survivors.[2] As

---

[1] The Increasing Complexity of Defamation Law in #MeToo Era Lawsuits (2021), https://www.loubar.org/UserFiles/files/bar-briefs/2021/6-June/Bar%20Briefs_June'21_Defamation%20Law%20in%20MeToo_Abrams_p22.pdf
[2] Retaliatory Defamation Suits: The Legal Silencing of the #MeToo Movement (2020),

1



LEGISLATIVE INTENT SERVICE, INC.   (530) 666-1917

news coverage of this abusive litigation tactic increases, our organizations are regularly contacted by workers, students, and others who are too fearful to speak out about sexual harassment and violence they have experienced for fear of being hit with a retaliatory defamation suit. Even if they will ultimately prevail against such an attack, survivors are often unable to take on the cost and emotional toll of such lengthy and costly litigation.

Existing law makes certain publications and speech—including complaints of sexual harassment— privileged and protected from civil defamation actions. However, these protections are limited, leaving survivors potentially open to defamation lawsuits if they engage in certain forms of speech, and therefore exposed to extended, costly, and retraumatizing legal proceedings.

AB 933 will ensure survivors of sexual assault, harassment, and discrimination are adequately protected from defamation lawsuits by clarifying that claims made in good faith are a form of protected speech. In doing so, the bill would make it harder for perpetrators to retaliate against survivors with legal threats and intimidation. The protections in this bill will help encourage survivors to speak their truth and expose the behavior of those who harmed them. This bill also provides relief to survivors in the form of reasonable attorneys' fees and damages for successfully defending themselves against these retaliatory lawsuits.

For all of the foregoing reasons, our organizations are proud to co-sponsor AB 933 and we strongly urge your support when the bill is heard before you in the Senate Judiciary Committee. Should you have any questions regarding this letter, please contact either of our organizations at the emails provided below.

Respectfully submitted,

MARIKO YOSHIHARA
CELA Legislative Counsel and Policy Director
mariko@cela.org

JESSICA STENDER
Equal Rights Advocates Policy Director & Deputy Legal Director
jstender@equalrights.org

---


https://www.tulanelawreview.org/tlronline/retaliatorydefamation

2

**SENATE RULES COMMITTEE**                                                         AB 933
Office of Senate Floor Analyses
(916) 651-1520    Fax: (916) 327-4478

---

## THIRD READING

---

Bill No:      AB 933
Author:       Aguiar-Curry (D) and Ward (D), et al.
Amended:      5/25/23 in Senate
Vote:         21

---

SENATE JUDICIARY COMMITTEE:  8-1, 6/13/23
AYES:  Umberg, Allen, Ashby, Caballero, Durazo, Laird, Min, Wiener
NOES:  Wilk
NO VOTE RECORDED:  Niello, Stern

ASSEMBLY FLOOR:  60-2, 4/20/23 - See last page for vote

---

**SUBJECT:**  Privileged communications:  incident of sexual assault, harassment,
                or discrimination

**SOURCE:**    California Employment Lawyers Association
                Equal Rights Advocates

---

**DIGEST:**  This bill makes privileged, and therefore excluded from the category of
communications that can constitute defamation, a communication made by an
individual, without malice, regarding an incident of sexual assault, harassment, or
discrimination, and authorizes a prevailing defendant in a defamation action arising
from such a privileged communication to recover reasonable attorney fees, costs,
and other specified relief.

**ANALYSIS:**

Existing law:

1) Provides that "defamation" is effected by either libel or slander, and defines
   those terms as follows:

   a)  "Libel" is a false and unprivileged publication by writing, printing, picture,
       effigy, or other fixed representation to the eye, which exposes any person to



<div style="writing-mode: vertical-rl">LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917</div>

**LIS - 8**

hatred, contempt, ridicule, or obloquy, or which causes them to be shunned or avoided, or which has a tendency to injure him in his occupation.

b) "Slander" is a false and unprivileged publication, orally uttered, and also communications by radio or any mechanical or other means which causes actual damage to a person, including through specifically enumerated damaging allegations such as charging a person with crime or their qualifications with respect to their profession. (Civ. Code, §§ 44-46.)

2) Provides that specified publications are "privileged," including:

a) A publication or broadcast made in the proper discharge of an official duty.

b) A publication or broadcast made in any legislative or judicial proceeding.

c) A communication made without malice to an interested person by one who is also interested, or by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or who is requested by the person interested to give the information; this includes a complaint of sexual harassment by an employee, without malice, to an employer based upon credible evidence and communications between the employer and interested persons, without malice, regarding a complaint of sexual harassment.

d) A fair and true report in, or a communication to, a public journal regarding a judicial, legislative, or other public or official proceeding, as specified. (Civ. Code, § 47.)

3) Defines "malice," where the absence of malice is necessary to render a publication privileged, to mean that the speaker "(1) was motivated by hatred or ill will toward the plaintiff, or (2) lacked reasonable grounds for [their] belief in the truth of the publication and therefore acted in reckless disregard of the" subject's rights. (*Schep v. Capital One, N.A.* (2017) 12 Cal.App.5th 1331, 1337 (internal quotation marks omitted).)

4) Establishes the anti-SLAPP statute, which provides that a cause of action against a person arising from any act of that person in furtherance of that person's right of petition or free speech under the United States or California Constitutions in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.

LEGISLATIVE INTENT SERVICE, INC.   (530)  666-1917

a) A defendant who prevails on an anti-SLAPP motion to strike is entitled to recover attorney fees and costs, with specified exemptions; if the court finds that an anti-SLAPP motion was frivolous or solely intended to cause delay, the court shall award costs and reasonable attorney fees to the prevailing plaintiff.

b) An "act in furtherance of a person's right of petition or free speech" under the state and federal Constitutions includes (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest. (Code Civ. Proc., § 425.16.)

This bill:

1) Defines "communication" as factual information related to an incident of sexual assault, harassment, or discrimination experienced by the individual making the communication, including, but not limited to, any of the following:

   a) An act of sexual assault.

   b) An act of sexual harassment, as defined in Civil Code Section 51.9.

   c) An act of workplace harassment or discrimination; failure to prevent an act of workplace harassment or discrimination; aiding, abetting, inciting, compelling, or coercing an act of workplace harassment or discrimination; or an act of retaliation against a person for reporting or opposing workplace harassment or discrimination, as set forth in subdivision (a), (h), (i), (j), or (k) of Government Code Section 12940.

   d) An act of harassment or discrimination, or an act of retaliation against a person for reporting harassment or discrimination, by the owner of a housing accommodation, as described in Government Code Section 12955.

   e) An act of harassment or discrimination, or an act of retaliation against a person for reporting an act of harassment or discrimination, based on any of

LEGISLATIVE INTENT SERVICE, INC.    (530)  666-1917

the protected classes enumerated in Education Code Sections 220, 221.51, or 66270.

    f)  An act of sexual harassment or cyber sexual bullying, as defined in Education Code Sections 212.5, 48900, or 66262.5.

2) Provides that a communication made by an individual, without malice, regarding an incident of sexual assault, harassment, or discrimination is privileged.

3) Authorizes a prevailing defendant in any defamation action brought against that defendant for making a communication that is privileged under 2) shall be entitled to their reasonable attorney fees and costs for successfully defending themselves in the action, plus treble damages for any harm caused to them by the defamation action against them, in addition to punitive damages as permitted under Civil Code Section 3294 and any other relief otherwise permitted by law.

4) Provides that 1)-3) apply only to an individual that has, or at any time had, a reasonable basis to file a complaint of sexual assault, harassment, or discrimination, whether the complaint is, or was, filed or not.

**Comments**

Defamation suits can serve the vital purpose of allowing a person harmed by the false statements of another to be compensated for that harm.[1] Unfortunately, the tort of defamation is also a frequent tool of persons who would chill legitimate speech in the form of strategic lawsuits against public participation (SLAPP).[2] In a SLAPP suit, a plaintiff files the lawsuit not because they expect to win—indeed, winning is not the point—but to use the cost and emotional toll of a lawsuit to (1) bully the defendant into silence or retaliate for speaking out against the plaintiff, and (2) intimidate others who might speak out, thereby chilling additional legitimate speech.[3]

This bill is intended to prevent SLAPP suits against actual victims of sexual abuse, harassment, and discrimination, both to protect the victims who come forward and to provide victims who are considering coming forward with greater assurances that they will not be the target of a baseless revenge suit.

---

[1] *E.g.*, *Carroll v. Trump* (1:20-cv-07311).
[2] *E.g.*, Pring & Canan, SLAPPs: Getting Sued for Speaking Out (1996), p. 217.
[3] Pring & Canan, *supra*, at pp. 8-9.

LEGISLATIVE INTENT SERVICE, INC.   (530)  666-1917



First, this bill creates a conditional privilege for communications made regarding an incident of sexual assault, harassment, or discrimination. This bill defines these categories with cross-references to existing statutes, to ensure that the scope of the statements is clear. The privilege itself is conditioned on two factors: the communication must be made without malice, and can be made only by an individual who has, or at any time had, a reasonable basis to file a complaint of sexual assault, harassment, or discrimination, whether or not the complaint was filed. By making the privilege conditional on the presence of a good faith claim, rather than absolute, this bill ensures that false, defamatory allegations will not be privileged.

Second, this bill allows a prevailing defendant in a defamation suit arising from communications that are privileged under this bill to recover reasonable attorney fees and costs for the costs of defending the suit, as well as (1) treble damages in any claims the defendant may have had against the plaintiff, and (2) any other damages already authorized by law, including punitive damages. These provisions provide a level of protection for defendants in baseless defamation suits that cannot be disposed of in an anti-SLAPP motion to strike. A court considering an anti-SLAPP motion to strike must take the plaintiff's version of the evidence as true, so a plaintiff could likely overcome the privilege at the anti-SLAPP stage with a declaration stating that the defendant's allegations of sexual abuse, harassment, or discrimination were false. And under current law, a defamation defendant generally has no further means to recover costs or attorney fees if it turns out that the plaintiff was lying—so even if the defendant prevails, the victory may be hollow because of the crushing legal fees they had to incur. This bill adds a layer of protection by giving the defendant a second chance, after they prevail, to recover the reasonable attorney fees and costs they were forced to expend in defending themselves against a retaliatory defamation suit. Ideally, however, this bill's fee-shifting provisions will deter SLAPP suits against the victims of sexual abuse, harassment, and discrimination before they are filed.

**FISCAL EFFECT:**  Appropriation:  No   Fiscal Com.:  No    Local:  No

**SUPPORT:**  (Verified  6/14/23)

California Employment Lawyers Association (co-source)
Equal Rights Advocates (co-source)
9to5
American Association of University Women – California
American Association of University Women San Jose
California Anti-SLAPP Project

LEGISLATIVE INTENT SERVICE, INC.   (530)  666-1917

California Partnership to End Domestic Violence
California Work & Family Coalition
Caring Across Generations
Child Care Law Center
Consumer Attorneys of California
GRACE – End Child Poverty in California
Legal Aid at Work
Lutheran Office of Public Policy – California
Media Alliance
Mujeres Unidas y Activas
National Council of Jewish Women California
Parent Voices, California
Santa Clara County Wage Theft Coalition
ValorUS
Women's Foundation California
Work Equity
Worksafe

**OPPOSITION:** (Verified  6/14/23)

None received

**ARGUMENTS IN SUPPORT:** According to the California Employment
Lawyers Association and Equal Rights Advocates, the sponsors of this bill:

> The threat of having to engage in years of litigation, relive the personal
> trauma of abuse in court, and take on the burden of responding to an
> expensive, resource draining SLAPP suit further harms survivors and causes
> a chilling effect that discourages others from coming forward to share their
> experience. In fact, the financial burden of defending against a defamation
> suit is one of the main reasons those suits tend to evoke so much fear in
> survivors. As news coverage of this abusive litigation tactic increases, our
> organizations are regularly contacted by workers, students, and others who
> are too fearful to speak out about sexual harassment and violence they have
> experienced for fear of being hit with a retaliatory defamation suit. Even if
> they will ultimately prevail against such an attack, survivors are often unable
> to take on the cost and emotional toll of such lengthy and costly litigation…
>
> AB 933 will ensure survivors of sexual assault, harassment, and
> discrimination are adequately protected from defamation lawsuits by
> clarifying that claims made in good faith are a form of protected speech. In
> doing so, the bill would make it harder for perpetrators to retaliate against



LEGISLATIVE INTENT SERVICE, INC.    (530)  666-1917

survivors with legal threats and intimidation. The protections in this bill will help encourage survivors to speak their truth and expose the behavior of those who harmed them. This bill also provides relief to survivors in the form of reasonable attorneys' fees and damages for successfully defending themselves against these retaliatory lawsuits.

ASSEMBLY FLOOR: 60-2, 4/20/23
AYES: Addis, Aguiar-Curry, Alvarez, Arambula, Bains, Bauer-Kahan, Bennett, Berman, Boerner Horvath, Bonta, Bryan, Calderon, Juan Carrillo, Wendy Carrillo, Cervantes, Connolly, Mike Fong, Friedman, Gipson, Grayson, Haney, Hart, Holden, Irwin, Jackson, Jones-Sawyer, Kalra, Lee, Low, Lowenthal, Maienschein, McKinnor, Muratsuchi, Stephanie Nguyen, Ortega, Pacheco, Papan, Pellerin, Petrie-Norris, Quirk-Silva, Ramos, Reyes, Luz Rivas, Robert Rivas, Rodriguez, Blanca Rubio, Santiago, Schiavo, Soria, Ting, Valencia, Villapudua, Wallis, Ward, Weber, Wicks, Wilson, Wood, Zbur, Rendon
NOES: Megan Dahle, Mathis
NO VOTE RECORDED: Alanis, Chen, Davies, Dixon, Essayli, Flora, Vince Fong, Gabriel, Gallagher, Garcia, Hoover, Lackey, McCarty, Jim Patterson, Joe Patterson, Sanchez, Ta, Waldron

Prepared by: Allison Whitt Meredith / JUD. / (916) 651-4113
6/16/23 13:16:52

**\*\*\*\* END \*\*\*\***

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

CONCURRENCE IN SENATE AMENDMENTS
AB 933 (Aguiar-Curry and Ward)
As Amended  May 25, 2023
Majority vote

## SUMMARY

Makes specified forms of communication regarding sexual assault, harassment, or discrimination, privileged communications for purposes of a defamation action.

*Major Provisions*

1)  Protects as privileged, a communication regarding an incident of sexual assault, harassment, or discrimination made without malice.

2)  Limits application of this bill's provisions to any individual that has, or at any time had, a reasonable basis to file a complaint of sexual assault, harassment, or discrimination, whether the complaint is, or was, filed or not.

3)  Authorizes a prevailing defendant in any defamation action brought against that defendant for making a communication that is privileged under the provisions of this bill to recover the following:

    a)  Reasonable attorney's fees and costs;

    b)  Treble damages for any harm caused to them by the defamation action against them;

    c)  Punitive damages;

    d)  Any other relief permitted by law.

4)  Defines a "communication" as any factual information regarding an incident of sexual assault, harassment, or discrimination, experienced by the individual making the communication as defined.

**Senate Amendments**
Clarifies the definition of "communication" to include factual information relating to acts of harassment, discrimination, and cyber sexual bullying as defined by the Education Code.

## COMMENTS

In 2017, the #MeToo movement arrived at the Capitol's doorstep. As the Legislature faced a reckoning on how to curb a pervasive culture of sexual assault and harassment, one female lobbyist in particular made headlines. In December 2017, Pamela Lopez, a long time lobbyist and member of the Capitol community, publicly accused Assemblymember Matt Dababneh of sexually assaulting her during an event in Las Vegas. After initiating a formal complaint process with the Assembly, Lopez gave a press conference detailing the incident and identifying Assemblymember Dababneh. Multiple media sources immediately reported on Lopez's account. In August 2018, Dababneh sued Lopez for both her complaint to the Assembly and the subsequent press conference, claiming both defamation and intentional infliction of emotional



<div align="right">LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917</div>

distress. In October, Lopez filed an anti-SLAPP motion, arguing that both her complaint to the Assembly and the press conference were protected by California's anti-SLAPP statute. Looking at the protections provided under Civil Code Section 47, the trial court ultimately held in Lopez's favor on the claim relating to her complaint to the Assembly, but that her statements to the press did not benefit from the same privilege and thus, Lopez was potentially vulnerable to Dababneh's claim of defamation and intentional infliction of emotional distress. While Lopez was ultimately successful on appeal, where the court held that her statements to the press did, in fact, fall under the privilege provided under Civil Code section 47, the initial trial decision nonetheless highlighted a concern for many who experience sexual assault and harassment.

*Privileged Communication and the Definition of Malice*: At common law, libel and slander were strict liability torts: the state of mind of the speaker or writer was not relevant, so the plaintiff only needed to show that there was a defamatory statement that caused reputational harm to the plaintiff and that the statement was "published" – which simply meant that it reached one person other than the defamed plaintiff. At common law, falsity was not a required element of the tort of defamation; however, the defendant could raise truth as a complete defense. While this may seem like a distinction without a difference – a defendant is liable for false statements in either case – the significance of the distinction lays in which party bears the burden of proof. As an element of the tort, the burden is on the plaintiff to show that the statement is false; as a defense, the burden is on the defendant to show that the statement is true. As codified in the California Civil Code, however, falsity is effectively an element, because defamation is defined as any "false and unprivileged publication" which defames (i.e. injures the reputation of) the plaintiff. The Civil Code does not define what an "unprivileged" publication means, but rather lists a number of "privileged publications" in Civil Code Section 47. Presumably an "unprivileged publication" is anything not listed in Section 47 or not expressly privileged in some other statute.

