UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| JED WALLACE,<br>STREET RELATIONS, INC. | § <br> § <br> § | |
| *Plaintiffs,* | § <br> § <br> § | |
| v. | § <br> § <br> § | CIVIL ACTION NO. 25-163 |
| BLAKE LIVELY, | § <br> § <br> § | **Jury Trial Demanded** |
| *Defendant.* | § <br> § | |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

TO THE HONORABLE COURT:

1.      Jed Wallace ("Wallace") and Street Relations, Inc. ("Street") (collectively "Plaintiffs") bring this action against Blake Lively ("Lively" or "Defendant") for defamation as follows:

## I.    INTRODUCTION

2.      Jed Wallace works from home in the Texas Hill County for Street, a small Texas company he founded and owns. Wallace was described by one of Lively's attorneys as living in the "shadows" with "no online presence" and "no public profiles." That ended on the Friday before Christmas, December 20, 2024, when his privacy was shattered to be replaced by the harsh (and in this case false, defamatory and undeserved) glare of the Hollywood spotlight involving two of the industry's biggest names, Lively and Justin Baldoni ("Baldoni"), and the movie they starred in, *It Ends With Us* ("Film").

3.     On that day (and before) Lively provided the press with her (i) three page form employment complaint filed with the California Civil Rights Division ("CRD Complaint") naming Wallace and Street as "Respondents" and alleging they had sexually harassed Lively and then retaliated when she reported the harassment (Ex. 1), and (ii) a 62-page 203-numbered paragraph draft complaint ("Draft Complaint") (Ex. 2) purportedly attached to the CRD Complaint, listing Wallace and Street as "Defendants" regarding ten claims ranging from "Sexual Harassment" to "Breach of Contract," and asserting that the harassment had taken place on the set of the movie and the retaliation occurred "in the days leading up to the Film's release." Wallace and Street were never on the set of the Film or otherwise involved in its production and their limited and sole involvement in gauging public reaction to the film and its stars occurred *after* the Film's release, not in "the days leading up to" it.

4.     The filings with the California agency are not available online and only available to the public pursuant to a written request for public information and yet, that night at 8:48 pm (ET), the day the CRD and Draft Complaints were filed, a reporter sent Wallace an "Urgent" page and a half e-mail which stated that she had "learned that Ms. Lively filed a legal complaint against you … alleging sexual harassment, retaliation … among other claims." She described details from the Draft Complaint including that "the complaint includes extensive private text messages and emails (which) include exchanges involving you." She added that "court records show that your clients have included Paramount Pictures," an obscure fact not easily uncovered.

5.     The reporter demanded that "we need to hear back from you by tomorrow (Saturday) by noon Eastern." At least as early as 5:26 am (ET) the next day (Saturday), which is before noon on most clocks, the reporter's newspaper posted the Draft Complaint (which was only a draft and never filed in any court) on its website under the banner: **"READ THE COMPLAINT."** The document remains on the website today. Lively[1] provided all of this information to the reporter and her newspaper.

6.     That Saturday (December 21, 2024) media including the *New York Times*, *The Hollywood Reporter, TMZ, E!News, Variety, Today, CNN, People Magazine* (which named Wallace), *Fox News* and *USA Today* all reported on the CRD Complaint or the Draft Complaint giving prominence to Lively's allegations. The next day additional media, including at least three outlets in Texas, reported on the Complaints. The CRD and Draft Complaints or the contents thereof had been shared by Lively with multiple media although she granted one newspaper exclusive access to "thousands of pages of text messages … and other documents (which) were reviewed by the (newspaper)"as noted in a lengthy article published within hours of the CRD and Draft Complaints filings under the headline: **'We Can Bury Anyone': Inside a Hollywood Smear Machine.**

7.     Then, on New Year's Eve 2024 the Draft Complaint, which had by this time grown into a 93-page, 327-numbered paragraph document ("The Real Complaint"), was filed in the United States District Court for the Southern District of

---

[1] When referring to Lively we mean to include her agents including her lawyers, consultants and husband, Ryan Reynolds and their related entities, including but not limited to Betty Buzz, LLC, Blake Brown, Aviation Gin, Mint Mobile, and Maximum Effort Productions.

