# EXHIBIT F

Bryan J. Freedman, Esq. (SBN: 151990)
Miles M. Cooley, Esq. (SBN: 206783)
Summer E. Benson, Esq. (SBN: 326398)
Jason H. Sunshine, Esq. (SBN: 336062)
LINER FREEDMAN TAITELMAN + COOLEY, LLP
1801 Century Park West, 5th Floor
Los Angeles, California 90067
Telephone: (310) 201-0005
Facsimile: (310) 201-0045
Email: bfreedman@lftcllp.com
       mcooley@lftcllp.com
       sbenson@lftcllp.com
       jsunshine@lftcllp.com

Electronically FILED by
Superior Court of California,
County of Los Angeles
1/02/2025 5:51 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By M. Gonzalez, Deputy Clerk

Attorneys for Plaintiffs Wayfarer Studios, LLC; Justin Baldoni; Jamey Heath; Steve Sarowitz; Melissa Nathan; The Agency Group PR LLC; Jennifer Abel; RWA Communications, LLC; Jed Wallace; and Street Relations Inc.

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES – CENTRAL DISTRICT**

| | |
|---|---|
| WAYFARER STUDIOS LLC, a California Limited Liability Company, JUSTIN BALDONI, an individual, JAMEY HEATH, an individual, STEVE SAROWITZ, an individual, MELISSA NATHAN, an individual, THE AGENCY GROUP PR LLC, a Delaware Limited Liability Company, JENNIFER ABEL, an individual, RWA COMMUNICATIONS, LLC, a California Limited Liability Company, JED WALLACE, an individual, STREET RELATIONS INC., a California Corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>THE NEW YORK TIMES COMPANY, a New York corporation; and DOES 1 through 100, inclusive,<br><br>Defendants. | Case No.: 24STCV34662<br><br>**NOTICE OF ERRATA RE COMPLAINT** |

1

Plaintiffs Wayfarer Studios LLC ("Wayfarer"); Justin Baldoni ("Baldoni"); Jamey Heath ("Heath"); Steve Sarowitz ("Sarowitz"); Melissa Nathan ("Nathan"); The Agency Group PR LLC ("TAG"); Jennifer Abel ("Abel"); RWA Communications, LLC ("RWA"); Jed Wallace ("Wallace"); and Street Relations Inc. ("Street Relations") (collectively, "Plaintiffs"), by and through their counsel, hereby file this Notice of Errata to Complaint regarding the following:

1.  The Complaint contained language and images on pages 14 through 16 and 20 subject to the reporter's privilege. The privileged language and images have been omitted per request in the corrected version of the Complaint attached hereto as Exhibit A.

Dated: January 2, 2025                    LINER FREEDMAN TAITELMAN + COOLEY, LLP

By: _____
Bryan J. Freedman, Esq.
Miles M. Cooley, Esq.
Summer E. Benson, Esq.
Jason H. Sunshine, Esq.

Attorneys for Plaintiffs,

Wayfarer Studios, LLC; Justin Baldoni; Jamey Heath; Steve Sarowitz; Melissa Nathan; The Agency Group PR LLC; Jennifer Abel; RWA Communications, LLC; Jed Wallace; and Street Relations Inc.

# EXHIBIT A

1  Bryan J. Freedman, Esq. (SBN: 151990)
2  Miles M. Cooley, Esq. (SBN: 206783)
   Summer E. Benson, Esq. (SBN: 326398)
3  Jason H. Sunshine, Esq. (SBN: 336062)
   LINER FREEDMAN TAITELMAN + COOLEY, LLP
4  1801 Century Park West, 5th Floor
   Los Angeles, California 90067
5  Telephone:  (310) 201-0005
   Facsimile:   (310) 201-0045
6  Email: bfreedman@lftcllp.com
7         mcooley@lftcllp.com
          sbenson@lftcllp.com
8         jsunshine@lftcllp.com

9  Attorneys for Plaintiffs Wayfarer Studios, LLC; Justin Baldoni; Jamey Heath; Steve Sarowitz;
   Melissa Nathan; The Agency Group PR LLC; Jennifer Abel; RWA Communications, LLC; Jed
10 Wallace; and Street Relations Inc.

11              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

12          **FOR THE COUNTY OF LOS ANGELES – CENTRAL DISTRICT**

13

| | |
|---|---|
| WAYFARER STUDIOS LLC, a California Limited Liability Company, JUSTIN BALDONI, an individual, JAMEY HEATH, an individual, STEVE SAROWITZ, an individual, MELISSA NATHAN, an individual, THE AGENCY GROUP PR LLC, a Delaware Limited Liability Company, JENNIFER ABEL, an individual, RWA COMMUNICATIONS, LLC, a California Limited Liability Company, JED WALLACE, an individual, STREET RELATIONS INC., a California Corporation, <br><br> Plaintiffs, <br><br> vs. <br><br> THE NEW YORK TIMES COMPANY, a New York corporation; and DOES 1 through 100, inclusive, <br><br> Defendants. | Case No.: <br><br> **COMPLAINT FOR DAMAGES FOR:** <br><br> **(1) LIBEL;** <br><br> **(2) FALSE LIGHT INVASION OF PRIVACY;** <br><br> **(3) PROMISSORY FRAUD; and** <br><br> **(4) BREACH OF IMPLIED-IN-FACT CONTRACT** <br><br> [DEMAND FOR JURY TRIAL] |

Plaintiffs Wayfarer Studios LLC ("Wayfarer"); Justin Baldoni ("Baldoni"); Jamey Heath ("Heath"); Steve Sarowitz ("Sarowitz"); Melissa Nathan ("Nathan"); The Agency Group PR LLC ("TAG"); Jennifer Abel ("Abel"); RWA Communications, LLC ("RWA"); Jed Wallace ("Wallace"); and Street Relations Inc. ("Street Relations") (collectively, "Plaintiffs"), by and through their counsel, hereby bring the following causes of action against Defendants The New York Times Company ("NYT" or the "Times") and DOES 1-100, inclusive (collectively, "Defendants"), and with knowledge as to themselves and otherwise on information and belief, claim and allege as follows:

## INTRODUCTION

1.      At 9:46 p.m. (EST) on Friday, December 20, 2024, NYT reporter Megan Twohey ("Twohey") requested Plaintiffs' response to an imminent 4,000-word bombshell story concerning their alleged orchestration of a smear campaign targeting Blake Lively ("Lively"), purportedly in response to Lively's disclosure of concerns about the working environment on the set of *It Ends With Us* (the "Film").

2.      The Film's production company, Wayfarer, its principals, Baldoni and Heath, and its public relations representatives, Nathan and Abel, were asked to provide "on-the-record comment" and to notify the Times of any "inaccuracies" by noon (EST) the next day, on December 21, 2024—a mere 14 hours overnight. Plaintiffs' representative promptly denied Lively's accusations as reported by the Times and criticized both Lively and the Times' reliance on "cherry-picked" and altered communications stripped of necessary context and deliberately spliced to mislead.

3.      Despite its claim to have "reviewed these along with other documents[,]" the Times relied almost entirely on Lively's unverified and self-serving narrative, lifting it nearly verbatim while disregarding an abundance of evidence that contradicted her claims and exposed her true motives. But the Times did not care. Given the breadth of the Article and the coordinated "drop," it is readily apparent that the Times had been quietly working in concert with Lively's team for weeks or months. The Times participated actively in the legal maneuvering at the heart of Lively's strategy. Notably, Lively chose not to file a lawsuit against Baldoni, Wayfarer, or any of the Plaintiffs—a choice that spared her from the scrutiny of the discovery process, including answering questions under oath and producing her communications. This decision was no accident. First, her administrative complaint is

rife with blatant falsehoods and egregious misrepresentations that would have subjected her to dismissal if not sanctions. Second, pursuing formal legal action would have derailed her true objective: an orchestrated campaign to rehabilitate her public image.

4.      Instead, Lively filed a request for a "right-to-sue" letter with the California Civil Rights Department (CRD), a procedural formality that does not require pleadings, remains confidential unless leaked–as it was here–and, crucially, does not subject the complainant to discovery. While such a letter can precede a lawsuit, it is clear that litigation was never her ultimate goal. Her real intention was to weaponize the appearance of legitimacy conferred by a numbered legal document to launch salacious, headline-grabbing allegations and reshape her public persona at the expense of the Plaintiffs.

5.      Lively found willing allies at the New York Times, which uncritically embraced her CRD Complaint as fact and disregarded the Plaintiffs' emphatic objections. Without even waiting for the response deadline of noon (EST) on December 21, 2024, the Times rushed to publish its inflammatory article, "We Can Bury Anyone': Inside a Hollywood Smear Machine," at 10:11 a.m.— nearly two hours early. This brazen disregard for journalistic integrity and fairness resulted in an article rife with inaccuracies, misrepresentations, and omissions.

6.      In an era where public trust in media has reached a historic low and legacy outlets are increasingly criticized as biased and agenda-driven, the Times has chosen to double down on sensationalism and oversimplified narratives. Rather than striving for accuracy and balance, it has prioritized hollow signaling over substantive reporting, further eroding its credibility and exacerbating the very mistrust it claims to combat.

7.      The Article's central thesis, encapsulated in a defamatory headline designed to immediately mislead the reader, is that Plaintiffs orchestrated a retaliatory public relations campaign against Lively for speaking out about sexual harassment—a premise that is categorically false and easily disproven. If the Times truly reviewed the thousands of private communications it claimed to have obtained, its reporters would have seen incontrovertible evidence that it was Lively, not Plaintiffs, who engaged in a calculated smear campaign. The complete communications demonstrate beyond question that Plaintiffs had no intention of "destroying" or "burying" Lively through aggressive tactics. On the contrary, Baldoni consistently expressed his desire to avoid harming Lively and protect

COMPLAINT

1    the Film but also recognized a legitimate need for public relations protection in light of Lively's false

2    and damaging claims.







1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

07:16

TAG TEAM

JB PR (W/O JB)

'It Ends With Us': Sony Chief Praises Blake Lively for "Advancing the Conversation Around Domestic Violence"

hollywoodreporter.com

They messaged me five minutes before this went up

TAG TEAM

Exclusive | Blake Lively was 'really impatient' on 'It Ends With Us' set as drama rumors swirl: 'Tension was so obvious'

pagesix.com

Jamey Heath

So glad Blake was praised. Let her get a win. It would be nice to have a Sony executive praise Justin.

Tue, 27 Aug at 08:48

removed Jen Abel DO NOT USE from the conversation.

Tue, 27 Aug at 08:48

added Jen Abel New number  to the conversation.

iMessage

8.    The Article is predicated on Lively's CRD Complaint, which references text exchanges between Nathan and Abel as purported evidence that Nathan planted a negative story in the Daily Mail titled "Is Blake Lively set to be CANCELLED?" Lively's portrayal is categorically false, misleading, and devoid of factual basis, yet knowingly endorsed by the Times, which claimed to have reviewed " thousands of pages of text messages and emails." The "smear campaign" hinges on an August 16th text exchange in which Nathan allegedly shared a link to this article with Abel. The text exchange shows Abel responding, "Wow," followed by, "You really outdid yourself with this one," to which Nathan allegedly replied, "That's why you hired me, right? I'm the best." These messages constitute the entirety of the purported evidence underlying the allegation of a "smear campaign" orchestrated on behalf of Baldoni.



9.      The Times, however, was aware that these text messages were unscrupulously altered and selectively edited, enabling both Lively and her team and the Times to propagate a false "smear campaign" narrative designed to destroy Plaintiffs. Specifically, in the immediately preceding text exchange on August 16th, Nathan forwarded a screenshot of a message from a reporter informing her, for the first time, of the Daily Mail article. In response, Nathan wrote, "Damn. This is not fair because it's also not me," followed by, "Everything now looks like it's me," conclusively refuting her involvement in the creation or dissemination of the article.



10.     Further evidence of the Times' complicity arises from its apparent endorsement of the criminal alteration of these text messages by Lively. After Nathan forwarded a screenshot of the article link, Abel responded with, "You really outdid yourself with this piece 🙃," adding a "🙃" to indicate the sarcastic nature of her message. The "🙃" emoji is commonly used to convey irony, sarcasm, joking, or a sense of goofiness or silliness.