Under Civil Code Section Section 47(c), a communication is privileged only if it is made "without malice." For purposes of defamation law, malice means publishing a false and defamatory statement knowing it to be false or with reckless disregard of whether that statement is true or false. (See *New York Times Co. v. Sullivan* (1964) 376 U.S. 254.) California courts have adopted a definition that effectively combines this definition, in the disjunctive, with the more popular meanings of "malice" as requiring some ill intent. For example, the California jury instructions for Civil Code Section 47(c) define malice as requiring either 1) that the statement evinces "hatred or ill-will toward the plaintiff" or 2) "that [the defendant] had no reasonable grounds for believing the truth of the statement." (CACI 1723, citing *Taus v. Loftus 40 Cal 4th 683 (2007);* see also *Schep v. Capitol One N.A*. (2017) 12 Cal.App.5th 1331, 1337.)

*This bill,* while arguably codifying existing law as evidenced by Lopez's ultimate success on appeal, would also potentially help curb any unnecessary, and ultimately unsuccessful, litigation against individuals who choose to come forward with their stories of sexual assault and harassment. The bill expands the privileges already encompassed in Section 47 of the Civil Code to include communications made by an individual who has experienced an incident of sexual assault, harassment, or discrimination, regardless of whether or not they have filed any formal complaint regarding the same. The protections proposed by the bill would apply to individuals who, after relaying any factual statement, whether in the form of a formal complaint or a statement outside a formal proceeding such as to a media outlet, is sued for defamation. The bill only applies to a statement by an individual who has experienced sexual harassment, assault, or discrimination. That is to say that the *perpetrator* of an incident of sexual harassment, assault, or discrimination would *not* be covered by the expanded protections.

Additionally, the bill provides significant remedies for successful defendants in defamation claims. By extending the protection of privilege provided by existing Section 47 to explicitly include true statements made by an individual who has experienced sexual harassment, assault, or discrimination about that incident, this bill likely functions to dissuade litigation against those who have made the difficult decision to come forward about their experiences. By doing so, this bill would also have the potential side effect of encouraging survivors of sexual assault, harassment, or discrimination to come forward with information regarding their experiences and help protect other individuals who may face similar situations. Further, a perpetrator who would otherwise opt to silence survivors by targeting them with litigation may be further dissuaded from filing a defamation claim due to the significant potential damages and penalties provided by this bill.

**According to the Author**

Strategic Lawsuits Against Public Participation (SLAPP) are increasingly being used as a weapon to threaten, silence, intimidate, and dissuade survivors of sexual assault, harassment, and discrimination from speaking out against their abusers and exposing predators. AB 933 expands protections for speech made by a survivor, without malice, about their own experience of sexual assault, harassment, or discrimination. This bill would make it harder for perpetrators to retaliate against survivors with legal threats and intimidation, but does not apply to unfounded claims. The protections in this bill will help encourage survivors to speak their truth and expose the behavior of those who harmed them.  In addition, AB 933 helps take the burden off of survivors by providing reasonable attorneys' fees and damages if they successfully defend themselves against meritless lawsuits.

**Arguments in Support**

This measure is supported and sponsored by the California Employment Lawyers Association (CELA) and Equal Rights Advocates (ERA). In support of the measure, they write:

AB 933 will ensure survivors of sexual assault, harassment, and discrimination are adequately protected from defamation lawsuits by clarifying that claims made in good faith are a form of protected speech. In doing so, the bill would make it harder for perpetrators to retaliate against survivors with legal threats and intimidation. The protections in this bill will help encourage survivors to speak their truth and expose the behavior of those who harmed them. This bill also provides relief to survivors in the form of reasonable attorneys' fees and damages for successfully defending themselves against these retaliatory lawsuits.

**Arguments in Opposition**

None on file

## FISCAL COMMENTS

None

## VOTES:

**ASM JUDICIARY:  8-0-3**
**YES:**  Maienschein, Connolly, Haney, Kalra, Pacheco, Papan, Reyes, Robert Rivas
**ABS, ABST OR NV:**  Essayli, Dixon, Sanchez

LEGISLATIVE INTENT SERVICE, INC.   (530)  666-1917

**ASSEMBLY FLOOR:  60-2-18**
**YES:**  Addis, Aguiar-Curry, Alvarez, Arambula, Bains, Bauer-Kahan, Bennett, Berman, Boerner Horvath, Bonta, Bryan, Calderon, Juan Carrillo, Wendy Carrillo, Cervantes, Connolly, Mike Fong, Friedman, Gipson, Grayson, Haney, Hart, Holden, Irwin, Jackson, Jones-Sawyer, Kalra, Lee, Low, Lowenthal, Maienschein, McKinnor, Muratsuchi, Stephanie Nguyen, Ortega, Pacheco, Papan, Pellerin, Petrie-Norris, Quirk-Silva, Ramos, Reyes, Luz Rivas, Robert Rivas, Rodriguez, Blanca Rubio, Santiago, Schiavo, Soria, Ting, Valencia, Villapudua, Wallis, Ward, Weber, Wicks, Wilson, Wood, Zbur, Rendon
**NO:**  Megan Dahle, Mathis
**ABS, ABST OR NV:**  Alanis, Chen, Davies, Dixon, Essayli, Flora, Vince Fong, Gabriel, Gallagher, Garcia, Hoover, Lackey, McCarty, Jim Patterson, Joe Patterson, Sanchez, Ta, Waldron

**SENATE FLOOR:  32-5-3**
**YES:**  Allen, Alvarado-Gil, Archuleta, Ashby, Atkins, Becker, Blakespear, Bradford, Caballero, Cortese, Dodd, Durazo, Eggman, Glazer, Gonzalez, Hurtado, Laird, Limón, McGuire, Menjivar, Min, Newman, Padilla, Portantino, Roth, Rubio, Skinner, Smallwood-Cuevas, Stern, Umberg, Wahab, Wiener
**NO:**  Dahle, Jones, Ochoa Bogh, Seyarto, Wilk
**ABS, ABST OR NV:**  Grove, Nguyen, Niello

## UPDATED

VERSION: May 25, 2023

CONSULTANT:  Manuela Boucher / JUD. / (916) 319-2334                    FN: 0001083

LEGISLATIVE INTENT SERVICE, INC.    (530)  666-1917





**Assemblymember Cecilia Aguiar-Curry, 4th Assembly District**

## AB 933 – Protecting Survivors from Weaponized Defamation Lawsuits (Aguiar-Curry and Ward)

**SUMMARY**

In recent years, defamation lawsuits have been weaponized against survivors of sexual assault, harassment, and discrimination. These retaliatory lawsuits subject survivors to extended, costly, and painful legal proceedings while being intended to intimidate or punish them for reporting their abusers. AB 933 protects survivors of sexual assault, harassment, and discrimination from defamation lawsuits by clarifying that claims made in good faith are a form of protected speech. This bill also provides relief to survivors in the form of reasonable attorneys' fees and damages for successfully defending themselves against meritless lawsuits.

**BACKGROUND**

An act of sexual assault is committed every 68 seconds. Sexual violence affects people of every gender identity, age, and sexual orientation and is, unfortunately, common. According to the Centers for Disease Control and Prevention (CDC), over half of women and nearly 1 in 3 men have experienced sexual violence in their lives. Sexual violence often impacts people early in life. Of people who experience sexual violence, more than 4 in 5 female survivors, and 71% of male survivors were raped before the age of 25.

The #MeToo movement gave many assault and harassment survivors the opportunity to bravely join countless others in sharing their stories on a national platform in solidarity. The movement unveiled a predatory culture that persists across all sectors of employment and society. While survivors courageously came forward, many were served with defamation lawsuits by those who abused them.

Strategic Lawsuits Against Public Participation (SLAPP) are increasingly being used as a weapon to threaten, silence, intimidate, and dissuade survivors of sexual assault, harassment, and discrimination

from speaking out against their abusers and exposing predators. The threat of having to engage in years of litigation, relive the personal trauma of abuse in court, and take on the burden of responding to an expensive, resource-draining SLAPP suit further harms survivors and causes a chilling effect that discourages others from coming forward to share their experience. In fact, the financial burden of defending against a defamation suit is one of the main reasons these suits tend to evoke so much fear in survivors.[1]

**PROBLEM**

Existing law makes certain publications and speech—including complaints of sexual harassment—privileged and protected from civil defamation actions. However, these protections are limited, leaving survivors potentially open to defamation lawsuits if they engage in certain forms of speech. The right to speak out must be protected in order to provide survivors with a safe outlet to report and communicate their truth, and protect others from such abuse, without fear of legal retaliation.

**THIS BILL**

AB 933 expands protections for speech made by a survivor, without malice, about their own experience of sexual assault, harassment, or discrimination.

This bill would make it harder for perpetrators to retaliate against survivors with legal threats and intimidation, but does not apply to unfounded claims. The protections in this bill will help encourage survivors to speak their truth and expose the behavior of those who harmed them. This bill also helps take the burden off of survivors by providing reasonable attorneys' fees and damages if

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917



---

[1] *Retaliatory Defamation Suits: The Legal Silencing of the #MeToo Movement*, https://www.tulanelawreview.org/tlr-online/retaliatorydefamation

**LIS - 10a**

they successfully defend themselves against meritless lawsuits.

**SUPPORT**
CA Employment Lawyers Association (co-sponsor)
Equal Rights Advocates (co-sponsor)
ACLU California Action
American Association of University Women CA
American Association of University Women San Jose
Pamela Lopez
Victoria Burke
California Anti-SLAPP Project
California Work & Family Coalition
California Partnership to End Domestic Violence
Caring Across Generations
Child Care Law Center
Consumer Attorneys of California
GRACE – End Child Poverty in California
Legal Aid at Work
Lutheran Office of Public Policy - California
Mujeres Unidas y Activas
National Council of Jewish Women California
Office of Lieutenant Governor Eleni Kounalakis
Parent Voices, California
Santa Clara County Wage Theft Coalition
ValorUS
Women's Foundation California
Work Equity
Worksafe
9to5

**CONTACT**
Rita Durgin | Legislative Aide
Rita.Durgin@asm.ca.gov
(916) 319-2004



LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

# CECILIA AGUIAR-CURRY
Assembly Majority Leader, District 4

Contact Cecilia    Know Your Rights Resources

# Assemblymembers Aguiar-Curry & Ward Bill to Prevent Weaponized Defamation Lawsuits Against Survivors of Abuse
## Passes Assembly Judiciary Committee

**FOR IMMEDIATE RELEASE:**

*Wednesday, March 22, 2023*

John Ferrera
Chief of Staff
916-402-8900
John.Ferrera@asm.ca.gov

SACRAMENTO, CA – Assemblymembers Cecilia Aguiar-Curry (D-Winters) and Chris Ward (D-San Diego) announced today that their Assembly Bill 933 passed the Assembly Committee on Judiciary by an 8–3 margin. The bill will protect survivors of sexual assault, harassment, and discrimination from weaponized defamation lawsuits. Specifically, AB 933 will strengthen the legal protection of survivors who may face retaliatory defamation lawsuits from speaking publicly about their personal experiences.

"Survivors of sexual assault, harassment, and discrimination are our family, our neighbors, our friends, and our colleagues" said Cecilia Aguiar-Curry (D-Winters), Vice Chair of the Legislative Women's Caucus. "We have to empower anyone who would expose those who've done them harm, because their courageous act will protect others."

"Far too often, perpetrators of sexual misconduct, abuse, assault and harassment use the court system to punish survivors for speaking out about their abuse. This further victimizes those who bravely choose to come forward," said Assemblymember Chris Ward (D-San Diego). "This bill will protect them from being silenced and lift up the voices of survivors, so they can freely share their experiences without fear of retaliation."

The #MeToo movement gave many assault and harassment survivors the opportunity to bravely join countless others in sharing their stories on a national platform, in solidarity. At the same time, it unveiled a toxic and predatory culture that persists across all sectors of employment and society. While survivors courageously came forward, many were served with defamation lawsuits by those who abused them. In fact, defamation lawsuits have become the weapon of choice by perpetrators to intimidate, punish, and silence their accusers. Existing law makes certain publications and speech - including complaints of sexual harassment – privileged and protected from civil defamation actions. However, these protections are limited. AB 933 expands protections for speech made by a survivor, without malice, about their own experience of sexual assault, harassment, or discrimination. This bill

## Search

Search

Do you live in the 4th District?

Contact Me

Meeting/Event Request

Certificate Request

EDD Request Form

## Connect with Us:

  

## Contact:

**Capitol Office:**
State Capitol
P.O. Box 942849
Sacramento, CA 94249-0004
Tel: (916) 319-2004
Fax: (916) 319-2104

**District Offices:**
600 A Street, Ste. D
Davis, CA 95616

(530) 666-1917

LEGISLATIVE INTENT SERVICE, INC.

LIS - 10b

would make it harder for perpetrators to retaliate against survivors with legal threats and intimidation, but does not apply to unfounded claims. This bill also helps take the burden off of survivors by providing reasonable attorneys' fees and damages if they successfully defend themselves against meritless defamation lawsuits.

AB 933 now heads to the Assembly Appropriations Committee.

*Assemblymember Aguiar-Curry represents the 4th Assembly District, which includes all of Lake, Colusa, Napa, and Yolo Counties, and part of Sonoma County.*

###

Tel: (530) 757-1034

Fax: (530) 757-1174

2721 Napa Valley
Corporate Drive
Napa, CA 94558

Tel: (707) 224-0440

Fax: (707) 224-0430

Privacy and Conditions of Use | Accessibility | General Disclaimer | © 2025 California State Assembly Democratic Caucus

(530) 666-1917   LEGISLATIVE INTENT SERVICE, INC.



# CECILIA AGUIAR-CURRY
Assembly Majority Leader, District 4

# Assemblymembers' Aguiar-Curry & Ward Legislation to Protect Survivors of Sexual Assault, Harassment, and Discrimination from Weaponized Defamation Lawsuits Signed by Governor

**FOR IMMEDIATE RELEASE:**

*Tuesday, October 10, 2023*

John Ferrera
Chief of Staff
916-402-8900
John.Ferrera@asm.ca.gov

SACRAMENTO, CA — Assembly Speaker pro Tempore Cecilia Aguiar-Curry (D-Winters) and Assemblymember Chris Ward (D-San Diego) announced today that their bill, AB 933, has been signed by Governor Gavin Newsom. AB 933 will protect survivors of sexual assault, harassment, and discrimination from weaponized defamation lawsuits by strengthening the legal protections of survivors who may face retaliation for speaking publicly about their personal experiences.

"An act of sexual assault is committed every 68 seconds, and sexual violence does not just affect women - it happens to people of every gender identity, age, and sexual orientation," said Assembly Speaker pro Tempore Aguiar-Curry. "AB 933 protects survivors from revenge lawsuits when they have the courage to come forward to put a stop to abuse – their act of bravery exposes predators and makes our communities safer."

"Far too often, perpetrators of sexual misconduct, abuse, assault, and harassment use the court system to punish survivors for speaking out about their abuse. This further victimizes those who bravely choose to come forward," said Assemblymember Ward. "The Protecting Survivors from Weaponized Defamation Lawsuits Act will protect them from being silenced and lift up the voices of survivors so they can freely share their experiences without fear of retaliation."

The #MeToo movement allowed many assault and harassment survivors to bravely join countless others in sharing their stories on a national platform in solidarity. At the same time, it unveiled a toxic and predatory culture that persists across all sectors of employment and society. While survivors courageously came forward, many were slapped with defamation lawsuits, which have become the weapon of choice by perpetrators seeking to intimidate, punish, and silence their accusers.

## Search

Search

Do you live in the 4th District?

Contact Me

Meeting/Event Request

Certificate Request

EDD Request Form

## Connect with Us:

  

## Contact:

**Capitol Office:**
State Capitol
P.O. Box 942849
Sacramento, CA 94249-0004
Tel: (916) 319-2004
Fax: (916) 319-2104

**District Offices:**
600 A Street, Ste. D
Davis, CA 95616

(530) 666-1917

LEGISLATIVE INTENT SERVICE, INC.

**LIS - 10c**

Existing law makes certain publications and speech - including complaints of sexual harassment - privileged and protected from civil defamation actions. However, these protections are limited. AB 933 will expand protections for speech made by a survivor about their experience of sexual assault, harassment, or discrimination, but does not apply to unfounded claims.

AB 933 will make it harder for perpetrators to retaliate against survivors with legal threats and intimidation, and will help take the burden off of survivors by providing reasonable attorneys' fees and damages if they successfully defend themselves against meritless defamation lawsuits.

"We must ensure that our laws are not weaponized against survivors," said Jessica Ramey Stender, Policy Director & Deputy Legal Director of Equal Rights Advocates. "Serial predators are using retaliatory defamation lawsuits to silence those who speak out and to discourage other survivors from coming forward for fear of enduring expensive, retraumatizing, and drawn-out litigation. We are proud to stand with Assemblymembers Aguiar-Curry and Ward in advancing AB 933 to combat this abuse and applaud Governor Newsom for signing this important measure into law."

"AB 933 will ensure survivors of sexual assault, harassment, and discrimination are adequately protected from retaliatory defamation lawsuits by clarifying that claims made in good faith are a form of protected speech," said Mariko Yoshihara, Policy Director for the California Employment Lawyers Association. "We applaud the Governor for signing this important piece of legislation that will stop abusers from weaponizing our justice system against those who speak out."

*Assembly Speaker pro Tempore Aguiar-Curry represents the 4th Assembly District, which includes all of Lake, Colusa, Napa, and Yolo Counties, and parts of Sonoma County. Assemblymember Ward represents the 78th Assembly District, which includes represents San Diego and El Cajon.*

### 

Privacy and Conditions of Use | Accessibility | General Disclaimer | © 2025 California State Assembly Democratic Caucus

Tel: (530) 757-1034
Fax: (530) 757-1174

2721 Napa Valley
Corporate Drive
Napa, CA 94558
Tel: (707) 224-0440
Fax: (707) 224-0430

(530) 666-1917

LEGISLATIVE INTENT SERVICE, INC.