New York ("New York Case"). But the Real Complaint, unlike the CRD and the Draft Complaints, **did not include Wallace or Street as defendants or Respondents.**[2] The reason for this omission was certainly known to Lively. There was and is no evidence to support the defamatory statements of and concerning Wallace or Street made in either the CRD or Draft Complaints or the press reports republishing her defamatory allegations. They had nothing to do with the production or marketing of the Film.

8.     This lack of proof explains why, three weeks later, Lively sued Wallace in Texas state court to obtain potential evidence of Wallace's alleged involvement in the matter, even retaining one of Wallace's former lawyers (who had represented him in a matter involving Paramount Pictures) to prosecute the Texas Lawsuit against him, to defend this case and serve as co-counsel with Lively's five other lawyers in the New York Case.

9.     That lawyer filed a lawsuit against Wallace in Hays County, Texas seeking to take his deposition. Lively represented to the judge under oath that she needed the discovery "to understand and evaluate potential claims (so that) any suit filed by (Lively against Wallace) is supported by competent witness testimony and evidence" and swearing that without this evidence any lawsuit against Wallace would be groundless and in bad faith or for harassment or improper purpose under Tex. Civ. Prac. & Rem. Code § 9.011 as prohibited by Tex. R. Civ. P. 13. ("Texas Lawsuit"). In other words, she sought from a *Texas* judge, in *Texas,* evidence from a

---

[2] Even so media continued to report that Wallace and Street were defendants even though they were not.

*Texan* to support her false claims in the CRD and Draft Complaints targeting, as to Wallace and Street, *Texas* residents.

10.    The Texas lawsuit was done purposely, and Lively paid a fee to the Hays County clerk to avail herself of the privilege of conducting activity in the Texas court system and she listed ten lawyers (Prather, Gottlieb, Bender, Hudson, Roeser, Noble, Keck, Pillifant, Wallace and Mitchell) from three law firms (Haynes and Boone, Wilkie and Manatt) as her representative contacts for the case. The Texas Lawsuit related directly to a claim or defense in this lawsuit that is, truth or falsity and fault. As we shall see, Lively purposely turned away from her self-styled investigation into the truth which is probative of both negligence and actual malice.

11.    What happened next is remarkable. Without waiting for the *Texas* judge to rule and, accordingly, without taking Wallace's deposition, Lively dismissed her Texas Lawsuit falsely (actually, preposterously) claiming to the Court that Baldoni's lawyer, in a hearing in the New York Case, suggested that she do so.

12.    And then, without any evidence and knowing (obviously) that neither Wallace nor Street had sexually harassed her or retaliated against her for publicizing the allegations, or breached a contract with her (no such contract exists), **she joined Wallace and Street in the New York Complaint as defendants** claiming that "Wallace and Street Relations intentionally violated Ms. Lively's rights under the California Fair Employment and Housing Act acting with malice, oppression and fraud."

13.    She added in the New York Case that Wallace and Street acted "despicably, maliciously, fraudulently and oppressively with the wrongful intention of injuring Ms. Lively." She branded Wallace as "evil," claiming he had no regard for

the rights or safety of Lively and others and intentionally caused her extreme emotional distress. Finally, she claimed Wallace and Street placed her in a "false light" forgetting, perhaps, that neither Texas (which is home for Wallace and Street) nor New York (where Lively lives) recognizes this claim, which is without merit in any event.

14.    After this lawsuit (on February 4, 2025) and after she sued Wallace and Street (February 18, 2025) in New York ("Amended New York Lawsuit"), Lively, accompanied by her publicists Leslie Sloan and Jami Kandel, appeared at SXSW in Austin, Texas where, on information and belief, she made additional false and defamatory remarks of and concerning the Plaintiffs. Specifically, when confronted by a Texas resident who stated that "Blake Lies" and referenced "Justice for Justin," Lively never admitted that her statements were false but rather allowed her lies to stand thus defaming Plaintiffs by, at the very least, implication. On information and belief while in Austin, Lively made additional defamatory remarks concerning Plaintiffs. Discovery will reveal the extent of those statements.