11.     In her CRD Complaint, Lively deliberately excluded not only the preceding screenshot of the text exchange disproving Nathan's involvement in the story, but also the '🙃' emoji, which fundamentally alters the sarcastic tone of Abel's message and misleads the reader into interpreting her

response as serious. This omitted context is critical, as it demonstrates that each subsequent message in the exchange was similarly intended as sarcasm, including Nathan's statement, "That's why you hired me, right? I'm the best." Further review of the text message exchange—also excluded from both Lively's CRD Complaint and the Times Article—unequivocally shows that Abel and Nathan were engaging in a sarcastic and joking manner, as evidenced by the use of the 'HaHa' tapback reaction. When read in full, the exchange reveals Nathan and Abel engaging in facetious, juvenile banter—not conspiring against Lively. The Times relied on Lively's CRD Complaint and, based solely on this exchange, intentionally duped readers into believing that Baldoni orchestrated a "smear campaign," purportedly using Nathan and Abel as his accomplices. Indeed, the Times, like Lively, misrepresented these communications to support its salacious and unfounded "smear campaign" narrative. This calculated distortion underscores the Article's lack of credibility and its reliance on sensationalism over substantive truth.

12.    Any negative press about Lively was unequivocally a consequence of her own actions. Even the Times itself acknowledged Lively's public missteps in an August 17, 2024, article titled, *"It Ends with Us: The Press Tour Drama, Explained."* In it, reporter Shivani Gonzalez observed: "Lively's promotion of the movie has included a push for her new hair care line, discussion of the clothes in the movie, and response to questions about abuse, which have been criticized as shallow and tone deaf . . . Baldoni, by contrast, has emphasized the importance of raising awareness of domestic violence and providing resources for those in similar situations."[1]

---

[1]  *See also* Natasha Jokic, *Here's What's Going On With The 'It Ends With Us' Drama* (Aug. 12, 2024), https://www.buzzfeed.com/natashajokic1/it-ends-with-us-blake-lively-justin-baldoni; Carly Johnson and Lillian Gissen, *Blake Lively goes into damage control FINALLY addressing the domestic violence in It Ends With Us Amid Criticism over 'tone deaf' film promo* (Aug. 13, 2024), https://www.dailymail.co.uk/tvshowbiz/article-13740773/Blake-Lively-address-domestic-violence-Ends-film.html; Lillian Gissen, *Blake Lively fans blast It Ends With Us actress over 'tone deaf' and "shallow" interview with costars* (Aug. 12, 2024), https://www.dailymail.co.uk/femail/article-13739569/blake-lively-tone-deaf-domestic-violence-interview.html; Elyse Wansehl, *People Are Disgusted By Blake Lively's Cutesy Press Tour For 'It Ends With Us'* (Aug. 14, 2024), https://www.dailymail.co.uk/femail/article-13739569/blake-lively-tone-deaf-domestic-violence-interview.html; Eboni Boykin-Patterson, *Blake Lively Dragged for Marketing Light of Domestic Violence* (Aug. 14, 2024), https://www.thedailybeast.com/blake-lively-dragged-for-making-light-of-domestic-violence/; Alex Abad-Santos, *Why is everyone mad at Blake Lively?* (Aug. 15, 2024), https://www.vox.com/culture/367451/blake-lively-it-ends-with-us-press-tour-controversy; Olivia Craighead, *Fans Are Not Impressed with Blake Lively's Press Tour* (Aug. 15, 2024), https://www.thecut.com/article/blake-lively-it-ends-with-us-press-tour-tone-deaf.html; Carolyn Gevinski, *The It Ends With Us promo has failed domestic violence survivors like me* (Aug. 16, 2024), https://www.glamourmagazine.co.uk/article/it-ends-with-us-domestic-abuse-first-person; Angela Yang, *Blake Lively's 'It Ends With Us' promotion called 'disrespectful' by some survivors of abuse* (Aug. 19, 2024 https://www.nbcnews.com/pop-culture/blake-lively-it-ends-with-us-promotion-criticism-rcna167175; Arwa Mahdawi, *Sorry, Blake Lively: using a movie about domestic violence to sell stuff is not a good look* (Aug. 20, 2024

https://www.theguardian.com/commentisfree/article/2024/aug/20/blake-lively-it-ends-with-us-colleen-hoover;    Hannah Holland, *'It Ends With Us' was already problematic. Blake Lively's press tour made it worse.* (Aug. 27, 2024), https://www.thecut.com/article/blake-lively-it-ends-with-us-press-tour-tone-deaf.html.

13.     Lively's marketing efforts, which included encouraging audiences to "grab your friends, wear your florals" while promoting her hair care and alcohol brands, were widely criticized as insensitive. This was particularly glaring given World Health Organization statistics showing that 55% of domestic violence incidents involve alcohol. Her actions naturally triggered organic public criticism and unleashed a cycle of negative coverage, including, as is common in the digital age, the resurfacing of old, unflattering content.



14.    Far from being the product of a calculated smear campaign by Plaintiffs, the backlash against Lively was the inevitable fallout of her own tone-deaf messaging and self-promotional tactics, amplified by her inability to read the room in addressing such a serious subject.







15.     The Article also deliberately ignores that Lively's publicist, Leslie Sloane ("Sloane"), of Vision PR, once backed by Harvey Weinstein, seeded stories critical of Baldoni, including that Baldoni was a sexual predator, ahead of the Film's release. Sloane did so even while Nathan attempted to cooperate in good faith.



*Redacted pursuant to reporter's privilege request*

1
2

*Redacted pursuant to reporter's privilege request*

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



Left screenshot:

21:53

- TMZ

cast/crew hating him

We are told cast/crew find Justin nice guy. Don't take as harsh of sides behind scenes as it's being reported. At this point we're told it's being milked for publicity. Justin's over it. It really was creative difference between Blake and Justin. But wasn't nearly as bad as reported. Blake huge ego etc is the reporting

I am in a hurricane

In PR

Puerto Rico

Melissa Nathan

Omg are you okay

Yes and I just ate a poke bowl

I'd be so ill

Melissa Nathan

Do u have sources ? BL camp keeps thinking its us placing and we are doing f all

TMZ

Yes on production

They've had a producer working overtime and spoke to people on

iMessage

Right screenshot:

05:44

- TMZ

Omg are you okay

Yes and I just ate a poke bowl

I'd be so ill

Do u have sources ? BL camp keeps thinking its us placing and we are doing f all

Yes on production

They've had a producer working overtime and spoke to people on production in post

Wait til I tell you the whole story

We are legit saying source says it's all blakes EGO

U have no idea. U think you do. You do not

In my whole career ive never come across this situation

But why aren't people saying the real story if known

Can I call you back

iMessage



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



## FW: Statement for TMZ

Jamey and team fyi

**From:** Neff, Charlie ███████████
**Date:** Wednesday, August 14, 2024 at 11:45 AM
**To:** WayfarerStudios ███████████████
**Subject:** Statement for TMZ



Hello,

I'm a reporter at TMZ and I'm reaching out to get a statement regarding some information.

We are being told there were at least three HR complaints filed against Justin Baldoni on set of 'It Ends With Us'.

We wanted to see if the complaints were investigated and what the results were.

Thank you,



**9:51**

**Reporter**    Wed, Aug 14 at 9:14 PM

A source close to set says they don't know of an investigation. But there was an intervention:

"We heard there were multiple HR complaints from crew and cast starting with the first day of production. Wayfarer is the studio. It's unclear if Wayfarer [Studios] performed an investigation into the claims against themselves. Separately, we are aware there was an intervention with Justin Baldoni mid-way through production based on a pattern of inappropriate behavior by him towards cast and crew.

**TAG Team**

Off record -

The only complaint, which not confirmed if it was an official HR complaint was a guy up for a gig on the crew. Complained the younger guy who got it did so because of ageism. There was investigation and found no wrongdoing. There are no other complaints especially no other

iMessage

---

**9:51**

younger guy who got it did so because of ageism. There was investigation and found no wrongdoing. There are no other complaints especially no other documented HR complaints

There was not an intervention on set or with members of the crew. This would be false to allude to. Blake and Ryan had Justin and his team over for a meeting where Blake expressed all the things she was upset about. This was not Justin versus the team behind the film. It was his team vs. Blake and Ryan - more of a contentious meeting. The way it reads now reads as if it was proper intervention with cast and crew. Not true

**Reporter**

Ty

I just sent im

I'll keep you posted

What is the email for wayfarer

I need to legal reach out

iMessage

---

21

16.     To assert that Plaintiffs orchestrated a premeditated smear campaign is to disregard objective evidence that unequivocally contradicts such claims. Even a cursory investigation by the Times would have exposed the baseless nature of Lively's allegations and the lack of factual support for her narrative. Most troubling, however, is the Times' deliberate omission of a critical player in this manufactured controversy: Stephanie Jones. Once Baldoni's and Wayfarer's trusted public relations representative, Jones not only had intimate access to the communications strategy and crisis management surrounding the Film but also played a pivotal role in leaking private communications cited in the Article. Her betrayal, driven by a quid pro quo arrangement with Lively, appears aimed at shielding herself while aligning with Lively to curry favor and secure future opportunities.

 

17.     The Times compounded its journalistic failures by uncritically advancing Lively's unsubstantiated claims of sexual harassment against Heath and Baldoni. For example, the Article, based on Lively's CRD Complaint, sensationally alleges that "Mr. Heath had shown [Lively] a video of his naked wife," with Lively's CRD Complaint even labeling the footage as "pornography." This claim is patently absurd. The video in question was a (non-pornographic) recording of Heath's wife and baby during a home birth—a deeply personal one with no sexual overtone. To distort this benign event into an act of sexual misconduct is outrageous and emblematic of the lengths to which Lively and her collaborators are willing to go to defame Plaintiffs.

Still of video referenced



18.     The Times' failure to scrutinize these claims or even provide a balanced account of the events further underscores its role in amplifying Lively's falsehoods while abandoning its responsibility to truth and accuracy. The video was shown to Lively as part of a creative discussion in preparation for a birthing scene in the Film. Heath informed Lively that his wife condoned his displaying the video. Any suggestion that Heath engaged in the exhibition of pornography or inappropriate content is false.

19.     Adding to the sexual harassment narrative is the Article's parroted accusation that "both men repeatedly entered her makeup trailer uninvited while she was undressed, including when

she was breastfeeding." What Lively (and the Article) fail to mention is that Lively *invited* Baldoni into her trailer (while pumping) to "work out their lines[.]"



20.    Likewise, the allegation that Baldoni inappropriately described Lively's character's attire as "sexy" is exaggerated and misleading. The text exchanges between Baldoni and Lively show that Lively had insisted that her character's clothing be "much sexier." When Baldoni later used the word "sexy," he was just responding to her creative input, not objectifying her personally. Lively set the tone that Baldoni heeded during the creative process.

21.    Also misleading, the Article draws on Lively's assertion that Baldoni "improvised unwanted kissing and discussed his sex life[.]" However, both the Times and Lively intentionally exclude that Lively refused to meet with the intimacy coordinator to plan out the Film's sex scenes. Baldoni, in turn, was forced to meet with the intimacy coordinator alone and relay any suggestions to Lively separately. Notwithstanding Baldoni's reluctance, he and Lively would later sketch out the scenes together, absent the intimacy coordinator. As part of those creative discussions, Baldoni and Lively sought to personalize and develop their characters and, in doing so, engaged in conversation about their individual experiences. The Times, taking Lively's CRD Complaint as true, characterizes this discussion as an inappropriate attempt by Baldoni to talk about his sex life–it was not. More still, Baldoni consistently acted at the direction of the intimacy coordinator. These baseless accusations do not constitute sexual harassment.



22.     Despite its effort to craft a distorted narrative, the Times fails to address a glaring contradiction in Lively's CRD Complaint. After the execution of the "Protections for Return to Production" agreement in November 2023, Lively herself acknowledges that the Film was "completed, marketed, and released safely and successfully." While Wayfarer, Baldoni, and Heath disagreed with Lively's rationale for requesting the document—many of its provisions were already standard practice—they chose to comply for the sake of the Film and to ensure Lively's comfort.

23.     Crucially, Lively concedes that neither Baldoni nor Heath engaged in any "harassing" behavior following the agreement in November 2023. Furthermore, she admits that her stated concerns were sufficiently addressed at that time. This admission directly undermines her allegations of retaliation and strips her claims of credibility. Without the fabricated smear campaign narrative propping up her CRD Complaint, Lively's retaliation claim collapses under its own contradictions, exposing it as yet another ploy to salvage her public image rather than pursue any legitimate grievance.