# Governor Newsom Signs Legislation 10.10.23

SACRAMENTO – Governor Gavin Newsom today announced that he has signed the following bills:

- AB 44 by Assemblymember James C. Ramos (D-Highland) – California Law Enforcement Telecommunications System: tribal police.

- AB 226 by Assemblymember James C. Ramos (D-Highland) – University of California: California Native American Graves Protection and Repatriation Act of 2001.

- AB 232 by Assemblymember Cecilia Aguiar-Curry (D-Winters) – Temporary practice allowances.

- AB 242 by Assemblymember Jim Wood (D-Healdsburg) – Critical access hospitals: employment.

- AB 243 by Assemblymember Juan Alanis (R-Modesto) – Child abduction survivors: address confidentiality program.

- AB 255 by Assemblymember Juan Alanis (R-Modesto) – Public postsecondary education: priority registration for first responders.

- AB 261 by Assemblymember Ash Kalra (D-San Jose) – Mushrooms.

- AB 286 by Assemblymember Jim Wood (D-Healdsburg) – Broadband infrastructure: mapping.

- AB 292 by Assemblymember Gail Pellerin (D-Santa Cruz) – Primary elections: ballots.

- AB 345 by Assemblymember Lori Wilson (D-Fairfield) – Habitat restoration: flood control: advance payments.

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917



- AB 350 by Assemblymember Cecilia Aguiar-Curry (D-Winters) – Regional transportation plans: Sacramento Area Council of Governments.

- AB 389 by Assemblymember James C. Ramos (D-Highland) – Native American repatriation: California Native American Graves Protection and Repatriation Act of 2001: California State University.

- AB 398 by Assemblymember Gail Pellerin (D-Santa Cruz) – Voting: replacement ballots.

- AB 402 by Assemblymember Cecilia Aguiar-Curry (D-Winters) – Weeds: Broomrape Program.

- AB 413 by Assemblymember Alex Lee (D-San Jose) – Vehicles: stopping, standing, and parking.

- AB 416 by Assemblymember Al Muratsuchi (D-Torrance) – Sale of shochu.

- AB 447 by Assemblymember Dr. Joaquin Arambula (D-Fresno) – Public postsecondary education: students with disabilities: inclusive college programs.

- AB 452 by Assemblymember Dawn Addis (D-Morro Bay) – Childhood sexual assault: statute of limitations.

- AB 520 by Assemblymember Miguel Santiago (D-Los Angeles) – Employment: public entities.

- AB 534 by Assemblymember Kevin McCarty (D-Sacramento) – Local agencies: airports: customer facility charges.

- AB 545 by Assemblymember Gail Pellerin (D-Santa Cruz) – Elections: access for voters with disabilities.

- AB 594 by Assemblymember Brian Maienschein (D-San Diego) – Labor Code: alternative enforcement.

- AB 607 by Assemblymember Ash Kalra (D-San Jose) – Public postsecondary education: course materials.

- AB 626 by Assemblymember Gail Pellerin (D-Santa Cruz) – Voting: returning vote by mail ballots in person.

- AB 652 by Assemblymember Alex Lee (D-San Jose) – Department of Pesticide Regulation Environmental Justice

(530) 666-1917    LEGISLATIVE INTENT SERVICE, INC.

Department of Pesticide Regulation Environmental Justice
Advisory Committee.

- AB 656 by Assemblymember Kevin McCarty (D-Sacramento) –
  California State University: doctoral programs.

- AB 773 by Assemblymember Gail Pellerin (D-Santa Cruz) –
  Elections: filings.

- AB 779 by Assemblymember Lori Wilson (D-Fairfield) –
  Groundwater: adjudication.

- AB 806 by Assemblymember Brian Maienschein (D-San Diego) –
  Criminal procedure: crimes in multiple jurisdictions.

- AB 839 by Assemblymember Dawn Addis (D-Morro Bay) –
  Residential care facilities for the elderly: financing.

- AB 899 by Assemblymember Al Muratsuchi (D-Torrance) – Food
  safety: baby food.

- AB 910 by Assemblymember Lori Wilson (D-Fairfield) – County
  officers: auditors: qualifications.

- AB 933 by Assemblymember Cecilia Aguiar-Curry (D-Winters) –
  Privileged communications: incident of sexual assault,
  harassment, or discrimination.

- AB 934 by Assemblymember Al Muratsuchi (D-Torrance) –
  Commission on Teacher Credentialing: public awareness
  campaign.

- AB 971 by Assemblymember Alex Lee (D-San Jose) – Vehicles:
  transit-only traffic lanes.

- AB 1037 by Assemblymember Marc Berman (D-Menlo Park) –
  Vote by mail ballots: signature verification.

- AB 1052 by Assemblymember Kevin McCarty (D-Sacramento) –
  Sacramento Regional Transit District: taxes.

- AB 1216 by Assemblymember Al Muratsuchi (D-Torrance) –
  Wastewater treatment plants: monitoring of air pollutants.

- AB 1219 by Assemblymember Marc Berman (D-Menlo Park) –
  Elections: ballots.

- AB 1257 by Assemblymember Marc Berman (D-Menlo Park) –

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917



Dentistry: Dental Hygiene Board of California: Dental hygienists: Examinations and licensure.

- AB 1259 by Assemblymember Esmeralda Soria (D-Fresno) – Dissolution of redevelopment agencies: enhanced infrastructure financing districts: City of Merced.

- AB 1261 by Assemblymember Miguel Santiago (D-Los Angeles) – Crime: witnesses and informants.

- AB 1262 by Assemblymember Marc Berman (D-Menlo Park) – Professional fiduciaries.

- AB 1263 by Assemblymember Marc Berman (D-Menlo Park) – Vehicles: Bureau of Automotive Repair: smog check program.

- AB 1264 by Assemblymember Marc Berman (D-Menlo Park) – Acupuncture.

- AB 1291 by Assemblymember Kevin McCarty (D-Sacramento) – University of California Associate Degree for Transfer Pilot Program.

- AB 1350 by Assemblymember Esmeralda Soria (D-Fresno) – Veterans: memorials.

- AB 1360 by Assemblymember Kevin McCarty (D-Sacramento) – Hope California: Secured Residential Treatment Pilot Program.

- AB 1366 by Assemblymember Brian Maienschein (D-San Diego) – Unfair competition and false advertising: disgorgement.

- AB 1412 by Assemblymember Gregg Hart (D-Santa Barbara) – Pretrial diversion: borderline personality disorder.

- AB 1414 by Assemblymember Ash Kalra (D-San Jose) – Civil actions: consumer debt.

- AB 1415 by Assemblymember Miguel Santiago (D-Los Angeles) – Outdoor advertising: City of Los Angeles.

- AB 1459 by Assemblymember James C. Ramos (D-Highland) – State Capitol: mural honoring Native Americans.

- AB 1484 by Assemblymember Rick Chavez Zbur (D-Los Angeles) – Temporary public employees.

- AB 1539 by Assemblymember Marc Berman (D-Menlo Park) –

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917



Elections: double voting.

- AB 1548 by Assemblymember Gregg Hart (D-Santa Barbara) – Greenhouse Gas Reduction Fund: grant program: recycling infrastructure projects.

- AB 1566 by Assemblymember Esmeralda Soria (D-Fresno) – Department of Veterans Affairs: veterans' services.

- AB 1745 by Assemblymember Esmeralda Soria (D-Fresno) – Public postsecondary education: veterans: waiver of mandatory systemwide tuition and fees.

- SB 29 by Senator Steven Glazer (D-Orinda) – The Political Reform Act of 1974: Fair Political Practices Commission: political reform education program.

- SB 40 by Senator Thomas Umberg (D-Santa Ana) – State Bar of California.

- SB 60 by Senator Thomas Umberg (D-Santa Ana) – Social media platforms: controlled substances: order to remove.

- SB 68 by Senator Mike McGuire (D-Healdsburg) – Vehicles: safety regulations.

- SB 76 by Senator Scott Wiener (D-San Francisco) – Alcoholic beverages: music venue license: entertainment zones: consumption.

- SB 77 by Senator Thomas Umberg (D-Santa Ana) – Voting: signature verification: notice.

- SB 78 by Senator Steven Glazer (D-Orinda) – Criminal procedure: factual innocence.

- SB 228 by Senator Richard D. Roth (D-Riverside) – Civilian youth opportunities program.

- SB 244 by Senator Susan Talamantes Eggman (D-Stockton) – Right to Repair Act.

- SB 280 by Senator John Laird (D-Santa Cruz) – Review of conservatorships: care plans.

- SB 281 by Senator Mike McGuire (D-Healdsburg) – Crimes: aggravated arson.

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

- SB 311 by Senator Susan Talamantes Eggman (D-Stockton) – Medi-Cal: Part A buy-in.

- SB 327 by Senator John Laird (D-Santa Cruz) – State teachers' retirement: disability allowances and benefits.

- SB 362 by Senator Josh Becker (D-Menlo Park) – Data broker registration: accessible deletion mechanism.

- SB 365 by Senator Scott Wiener (D-San Francisco) – Civil procedure: arbitration.

- SB 369 by Senator Janet Nguyen (R-Huntington Beach) – Pupil instruction: model curricula: Vietnamese American refugee experience: Cambodian American history and heritage.

- SB 412 by Senator Bob Archuleta (D-Pico Rivera) – Parole hearings.

- SB 419 by Senator Richard D. Roth (D-Riverside) – Property tax: exemptions: personal property used in space flight.

- SB 463 by Senator Aisha Wahab (D-Hayward) – Dependent children.

- SB 464 by Senator Aisha Wahab (D-Hayward) – Criminal law: rights of victims and witnesses of crimes.

- SB 545 by Senator Susan Rubio (D-Baldwin Park) – Juveniles: transfer to court of criminal jurisdiction.

- SB 603 by Senator Susan Rubio (D-Baldwin Park) – Children's advocacy centers: recordings.

- SB 644 by Senator Steven Glazer (D-Orinda) – Hotel and private residence rental reservations: cancellation: refunds.

- SB 723 by Senator María Elena Durazo (D-Los Angeles) – Employment: rehiring and retention: displaced workers.

- SB 798 by Senator Steven Glazer (D-Orinda) – Elections: local bond measures: tax rate statement.

- SB 801 by Senator Ben Allen (D-Santa Monica) – California Uniform Directed Trust Act.

- SB 806 by Senator Bob Archuleta (D-Pico Rivera) – Trash receptacles and storage containers: reflective markings:

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

enforcement.

- SB 816 by Senator Richard D. Roth (D-Riverside) – Professions and vocations.

- SB 848 by Senator Susan Rubio (D-Baldwin Park) – Employment: leave for reproductive loss.

For full text of the bills, visit: http://leginfo.legislature.ca.gov.

###

LEGISLATIVE INTENT SERVICE, INC.     (530) 666-1917

# Assembly Committee on Judiciary

# 2023–2024 Bill Summary

*A Comprehensive Breakdown of Legislation Considered by the Committee in 2023–2024*

**Ash Kalra**
*Chair*

**Diane Dixon**
*Vice Chair*

**Rebecca Bauer-Kahan**
**Isaac Bryan**
**Damon Connolly**
**Matt Haney**
**Brian Maienschein**
**Tina McKinnor**
**Blanca Pacheco**
**Joe Patterson**
**Eloise Reyes**
**Kate Sanchez**

**Staff**

**Alison Merrilees**
*Chief Counsel*

**Nicholas Liedtke**
*Deputy Chief Counsel*

**Tom Clark**
*Counsel*

**Manuela Boucher-De La Cadena**
*Counsel*

**Shiran Zohar**
*Counsel*

**Cindy Morante**
*Committee Secretary*

**Grant Silva**
*Committee Secretary*

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

**MEMBERS**
DIANE DIXON, VICE CHAIR
REBECCA BAUER-KAHAN
ISAAC BRYAN
DAMON CONNOLLY
MATT HANEY
BRIAN MAIENSCHEIN
TINA MCKINNOR
BLANCA PACHECO
JOE PATTERSON
ELOISE GÓMEZ REYES
KATE SANCHEZ

**STATE CAPITOL**
P.O. BOX 942849
SACRAMENTO, CA 94249-0108
(916) 319-2334

## Assembly
## California Legislature

### ASSEMBLY COMMITTEE ON JUDICIARY
#### ASH KALRA, CHAIR

**CHIEF COUNSEL**
ALISON MERRILEES

**DEPUTY CHIEF COUNSEL**
NICHOLAS LIEDTKE

**COUNSEL**
TOM CLARK
MANUELA BOUCHER-DE LA CADENA
SHIRAN ZOHAR

**COMMITTEE SECRETARIES**
CINDY MORANTE
GRANT SILVA

*November 2024*

*The counsel and staff of the Assembly Judiciary Committee have prepared this comprehensive report of bills considered by the Committee during the 2023-24 legislative session. As in past years, the Committee was responsible for one of the largest and most complex bill loads in the Legislature, encompassing virtually all areas of our civil justice and legal system. Some of the highlights of the session are described below. A more detailed summary of all bills referred to the Committee follows.*

***Courts, Civil Procedure and Practice, and Related Matters.*** *This session, the Committee heard a wide variety of bills addressing the operation of California's courts and civil justice system. A few key areas of the Committee's focus were streamlining the civil arbitration and mediation processes; strengthening judicial recusal statutes; and improving the State Bar's oversight of trust accounts maintained by civil litigators. The Committee also heard bills addressing the California Environmental Quality Act (CEQA); modifying various statute of limitations impacting personal rights, and clarifying venue rules governing certain family law matters. The Committee heard and approved a number of noteworthy bills, including bills modernizing procedures governing lemon law litigation; providing new civil procedures for labor law cases; and clarifying that specified regulatory processes must be exhausted before utility rates can be challenged in court, all of which ultimately were signed by the Governor. As in years past, the Committee also heard measures to continue remote access to the court system that began during the early pandemic lockdowns; the development of new court facilities; and the sale of courthouses. Finally, the Committee authored a number of bills dealing with civil procedure and the courts, including one to encourage the cost-effective and timely construction of public lactation rooms in courthouses. One Committee-authored measure that would have required greater transparency about the efforts of courts to make their records available online was vetoed by the Governor due to other unrelated provisions in the bill.*

***Civil and Constitutional Rights.*** *While the Committee typically hears a number of bills related to civil and constitutional rights, it considered more than the usual number this session, partly due to the work of the Task Force on Reparations. Successful efforts that grew from the Task Force's recommendations included legislation strengthening protections against hairstyle discrimination; recognizing "intersectional" forms of discrimination; addressing racial discrimination in health care; and formally apologizing for the state's responsibility for harms committed by the state in connection with slavery and its systemic legacies. However, the highest priority Task Force measures failed. Specifically, a measure that would have established an agency to oversee recommendations of the Task Force and a measure that would have created a Fund for Reparations and Restorative Justice, both of which died on the Assembly Floor. The Governor vetoed a Task Force priority bill that would have provided a means to compensate victims of racially motivated eminent domain.*



LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

*The Committee also heard several measures that implicated, either directly or indirectly, the First Amendment, including both free speech and religious freedom protection, mainly in regards to social media. The Committee heard and the Legislature approved a measure that required online platforms to remove or label "materially deceptive and digitally modified" content related to elections for specified periods before and after the election. Another measure requiring online platforms to report instances of cyberbullying within specified time lines also became law. Another measure with serious First Amendment implications that became law requires the California State University, and requests the University of California, to develop and enforce student codes of conduct regulating speech and protect activities. The Committee heard and the Governor signed a measure excusing students from physical education activities during periods of religious fasting. By contrast, a measure that would have exempted persons who wore turbans or patkas for religious purposes from the motorcycle helmet mandate failed in a prior Committee. Finally, the Committee heard and the Governor signed several anti-discrimination bills, including several measures strengthening or expanding anti-discrimination in the states Education Code and state law provisions paralleling federal Title IX protections. However, the Governor vetoed a bill passed by the Committee that would have amended the list of protected characteristics under FEHA to include "caste."*

***Civil Liability and Immunity.*** *As always, the Committee heard many bills related to liability and immunity that covered a diverse array of topics. This session, the Committee heard and approved bills imposing liability on social media companies for the sale of controlled substances on online platforms; creating a private right of action for persons harmed by the decisions of algorithms utilized by artificial intelligence; and mandating standardized charging equipment for mobile devices. The Committee heard several measures seeking to use civil liability as a tool to combat climate change and protect the environment, including measures to strengthen the civil liability of (1) oil and gas operators who violate state laws; (2) persons engaging in illegal and environmentally harmful cannabis operations; (3) companies that violate California's air pollution laws; and (4) companies that sell menstrual products or rodenticides that contain specified toxic ingredients. Given the Presidential election in November of 2024, the Committee considered a number of election-related bills, including one that was signed into law which prohibits a person from intimidating, threatening, or coercing, or attempting to intimidate, threaten, or coerce, any other person for engaging in specified election-related activities, and authorizes an aggrieved person, an officer holding an election, or the Attorney General (AG) to file a civil action to enforce these prohibitions. The Committee heard and passed a measure authorizing a student to bring a "hazing" action against an institution of higher education if the university knows or should know about the hazing and fails to take specified reasonable steps, which became law. Finally, the Committee heard and passed a high-profile bill that would have required developers of artificial intelligence models that are more powerful than a specified level and those providing the computing power to train such models to put appropriate safeguards and policies into place to prevent critical harms from their products, but it was vetoed.*