15.    During her stay in Texas, Lively also traveled to Waco to visit Chip and Joanna Gaines' hotel and while there engaged in a confrontation with a young girl who was attempting to take Lively's photograph. On information and belief, Lively made additional defamatory comments about Plaintiffs, purposefully availing herself of the Texas forum. Discovery will reveal the extent of those remarks.

16.    On February 5, 2025, Plaintiffs demanded that Lively retract, clarify or correct defamatory statements made by her. On March 7, 2025, Lively availed herself of her rights under a *Texas* law (Tex. Civ. Prac. & Rem. Code, Section 73.056(a))

and demanded certain information from Plaintiffs under the statute. Plaintiffs complied. As of this filing Lively has neither retracted, clarified nor corrected her defamatory statements even though she knows that Plaintiffs had nothing to do with the alleged sexual harassment and further knows that she may avoid punitive damages for part of the claim if she were to retract, again availing herself of the protection afforded by the *Texas* law.

17.    All conditions precedent to the filing of this suit have been satisfied by Plaintiffs.

18.    Lively reasonably foresaw that her furious allegations would be republished by the media "worldwide" and that this form of hell would be visited upon Plaintiffs who, it should be noted, never did anything to earn her scorn.

## II.   PARTIES

19.    Wallace is a citizen of Texas and resides in Dripping Springs which is within the Austin Division of the United States District Court for the Western District of Texas. He owns a small company, Street, a crisis mitigation firm primarily helping families and individuals who find themselves unjustly attacked, extorted, doxed, swatted, scammed or needing help navigating their most frightening situations. Doing so requires a low profile so that when people retain Wallace and Street, they do not call attention to themselves—attention that would harm the goals of their recovery which, in some cases, includes addiction.

20.    Street is a Texas corporation (previously California) and, since 2021 (long before the defamation complained of here), maintained its principal place of business in Texas and is therefore a citizen of a state other than New York.

21.    Lively is an actress and entrepreneur and is a citizen of New York.

### III.   FACTUAL BACKGROUND

22.    *It Ends With Us* premiered at the AMC Lincoln Square in New York City on August 6, 2024, although it was first shown weeks before in Texas at an event, Book Bonanza. Street was first approached on August 7, 2024, by TAG PR ("TAG") about assisting it in social/digital mitigation and remediation regarding Wayfarer Studios (the Film's Production Studio).

23.    On August 9, 2024, Street began work on the three month project by monitoring social media regarding the movie and its two stars, but did not publish any information to third parties about the participants or anything else, but rather spotted trends about the public's reaction to the Film and its stars and subsequently provided advice to TAG and Wayfarer on those subjects.

24.    Plaintiffs had no involvement in the production of or marketing of the Film and never interacted with Lively at any time. Lively, however, included Plaintiffs in her sexual harassment/retaliation CRD Complaint and Draft Complaint, and leaked those documents to the press and other third parties. Lively reasonably foresaw that her defamatory accusations against Plaintiffs would be republished and they were, all over the world, including in Texas, causing damage to Plaintiffs.

25.    The CRD Complaint alleged that Wallace and Street "engaged in a variety of conduct in violation of California Government Code section 12940 ("FEHA") and Title VII of the Civil Rights Act of 1964 ("Title VII")." The CRD Complaint went on to allege that Wallace's and Street's "conduct includes: sexual

harassment, retaliation; failure to investigate, prevent, and/or remedy harassment; and aiding and abetting harassment and retaliation." Ex. 1.

26.    The CRD Complaint also asked the reader to "please see attached complaint for specific details." This CRD Attachment was the Draft Complaint which had many indicia of a stand-alone legal complaint. *See* Ex. 2. Indeed, some media later published the Draft Complaint under the headline: "**Read The Complaint.**" The Draft Complaint named Wallace and Street as Defendants and sought damages for (1) "Sexual Harassment" under California and Federal Law; (2) Retaliation under California and Federal Law; (3) Failure to Investigate, Prevent, and/or remedy harassment under California law; (4) Retaliation under the California Labor Code; (5) Aiding and Abetting Harassment and Retaliation under California Law; (6) Breach of Contract; (7) Intentional Infliction of Emotional Distress; (8) Negligence; (9) False Light Invasion of Privacy under the California Constitution; and (10) Interference with Prospective Economic Advantage.