24.     The fact is that Lively embarked on a hostile takeover of the production, strong-arming Sony into blessing her with ultimate control. As they became increasingly frantic and unsettled by the usurpation of their roles, Baldoni remained resolute that they continue to take the "high road" and be proud of the "beautiful baby" they had all made together. Notwithstanding, Lively waged war on Baldoni, weaponizing innocuous interactions from May and June 2023—long before there was any tension between them—to vilify and discredit him. At the time, Baldoni and Lively had a solid working relationship, and Lively expressed no unease around him. Only after the writer's strike had ended and filming was set to resume did Lively express any concern about returning to set. In response, Wayfarer and Baldoni agreed to all of Lively's demands.



COMPLAINT

25. To suggest, as the Times does, that Plaintiffs engaged in dark arts to destroy Lively's reputation is to ignore that Lively had long-standing reputational challenges and that Plaintiffs' public relations efforts were rudimentary, above-board, and entirely defensive. The Times willingly omits any meaningful discussion of the true source of tension between Lively and Plaintiffs, which was Lively's brazen and calculated effort to expropriate the Film.




26.     The Times' assertion that Plaintiffs orchestrated a campaign to tarnish Lively's reputation blatantly disregards her bizarre behavior at the time and misrepresents Plaintiffs' actions, which were modest, transparent, and purely defensive. The Article entirely sidesteps the real source of conflict between Lively and Plaintiffs: Lively's calculated and audacious attempt to seize control of the Film.

27.     Notably absent from the Times' narrative is Lively's insistence on obtaining editing privileges and demanding her own version of the Film—a departure from industry standards. Even more egregiously, Lively leveraged her promotional commitments to pressure for the release of her cut. Evidence of Baldoni's efforts to accommodate Lively's demands, including a series of text exchanges with editors who were later replaced by Lively in favor of her husband's editor, underscores the extreme lengths Baldoni went to in order to preserve the Film's integrity: The Times' willful omission of these critical details not only distorts the truth but also perpetuates a false narrative that conveniently absolves Lively of her own culpability in the unraveling of professional relationships and the upheaval surrounding the Film.






28.    Also missing from the Article is Lively's demand for an unearned producer credit and coveted p.g.a mark, a demand that Wayfarer and Baldoni were forced to concede under duress (as documented internally):

Private and Confidential. PGA Letter  `External`  Inbox ×



Jamey Heath <jamey@wayfarerstudios.com>                    Thu, Jun 27, 3:55PM    ☆    ↩ Reply to all    ⋮
to imene, Nina, Danny, me, JB ▾

Hi Everyone,

I'm writing to you all regarding a letter that I wrote on behalf of Justin and myself addressed to the Producers Guild.

As you know, we received a request to write a recommendation on behalf of Blake for her to receive the PGA mark.
This was a request that we feel was unreasonable and cold hearted.  Essentially, the movie IEWU has been taken unjustly from Justin as a director and essentially from Wayfarer's control due to the extortion of Blake.
Without going into all the details of the events that have transpired over the months, Justin and I ended up agreeing to write the letter due to feeling trapped.  She continues to hold a threat over our heads and every time we try and hold a line she uses that threat either directly or indirectly to get us to fold.  Make no mistake, I am not suggesting that we were literally forced to acquiesce, but given the high profile of the movie, the partnership with Sony, the amount of money invested and the need to complete the movie, we have written the letter on her behalf, omitting the truth of how and why she was able to contribute in the ways we listed.

There is nothing to do with this letter now.  It only serves as a way to memorialize why the letter was sent in the first place should we ever need to explain it.

Thank you!

Jamey

  **Jamey Heath**
WAYFARER   CEO
Wayfarer Studios
310-245-8030



WAYFARER

June 26, 2024

Dear members of the Producers Guild of America,

We hope this letter finds you well. We are writing to inform you of the significant role and contributions that Blake Lively has played in the making of the film, IT ENDS WITH US, based on the best-selling novel by Colleen Hoover.

This film has meant a great deal both personally and to our company, Wayfarer Studios, as we optioned the property nearly five years ago. As such, we've been directly involved in overseeing every step of development from adapting the book to the big screen, to bringing on our co-financier/distributor, Sony, and of course, casting our lead.

From the time Blake was brought on, she has had an instrumental voice in many different aspects of the making of the film. Her contributions have been impactful as she was consulted with many of the casting options, she helped to refine the script, she redesigned her own wardrobe as well as gave notes on others, she contributed to the production design and set decoration, and had influence on how many of the scenes were shot.

Blake has been very involved in the post process as well.  She has had an active role in the edit, the sound mix and has made decisions on the music selections and score.  She also continues to find creative ways to promote the film so that it can achieve its greatest success.

Since contractually she began the movie with an EP credit, our earlier submission to the PGA did not include her as a named Producer, but we both feel her contributions have warranted the revised credit and consideration for the PGA mark.

On behalf of Wayfarer Studios,

Justin Baldoni -
Director  IT ENDS WITH US

Jamey Heath
Producer p.g.a IT ENDS WITH US



WAYFARER   **Jamey Heath**
CEO
Wayfarer Studios
310-245-8030

COMPLAINT

29.     Moreover, the Article fails to address the fact that Baldoni was systematically sidelined from the marketing of his own Film. From the very beginning, Baldoni had insisted on marketing the Film with a focus on domestic violence and its survivors, a message that was integral to the Film's purpose. Yet, Lively drastically limited his input and deliberately steered the promotional campaign away from its societal message. Further undermining Baldoni's role, Lively initially refused to permit his attendance at the Film's premiere. Only after significant pressure did she reluctantly agree to allow Baldoni and the Wayfarer team to attend, but under humiliating conditions. The Wayfarer team and their families, including Baldoni and Heath, were segregated from the main cast, barred from the exclusive after-party, and forced to organize their own event at additional cost. Baldoni's participation on the red carpet was cut short, and his family and friends were confined to a makeshift holding area in the basement before being escorted into a separate theater after Lively's departure. Not only had Lively stolen the Film, but she also robbed Baldoni and his team of any genuine opportunity to celebrate their hard work.

**Jen Abel**
But nothing we can't get through together!! This film will be successful, she has already promoted heavily so if she backs away now it looks worse on her, and you just focus on the bigger picture of how this film is going to change the game for you and the studio

**Justin Baldoni**
Just find ways to keep me busy when she gets everyone together –
Obviously if the whole cast is making content together that's her trying to clue people onto their being an issue. Everything she does is calculated yet also manic.

**Jen Abel**
I hear you, and we are already ahead of this with Sony who has our back here. I feel good about that and they understand the larger issue if fans start poking holes.

That doesn't benefit Sony either

**Justin Baldoni**
She doesn't wanna be the bad guy so she'll find a way to

say it without saying it

**Jen Abel**
And that's why we just stay ahead of it

**Justin Baldoni**
Attempting to rewrite history and like I'm not the one who developed this and spent five years, trying to make it

And like there's an issue with me, it's just mean and hurtful and she knows exactly what she's doing













30.     When Wayfarer and Baldoni hired Lively to appear in the Film, they did not anticipate that she would execute a hostile takeover of the entire project. Lively's cynical abuse of sexual harassment allegations to assert unilateral control over every aspect of the production was both strategic and manipulative. Simultaneously, her public image suffered as a result of a series of high-profile blunders, which she tried to deflect by blaming Plaintiffs for the public's prying interest into the foibles of an A-list celebrity. This is nothing but an excuse. Fame is a double-edged sword, but Lively's tactics here are unconscionable. Alongside the Times, she orchestrated a malicious attack on the reputations, careers, and personal lives of Plaintiffs, subjecting them to public humiliation, threats, and vitriol. This lawsuit seeks to hold the Times accountable for its role in this defamation campaign, but Plaintiffs are not done. There are other bad actors involved, and make no mistake—this will not be the last lawsuit.




**PARTIES AND JURISDICTION**

31.    Plaintiff Wayfarer Studios, LLC is, and at all relevant times herein was, a Delaware limited liability company with its principal place of business in the County of Los Angeles, State of California.

32.    Plaintiff Justin Baldoni is, and at all relevant times herein was, an individual residing in the County of Los Angeles, State of California.

33.    Plaintiff Jamey Heath is, and at all relevant times herein was, an individual residing in the County of Los Angeles, State of California.

34.    Plaintiff Steve Sarowitz is, and at all relevant times herein was, an individual residing in the County of Lake, State of Illinois.

35.    Plaintiff Melissa Nathan is, and at all relevant times herein was, an individual residing in the County of Los Angeles, State of California.

36.    Plaintiff The Agency Group PR LLC is, and at all relevant times herein was, a Delaware limited liability company with its principal place of business in the County of Los Angeles, State of California.

37.    Plaintiff Jennifer Abel is, and at all relevant times herein was, an individual residing in the County of Los Angeles, State of California.

38.    Plaintiff RWA Communications, LLC is, and at all relevant times herein was, a California limited liability company with its principal place of business in the County of Los Angeles, State of California.

39.    Plaintiff Jed Wallace is, and at all relevant times herein was, an individual residing in the County of Hays, State of Texas.

40.    Plaintiff Street Relations Inc. is, and at all relevant times herein was, a California corporation with its principal place of business in the County of Hays, State of Texas.

41.    Defendant The New York Times Company is, and at all relevant times herein was, a New York corporation with its principal place of business in New York, New York.

42.    Does 1 through 10 are individuals and/or entities whose true names and capacities are currently unknown to Plaintiffs. Does 1 through 100 are legally responsible and liable to Plaintiffs to

COMPLAINT

the extent of the liability of the named Defendants. Plaintiffs will seek leave of the Court to amend this Complaint to reflect the true names and capacities of the Defendants designated herein as Does 1 through 100 when such identities and capacities become known.

43.     At all relevant times herein, each of the Defendants was the agent, servant, employee, employer, joint-venturer, partner, and/or alter ego of each of the named Defendants and was at all times operating and acting within the purpose and scope of said agency, service, employment, joint venture, partnership, and/or alter ego. Each Defendant has rendered substantial assistance and encouragement to the other Defendants, acting in concert knowing that his/her/its conduct was wrongful and/or unlawful, and each Defendant has ratified and approved the acts of each of the remaining Defendants.

## JURISDICTION AND VENUE

44.     Jurisdiction is proper in the Superior Court of the State of California for the County of Los Angeles pursuant to California Code of Civil Procedure section 410.10 *et seq*. since at least some of the obligations, liabilities, and breaches complained of herein arose or occurred in the County of Los Angeles. Moreover, each defendant either owns, maintains offices, transacts business, has an agent or agents within the County of Los Angeles, or otherwise is found within the County of Los Angeles and each defendant is within the jurisdiction of this Court for purpose of service of process.

45.     Venue as to each of the defendants is proper in this judicial district pursuant to California Code of Civil Procedure sections 395(a) and 395.5 since at least some of the obligations, liabilities, and breaches complained of herein arose or occurred in the County of Los Angeles. Each of the defendants either owns, maintains offices, transacts business, has an agent or agents within the County of Los Angeles, or otherwise is found within the County of Los Angeles and each of the defendants is within the jurisdiction of this Court for purpose of service of process.

## FACTS COMMON TO ALL CAUSES OF ACTION

### A.  Lively Uses Unsubstantiated Claims to Bully Wayfarer and Baldoni in an Effort to Take Over the Film

46.     In or about early 2019, Baldoni, through his literary agent, contacted the author of the book on which the Film is based. He expressed a deep interest in adapting the book into a feature-

length motion picture that aligned with his history of impactful storytelling. Baldoni envisioned a film that would shed light on the struggles of domestic violence survivors, amplify their voices, and inspire societal change. Driven by his unwavering commitment—often at significant personal sacrifice—Baldoni ensured the Film stayed true to this vision, ultimately achieving its purpose.

47.    On or about May 8, 2019, Wayfarer secured an option for the book's rights with the intent of creating a film that would bring critical attention to the widespread issue of intimate partner violence. Over the next five years of development, Baldoni and Wayfarer maintained a strong and collaborative relationship with the book's author.

48.    With the rights to the book secured and a plan to finance the project, Wayfarer committed to producing the Film. Baldoni, whose passion and creative vision were central to the project, would direct and star in it.