***Family Law, Children, and Related Matters.*** *The Committee, as usual, heard many bills relating to marriage, family law, domestic violence, and the rights of minors. The Committee heard and the Governor signed relatively minor, but important, bills related to marriage, including a measure that allows a couple to file a joint petition to dissolve a marriage amicably. More controversially, the Committee did not hear a bill (at the author's request) that would have prohibited issuance of a marriage license to anyone under 18 years of age, thereby eliminating an exemption in existing law that allows a small number of minors to marry with parental and court approval. On the other hand, a measure that will require the State Register to create a report on the incidence and nature of underage marriage in California became law. Finally, the Legislature approved a proposed constitutional amendment that removes a provision limiting marriage to*

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

*a "man and a woman" (which was effectively invalidated by the U.S. Supreme Court) and replaces it with a provision expressly affirming that the right to marry is a fundamental right.*

*Consistent with past years, the Committee also heard many bills concerning child custody, visitation rights, and child support. Bills that became law included measures limiting the court's ability to order certain kinds of family reunification treatments; strengthening existing procedures that courts must follow when issuing custody and visitation orders; and requiring family court personnel to receive training on risks associated with access to firearms. The Committee also heard and the Governor signed two measures relating to domestic violence restraining orders (DVRO), one of which prohibits a court from rejecting a request for a DVRO, as specified, and another measure that authorizes the court to limit discovery requests when used for purposes of harassment or delay. Finally, three measures relating to child support particularly stand out. First, the Committee heard and the Governor signed important legislation that will modify the statewide uniform child support guidelines and make other changes that bring the state into compliance with new federal requirements. Second, in an effort to facilitate reentry of formerly incarcerated persons, the Committee heard and the Governor signed a measure that extends the time for a non-custodial parent to resume child support payments after release from incarceration. Finally, the Governor signed a measure that will authorize a court to order that child support payments be paid to a "special needs trust" in a manner that will allow a child to receive Social Security Income and other federal benefits, notwithstanding the deposits.*

***Conservatorships and Mental Health.*** *Conservatorships, especially those created under the Lanterman-Petris-Short (LPS) Act, continued to receive significant legislative attention this session. Most notably, this session the Committee heard and the Governor signed a bill that substantially expands the definition of "gravely disabled" for purposes of involuntary detention and establishment of an LPS conservatorship to include a person with a mental disorder OR a severe substance abuse disorder (SUD), and includes a person who cannot care for their "personal safety" or "necessary medical care." The bill also modified longstanding hearsay rules to exempt statements of certain health practitioners in a conservatorship hearing. The Committee also heard and the Governor signed measures that (1) made numerous changes to the CARE Court program; (2) required a conservator to file a prescribed "care plan" for the conservatee within 120 days of appointment and at least ten days before any hearing to determine the continuation or termination of an existing conservatorship; and (3) allowed, under "exigent circumstances," an order for involuntary treatment with antipsychotic medication to continue after the expiration of a detention period and until a new hearing for a determination of the person's capacity to refuse treatment occurs.*

***Business and Consumer Protection, including Creditor-Debtor Relations.*** *In 2023, the Committee heard several bills regulating the advertisement and sale of goods and services to consumers. Among the bills signed into law were measures updating the Consumers Legal Remedies Act, making it an unlawful business practice to advertise a good or service without including all mandatory fees and charges for those goods or services; permitting a court to award disgorgement in consumer protection cases brought by the Attorney General; requiring short-term lodging establishments to disclose all required fees at the time of booking; requiring a venture capital company to report its funding determinations; and mandating that large companies report on their climate-related financial risk. In addition, the Committee heard and the Governor signed measures regulating creditor-debtor relations, establishing an alternative method for debtors to submit financial information, and prohibiting the use of common counts in consumer debt cases arising from breach of contract claims.*

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

*In 2024, the Committee heard several bills aimed at enhancing consumer protection and business transparency. Among those signed into law were measures prohibiting the conditioning of consumer refunds on the removal of reviews or signing non-disclosure agreements, and updating procedures for recording documents with county recorders to facilitate the use of remote online notarization. Additionally, the Committee approved bills that required third-party franchise sellers to register with the Department of Financial Protection and Innovation and disclose specific business information; and mandated that grocery and pharmacy establishments provide written notice to employees and specified others prior to closures. The Committee also heard and passed controversial bills clarifying that a mandatory fee or charge imposed by restaurants and certain food service providers are not required to be included in the advertised "all-in" price. The Committee also heard and passed significant bills that did not become law, including a measure, vetoed by the Governor, which would have required financial institutions to take preventative actions against elder and dependent financial abuse. In the creditor-debtor area, the Committee passed significant bills that became law, including a measure that prohibits furnishing medical debt to consumer credit reporting agencies, as well as a bill that extends Rosenthal Act protections to certain types of commercial debt.*

***Employee Rights.*** *The Committee heard many important measures this session designed to protect and enforce the rights of employees, including ones providing significant protections for the rights of fast-food and grocery workers and extending job-protected leave programs. Arguably the most significant measure passed by the Committee and signed into law this session was a bill amending the Private Attorneys General Act (PAGA) to do the following: (1) reform the statute's penalty structure; (2) encourage employers to comply with labor law by creating greater opportunity and incentive for employers to cure violations; authorizing courts to provide injunctive relief; and (3) grant aggrieved employees 35 percent of any final award, up from 25 percent previously. Other noteworthy measures included bills to require vendors who contract with the University of California (UC) to provide their employees with the total wage specified in their contract with the UC, or as specified by the UC's equal pay for equal work policy; establish a rebuttable presumption in favor of an employee filing a claim against their employer of unlawful retaliation if the employee were disciplined within 90 days of the protected activity; entitle an employee of a larger business (with 25 or more employees) who is the victim of a crime, or who has a family member who is the victim of a crime, with up to 12 weeks of job-protected leave; and the Freelance Worker Protection Act to impose minimum requirements in a contract between the hiring party and a freelance worker. The Committee passed other significant bills that did not become law, including bills requiring large chain employers to provide each temporary employee who is under contract with a temp agency with a displacement notice at least 60 days before the expected date of a closure of an establishment and an opportunity to transfer to another worksite; protecting the right of public employees to engage in sympathy strikes without adverse consequences; and requiring local governments, when collecting demographic data on employees, to include categories for African Americans related to their status as descendants of enslaved persons.*

***Landlord-Tenant.*** *In the area of landlord-tenant law, a subject over which the Committee has primary jurisdiction, the Committee reviewed and passed multiple bills this session that were aimed at enhancing protections for residential and commercial tenants and clarifying landlord obligations. In residential tenancy, the Committee approved numerous bills that were signed into law, including measures that prohibit landlords from charging application fees when no rental units are available; limit the amount of security deposit a landlord can collect to no more than one month's rent; restrict deductions from security deposits for wear-and-tear repairs; require photographic evidence of a unit's pre-tenancy condition; and*

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917



*require landlords to offer tenants the option to report positive rental payments to credit bureaus, helping tenants build credit. The Committee also passed measures that broaden lock change and eviction protections for abuse victims, extending coverage to family members; establish a pilot program that unbundles the cost of parking from the cost of rent; limit the ability of local governments to adopt local ordinances penalizing a tenant's contact with law enforcement or require landlords to adopt policies or procedures that do so; and permitting a tenant to own and store a personal micromobility device in their dwelling unit. The Governor also signed a measure that extends certain protections, such as contract translations, notice of rent adjustments, and clear disclosures on building operating cost fees, to "qualified commercial tenants" in the commercial rental context. The Committee heard and passed several significant pieces of legislation that did not make it to the Governor's desk, such as a measure that would have required landlords to accept pets in their rental properties and a measure that would have established the Office of Tenants' Rights and Protections. Collectively, the enacted measures strengthen tenant rights and reinforce transparency in both residential and commercial rental practices.*

*The following report contains a summary of each bill referred to the Committee, as well as helpful statistical data regarding the disposition of the bills assigned to the Committee during the 2023-24 session. We hope that you find this information useful.*

*Sincerely,*

*Alison Merrilees*
*Chief Counsel, Assembly Judiciary Committee*

LEGISLATIVE INTENT SERVICE, INC.   (530) 666-1917

**SB 1022 (Skinner) Enforcement of Civil Rights.** This bill would have modified and expanded the timelines for the Civil Rights Department to issue right to sue notices as well as the timelines for filing various civil actions related to violations of the Fair Employment and Housing Act. Status: Vetoed.

**SB 1141 (Niello) Mediation: amount in controversy.** This bill would have increased the amount in controversy limit for court ordered mediation in civil actions to $150,000 and adopted procedural guidelines regarding when a matter can be referred to mediation. Status: Failed, Asm Judiciary.

*Evidence*

**AB 360 (Gipson) Excited delirium.** This bill prohibits "excited delirium" from being recognized as a valid medical diagnosis or cause of death in California, prohibits peace officers from using that term to describe an individual in an incident report, except as specified, and deems evidence that a person experienced "excited delirium" inadmissible in a civil action, as specified. Status: Chap. 431, Stats. 2023.

**AB 933 (Aguiar-Curry, Ward) Privileged communications: complaint of sexual assault, harassment, or discrimination.** This bill expands the privileges already encompassed in Section 47 of the Civil Code, which identifies types of communications that are subject to legal privilege protections, to include communications made by an individual who has experienced an incident of sexual assault, harassment, or discrimination, regardless of whether or not they have filed any formal complaint regarding the same. Additionally, the bill provides significant remedies for successful defendants in defamation claims. Status: Chap. 670, Stats. 2023.

**AB 1253 (Maienschein) Hearsay: exceptions.** This bill establishes a hearsay exemption that allows certain statements within an official written report or record of a law enforcement officer regarding a sexual offense that resulted in a person's conviction to be admitted at a civil probable cause hearing to determine whether there is probable cause to believe that the person is likely to engage in sexually violent predatory criminal behavior upon the person's release from custody. Status: Chap. 363, Stats. 2023.

**AB 2833 (McKinnor) Evidence: restorative justice communications.** This bill would have established a rule of evidence that an individual's participation or nonparticipation in a restorative justice process and any communications within that process are not admissible or subject to disclosure, and disclosure cannot be compelled in any arbitration, administrative adjudication, civil action, criminal action, juvenile action, or other proceeding regardless of completion or outcome of the process, except as specified. Status: Dead, Sen Inactive.

**SB 652 (Umberg) Evidence: expert testimony.** This bill clarifies and codifies longstanding law regarding the standard for expert witness testimony by ensuring that when testifying to a jury about the cause of an injury, all experts provide their opinion regarding the cause of the injury to a reasonable degree of probability. Status: Chap. 75, Stats. 2023.

**SB 674 (Gonzalez) Air pollution: covered facilities: community air monitoring systems: evidence of fence-line monitoring system trigger.** This bill would have modernized the laws regarding the state's fence line monitoring system program for communities and covered

24



LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917



# SENATE JUDICIARY COMMITTEE

# 2023-24 Legislative Bill Summaries

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

**MEMBERS**

Senator Thomas J. Umberg, Chair
Senator Scott Wilk, Vice Chair
Senator Ben Allen
Senator Angelique Ashby
Senator Anna Caballero
Senator María Elena Durazo
Senator John Laird
Senator Richard Roth
Senator Roger Niello
Senator Henry Stern
Senator Aisha Wahab

**STAFF**

Margie Estrada, Chief Counsel
Christian Kurpiewski, Deputy Chief Counsel
Amanda Mattson, Counsel
Allison Whitt Meredith, Counsel
Ian Dougherty, Counsel
Erica Porter, Lead Committee Assistant
Margaret Buxton, Committee Assistant

**WEB** .................................. sjud.senate.ca.gov
**TEL** ..................................................916.651.4113

Author's Note

During the 2023-24 Regular Legislative Session, 650 measures were referred to the Senate Judiciary Committee. This report contains summaries of the bills referred to the Judiciary Committee during the 2023-24 Regular Legislative Session. Bills that were passed by the Legislature and became law are followed by the chapter number and year enacted. For bills that did not become law, the last location of the bill in the legislative process is shown. Veto messages are included for bills vetoed by Governor Gavin Newsom. Bills are listed categorically based on the main subjects of the bill.

Additional information on these measures may be obtained online at leginfo.legislature.ca.gov, or by calling the Senate Judiciary Committee at (916) 651-4113.

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

## AB-933 (Aguiar-Curry) - Privileged communications: incident of sexual assault, harassment, or discrimination.

This bill makes privileged, and therefore excluded from the category of communications that can constitute defamation, a communication made by an individual, without malice, regarding an incident of sexual assault, harassment, or discrimination, and authorizes a prevailing defendant in a defamation action arising from such a privileged communication to recover reasonable attorney fees, costs, and other specified relief.
**Status:** Chapter 670, Statutes of 2023

## AB-994 (Jackson) - Law enforcement: social media.

This bill requires booking photos posted on social media by law enforcement to be taken down within 14 days, except as provided. It requires law enforcement to use the name and pronouns given by an individual, as specified. Law enforcement may include other legal names or known aliases of an individual where certain conditions are met.
**Status:** Chapter 224, Statutes of 2023

## AB-1079 (Jackson) - Discrimination: Public engagement.

Recognizing that hate crime poses a serious public health issue, this bill would have created, upon appropriation by the Legislature, a Hate Crimes Intervention Program within the California Public Health Department (Department) to implement evidence-based community interventions to hate crime, and would have created a media campaign under the Department for focusing on discouraging and preventing hate crimes. The media campaigns would have been implemented by a nine-member working group convened to plan and implement the media campaigns and comprised of a member of each house of the Legislature and nine experts in the fields of marketing and messaging. The media campaigns would have focused on combating hate crime directed towards specific communities based on the rate of hate crimes committed against each community, as determined by the most recent Hate Crime in California report from the Attorney General, or other reliable and more accurate data. The Governor vetoed this bill for budgetary concerns, stating that: "with our state facing continuing economic risk and revenue uncertainty, it is important to remain disciplined when considering bills with significant fiscal implications, such as this measure. For this reason, I cannot sign this bill."
**Status:** Assembly-Vetoed

## AB-1163 (Luz Rivas) - Lesbian, Gay, Bisexual, and Transgender Disparities Reduction Act.

This bill expands the Lesbian, Gay, Bisexual, and Transgender Disparities Reduction Act. The Act currently requires four specific state departments, the State Departments of Health Care Services, Public Health, and Social Services, and the California Department of Aging, in the course of collecting demographic data directly or by

LEGISLATIVE INTENT SERVICE, INC.    (530)  666-1917







🔍  ✉ **SIGN UP**  ❤ |

# ERA-Sponsored CA Bill to Prevent Weaponized Defamation Lawsuits Against Survivors Introduced, Passes First Committee Vote

March 24. 2023

Share  in  f  ✉

**For Immediate Release**
Mar 24, 2023

**Media Contact**
Nazirah Ahmad
**era@emccommunications.com**

SACRAMENTO, Calif. – Assemblymembers Cecilia Aguiar-Curry (D-Winters) and Chris Ward (D-San Diego) announced today that their Assembly Bill 933 passed the Assembly Committee on Judiciary with an 8-0 vote. The bill will protect survivors of sexual assault, harassment, and discrimination from weaponized defamation lawsuits. Specifically, AB 933 will strengthen the legal protection of survivors who may face retaliatory defamation lawsuits from speaking publicly about their personal experiences.

Sponsored by Equal Rights Advocates and our partner organization CA Employment Lawyers Association, the bill is part of our 2023 **Stronger California** Agenda.

**LIS - 16a**

LEGISLATIVE INTENT SERVICE, INC.     (530)   666-1917



> **"The Assembly Judiciary Committee is sending a clear message that our justice system cannot be used as a weapon to further harm and silence survivors of sexual assault, harassment, and discrimination who speak out,"** said **Jessica Ramey Stender**, Policy Director & Deputy Legal Director of Equal Rights Advocates.

"Survivors of sexual assault, harassment, and discrimination are our family, our neighbors, our friends, and our colleagues" said Cecilia Aguiar-Curry (D-Winters), Vice Chair of the Legislative Women's Caucus. "We have to empower anyone who would expose those who've done them harm, because their courageous act will protect others."

"Far too often, perpetrators of sexual misconduct, abuse, assault and harassment use the court system to punish survivors for speaking out about their abuse. This further victimizes those who bravely choose to come forward," said Assemblymember Chris Ward (D-San Diego). "This bill will protect them from being silenced and lift up the voices of survivors, so they can freely share their experiences without fear of retaliation."

The #MeToo movement gave many assault and harassment survivors the opportunity to bravely join countless others in sharing their stories on a national platform, in solidarity. At the same time, it unveiled a toxic and predatory culture that persists across all sectors of employment and society. While survivors courageously came forward, many were served with defamation lawsuits by those who abused them. In fact, defamation lawsuits have become the weapon of choice by perpetrators to intimidate, punish, and silence their accusers.

Existing law makes certain publications and speech — including complaints of sexual harassment — privileged and protected from civil defamation actions. However, these protections are limited. AB 933 would expand protections for speech made by a survivor, without malice, about their own experience of sexual assault, harassment, or discrimination. This bill would make it harder for perpetrators to retaliate against survivors with legal threats and intimidation, but does not apply to unfounded claims. The bill also helps take the burden off of survivors by providing reasonable attorneys' fees and damages if they successfully defend themselves against meritless defamation lawsuits.

(530) 666-1917

LEGISLATIVE INTENT SERVICE, INC.

Case 1:25-cv-00163-DAE    Document 17-18    Filed 04/04/25    Page 189 of 220

to the Assembly Appropriations Committee.