27.    Critically, however, the Draft Complaint was missing several indispensable components such as: (i) the name of the Court, (ii) the cause number, (iii) the causes of action, (iv) the prayer for relief including a statement of damages, and (v) the signature block for Lively's lawyers (although they were listed on the first page as customary in California but not New York where the case (minus the Plaintiffs) was ultimately filed over a week later).

28.    Adding to the confusion, Lively used ambiguous group pleading by lumping Plaintiffs into phrases like "Wayfarer parties," "Wayfarer team," "TAG digital team," "Baldoni-Wayfarer team," "Respondents" and "Defendants." That

left a reasonable reader with the impression that all causes of actions—severe allegations of sexual harassment and violations of California and federal law—are attributable to all defendants, including Plaintiffs and/or Respondents.

29.    Beyond listing the causes of action on the first page of the Draft Complaint, Lively makes several specific statements about Plaintiffs. First, in paragraph 18, Lively specifically states that Plaintiffs are "a Texas-based contractor … who weaponized a digital army around the country … to create, seed, and promote content that appeared to be authentic on social media platforms and internet chat forums"—a false statement other than "a Texas-based contractor."

30.    Second, the Draft Complaint identified "Mr. Jed Wallace, an independent contractor based in Austin, Texas, who was retained by TAG to perform social media services on behalf of Wayfarer and Mr. Baldoni in connection with TAG's engagement." Ex. 2, ¶139. Wallace is an independent contractor and he is based in Texas near Austin. He was not, however, retained by TAG for any purpose and it was false to say so.

31.    On top of the specific statements, the overall gist or sting of the Draft Complaint was that Plaintiffs sexually harassed Lively and retaliated against her in violation of state and federal laws. The gist was and is false.

32.    Lively went far beyond merely saying "these are my allegations." Instead, she or her agents communicated them as standalone facts. Indeed, in the end of the Draft Complaint she claimed that she had "discover[ed] the full extent of the retaliatory campaign launched by the Wayfarer Parties[.]" Ex. 2, ¶203. This is at odds with what she later told a Texas judge: that she needed Wallace's deposition to

learn about his involvement in the alleged sexual harassment and purported retaliation.

33.    She also alleged in the Draft Complaint that "Lively s[ought] to set the record straight, to hold the Wayfarer Parties and Associates accountable, and to shine a light on this new form of retaliation …" *Id.* Elsewhere, Lively claims that retaliation is about "the risk of [her] ever revealing the truth," *Id.* at ¶18, which, she claims to be doing in the Draft Complaint by shining a light and setting the record straight, *Id.* at ¶203. Lively fully intended this Draft Complaint—a press release dressed as a not-yet-fully-baked lawsuit—to be taken as statements of fact, including about the Plaintiffs. And of course she mistakenly thought that by purportedly attaching it to an administrative filing she would create a privilege against a defamation action such as this.

34.    In any event, nothing in the CRD rules require a complaint with such specificity or to attach the (incomplete) Draft Complaint which was totally gratuitous and unnecessary for Lively to obtain a Right to Sue letter, and some of the asserted claims in the Draft Complaint were not even within the California Agency's jurisdiction.

35.    On the same day that the CRD Complaint, with the Draft Complaint purportedly attached, was filed (December 20, 2024), the Civil Rights Department issued Lively a "Right to Sue" letter.

36.    The CRD Complaint, the Draft Complaint, and the Right to Sue letter were not posted online. There was no public filing of these documents on December

20, 2024, or at any other time. The only way for a third-party to obtain these documents was through a public information request or for the applicant to provide it themselves.[3]

37.    Neither Plaintiffs nor their representatives provided either the CRD Complaint or the Draft Complaint to the media at any time. It is not plausible that news media became aware of the CRD Complaint and the Draft Complaint through the filing and worked through the public information bureaucracy in time to post the Draft Complaint within hours of its filing, all at the beginning of a holiday weekend. We know, for example, that one reporter had the Complaints by at least 5:48 Pacific Time PM on the filing date. Other media piggy-backed off that media entity's reporting, referencing that they got from that entity the Draft Complaint which, by then, was on the media company's web site.