49.    Wayfarer partnered with Sony to co-finance and distribute the Film. That agreement included, at Wayfarer's and Baldoni's assistance, a requirement that 1% of the Film's proceeds be donated to survivors of domestic violence. That 1% was ultimately earmarked for the organization "No More", with which Baldoni had wanted to partner as early as September 2022.

50.    On or about December 31, 2022, Lively agreed to take on the lead role of "Lily Bloom". As part of the subsequent negotiations, Lively was granted an "Executive Producer" credit, a title often associated with talent of her stature. Wayfarer did not request that Lively contribute to the Film in any capacity beyond her performance and this credit.

### i.    Lively takes over wardrobe

51.    On or about May 15, 2023, principal photography of the Film commenced in New Jersey. During pre-production, Lively began to assert control over aspects of the Film beyond her role as an actor and outside the scope of her contractual entitlements. While lead actors are sometimes granted approval over the general "look" of their on-screen character, this authority typically does not include full control over wardrobe decisions without input from the director and producers.[2] Nevertheless, Lively overstepped these boundaries, sidelining the production's costume designer—a

---

[2] Lively went so far as to purchase items for her wardrobe, albeit at her own expense, without the approval of the director or producers.

seasoned professional with a longstanding working relationship with Lively.

52.     Ignoring the director's vision for her character and disregarding the weeks spent by the entire team shopping and thoughtfully crafting her wardrobe in preparation for filming, Lively would send hundreds of images to the Film's costume designer during all hours of the evening, pointing them in the direction of the appearance she wanted for her character. The costume designer then had to re-shop her wardrobe, far exceeding the allocated budget and diverting time and resources. At one point Lively insisted that her character "had money" and could afford $5,000 shoes, which had Baldoni rethinking the entire script that had been being worked on for well over a year and had been approved by both studios.

53.     Lively also several times refused to participate in wardrobe fittings at the production office, a mere fifteen minutes away from Lively's Tribeca residence. Instead, she insisted the costume department pack up the wardrobe department and deliver all her wardrobe items to her. Loading the wardrobe department on trucks and delivering them to Lively's residence for fittings added both time to the production schedule and expense to the Film - two things productions work hard to avoid with careful planning. These demands were never mentioned at the contract negotiation phase and therefore were not included in the budget. Lively, herself having a further obligation to the studios as an Executive Producer, paid no mind to the budget and the months of planning that had already occurred.

54.     Even if Lively had the contractual authority to approve her character's wardrobe (which she did not), a grant of such authority would not and could not imply the right to blow up the Film's budget with additional unanticipated costs.

55.     In an effort to maintain harmony at the start of their working relationship and to avoid further delays caused by wardrobe conflicts, Baldoni and the studio reluctantly allowed Lively full control over her wardrobe. This concession quickly proved regrettable.

56.     On the first day of principal photography, paparazzi captured and published photos of Lively in character wearing her self-selected wardrobe. These images were described as unflattering and sparked a backlash from the Film's distributor, Sony. Baldoni received direct criticism from Sony, who voiced concerns about the impact of the photos on the Film's public perception.

57.    Following these events, Baldoni approached Lively in her trailer to discuss necessary wardrobe adjustments. The conversation, while professional, took considerable time and was later grossly misrepresented in Lively's CRD Complaint, falsely characterizing the exchange as a "lengthy outburst" that delayed filming and caused the crew to "wait for hours while [Baldoni] cried in Lively's dressing room."[3] This account—later published by the Times—is false.

58.    Although Baldoni did briefly tear up during the conversation, it was in response to what he believed was a genuine compliment from Lively, praising his work as a director and actor. In hindsight, Baldoni recognized this as a manipulation tactic, likely intended to persuade him to continue allowing her unchecked control over wardrobe decisions.

59.    Lively later leveraged this conversation in support of her allegations of harassment, alleging that Baldoni made inappropriate "comments on her appearance." In reality, Baldoni was relaying the distributor's concerns and the widespread social media criticism regarding the wardrobe's failure to meet audience expectations—a sentiment Baldoni shared. This incident marked the beginning of a troubling pattern of manipulative behavior by Lively.

### ii. Lively begins re-writing the script

60.    During a red-carpet interview at the New York City celebrity premiere of the Film, Lively stated, "[t]he iconic rooftop scene, my husband actually wrote it. Nobody knows that but you now." This revelation came as a surprise to the Film's credited screenwriter, who, when later interviewed, graciously responded: "So if I'm being told that Ryan wrote that, then great, how wonderful." The screenwriter further acknowledged, "There were a few little flourishes that I did not write … and if those flourishes came from Ryan, I think that's wonderful."[4] This was also the first time Plaintiffs learned that Reynolds—who had no formal role in the Film's production—made unauthorized changes to the script in secret.

61.    Furthermore, Lively herself began altering the script daily. The frequency of Lively's revisions alarmed the producers, director, and studio, who anticipated that her interference would

---

[3] *See* CRD Complaint ¶ 46.

[4] *See* Benjamin VanHoose and Julia Moore, *Blake Lively Says 'Nobody Knows' Ryan Reynolds Wrote a Scene in It Ends With Us as Screenwriter Weighs In* (Aug. 8, 2024), https://people.com/blake-lively-ryan-reynolds-wrote-scene-it-ends-with-us-8692864.

persist "every day of the shoot" and disrupt the production schedule. Each shooting day was already intricately planned, and her constant changes introduced significant stress on the production crew and financial strain. However, just weeks prior, Lively's husband, Ryan Reynolds, had aggressively berated Baldoni during a meeting at their penthouse in New York, accusing him of "fat shaming" Lively, Baldoni, in an effort to avoid further confrontation with Lively and Reynolds and rebuild rapport with his co-star, continued to bend to her will.

62.     Reynolds and Lively's inappropriate and humiliating berating of Baldoni—delivered, perhaps intentionally, as other celebrity friends were coming in and out of their penthouse—was prompted by Baldoni's reasonable inquiry into crucial information needed to ensure safety and avoid injury in a scene. Baldoni, while training for a physically demanding scene in which his character "Ryle" would lift "Lily", asked his trainer (who was introduced to him by Lively and oversaw his training for the Film) how much Lively weighed. Baldoni, who suffers from back issues and has multiple bulging discs, made the inquiry to ensure he could safely perform the lift without injury. Unfortunately, the trainer relayed this information to Lively, who then informed Reynolds. The confrontation that followed was so aggressive that Baldoni felt compelled to offer repeated apologies, despite his question being entirely reasonable and made in good faith. Following this incident, Lively refused to perform the lift scene, even though it had already been rehearsed with a stunt double.

63.     In fact, Lively threatened to quit the production altogether, despite her contractual obligations. Lively gave Baldoni an ultimatum: to either cast someone else or work with her in the way *she* works. It was her way or the highway. Recasting would be detrimental to production, sever Wayfarer's relationship with Sony, and cost millions. To highlight the effects of masterful gaslighting, Baldoni and Wayfarer also truly believed that in an effort to save herself from the backlash of being re-cast, Lively could leak that she felt "fat shamed" by Baldoni, which he thought would ruin his career. Notably, it appears he was not wrong, and despite his efforts to do everything *her* way, she *still* tried, continues to try, and arguably did, with the help of the Times, ruin his career, reputation, and well-being.

64.     Beyond the script revisions, Lively extended her influence over the Film to other areas, frequently challenging decisions and asserting control. She not only re-wrote her own dialogue but

also made unilateral changes to other characters' lines, effectively altering the script on a broad scale. This pattern of interference continued to disrupt the production process, often causing stress, chaos, and delays.

65.     Over the months leading up to the Film's release, Lively and her collaborators consistently scrutinized interactions with Baldoni and employed tactics that fall squarely within the definition of gaslighting. This behavior pressured Sony, Baldoni, and Wayfarer into ceding control to Lively at every turn, resulting in her domination of nearly every aspect of the Film's production.

***iii. Lively sets the stage for coercion by drafting a "protection letter" that intentionally misrepresents the nature of the conversations had between Baldoni and/or Heath and Lively; demands Wayfarer parties sign for Lively to return to work after the industry strikes***

66.     Principal photography began on May 15, 2024. From mid-June to early-November 2023, production was suspended due to the industry guild strikes. When the strikes ended on November 9, 2023, production was eager to resume filming and make up for lost time.

67.     That same day, however, Wayfarer received an unsettling and unexpected email from Lively, through her counsel, containing a 17-point list of non-negotiable conditions that must be met before Lively would return to work. Though Wayfarer disagreed as to the basis for requesting these conditions (which insinuated those demands were the result of inappropriate behavior by Baldoni and Heath), the terms were agreeable, and some were already in place. For example, Lively demanded that an intimacy coordinator be present at all times when Lively was on set. In fact, an intimacy coordinator had already been engaged during the first half of production, so Wayfarer took no issue with this request. Contrary to Lively's assertion**, it was she who refused to meet with the intimacy coordinator to plan out scenes**, putting Baldoni in the awkward position of meeting with the intimacy coordinator alone and later relaying sex scene suggestions to Lively in the intimacy coordinator's absence—not only defeating the purpose but resulting in accusations by the Times that, before shooting began, Baldoni wanted to add sex scenes that Lively considered gratuitous; in fact, these scenes were proposed by the intimacy coordinator. This is well-documented in hand-written notes Baldoni took during meetings with the intimacy coordinator.

1

2

3

4

5

6

7

8

9

10

11

12



13

14

15

16

17    68.    Baldoni's dated, hand-written notes from his meetings with the intimacy coordinator,

18  which again, Lively declined attending, were read to Lively at her penthouse, where she insisted she

19  and Baldoni meet to write sex scenes together. As it was, the sex scenes were not written and it was

20  always Baldoni's intention for them to be written with input from both the intimacy coordinator and

21  Lively (the "female gaze" that Lively distorts in her CRD Complaint, which the Times then

22  publishes). In response to a proposal from the intimacy coordinator that "Ryle" not orgasm after he

23  satisfied "Lily," Lively remarked: "I'd be mortified if that happened to me", to which Baldoni,

24  following Lively's lead in what seemed like an attempt to connect and develop their characters,

25  remarked that "those have been some of the most beautiful moments with [my wife] and I". Lively

26  again distorts this both in the "Protections for Return to Production" she made Wayfarer, Heath, and

27  Baldoni sign, and in the CRD Complaint, which the Times publishes as fact without any investigation

28  whatsoever. First, this suggestion did not originate with Baldoni, and Lively knew this. Second, it

COMPLAINT

was *Lively* who first personalized the scenes. And third, and perhaps most importantly, *they were writing scenes for their characters.*

69.     Lively claims that Baldoni made her feel "unsafe" when he used the word "sexy" while discussing a wardrobe adjustment, when in fact, Lively herself had previously indicated both verbally and in a text message shown below that she wanted her character's wardrobe to be "sexier". For a scene in which all the characters wore onesies, Lively opted to wear a large coat over hers, obscuring the outfit. Baldoni, as the Film's director, suggested she remove the coat, explaining that the look would be "sexier" without it. Lively took offense to the comment and appeared upset, interpreting it negatively rather than as creative direction. Feeling he had upset her, Baldoni apologized, despite having made a professional suggestion as director. Notably, in a separate text exchange, Lively herself used the word "sexy" to describe one of her character's outfits while advocating for her own wardrobe choice—an inconsistency that undermines the basis of her complaint.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18



19    70.    Lively established what language is acceptable to her and what is not, at the very outset

20  of the relationship – just 2 days into filming. To use this language herself, then, in turn, make a note

21  of each instance when her director used this same language, also to describe wardrobe and character,

22  is, at best, a double standard. To generate a list of demands that insinuate he and his business partner

23  acted inappropriately and refuse to work unless they agree not to do it again is calculating and even

24  extortionistic. But to then use Wayfarer, Baldoni, and Heath's agreement to *not* do something they

25  *already* did not do, were not doing, and had no intention of doing, as the basis to file a non-public

26  CRD Complaint against them and release it to the public herself in order to ruin their reputations, is

27  defamation. The Times was directly complicit in this.