*Stay tuned for our AB 933 Action Campaign, where you will be able to send a pre-drafted email lawmakers supporting this bill!*

**RELATED NEWS**

March 4. 2025 | Press Release

**STATEMENT: McMahon Confirmation Threatens Civil Rights Protections for Students**

February 26. 2025 | Media Mention

**Teen Vogue: Trump's Order on Trans Athletes Likely Targets 160 or Fewer Teens Nationwide**

February 20. 2025 |

**Bloomberg La Return Upenc Enforcement Record Speed**

# Stay Connected & Take Action

 **Get the Latest News &**
Sign up for Email Updates

 **Sign Up for Action Alert**
Join the Action Team

 **Follow Us**

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917



🔍    ✉ **SIGN UP**    ❤ |

# CA Gov. Newsom Signs MeToo Bill AB 933, Protecting Survivors from Predatory Defamation Lawsuits Meant to Silence Them

October 11. 2023

Share  in  f  ✉

**For Immediate Release**
Oct 11, 2023

**Media Contact**
Nazirah Ahmad
**era@emccommunications.com**

**SACRAMENTO –** On Oct. 10, California Governor Gavin Newsom signed a crucial #MeToo bill, Assembly Bill 933 (Aguiar-Curry), that will better protect survivors of sexual assault, harassment, and discrimination from retaliatory and baseless defamation lawsuits filed by those who harmed them. The bill is co-sponsored by nonprofits Equal Rights Advocates and CA Employment Lawyers Association.

AB 933, which will go into effect Jan. 1, 2024, will strengthen California defamation law to better shield survivors from weaponized use of defamation claims, and help ensure other survivors are not discouraged from coming forward to report similar claims. It is a major win for the movement to expose and end sexual assault and harassment.

<div align="right">(530) 666-1917    LEGISLATIVE INTENT SERVICE, INC.</div>



**LIS - 16b**



> ## "We must ensure that our laws are not weaponized against survivors."
>
> ## Jessica Ramey Stender, ERA Policy Director

"We must ensure that our laws are not weaponized against survivors," said **Jessica Ramey Stender**, Policy Director & Deputy Legal Director of Equal Rights Advocates. "Serial predators are using retaliatory defamation lawsuits to silence those who speak out and to discourage other survivors from coming forward for fear of enduring expensive, retraumatizing, and drawn-out litigation. We are proud to stand with Assemblymembers Aguiar-Curry and Ward in advancing AB 933 to combat this abuse and applaud Governor Newsom for signing this important measure into law."

Since many survivors have been empowered to speak out in the wake of the MeToo movement, advocates have seen a growing trend of serial harassers attempting to silence or retaliate against their victims by filing defamation lawsuits, or threatening to do so. Even though the defamation claims are often meritless and would not ultimately succeed in court, many survivors back down on their claims because they're suddenly faced with the threat of financial ruin via legal fees and possible reputational and/or professional consequences.

> ## Advocates say AB 933 will help ensure survivors are able to speak out after being harmed and reclaim their agency.

"An act of sexual assault is committed every 68 seconds, and sexual violence does not just affect women – it happens to people of every gender identity, age, and sexual orientation," said Assembly Speaker pro Tempore Aguiar-Curry. "AB 933 protects survivors from revenge lawsuits when they have the courage to come forward to put a stop to abuse – their act of bravery exposes predators and makes our communities safer."

(530) 666-1917    LEGISLATIVE INTENT SERVICE, INC.

ready drastically underreported, as survivors fear disbelief or punishment for speaking out—an often-founded result. The threat of having to engage in years of litigation, relive the personal trauma of abuse in court, and take on the burden of responding to an expensive lawsuit also causes a chilling effect in reporting, discouraging others from coming forward to expose predatory behavior. Advocates say AB 933 will help ensure survivors are able to speak out after being harmed and reclaim their agency.

"AB 933 will ensure survivors of sexual assault, harassment, and discrimination are adequately protected from retaliatory defamation lawsuits by clarifying that claims made in good faith are a form of protected speech," said Mariko Yoshihara, Policy Director for the California Employment Lawyers Association. "We applaud the Governor for signing this important piece of legislation that will stop abusers from weaponizing our justice system against those who speak out."

The bill is part of the Stronger California 2023 Legislative Agenda, an annual policy agenda from 60+ nonprofit and advocacy organizations across the state to advance economic justice for women and families.

### 

## About Equal Rights Advocates

Equal Rights Advocates fights for gender justice in workplaces and schools across the country. Since 1974, they have been fighting on the front lines of social justice to protect and advance rights and opportunities for women, girls, and people of all gender identities through groundbreaking legal cases and bold legislation that sets the stage for the rest of the nation.

**RELATED NEWS**

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

# TULANE
# LAW REVIEW ONLINE

VOL. 94                                                    MARCH 2020

## Retaliatory Defamation Suits: The Legal Silencing of the #MeToo Movement

### Chelsey N. Whynot[*]

I.     INTRODUCTION ...................................................................2
II.    DEFAMATION ....................................................................3
       A.   Private Figures ..................................................4
       B.   Public Figures ...................................................5
       C.   Defamation in Louisiana ..................................10
III.   RETALIATORY DEFAMATION SUITS FILED IN RESPONSE TO
       ACCUSATIONS OF SEXUAL MISCONDUCT ...................................11
IV.    DEFAMATION CLAIMS USED TO COMBAT TITLE IX
       COMPLAINTS ....................................................................14
       A.   Sexual Misconduct in Educational Settings—A
            Brief History of Title IX ..................................15
       B.   Defamation Lawsuits Brought by Title IX
            Respondents .....................................................17
V.     POTENTIAL OPPORTUNITIES TO ELIMINATE RETALIATORY
       DEFAMATION SUITS ...........................................................20
       A.   Fifty State Adoption of Recent California Model
            Law ...................................................................20
       B.   Utilization of Anti-SLAPP Laws ......................23
       C.   Truth as a Defense ...........................................26
VI.    CONCLUSION ...................................................................28

\*      © 2020 Chelsey N. Whynot. J.D. candidate 2020, Tulane University Law School; B.S. 2017, Bentley University. With thanks to Professor Amy Gajda whose enthusiastic and thought-provoking suggestion challenged and motivated me throughout the writing process. Thanks also to the *Tulane Law Review* members and staff for their tireless efforts in the production of this Comment. Finally, to my parents, whose guidance, encouragement, and love gave me the assurance to speak up and let my voice be heard.

1

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

2              *TULANE LAW REVIEW ONLINE*          [Vol. 94:1

I.    INTRODUCTION

The #MeToo movement[1] has inspired a wave of testimony from survivors of sexual misconduct. In response, there has been a corresponding influx of retaliatory defamation lawsuits brought by the individuals accused of sexual misconduct. The retaliatory use of defamation lawsuits has the effect of deterring survivors from reporting, therefore chilling the free exercise of their First Amendment rights. There are many reasons why survivors think twice about reporting sexual misconduct committed against them, and fear of liability for defamation should not be one of them.

This phenomenon of using defamation suits as a retaliatory measure is so widespread that even the President of the United States of America has used them as a tool to silence his own accusers.[2] In an interview with Courthouse News, attorney Lisa Bloom reported that, while on the presidential campaign trail, President Donald Trump threatened survivors who were accusing him of sexual assault with defamation suits.[3] As a candidate for president, Trump publicly announced that he was going to sue women claiming he sexually assaulted them.[4] Bloom told Courthouse News that she "actually had clients who were considering coming out publicly and after he said that, they were afraid and they didn't want to because they said, '[h]e's going to sue us.'"[5]

This is exactly the problem with retaliatory defamation suits. They are meant to scare survivors into silence, and they are quite effective to that end.[6] Individuals accused of sexual misconduct are increasingly using defamation suits as "a way to put pressure on an accuser to make her go away."[7] If successful, these defamation suits have the power to chill the survivor's "First Amendment right to

---

1.    The #MeToo movement was founded in 2006 with the goal of "refram[ing] and expand[ing] the global conversation around sexual violence." *History & Vision*, METOO, https://metoomvmt.org/about/ (last updated 2018).

2.    Daniel Jackson, *Sex-Assault Accusers Turn to Defamation Lawsuits in #MeToo Era*, COURTHOUSE NEWS SERV. (Jan. 25, 2018), https://www.courthousenews.com/sex-assault-accusers-turn-to-defamation-lawsuits-in-metoo-era/ ("Even the threat of a lawsuit can chill an alleged victim's plans to speak out.").

3.    *Id.*

4.    *Id.*

5.    *Id.*

6.    *Id.*

7.    *Id.*

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917



petition the government."[8] Worse yet, "defamation cases which are being used as a bullying tactic by law firms and individuals, who wish to silence a victim (MeToo survivor) are absolutely unfair and are an abuse of this legislation."[9] This Comment will discuss the escalation of this emerging crisis and propose potential solutions to this widespread problem.

This Comment will proceed in two Parts. Part I will discuss the legal background of defamation law in the United States, and how the law differs depending on whether the claim is being brought by a private figure or a public figure. Part II will discuss the use of retaliatory defamation suits by individuals accused of sexual misconduct.[10]

## II.  DEFAMATION

"The law of defamation is the imperfect mechanism by which the law attempts to reconcile the competing interests of freedom of expression and the protection of individual reputation."[11] Defamation suits were created to "provide[] a legal remedy for a person whose reputation has been sullied by false statements of fact."[12] Federal law defines defamation as "any action or other proceeding . . . alleging that forms of speech are false, have caused damage to reputation or emotional distress, have presented any person in a false light, or have resulted in criticism, dishonor, or condemnation of any person."[13]

In the United States, defamation is a state law claim, so the elements to state a claim for defamation can differ depending on what

---

8. BARRY A. LINDAHL, MODERN TORT LAW: LIABILITY AND LITIGATION § 35:41 (2d ed.), Westlaw (database updated June 2019).

9. *"Criminal Defamation Cases Against 'MeToo' Victims Unfair,"* ECON. TIMES (Nov. 12, 2018), https://economictimes.indiatimes.com/news/politics-and-nation/criminal-defamation-cases-against-metoo-victims-unfair/articleshow/66592510.cms (quoting Email from Anjuli Pandit, Former Exec., Tata Group, to Press Trust of India (2018)); *see also* Melanie Mason, *Ex-Assemblyman Matt Dababneh, Under Legislative Investigation on Sexual Misconduct Allegations, Sues Lobbyist for Defamation*, L.A. TIMES (Aug. 15, 2018), https://www.latimes.com/politics/la-pol-ca-matt-dababneh-defamation-suit-20180814-story.html (arguing that survivors of "sexual harassment or sexual assault ha[ve] every right to report what happened without suffering retaliation like this" (quoting Jean Hyams)).

10. This Comment will not address the defamation suits that are founded and brought as a result of a person being truly defamed, but rather, the phenomenon discussed, and the solutions proposed herein, are in reference to defamation suits brought for the sole purpose of defaming survivors.

11. MATTHEW COLLINS, THE LAW OF DEFAMATION AND THE INTERNET 4 (3d ed. 2010).

12. AMY GAJDA, THE TRIALS OF ACADEME: THE NEW ERA OF CAMPUS LITIGATION 161 (2009); *see also* Rosenblatt v. Baer, 383 U.S. 75, 92 (1966) (noting that the essence of a defamation claim is the right to protect one's good name).

13. 28 U.S.C. § 4101(1) (2012).

LEGISLATIVE INTENT SERVICE, INC.   (530) 666-1917

state the claim is being brought in.[14] However, despite the differences among the states, the *typical* elements to establish a prima facie cause of action for defamation include the following:

(1)     a false and defamatory statement concerning another;
(2)     an unprivileged publication to a third party;
(3)     fault amounting at least to negligence on the part of the publisher; and
(4)     either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.[15]

Defamation suits in general are either considered libel or slander.[16] The only difference between the two is the method in which the statement is published.[17] The statement is considered slander if it is spoken and is considered libel if it is written; but both are separate forms of defamation, which are generally proven using the same set of elements above.[18]

## A.    Private Figures

Another crucial distinction within the defamation cause of action is the difference between private figure plaintiffs and public figure plaintiffs.[19] The reason this is such an important contrast in defamation law is because of the standard the plaintiff will have to meet in proving their claim. If the person defamed is a private figure, the burden of proving that the relevant statement is defamatory is significantly lower than if the person defamed is a public figure.[20]

When the plaintiff (defamed individual) is a "purely private individual[], they are generally able to recover damages where the material defaming them is false, and the defendant was at least *negligent* as to the truth or falsity of the material."[21] To prove negligence in this context, the defamation plaintiff simply must show that the defendant did "not exercis[e] reasonable care to determine if

---

14.     *See* COLLINS, *supra* note 11, at 11.
15.     RESTATEMENT (SECOND) OF TORTS § 558 (AM. LAW INST. 1977).
16.     Ivie Guobadia & Emily Haigh, *Title IX and Defamation: An Emerging Challenge Facing Higher-Education Institutions*, LITTLER (Jan. 5, 2018), https://www.littler.com/publication-press/publication/title-ix-and-defamation-emerging-challenge-facing-higher-education.
17.     *See* RESTATEMENT (SECOND) OF TORTS § 558.
18.     *Id.*
19.     COLLINS, *supra* note 11, at 547-50.
20.     *See id.*
21.     *Id.* at 549 (emphasis added).

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917



the statements [made] were false" prior to making them.[22] This is the standard for private individuals who bring defamation claims.

As Part II.B will explain, the negligence burden becomes much higher when the plaintiff is a public figure.[23] In *Gertz v. Robert Welch, Inc.*, the Court held that the standard for private individuals bringing defamation suits must be lower than suits brought by public figures for three reasons: (1) private individuals are more vulnerable to defamatory statements given that they do not have an opportunity to publicly refute defamatory statements; (2) private individuals do not purposefully expose themselves to increased risk of injury from defamatory statements; therefore, they are more deserving of the ability to recover; and (3) the state has a legitimate "interest in compensating injury to the reputation of private individuals."[24] The Court in *Gertz* ultimately held that "the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual,"[25] therefore lowering the burden of proof for a private figure defamation plaintiff that had been set out ten years earlier in *New York Times Co. v. Sullivan*.[26]

In conclusion, private figures bringing defamation suits must generally prove that the individual who made the defamatory statement against them was negligent in his or her determination of the truthfulness of the statement.[27] This is a low standard and is much easier to establish than the standard that public figures must meet in proving defamation.[28]

## B.    Public Figures

In *Sullivan*, the United States Supreme Court first discussed defamation actions brought by public figures.[29] "The effect of that decision and its progeny is that where the plaintiff is a 'public figure' . . . defendants will only be liable for damages in a defamation action . . . where the plaintiff proves with 'convincing clarity' that the

---

22.    Johnita P. Due, *This Court Ruling Could Silence Victims of Sexual Misconduct*, CNN, https://www.cnn.com/2017/10/26/opinions/defamation-silence-women-opinion-due/index.html (last updated Oct. 27, 2017).

23.    *See* COLLINS, *supra* note 11, at 547-49; discussion *infra* Part II.B.

24.    418 U.S. 323, 342-45 (1974).

25.    *Id.* at 347.

26.    *See* 376 U.S. 254, 283-84 (1964) (holding that *all* defamation plaintiffs must prove actual malice to prevail on a defamation claim).

27.    COLLINS, *supra* note 11, at 549.

28.    *Id.* at 547-49.

29.    376 U.S. at 256.

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917



defendant published false, defamatory material with actual malice . . . ."[30] Actual malice means "with knowledge of its falsity or with reckless disregard for its truth or falsity."[31] These decisions dictating the burden for public versus private figures are important in the context of the #MeToo movement because courts often hold that defamation plaintiffs will automatically become limited purpose public figures if they choose to respond to allegations through the media, which has been a typical reaction to public allegations of sexual misconduct.[32] This heighted burden is beneficial for defamation defendants (survivors) because the individual accused of sexual misconduct, the defamation plaintiff, would be forced to prove that the survivor made a false allegation with actual malice, instead of negligent disregard for the truth, in order to win the defamation case.

Although the *Sullivan* Court decided that it had "no occasion . . . to determine how far" the public figure classification would extend,[33] the Court held two years later in *Rosenblatt v. Baer* that public officials "among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs" are to be considered public figures.[34] The next year, the Court expanded the definition of public figures to include more than just governmental officials. The Court held in *Curtis Publishing Co. v. Butts* that "a 'public figure' who is *not* a public official may also recover damages for a defamatory falsehood."[35] In 1974, the Court clarified what types of individuals could be considered public figures that are not public officials. The Court in *Gertz* held that "[t]hose who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention" are public figures.[36] This further expansion of the public figure classification has led to many more types of individuals being treated as public figures by the courts.

The Supreme Court has also established that individuals can be public figures for a limited purpose; they can become what the courts now refer to as "limited purpose public figures."[37] "Individuals . . .

---

30.    COLLINS, *supra* note 11, at 548.
31.    *Id.*
32.    *See* McKee v. Cosby, 874 F.3d 54, 61-62 (1st Cir. 2017).
33.    376 U.S. at 283 n.23.
34.    383 U.S. 75, 85 (1966).
35.    388 U.S. 130, 155 (1967) (emphasis added).
36.    418 U.S. 323, 342 (1974).
37.    COLLINS, *supra* note 11, at 548.