38.    The false allegations against Wallace and Street made "headlines around the world" according to Elle Magazine which linked to the Draft Complaint, as did many other media.

39.    Not only did Lively or her agents provide the CRD and Draft Complaints to various media entities for out-of-court republication either directly or indirectly, but they were relied upon in a videotaped program that one media organization used to promote its upcoming article published on December 21, 2024. Metadata within the video demonstrates that the video was created prior to December 20, 2024 and made use of both the CRD and Draft Complaints.

---

[3] *See* Instructions for Obtaining a Right-to-Sue Notice, California Civil Rights Department, at 13 https://calcivilrights.ca.gov/wp-content/uploads/sites/32/2024/09/CRD-Right-to-Sue_ENG.pdf.

40.    Despite listing ten violations of California and Federal law, and alleging a major social media astroturfing campaign, Lively later admitted she knew of no facts to support the allegations against Wallace or Street. Lively filed her "**Verified Petition For Rule 202 Deposition**" ("Texas Lawsuit") in Hays County, Texas against Wallace, alleging that Wallace was a "subcontractor" to a company called TAG and, on information and belief, it was "to assist them (sic) in their (sic) unlawful, retaliatory 'social combat' campaign … against Lively." The Texas Lawsuit conceded that Lively has no facts supporting the allegations she made against Wallace and Street in the Draft Complaint but that now, apparently under the threat of sanctions from one of Plaintiffs' attorneys, she sought to "investigate" the "scope" of Mr. Wallace's conduct.

41.    Lively's verified Texas Lawsuit is replete with judicial admissions that (i) "Wallace worked remotely from Dripping Springs, Texas …," (Texas Lawsuit, ¶16); (ii) "a substantial part of the events giving rise to the claims that [Lively] seeks to investigate—specifically, Mr. Wallace's work on the 'social manipulation' campaign—occurred in Hays County (Texas)," (*Id.* at ¶35); and (iii) "a substantial part of the underlying events that would give rise to the claims (against Wallace) being investigated occurred in Hays County and Mr. Wallace resides in Hays County," (*Id.* at ¶36).

42.    It also admits that Lively lacked "[t]he critical evidence relevant to Petitioner's potential claims, the specifics of the conduct by Mr. Wallace[.]" *Id.* at ¶48. So that is why she was bringing the Texas Lawsuit—"for [the] discrete and specific

purpose: to investigate the nature and scope of Mr. Wallace's work," (*Id.* at ¶37), the very thing she had already leaked to the press as factual assertions.

43.    On top of admitting that she did not have the factual and evidentiary basis for the claims against Plaintiffs, Lively knew that her timeline did not add up. Lively is very clear that she believes Plaintiffs were hired no earlier than August 8, 2024 (they were actually approached on August 7th but did not begin work until the 9th) and that even TAG was not engaged until August. But her own Draft Complaint shows negative sentiment towards her building in July. *See Id.* at ¶195. This fact alone should have put Lively on notice that her accusations were false, or at the least she was negligent for not inquiring.

44.    And it makes sense that she would lack that evidentiary and factual basis—that she would lack "the critical evidence" and the "specifics of the conduct by Mr. Wallace." *See Id.* at ¶48. Lively *knew* that Plaintiffs had not harassed her and she had no evidence that they retaliated or were guilty of any of her other claims.

45.    Again, in the Draft Complaint, Lively paints a nefarious picture that Wallace, as an employee of Street, participated in an astroturfing campaign that published false and negative statements about her or boosted comments that did so. But that's not what Wallace did.

46.    Wallace's job was to read, analyze, and assess all forms of media and trends taking place with respect to various issues. Wallace did this limited role as an employee of Street. And all these tasks were performed in Texas.