28    71.    Lively also established very early that it was acceptable to be present while Lively was

COMPLAINT

breastfeeding. Both Heath and Baldoni have children, and are comfortable around breastfeeding mothers, and Lively seemed equally comfortable. In fact, Baldoni's wife co-founded a company that makes a breastfeeding garment, a prototype that originated with his mother when he was a baby. And as revealed in a text message exchange between Baldoni and Lively less than two weeks into filming, Lively invited Baldoni to her trailer to rehearse lines while she was pumping breast milk. Lively now alleges in the CRD Complaint that Baldoni and/or Heath would enter her makeup trailer of their own volition while she was breastfeeding. Notably, breastfeeding was an activity she often conducted openly in the presence of both Baldoni and Heath, including during production meetings.



72.     In the CRD Complaint, published in part by the Times, Lively suggests Heath walked in her trailer unannounced while "in state of undress" and topless, which is false. Heath was invited into her trailer, along with a female producer, Baldoni, and a Sony representative for a meeting requested by Lively. Mr. Heath arrived first to see if Lively was ready for the meeting, and after knocking and being invited in, saw that Lively was breastfeeding. She was not topless. She was having makeup removed from her collar bone while fully-covered.

73.     Heath asked if they should return at a later time. Lively said no, they could move forward with the meeting as initially planned and would meet them after she finished removing makeup. Roughly two weeks later Lively announced that she thought she had seen Heath make eye contact with her. Heath immediately apologized and said he hadn't even realized he looked her way, in response to which Lively remarked, *"I know you weren't trying to cop a look."* A reference to this incident conveniently showed up on a document months later, distorted like the others and out of context, in a list that the Times later published as fact.

74.     By the time Wayfarer received the "Protections for Return to Production" document, Wayfarer had invested millions of dollars, completed half the Film with Lively as the lead, and incurred substantial costs in preparation to resume production immediately following the strikes. However, instead of returning to work as anticipated, they received Lively's list of demands. In the spirit of ensuring Lively felt comfortable on set, Wayfarer promptly agreed to her terms, despite disagreeing with the insinuations underlying them. Neither Wayfarer, Heath, nor Baldoni had engaged in any of the behavior alluded to in the Return to Production document, nor did they plan to. They thought that was the end of it, and they were ready to move ahead and make a great film.

75.     It was agreed that filming would resume on January 5, 2024. On the evening of January 4, 2024, Baldoni, Heath, and producers Todd Black and Alex Saks, a representative of Sony, and the Films 1st AD were invited to Lively and Reynolds' penthouse in New York City. They arrived eager to discuss plans for the next day's filming, prepared with their production materials. Instead, they were blindsided by Lively and Reynolds, who presented a list of grievances that were both unanticipated and troubling. Reynolds launched into a tirade, berating Baldoni in what Baldoni later described as a "traumatic" encounter, stating he had "never been spoken to like that in his life."

Reynolds demanded an apology to Lively for actions that were mischaracterized and demonstrably false (see below). When Baldoni resisted apologizing for what he had not done, Reynolds became further enraged. Everyone, including the producer Lively had asked production to engage and a representative of Sony that was in attendance, left that "meeting" in shock. The producer offered that in his 40-year career he had never seen anyone speak to someone like that in a meeting, The Sony representative mentioned that she would often think of that meeting and her one regret is that she didn't stop Reynolds' berating of Baldoni.

76.    On the very first page of her CRD Complaint, Lively inaccurately claims that a list of thirty items was agreed upon during this meeting. This assertion is categorically false. The 30-point list is strategically positioned to appear as if it were a standalone written document. However, no such document was ever presented to Baldoni, the Wayfarer team, or, to their knowledge, anyone else—whether during that meeting or at any other time—and therefore, could not have been agreed to. In reality, many of these items were encountered for the first time in the CRD Complaint itself and include references to highly disturbing events that never occurred. The repeated use of the phrase "no more" before each demand falsely suggests that these alleged incidents had previously taken place and needed to cease. This implication is not only misleading but entirely untrue.

77.    Baldoni and Heath left the meeting deeply unsettled by the implications of Lively and Reynolds' behavior and the power dynamics at play. Faced with mounting pressure, and weighing the financial implications of what shutting down a film half-way through production would mean, Wayfarer made the difficult decision to resume production and finish the Film despite fears that Lively was intentionally manipulating facts for her own gain. The stakes were extraordinarily high: financiers had invested substantial resources, hundreds of cast and crew members had endured months without work due to the strikes, and nearly five years of development had gone into bringing this Film to life.

78.    Filming resumed without further grievances or references to prior disputes from Lively, a fact that Lively concedes in her CRD Complaint:

> [T]he parties agreed to implement and follow the Protections for Return to Production to ensure that the Film could be completed, marketed, and released safely and successfully. **And it was**. Production of the Film resumed on January 5, and concluded on February 9, 2024.

The Film has been a resounding success."[5]

79.    However, the lasting effects of Lively's allegations left Baldoni uneasy. He and Wayfarer continued to make considerable concessions throughout production, all in the interest of successfully delivering an outstanding film.

> ### iv. Lively takes over editing, fires the film's editor and composer, and creates her own version of the Film, at Wayfarer's expense, while the rightful director continues to edit his cut of the Film

80.    The Director's Guild of America ("DGA") mandates a 10-week "protected" period during which the director of a feature film is entitled to privately edit the film and assemble their "director's cut." This period is considered sacred, providing the director with uninterrupted time to creatively shape the final product—an opportunity to experiment, take risks, and refine until the film fully reflects their artistic vision. For Baldoni, this period represents the pinnacle of the filmmaking process: a time to immerse himself in the creative craft, free from external influences. Unfortunately, he was denied this essential experience.

81.    Lively requested to join Baldoni in the editing bay. As a seasoned professional with over twenty years of experience in the entertainment industry—and having grown up in a family deeply involved in the field—Lively was fully aware of the implications of her request. In fact, her request explicitly acknowledged that it infringed upon Baldoni's "protected period." Nonetheless, in the aftermath of the serious false allegations she had leveled against the production, Baldoni, Wayfarer, and Sony reluctantly agreed to grant her access to the editing bay for two days. Notably, despite her allegations that Baldoni made her "uncomfortable," Lively sought to spend prolonged, close time with him in the confined and collaborative space of the editing bay.

82.    What began as a two-day collaboration extended into ten days, during which Lively sought to work alone in the editing bay, without Baldoni. Despite Baldoni incorporating seven pages of her notes into his own edit at the very onset and consistently keeping her involved in every subsequent edit, Lively expressed dissatisfaction with mere collaboration, asserting that she too deserved the opportunity to see her creative vision realized. She requested exclusive time with the

---

[5] *See* CRD Complaint ¶ 5.

COMPLAINT

editors. In response, Wayfarer flew Baldoni's editor to New York to assist Lively in the process. Eventually, Lively fired the Film's editors, replacing them with her own choice—specifically, an editor often used by Reynolds. She also fired the Film's award-winning composer, replacing him with composers from Reynolds' recent project. Against repeated objections, Lively created her own cut of the Film, at Wayfarer's/Sony's expense. Sony later informed Wayfarer that Lively would not promote the Film unless her demands were met.

83.    Believing that Lively's edits would simply supplement Baldoni's work, Baldoni continued refining his director's cut. However, faced with the possibility of Lively refusing to promote the Film or approve any related marketing material (such as trailers, posters, and social media posts)—a scenario that would have catastrophic implications—Wayfarer and Baldoni felt compelled to acquiesce. This included funding a "friends and family" screening of a version of the Film they had not approved *or even seen*, entirely at Lively's insistence. Having already invested millions of dollars, along with years of time, energy, and personal sacrifice, Wayfarer and Baldoni were left with no viable alternatives.

84.    Wayfarer and Sony found themselves in an unprecedented and uncomfortable predicament: two competing versions of the Film, created by two different individuals—one of whom had no contractual or creative right to edit the Film, let alone produce their own cut. Faced with Lively's threat to withhold promotion of the Film, the studio reluctantly agreed to do an official "audience-test" of both versions, Lively's cut, and Baldoni's director's cut, once again at Wayfarer's/Sony's expense. This decision was made with the understanding that Lively had agreed with Sony that, if Baldoni's director's cut tested higher, she would drop the matter and fully cooperate and Baldoni could proceed finishing the Film without Lively's editorial interferences.

85.    Unsurprisingly, despite Baldoni's cut scoring significantly higher with audiences and the Film's target demographic, Lively reneged on her promise. She insisted that her cut be the version released to the public, even going so far as to claim that the author of the book would also refuse to promote the Film if Lively's version was not chosen. Under immense pressure, Sony and Wayfarer once again conceded.

*v. Lively demands a producer credit and an undeserved p.g.a. mark*

86.     Under the continued threat that, in spite of her contractual obligation, Lively would not promote the Film or approve marketing materials, Wayfarer agreed, at Sony's behest, to give Lively a producer credit. But her commands did not stop there.

87.     Lively later sought the coveted *p.g.a.* mark on her producer credit—a certified designation licensed by the Producers Guild of America ("PGA") to identify producers who have performed the majority of the producing functions on a motion picture. Neither Baldoni nor Wayfarer felt Lively fulfilled the requisite criteria to earn this mark.

88.     Lively demanded that Baldoni, Heath, and other producers and department heads send letters to the PGA in support of her certification for the *p.g.a.* mark. Despite unanimous recognition of the absurdity and the unsettling nature of what appeared to be an attempt at coercion, Sony and other parties ultimately acquiesced and submitted letters of support.

89.     However, because Lively did not perform the duties of a producer and, therefore, in the professional opinion of the studios, did not qualify for the p.g.a. mark—a distinction highly valued and taken seriously within the industry—Wayfarer and Baldoni refused to misrepresent her contributions to the Film. Despite having conceded on nearly every other demand to this point, they believed it unjust and unethical to falsely represent to the PGA that she had fulfilled the requisite producing responsibilities. Lively, in turn, instructed Sony to tell Wayfarer and Baldoni that "any good will left between us is done."

90.     Eventually, in the face of persistent threats levied against Wayfarer and Baldoni, they were left with little choice but to draft and sign a letter on Lively's behalf. Upon doing so, Heath provided a copy of the letter to Wayfarer's lawyers, accompanied by a statement indicating that they signed the letter under duress:

> Hi Everyone,
>
> I'm writing to you all regarding a letter that I wrote on behalf of Justin and myself addressed to the Producers Guild.
>
> As you know, we received a request to write a recommendation on behalf of Blake for her to receive the PGA mark.
> This was a request that we feel was unreasonable and cold hearted.  Essentially, the movie IEWU has been taken unjustly from Justin as a director and essentially from Wayfarer's control due to the extortion of Blake.
> Without going into all the details of the events that have transpired over the months, Justin and I ended up agreeing to write the letter due to feeling trapped.  She continues to hold a threat over our heads and every time we try and hold a line she uses that threat either directly or indirectly to get us to fold.  Make no mistake, I am not suggesting that we were literally forced to acquiesce, but given the high profile of the movie, the partnership with Sony, the amount of money invested and the need to complete the movie, we have written the letter on her behalf, omitting the truth of how and why she was able to contribute in the ways we listed.
>
> There is nothing to do with this letter now.  It only serves as a way to memorialize why the letter was sent in the first place should we ever need to explain it.
>
> Thank you!
>
> Jamey

1    91.    Lively proceeded to made good on her threat.

2    **B.    Lively's Successful Bullying Tactics Result in Baldoni's Exile from His Own Film**

3    92.    Consistent with her pattern of vindictiveness, as the premiere of the Film approached,

4    Lively instructed Sony that she and the cast would not participate in any marketing or promotion of

5    the Film alongside Baldoni. She made certain that Baldoni was removed from all artwork for the Film

6    (posters included) and stripped him of his "A Film By" credit. Furthermore, Lively and Reynolds

7    unfollowed him on social media, as did the author of the book—someone with whom Baldoni had

8    maintained a five-year personal relationship, and for whom Baldoni created this opportunity—and

9    other cast members, creating the false impression that Baldoni had done something wrong. It became

10   clear that Lively was working diligently to contrive a narrative that would explain why she took over

11   the film and exiled Baldoni. Baldoni had no intention of ever making this information public, ever.

12   He promoted the Film as originally intended, gave Lively full credit and praise, and wanted the Film

13   to succeed. He wanted to move on. Lively, however, refused to let it go.

14   93.    Baldoni later received word that, during the premiere of his movie *Deadpool &*

15   *Wolverine*, Reynolds approached Baldoni's agent at William Morris Endeavor and demanded that the

16   agent "drop" Baldoni. The wielding of power and influence became undeniable. Baldoni and

17   Wayfarer grew increasingly fearful of what Lively and Reynolds were capable of, as their actions

18   seemed aimed at destroying Baldoni's career and personal life.