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

become 'limited purpose public figures' where they inject themselves, or are drawn, into a particular public controversy . . . [though they will only be considered] public figures in relation to alleged defamations that are germane to their participation in the controversy."[38] The elements that a defamation defendant must prove in order to show that the defamation plaintiff is a limited purpose public figure are (1) the existence of a public controversy, (2) the defamation plaintiff "thrust[ed] themselves [in]to the forefront" of said controversy, and (3) that the plaintiff thrust him or herself with the purpose of "influenc[ing] the resolution of the issues involved."[39]

Public figures (whether for a limited purpose or not) who bring defamation suits have a higher burden of proving falsehoods than do private figures.[40] They must prove that the defamatory statements were made "with reckless disregard . . . or [knowledge of] falsity," whereas private individuals must generally prove that the defamatory statements were made negligently.[41]

Therefore, public figures have lesser protection when faced with defamation suits. Courts have indicated that reporting survivors of "sexual misconduct . . . will . . . be classified as [limited purpose] public figures simply because they've spoken up to give public accounts of the crimes against them."[42] If this judicial trend continues, then hopefully the same logic would be applied to the person accused of sexual misconduct. Ideally, those accused of sexual misconduct would become limited purpose public figures simply because a survivor has spoken up to make public accusations. This logic follows because, realistically, the same amount of attention (or more) is drawn to an individual accused of sexual misconduct as is drawn to the survivor who reports to the media, regardless of whether or not the accused speaks out to the media in response. If the courts do decide to classify those accused of sexual misconduct as limited purpose public figures, they could potentially create stronger protections for survivors being sued for defamation because defamation plaintiffs would need to prove that the survivor acted with actual malice and recklessly disregarded the truth in making her claim, as discussed above.

---

38.    *Id.*
39.    *Gertz*, 418 U.S. at 345.
40.    COLLINS, *supra* note 11, at 548-49.
41.    *See id.*
42.    Due, *supra* note 22.

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917



One well-known case that exemplifies the trend of treating survivors as limited purpose public figures is *McKee v. Cosby*.[43] Kathrine McKee, a well-established actress and performer, filed suit against Bill Cosby, "an internationally renowned celebrity and entertainer."[44] The two had met after McKee appeared on the *Bill Cosby Show*, Cosby's television program, in 1971.[45] When she finally decided to speak out about her assault years later, McKee reported to the media that "Cosby forcibly raped her" in his hotel room several years after meeting him in 1974.[46] Her allegations came in 2014, "after more than twenty other women had publicly accused Cosby of sexual assault," contributing to the escalation of the #MeToo movement.[47] In response, Cosby's attorney sent a letter of admonishment[48] to the *Daily News*, the media outlet that reported on McKee's allegations.[49] McKee contends that "on the same day [Cosby's attorney] sent the [l]etter to the Daily News, he leaked copies of it to the media," which "appeared in news outlets around the world."[50] McKee brought a defamation suit[51] in the United States District Court for the District of Massachusetts alleging that the dissemination of copies of the letter from Cosby's attorney defamed her because of the derogatory accusations made about McKee in the letter.[52] The district court granted Cosby's motion to dismiss the defamation suit,[53] and McKee appealed.[54] One of the questions on appeal was whether or not McKee was a limited purpose public figure and therefore subject to the actual malice standard.[55]

To classify McKee as a public figure, the court had to determine whether: (1) there was "a matter of 'public controversy' . . . prior to the

---

43. 874 F.3d 54 (1st Cir. 2017), *cert. denied*, No. 17-1542, 139 S. Ct. 675 (2019).

44. *McKee*, 874 F.3d at 58.

45. *Id.*

46. *Id.*

47. *Id.*

48. The relevant portions of the letter that referenced McKee stated that the *Daily News* should not have published McKee's "never-before-heard tale" and argued that the *Daily News* "ignor[ed] or fail[ed] to investigate what [Cosby's lawyer] called 'evidence undermining [McKee's] reliability.'" Due, *supra* note 22 (quoting *McKee*, 874 F.3d at 58).

49. *McKee*, 874 F.3d at 58.

50. *Id.* at 59.

51. This Comment will almost exclusively discuss defamation suits brought by individuals *accused* of sexual misconduct; *McKee v. Cosby* is being used only to demonstrate the court's decision to consider a survivor of sexual assault a limited purpose public figure solely because she chooses to report the misconduct she experienced.

52. *McKee*, 874 F.3d at 58-59.

53. McKee v. Cosby, 236 F. Supp. 3d 427, 454 (D. Mass. 2017).

54. *McKee*, 874 F.3d at 58-59.

55. *Id.* at 61-62.

LEGISLATIVE INTENT SERVICE, INC.     (530) 666-1917

alleged defamation," and (2) McKee thrust herself to the forefront of the controversy, *or* (3) McKee "otherwise 'engage[d] the public's attention in an attempt to influence its outcome.'"[56]

Despite McKee's argument that "her dispute with Cosby [was] a self-contained, private dispute—'purely a matter of private concern,'" the court ultimately held that a public controversy existed when McKee lodged sexual assault allegations against Cosby to the media.[57] The court took into consideration the way McKee publicized her allegations (to the press, after decades of silence) and that she reported after twenty others had already come forward, essentially implying that she knew she was joining a movement.[58]

The court went on to note that this method of coming forward satisfied the second prong of the limited purpose liability element analysis because reporting to the media necessarily thrusted McKee to the forefront of the Cosby controversy, especially when she sought to influence the outcome of the controversy.[59]

Because the court found that McKee was a limited purpose public figure, it held that "she may not recover damages for a defamatory statement unless . . . she can prove that the statement was made with "'actual malice"—that is, with knowledge that it was false or with reckless disregard of whether it was false or not.'"[60] Although McKee argues that she should not be deemed a limited purpose public figure just because she was "involved in or associated with a matter that attracts public attention,"[61] the court ultimately decided that because she voluntarily and deliberately came forward to accuse Cosby (as opposed to prior cases where the defamation plaintiff was "dragged unwillingly into the controversy"),[62] she purposefully "invit[ed] public scrutiny."[63] Therefore, the court held, "as a matter of law that McKee [wa]s a limited-purpose public figure."[64]

There has not yet been a case before the Supreme Court in which the Court has had to determine whether or not an individual accused of

---

56.    *Id.* at 61 (quoting Gertz v. Robert Welch, Inc., 418 U.S. 323, 351-52 (1974)).
57.    *Id.* at 62.
58.    *Id.*
59.    *Id.*
60.    *Id.* at 61 (quoting N.Y. Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964)).
61.    *Id.* at 62 (quoting Wolston v. Reader's Digest Ass'n, 443 U.S. 157, 167 (1979)).
62.    *Id.* (quoting *Wolston*, 443 U.S. at 166).
63.    *Id.* (quoting Pendleton v. City of Haverhill, 156 F.3d 57, 69 (1st Cir. 1998)).
64.    *Id.* Taking into account McKee's status as a limited purpose public figure, the court concluded its analysis by affirming the district court's decision to grant Cosby's motion to dismiss the defamation suit. *Id.* at 65.



LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

sexual misconduct can become a limited purpose public figure simply by being accused in the media (assuming the accused is not already a public figure like Bill Cosby), just as it has repeatedly decided that a survivor can become a limited purpose public figure simply by reporting to the media.[65] However, a strong argument can be made that when accused of sexual misconduct, those accused do become limited purpose public figures. One could argue that a controversy exists any time someone is publicly accused of sexual misconduct and that those accused thrust themselves to the forefront of the conflict when they publicly respond, *especially* when seeking to influence the outcome of the controversy, just like McKee did in her case. If this argument were to succeed in court, the defamation plaintiff (the accused) would have to meet the actual malice standard instead of the negligent standard in his defamation suit against the survivor. This heightened burden of proof would provide an important protection for survivors moving forward in the #MeToo movement and should be considered a potential reprieve for survivors in the context of the retaliatory defamation suits that this Comment discusses.

## C.   *Defamation in Louisiana*

Consistent with federal Supreme Court cases, "Louisiana has always recognized the individual rights of freedom of the press and of speech, always warning that the abuse of these liberties would not be tolerated . . . under the state's Civil Code."[66] In Louisiana, a cause of action for defamation arises out of a violation of Civil Code Article 2315.[67] Just like the federal case law, Louisiana defamation laws serve the purpose of protecting reputation and good name. In order to prove defamation in Louisiana specifically, the plaintiff must establish:

(1)   false and defamatory statement concerning another,
(2)   unprivileged publication to a third party,
(3)   fault, requiring negligence, or greater, on the part of the publisher and

---

65.    *See* COLLINS, *supra* note 11, at 548 ("Whether the 'actual malice' requirement applies where a public figure sues a non-media defendant has not been resolved by the United States Supreme Court.").

66.    MICHAEL A. KONCZAL & GERALD V. FLANNERY, DEFAMATION LAW IN LOUISIANA, 1800-1988, at 108 (1989).

67.    *See* LA. CIV. CODE ANN. art. 2315 (2010).

(4)    resulting injury.[68]

Put another way, the plaintiff "must prove 'that the defendant, with actual malice or other fault, published a false statement with defamatory words which caused plaintiff damages.'"[69] Louisiana defines "a communication [as] defamatory if it tends to harm the reputation of another so as to lower the person in the estimation of the community, to deter others from associating or dealing with the person, or otherwise exposes a person to contempt or ridicule."[70] The Louisiana Supreme Court has held that this necessarily implicates any "communication which [addresses] an element of personal disgrace, dishonesty, or disrepute."[71] Therefore, Louisiana defamation law undoubtedly creates a cause of action for individuals who have been publicly accused of sexual misconduct, assuming they satisfy all the elements stated above.

## III.   RETALIATORY DEFAMATION SUITS FILED IN RESPONSE TO ACCUSATIONS OF SEXUAL MISCONDUCT

As the #MeToo movement has gained momentum, "there has been a surge in retaliatory defamation lawsuits by [alleged] abusers."[72] These defamation suits are being used to silence survivors from reporting acts of sexual misconduct.

In 2002, sixteen-year-old Alice Glass met indie rock star, Ethan Kath, while he was on tour with his rock band, Kill Cheerleader.[73] Three years later, when Kath started a new band, Crystal Castles, he invited Glass to join as a vocalist.[74] The band attained widespread success and achieved mainstream recognition as it traveled the world

---

68.    WILLIAM E. CRAWFORD, 12 LOUISIANA CIVIL LAW TREATISE: TORT LAW 469 (2d ed. 2009).

69.    Trentecosta v. Beck, 96-2388, p. 10 (La. 10/21/97); 703 So. 2d 552, 559 (quoting Sassone v. Elder, 626 So. 2d 345, 350 (La. 1993)).

70.    Fitzgerald v. Tucker, 98-C-2313, p.11 (La. 6/29/99); 737 So. 2d 706, 716 (La. 1999) (quoting *Trentecosta*, 96-2388 at p. 10, 703 So. 2d at 559).

71.    *Id.*

72.    Bruce Johnson & Davis Wright Tremaine, *Worried About Getting Sued for Reporting Sexual Abuse? Here Are Some Tips.*, ACLU (Jan. 22, 2018), https://www.aclu.org/blog/womens-rights/worried-about-getting-sued-reporting-sexual-abuse-here-are-some-tips ("Many lawyers say they've seen a spike in defamation lawsuits in recent years.").

73.    Amy Zimmerman, *The Indie Rocker Accused of Sexually Abusing Young Fans*, DAILY BEAST, https://www.thedailybeast.com/the-indie-rocker-accused-of-sexually-abusing-young-fans (last updated Feb. 17, 2018).

74.    *Id.*

performing at shows and festivals.[75] The band reveled in this success for nine years until Glass, who had received numerous individual awards for her "pioneering spirit and an uncompromising approach to music,"[76] abruptly announced her intention to leave Crystal Castles.

Glass described her departure as "the culmination of years of . . . sexual assault, manipulation, and physical and emotional abuse" perpetrated by Ethan Kath, the leader of the band.[77] Glass released a "lengthy statement" where she described the sexual assault she experienced at the hands of Kath for the nine years that she worked as his bandmate. In response, "Kath [immediately] filed a defamation suit against Glass . . . . accus[ing] [her] of releasing 'false and malicious lies to the online world.'"[78] Glass reported in an interview with the *Daily Beast* that the defamation suit from Kath was "meant to intimidate the other alleged victims who 'probably don't have access to a lawyer and so they'd be too scared to speak out if they think they'll be sued for hundreds of thousands of dollars.'"[79] This is exactly the problem this Comment seeks to address—the legal silencing of survivors by threat of a defamation lawsuit.

Alice Glass was one of the lucky ones, particularly because she had the means to defend against her retaliatory defamation suit and the courage to speak out under threat of lawsuit. As is exemplified by Glass's case, there has "definitely been an uptick" in recent years in retaliatory defamation suits, which are being used "as a strategy to silence survivors."[80] Individuals accused of sexual misconduct often file these "shameless lawsuits they know they can't win but which they hope will intimidate" survivors and force them into silence.[81]

---

75.     *Id.*

76.     *Id.* (quoting Jamie Fullerton, *Crystal Castles Get John Peel Award for Innovation at Shockwaves NME Awards*, NEW MUSICAL EXPRESS (Feb. 23, 2011), https://www.nme.com/news/music/crystal-castles-2-36-1299451).

77.     *Id.*

78.     *Id.* (quoting Verified Complaint for Damages at 2, Palmieri v. Osborn, No. BC681889 (C.D. Cal. Nov. 3, 2017)).

79.     Noah Yoo, *Facing Defamation Suit, Alice Glass Speaks Out Against Former Crystal Castles Bandmate Ethan Kath*, PITCHFORK (Feb. 17, 2018), https://pitchfork.com/news/facing-defamation-suit-alice-glass-speaks-out-against-former-crystal-castles-bandmate-ethan-kath/ (quoting Zimmerman, *supra* note 73).

80.     Katherine Mangan, *Blasted as Predators, Professors Are Fighting Back with Lawsuits*, CHRONICLE HIGHER EDUC. (July 12, 2018), https://www.chronicle.com/article/Blasted-as-Predators/243918 (quoting Carly N. Mee, Interim Executive Director of SurvJustice).

81.     *Hollywood's Notorious Men Retaliate Against #MeToo Movement*, EARTHRIGHTS INT'L (Aug. 20, 2018), https://earthrights.org/blog/hollywoods-notorious-men-retaliate-against-metoo-movement/.

Financial burdens should be considered at the forefront of the discussion regarding this crisis. Alice Glass was fortunate that as a twenty-five-year-old acclaimed rock star, she had the means to defend against the defamation suit that was brought against her. However, not all survivors are so lucky. Defending against these retaliatory defamation suits "can be enormously expensive."[82] In fact, the financial burden of defending against a defamation suit is one of the main reasons these suits tend to evoke so much fear in survivors. In one instance, defending against a defamation suit that was brought by an individual accused of sexual misconduct cost the survivor "nearly $20,000 to defend herself. Some months, her legal bills have reached as high as $6,000—more than twice her monthly income."[83] In that particular case, the accused perpetrator knew the survivor did not have the financial capacity to defend against an expensive lawsuit.[84] "[T]he proceedings for defamation cases often drag on for months, making paying a lawyer by the hour a steep expense."[85]

Experts in the field are concerned that this influx in defamation suits filed against survivors "will further discourage reporting."[86] This fear stems from the systematic oppression that survivors are already facing when it comes to reporting. Even without the threat of being hit with a defamation lawsuit, "[s]urvivors . . . already face a myriad of hurdles when it comes to reporting their assault, including victim blaming, stigmatization, and officials not taking their accusations seriously, among others."[87] Overall, the threat of a defamation lawsuit acts to silence survivors from coming forward.

The introduction to this Comment provided the example of Donald Trump's use of retaliatory defamation suits. But neither the President of the United States nor Ethan Kath of Crystal Castles is the only person who has recently attempted to use retaliatory defamation suits to silence survivors. The news media has brought to light

---

82.   Hazel Cills, *Students Accused of Sexual Misconduct Are Increasingly Filing Defamation Suits Against Their Accusers*, JEZEBEL (Dec. 5, 2017), https://jezebel.com/students-accused-of-sexual-misconduct-are-increasingly-1821026491.

83.   Tyler Kingkade, *As More College Students Say "Me Too," Accused Men Are Suing for Defamation*, BUZZFEED NEWS (Dec. 5, 2017), https://www.buzzfeednews.com/article/tylerkingkade/as-more-college-students-say-me-too-accused-men-are-suing/.

84.   *Id.*

85.   Jackson, *supra* note 2.

86.   Sarah Friedmann, *Reporting Sexual Assault on Campus Is Becoming Riskier Than Ever—Here's Why*, BUSTLE (Dec. 6, 2017), https://www.bustle.com/p/reporting-sexual-assault-on-campus-is-becoming-riskier-than-ever-heres-why-7209692.

87.   *Id.*

innumerable similar instances. Just to name a few, comedian Jasmine Pierce was sued for defamation for $38 million after accusing fellow comedian Aaron Glaser of being a rapist.[88] Writer Moira Donegan was handed a $1.5 million defamation lawsuit by author Stephen Elliot after she created "the 'Shitty Media Men' list, a crowdsourced Google spreadsheet that names more than 70 men as alleged perpetrators of sexual misconduct."[89] Fifty-two-year-old jazz musician, Steve Coleman, delivered a defamation lawsuit to his teenage protégé who accused him of sexual misconduct.[90] Political figures are also involved as Plaintiffs: Matt Dababneh, ex-assemblyman of the California legislature "filed a defamation []suit . . . against a lobbyist who accused him of" sexual misconduct.[91] These are just a few examples of what has unfortunately become a widespread phenomenon that this Comment addresses.

There is no question that defamation suits are being used as a retaliatory tool to mute survivors. The solutions proposed in Part V of this Comment aim to eliminate the use of defamation suits for this sole purpose.

## IV.  DEFAMATION CLAIMS USED TO COMBAT TITLE IX COMPLAINTS

This Part exclusively discusses retaliatory defamation lawsuits in the context of university settings because the use of these suits to silence survivors is particularly common on college campuses. Although defamation suits have been around for quite some time, defamation "claims arising from scholarship and academic debate are

---

88.    *A Comedian Called Out an Alleged Rapist—and Was Sued for $38 Million*, PUB. PARTICIPATION PROJECT (Nov. 2, 2017), https://anti-slapp.org/slapp-blog/2018/8/14/a-comedian-called-out-an-alleged-rapistand-was-sued-for-38-million.