47.    This job was in line with Wallace's work generally with respect to all forms of media. Specifically, for the events related to Mr. Baldoni, Wallace's limited

job was to conduct analysis of all forms of media, analyze the sentiment of the coverage, and then provide updates on the observations. After passively observing the social media environment, Wallace saw an organic outpouring of support for Baldoni and the Film. Wallace's feeling, based on what he saw, was that no remedial actions needed be taken at that time, and that everyone should let the sentiment on social media unfold organically. In addition to observing that people on social media organically supported Mr. Baldoni, there appeared to be a dislike for Ms. Lively based on her tone-deaf promotion of the film. Therefore, Wallace's advice was not to do anything at that time and let the sentiment on social media continue to unfold organically.

48.    Because that role was strictly passive, both the specific assertions in the Draft Complaint as well as its general thrust and gist are false. Plaintiffs never published, directly or indirectly, any information or content (negative or otherwise) regarding Lively.

49.    Plaintiffs never seeded or promoted content that appeared to be authentic on social media platforms and internet chat forums about *It Ends With Us*, Wayfarer, Justin Baldoni, Blake Lively, Ryan Reynolds, or any of Lively's or Reynolds's businesses or family.

50.    Plaintiffs have never asked or directed anyone to post about, comment on, or like any social media posts about *It Ends With Us*, Wayfarer, Justin Baldoni, Blake Lively, Ryan Reynolds, or any of Lively's or Reynolds's businesses or family. That makes each of the specific statements made in the Draft Complaint untrue. And taken together, Lively's gist or thrust of her Draft Complaint was untrue.

51.    The statements of fact, actual or implied, of and concerning Plaintiffs in the Draft Complaint are false, defamatory, made with either negligence or "actual malice" and have caused millions of dollars in reputational harm including both general and special damages through emotional harm (Wallace), actual damages and real and projected loss of business (Wallace and Street) in an amount that exceeds $1,000,000.

52.    Specifically, Wallace and Street's business model primarily relies on anonymity. Not to post negative social media or to weaponize a digital army for an untraceable digital social manipulation campaign, as Lively alleges. But to help ordinary people—and some famous—to receive treatment from a variety of attacks, some physical. In addition, Plaintiffs help some people and their families with their addictions by providing health plans and support.

53.    The false allegations of fact made with actual malice has meant that Wallace and Street have lost business.

54.    Worse than the economic toll is the assault on Wallace's emotional condition. Lively has blasted out in court filings in this case confidential health information about Wallace despite this information being sealed in the New York Case and in a redacted declaration, and in letters marked confidential: Wallace has suffered medical issues induced by Lively's actions. Wallace's stress began on December 20, 2024, when Plaintiffs' world was turned upside down from the maliciously leaked CRD Complaint and the Draft Complaint, which made totally false and fabricated allegations against Plaintiffs. Such physical manifestations are the strongest evidence of mental anguish damages.

55.    This factual statement section incorporates all of the factual allegations in the Introduction section of this amended complaint.

### IV.    JURISDICTION AND VENUE

56.    This Court has jurisdiction under 28 U.S.C. § 1332 because the matter exceeds the sum or value of $75,000, exclusive of interest and costs, and Wallace and Street as plaintiffs are not citizens of the same state as the sole defendant, Lively.

57.    This Court may exercise personal jurisdiction over Lively because she purposefully availed herself of the forum by filing the Texas Lawsuit where she sought to obtain evidence to defend this claim of defamation. Lively either knew that her defamatory claims were untrue (that Plaintiffs sexually harassed her) or had no evidence of the other claims, although she told the Texas judge she did not know the circumstances of Wallace's involvement.

58.    The defamation claims here have a nexus to the Texas Lawsuit because its filing and dismissal will demonstrate, in part, the fault element of the claim that is negligence and actual malice (for punitive damages). The Texas Lawsuit dismissal demonstrates a purposeful avoidance of the truth which has been, in appropriate cases, held to be evidence of actual malice and certainly negligence. The Texas Lawsuit also relates to the truth or falsity of the defamatory allegations because Lively admits that she has no evidence that they are true.