19   94.    Lively systematically excluded Baldoni from all marketing and promotional efforts

20   with her and the cast for the Film. He was not invited to any cast promotional events, cast screenings,

21   premieres, photo shoots, or other cast campaigns. Baldoni was marginalized from the marketing

22   process and left in the dark about the purported "Marketing Plan" allegedly created by Lively and

23   Sony, which was later referenced in Lively's CRD Complaint as "agreed to by all".

24   95.    While in Sweden celebrating his wife's birthday, Baldoni was informed that Lively

25   demanded he not attend the Film's premiere on August 9, 2024. Lively further threatened that if

26   Baldoni attended the premiere, she and the majority of the cast would boycott. It remained unclear

27   what Lively had communicated to or promised the cast, but they now also refused to attend if Baldoni

28   was present. The fact that Sony advised Wayfarer to concede underscores Lively and Reynold's

immense power and influence.

96.    Baldoni and Wayfarer refused to succumb to the bullying tactics aimed at preventing them from attending the premiere of their Film—a project they had financed, produced, and owned. This threat marked the culmination of year-long campaign of intimidation and harassment. Although objectively egregious and shocking, the Wayfarer team had unfortunately grown accustomed to the bullying, fully aware of the immense power this couple wielded and the far-reaching extent of their influence. However, they refused to concede to this demand.

97.    Just days before the Film's premiere, Baldoni was still unsure if he would even be "allowed" to attend. His friends and family, many traveling from outside New York, were left in limbo, unable to finalize travel plans or book flights. Finally, through Sony, Wayfarer persuaded Lively to "permit" Baldoni and the Wayfarer team, along with their friends and family, to attend—though only under demeaning and humiliating conditions. They were relegated to a separate theater to view the Film, required to arrive at a different time than the rest of the cast, and instructed to leave the venue immediately after Lively arrived. Baldoni was also excluded from the official celebrity after-party, despite it being an event paid for by Wayfarer. As a result, Baldoni had to quickly organize and personally fund a separate after-party for himself and the Wayfarer team, forcing the company to cover the costs for two events—one for Lively and one for their own friends, family, crew, and team.

98.    Upon arrival, Baldoni began participating in red carpet photos and interviews. However, his efforts were abruptly cut short when it was conveyed that "Lively was on her way", and he was instructed to stop immediately. He and his family were quickly ushered away. Security personnel, acting as though there was a risk of "escape," escorted Baldoni's group to the basement of the building. There, they were confined to a makeshift area surrounded by concession stand stock, with only fold-out tables and chairs arranged in a square. Surrounded by close friends, family, soda bottles, and a lot of love, the irony of being held in a basement on what was arguably one of the most important nights of Baldoni's career thus far, was not lost on anyone. Once the main theater was deemed "clear" of Lively and her guests, Baldoni and his group were ushered into a separate theater to view the Film. At the conclusion of the screening, they were again quickly escorted by security,

out of the building to avoid even a chance of interaction with Lively and her guests. The Wayfarer after-party, held separately from the celebrity event, was a "dry" gathering, reflecting the values and themes that Wayfarer stands for. It was attended by the entire Wayfarer team from Los Angeles and their friends and family. The atmosphere and tone of the Wayfarer after-party were aligned with Baldoni's vision for the Film, focusing on celebration and gratitude.

99.    In the meantime, Baldoni was sidelined as Lively and Sony pressed forward with his original promotional strategy for the Film. This plan, outlined in his initial proposal to Sony years prior, shared with Lively, and communicated numerous times to both Sony and Lively, centered on a partnership with the organization *No More*. Founded in 2013, *No More* is a global initiative aimed at raising awareness, inspiring action, and sparking conversations to end domestic violence and sexual assault. Baldoni's collaboration with the organization began in 2022 and held deep personal significance. Staying true to his purpose for undertaking the Film, Baldoni prioritized amplifying the voices of survivors of domestic violence. His efforts reflected the heart of the Film's story and its profound impact on audiences. He returned to the core reason for embarking on the project in the first place—his initial outreach to the author of *It Ends With Us* five years earlier. Focusing on the Film's message and its potential to create positive change, Baldoni poured himself into ensuring its success despite the mounting challenges. These genuine efforts, aimed at amplifying the voices of survivors impacted by the Film, were later mischaracterized and weaponized against Baldoni. The Times, failing to do its due diligence before publishing the Article, describes these genuine efforts to bring attention to a serious issue as part of a calculated campaign to "destroy" Lively's reputation, and in doing so, participated in "destroying" *Plantiffs'* lives.

**C.  Baldoni Forced to Hire Crisis Public Relations to Combat Lively's Negative Press Push**

100.    In direct response to Lively's oppressive tactics as described herein, Wayfarer and Baldoni retained Nathan and TAG as a protective measure ahead of the Film's premiere. Contrary to the Times' portrayal, TAG's engagement focused exclusively on defensive strategy and fact verification. Though, as is standard industry practice, TAG prepared for worst-case scenarios (based on Lively and Reynolds' prior behavior), no aggressive tactics (e.g., astroturfing) were ever employed. TAG maintained this defensive position throughout its engagement, verifying facts and

correcting misinformation without retaliation—a strategy endorsed by Baldoni and Wayfarer in an effort to reprioritize the Film's significant social message.

101.    Meanwhile, Lively's publicist Sloane launched a negative press push against Baldoni. At least as early as August 1, 2024, TAG was made aware of Sloane planting an unfavorable, false, and defamatory story about Baldoni's Bahá'í faith to Page Six. Sloane proceeded to feed false stories to the Daily Mail and the New York Post containing allegations that Baldoni was a sexual predator. Sloane would also plant a false story alleging that there were "multiple" HR complaints during production. This, in addition to Sloane weaponizing Baldoni and Wayfarer hiring TAG and Nathan.




COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28





1
2
3
4
5
6
7
8
9
10
11
12



**11:33**     .ıl 5G 6G

‹    **LS**    🎥
        Leslie ›

> They're liking city

Good for you.

I know you are friends with Melissa

> Yeah we are

I am not paid to take people down. I'm honest

> She hasn't done anything literally anti-Blake

Kk

> She told me the same thing that she told you which is she said that Blake's backlash is organic

It's not. She did nothing

But help get a movie make tons of money. Justin makes tons

> Ehhhh she was kinda off promoting it as if it was Barbie... it's just based on the things that she said directly

+   iMessage     🎤

---

**11:35**     .ıl 5G 6G

‹    **LS**    🎥
        Leslie ›

It's not. She did nothing

But help get a movie make tons of money. Justin makes tons

> Ehhhh she was kinda off promoting it as if it was Barbie... it's just based on the things that she said directly

> Melissa definitely doesn't talk shit she's like you incredibly honest and fair

> She told me what she did to steer Justin away from the drama, but nothing about Blake

Not fair

> Was literally zero Blake

Got it 👍

But there are others at your paper and site

> 15,000

+   iMessage     🎤

1

2

3

4



5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21    102.    In spite of Sloane's efforts to lambast Baldoni and Nathan, it was Lively who ultimately

22    stirred up her own public ridicule. *See*, *e.g.*, Natasha Jokic, *Here's What's Going On With The 'It*

23    *Ends With Us' Drama* (Aug. 12, 2024), https://www.buzzfeed.com/natashajokic1/it-ends-with-us-

24    blake-lively-justin-baldoni; Carly Johnson and Lillian Gissen, *Blake Lively goes into damage control*

25    *FINALLY addressing the domestic violence in It Ends With Us Amid Criticism over 'tone deaf' film*

26    *promo* (Aug. 13, 2024), https://www.dailymail.co.uk/tvshowbiz/article-13740773/Blake-Lively-

27    address-domestic-violence-Ends-film.html; Lillian Gissen, *Blake Lively fans blast It Ends With Us*

28    *actress   over   'tone   deaf'   and   "shallow"   interview   with   costars*   (Aug.   12,   2024),

1   https://www.dailymail.co.uk/femail/article-13739569/blake-lively-tone-deaf-domestic-violence-
2   interview.html; Elyse Wansehl, *People Are Disgusted By Blake Lively's Cutesy Press Tour For 'It*
3   *Ends With Us'* (Aug. 14, 2024), https://www.dailymail.co.uk/femail/article-13739569/blake-lively-
4   tone-deaf-domestic-violence-interview.html; Eboni Boykin-Patterson, *Blake Lively Dragged for*
5   *Marketing Light of Domestic Violence* (Aug. 14, 2024), https://www.thedailybeast.com/blake-lively-
6   dragged-for-making-light-of-domestic-violence/; Alex Abad-Santos, *Why is everyone mad at Blake*
7   *Lively?* (Aug. 15, 2024), https://www.vox.com/culture/367451/blake-lively-it-ends-with-us-press-
8   tour-controversy; Olivia Craighead, *Fans Are Not Impressed with Blake Lively's Press Tour* (Aug.
9   15, 2024), https://www.thecut.com/article/blake-lively-it-ends-with-us-press-tour-tone-deaf.html;
10  Carolyn Gevinski, *The It Ends With Us promo has failed domestic violence survivors like me* (Aug.
11  16, 2024), https://www.glamourmagazine.co.uk/article/it-ends-with-us-domestic-abuse-first-person;
12  Angela Yang, *Blake Lively's 'It Ends With Us" promotion called 'disrespectful' by some survivors*
13  *of abuse* (Aug. 19, 2024    https://www.nbcnews.com/pop-culture/blake-lively-it-ends-with-us-
14  promotion-criticism-rcna167175; Arwa Mahdawi, *Sorry, Blake Lively: using a movie about domestic*
15  *violence to sell stuff is not a good look* (Aug. 20, 2024
16  https://www.theguardian.com/commentisfree/article/2024/aug/20/blake-lively-it-ends-with-us-
17  colleen-hoover; Hannah Holland, *'It Ends With Us' was already problematic. Blake Lively's press*
18  *tour made it worse.* (Aug. 27, 2024), https://www.thecut.com/article/blake-lively-it-ends-with-us-
19  press-tour-tone-deaf.html.

20      103.    Indeed, while Baldoni sought to focus on the Film's central premise, Lively incensed
21  audiences with seemingly flippant and tone-deaf remarks, encouraging viewers to "grab your friends"
22  and "wear your florals." Embarrassed by this self-induced backlash, Lively now seeks to vilify
23  Baldoni in a dubious attempt resuscitate her public image.

24      104.    While the *Times* thrusts allegations of an offensive smear campaign concocted by
25  Plaintiffs, the incomplete and misleading evidence supplied by Lively, and on which the Times
26  purports to rely, proffers a warped view of reality. Setting aside the unscrupulous means by which
27  the cited communications were obtained, the Times, as with Lively's CRD Complaint, deliberately
28  takes these communications out of context to bolster a fallacious narrative (designed in concert with

1  Lively) to quash Plaintiffs. When viewed in full context, these handpicked, doctored communications

2  lose their manufactured impropriety and disprove Lively's allegations:





12. Initially, Mr. Baldoni expressed concerns that TAG's written plan was insufficiently aggressive to "protect" him. Writing to Mr. Heath and Ms. Abel, he said he was "[n]ot in love with the document they sent – Not sure I'm feeling the protection I felt on the call" with Ms. Nathan and her colleagues. In response, Mr. Heath attempted to reassure Mr. Baldoni that they had found the right people for his campaign. In Mr. Heath's words, "the most important part of this is how quickly they can shut things down and place stories in your favor."







18.    The retaliation campaign relied on more than just publicists and crisis managers spinning stories.  They also retained subcontractors, including a Texas-based contractor named Jed Wallace, who weaponized a digital army around the country from New York to Los Angeles to create, seed, and promote content that appeared to be authentic on social media platforms and internet chat forums.  The Baldoni-Wayfarer team would then feed pieces of this manufactured content to unwitting members, making content go viral in order to influence public opinion and thereby cause an organic pile-on.  To safeguard against the risk of Ms. Lively ever revealing the truth about Mr. Baldoni, the Baldoni-Wayfarer team created, planted, amplified, and boosted content designed to eviscerate Ms. Lively's credibility.  They engaged in the same techniques to bolster Mr. Baldoni's credibility and suppress any negative content about him.