89.    Michelle Kaminsky, *The 'Shitty Media Men' Defamation Lawsuit Is a Danger to Both Free Speech and the #MeToo Movement*, FORBES (Oct. 22, 2018), https://www.forbes.com/sites/michellefabio/2018/10/22/the-shitty-media-men-defamation-lawsuit-is-a-danger-to-both-free-speech-and-the-metoo-movement/#3feb20d17be9. Donegan's attorney argued in this article that the purpose "of the [defamation] case is not actually to succeed against my client, or maybe not even to go forward with the case at all . . . but to file it to send a strong message to other women that if you do this you will be sued." *Id.*

90.    John Annese, Elizabeth Keogh & Nancy Dillon, *Famed Jazz Saxophonist Accused of Sexual Misconduct by Former Protégé Now Suing for Defamation*, N.Y. DAILY NEWS (Oct. 12, 2018), https://www.nydailynews.com/news/ny-news-jazz-star-steven-coleman-defamation-lawsuit-sexual-harassment-20181011-story.html.

91.    Mason, *supra* note 9 ("Including Dababneh, three legislators resigned after public accusations of sexual harassment as the groundswell of the #MeToo movement hit California's state Capitol last fall.").

a relatively recent phenomenon."[92] In recent years, defamation lawsuits have been used as a tool to respond to claims of Title IX violations on college campuses.[93]

### A.   *Sexual Misconduct in Educational Settings—A Brief History of Title IX*

In 1972, Title IX of the Education Amendments was enacted by Congress.[94] Title IX prohibited discrimination on the basis of sex.[95] Initially, Title IX served the exclusive purpose of enforcing equal access to athletics at institutions of higher education receiving federal funding.[96] The first time Title IX was used to address sexual misconduct was eight years later when the United States Court of Appeals for the Second Circuit decided *Alexander v. Yale University*.[97] There, female graduates of Yale University sued their alma mater alleging that the sexual harassment that they had experienced while enrolled at Yale University violated Title IX.[98] The court held that, because the students had already graduated the university and were no longer subject to the misconduct, they were not able to state a justiciable case or controversy.[99] Even though the plaintiffs alleging sexual misconduct in this case did not prevail, they moved the fight against sexual misconduct using Title IX forward by bringing it into the courts.

Sixteen years later, a district court in California heard a case alleging a Title IX violation by a high school student who had experienced repeated instances of sexual harassment while in school.[100] There, the court granted the plaintiff's motion for reconsideration, setting out specific standards plaintiffs must meet (as adopted from

---

92.    GAJDA, *supra* note 12, at 161.

93.    Kingkade, *supra* note 83.

94.    *See* Title IX, 20 U.S.C. § 1681 (1972).

95.    Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." *Id.* § 1681(a).

96.    *History of Title IX*, WOMEN'S SPORTS FOUND. (Aug. 13, 2019), https://www.womenssportsfoundation.org/advocate/title-ix-issues/history-title-ix/history-title-ix/.

97.    *See* 631 F.2d 178 (2d Cir. 1980); Tyler Kingkade, *How a Title IX Harassment Case at Yale in 1980 Set the Stage for Today's Sexual Assault Activism*, HUFFINGTON POST, https://www.huffpost.com/entry/title-ix-yale-catherine-mackinnon_n_5462140 (last updated June 10, 2014).

98.    *Alexander*, 631 F.2d at 181.

99.    *Id.* at 183-84.

100.    Doe *ex rel.* Doe v. Petaluma City Sch. Dist., 949 F. Supp. 1415, 1416 (N.D. Cal. 1996).

Title VII) in order to prove they were subject to a hostile environment because of sexual harassment based on gender under Title IX.[101]

Finally, after prompting from courts deciding cases like *Petaluma City School District*, the Office of Civil Rights (OCR) within the Department of Education (DOE) issued the *1997 Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*.[102] This guidance document set out the sexual harassment policy standards schools must conform to in order to be in compliance with Title IX.[103] This was extremely significant because it was the first time the OCR had indicated that sexual misconduct is a violation of Title IX.

From that point forward, Title IX became an important tool in combating sexual misconduct in educational settings. Guidance documents from the DOE[104] as well as prominent Circuit and Supreme Court cases[105] advanced students' rights to be free from sexual misconduct on the theory that sexual misconduct is discrimination on the basis of sex and therefore a violation of Title IX.

The most prominent advancement was the 2011 Dear Colleague Letter issued by the DOE under the Obama administration.[106] This guidance document, again issued by the OCR, sets out the requirements under Title IX for schools that want to continue receiving federal assistance.[107] The document "explains that the requirements of Title IX pertaining to sexual harassment also cover sexual violence, and lays out the specific Title IX requirements applicable to sexual violence."[108]

---

101.  *Id.* at 1427.

102.  Norma V. Cantu, *Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, U.S. DEP'T EDUC. (Mar. 13, 1997), https://www2.ed.gov/about/offices/list/ocr/docs/sexhar00.html.

103.  *Id.*

104.  Letter from Russlynn Ali, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., to Colleagues (Apr. 4, 2011) [hereinafter 2011 Dear Colleague Letter], https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf.

105.  *See* Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 184 (2005) (holding that Title IX prohibits schools from retaliating against individuals who complain of sex discrimination); Davis v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 654 (1999) (holding that Title IX covers student-on-student harassment); Mansourian v. Regents of Univ. of Cal., 602 F.3d 957, 968 (9th Cir. 2010) (holding plaintiffs who allege Title IX violations do not have to give the university "notice and opportunity to cure" before bringing suit).

106.  2011 Dear Colleague Letter, *supra* note 104.

107.  *Id.*

108.  *Id.*

LEGISLATIVE INTENT SERVICE, INC.   (530) 666-1917

The letter was backed by enormous support from survivors' rights advocates, including the Association of Title IX Administrators.[109]

Because of how wide-ranging the survivor protections were under these new guidelines, the letter paved the way for many more findings of "responsible" in Title IX investigations. In response, there has been a corresponding growth in the amount of defamation claims brought by respondents against petitioners and universities alike.

Six years after the 2011 Dear Colleague Letter was issued, on September 22, 2017, the Department of Justice, operating under the Trump administration, rescinded the Dear Colleague Letter of April 4, 2011, as well as the April 29, 2014 Questions and Answers document on Title IX and Sexual Violence.[110] However, despite the rollback on survivors' rights that came along with this rescission, there has not been an equal decrease in retaliatory defamation suits.

## B.  *Defamation Lawsuits Brought by Title IX Respondents*

About one in every six female college students has reported that she was sexually assaulted during her time in college.[111] The #MeToo movement has inspired student survivors of sexual misconduct to share their stories and file Title IX complaints at their universities, but at what cost? "On college campuses, survivors of alleged sexual assault are increasingly facing an additional hurdle after reporting an incident—the possibility of a defamation lawsuit from the accused."[112] This new trend is causing reporting of sexual misconduct on college campuses to become even more perilous for survivors of assault, and leaves them "even further disincentivized to come forward with allegations."[113]

---

109. Letter from Neena Chaudhry & Lara S. Kaufmann, Seniors Counsels, Nat'l Women's Law Ctr., to Honorable Russlynn Ali, Assistant Sec'y for Civil Rights, Office for Civil Rights, Dep't of Educ. (Feb. 8, 2012), https://nwlc-ciw49tixgw5lbab.stackpathdns.com/wp-content/uploads/2015/08/nwlc_ltr_to_ocr_re_prep_of_evidence_std_2_8_12_2.pdf; *see* Letter from Brett Sokolow, Esq., Exec. Dir., Ass'n of Title IX Adm'rs, et al., to Russlynn Ali, Assistant Sec'y for Civil Rights, Office for Civil Rights, Dep't of Educ. (Feb. 7, 2012), https://www.shatteringthesilence.org/wp-content/uploads/2012/02/Organizational-Sign-on-for-DCL-re-Sexual-Violence-2012-FINAL-Sign-on.pdf.

110. Letter from Candice Jackson, Acting Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., to Colleagues (Sept. 22, 2017) [hereinafter 2017 Dear Colleague Letter], https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.

111. *Campus Sexual Violence: Statistics*, RAPE, ABUSE & INCEST NAT'L NETWORK, https://www.rainn.org/statistics/campus-sexual-violence (last updated 2019).

112. Friedmann, *supra* note 86.

113. *Id.*



LEGISLATIVE INTENT SERVICE, INC.  (530) 666-1917

The filing of defamation lawsuits in response to sexual misconduct cases used to be relatively uncommon, but "it has now become almost 'reflective' for those who are accused."[114] Reports show that 72% of respondents who file lawsuits in response to violations in the Title IX adjudicatory process sue not only their university, the entity conducting and pursuing the Title IX investigation,[115] but also their accuser.[116] Experts in this field have said that though it is "difficult to track how many defamation lawsuits arising from campus sexual assault cases are filed nationwide . . . [the] numbers . . . point to a clear uptick."[117]

There is no question that there has been an escalation in defamation lawsuits in response to Title IX allegations.[118] "[D]efamation lawsuits . . . are a new tool in the battle over Title IX enforcement and are proving to be serious obstacles to students filing sexual misconduct complaints."[119] Worst of all, in many cases, defamation lawsuits are being filed as a strategic move, to purposefully threaten sexual assault survivors into silence.[120]

This increase in defamation lawsuits brought by students accused of sexual misconduct accelerated after one case of public prominence—the case of Florida State University (FSU) quarterback, Jameis Winston.[121] Erica Kinsman, a fellow student of Winston's at

---

114.    *Id.* In preparing this article, *Bustle News* reviewed an interview of Colby Bruno, a lawyer at the Victim Rights Law Center, who reported that "just a few years ago, only around 5 percent of her cases related to campus sexual assaults involved the accused suing the alleged victim. Now, over half of Bruno's cases involve a defamation lawsuit." *Id.*

115.    Though this Comment will focus on defamation suits brought against accusers of sexual misconduct, it is important to note that many institutions of higher education have also fallen victim to this influx of retaliatory defamation suits. *See* Guobadia & Haigh, *supra* note 16.

116.    Friedmann, *supra* note 86; *see* Doe v. Salisbury Univ., 123 F. Supp. 3d 748, 754 (D. Md. 2015).

117.    Kingkade, *supra* note 83; *see* Friedmann, *supra* note 86.

118.    Kingkade, *supra* note 83.

119.    *Id.*

120.    Friedmann, *supra* note 86.

121.    In 2013, Jameis Winston was the first college freshman to win the Heisman trophy, which "recognizes the outstanding college football player whose performance best exhibits the pursuit of excellence with integrity," the year after he was publicly accused of sexual assault by Erica Kinsman, a fellow student at Florida State University. *Heisman Trust*, HEISMAN https://www.heisman.com/heisman-trust/ (last visited Feb. 19, 2020); Laura Wagner, *FSU Pays $950,000 to Woman Who Accused Jameis Winston of Sexual Assault*, NPR (Jan. 25, 2016), https://www.npr.org/sections/thetwo-way/2016/01/25/464332250/fsu-pays-950-000-to-woman-who-accused-jameis-winston-of-sexual-assault.

2020]          *RETALIATORY DEFAMATION SUITS*          19

FSU, publicly accused[122] him of sexual battery after he allegedly raped her while she was a student at FSU.[123] Winston responded by filing a counterclaim for defamation.[124] In the end, the case settled and "Winston was never prosecuted or disciplined."[125]

Cases like these are not a rarity. In 2016, a former Tulane University football player filed a defamation suit against a student who alleged he had raped her.[126] The survivor alleged that "Davis had sexually assaulted her in his campus apartment in the early morning of Jan. 31."[127] Davis was subsequently expelled from the university by the hearing board that found him responsible.[128] Reactively, Davis filed a defamation suit against his accuser in the Civil District Court Parish of Orleans, Louisiana, which is still pending.[129]

The mere possibility of a potential defamation suit can have a deterrent effect on a student's decision to make a Title IX complaint, even if the defamation suit never comes to fruition.[130] Sometimes, this can even be the purpose of filing a defamation lawsuit.[131] "Often, these lawsuits are filed just to scare a student into not reporting their assault or withdrawing their claims, even when there is sufficient evidence to support them."[132] And as discussed in Part III, defending against these lawsuits can be extremely expensive for the survivor, therefore creating an additional and unnecessary barrier to reporting.[133]

---

122. *See* THE HUNTING GROUND (Chain Camera Pictures 2015). This documentary about campus sexual assault featuring Kinsman aired despite threats by Winston's legal team to sue the network if it proceeded. Jim Zarroli, *CNN Airs Documentary on Sexual Assault, Despite Legal Threats*, NPR (Nov. 22, 2015), https://www.npr.org/sections/thetwo-way/2015/11/22/457027388/cnn-will-air-documentary-on-sexual-assault-despite-legal-threats.

123. Marc Tracy, *Jameis Winston and Woman Who Accused Him of Rape Settle Lawsuits*, N.Y. TIMES (Dec. 15, 2016), https://www.nytimes.com/2016/12/15/sports/football/jameis-winston-erica-kinsman-lawsuit.html.

124. Kinsman v. Winston, No. 6:15-cv-696-Orl-22GJK, 2015 WL 12839267, at *1 (M.D. Fla. Sept. 15, 2015).

125. Tracy, *supra* note 123.

126. Guerry Smith, *Former Tulane Safety Leonard Davis Files Petition for Damages Against Student Who Said He Raped Her, Leading to His Expulsion*, ADVOCATE (Oct. 30, 2016), https://www.theadvocate.com/new_orleans/sports/tulane/article_7188ad4e-9cb2-11e6-8ce1-1b0ca5e6ee6d.html.

127. *Id.*

128. *Id.*

129. Order on Motion to Remand, Davis v. Doe, No. 18-1592 (E.D.L.A. May 1, 2018); Smith, *supra* note 126.

130. Kingkade, *supra* note 83; *see also* Jackson, *supra* note 2 (noting that defamation suits are being used as a tool to force survivors to disappear).

131. Kingkade, *supra* note 83.

132. Cills, *supra* note 82.

133. *See* discussion *supra* Part III.



LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

The handling of these complex situations can pose serious ethical dilemmas for universities as well. If not handled properly, defamation lawsuits can force universities into dropping Title IX claims in some circumstances.[134] "If an alleged victim backs out of filing a complaint to avoid being sued for defamation, for example, a college might close the case by having all parties sign a nondisclosure agreement and letting the accused rapist withdraw from school and have the allegation erased."[135] In these situations, the university protects the survivor from being forced to be in the same living and learning environment as their alleged perpetrator, but the university also "pass[es] onto other campuses students who could be dangerous" with clean slates and no documented history of sexual misconduct.[136] Overall, it is clear that we must enact legislative and judicial remedies to reconcile the use of retaliatory defamation suits on and off college campuses.

## V.   POTENTIAL OPPORTUNITIES TO ELIMINATE RETALIATORY DEFAMATION SUITS

While this Comment does not deny that some defamation claims are legitimate and founded, the solutions proposed herein are aimed at addressing suits brought for the sole purpose of silencing survivors. There is no doubt that the increase in retaliatory defamation suits has had a chilling effect on survivor's ability to report, and "#MeToo victims do not have sufficient protections from defamation lawsuits by their abusers."[137] We cannot let the silencing of survivors through the threat of defamation lawsuits become a regular practice by those accused of sexual misconduct. To that end, this Comment discusses several potential solutions to this developing crisis.

### A.   *Fifty State Adoption of Recent California Model Law*

The most effective solution to this pressing problem is a full fifty state adoption of a recently enacted California model law (Bill No. 2770). A recent law[138] passed in July of 2018, which became effective on January 1, 2019, in California, "creat[ed] new protections for

---

134.   Kingkade, *supra* note 83.

135.   *Id.*

136.   *Id.*

137.   Bruce E.H. Johnson & Antoinette Bonsignore, *Protect #MeToo Victims from Retaliatory Lawsuits*, SEATTLE TIMES, https://www.seattletimes.com/opinion/protect-metoo-victims-from-retaliatory-lawsuits/?utm_source=facebook&utm_medium=social&utm_campaign=article_left_1.1 (last updated Jan. 23, 2018).

138.   A.B. No. 2770, 2018 Leg. Sess., Reg. Sess. (Cal. 2018).

employers, witnesses, and complainants from defamation lawsuits related to making, assisting, or discussing good-faith sexual harassment claims and investigations."[139] The bill "seeks to strike a balance between encouraging individuals to report misconduct while protecting individuals from false accusations made with a complete disregard for the truth, hence the 'without malice' condition."[140] This Comment proposes that this new bill serve as a model to be adopted by the states,[141] which would provide the same protections for survivors across the country. As it stands, Bill No. 2770 protects employees from defamation suits[142] "when [employees] accuse someone of inappropriate behavior [sexual misconduct], as long as they do so in good faith."[143]

Bill No. 2770 is expansive in the communications that it protects but unfortunately not in the scope that it extends to. In terms of the communication it protects, it protects almost any good faith discussion or reporting of sexual harassment claims or investigations.[144] Bill No. 2770 added three types of "privileges" that can be used as a defense to defamation claims.[145] Most significantly for purposes of this Comment, any "sexual harassment complaints (written or oral) that employees make without malice, and based upon credible evidence" are privileged and therefore protected from defamation claims.[146] However, Bill No. 2770 goes even further to protect current and former employers so that they are able to "answer whether the decision to not rehire a current or former employee is based on the employer's determination that the employee engaged in sexual harassment, so long as the statements are

---

139.  A.B. No. 2770, 2018 Leg. Sess.; Paul M. Huston, *New California Law Extends Defamation Privilege to Communications Related to Sexual Harassment Claims and Investigations*, NAT'L L. REV. (July 27, 2018), https://www.natlawreview.com/article/new-california-law-extends-defamation-privilege-to-communications-related-to-sexual.