59.    In addition, her defamatory statements were aimed at Texas where both Plaintiffs reside and they undoubtably caused harm in Texas. Two mentions of Wallace in the Draft Complaint specifically state that he is based in Texas.

60.     In addition, Lively frequently visits Texas and did so in connection with promotion of the Film including at the Texas Book Bonanza where she appeared with the Texas author of the book the Film was based on, Colleen Hoover, and her other co-star (besides Baldoni), Brandon Sklenar.

61.     A news report of the appearance contained the following:



62.     During the appearance she spoke to hundreds of people as depicted here:



63.     Also during Lively's multi-day appearances in Texas, she promoted the Film. Discovery will reveal whether she made any additional defamatory remarks about Plaintiffs during these appearances. She did, however, attempt to leverage her brand of sparkling drinks—Betty Buzz— with an ad campaign "It Ends With Buzz" playing off the Film. Her take line for the drink was: "Every person with a mouth should drink this drink" and published a map with 43 locations between Waco and Austin where Betty Buzz could be purchased.

64.     Lively purposefully availed herself of the Texas forum by suing Wallace there, her defamatory accusations were directed at their conduct in Texas, and all of the damage suffered by Plaintiffs occurred in Texas. Furthermore, on information

and belief, additional defamatory statements about Plaintiffs were made by Lively at SXSW in Austin, Texas and later in Waco, and these form the basis, in part, of this suit.

65.    Venue is proper because, as Lively alleges in her Rule 202 petition, "a substantial part of the underlying events that would give rise to the claims being investigated occurred in Hays County," part of the Austin Division of the Western District of Texas. *See In re Blake Lively*, Cause No. 2025-25-0200-DC (Hays County D. Ct. Jan. 21, 2025), at ¶36. Lively's defamatory statements were 100% directed at Texas, targeting Texas residents and were published in Texas. Her out-of-court publication of the CRD and Draft Complaints were directly published by her to the press and, to the extent they weren't, she could reasonably foresee that they would be republished around the world—but specifically in Texas. Finally, she made additional repeated defamatory comments in Texas during an appearance(s), which occurred, at least, after this lawsuit. Venue is proper here. *See* 28 U.S.C. § 1391(b)(2).

66.    All of the factual statements in the preceding sections are incorporated in this section by reference.

## V.    FIRST CAUSE OF ACTION
### (Defamation and Defamation Per Se)

67.    The Draft Complaint and CRD Complaint which were published by Defendant were "of and concerning" Wallace and Street and falsely stated that they had engaged in ten illegal, including criminal, acts under state and federal law. It is

defamatory to falsely accuse someone of sexual harassment and retaliation for reporting the sexual harassment. The Defendant's publications, including identical or similar statements that she made in Austin, Texas and, upon information and belief, Austin and Waco, caused Plaintiffs damage. Defendant was at fault in publishing the defamatory statements because she did not act as a reasonably prudent publisher — that is, she was negligent as evidenced by her withdrawal of the Texas Lawsuit which would have revealed the truth.

68.     Neither the Draft Complaint nor the CRD Complaint were privileged because, among other reasons, they were provided by the Defendant or her agents to third parties including many media outlets. Defendant knew or should have reasonably anticipated, indeed she hoped, that these allegations would be republished "around the world." As a result, Defendant is responsible for Republication Damages.

69.     The statements of fact of and concerning Plaintiffs in the CRD and Draft Complaints are false and defamatory ("Statements"). They are made either negligently (if Plaintiffs are private figures which they are) or with "actual malice" (if Plaintiffs are public figures which they are not). The Statements have caused (both by the original publications and the republications around the world) great harm to Plaintiffs and such damages are presumed (if some or all of the Statements are defamatory per se) or per quod (if not per se) and, in any event, exceed $1,000,000. In considering whether the $75,000 jurisdictional amount has been reached the Court can take notice that many recent awards (Freeman and Moss v.

Giuliani, $148,000,000) or settlements (Dominion/Fox, $787,500,000; Trump/ABC $15,000,000) far exceed that amount.