19.    On August 10, the day after release of the Film, Ms. Nathan's team reported that they had "started to see shift on social, due largely to Jed and his team's efforts *to shift the narrative*" against Ms. Lively.



19.    On August 10, the day after release of the Film, Ms. Nathan's team reported that they had "started to see shift on social, due largely to Jed and his team's efforts *to shift the narrative*" against Ms. Lively.

20.    That same day, Ms. Nathan noted that as part of this shift, "[t]he majority of socials are so pro Justin *and I don't even agree with half* [sic] *lol*."











COMPLAINT



105.   In the Article, the Times writes: "[Lively's] filing includes excerpts from thousands of pages of text messages and emails that she obtained through a subpoena. These and other documents were reviewed by the New York Times." However, the Times failed to review and/or investigate the plethora of communications demonstrating that Plaintiffs had zero intention of "smearing" Lively, and every intention of simply promoting the Film and its message:

Sun, Aug 11 at 6:48 AM

Justin

Good morning team, so I was thinking about the response to this weekend and I feel like what we should do is make sure to emphasize the voices of the survivors. It's gonna be a lot of buzz how much money the movie made but I want to be the one that always direct, the back to the survivors. So I would love to come up with some sort of video or carousel of messages from survivors and the response to the film.









Tue, Aug 13 at 12:53 PM

Melissa Nathan

Completely unsolicited story from tmz –
Blake has a huge ego
JB was liked by many cast and crew
And this is her ego being bruised etc



Jen Abel Old Number

The post has a similar tip

Not from any of us obv

Melissa Nathan

Totally not from us.

Jen Abel Old Number

These are clearly people on set coming out to
defend JB which is good and we just let them do
their thing

Melissa Nathan

The reporter told me her rep is working overtime

Thu, Aug 15 at 1:47 PM



COMPLAINT

1

2

3

4

5

6

7

8

9



10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

72



106.    Worse still, there are documented communications overlooked by Lively and the Times that expressly refute Lively's erroneous accusation. By way of example:



48.    Throughout filming, Mr. Baldoni and Mr. Heath invaded Ms. Lively's privacy by entering her makeup trailer uninvited while she was undressed, including when she was breastfeeding her infant child.  Ms. Lively often had to work while breastfeeding, which she felt comfortable doing so long as she was given the time and space to cover herself.  She did this frequently, because she was not given breaks to feed her baby,[9] but Ms. Lively did not expect or consent to anyone entering her private spaces while topless, exposed, and vulnerable with her newborn, or during body makeup application or removal.  Mr. Baldoni and Mr. Heath both showed a shocking lack of boundaries by invading her personal space when she was undressed and vulnerable.

107.    Though the Times admits that it had access to "thousands" of relevant text messages and emails, its skewed reporting makes painfully obvious that it failed to substantiate the false accusations hurled by Lively. Indeed, the objective evidence refutes any allegation that Plaintiffs engaged in a smear campaign to "bury" Lively and "destroy" her reputation. Lively's wound was entirely self-inflicted. That Plaintiffs retained crisis public relations to defend against Lively's unrelenting assault does not change this fact.

**D.  Stephanie Jones Discloses Confidential Communications**

108.    Curiously, neither Lively's CRD Complaint nor the Article make any mention of embattled publicist Stephanie Jones ("Jones"). Jones, former publicist to Wayfarer, now insists (as part of a separate lawsuit filed in New York) that she was swept up in Plaintiffs' so-called smear campaign. And yet, on August 14, 2024, Jones sent an email to Heath detailing her "recommended strategy":

**Flood the Zone with Positives**: We need to ensure that we promote positive narratives that media outlets cannot ignore. Currently, most stories are heavily biased towards Blake's perspective, leaving Justin unrepresented. It's crucial that we fight for every inch of every story, which requires far more effort than typical crisis PR want to put forth in our experience working with specialized crisis teams.

**Prepare Alternate Stories**: We should mobilize a robust network of supporters and third-party advocates ready to counter these narratives on deep background as well as some on the record, making it clear that the claims being made are untrue and unfounded.

Wayfarer later terminated Jones for, among other things, having allegedly leaked information to the Daily Mail despite specific instruction from Wayfarer not to.

109.    Jones is notorious for exacting her revenge on any client brave enough to escape her grasp.[6] Jones is equally notorious for her alleged maltreatment of current and former employees alike. Wayfarer and Abel are no exception.

110.    It is hardly coincidence that all of the communications on which Lively and the Times now rely were purportedly produced by Jones' company, Jonesworks, LLC, pursuant to subpoena.[7] The propriety of this alleged subpoena is unverified and, at a minimum, highly questionable given Jones' involvement and the means by which Jones first obtained these confidential communications.

111.    Abel, a former employee of Jonesworks, was forced to relinquish her electronic devices when confronted by a Jonesworks security guard and attorney upon her separation from the company, six weeks after she had put in notice and shared her plan to start her own business. Jones, on the heels of a damning Business Insider article and hemorrhaging clients, insisted that Abel turn over her electronic devices to allow Jonesworks to "delete" all confidential and proprietary information therefrom. Though Jones initially agreed to release Abel's personal cell phone number, she reneged. Four months later, Abel's text messages are now the subject of Lively's CRD Complaint and the Article. Plaintiffs are informed and believe that Jones invited the subject subpoena to circumvent her

---

[6]  *See* Katie Warrren and Jack Newsham, *Who's Afraid of Stephanie Jones* (Aug. 17, 2024), https://www.businessinsider.com/stephanie-jones-jonesworks-pr-clients-tom-brady-jeff-bezos.

[7]  Lively's CRD Complaint states that she obtained the communications set forth therein "through legal process, including a civil subpoena." Lively's legal representatives have since doubled-down: "The subpoena disclosed and referenced in the Complaint was served on Jonesworks LLC. The internal documents referred to in the Complaint were produced subject to that subpoena. We expect that further details regarding the subpoena process will be disclosed during discovery."

1   confidentiality obligations to Wayfarer and inflict the most unethical form of revenge.

2   **E.  The Times Publishes a False and Defamatory Article Based on Lively's Administrative**

3   **Complaint**

4   112.  *The New York Times* is one of the most widely read newspapers in the United States

5   and, once upon a time, served as a primary newspaper of record, publishing "all the news that's fit to

6   print." The Times was considered a paragon of journalistic integrity and excellence, the gold-standard

7   for journalism in the United States, and a highly respected new outlet internationally.

8   113.  For generations, the paper's historical influence on the socio-political and cultural life

9   of the country and its institutions could not be overstated. Americans long relied on the *Times* as a

10  source of accurate and balanced news reporting. Viewpoint-based commentary was expressly

11  excluded from news stories. Indeed, for years, Americans grew to expect that the *Times* would, as

12  legendary *Times* Executive Editor A.M. Rosenthal said, "tell it straight" or, in other words, simply

13  report the news without embellishing or driving it. For much of its storied history, whether it was the

14  civil rights movement, the Vietnam War, Watergate or other political and cultural issues, through its

15  objective, investigative reporting and the diverse views presented on its Op-Ed pages, the *Times*

16  strove to inform America through high journalistic standards, accuracy and fairness. The publication

17  has won far more Pulitzer Prizes than any other media company in U.S. history, with its first being

18  awarded more than 100 years ago.

19  114.  But over the last 20 years, *Times* reporters have ever more frequently veered

20  spectacularly from their own journalistic guidelines. As a result, it has become commonplace to find

21  *New York Times* stories containing egregious factual errors or infected with bias. Such lapses have

22  contributed to public distrust of the *Times* and a landscape where partisan actors can cry "fake news"

23  with some justification.

24  115.  But the *New York Times* still wields a powerful and influential megaphone in the media

25  and greater society. It is, therefore, under a solemn obligation to do the work necessary to get its

26  reporting right. As reporters at the *Times* well know, getting it wrong can lead to disastrous outcomes

27  for story subjects, including financial, professional, and reputational ruin. And *New York Times* sets

28  the narrative and tone for other news organizations, amplifying the impact of its mistakes.

116. The instant case is emblematic of the *Times* having "lost its way", as the facts here make plain that the *Times* failed to follow its own journalistic standards, rushed to judgment, and, with careless disregard, published a story accusing Plaintiffs of waging a "smear campaign" against Lively, causing a feeding frenzy based on a demonstrably false premise.

117. At 9:43 p.m. (EST) on December 20, 2024, Twohey requested Plaintiffs' response to its reporting regarding "a crisis communication operation, conducted on behalf of Justin Baldoni, Jamey Heath and Wayfarer Studios, to protect their reputations and harm Blake Lively's, as described in a legal complaint filed today." Twohey wrote, in part: "We are seeking your response to the claims of retaliation through this P.R. campaign, and we would welcome the opportunity to talk with you on the record. Please offer any on-the-record comment, as well as any other information you think we should know. Additionally, please notify us of any inaccuracies. **We need to hear back from you tomorrow by noon Eastern**."

118. At 2:16 a.m. (EST), Plaintiffs' legal representatives responded as follows:

> It is shameful that Ms. Lively and her representatives would make such serious and categorically false accusations against Mr. Baldoni, Wayfarer Studios and its representatives, as yet another desperate attempt to 'fix' her negative reputation which was garnered from her own remarks and actions during the campaign for the film; interviews and press activities that were observed publicly, in real time and unedited, which allowed for the internet to generate their own views and opinions. These claims are completely false, outrageous and intentionally salacious with an intent to publicly hurt and rehash a narrative in the media. Wayfarer Studios made the decision to proactively hire a crisis manager prior to the marketing campaign of the film, to work alongside their own representative with Jonesworks employed by Stephanie Jones, due to the multiple demands and threats made by Ms. Lively during production which included her threatening to not showing up to set, threatening to not promote the film, ultimately leading to its demise during release, if her demands were not met. It was also discovered that Ms. Lively enlisted her own representative, Leslie Sloan with Vision PR, who also represents Mr. Reynolds, to plant negative and completely fabricated and false stories with media, even prior to any marketing had commenced for the film, which was another reason why Wayfarer Studios made the decision to hire a crisis professional to commence internal scenario planning in the case they needed to address. The representatives of Wayfarer Studios still did nothing proactive nor retaliated, and only responded to incoming media inquiries to ensure balanced and factual reporting and monitored social activity. What is pointedly missing from the cherry-picked correspondence is the evidence that there were no proactive measures taken with media or otherwise; just internal scenario planning and private correspondence to strategize which is standard operating procedure with public relations professionals.

119.    At 10:11 a.m. (EST) on December 21, 2024, the Times published the Article. Notwithstanding that the Times was made aware of the egregiously defamatory allegations contained therein, it proceeded with publication without further inquiry. Indeed, in its rush to publish a one-sided, unsubstantiated story on behalf of Lively, the Times got it dramatically wrong. The aftershocks have been disastrous for Plaintiffs, and they now, reluctantly and knowing the damage cannot be fully undone, bring suit to hold the Times accountable for its egregious misfire.

**FIRST CAUSE OF ACTION**
**LIBEL**
**(Plaintiffs Against All Defendants)**

120.    Plaintiffs incorporate by reference each and every allegation set forth in Paragraphs 1 through 119, inclusive, as if set forth fully herein.

121.    As alleged herein, on December 21, 2024, the Times published the Article.

122.    The Article purported to detail a "campaign" allegedly orchestrated by Plaintiffs to "tarnish" Lively. It did so chiefly through the selective disclosure of private communications allegedly exchanged between Plaintiffs.

123.    Persons who read the Article reasonably understood the references to Baldoni, Heath, Sarowitz, Abel, Nathan, and Wallace, and their respective companies, to be references to Plaintiffs herein.

124.    The Article contains fabricated, false, malicious, and defamatory statements of fact concerning Plaintiffs.

125.    The Article is libelous on its face and exposes Plaintiffs to hatred, contempt, ridicule, and obloquy, causes Plaintiffs to be shunned or avoided, and has a tendency to injure them in their occupation. Specifically, the Article falsely attributes negative public sentiment towards Lively to a malicious pre-meditated affirmative smear campaign orchestrated by Plaintiffs and not to Lively's long-standing reputational challenges and the whims of a fickle and sometimes cruel online public.