140.  Huston, *supra* note 139.

141.  Because defamation is a state law claim, adoption of a federal statute would not necessarily prove helpful. Instead, this Comment proposes a model law that all states would be encouraged to adopt.

142.  Louisiana also has one statute that protects employees from "fraudulent or frivolous" defamation suits, but only those filed by their employer, not by coworkers. LA. REV. STAT. § 13:3381 (2018).

143.  Nadine Sebai, *New Law Will Protect California Employees from Defamation Lawsuits After Reporting Sexual Harassment*, CAP. PUB. RADIO (Dec. 20, 2018), http://www.capradio.org/articles/2018/12/20/new-law-will-protect-california-employees-from-defamation-lawsuits-after-reporting-sexual-harassment/.

144.  Huston, *supra* note 139.

145.  *Id.*

146.  *Id.*

made without malice."[147] This is a substantial step in the fight to end sexual misconduct (especially in the workplace) because it will prevent employees who have engaged in sexual misconduct from flying under the radar as they move from job to job.

Unfortunately, Bill No. 2770, while noble in its protection of survivors, only applies to defamation suits in the employment setting. The bill was originally enacted by California with the purpose of preventing harassers from "suing former employers for defamation when the latter advise prospective employers that the job seeker was terminated because of sexually harassing behavior," though it has had the effect of limiting harassers from being able to "wriggle out of their self-imposed predicaments by filing defamation lawsuits against those seeking justice."[148]

Qualifying those accused of sexual misconduct as limited purpose public figures, as discussed in Part II.B would make this solution even more effective. If those accused of sexual misconduct were deemed limited purpose public figures when they bring defamation claims against survivors, then they would need to prove that the statement was made with actual malice. Because the Model California Law provides that a defamation defendant will be protected if her accusation was made in good faith, the defamation plaintiff would not be able to prove an essential element of the claim, therefore ensuring that it is dismissed as timely as possible.

Though Bill No. 2770 exclusively governs allegations of sexual misconduct and responding defamation suits springing from the employment setting, the ideal model statute would not be so restricted in scope. This Comment advocates for the adoption of a model law by all fifty states restricting *any* defamation suit brought in response to an allegation of sexual misconduct made in *good faith*, no matter what setting that claim is brought in. This Comment further advocates for the burden of proving bad faith to rest on the plaintiff bringing the defamation suit.

Overall, the full-state adoption of the model law would protect *any* survivor (not just employees at companies in California who must conform to bills like Bill No. 2770) from being exposed to a retaliatory

147. *Id.*

148. Jennifer Barrera, *Harassment Victims and Employers Need Protection from Defamation Lawsuits*, CAL. CHAMBER COM. ALERT (Apr. 27, 2018), https://calchamber alert.com/2018/04/27/harassment-victims-and-employers-need-protection-from-defamation-lawsuits/.

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

defamation suit and would protect survivors from the financial and psychological burdens of a false lawsuit so it would encourage survivors to speak out and say #MeToo. Eventually, laws like these will force individuals who engage in sexual misconduct to face the consequences of their actions instead of deflecting them with retaliatory lawsuits, and the laws will hopefully contribute in the eradication of sexual violence in this country.

### B.    *Utilization of Anti-SLAPP Laws*

Many states have adopted Anti-SLAPP statutes, which aim to prevent "strategic lawsuit[s] against publication participation" (SLAPP).[149] These strategic lawsuits "are intended to intimidate the target by draining their financial resources and dragging them through years in the court system."[150] A perfect example of a SLAPP lawsuit is a retaliatory defamation claim.

In response to a growing number of lawsuits that were "threaten[ing] a citizen's right to petition . . . . and recognizing that traditional legal remedies such as abuse of process or malicious prosecution claims and motions for summary judgment were inadequate tools to ameliorate the problem, states enacted legislation," which we now know as Anti-SLAPP statutes.[151] These statutes create a special motion to strike for defendants that is "designed to guard against meritless lawsuits brought with the intention of chilling or deterring the free exercise of a defendant's First Amendment right to petition the government by threatening would-be activists with litigation costs."[152] Although these state statutes[153] were originally created to prevent corporations from suppressing whistleblowers,[154]

---

149.   LEE & LINDAHL, *supra* note 8.

150.   Evan Mascagni, *How a Proposed First Amendment Law Would Protect Survivors of Domestic Violence and Sexual Assault in Ohio*, PUB. PARTICIPATION PROJECT (Nov. 9, 2017), https://anti-slapp.org/slapp-blog/2017/11/9/how-a-proposed-first-amendment-law-would-protect-survivors-of-domestic-violence-and-sexual-assault-in-ohio.

151.   Yount v. Handshoe, 2014-919, pp. 9-10 (La. App. 5 Cir 5/28/15); 171 So. 3d 381, 387.

152.   LEE & LINDAHL, *supra* note 8.

153.   Even though Anti-SLAPP statutes are not federal statutes, the United States Court of Appeals for the Fifth Circuit has held that Anti-SLAPP statutes apply in federal courts under the *Erie* doctrine because these statutes are "functionally substantive." *See* Henry v. Lake Charles Am. Press, L.L.C., 566 F.3d 164, 168-69 (5th Cir. 2009).

154.   Kingkade, *supra* note 83; *see also Anti-SLAPP Statutes and Commentary*, MEDIALAW.ORG, http://www.medialaw.org/topics-page/anti-slapp?tmpl=component&print=1 (last visited Feb. 19, 2020) (noting that "the actual resolution of the plaintiff's claims—for



LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

24            *TULANE LAW REVIEW ONLINE*            [Vol. 94:1

they now provide defendants, like those defending against retaliatory defamation claims, "a statutory motion designed to minimize the litigation costs associated with the defense of meritless suits."[155]

Anti-SLAPP statutes are particularly applicable to the issue discussed in this Comment because survivors who decide to speak out or report sexual misconduct are necessarily chilled from free exercise of their First Amendment rights when their reports are met with responsive defamation lawsuits. The reason that retaliatory defamation claims impose First Amendment violations on reporting survivors is because these reports are "statement[s] that [survivors] should be able to make without liability[, a]nd it's a public policy concern."[156]

Anti-SLAPP motions allow "victims to ask the courts to decide whether a lawsuit has any legal merit before the victim is forced to endure unnecessary and time-consuming discovery."[157] If the judge grants the motion, all the financial burdens of litigation discussed in Part III are eliminated for the defamation defendant. If a defendant prevails on an Anti-SLAPP motion, the meritless suit will be dismissed quickly, and attorney's fees will be awarded to the party whom the original suit was brought against.[158] Not only does this support survivors financially, but it also ensures that they will be able to retain and compensate competent legal counsel for their defense.

Different states have different standards of proof for the defendant of a defamation claim to prevail on an Anti-SLAPP motion. In Louisiana, for example, the burden rests on the plaintiff bringing the defamation suit to establish a "probability of success."[159] This approach is somewhat common, and the Louisiana Second Circuit has itself acknowledged the vast similarities between Louisiana's Anti-SLAPP statutes and California's Anti-SLAPP statutes.[160] California's progressive Anti-SLAPP statutes have served as a model for other

---

defamation, tortious interference or related theories—was a secondary motivation at best" for enacting Anti-SLAPP statutes).

155.   LEE & LINDAHL, *supra* note 8.

156.   Kingkade, *supra* note 83 (quoting Krista Lee Baughman).

157.   Johnson & Bonsignore, *supra* note 137. This article also noted that continuous court appearances particularly affect survivors who could be traumatized by being "forced to personally confront their abusers." Fortunately, these regular court appearances would also be eliminated by effective Anti-SLAPP statutes. *Id.*

158.   Yount v. Handshoe, 2014-1919, p. 10 (La. App. 5 Cir. 5/28/15), 171 So. 3d 381, 387.

159.   LA. CODE CIV. PROC. ANN. art. 971 (2012).

160.   Thomas v. City of Monroe La., 36-526, pp. 6-7 (La. App. 2 Cir. 12/18/02); 833 So. 2d 1282, 1286.

LEGISLATIVE INTENT SERVICE, INC.   (530) 666-1917

states who have enacted them.[161] California offers the "broadest scope of protection . . . which protects not only traditional petitioning activity but speech made in connection with issues of public concern."[162] Louisiana courts in particular have often "looked to California precedent in interpreting Louisiana's provisions."[163]

Louisiana's probability of success standard is akin to California's "probability of prevailing" standard, which requires "a determination 'that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment.'"[164]

This standard is beneficial to defamation defendants. Under this standard, the burden rests on the plaintiff bringing the defamation suit to prove it has merit, instead of on the defendant to prove that the statements he or she made were in fact true (which is the standard the defendant must meet to prove truth, as will be discussed in Part V.C).[165] Therefore, defamation defendants who have access to Anti-SLAPP statutes have a much lower burden and a much higher chance of prevailing.

In addition to the lower burden, the benefits to Anti-SLAPP statutes for defamation defendants in sexual assault cases are abundant. As previously stated, the special motion is financially beneficial to survivors/defendants of defamation suits. If they prevail on the special motion, the plaintiff is forced to pay their attorney's fees. This gives survivors better access to legal counsel and also nips costly litigation in the bud that has the potential to drag on for years. It also allows defamation defendants to have suits against them dismissed swiftly, so they can move on from these traumatizing events. Most importantly, these statutes help to ensure that survivors of sexual misconduct do not become victims of the legal system that is meant to protect them.

Despite all the benefits, there are some considerable issues with using Anti-SLAPP statutes as the sole remedy for retaliatory state defamation claims. For one, not all states have Anti-SLAPP statutes in

161.  Several states have replicated the California model (Indiana, Louisiana, Oregon, Colorado, Nevada, Tennessee, and Oklahoma). *Anti-SLAPP Statutes and Commentary*, *supra* note 154.

162.  *Id.*

163.  Lozovyy v. Kurtz, 813 F.3d 576, 584 (5th Cir. 2015).

164.  *Id.* at 584 (quoting D'Arrigo Bros. v. United Farmworkers, 244 Cal. App. 4th 790, 800 (Cal. Ct. App. 6th 2014)).

165.  *See* discussion *infra* Part V.C.

LEGISLATIVE INTENT SERVICE, INC.    (530)  666-1917



place.[166] In fact, twenty-one states do *not* have Anti-SLAPP statutes at all.[167] For this reason, this Comment proposes enactment of a federal Anti-SLAPP statute that, again, mimics the legislation passed by California. California's Anti-SLAPP statute is the most ideal model because it "protects not only traditional petitioning activity but speech made in connection with issues of public concern" as previously stated.[168]

The second issue with SLAPP motions is that they typically call for mini trials on the merits before the court will grant them. Courts want the nonmoving party to prove, in response to a SLAPP motion, the "likelihood of success on the merits" before they decide on the motion.[169] The demand for these mini trials indicates that the SLAPP solution will not *always* avoid the cost of litigation and lack of access to competent legal counsel problems discussed previously.

Because of these drawbacks to the reliance on Anti-SLAPP statutes, this Comment proposes utilization of the California Model Rule, discussed in Part V.A, as the most effective solution to this problem. Overall, however, Anti-SLAPP statutes and the option to make the special motion to dismiss under Anti-SLAPP legislation can prove vitally important to eradicating retaliatory defamation suits and ensuring First Amendment rights *especially* to survivors of sexual misconduct.

## C.   *Truth as a Defense*

Given that the making of a "false statement" is an essential element to prove defamation, survivors being sued for defamation can always use truth as a defense—that is, they can prove that their allegations of sexual misconduct are true and that the misconduct actually did occur as they reported. Truth is an absolute defense to a defamation claim.[170] However, the defamation defendant (the survivor)

---

166.   *Anti-SLAPP Statutes and Commentary*, *supra* note 154.

167.   *Id.* ("As of June 2019, 29 states have anti-SLAPP statutes: Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Kansas, Louisiana, Maine, Maryland, Massachusetts, Missouri, Nebraska, Nevada, New Mexico, New York, Oklahoma, Oregon, Pennsylvania, Rhode Island, Texas, Tennessee, Utah, Vermont.").

168.   *Id.*

169.   Order Granting Plaintiff/Counter-Defendant's Special Motion to Dismiss at 6, Ctr. for Advanced Def. Studies v. Kaalbye Shipping Int'l, No. 2014 CA 002273 B (D.C. Super. Ct. Apr. 7, 2015).

170.   Phila. Newspapers, Inc. v. Hepps, 475 U.S. 767, 770 (1986). Louisiana courts have adopted this to be true. *See* Martin v. Lincoln Gen. Hosp., 588 So. 2d 1329, 1333 (La. App. 2 Cir. 1991).

would have the burden of proving that the defamatory statement is unequivocally true in fact.[171]

The problem with using truth as a defense is that in practice, sexual assault is extremely difficult to prove. "Many states . . . still require the prosecution to prove that the sexual contact was the product of force, as well as being nonconsensual."[172] Even the Violence Against Women Act (a progressive piece of legislation passed in 1994 that expanded women's rights to be free from violence and sexual violence in particular)[173] allows federal courts "to read into state criminal codes an additional force requirement even if the state statute only requires nonconsensual sex to prove rape."[174]

Worse yet is the requirement of corroboration to prove that the allegations are true. The corroboration requirement proves difficult with sexual misconduct cases because "there are usually only two witnesses to the crime—the victim and the defendant."[175] The Model Penal Code, as replicated by many states, provides that "[n]o person shall be convicted of any felony [including sexual violence] . . . upon the uncorroborated testimony of the alleged victim."[176] Rape is one of the only two crimes codified in the Model Penal Code that requires corroborating evidence, despite the fact that it is incredibly difficult to provide.[177]

Though "truth as a defense" sounds like a simple solution, in effect it can create acute obstacles for survivors. To prove the truth of the allegations, survivors will not only have to relive the assault, which can be "re-traumatizing" and "emotionally draining,"[178] but they would have to find a way to produce evidence of a crime that typically comes down to he-said-she-said.

This strategy proves particularly unhelpful to survivors when the accused is willing to lie to counter the survivor's testimony. Defendants

---

171.   *Phila. Newspapers, Inc.*, 475 U.S. at 770.

172.   Wendy Rae Willis, Note, *The Gun Is Always Pointed: Sexual Violence and Title III of the Violence Against Women Act*, 80 GEO. L.J. 2197, 2213 (1992).

173.   Violence Against Women Act, H.R. 1502, 102d Cong. (1st Sess. 1991).

174.   Willis, *supra* note 172, at 2213-14.

175.   Mary Wood, *City Attorney Shares Reality of Prosecuting Sexual Assault Cases*, U. VA. SCH. L., https://www.law.virginia.edu/news/2001_02/zug.htm (last visited Jan. 29, 2020).

176.   MODEL PENAL CODE § 213.6(5) (1980).

177.   *See id.* § 241.1(6) (stating that perjury is the only other crime in the Model Penal Code that requires corroboration); *see also* H.B. 106, 2017 Leg., 2017 Sess. (N.H. 2017) (providing an example of a corroboration bill brought to the table in the New Hampshire state legislature; "that a victim's testimony in a sexual assault case shall require corroboration").

178.   Friedmann, *supra* note 86.



LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917

in sexual misconduct cases often argue in court that the sex was consensual as their defense.[179] In fact, in recent years this "is the most common and the most difficult [defense] to defeat."[180]

Further, this option still poses a significant financial burden on survivors. Recall the defamation defendant/survivor in Part III whose legal bills she pays to defend herself "have reached as high as $6,000 [per month]—more than twice her monthly income."[181] In sum, though using the truth as a defense seems like a simple fix to defending against retaliatory defamation suits, in actuality, it can prove incredibly difficult in practice.

VI.  CONCLUSION

The retaliatory use of defamation lawsuits has the effect of deterring survivors from reporting, therefore chilling the free exercise of their First Amendment rights. The pattern of legal abuse is readily detectable and must be stopped. Every seventy-three seconds, an American is sexually assaulted.[182] Put another way, 433,648 individuals survive sexual assault every year in the United States.[183] "Among undergraduate students, 23.1% of females and 5.4% of males experience rape or sexual assault through physical force, violence, or incapacitation."[184] Despite this uncontrolled crisis, only 75% of sexual assaults are reported by survivors.[185] This is a problem. It is not possible to change the culture around sexual misconduct if those that are brave enough to speak out are being subsequently slapped down and silenced by retaliatory defamation suits. The threat of these defamation suits must be eliminated in order to support the progression of the #MeToo *movement* and ensure that it does not just become a brief #MeToo *moment* in time.

---

179.  Wood, *supra* note 175.

180.  *Id.*

181.  Kingkade, *supra* note 83. This article also discussed a defamation suit brought against defendant Bridget Mahoney by her ex-husband, which ended up costing her $100,000 to defend against.

182.  *Statistics*, RAPE, ABUSE & INCEST NAT'L NETWORK (2019), https://www.rainn.org/statistics.

183.  *Victims of Sexual Violence: Statistics*, RAPE, ABUSE & INCEST NAT'L NETWORK (2019), https://www.rainn.org/statistics/victims-sexual-violence.

184.  *Campus Sexual Violence: Statistics*, RAPE, ABUSE & INCEST NAT'L NETWORK (2019), https://www.rainn.org/statistics/campus-sexual-violence.

185.  *Criminal Justice System: Statistics*, RAPE, ABUSE & INCEST NAT'L NETWORK (2019), https://www.rainn.org/statistics/criminal-justice-system.

LEGISLATIVE INTENT SERVICE, INC.    (530) 666-1917