70.     Although Lively is a public figure, Wallace and Street are not. Thus, Plaintiffs need prove only negligence to establish liability. However, Plaintiffs also seek punitive damages in an amount not less than $6,000,000, and to satisfy the evidentiary burden in establishing the right to such damages, they must demonstrate "actual malice"—that Lively either knew the allegations were false at the time she made them or she acted in reckless disregard of the truth—that is, she had a high degree of awareness of falsity and in fact entertained serious doubt about their truth.

71.     She acted with "actual malice" because she was the one claiming to have been harassed and retaliated against. She was the one who claimed she had a contract with Plaintiffs and yet there is no such contract, and Plaintiffs were nowhere near where the alleged harassment/retaliation took place. Lively knew this and it is not the case that she was harassed by some masked stranger who turned out to be the Plaintiffs. She knew (and knows) that they were not the harassers/retaliators but made these allegations anyway, leaked them to the press hoping they would be widely republished (which they were), but then excluded Plaintiffs from the Real Complaint (knowing they had nothing to do with the events depicted therein). When she had the opportunity to learn the true facts through her Texas Lawsuit, she intentionally turned away and dismissed the litigation.

72.     The defamatory statements are per se because they accuse Plaintiffs of conduct which is criminal. *See* Tex. Pen. Code Ann. §42.07. In addition, the defamatory statements injure Plaintiffs in their office, profession or occupation and are

thus *per se*, that is damages are presumed and Plaintiffs are entitled, at least, to nominal damages and the damage case may get to the jury without any proof of damage.

73.    All of the statements of facts from the previous sections are incorporated in this section by reference.

## VI.    CONCLUSION

74.    Sadly for Plaintiffs, they find themselves in the middle of this coast-to-coast, ginormous Hollywood litigation between two of America's leading film stars regarding events (which Plaintiffs had nothing to do with) purportedly occurring during filming of the movie *It Ends With Us* ("Film") and, thereafter, its marketing.

75.    The problem for Defendant, of course, is that Wallace has never met Lively (and certainly never harassed her), was never on the set of the Film (where the sexual harassment apparently occurred), and could not have investigated, prevented or remedied the claimed harassment, if it occurred, because, for one reason, he had no knowledge of it (and still doesn't). He certainly had no power to remedy it, as he was not and has never been her or Baldoni's (who he also never met) employer and did not retaliate against Lively for claiming he (Wallace) or anyone else sexually harassed her. Neither he nor Street ever contracted with her.

76.    Plaintiffs, therefore, respectfully request that this Court enter a final judgment and award damages for (i) Wallace's loss of reputation and emotional distress in the amount of at least $1,000,000 and punitive damages in an amount of at least $6,000,000, and (ii) Street's loss of reputation in an amount not less than $1,000,000, and punitive damages in the amount of at least $6,000,000, (iii) court

costs and for such further relief at law or in equity as to which Plaintiffs may be entitled.

Dated: April 25, 2025

Respectfully submitted,

JACKSON WALKER LLP

/s/ *Charles L. Babcock*
Charles L. Babcock
Texas Bar No. 01479500
Joel Glover
Texas Bar No. 24087593
Tori Emery
Texas Bar No. 24126228
1401 McKinney, Suite 1900
Houston, TX 77010
(713) 752-4200
cbabcock@jw.com
jglover@jw.com
temery@jw.com

Minoo Blaesche
Texas Bar No. 24075102
Carl C. Butzer
Texas Bar No. 03545900
2323 Ross Avenue, Suite 600
Dallas, TX 75201
(214) 953-6000
mblaesche@jw.com
cbutzer@jw.com

Matt Dow
Texas Bar No. 06066500
Katharine Lee Carmona
Texas Bar No. 00787399
Cody Lee Vaughn

Texas Bar No. 24115897
100 Congress Ave. Suite 1100
Austin, TX 78701
(512) 236-2000
mdow@jw.com
kcarmona@jw.com
cvaughn@jw.com

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of April, 2025, I electronically filed the

foregoing document with the Clerk of the Court using the CM/ECF system.

*/s/ Charles L. Babcock*
Charles L. Babcock