126.    The Article advances its false narrative by cherry-picking out-of-context (and in some cases doctored) private communications never intended for public disclosure or consumption to advance a highly inflammatory, one-sided narrative plainly designed to villainize Plaintiffs, manufacture an impression of impropriety where none exists, and grossly exaggerate Plaintiffs'

control over online public opinion or the tone and tenor of press coverage, particularly with respect to an enormously well-resourced A-list actress with her own pit bull press team.

127.    The Article also falsely portrays Plaintiffs as motivated to harm Lively. As the unlawfully obtained communications demonstrate, however, that is flatly false. Plaintiffs' motivations were defensive in nature and driven by the (valid) concern that Lively's team had been seeding stories critical of Baldoni and Wayfarer. The Times, without elaboration, dismisses this concern as baseless, treating Plaintiffs' candid private discussions, which were never intended to see the light of day, as if it were a press release. In fact, as the Times should know from the voluminous confidential communications it apparently has obtained, Plaintiffs' concerns were not baseless.

128.    Plaintiffs are informed and believe, and based thereon allege, that Defendants, and each of them, portrayed Plaintiffs in this manner knowing that the portrayal was false or with reckless disregard for its truth or falsity. This is apparent because, per the Article, the Times reviewed, among other documents, "thousands of pages of text messages and emails[.]" Defendants, therefore, had access to documents and communications sufficient to refute its portrayal of Plaintiffs.

129.    Indeed, the totality of the communications obtained and reviewed by the Times, when not spliced dishonestly, cherry-picked, and stripped of critical context, refute the Article's premise that Plaintiffs were responsible for negative public sentiment towards Lively and the implication throughout that Plaintiffs were motivated to harm Lively and engaged in unethical behavior to do so. Defendants knew that their portrayal of Plaintiffs was false, incomplete, misleading, and highly inflammatory.

130.    The actual malice of Defendants, and each of them, is evident from their deliberate decision to publish the Article without having (i) afforded Plaintiffs a meaningful opportunity to respond, (ii) verified the authenticity, accuracy, and completeness of the communications relied upon, or (iii) ensured even a modicum of impartiality, skepticism, or even-handedness when covering highly inflammatory allegations they knew could destroy the reputation and careers of Plaintiffs.

131.    As a direct and proximate result of the above-described by Defendants, and each of them, Plaintiffs have suffered general and special damages in an amount of not less than $250 million, including damage to Plaintiffs' reputations and standing in the community, shame, mortification, hurt

feelings, embarrassment, humiliation, damage to peace of mind, emotional distress, and injury in their occupations. Although the full nature, extent, and amount of these damages are currently unknown, this Complaint will be amended at or before trial to insert such information if such amendment is deemed necessary by the Court.

132.    Plaintiffs are informed and believe, and based thereon allege, that the conduct of Defendants, and each of them, was malicious as that term is defined in California Civil Code Section 3294, as follows:

        a.  Plaintiffs are informed and believe, and based thereon allege, that Defendants, and each of them, depicted Plaintiffs in a defamatory manner in conscious disregard of Plaintiffs' legal rights;

        b.  Plaintiffs are informed and believe, and based thereon allege, that Defendants, and each of them, intended to injure Plaintiffs by the defamatory statements in the Article.

133.    Defendants' conduct warrants an award of punitive and exemplary damages against each of the Defendants.

## SECOND CAUSE OF ACTION
## FALSE LIGHT INVASION OF PRIVACY
### (Plaintiffs Against All Defendants)

134.    Plaintiffs incorporate by reference each and every allegation set forth in Paragraphs 1 through 133, inclusive, as if set forth fully herein.

135.    As alleged herein, Defendants, and each of them, published false statements of and concerning Plaintiffs. To the extent the trier of fact finds that these statements are not defamatory, Plaintiffs are informed and believe, and based thereon allege, that Defendants, and each of them, intended them to depict Plaintiffs in a false, fictionalized, and sensationalized light in order to catalyze public opprobrium towards Plaintiffs, stir public discussion of the Article, and draw readers to the Times.

136.    The Article, as noted above, falsely portrays negative public sentiment towards Lively as the result of a pre-meditated smear campaign orchestrated by Plaintiffs, intentionally exaggerating Plaintiffs' power to manipulate public sentiment, mischaracterizing Plaintiffs' stated motivations and cherry-picking out-of-context, incomplete, and sometimes doctored private communications. As a

result of these deliberate choices, which seem transparently intended to elevate Lively and restore her reputation rather than accurately portray the events described therein, millions of readers, as well as the broader public, were exposed to a deeply misleading, unfair, and untrue picture of Plaintiffs. Among other things, the Article portrays Plaintiffs as having waged an affirmative campaign to harm Lively through planted news stories and the exploitation of bots to shape social media discourse. In fact, as alleged herein and evident in the communications reviewed by the Times, Plaintiffs' aims were purely defensive, not offensive, and they were themselves taken aback by the groundswell of public support for Baldoni, which was organic. Notwithstanding the supposition throughout the Article, Plaintiffs do not control the viewpoints of the online public and were not motivated to harm Lively's reputation. They were concerned, above all, with the protection of Baldoni and Wayfarer.

137.    The Article, therefore, portrayed Plaintiffs in a false light, and the false light created by the Article is highly offensive to reasonable people in Plaintiffs' position.

138.    Plaintiffs are informed and believe, and based thereon allege, that Defendants, and each of them, portrayed Plaintiffs in a false light, knowing that the portrayal was false or with reckless disregard for its truth or falsity. This is evident from Defendants', and each of their, possession of private communications directly refuting and contradicting the portrayal of Plaintiffs and the central premise of the Article, namely that Plaintiffs had orchestrated a smear campaign to harm Lively.

139.    In addition, Defendants, and each of them, willfully refused to afford Plaintiffs meaningful opportunity to respond to the allegations. Defendants contacted Plaintiffs concerning the allegations the evening of Friday, December 20, 2024, providing them until the following morning to respond to extensive, highly inflammatory allegations based on curiously obtained, cherry-picked private communications of uncertain authenticity or accuracy. Thereafter, Defendants, and each of them, published the Article two hours before their stated deadline, cutting off Plaintiffs' ability to respond before the inevitable feeding frenzy began.

140.    As a direct and proximate result of the above-described conduct by Defendants, and each of them, Plaintiffs have suffered general and special damages in an amount of not less than $250 million, including damage to Plaintiffs' reputations and standing in the community, shame, mortification, hurt feelings, embarrassment, humiliation, damage to peace of mind, emotional distress,

and injury in their occupations. Although the full nature, extent, and amount of these damages are currently unknown, this Complaint will be amended at or before trial to insert such information if such amendment is deemed necessary by the Court.

141.    Plaintiffs are informed and believe, and based thereon allege, that the conduct of Defendants, and each of them, was malicious as that term is defined in California Civil Code Section 3294, as follows:

      a.    Plaintiffs are informed and believe, and based thereon allege, that Defendants, and each of them, depicted Plaintiffs in a defamatory manner in conscious disregard of Plaintiffs' legal rights;

      b.    Plaintiffs are informed and believe, and based thereon allege, that Defendants, and each of them, intended to injure Plaintiffs by the defamatory statements in the Article.

142.    Defendants' conduct, therefore, warrants an award of punitive and exemplary damages against each of the Defendants.

### THIRD CAUSE OF ACTION
### PROMISSORY FRAUD
### (Plaintiffs Against All Defendants)

143.    Plaintiffs incorporate by reference each and every allegation set forth in Paragraphs 1 through 142, inclusive, as if set forth fully herein.

144.    On or about Friday, December 20, 2024, at approximately 9:45 p.m. (EST), Twohey of the Times emailed Plaintiffs concerning the forthcoming publication of the Article. Towhey laid out a series of highly inflammatory allegations involving Plaintiffs purportedly derived from a review of their private communications that the Times had taken possession of.

145.    The Times offered Plaintiffs until noon (EST) the following day to respond to the allegations, provide additional relevant information, and correct inaccuracies.

146.    Plaintiffs are informed and believe, and based thereon allege, that the Times had been coordinating with Lively and/or her team to align the publication of the Article with the filing of Lively's CRD Complaint, a document that was not publicly available and had to have been provided to Defendants by Lively and/or her team.

147.    Although Plaintiffs strongly believed that the Times had not afforded them remotely

enough time to meaningfully respond to the allegations, correct inaccuracies, or even verify the authenticity of their unlawfully obtained private communications, they fully intended to make use of that brief window to correct the record as best they could. Plaintiffs justifiably relied on the express representation of Defendants, and each of them, that Plaintiffs had until noon (EST) on December 21, 2024, to do so.

148.    However, the Times published the Article without warning at 10:11 a.m. (EST), cutting off Plaintiffs' ability to do so and catalyzing a feeding frenzy.

149.    Plaintiffs are informed and believe, and based thereon allege, that Defendants, and each of them, reached out to Plaintiffs to pay lip service to journalistic ethics and fundamental fairness and never intended—or wanted—for Plaintiffs to respond.

150.    Plaintiffs are informed and believe, and based thereon allege, that Defendants, and each of them, intended for Plaintiffs to rely on their false promise, which Plaintiffs did, in fact, do to their detriment.

151.    As a direct and proximate result of the above-described conduct of Defendants, and each of them, Plaintiffs have been harmed in an amount to be proven at trial.

**FOURTH CAUSE OF ACTION**
**BREACH OF IMPLIED IN FACT CONTRACT**
**(Plaintiffs Against All Defendants)**

152.    Plaintiffs incorporate by reference each and every allegation set forth in Paragraphs 1 through 151, inclusive, as if set forth fully herein.

153.    As alleged herein, on or about Friday, December 20, 2024, at approximately 9:45 p.m. (EST), Twohey of the Times emailed Plaintiffs concerning the forthcoming publication of the Article. Twohey laid out a series of highly inflammatory allegations involving Plaintiffs purportedly derived from a review of their private communications that the Times had taken possession of.

154.    Through their express written words, Defendants offered Plaintiffs until noon (EST) the next morning to respond to the allegations, provide additional relevant information, and correct inaccuracies.

155.    Plaintiffs accepted Defendants' offer, which created an implied-in-fact contract between the parties whereby the Times would refrain from publication for a brief period in exchange

84

COMPLAINT

for a substantive response to the allegations, additional relevant information, and confirmation of the authenticity, accuracy, and completeness of the relied upon communications.

156.    Plaintiffs performed in accordance with this mutual understanding.

157.    Defendants breached the implied-in-fact contract by publishing the Article at 10:11 a.m. (EST), in direct violation of their express representation to Plaintiffs.

158.    As a direct and proximate result of Defendants' foregoing breach, Plaintiffs were deprived of the benefits of the bargain in that they lost the opportunity to meaningfully assess and respond to a false, misleading, extremely inflammatory portrayal of their actions and character.

159.    As a direct and proximate thereof, Plaintiffs suffered harm an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1.    For general and special damages in an amount according to proof;

2.    For all statutory penalties authorized by law;

3.    For punitive and/or exemplary damages, in an amount sufficient to punish Defendants for the wrongful conduct alleged herein and to deter such conduct in the future;

4.    For liquidated damages;

5.    For costs of suit incurred herein;

6.    For attorneys' fees as permitted by law or contract;

7.    For prejudgment interest;

8.    For such other relief as the Court may deem proper.

Dated: December 31, 2024                LINER FREEDMAN TAITELMAN + COOLEY, LLP

By: _____
Bryan J. Freedman, Esq.
Miles M. Cooley, Esq.
Summer E. Benson, Esq.
Jason H. Sunshine, Esq.

COMPLAINT

Attorneys for Plaintiffs,

Wayfarer Studios, LLC; Justin Baldoni; Jamey Heath; Steve Sarowitz; Melissa Nathan; The Agency Group PR LLC; Jennifer Abel; RWA Communications, LLC; Jed Wallace; and Street Relations Inc.

COMPLAINT

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.

Dated: December 31, 2024                    LINER FREEDMAN TAITELMAN + COOLEY, LLP

By: _____
　　　Bryan J. Freedman, Esq.
　　　Miles M. Cooley, Esq.
　　　Summer E. Benson, Esq.
　　　Jason H. Sunshine, Esq.

　　　Attorneys for Plaintiffs,

　　　Wayfarer Studios, LLC; Justin Baldoni;
　　　Jamey Heath; Steve Sarowitz; Melissa
　　　Nathan; The Agency Group PR LLC;
　　　Jennifer Abel; RWA Communications,
　　　LLC; Jed Wallace; and Street Relations
　　　Inc.