# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                                                  :
BLAKE LIVELY,                                                     :
                                                                  :
                                    Plaintiff,                    :          24-cv-10049 (Lead Case);
                                                                  :          25-cv-449 (Member Case)
            -v-                                                   :
                                                                  :          OPINION AND ORDER
WAYFARER STUDIOS LLC, JUSTIN BALDONI,                            :
JAMEY HEATH, STEVE SAROWITZ, IT ENDS WITH                        :
US MOVIE LLC, MELISSA NATHAN, THE AGENCY                         :
GROUP PR LLC, JENNIFER ABEL, JED WALLACE,                        :
STREET RELATIONS INC.,                                           :
                                                                  :
                                    Defendants.                   :
                                                                  :
------------------------------------------------------------------X
                                                                  :
WAYFARER STUDIOS LLC, JUSTIN BALDONI,                            :
JAMEY HEATH, IT ENDS WITH US MOVIE LLC,                          :
MELISSA NATHAN, JENNIFER ABEL, STEVE                             :
SAROWITZ,                                                         :
                                                                  :
                                    Plaintiffs,                   :
                                                                  :
            -v-                                                   :
                                                                  :
BLAKE LIVELY, RYAN REYNOLDS, LESLIE                              :
SLOANE, VISION PR, INC., THE NEW YORK TIMES                      :
COMPANY,                                                          :
                                                                  :
                                    Defendants.                   :
                                                                  :
------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

        Consolidated Defendants Blake Lively ("Lively"), Ryan Reynolds ("Reynolds"), Leslie

Sloane ("Sloane"), Vision PR, Inc. ("Vision PR," and together with Sloane the "Sloane Parties"

or "Sloane"[1]), and The New York Times Company (the "New York Times" or "Times," and

------------------------
[1] The Amended Complaint make no allegations against Vision PR, Inc. other than that it is a

together with Lively, Reynolds, and the Sloane Parties, "Defendants"), each move to dismiss the

Amended Complaint of Wayfarer Studios LLC ("Wayfarer"), Justin Baldoni ("Baldoni"), Jamey

Heath ("Heath"), It Ends With Us Movie LLC, Melissa Nathan ("Nathan"), Jennifer Abel

("Abel,"), and Steve Sarowitz ("Sarowitz," and collectively with Wayfarer, Baldoni, Heath, It

Ends With Us Movie LLC, Nathan, and Abel, the "Wayfarer Parties") pursuant to Federal Rule

of Civil Procedure 12(b)(6).  Dkt. Nos. 86, 105, 132, 144.[2]

Reynolds, Sloane, and Vision PR additionally move for an award of attorney's fees and

costs pursuant to New York's anti-SLAPP law, New York Civil Rights Law § 70-a.  Dkt.

Nos. 86, 132.  Lively moves for an award of attorney's fees, treble damages, and punitive

damages pursuant to California Civil Code § 47.1.  Dkt. No. 144.

Finally, Lively, Sloane, and Reynolds move to strike Exhibit A to the Amended

Complaint pursuant to Federal Rule of Civil Procedure 12(f).  Dkt. Nos. 86, 132, 144.

For the following reasons, the motions to dismiss are granted.  The motion to strike is

denied, but the Court will disregard Exhibit A to the Amended Complaint for purposes of this

motion.  The motions for fees are denied without prejudice to renewal.

## BACKGROUND

The Wayfarer Parties' Amended Complaint contains allegations regarding a dispute

between two well-known actors over the making of a Hollywood motion picture.  Virtually every

fact is hotly contested.  For purposes of this motion, the Court accepts as true the well-pleaded

allegations of the Wayfarer Parties' Amended Complaint.  *See Swierkiewicz v. Sorema N. A.*, 534

U.S. 506, 508, n.1 (2002).  Accordingly, the narrative set out below "do[es] not reflect the

New York corporation affiliated with Sloane.  Dkt. No. 50 ¶¶ 282, 310.  Accordingly, this
opinion uses "Sloane" to refer to Sloane and Vision PR together.
[2] Sloane and Vision PR submit a joint motion.  Dkt. No. 86.  Each other defendant moves
separately.  Dkt. Nos. 105, 132, 144.

Court's own findings" but simply repeats the account of events stated by the Wayfarer Parties in their Amended Complaint. *Brown v. Maxwell*, 929 F.3d 41, 52 (2d Cir. 2019). At this stage of proceedings, the Court has not considered whether the allegations in the Amended Complaint are true.[3]

In addition to the allegations in the Amended Complaint, the Court has considered several documents which are deemed to be part of the Amended Complaint as a matter of law. A complaint is "deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." *Sierra Club v. Con-Strux, LLC*, 911 F.3d 85, 88 (2d Cir. 2018) (quoting *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011)). If a complaint makes "clear, definite, and substantial" reference to a document, for example by quoting from it extensively, the entire document is deemed to be part of the complaint. *Trump v. Vance*, 977 F.3d 198, 210 n.8 (2d Cir. 2020)); *see Geiger v. Town of Greece*, 311 F. App'x 413, 416 (2d Cir. 2009) ("Geiger's amended complaint quoted extensively from the Assurance, thereby incorporating it into the pleading."). Relatedly, if the complaint "relies heavily on [the] terms and effect," of a document, but for some reason does not include the entire document, the Court may consider the entire document as part of the complaint. *Searle v. Red Creek Cent. Sch. Dist.*, 2023 WL 3398137, at *2 (2d Cir. May 12, 2023) (quoting *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016)). The purpose of this rule is to prevent a complaint from surviving simply because a clever plaintiff included certain parts of a key document and left out others.

---

[3] The Second Circuit has cautioned the press to understand court documents "for what they are," including by distinguishing between facts which are found by a court to be true and allegations which "are prepared by parties seeking to advance their own interests in an adversarial process." *Brown*, 929 F.3d at 52.

*See Guzman v. Bldg. Serv. 32BJ Pension Fund*, 2023 WL 2526093, at *6 (S.D.N.Y. Mar. 15, 2023) ("The purpose of the rule is to prevent complaints from being invulnerable at the motion to dismiss stage purely 'by clever drafting.'" (*quoting Glob. Network Comm'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006))).

Under this standard, the Amended Complaint is deemed to include the New York Times article that is the subject of the Wayfarer Parties' defamation claims (the "Article"), Dkt. No. 107-1, the accompanying video (the "Video"), Dkt. No. 107-2, Lively's California Civil Rights Department ("CRD") complaint, Dkt. Nos. 107-3–107-7, a list of seventeen protections demanded by Lively to return to production in November 2023, Dkt. No. 84-1,[4] and emails between the New York Times and the Wayfarer Parties, Dkt. Nos. 107-7–107-12. Each of these documents is extensively quoted and discussed in the amended complaint. *See* Dkt. No. 50 ¶¶ 36, 131–132, 163, 262, 275, 278, 285 (CRD complaint); *id.* ¶¶ 75–122 (return to production demands); *id.* ¶¶ 262–263, 270, 274–276, 278, 282 (Article); *id.* ¶¶ 266–267 (Video); *id.* ¶¶ 257–258, 376–379, 385–389 (Times emails). The complaint also "relies heavily on [the] terms and effect" of each document, either because it alleges the terms are defamatory or because it alleges they constitute a contract. *Searle*, 2023 WL 3398137, at *2 (quoting *Nicosia*, 834 F.3d at 230); *see Glob. Network Comm'ns*, 458 F.3d at 157 ("In most instances where this exception is recognized, the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls."); *Bongiorno v. Baquet*, 2021 WL 4311169,

---

[4] This document is also in the record as part of Exhibit A to the Wayfarer Parties' complaint, Dkt. No. 50-1 at 52. The list of protections in Exhibit A of the Wayfarer Parties' complaint is identical to the list at Dkt. No. 84-1.

at *10 (S.D.N.Y. Sept. 20, 2021) ("[T]his principle applies to documents alleged to contain the false and misleading statement.").[5]

In determining whether the Wayfarer Parties have stated a claim for relief, the Court does not consider Exhibit A to the Wayfarer Parties' Amended Complaint. Dkt. No. 50-1. Under the Federal Rules of Civil Procedure, a "[d]efendant is entitled to know the allegations against it, and to have those allegations framed in separate paragraphs, with sufficient clarity to allow the defendant to frame a responsive pleading." *In re Turquoise Hill Res. Ltd.*, 2024 WL 4711185, at *11 (S.D.N.Y. Nov. 7, 2024) (quoting *Ahmad v. Experian Info. Sols., Inc.*, 2023 WL 8650192, at *5 (S.D.N.Y. Dec. 14, 2023)); *see Smith v. Hogan*, 794 F.3d 249, 255 (2d Cir. 2015) (refusing to consider an "affidavit, buried in 170 pages of exhibits" attached to the complaint because it "would do considerable damage to Rule 8(a)'s notice requirement"); Fed. R. Civ. P. 10(b) ("A party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances."). The body of the Wayfarer Parties' Amended Complaint is 224 pages long. Dkt. No. 50. Exhibit A is a "timeline" providing "a summarized account of the sequence of key events" which is an additional 168 pages long. Dkt. No. 50-1. It is significantly but not entirely repetitive of the Amended Complaint, and it does not set out its claims in numbered paragraphs as required by Federal Rule of Civil Procedure 10. *Id.*; *see* Fed. R. Civ. P. 10(b). The document is not a written instrument that "evidences legal rights or duties" or

---

[5] The Wayfarer Parties do not object to consideration of the Article, the Video, the CRD complaint, or the return to production demands, but they do object to consideration of the emails between the Times and the Wayfarer Parties. Dkt. No. 137 at 24 & n.27. This objection is unavailing, because the Wayfarer Parties plead in their complaint that "the[] express written words" of the emails "created an implied-in-fact contract," which the Wayfarer Parties accepted and the Times then breached. Dkt. No. 50 ¶¶ 386–389. The emails therefore show the terms of the purported contract and are necessarily integral to the breach-of-contract claim. *See Glob. Network Comm'ns*, 458 F.3d at 157; *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *Nicosia*, 834 F.3d at 234; *Guzman*, 2023 WL 2526093, at *7.

otherwise forms the basis for the Wayfarer Parties' claims, but is simply an additional "narrative summary." *Smith*, 794 F.3d at 254. "If such a[] [document] could be deemed part of a complaint, then Rule 8(a)'s requirement of a short and plain statement of a claim for which relief could be granted would be eviscerated." *Id.* at 255. If the Wayfarer Parties wanted any factual statements in the "timeline" to be considered, they should have alleged them in the Amended Complaint.[6]

## I.        The Parties

Justin Baldoni is an individual residing in Los Angeles, California. Dkt. No. 50 ¶ 301. Baldoni co-founded Wayfarer Studios LLC ("Wayfarer") in 2019 to be a studio that would produce "world-class entertainment driven by a powerful vision for change." *Id.* ¶ 20. Wayfarer

---

[6] At this time, the Court will not grant the motions to strike Exhibit A from the docket. Federal Rule of Civil Procedure 12(f) authorizes courts to strike "any redundant, immaterial, impertinent or scandalous matter" from a pleading. Fed. R. Civ. P. 12(f). Exhibit A is largely redundant of the Amended Complaint and, given that it must be disregarded, is immaterial to the Court's decision on the motion to dismiss. But the fact that material is irrelevant or must be disregarded generally does not justify striking it from the docket, unless "permit[ting] the allegations to stand would result in prejudice to the movant." *Bartlett v. Societe Generale De Banque Au Liban SAL*, 2021 WL 8155950, at *1 (E.D.N.Y. Aug. 5, 2021) (quoting *Roe v. City of New York*, 151 F. Supp. 2d 495, 510 (S.D.N.Y. 2001)). None of the Defendants have identified any particular prejudice caused by Exhibit A, a document which is no more scandalous than the Amended Complaint. *See* Dkt. No. 87 at 23–25 (arguing only that Exhibit A is irrelevant); Dkt. No. 106 at 1 n.1; Dkt. No. 133 at 29; Dkt. No. 145 at 11 n.14; *see also Lipsky v. Commonwealth United Corp.* 551 F.2d 887, 893 (2d Cir. 1976) ("[C]ourts should not tamper with the pleadings unless there is strong reason for doing so."). At the conference on February 3, 2025, counsel for Lively and Reynolds expressed some concern about the use of the attachment on a website created by defense counsel and stated they would move "promptly" to strike the exhibit. Dkt. No. 63 at 38:7–20. But the earliest motion to strike was made by Sloane on February 20, Dkt. No. 86, Reynolds and Lively did not move until March 18 and 20, Dkt. Nos. 132, 144. More importantly, none of the motions mentioned anything about improper or prejudicial use of Exhibit A. "Motions to strike are generally disfavored, and should be granted only when there is a strong reason for doing so." *Dolan v. Fairbanks Cap. Corp., 2008 WL 4515932*, at *1 (E.D.N.Y. Sep. 30, 2008). Absent prejudice or impropriety there is no strong reason to strike the document, as opposed to simply disregarding it.

is a Delaware limited liability company with its principal place of business in Los Angeles, California. *Id.* ¶ 300. All of Wayfarer's members are citizens of California. *Id.*

Wayfarer produced and co-financed the film *It Ends With Us*. *Id.* ¶ 6. Baldoni directed the film and played the lead role of Ryle. *Id.* ¶¶ 6, 89.

It Ends With Us Movie LLC is a California limited liability company with its principal place of business in California. *Id.* ¶ 303. All members of the LLC are citizens of California. *Id.*

Jamey Heath is an individual residing in Los Angeles, California. *Id.* ¶ 302. He is the CEO of Wayfarer Studios and a producer of *It Ends With Us*. *Id.* ¶ 157.

Steve Sarowitz is an individual residing in the County of Lake, Illinois. *Id.* ¶ 306.

Jennifer Abel is an individual residing in Los Angeles, California. *Id.* ¶ 305. She managed the Baldoni/Wayfarer account at Wayfarer's public relations firm, Jonesworks. *Id.* ¶¶ 196–197.

Melissa Nathan is an individual residing in Los Angeles, California. *Id.* ¶ 305. She is a crisis public relations ("PR") specialist and was engaged by Wayfarer in approximately August 2024. *Id.* ¶ 227.

Blake Lively is an individual residing in New York, New York. *Id.* ¶ 307. She played the lead role of Lily Bloom ("Lily") in *It Ends With Us*. *Id.* ¶ 27.

Ryan Reynolds is an individual residing in New York, New York. *Id.* ¶ 308. Reynolds is married to Lively and is a well-known actor. *Id.* ¶ 176.

Leslie Sloane is an individual residing in New York, New York. *Id.* ¶ 309. She is Lively's publicist. *Id.* ¶ 14. Sloane is affiliated with Vision PR, a New York corporation with its principal place of business in New York, New York. *Id.* ¶¶ 282, 310.

The New York Times Company is a New York corporation with its principal place of business in New York, New York.  *Id.* ¶ 311.

## II.    *It Ends With Us*

The book *It Ends With Us* is a romance novel by Colleen Hoover ("Hoover") published in 2016.  *Id.* ¶ 22.  The book explores themes of domestic violence and generational patterns of abuse.  *Id.*  Baldoni was moved by the book and wanted to make it into a film.  *Id.* ¶¶ 21, 23.  In early 2019, he emailed Hoover complimenting the book's realistic depiction of a difficult subject matter, stating that it could "change (and save) lives" and "have a huge impact," and asked to option it for production as a film.  *Id.* ¶ 23.  Hoover believed Baldoni was the right person for the project because she appreciated his film *Five Feet Apart*, which told the story of a woman with cystic fibrosis.  *Id.* ¶¶ 21, 23.  She emailed Baldoni that "[y]ou 'get'" the book, stating that "[m]y big fear is that I'll option it to someone who thinks it's a hot romance and they'll take it in the absolute wrong direction."  *Id.* ¶ 23.  Hoover also suggested that Baldoni portray one of the lead characters, Ryle.  *Id.* ¶ 23.

Wayfarer acquired the film rights to *It Ends With Us* in 2019.  *Id.* ¶ 22.  Wayfarer partnered with Sony to co-finance and distribute the film.  *Id.* ¶ 24.  As part of the deal, Baldoni insisted that 1% of the film's proceeds be donated in support of survivors of domestic abuse.  *Id.*

On or around December 31, 2022, Lively agreed to take the lead role of Lily Bloom in the adaptation of *It Ends With Us*.  *Id.* ¶ 27.  Lively was granted an executive producer credit.  *Id.*  In the film, Lively's character Lily is romantically involved with Baldoni's character Ryle.  *Id.* ¶¶ 39, 89, 100.

## III.    **Early Production of the Film**

Production of the film occurred in two parts.  Initial production occurred in approximately May–June of 2023, at which point filming was disrupted by the Writers Guild of

America ("WGA") and Screen Actors Guild ("SAG-AFTRA") strikes. *Id.* ¶¶ 27–65; *see id.*
¶¶ 79–121 (further describing events during this period). The strikes ended in September and
November 2023, respectively, and the second stage of filming occurred in January–February
2024. *Id.* ¶¶ 73, 132. The film premiered on August 6, 2024. *Id.* ¶ 166.

### A.    Pre-Production

The parties took a number of steps in early 2023 to prepare for the filming of *It Ends
With Us*. Beginning around February 2023, Baldoni and Lively worked with trainers to
physically prepare for their roles. *Id.* ¶¶ 47–50. Lively introduced Baldoni to the personal
trainer he worked with for the film. *Id.* ¶ 47. On February 17, 2023, Lively texted Baldoni
expressing a desire to do body scenes at the end of the schedule. *Id.* ¶ 50. Baldoni responded
that she would look amazing, that she should not stress about her body, and that they would talk
through anything she was insecure about. *Id.* Lively responded stating that she would work
extremely hard and make sure to be in shape, even though she just had her fourth baby, and that
Baldoni's support in this area was critical and appreciated. *Id.*

In early April 2023, Baldoni hired an intimacy coordinator to work on the film. *Id.* ¶ 79.
Although an intimacy coordinator is not required by SAG-AFTRA, Baldoni was eager to engage
one to ensure that he and others felt safe during intimate scenes. *Id.* ¶ 80. It was important to
him that the intimacy coordinator be female to help craft sex scenes that would appeal to the
mostly-female audience of the book. *Id.* Baldoni attempted to set up a meeting between the
intimacy coordinator and Lively, but Lively declined, saying she would meet the coordinator
"when we start." *Id.* ¶ 85. Baldoni met with the intimacy coordinator alone and then later
relayed plans for the sex scenes to Lively at meetings which Lively insisted occur at her home,
often while her husband was present. *Id.* Although Lively later accused Baldoni of personally
adding "graphic content" and insisting she do "uncomfortable" or "gratuitous" scenes, including

a scene in which Lively would orgasm on camera, the scenes were in fact proposed by the intimacy coordinator.  *Id.* ¶¶ 87–88.

       At some point during pre-production, Lively asked Baldoni if she could "take a pass" at writing the rooftop scene in *It Ends With Us* in which Lily and Ryle first meet. *Id.* ¶ 39.  Lively sent Baldoni a draft that differed dramatically from what was originally written.  *Id.* ¶ 40. Baldoni thanked Lively for her passion and told her the scene would likely end up being somewhere between the original version and the version she submitted.  *Id.*  Lively told Baldoni to come to her apartment, where Reynolds and a famous friend of Lively's enthusiastically praised Lively's script.  *Id.* ¶ 41.  On April 14, 2023, Baldoni texted Lively that her writing made the scene "more fun and interesting" and he "would have felt that way without Ryan and Taylor."  *Id.* ¶ 42.   Lively responded with thanks and encouragement, stated that it "didn't feel great" when he originally praised only her passion, stated that Ryan and the friend had watched her be overlooked in the past, and stated that Ryan and the friend want to make sure Lively is "seen for all I can, and do, offer."  *Id.*

       On April 22, 2023, Baldoni reached out to his personal trainer to ask how much Lively weighed so that he could train his back muscles to prepare for a lift scene.  *Id.* ¶¶ 47–48.  On April 25, 2023, Lively invited Baldoni to her penthouse to discuss the script, but when Baldoni arrived he was met by Reynolds, who screamed at him about "fat-shaming" Lively and demanded that he remove the lift scene.  *Id.* ¶ 49.  Baldoni apologized.  *Id.*  Lively eventually refused to perform the lift scene, and Baldoni rewrote it.  *Id.*  After the April 25 incident, Lively told Baldoni that if he could not get on board with her work methods, he still had two weeks to recast her.  *Id.* ¶ 51.

By May of 2023, Lively was making daily alterations to the script. *Id.* ¶ 43. Although Baldoni initially invited Lively to make changes to the script, the frequency of her changes alarmed the producers and studio. *Id.* ¶ 43. On May 1, 2023, a producer texted Heath "Blake is now directing the movie," "[t]his is bad." *Id.* Around the same time, the same producer texted Heath "[h]e cannot let her have her opinions on everything" "[o]r shes going to be codirecting this film," "[t]his is why everyone is starting to lose it," and "[w]e been talking about the same thing for months." *Id.* ¶ 52.

Lively insisted on creative control over her character's wardrobe, ignoring the director's vision for her character and the choices made by the wardrobe team in accordance with that vision. *Id.* ¶ 31. She required the costume designer to re-shop her wardrobe in the style she wanted, insisted that her character could afford $5,000 shoes as a small business owner, and required that her wardrobe be delivered to her personal residence instead of the production office. *Id.* ¶¶ 32–33. To maintain harmony, Baldoni and Wayfarer reluctantly ceded to Lively full control over her wardrobe. *Id.* ¶ 34.

Prior to filming, Wayfarer attempted to secure Lively's signature on a certificate of engagement and a nudity rider. *Id.* ¶¶ 106–107. On May 8, 2023, Wayfarer provided Lively with a nudity rider approved by the intimacy coordinator. *Id.* ¶ 79. On May 12, 2023, Lively's counsel responded that they were reviewing the nudity rider and would provide notes. *Id.* ¶ 107. However, the discussion then shifted to the issue of whether Lively's fee should be deposited in escrow despite the fact that she had not yet signed her employment agreement or certificate of engagement. *Id.* ¶¶ 106–107. The fee was deposited in escrow, and filming began without Lively signing the certificate of engagement or nudity rider. *Id.* ¶ 107.

B.      **Initial Filming**

Filming began in early May of 2024.  *Id.* ¶¶ 54, 79.  On the first day of principal

photography, paparazzi photographs of Lively's wardrobe were negatively reported and led to

Baldoni receiving criticism from Sony.  *Id.* ¶ 35.  Baldoni had a conversation with Lively in her

trailer to discuss wardrobe adjustments, reassert his role as director, and get her on board with

him having approval over her character's wardrobe.  *Id.* ¶ 36.  Lively suggested that Baldoni was

being "gaslit" by Sony and Heath.  *Id.* ¶ 37.  She also complimented Baldoni's work as a director

and actor, which led him to become emotional.  *Id.* ¶ 37.  The conversation took "considerable

time" but was "professional."  *Id.* ¶ 36.[7]

During the first period of filming, Lively had a close relationship with Baldoni and

repeatedly expressed gratitude for his work.  *Id.* ¶¶ 55–61, 98.  She spoke openly with him about

what would make her character look "sexier."  *Id.* ¶ 56.  She freely breastfed in front of him

during meetings and took photographs of him soothing her crying baby.  *Id.* ¶ 59.

Lively sometimes invited Baldoni, Heath, and other producers into her trailer.  *Id.* ¶ 104.

For example, she invited Baldoni into her trailer to work on lines while she pumped breast milk.

*Id.*  On one occasion, Heath was invited into Lively's trailer while she was having makeup

removed from her collarbone, with Lively's nanny, makeup artist, and assistant present.  *Id.*

Lively was fully covered while either nursing or pumping breast milk.  *Id.*  Lively asked Heath to

turn away while they spoke, and he did so.  *Id.*  At some later point, Lively told Heath that she

was uncomfortable that he had made eye contact with her during this interaction.  *Id.*  Heath said

---

[7] Lively later misrepresented this conversation in her complaint to the CRD.  *Id.* ¶¶ 4, 36.  She characterized it as a "lengthy outburst" lasting "hours" in which Baldoni cried and made inappropriate "comments on her appearance."  *Id.* ¶¶ 36, 38.

"I'm so sorry, I really didn't realize," and Lively responded "I know you weren't trying to cop a look." *Id.*

No intimacy or simulated sex scenes with Lively were shot during the first phase of filming. *Id.* ¶¶ 82, 108. However, some romantic or otherwise sensitive scenes were shot during this phase. One simulated nude scene was shot, for which Lively wrote and directed the action. *Id.* ¶ 82. Lively never requested a nudity rider or intimacy coordinator for that scene. *Id.* A scene was shot showing Lively's character giving birth, in which Lively was wearing black briefs and a pregnancy suit and her top was covered by a hospital gown. *Id.* ¶ 83.[8] Only essential individuals were present for the scene, and only Lively's legs were exposed. *Id.* ¶¶ 83 & n.16, 84. The actor portraying the obstetrician in the scene was an experienced actor who is friends with Baldoni. *Id.* ¶ 119. In connection with this scene and Baldoni's vision for the scene, Heath offered to show Lively a video taken of his wife and their newborn baby after his wife gave birth at home. *Id.* ¶ 101. Lively asked to see the video after she ate, but she never actually saw the video. *Id.* She only saw the first image at the start of the video, which shows Heath's wife, himself, and their baby after his wife gave birth at home. *Id.*

A romantic scene shot in the first phase depicted a "romance montage" of Lily and Ryle on a date. *Id.* ¶ 89. As part of the scene, the characters were slow dancing. *Id.* Lively insisted she liked the idea of the characters constantly talking, because that is what she and her husband like to do. *Id.* Baldoni said this was "cute" but tried to persuade Lively that they should instead silently look into each other's eyes. *Id.* As the scene continued, Lively apologized for the smell of her spray tan and body makeup. *Id.* ¶ 90. Baldoni responded "it smells good" and continued

---

[8] It is not clear from the Amended Complaint whether the "simulated nude" scene described in the previous sentence is this birth scene or a different scene. *Id.* ¶¶ 82–83.

acting and dancing.  *Id.*  Footage of the scene shows that there was no unprofessional conduct. *Id.* ¶ 90.

There were only two kissing scenes filmed before the strike break, both of which included kisses written in the script.  *Id.* ¶ 92.  In one scene, Lively initiated unchoreographed kissing, with different variations for different takes.  *Id.* ¶ 91.  Baldoni accepted this as a normal and acceptable part of filming romantic scenes.  *Id.*  Although some kissing by Lively was "unchoreographed," the kissing scenes were not "improvised."  *Id.* ¶¶ 91–92.[9]  Baldoni acted professionally during the kissing scenes.  *Id.* ¶ 91.

In another scene, where everyone was wearing "onesies," Lively covered her onesie with a big coat.  *Id.* ¶ 94.  Baldoni asked that she take off the big coat so that her onesie would be visible.  *Id.*  He stated that "it will be hot," referring to the fact that it was 90 degrees in a small bar with no air conditioning.  *Id.*  He also said "it's sexy," to which Lively responded "that's not what I'm going for."  *Id.*  Baldoni then recognized that Lively appeared offended, and he apologized multiple times.  *Id.*

Although the planned sex scenes between Lily and Ryle were not shot during the first phase, Lively and Baldoni did discuss them.  *Id.* ¶ 100.  In response to a proposal from the intimacy coordinator that Ryle not orgasm in one of the scenes after he satisfied Lily, Lively remarked "I'd be mortified if that happened to me."  *Id.*  Baldoni responded that "those have been some of the most beautiful moments" between him and his wife.  *Id.*  In another instance, Lively stated that she did not want a scene to "look like porn," and then additionally stated that she had never seen pornography in her life.  *Id.*  Baldoni stated that this was wonderful, because

---

[9] The distinction between "unchoreographed" and "improvised" kissing is not clear from the Amended Complaint.  However, the statement that kissing was not "improvised" appears to reflect the fact that the scenes "included kisses as written in the script."  *Id.* ¶ 92.

he had been exposed to pornography early in his life and had struggled with a pornography addiction.  *Id.*  Pornography addiction is an issue Baldoni had openly discussed in several books. *Id.*

On May 2, 2023, the WGA went on strike.  *Id.* ¶ 63.  Production on the film halted temporarily on June 14, 2023, due to WGA picketing.  *Id.* ¶ 64.  Production resumed the next day after the WGA agreed not to picket the set, but Lively was already gone and refused to immediately return.  *Id.* ¶ 64.  Wayfarer reworked the shooting schedule, at great expense, to film scenes which did not require Lively.  *Id.* ¶ 64.  However, production shut down entirely on June 27, 2023.  *Id.*  On July 14, 2023, SAG-AFTRA went on strike.  *Id.* ¶ 65.

**IV.     Return to Set and End of Production**

During the strikes, Baldoni began editing the film footage in his role as director.  *Id.* ¶ 66. Lively repeatedly asked for access to the "dailies," raw footage of what is filmed on a given day that is generally not shared with the cast, and early cuts of scenes.  *Id.* ¶ 68.  Baldoni asked Heath and another producer about the request for dailies.  *Id.* ¶ 69.  All of the producers agreed the answer was no, with Heath saying "[i]t's an absolute no."  *Id.*  Baldoni expressed concerns that Lively would then "start to edit the movie and tell me which takes to use," similar to what had happened with the writing of the rooftop scene.  *Id.*  When Baldoni told Lively it was "too early" to share the dailies, Lively asked: "none of the producers have had access to dailies?  It's just you?"  *Id.* ¶ 71.  Baldoni responded that Heath and another person had access to the dailies, and he shared some limited scenes with Lively.  *Id.* ¶ 72.

The WGA strike ended on September 27, 2023, and the SAG-AFTRA strike ended on November 9, 2023.  *Id.* ¶ 73.

On November 9, 2023, Lively's lawyer sent Wayfarer "a list of protections that will need to be guaranteed and observed by the Film's producers" for Lively to return to work.  *Id.* ¶ 75. The document listed seventeen demands.  *Id.*; *see* Dkt. No. 84-1.

1) That an intimacy coordinator be present at all times when Lively was on set.  Dkt. No. 50 ¶ 79.

2) Limiting review of intimate scene footage to essential personnel.  *Id.* ¶ 82.

3) No spontaneous improvisation of scenes involving physical touching, simulated sex, or nudity, which must be choreographed with the intimacy coordinator.  *Id.* ¶ 85.

4) No physical touching of Lively (including hugging) or comments on her physical appearance except in connection with the character and/or scene work.  *Id.* ¶ 93.

5) No discussion of personal experiences with sex or nudity, including as it relates to conduct with spouses or others.  *Id.* ¶ 98.

6) No one to enter Lively's trailer while she is undressed.  *Id.* ¶ 104.

7) No filming nude or sex scenes without a nudity rider in place, and no use of scenes shot without a nudity rider except with Lively's consent.  *Id.* ¶ 106; Dkt. No. 84-1 ¶ 7.

8) Lively may have a personal representative on set.  Dkt. No. 50 ¶ 109.

9) Notice of COVID-19 exposure.  *Id.* ¶ 110.

10) No retaliation for making these requests.  *Id.* ¶ 112.

11) Mutually-approved Sony representative required on set.  *Id.* ¶ 113.

12) Additional, Lively-approved producer to be hired to supervise filming.  *Id.* ¶ 114.

13) Existing third-party producers empowered to actively supervise the production.  *Id.* ¶ 116.

14) Use of a Lively-approved body and stunt double for rape and sexual violence scenes.  *Id.* ¶ 117.

15) No filming nude or sex scenes of any actor's portrayal of Lily except in accordance with the nudity rider.  *Id.* ¶ 118; Dkt. No. 84-1 ¶ 15.

16) All day players must be hired through talent agencies, not personal connections.  Dkt. No. 50 ¶ 119.

17) All-hands meeting before production resumes.  *Id.* ¶ 122.

Wayfarer and Sony sought to revise the document because they believed it inaccurately represented set culture. *Id.* ¶ 76. However, Lively's counsel responded that the document was not "a starting place for negotiation," but "a set of protections that needs to be in place in order for our client to return to work." *Id.* Although they were concerned about the "underlying insinuations/allegations," Wayfarer and Sony found the substance of many of the demands unobjectionable, because the relevant protections were already in place. *Id.* ¶¶ 77, 123. For example, an intimacy coordinator was already engaged and involved in coordinating scenes (despite Lively's refusal to meet with her), *id.* ¶¶ 79, 85, intimate scene footage was already limited to essential personnel, *id.* ¶ 82, touching and comments on Lively's appearance were limited to character work, *id.* ¶¶ 93–94, Wayfarer had sought to ensure Lively had a nudity rider (despite her refusal to sign it), *id.* ¶¶ 106–108, and existing third-party producers were already empowered to supervise production, *id.* ¶ 116. Additionally, Wayfarer had no objection to Lively having a personal representative on set, *id.* ¶ 109, to having a Sony representative on set, *id.* ¶ 113, or to Lively's preapproved stunt and body doubles, *id.* ¶ 117. The Wayfarer Parties did object to the cost of hiring an additional producer and to Lively's imposition of control over nude or sex scenes involving the younger version of Lily, played by a different actress. *Id.* ¶¶ 114, 118. However, the Wayfarer Parties agreed to the demands because "[t]he alternative was to lose millions of dollars, cost hundreds of people their jobs after they had been out of work for months, and destroy their relationship with Sony." *Id.* ¶ 77.

On December 27, 2023, Baldoni sent an email to other members of the production team attaching a revised script with further changes demanded by Lively. *Id.* ¶ 124. He stated that he was angry that "Blake has taken over our film and somehow re-wrote a movie we spent years developing," but he had decided to wave "the white flag" and "give her 98% of what she wants"

17

since "none of us have the energy to fight anymore." *Id.* ¶ 124. He also expressed concerns about further intimacy given "the risk of something innocuous or not meeting her standards could and would very likely be used against me (as it already has)." *Id.* On January 1, 2024, Baldoni stated there would now be a "negotiation" with Lively "for what the final script looks like." *Id.* ¶ 126.

On January 4, 2024, the day before filming was scheduled to resume, Lively reached out to Baldoni, Heath, and the film's producers to meet in her home in New York. *Id.* ¶ 127. At the meeting, Lively read a list of grievances which were separate and apart from the seventeen demands already made. *Id.* ¶¶ 128, 131. Reynolds then aggressively berated Baldoni, demanding that he apologize for actions that did not happen or were grossly mischaracterized. *Id.* ¶ 129. One of the producers stated that in his forty-year career, he had never seen anyone speak to someone like that in a meeting. *Id.*

Baldoni and Heath were deeply unsettled by the meeting, but they felt compelled to finish the film given that the financial and reputational implications of shutting down a film halfway through production. *Id.* ¶ 131. On January 19, 2024, the parties signed the seventeen-point list of demands. *Id.* ¶ 131. Filming resumed the next day and concluded on February 9, 2024, without any further grievances from Lively. *Id.* ¶ 132.

## V.    Post-Production

The Directors' Guild of America ("DGA") requires a ten-week editing period for directors to privately edit and assemble their director's cut. *Id.* ¶ 134. Lively requested to join Baldoni in the editing bay during this time. *Id.* ¶ 135. On February 25, 2024, Baldoni offered for her to join him beginning on March 18, after he had a few weeks to start working. *Id.* Lively responded that she would love to "be in the passenger seat with you as soon as possible." *Id.* The collaboration was originally supposed to be for two days but extended to ten days, and

Lively sought to work alone in the editing bay without Baldoni. *Id.* ¶ 137. Texts between Baldoni and the film's editors show them reluctantly agreeing to give Lively what she wanted in the hope that she can "move on from this need of hers." *Id.* ¶ 137.

In April and May 2024, Sony agreed to allow Lively to create her own cut of the entire film, a right that is generally reserved exclusively for directors. *Id.* ¶ 140. Sony told Wayfarer that Lively refused to promote the film unless her demands were met. *Id.* Wayfarer argued that Lively should at least finally sign her engagement contract before her demands were met, but Sony disagreed. *Id.* Sony told the editors and Baldoni that they were not permitted to look at Lively's cut. *Id.* ¶ 141. At this point, Baldoni assumed that Lively's edits would simply supplement his work. *Id.* ¶ 142. However, as Lively threatened to refuse to promote the film or approve related marketing materials, Wayfarer and Baldoni were forced to agree to more demands, including co-funding a "friends and family" screening of Lively's version of the film. *Id.* ¶ 142. Lively ultimately replaced the film's editors and composer with her own choices, who had previously worked with Reynolds. *Id.* ¶ 143. Sony supported these demands. *Id.*

Wayfarer and Sony ended up with two competing versions of the film: Lively's and Baldoni's. *Id.* ¶ 144. Because of Lively's threat to withhold promotion of the film and the concern that she would end Baldoni's career with false accusations, Wayfarer agreed to do an audience test of both versions. *Id.* This decision was made on the understanding that Lively had agreed with Sony to drop the matter if Baldoni's cut of the film scored higher than hers. *Id*. Baldoni's cut did score higher with most key demographics, with Lively's cut scoring higher only with men, who were not the target audience of the film. *Id.* ¶ 145. However, Lively still insisted that her version, rather than Baldoni's, be publicly released. *Id.* ¶ 146. Sony told Wayfarer that neither Lively nor the rest of the cast would promote the film unless Lively's cut

was used.  *Id.*  Baldoni reluctantly stood down and allowed Lively's version of the film to be

released and promoted.  *Id.* ¶ 146.

Sony did convince Lively to put much of Baldoni's work back into the film.  *Id.*

However, Baldoni was completely locked out of Lively's final cut of the film.  *Id.* ¶ 149.  He was

permitted only to "give notes as a studio" due to his role at Wayfarer.  *Id.* ¶ 150.

Lively additionally threatened to abandon her contractual obligation to promote the film

and approve marketing materials if she was not awarded a producer credit.  *Id.* ¶ 152.  Lively

sought the *p.g.a.* mark on her producer credit, a designation licensed by the Producers Guild of

America ("PGA") to identify a producer who has performed the majority of the production work

on a motion picture.  *Id.* ¶ 153.  She demanded "with extortionate threats" that Baldoni, Heath,

and other producers send letters to the PGA in support of this mark.  *Id.* ¶ 154.  Wayfarer

reluctantly agreed to give Lively a producer credit, *id.* ¶ 152, but Wayfarer and Baldoni refused

to support the *p.g.a.* mark because Lively had not earned it, *id.* ¶ 155.  In response, Lively

instructed Sony to tell Wayfarer and Baldoni that "any good will left between us is done."  *Id.*

¶ 156.  Eventually, Wayfarer and Baldoni did send a letter of support for the *p.g.a.* mark.  *Id.*

¶ 157.  Heath memorialized their reasons for doing so in a letter to Wayfarer's attorneys stating

that "Justin and I ended up agreeing to write the letter due to feeling trapped" because Lively

"continues to hold a threat over our heads and every time we try and hold a line she uses that

threat either directly or indirectly."  *Id.*  It continues: "I am not suggesting that we were literally

forced to acquiesce, but given the high profile of the movie, the partnership with Sony, the

amount of money invested, and the need to complete the movie, we have written the letter on her

behalf, omitting the truth of how and why she was able to contribute."  *Id.* ¶ 157.

## VI.    Release of the Film and Public Relations Efforts

Around June 6, 2024, Baldoni was hospitalized with a serious spine infection.  *Id.* ¶ 146.  At that time, Lively was dictating much of the marketing for the film.  *Id.* ¶ 147.  She removed Baldoni from all posters, trailers, and promotional materials, saying she would otherwise refuse to promote the film.  *Id.* ¶ 148.  She also removed his "A Film By" credit.  *Id.* ¶ 158.  Lively insisted on screening her cut of the film at Book Bonanza, an annual Colleen Hoover convention, but stated that Baldoni could not attend.  *Id.* ¶ 149.  Lively informed Sony that she and the cast would not participate in any marketing or promotion of the film alongside Baldoni.  *Id.* ¶ 158.  Lively, Reynolds, and other cast members "unfollowed" Baldoni on social media.  *Id.* ¶¶ 158–159.  Lively encouraged the other cast members to shun Baldoni.  *Id.* ¶ 159.  Baldoni was not invited to any cast promotional events, cast screenings, premieres, photo shoots, or other cast campaigns.  *Id.* ¶ 163.

Because Baldoni was systematically excluded from marketing of the film, he also did not agree to Sony's marketing plan for the film.  *Id.* ¶ 163.  That plan suggested marketing "focus more on Lily's strength and resilience as opposed to describing the film as a story about domestic violence," "avoid talking about this film that makes it sad or heavy," and "focus on the positive elements in interviews" rather than "discussing abuse."  *Id.*  As he had always planned, Baldoni wanted to use the film to bring awareness to domestic violence.  *Id.*  Baldoni was specifically focused on Wayfarer's partnership with No More, a global initiative aimed at raising awareness, inspiring action, and sparking conversations to end domestic violence and sexual assault.  *Id.* ¶ 172.

In July 2024, Lively's social media posts promoting the film took a lighthearted tone, focusing on fun, fashion, and floral motifs.  *Id.* ¶ 179.  She also promoted the launch of her new

hair care line, Blake Brown, which was timed to coincide with the film's release, and her alcohol brand Betty Booze. *Id.* ¶¶ 180–181.

Reynolds' movie *Deadpool and Wolverine* premiered on July 26, 2024. *Id.* ¶ 164. The film had a character named Nicepool, also portrayed by Reynolds, who could be interpreted as a reference to Baldoni. *Id.* Nicepool is a caricature of a "woke" feminist who inappropriately comments on a female character's body after childbirth, excuses his inappropriate remarks by claiming he is a feminist, and references an intimacy coordinator. *Id.* Nicepool is shot and killed by a character voiced by Lively. *Id.* During the premiere of *Deadpool and Wolverine*, Reynolds approached an executive at William Morris Endeavor ("WME"), Baldoni's agency, and told him Baldoni was a "sexual predator." *Id.* ¶ 162. At a later date, Reynolds also demanded that WME drop Baldoni. *Id.* WME also represented Reynolds and Lively. *Id.* ¶ 16.

Wayfarer and Baldoni became fearful that Lively and Reynolds were attempting to destroy Baldoni's career and personal life. *Id.* ¶ 162. Baldoni sought help from Wayfarer's public relations firm, Jonesworks, which Wayfarer had engaged since 2020 and which also handled publicity for Baldoni personally. *Id.* ¶ 196. The Baldoni/Wayfarer account at Jonesworks was managed by Abel. *Id.* ¶ 197. Abel recommended that Wayfarer engage a crisis PR specialist, Nathan, to assist with "a massive PR crisis" stemming from news stories beginning to trickle out concerning tension between Lively and Baldoni. *Id.* ¶ 227.

A particular public relations concern at the time was a threat by Lively that if Baldoni attended the film's premiere on August 6, 2024, she and a majority of the cast would boycott. *Id.* ¶¶ 166, 227. Eventually, Heath and Sony negotiated a compromise in which Baldoni and Wayfarer attended the premiere but arrived before Lively and others. *Id.* ¶ 169. When Lively arrived, Baldoni and his group were required to leave the red carpet and were escorted by

security to a makeshift area in the basement with folding tables and chairs.  *Id.* ¶¶ 169–170.
Once the main theater was cleared of Lively and her guests, Baldoni and his group were
permitted to watch the film in a separate theater.  *Id.* ¶ 171.  The fact that Lively and Baldoni did
not appear together at the premiere led to further speculation on social media regarding their
relationship.  *Id.* ¶ 231.

In a red-carpet interview at the New York premiere of the film, Lively stated that
Reynolds actually wrote the rooftop scene.  *Id.* ¶ 44.  The Wayfarer Parties and Sony were not
previously aware that Reynolds, who had no formal role in the film, contributed to the scene.  *Id.*
¶¶ 44–46.

On August 8, 2024, two days after the premiere, Nathan and Lively's publicist, Sloane,
agreed that neither would speak to any reporters about problems between Lively and Baldoni
without informing the other.  *Id.* ¶ 188.  However, Sloane then immediately responded to a text
from a reporter at the Daily Mail who reached out regarding problems on the set between Lively
and Baldoni.  *Id.* ¶ 189.  Sloane texted back that the reports were "1000 percent untrue"; "[y]our
info is totally off"; "[y]ou have it all wrong"; and "[y]our reporters are so wrong."  *Id.* ¶ 190.
She added: "wtf is going on.  The whole cast doesn't like Justin nothing [to] do with Blake," and
"[t]hey are panicking as the whole cast hates him."  *Id.* ¶ 190.  Nathan was contacted by the same
reporter the next day and told Sloane she "would have to speak with him," but would "tell him
nothing."  *Id.* ¶ 191.  Nathan was not aware that Sloane was speaking to the media outside of
their agreement, and she and Abel still sought to maintain the truce they had agreed on with
Sloane.  *Id.* ¶¶ 192, 230.

However, also on August 8, 2024, Abel's supervisor, Jonesworks' CEO Stephanie Jones
("Jones"), spoke to a Daily Mail reporter about a story the Daily Mail had published about

Baldoni and Lively.  *Id.* ¶ 231.  Jones had not previously been closely involved with Wayfarer and Baldoni, leaving management of the account to Abel.  *Id.* ¶ 226.  But Abel was transitioning out of Jonesworks to start her own business and was set to finish work on August 23, 2024.  *Id.* ¶ 212.  Jones was unhappy with this decision and, with Abel leaving, Jones sought to reassert her authority over the account and convey her engagement.  *Id.* ¶ 226.  Even though Abel had expressly told Jones and others not to speak to the press because of the truce agreed to between Lively's and Baldoni's teams, Jones did so.  *Id.* ¶ 231.  Contemporaneous texts show that Nathan and Abel were furious with Jones for ruining their plan.  *Id.*  Wayfarer directed Jones to cease all activities on behalf of Wayfarer and Baldoni and let Abel, Nathan, and another Jonesworks employee handle the crisis.  *Id.* ¶ 232.[10]  Sloane and Sony learned that someone from Baldoni's team had been communicating with the media, and Nathan started hearing that Sloane was planting her own negative stories.  *Id.* ¶ 233.

In the days after the premiere, Lively received a wave of online criticism for her marketing of the film, which was criticized as "shallow" and "tone deaf."  *Id.* ¶¶ 184–185, 279.  Her cross-promotions with her alcohol brand were criticized due to the ties between alcohol and domestic violence.  *Id.* ¶¶ 181, 280.  A post stating "grab your friends. wear your florals" went viral and was perceived as insensitive given the film's focus on domestic violence.  *Id.* ¶¶ 183–185, 280.  On August 9, 2024, Heath emailed Sony noting that "many people are pointing out that the DV is being glossed over and that Justin is essentially the only one appreciating the subject matter whilst others may be not giving it the proper respect it deserves."  *Id.* ¶ 182.  He further stated that "this has always been a concern of ours" and suggested that the movie be

---

[10] Jones continued to advocate for a more aggressive PR strategy and repeatedly stated that she had not spoken with the Daily Mail.  *Id.* ¶¶ 234–237.

"more deliberate in embracing the DV aspect" so that people know "we too recognize the gravity and sensitivities of this subject." *Id.*

On August 12, 2024, Heath and Abel had a call with two executives from "their then talent agency."[11] *Id.* ¶ 250. One admitted that the criticism of Lively was caused by the focus on frivolities and glamor in her promotion of the film. *Id.* However, the executive also told Heath and Abel that Lively believed Wayfarer, Baldoni and Heath were waging a shadow campaign against her. *Id.* ¶ 251; *see id.* ¶ 282 (messages from Sloane denying that the backlash was organic and stating that Lively "did nothing"). Abel stated her belief that the parties had reached a truce. *Id.* ¶ 251. The executive communicated a demand from Lively and Reynolds that Wayfarer, Heath, and Baldoni make a public apology that day or else "the gloves would come off." *Id.* ¶ 250. The next day, Heath told talent agency executives that Wayfarer, Baldoni, and Heath had no connection to the negative publicity but that Lively and Reynolds had demanded they take the blame. *Id.* ¶ 253. The executives told Heath and Abel that Lively and Reynolds demanded Wayfarer put out a statement that Lively and Reynolds had dictated calling *It Ends With Us* a "troubled" production and requiring Wayfarer to take "accountability," or else Lively and Reynolds would attack Wayfarer in the press. *Id.* ¶ 254. The executive admitted that Lively and Reynolds brought the backlash on themselves but were looking to find someone else to blame. *Id.* ¶ 255.

In a number of contemporaneous messages, Nathan and Abel stated that they were not creating negative publicity about Lively. On August 13, 2024, Nathan sent Abel a text describing a negative TMZ story about Lively as "completely unsolicited." *Id.* ¶ 279. Abel

---

[11] The Court construes this allegation to refer to Baldoni and Wayfarer's talent agency, WME. *See id.* ¶ 16.

stated that "The post has a similar tip / Not from any of us obv," and further stated "These are clearly people on set coming out to defend JB which is good and we just let them do their thing." On August 15, 2024, Nathan texted Baldoni a negative Daily Mail story about Lively stating "This just ran – obviously none of us knew about this either." *Id.* On August 16, 2024, Baldoni texted Nathan's team asking to confirm that certain Instagram comments defending him that "feel like bots" were not created by his team, to which Abel and Nathan responded that it was not them and they do not use bots. *Id.* ¶ 286. Baldoni expressed worry about the perception that "we are planting these stories which is not true obviously," and Abel stated that he should not worry because "[t]he people saying that there are bots and this is a PR play on your side is a minority voice compared to the thousands and thousands who are calling it what it is, and reacting to Blake's own actions and interviews." *Id.* Baldoni asked "[h]ow can we say somehow that we are not doing any of this – it looks like we are trying to take her down" and Nathan responded "[i]t doesn't. They are doing all of this themselves and it's really obvious." *Id.* On August 18, 2024, Baldoni texted Nathan asking for reassurance that "This is not us right?" referring to a story about a TikTok creator receiving messages instructing her how to discuss the Lively and Baldoni drama. *Id.* ¶ 281. Nathan responded: "None of us would ever do this." *Id.* In texts with a TMZ reporter, Nathan stated "BL camp keeps thinking its us placing and we are doing f all." *Id.* ¶ 282.[12]

On August 16, 2024, Nathan forwarded Abel a screenshot of a message from a reporter informing her of a story in the Daily Mail titled "Is Blake Lively set to be CANCELLED?" *Id.*

---

[12] On August 14, 2024, Abel's team was asked for comment about HR complaints and an intervention with Baldoni during production and responded that there were no relevant HR complaints and that it was not an intervention but more of a "contentious meeting" between Lively's team and Baldoni's team in which "Blake expressed all the things she was upset about." *Id.* ¶ 282.

¶ 276.  The screenshot shows that Nathan had responded to the reporter: "Damn this is unfair because its also not me / Everything now looks like it's me / Maybe not to you."  *Id.*  Nathan then sent Abel a link to the story, and Abel responded: "Wow / You really outdid yourself with this piece 🙃."  *Id.* ¶ 275.  The 🙃 emoji is commonly used to convey irony, sarcasm, joking, or silliness.  *Id.* ¶ 277.  Nathan responded "That's why you hired me right? I'm the best."  *Id.*

On August 21, 2024, two days before her last day at Jonesworks, Abel arrived at the office and was ushered into a conference room with an attorney, a security guard, and others.  *Id.* ¶ 217.  The attorney told her that Jonesworks believed she had proprietary information on her personal laptop and that Jonesworks would likely have grounds to sue if Abel did not allow it access.  *Id.*  Abel went into a state of shock and signed several documents without digesting their contents, at which point an IT professional searched her laptop and found nothing.  *Id.* ¶ 219.  The lawyer instructed Abel to hand over her phone, which she agreed to do as long as Jonesworks would immediately release her personal cell phone number.  *Id.* ¶ 220.  Jonesworks' chief of staff and attorney expressly confirmed that they would do so, and Abel handed them the phone and was ushered out of the building.  *Id.*  Abel went directly to a Verizon store to transfer the number to a new phone, but Jonesworks did not release the number.  *Id.* ¶ 221.  Abel's access to her contacts and critical accounts was cut off, and Jonesworks gained unrestricted access to everything in Abel's phone, including personal messages and accounts.  *Id.*[13]

On the same day, Sloane called Nathan stating that she had seen Nathan's text messages and that Nathan should expect to be sued.  *Id.* ¶ 238.  The Wayfarer Parties allege on information and belief that Jones provided Abel's texts, including her texts with Nathan, to Lively.  *Id.* ¶¶ 244–245, 283.  Jones had a motive to do so because she was upset that Wayfarer and Baldoni

---

[13] It took Abel over a month to regain access to her accounts.  *Id.* ¶ 222.

continued working with Abel, not Jones, after Abel left Jonesworks.  *Id.* ¶¶ 239–240.  Rather than accepting Wayfarer's decision to leave, Jones threatened to sue and demanded exorbitant payment for work not done.  *Id.* ¶ 241.

**VII.    The New York Times Article**

On December 20, 2024, Lively filed a complaint with the California Civil Rights Department.  *Id.* ¶ 262; Dkt. Nos. 107-3–107-6.  The complaint alleged that "Baldoni and his Wayfarer associates embarked on a sophisticated press and digital plan in retaliation for Ms. Lively exercising her legally-protected right to speak up about their misconduct on the set," attempting to "destroy Ms. Lively's reputation."  Dkt. No. 103-3 ¶ 8 (internal quotation marks omitted).  The complaint alleged among other things that Baldoni bit and sucked on Lively's lower lip during an improvised kissing scene that he insisted on shooting over and over again, *id.* ¶ 31, slowly dragged his lips down her neck during the romance montage in a way that had nothing to do with their roles, *id.* ¶ 32, personally added graphic content, including a scene where Lively would orgasm on camera, *id.* ¶ 33, insisted that Lively be naked in the birthing scene, *id.* ¶ 35, discussed his pornography addiction with Lively and revealed to other cast and crew that Lively had never seen pornography, *id.* ¶ 41, and repeatedly commented that Lively looked "sexy" or "hot," *id.* ¶¶ 43–44.  It included a number of quotations and screenshots of messages allegedly showing that after Lively complained about this treatment, Baldoni and Wayfarer worked with Abel, Nathan, and Wallace on an online campaign to ruin Lively's reputation.  *See generally* Dkt. Nos. 103-3–103-6.  The complaint asserted claims for sexual harassment, retaliation, breach of contract, intentional infliction of emotional distress, and false light invasion of privacy under California law.  Dkt. No. 103-3.

At 9:46 p.m. the same day, New York Times reporter Megan Twohey ("Twohey") emailed the Wayfarer Parties requesting comment on an imminent 4,000-word story concerning

their alleged orchestration of a smear campaign against Lively as a response to her disclosure of concerns about the working environment on the set of *It Ends With Us*, based on the CRD complaint.  Dkt. No. 50 ¶ 257; *see* Dkt. Nos. 107-8–107-12.  Twohey described the allegations of the CRD complaint and stated:

> [W]e are seeking your response . . . and we would welcome the opportunity to talk with you on the record. . . .  Please offer any on-the-record comment, as well as any other information you think we should know.  Additionally, please notify us of any inaccuracies.  We need to hear back from you tomorrow by noon Eastern.

Dkt. No. 107-8; *see* Dkt. Nos. 107-9–107-12.

> At 2:16 a.m., the Wayfarer Parties' legal representatives responded:

> It is shameful that Ms. Lively and her representatives would make such serious and categorically false accusations against Mr. Baldoni, Wayfarer Studios and its representatives, as yet another desperate attempt to 'fix' her negative reputation which was garnered from her own remarks and actions during the campaign for the film; interviews and press activities that were observed publicly, in real time and unedited, which allowed for the internet to generate their own views and opinions.  These claims are completely false, outrageous and intentionally salacious with an intent to publicly hurt and rehash a narrative in the media.  Wayfarer Studios made the decision to proactively hire a crisis manager prior to the marketing campaign of the film, to work alongside their own representative with Jonesworks employed by Stephanie Jones, due to the multiple demands and threats made by Ms. Lively during production which included her threatening to not showing up to set, threatening to not promote the film, ultimately leading to its demise during release, if her demands were not met.  It was also discovered that Ms. Lively enlisted her own representative, Leslie Sloan with Vision PR, who also represents Mr. Reynolds, to plant negative and completely fabricated and false stories with media, even prior to any marketing had commenced for the film, which was another reason why Wayfarer Studios made the decision to hire a crisis professional to commence internal scenario planning in the case they needed to address.  The representatives of Wayfarer Studios still did nothing proactive nor retaliated, and only responded to incoming media inquiries to ensure balanced and factual reporting and monitored social activity.  What is pointedly missing from the cherry-picked correspondence is the evidence that there were no proactive measures taken with media or otherwise; just internal scenario planning and private correspondence to strategize which is standard operating procedure with public relations professionals.

Dkt. No. 50 ¶ 294; Dkt. No. 107-7.  Twohey responded by asking who was represented by the statement, and Abel stated that it was Baldoni, Heath, Sarowitz, Abel, Nathan, and Wallace. Dkt. No. 107-7.

The Article was published at 10:11 a.m. on December 21, 2024, with the headline "'We Can Bury Anyone': Inside a Hollywood Smear Machine."  Dkt. No. 50 ¶ 261.  The Article draws heavily from Lively's CRD complaint and includes a link to a PDF of the complaint.  *Id.* ¶¶ 262, 265.  The Article states that the CRD complaint "includes excerpts of thousands of pages of text messages and emails that [Lively] obtained through a subpoena.  These and other documents were reviewed by the New York Times."  *Id.*; Dkt. No. 107-1.  The Wayfarer Parties allege on information and belief that Lively provided her CRD complaint to the Times long before filing it. Dkt. No. 50 ¶ 275.  URLs for images in the Article include strings of characters such as "2024-12-16" and "2024/12/18," apparently referencing dates before the CRD complaint was filed.  *Id.* ¶ 264.  The CRD Complaint linked in the Article states that it was created on December 21, 2024, but a web crawler (a program that scours the Internet to locate and catalog websites and files) records the file as having been uploaded on December 10, 2024.  *Id.* ¶ 265.  The file name for a video of Twohey reporting on the contents of the Article contains the characters "2024/12/12," apparently a reference to December 12, 2024.  *Id.* ¶ 266.[14]

The body of the Article details "an alleged campaign to tarnish Blake Lively after she accused Justin Baldoni of misconduct on the set of 'It Ends With Us.'"  Dkt. No. 107-1 at 1.  It states that "according to a legal complaint," Baldoni and Heath hired a crisis PR expert with an "explicit goal" to "harm Ms. Lively's reputation" after expressing fears that her allegations of

---

[14] A piece of the HTML source code for the article related to embedding text messages references October 31, 2024.  *Id.* ¶ 268.

on-set misconduct would "become public and taint them." *Id.* at 2. The Article is framed by the idea that the documents reviewed by the Times "show a[] . . . playbook for waging a largely undetectable smear campaign in the modern era." *Id.*

The Article specifies that on August 2, 2024, Nathan sent Baldoni an initial planning document with media talking points, including negative talking points regarding Lively. *Id.* at 7. Baldoni texted Abel and Heath that he was "[n]ot in love with the document" and "[n]ot sure I'm feeling the protection I felt." *Id.* Abel then texted Nathan that Baldoni "wants to feel like she can be buried." *Id.* at 2, 7. Nathan responded "Of course—but you know when we send over documents we can't send over the work we will or could do because that could get us in a lot of trouble," adding "[w]e can't write we will destroy her." *Id.* at 7. Nathan also wrote: "You know we can bury anyone." *Id.*

The Article states that Nathan then "went hard at the press, pushing to prevent stories about Mr. Baldoni's behavior and reinforce negative ones about Ms. Lively, the text messages show," and that the effort "appears to have paid off" via negative media coverage "within days of the film's release." *Id.* at 2–3. The Article specifies that Baldoni texted Abel a social media thread that accused another celebrity of bullying behavior, stating "[t]his is what we would need." *Id.* at 8. Nathan then proposed hiring contractors to "dominate social media through 'full social account take downs'" that would be "untraceable," and the Wayfarer Parties started working with Jed Wallace and his company Street Relations for that purpose. *Id.* Abel told Nathan on August 4 that "I'm having reckless thoughts of wanting to plant pieces this week of how horrible Blake is to work with," and Nathan responded that she had already spoken off the record to an editor at the Daily Mail. *Id.* at 9. The Article quotes a text from one of Nathan's employees stating "[w]e've started to see shift on social, due largely to Jed and his team's efforts

to shift the narrative." *Id.* at 10.  The Article cites a brand marketing report completed for Lively

that "concluded she had likely been the object of a 'targeted, multichannel online attack.'" *Id.* at

12.

The Article quotes the August 16 texts between Abel and Nathan in which Nathan shared

the Daily Mail article headlined "Is Blake Lively set to be CANCELLED?" *Id.*  It quotes Abel

as stating "[y]ou really outdid yourself with this piece," and Nathan responding "[t]hat's why

you hired me right?" *Id.*  It did not provide any context suggesting these statements could have

been sarcastic.  *Id.*

The Article prominently includes statements from Wayfarer's counsel that the Wayfarer

Parties "did nothing proactive nor retaliated," that the claims are "completely false" and that

Lively planted her own negative stories, which "was another reason why Wayfarer Studios made

the decision to hire a crisis professional." *Id.* at 2.  The Article comments that "[i]t is impossible

to know how much of the negative publicity" against Lively "was seeded by Ms. Nathan, Mr.

Wallace and their team, and how much they noticed and amplified." *Id.* at 9.  It also notes that

during the film rollout, Lively was criticized for being insensitive about domestic violence, for

cross-promoting the film with Betty Booze, and for stating that Reynolds had written the rooftop

scene.  *Id.* at 10.  It states that Baldoni encouraged the campaign but sometimes "vacillate[d],

seeking assurances about the tactics being deployed." *Id.* at 11.

The Article was accompanied by a Video in which Twohey, drawing on text messages

and other images, explained the story.  Dkt. No. 50 ¶¶ 266–267; Dkt. No. 107-2.  The Video

states that:

> In a legal complaint Lively filed on Friday, private text messages and other
> documents that we've obtained reveal what really happened: a campaign to tarnish
> Lively after she alleged that Justin Baldoni, her co-star and director, and Jamey
> Heath, the producer, had engaged in misconduct while shooting the film.

Dkt. No. 107-2.  The Video otherwise does not mention the CRD complaint.  *Id.*  It follows a similar narrative to the Article.  *Id.*  It concludes by stating that "[t]his story reveals a new playbook for waging a far-reaching and largely undetectable smear campaign in the digital age." Dkt. No. 50 ¶ 267; Dkt. No. 107-2.

The Wayfarer Parties allege that "Lively and her team used cherry-picked text messages, stripped of context and even manipulated, to peddle a narrative that the Wayfarer Parties had responded to Lively's complaints about purported sexual harassment by plotting to destroy her reputation through a shadow smear campaign" to the New York Times.  *Id.* ¶ 272.  It states that Lively "selectively and deceptively edited" the text messages in her CRD complaint, and "apparently in the materials she forwarded to the Times," to tell the false story that the Wayfarer Parties committed public relations sabotage as revenge for her sexual harassment complaints.  *Id.* ¶ 275.  For example, Lively's CRD complaint includes the message from Abel to Nathan stating "[y]ou really outdid yourself with this piece" while omitting the upside-down smiley face and preceding messages suggesting that this comment was sarcastic.  *Id.* ¶¶ 277, 285.  In the CRD complaint, the initial statements by Nathan that "you know we can bury anyone" and "[w]e can't write we will destroy her" are included without the context of communications in which Nathan and Abel are discussing how to explain the process to Baldoni and explain to him "why we can't be proactive."  *Id.* ¶ 285.

The Amended Complaint alleges that the Times then "failed to review and/or investigate the plethora of communications demonstrating that the Wayfarer Parties' press strategy was at all times wholly defensive."  *Id.* ¶ 286.  It also alleges that the Times "deliberately takes [the text] communications out of context to bolster a fallacious narrative (designed in concert with Lively) to harm the Wayfarer Parties."  *Id.* ¶ 285.  It claims the Article deliberately omits "any

meaningful discussion of the true source of tension between Lively and the Wayfarer Parties," which was Lively's effort to take over the film, *id.* ¶ 284, as well as any mention of "a critical player in this manufactured controversy: Stephanie Jones," *id.* ¶ 283. It states that the Times "failed to follow its own journalistic standards," including by publishing the Article without further inquiry only hours after the Wayfarer Parties informed them that the story was false. *Id.* ¶¶ 292, 295.

After publication of the Article, Nathan received death threats. *Id.* ¶ 296. A reporter from the Daily Mail texted Nathan saying that now Sloane is "saying that Blake was sexually assaulted," noting that this differed from Sloane's original story that "the whole cast hates Justin and its nothing to do with Blake." *Id.* ¶ 193.

## PROCEDURAL HISTORY

On December 31, 2024, Lively filed a complaint against the Wayfarer Parties in this Court, bringing claims for sexual harassment, retaliation, breach of contract, and intentional and negligent infliction of emotional distress. Dkt. No. 1.[15] The Wayfarer Parties then filed their original complaint on January 16, 2025. Dkt. No. 1, 25-cv-449.[16] The Times was not named in that complaint. *Id.*

On January 30, 2025, the Court ordered the parties to show cause by January 30, 2025, why the case initiated by the Wayfarer Parties should not be consolidated with the previously-filed case brought by Lively, *Lively v. Wayfarer Studios LLC et al.*, 24-cv-10049. Dkt. No. 37, 25-cv-449. No party objected to consolidation. Dkt. Nos. 44–46, 25-cv-449. On January 30, 2025, the Court ordered the cases to be consolidated. Dkt. No. 49, 25-cv-449.

---

[15] All citations which do not provide a case number are to the docket in 24-cv-10049.
[16] Filings in 25-cv-449 before consolidation with 24-cv-10049 are available only on the docket of 25-cv-449, and they are therefore cited to that docket.

On January 31, 2025, the Wayfarer Parties filed an Amended Complaint naming the New York Times as a defendant.  Dkt. No. 50.[17]

On February 3, 2025, the Court held an initial pretrial conference and entered a Case Management Plan and Scheduling Order.  Dkt. No. 58; February 3, 2025, Minute Entry.  The Case Management Plan and Scheduling Order provided, among other things, that any motion to amend or join additional parties would be filed no later than April 18, 2025.  Dkt. No. 58.

On February 20, 2025, Sloane and Vision PR filed a motion to dismiss accompanied by a memorandum of law.  Dkt. Nos. 86–87.  On March 6, 2025, the Wayfarer Parties filed a memorandum in opposition to Sloane and Vision PR's motion to dismiss.  Dkt. No. 121.  On March 13, 2025, Sloane and Vision PR filed a reply memorandum of law.  Dkt. No. 126.  On March 17, 2025, Sloane and Vision PR moved to stay discovery pending a decision on their motion to dismiss.  Dkt. No. 129.  The motion was denied on March 21, 2025.  Dkt. No. 156.

On February 28, 2025, the Times filed a motion to dismiss accompanied by a memorandum of law and a declaration of counsel with twelve exhibits.  Dkt. Nos. 105–108.  The Times also moved for leave to file hard copy materials with the Court on a flash drive, which was granted.  Dkt. Nos. 108, 115.  The same day, the Times moved for a stay of discovery pending a decision on its motion to dismiss.  Dkt. No. 109.  On March 4, 2025, the motion was granted and discovery was stayed as to the Times.  Dkt. No. 118.  On March 14, 2025, the Wayfarer Parties filed a memorandum in opposition to the Times' motion to dismiss, accompanied by a declaration of counsel with one exhibit.  Dkt. No. 128.  The Times filed a reply memorandum of law in support of its motion on March 21, 2025.  Dkt. No. 158.

---

[17] The New York Times had previously been sued by the Wayfarer Parties in California, but that suit was dismissed after the New York Times was added as a Defendant in the Amended Complaint.  *See* Dkt. No. 63 at 21:21–22:1, 23:10–13.

On March 18, 2025, Reynolds filed a motion to dismiss accompanied by a memorandum of law.  Dkt. Nos. 132–133.  On April 1, 2025, the Wayfarer Parties filed a memorandum of law in opposition.  Dkt. No. 160.  On April 9, 2025, Reynolds filed a reply memorandum of law in support of his motion.  Dkt. No. 166.

On March 20, 2025, Lively filed a motion to dismiss accompanied by a memorandum of law and a declaration of counsel with one exhibit.  Dkt. Nos. 144–146.  On April 3, 2025, the Wayfarer Parties filed a memorandum of law in opposition.  Dkt. No. 162.  On April 10, 2025, Lively filed a reply memorandum of law in support of her motion.  Dkt. No. 172.

On April 15, 2025, the Wayfarer Parties filed a letter notifying the Court that the Wayfarer Parties would not move to amend their pleading by the April 18, 2025 deadline set out in the Case Management Plan and Scheduling Order.  Dkt. No. 178; *see* Dkt. No. 58.  However, the Wayfarer Parties stated that "[i]f the Court were to grant one or more of the motions to any extent, the Wayfarer Parties will move for leave to amend pursuant to Fed. R. Civ. P. 15(a)(2) and seek a commensurate modification of the Scheduling Order under the 'good cause' standard pursuant to Fed. R. Civ. P. 16(b)(4)."  Dkt. No. 178.

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).  A complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal.  *Twombly*, 550 U.S. at 555, 557.  The ultimate question is whether "[a] claim has facial plausibility, [i.e.,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

## DISCUSSION

The Amended Complaint focuses broadly on two types of claims. First, the Wayfarer Parties claim that Lively, assisted by Reynolds and Sloane, stole the film from Baldoni and Wayfarer, threatening to refuse to promote the film and attack Baldoni and Wayfarer in the press if the Wayfarer Parties did not agree to grant her, rather than Wayfarer, control over and credit for the film. Dkt. No. 50 ¶¶ 124, 130, 144, 146, 152–157, 192–193, 250–255. The Wayfarer Parties seek damages for this conduct based on a legal theory that Lively, Reynolds, and Sloane committed civil extortion. *Id.* ¶¶ 316–323. Second, the Wayfarer Parties claim that Lively, Sloane, Reynolds, and the Times spread a false narrative that Baldoni committed sexual misconduct towards Lively and the Wayfarer Parties then engaged in a smear campaign to ruin her reputation. *Id.* ¶ 17; *see id.* ¶¶ 8, 162, 193, 272–273, 275, 370. The Wayfarer Parties claim that by doing so, Lively, Reynolds, Sloane, and the Times committed the torts of defamation and false light. Although these two types of claims are the focus of the Amended Complaint, the Wayfarer Parties also bring claims for breach of contract, tortious interference with contract or prospective economic advantage, and promissory fraud. *See id.* ¶¶ 340–391.

The Wayfarer Parties cannot recover for Lively's alleged actions to steal creative control of the film from Baldoni and the Wayfarer Parties. Regardless of the propriety of these actions, they do not constitute civil extortion under California law. California courts have recognized a

claim for civil extortion in situations where a plaintiff gives a defendant money or property under threat and seeks to have it returned. *See Fuhrman v. Cal. Satellite Sys.*, 231 Cal. Rptr. 113, 122 (Cal. Ct. App. 1986). However, the Wayfarer Parties have not adequately alleged that Lively's threats were wrongful extortion rather than legally permissible hard bargaining or renegotiation of working conditions. Additionally, the Wayfarer Parties have not shown that some of Lively's allegedly extortionate acts damaged them.

The Wayfarer Parties also cannot recover on their defamation claims. The Wayfarer Parties have not alleged that Lively is responsible for any statements other than the statements in her CRD complaint, which are privileged. The Wayfarer Parties have alleged that Reynolds and Sloane made additional statements accusing Baldoni of sexual misconduct and that the Times made additional statements accusing the Wayfarer Parties of engaging in a smear campaign. But the Wayfarer Parties have not alleged that Reynolds, Sloane, or the Times would have seriously doubted these statements were true based on the information available to them, as is required for them to be liable for defamation under applicable law.

The Wayfarer Parties' additional claims also fail. Accordingly, the Amended Complaint must be dismissed in its entirety. However, the Wayfarer Parties have leave to amend their claims for breach of implied covenant and tortious interference with contract.

## I.     Choice of Law

The Wayfarer Parties plead their claims under California law. Dkt. No. 50 at 211 n.27. Lively agrees with the Wayfarer Parties that California law applies to the claims asserted against her. Dkt. No. 145 at 10. However, Sloane, Reynolds, and the Times argue that New York law applies to the claims against them. Dkt. No. 87 at 7; Dkt. No. 106 at 6–7; Dkt. No. 133 at 5–6.

This dispute is important because New York and California law differ in a number of ways relevant to the Wayfarer Parties' claims. *See Karaha Bodas Co. v. Perusahaan*

*Pertambangan Minyak Dan Gas Bumi Negara* ("*Pertamina*"), 313 F.3d 70, 85 (2d Cir. 2002)

("The first step in any case presenting a potential choice of law issue is to determine whether

there is an actual conflict between the laws of the jurisdictions involved." (quoting *In re Allstate*

*Ins. Co. & Stolarz*, 81 N.Y.2d 219, 223 (N.Y. 1993))).  New York law does not recognize causes

of action for civil extortion, false light invasion of privacy, or negligent interference with

prospective economic advantage.  *See Shak v. Krum*, 2018 WL 5831319, at *5 (S.D.N.Y. Nov. 6,

2018) ("Civil extortion is not a recognized cause of action under New York law."); *Minnelli v.*

*Soumayah*, 839 N.Y.S.2d 727, 728 (1st Dep't 2007) (same); *DeIuliis v. Engel*, 2021 WL

4443145, at *9 (S.D.N.Y. Sept. 27, 2021) ("New York does not recognize the tort of false light

invasion of privacy."); *Howell v. N.Y. Post Co*., 612 N.E.2d 699, 703 (N.Y. 1993) (declining to

recognize such a tort); *Lokai Holdings LLC v. Twin Tiger USA LLC*, 306 F. Supp. 3d 629, 643

(S.D.N.Y. 2018) ("The third cause of action, negligent interference with prospective economic

relations, does not exist."); *Alvord & Swift v. Stewart M. Muller Const. Co*., 385 N.E.2d 1238,

1241 (N.Y. 1978) ("[T]he interference must be intentional, not merely negligent.").  In addition,

although the elements of defamation under New York and California Law are generally similar,

the New York Constitution provides independent protection for statements of opinion, *see*

*Immuno AG. v. Moor-Jankowski*, 567 N.E.2d 1270, 1277–1280 (N.Y. 1991), and the two states

have different statutory privileges against defamation, *see, e.g.*, Cal. Civ. Code § 47.1

(recognizing a privilege for reports of sexual assault and harassment that is not available under

New York law).

    "[A] federal court sitting in diversity borrows the forum State's choice-of-law rule."

*Cassirer v. Thyssen-Bornemisza Collection Found*., 596 U.S. 107, 115 (2022).  "In the context of

tort law, New York utilizes interest analysis to determine which of two competing jurisdictions

39

has the greater interest in having its law applied in the litigation." *Padula v. Lilarn Props. Corp.*, 644 N.E.2d 1001, 1002 (N.Y. 1994).[18]  This requires consideration of the "facts or contacts" relating to the tort and "in which jurisdiction they are located." *Id.* at 1002 (quoting *Schultz v. Boy Scouts of Am., Inc.*, 480 N.E.2d 679, 684 (N.Y. 1985)).

As to the claims against Sloane and Reynolds, the Court is unable to determine what law applies at this stage.  "The record lacks facts necessary to conduct the context-specific . . . analysis required by New York's choice-of-law principles." *Speedmark Transp., Inc. v. Mui*, 778 F. Supp. 2d 439, 444 (S.D.N.Y. 2011); *see DarkPulse, Inc. v. Crown Bridge Partners LLC*, 2024 WL 3872725, at *3 (2d Cir. Aug. 19, 2024) ("[A]ccepting the complaint's allegations as true, and relying solely on those allegations as we must at this stage, it is not clear whether a reasonable relationship exists between the parties, the transaction, and any particular state."); *Bristol–Myers Squibb Co. v. Matrix Lab'ys Ltd.*, 655 F. App'x 9, 13 (2d Cir. 2016) (summary order) (noting that "choice-of-law determinations are fact-intensive inquiries" which may be "premature to resolve at the motion-to-dismiss stage").  The Wayfarer Parties' defamation and false light claims are based on allegations that Sloane made false statements in texts to a Daily Mail reporter, Dkt. No. 50 ¶¶ 189–190, 193, that Reynolds made false statements that Baldoni

---

[18] The Wayfarer Parties' fourth and ninth causes of action sound in contract.  *See* Dkt. No. 50 ¶¶ 340–346, 384–391.  However, choice of law is not meaningfully disputed with regard to these causes of action.  The fourth cause of action is solely against Lively, and the parties agree that the claims against Lively should be decided under California law.  Dkt. No. 145 at 10.  The ninth cause of action is for breach of implied contract against the Times.  Dkt. No. 50 ¶¶ 384–391. The parties have identified no difference between New York law and California law relevant to whether the Wayfarer Parties have stated a claim for breach of implied contract.  *See* Dkt. No. 127 at 24 & n.25 (stating that under both New York and California law, a cause of action for breach of implied contract has the same elements as a cause of action for express contract); *Prestige Brands Inc. v. Guardian Drug Co.*, 951 F. Supp. 2d 441, 446 (S.D.N.Y. 2013) (noting that the elements of breach of contract are the same under New York and California law); *Rudolph v. Hudson's Bay Co.*, 2019 WL 2023713, at *9–11 (S.D.N.Y. May 7, 2019) (same); *Labajo v. Best Buy Stores, L.P.*, 478 F. Supp. 2d 523, 528 (S.D.N.Y. 2007) (same).

was a "sexual predator," *id.* ¶¶ 8, 162, and that both Sloane and Reynolds participated in a campaign to leak false information to the press, *id.* ¶¶ 17, all of which occurred at unspecified locations.  The civil extortion and false light claims against Sloane and Reynolds are based on essentially the same allegations, as are the claims for tortious interference against Reynolds.  *See* Dkt. No. 121 at 36 (civil extortion against Sloane); Dkt. No. 50 ¶¶ 17, 162, 250–255 (civil extortion against Reynolds); *id.* ¶¶ 332–339 (false light); *id.* ¶¶ 347–374 (tortious interference).

Because it is unclear from the pleadings where the facts underlying the claims against Sloane and Reynolds occurred, the Court cannot dismiss the claims based on a holding that they must be brought under New York law.  If the allegations state a claim under California law, the claim must be allowed to continue until such time as the facts developed show California law does not apply.  Therefore, the Court will analyze the claims against Sloane and Reynolds under California law for purposes of this motion.  *See Halberstam, Tr. of Zupnick Fam. Tr. 2008 B v. Allianz Life Ins. Co. of N. Am.*, 2017 WL 10187689, at *3–4 (E.D.N.Y. June 9, 2017) (evaluating claims under each potentially applicable law when "[t]he complaint and its attachments do not contain sufficient allegations . . . to determine" which law applies); *Meserole v. Sony Corp. of Am.*, 2009 WL 1403933, at *5 n.6 (S.D.N.Y. May 19, 2009) (same); *Foisie v. Worcester Polytechnic Inst.*, 967 F.3d 27, 42–43 (1st Cir. 2020) ("[W]hen there are important holes in the record, discovery will likely illuminate critical facts bearing on the unanswered questions and, thus, on the ultimate question of which state's law should apply.").

However, the defamation and false light[19] claims against the Times must be analyzed under New York law.[20]  The Wayfarer Parties argue that these claims are properly brought under California law, because they are California citizens and feel the impact of the defamation in California.  Dkt. No. 127 at 9.  But the Second Circuit analyzed a similar situation in *Kinsey v. N.Y. Times Co.*, 991 F.3d 171, 176–78 (2d Cir. 2021), in which the Times published an allegedly defamatory article regarding events that took place in the District of Columbia and affected the plaintiff's employment there.  The Circuit distinguished between defamation cases involving a targeted publication, in which "the state of the plaintiff's domicile will usually have the most significant relationship to the case," and "multistate defamation cases" in which "an allegedly defamatory statement is published nationally" and the plaintiff suffers harm in every state simultaneously.  *Id.* (quoting *Lee v. Bankers Tr. Co.*, 166 F.3d 540, 545 (2d Cir. 1999)).  The Circuit stated that in multistate defamation cases, the traditional rule that the law of the plaintiff's domicile applies is only "presumptive" and may be overcome if "some other state has a more significant relationship," taking into account "where [the] plaintiff suffered the greatest injury; where the statements emanated and were broadcast; where the activities to which the allegedly defamatory statements refer took place; and the policy interests of the states whose law might apply."  *Id.* (quoting *Catalanello v. Kramer*, 18 F. Supp. 3d 504, 512 (S.D.N.Y. 2014) and then quoting *Condit v. Dunne*, 317 F. Supp. 2d 344, 353-54 (S.D.N.Y. 2004)).  The Circuit then held that although the plaintiff suffered the greatest injury in the District of Columbia and Maryland

---

[19] Because the Wayfarer Parties' false light claim against the Times involves the same underlying facts as the defamation claim, the choice-of-law analysis is the same.  *See* Dkt. No  127 at 23 (arguing that false and reckless accusations in the Article state a claim for false light); *see also* Dkt. No. 50 ¶¶ 267 (alleging that publication of the Video "constituted a malicious and reckless act of defamation and false light invasion of privacy").

[20] Choice of law is not disputed as to the remaining claims against the Times, which are for breach of contract and promissory fraud.  *See* Dkt. No. 50 ¶¶ 375–391.

(where he was domiciled), New York had the most significant interest in the litigation because "the Times is domiciled in New York," "the allegedly defamatory statement emanated from New York, and "New York has strong policy interests in regulating the conduct of its citizens and its media." *Id.* at 178.

The same factors require application of New York law to the defamation and false light claims against the Times here.  The Wayfarer Parties presumably suffered the greatest injury in California, where they are domiciled,[21] but *Kinsey* holds that this is not decisive.  The events underlying the allegedly defamatory statements took place in New York, where Lively, Sloane and Reynolds were based and sometimes met with Baldoni and the Wayfarer Parties, California, where the Wayfarer Parties were based, and the location of filming, which is not clearly specified but at least some of which occurred in New York.  *See* Dkt. No. 50 ¶ 67 ("Lively expressed excitement over returning to shoot in the fall in New York.").  The statements emanated from New York, where the Times is located.  Dkt. No. 50 ¶ 311.  And decisively, "New York has strong policy interests in regulating the conduct of its citizens and its media." *Kinsey*, 991 F.3d at 178.  "[A]s the national center of the publishing industry, [New York] has a significant interest in assuring that the risks and liabilities flowing from publishing . . . will be uniform," ensuring that publishers are able to "mold their conduct" to predictable legal norms. *Jacob v. Lorenz*, 626 F. Supp. 3d 672, 685 (S.D.N.Y. 2022) (quoting *Davis v. Costa-Gavras*, 580 F. Supp. 1082, 1092 (S.D.N.Y. 1984)); *cf. Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 245 (2d Cir. 2007) (noting that New York chose not to give its courts jurisdiction over non-domiciliaries based on defamation causing injury within New York, because the legislature "did not wish New

---

[21] Sarowitz is domiciled in Illinois, but no party has argued the law of Illinois should apply to the claims against him.  Dkt. No. 50 ¶ 306.

York to force newspapers published in other states to defend themselves in states where they had no substantial interests").  Under *Kinsey*, a plaintiff must do more to overcome this interest than simply show that a publisher based in New York and reporting from New York was reporting on a plaintiff who lives in another state, especially here where the underlying events also have a nexus to New York.  The Court will "follow the reasoning from *Kinsey* and also join several of our sister courts in this District" holding that similar circumstances require the application of New York law.  *DeIuliis*, 2021 WL 4443145, at *10; *see Jacob*, 626 F. Supp. 3d at 685 (applying New York law to a defamation claim against a New York publisher involving California citizens and events); *Prince v. Intercept*, 634 F. Supp. 3d 114, at 133–134 (S.D.N.Y. 2022); *Belya v. Kapral*, 2025 WL 963111, at *4 (S.D.N.Y. Mar. 31, 2025).[22]

## II.    Impermissible Pleading

All Defendants argue that the Amended Complaint should be dismissed without further analysis because it engages in impermissible group pleading and otherwise violates Federal Rule of Civil Procedure 8.  Dkt. No. 87 at 5–6; Dkt. No. 106 at 8–9; *see* Dkt. No. 133 at 6 n.4; Dkt. No. 145 at 2, 11 n.14.  Under Rule 8, a complaint is required to "give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial."  *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988).  Defendants argue that they lack proper notice of the claims against them because the Amended Complaint consistently makes allegations regarding

---

[22] The Wayfarer Parties argue that this case is distinguishable from *Kinsey* because it involves "not only California residents but also Hollywood's entertainment industry" and because the Article focuses heavily on Lively's CRD complaint filed in California.  Dkt. No. 127 at 11.  But these facts do not distinguish the case from *Kinsey*, in which the Times reported on alleged sexual harassment that occurred entirely in the District of Columbia and involved a quintessentially Washingtonian entity, the Department of Justice.  *Kinsey*, 991 F.3d at 177.  Analysis of "where the activities to which the allegedly defamatory statements refer took place" favors New York here to a greater degree here than in *Kinsey*, where the underlying events had no connection to New York whatsoever.  *Id.* (quoting *Condit*, 317 F. Supp. 2d at 354).

"the Lively Parties" and "the Wayfarer Parties," leaving defendants unable to discern which of them purportedly injured which plaintiff, and how. Dkt. No. 87 at 6; Dkt. No. 106 at 8–9. This issue is compounded by the fact that "the complaints' length and 'tangents' 'make it difficult to understand exactly how the facts alleged provide a basis for Plaintiff's claims.'" Dkt. No. 106 at 9 (quoting *Komatsu v. City of New York*, 2021 WL 3038498, at *5 (S.D.N.Y. July 16, 2021)).

"Rule 8 'does not demand that a complaint be a model of clarity' so long as it provides 'fair notice of what the plaintiff's claim is and the ground upon which it rests.'" *Vantone Grp. Liab. Co. v. Yangpu NGT Indus. Co.*, 2015 WL 4040882, at *3–4 (S.D.N.Y. July 2, 2015) (quoting *Atuahene v. City of Hartford*, 10 F. App'x. 33, 33 (2d Cir.2001) (summary order)). "Dismissal [under Rule 8] is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Komatsu*, 2021 WL 3038498, at *3 (quoting *Salahuddin*, 861 F.2d at 42). The Wayfarer Parties' Amended Complaint is lengthy and repetitive, and it relies heavily on group pleading, but it is not so confusing or lacking in substance that dismissal is appropriate. *See Komatsu*, 2021 WL 3038498, at *1 (dismissing complaint under Rule 8 that was "a total of 1,713 pages and include[d] dozens, if not hundreds, of links to days' worth of video footage, as well many lengthy diatribes against the defendants and others not named in the case"); *Barsella v. United States*, 135 F.R.D. 64, 66 (S.D.N.Y. 1991) (dismissing complaint under Rule 8 that was "a virtually illegible handwritten document accompanied by numerous equally incomprehensible documents termed 'exhibits'").

"The key to Rule 8(a)'s requirements is whether adequate notice is given." *Wynder v. McMahon*, 360 F.3d 73, 79 (2d Cir. 2004); *see Vantone Grp.*, 2015 WL 4040882, at *3–4. Although the Amended Complaint lacks clarity as to the boundaries of certain claims,

Defendants have adequate notice of many core claims that are evident from the face of the complaint and have been fully briefed by the parties. For example, it is evident from the language of the complaint that the civil extortion claim is based on Lively refusing to promote the film unless she was allowed to create her own cut, Dkt. No. 50 ¶¶ 140, 142, Lively demanding "with extortionate threats" that Baldoni and Heath support her *p.g.a.* certification, *id.* ¶ 154, and Lively and Reynolds attempting to force Baldoni and Wayfarer to read a statement apologizing for issue with the film, *id.* ¶¶ 3, 16. It is evident that the defamation claim is based on Lively, Sloane, and Reynolds providing the CRD complaint to the Times before it was released and stating to the Times in substance that the Wayfarer Parties engaged in sexually inappropriate conduct towards Lively and retaliated against her for reporting the misconduct by engaging in a campaign to ruin her reputation, *id.* ¶ 325, Sloane and Reynolds making additional statements that Baldoni had committed sexual misconduct, *id.* ¶¶ 8, 162, 193, and the Times stating that Baldoni, Health, Abel, and Nathan had engaged in a "smear campaign" to ruin Lively's reputation, *id.* ¶¶ 272, 274. "[P]laintiff's submission is a model of neither clarity nor brevity . . . but it is sufficient to put the defendants on fair notice" of these claims. *Wynder*, 360 F.3d at 79.

Where the Amended Complaint does lack clarity, the Court will consider only the claims of which Defendants have fair notice. To the extent a fair reading of the Amended Complaint does not provide notice that the Wayfarer Parties are making a particular claim, against a particular defendant, based on a particular statement, the Court will not parse through the various allegations and documents to determine whether a claim could theoretically be stated. For example, although the Amended Complaint alleges the CRD complaint "was rife with lies and doctored 'evidence,'" Dkt. No. 50 ¶ 4, the Court will not consider whether the CRD complaint

contained any defamatory statements beyond those specifically alleged in the Amended Complaint. Similarly, in analyzing the defamation claim against the New York Times, the Court will not consider whether any statements in the Article are defamatory beyond those identified in the Amended Complaint. The Wayfarer Parties have an obligation to identify the statements which harmed them, rather than gesturing at a document or category of statements and forcing the defendant to guess at which ones are actionable. *See D'Annunzio v. Ayken, Inc*., 876 F. Supp. 2d 211, 216 (E.D.N.Y. 2012) ("[T]he pleadings must be sufficient to afford the defendant sufficient notice of the communications complained of to enable him to defend himself." (quoting *Kelly v. Schmidberger*, 806 F.2d 44, 46 (2d Cir.1986)); *see Biro v. Conde Nast*, 883 F. Supp. 2d 441, 456 (S.D.N.Y. 2012). Likewise, if the complaint uses the "Lively Parties" or "Wayfarer Parties" in a context where a particular plaintiff or defendant is not clearly indicated, the Court will not guess at what claim the Amended Complaint is attempting to make. Such a course would "promote litigation by ambush," allowing plaintiffs to use vague pleading to hide their claims only to spring them on defendants in opposition briefing or at trial. *Wade Park Land Holdings, LLC v. Kalikow*, 2023 WL 2614243, at *10 (S.D.N.Y. Mar. 23, 2023), *aff'd sub nom. In re Wade Park Land Holdings*, 2024 WL 3024648 (2d Cir. June 17, 2024).

Accordingly, though the Court will not strike or dismiss any allegations on Rule 8 grounds, the Court will consider only those claims that a reasonable defendant would understand to be asserted against it based on the allegations in the Amended Complaint.

## III.    Civil Extortion

The Wayfarer Parties' first claim is for civil extortion under California law against Lively, Reynolds, and Sloane. Dkt. No. 50 ¶¶ 316–323. In support of this claim, the Wayfarer Parties allege 1) that Lively refused to return to production unless the Wayfarer Parties agreed to her return to production demands, *id.* ¶¶ 6, 75, 124, 130; 2) that Lively threatened to abandon her

contractual obligation to promote the film or approve marketing materials unless the Wayfarer Parties agreed to co-fund a screening of her version of the Film, *id.* ¶ 142, eventually release that version, *id.* ¶ 146, and grant her a producer credit and support in seeking the *p.g.a.* designation, *id.* ¶¶ 152–157; 3) that Lively threatened to boycott the premiere unless Baldoni was excluded, *id.* ¶¶ 166–170; 4) that Lively and Reynolds threatened to attack Wayfarer in the press if it did not take the blame for problems during filming, *id.* ¶¶ 250–255; and 5) that Sloane carried out Lively and Reynolds' threats by spreading false allegations that the Wayfarer Parties had engaged in or concealed sexual misconduct, *id.* ¶¶ 192–193; *see* Dkt. No. 121 at 36.[23]

Lively, Sloane, and Reynolds argue that none of the alleged acts are wrongful and that they did not obtain money or property from the Wayfarer Parties. Dkt. No. 87 at 7–9; Dkt. No. 133 at 19; Dkt. No. 145 at 27–30. The Wayfarer Parties argue that they are not required to allege a transfer of money or property and that the threats alleged in the Amended Complaint are sufficient. Dkt. No. 160 at 17; Dkt. No. 162 at 24. Lively, Sloane, and Reynolds have the better of the argument.

---

[23] The Wayfarer Parties also allege in several instances that they took actions desired by Lively because of her past threats or because of a general atmosphere of threats and fear. Specifically Baldoni realized after the return to production demands that "he needed to cede control of the script to Lively," Dkt. No. 50 ¶124, and "the studio" agreed "in light of" Lively's threats to do an official audience test of Lively's version of the Film. Dkt. No. 50 ¶ 144. These allegations fail to connect particular threats by Lively with particular demands, and it is at best unclear whether the Wayfarer Parties are alleging that Lively threatened to take a particular action unless the Wayfarer Parties gave her control of the script or agreed to an audience test. Lively does not have fair notice that the Wayfarer Parties' extortion claim could be based on such allegations. *See Salahuddin*, 861 F.2d at 42 (stating that a party must have "fair notice of the claim asserted so as to enable him to answer and prepare for trial"). Assuming these claims were clearly alleged, they would nevertheless fail for the reasons discussed below. Neither threat constitutes wrongful duress as a matter of law, and the Wayfarer Parties have not pleaded that ceding control of the script resulted in damages.

48

### A.   Governing Law

The parties advance different understandings of the tort of civil extortion under California law.  Lively, Reynolds and Sloane argue that civil extortion is a cause of action for "moneys obtained by duress," which is separate from the crime of extortion and requires proof of actual damages.  Dkt. No. 145 at 27 (quoting *Fuhrman*, 231 Cal. Rptr. at 122).  The Wayfarer Parties argue that civil extortion is a cause of action based on the criminal extortion statute and that it does not require money or property actually be obtained.  Dkt. No. 162 at 24.  Lively, Reynolds, and Sloane are correct.  Although the claim is labeled "civil extortion," it is derived from the common law rather than the criminal extortion statute and requires actual damages.

"Blackmail and extortion are, in almost all jurisdictions, crimes, not civil causes of action."  *Rader v. ShareBuilder Corp.*, 772 F. Supp. 2d 599, 606 (D. Del. 2011), *aff'd sub nom. Rader v. ING Groep NV*, 497 F. App'x 171 (3d Cir. 2012).  The crime of extortion involves "the obtaining of property or other consideration from another, with his or her consent, . . .  induced by a wrongful use of force or fear."  Cal. Penal Code § 518.  A few states have also recognized a tort of civil extortion based on the criminal offense.  *See, e.g.*, *Lagonoy v. Gun*, 2022 WL 496252, at *2 (Mich. Ct. App. Feb. 17, 2022) ("Michigan law recognizes the tort of civil extortion based upon the criminal statute prohibiting extortion."); *Duncan v. Ford Motor Credit, Repossessors, Inc.*, 2018 WL 3060265, at *3 (Iowa Ct. App. 2018) ("The criminal offense of extortion gives rise to a civil cause of action for extortion.").

A slightly larger number of states have recognized a similar cause of action for duress.  *See Troutman v. Facetglas, Inc.*, 316 S.E.2d 424, 426 (S.C. Ct. App. 1984) (collecting cases); *First Nat. Bank in Albuquerque v. Sanchez*, 815 P.2d 613 (N.M. 1991); *Wurtz v. Fleischman*, 278 N.W.2d 266, 270–72 (Wis. Ct. App. 1979), *rev'd on other grounds*, 293 N.W.2d 155 (Wis. 1980); *Likover v. Sunflower Terrace II, Ltd.*, 696 S.W.2d 468, 472 (Tex. App. 1985).  Like

49

extortion, duress involves the obtaining of a benefit by wrongful threats. However, the tort of

duress is not descended from the criminal law but rather from the contractual defense of duress.

This defense allows a party to void a contract and receive restitution for any benefits it provided

to its counterparty if it entered into the contract due to "unlawful threats or wrongful, oppressive,

or unconscionable conduct on the part of the defendant which leaves the plaintiff no reasonable

alternative but to acquiesce." *Mach. Hauling, Inc. v. Steel of W. Va.*, 384 S.E.2d 139, 142

(W.Va. 1989); *see* Restatement (Second) of Contracts § 175 (1981) ("If a party's manifestation

of assent is induced by an improper threat by the other party that leaves the victim no reasonable

alternative, the contract is voidable by the victim."); *see also* Restatement (Third) of Restitution

and Unjust Enrichment § 14 (2011) (noting that "[t]he transferee is liable in restitution as

necessary to avoid unjust enrichment").

California permits plaintiffs to bring a claim labeled "civil extortion." However, "an

action for extortion under California law is more appropriately considered a claim for 'moneys

obtained by duress.'" *Intermarketing Media, LLC v. Barlow*, 2021 WL 5990190, at *12 (C.D.

Cal. May 4, 2021) (quoting *Fuhrman*, 231 Cal. Rptr. at 122); *see Fowler v. Univ. of Phoenix,

Inc.*, 2019 WL 1746576, at *17 (S.D. Cal. Apr. 18, 2019) ("California courts recognize extortion

as civil tort cause of action for moneys obtained by duress, a form of fraud." (citation and

quotation marks omitted)), *aff'd*, 817 F. App'x 442 (9th Cir. 2020); *Doe v. Mahboubi-Fardi*,

2024 WL 2206640, at *12 (C.D. Cal. Jan. 2, 2024) (same). In other words, the California tort is

based on the common-law concept of duress rather than the statutory elements of criminal

extortion. *See Intermarketing Media*, 2021 WL 5990190, at *12 n.10; *Yang v. Yang*, 2019 WL

8640452, at *2 (Cal. Super. May 31, 2019).[24]  Although the concepts of duress and criminal extortion are similar, the lineage of the tort clarifies two points important to this case.  First, if a threat would not support a contract claim for duress it is not sufficient to support a tort claim for civil extortion.  Second and of equal importance, in order to state a civil extortion claim, the plaintiff must allege that they suffered damages or lost something of value as a result of defendant's threat.  The threat alone is not sufficient.

The few published California cases discussing the tort involve the return of money conveyed due to a wrongful threat, a situation which the cases analogize to voiding a contract made under duress and receiving restitution.  *See Fuhrman*, 231 Cal. Rptr. 113, 122 (Cal. Ct. App. 1986); *Leeper v. Beltrami*, 347 P.2d 12, 18 (Cal. 1959); *Woodham v. Allen*, 162 P. 398, 399 (Cal. 1900).  The leading California case articulating the tort is *Fuhrman v. California Satellite Systems*.  *See Intermarketing Media*, 2021 WL 5990190, at *12 (citing and discussing *Fuhrman*, 231 Cal. Rptr. at 122); *Monex Deposit Co. v. Gilliam*, 666 F. Supp. 2d 1135, 1136 n.3 (C.D. Cal.

---

[24] Some cases have stated that "there is no private right of action for 'extortion'" under California law.  *Arista Recs. v. Sanchez*, 2006 WL 5908359, at *2 (C.D. Cal. Mar. 1, 2006); *see Samzelius v. Bank of Am.*, 2012 WL 12949683, at *9 (N.D. Cal. Oct. 9, 2012).  However, the holding of these cases is simply that there is no cause of action for civil extortion based on criminal extortion statutes.  *See Arista Recs.*, 2006 WL 5908359, at *2 ("Extortion is a criminal offense, not a civil cause of action."); *Samzelius*, 2012 WL 12949683, at *9 ("Extortion is a federal criminal offense, and there is no private right of action for extortion.").  The cases do not and cannot deny that California recognizes a cause of action for recovery of moneys obtained under threat, which has been explicitly recognized by the California Supreme Court.  *Leeper*, 347 P.2d at 18.  It is also notable that, in addition to the cases cited above, there are numerous unpublished California cases involving the tort of civil extortion.  *See Hines v. Anderson*, 2006 WL 2796209, at *9 (Cal. Ct. App. Sept. 29, 2006); *Young v. Schultz*, 2023 WL 2705830, at *10 (Cal. Ct. App. Mar. 30, 2023), *review denied* (July 12, 2023); *Fleet v. State Pers. Bd.*, 2018 WL 1061579, at *5 (Cal. Ct. App. Feb. 27, 2018); *Berglund v. Rogers*, 2020 WL 373019, at *3 (Cal. Ct. App. Jan. 23, 2020); *Schiffman v. Knoll*, 2019 WL 1254152, at *3 (Cal. Ct. App. Mar. 19, 2019); *Ryan v. Allione*, 2015 WL 7919253, at *3 (Cal. Ct. App. Dec. 4, 2015); *From the Earth, LLC v. Beltran*, 2022 WL 9692823, at *6 (Cal. Ct. App. Oct. 17, 2022); *Platino Recs., Inc. v. Univision Music, LLC*, 2010 WL 1840216, at *7 (Cal. Ct. App. May 10, 2010).

2009) ("[T]he Court relies on *Fuhrman* as the most relevant authority for this issue.").  In

*Fuhrman*, the plaintiff brought a claim for "extortion," alleging that the defendants baselessly

accused her of illegally receiving satellite broadcasts and threatened to sue her unless she paid

them $275 to settle the claim.  231 Cal. Rptr. at 115, 121.  The California Court of Appeal held

that a claim for "extortion" was cognizable, rejecting the defendant's argument that "'extortion'

is only a crime and cannot form the basis for a civil action in tort."  *Id.* at 122.  At the same time,

*Fuhrman* did not discuss or even mention the criminal extortion statute.  *See id.*  Rather, it

described the relevant claim, "[h]owever denominated (e.g. extortion, menace, duress)" as

"essentially a cause of action for moneys obtained by duress, a form of fraud."  *Id.* at 122; *see id.*

at 123 (stating that a claim is properly brought "for the recovery of moneys received by a

defendant under the influence of duress").  The court suggested that if the plaintiff "had actually

paid the money demanded by defendants," she could have recovered her money.  *Id.* at 123.

However, it dismissed the claim because she had not paid the demand and therefore had no claim

for relief.  *Id*.  The threat itself did not support a claim for extortion or duress in the absence of

an allegation that defendants took property from plaintiff as a result of the threat.  *Fuhrman* thus

stands for the propositions that 1) a plaintiff may bring a civil claim for extortion under

California law, 2) such a claim is based on the common-law concept of duress, and 3) the

plaintiff may not recover on such a claim unless she actually paid the demand or conveyed

something of value to the defendant.  *See Intermarketing Media*, 2021 WL 5990190, at *12

(stating that "following *Fuhrman*," a claim for extortion is in substance a claim for duress and

requires actual damages, and collecting authority).

   This reading of *Fuhrman* is supported by the decisions on which it relies.  Although

*Fuhrman* was an intermediate appellate court decision, it relied on two California Supreme Court

decisions which had previously recognized "a cause of action for the recovery of money obtained by the wrongful threat of criminal or civil prosecution." 231 Cal. Rptr. at 122. In *Woodham v. Allen*, the California Supreme Court sustained a tort claim by a woman seeking to recover money that was "unlawfully extorted" from her based on the defendant's threat that he would have her husband arrested on false pretenses. 62 P. 398, 398–99 (Cal. 1900). The court stated that "the ultimate fact to be established" was that the money was paid under duress, and if this were established, "the money can be recovered back." *Id.* at 399.

In *Leeper v. Beltrami*, the California Supreme Court sustained a cause of action "for wrongful acts in the nature of duress" when the defendant filed a false suit which clouded the title of plaintiff's property, preventing its sale, and demanded consideration to withdraw the claims, which the plaintiff paid. 347 P.2d 12, 17–18 (Cal. 1959). The court expressed some uncertainty over whether the case should "be considered a suit for restitution to recover money paid under duress," "an action for money had and received sounding in tort," or "simply an action for money damages for the tortious conduct of the defendants resulting in injury to the plaintiffs." *Id.* at 20–21. But it stated that "the basic nature of the wrongdoing of these defendants is duress." *Id.* at 21. *Leeper* explained that although generally "the taking of legal action or the threat to take such action cannot constitute duress," the pressing of a false claim is a wrongful act that may constitute duress. *Id.* at 19. It added that duress does not exist if the plaintiff "had a reasonable alternative to the parting with the consideration to satisfy the false claim," which should be judged by the standard of "a reasonably prudent person." *Id.* at 19.

Each of these cases involved a suit to recover money paid under a threat of wrongful prosecution. As stated in *Leeper*, this type of claim sounds in restitution, "the return of money or other property obtained through an improper means to the person from whom the property was

taken." *Clark v. Superior Ct.*, 235 P.3d 171, 176 (Cal. 2010); *see Leeper*, 347 P.2d at 20–21.

"[T]he historic purpose of restitution in equity" is "to preclude unjust enrichment" by preventing

a party from retaining a wrongfully gained benefit. *Cortez v. Purolator Air Filtration Prods.*

*Co.*, 999 P.2d 706, 714 (Cal. 2000). The tort of civil extortion was not derived from the criminal

extortion statute, but stems from the California courts' recognition that it would be unjust to

allow a party to retain a benefit that it received in circumstances that the common law recognizes

as duress. *See Leeper*, 347 P.2d at 18–19; *Woodham*, 62 P. at 399; *see also Burke v. Gould*, 38

P. 733, 734 (Cal. 1894) ("Money paid to prevent the unlawful taking or detention of property

may be recovered back. The doctrine is an equitable one, and is founded upon the theory of the

moral duress not justified by law.").

Accordingly, a civil extortion claim under California law will not lie in the absence of a

threat that would be sufficient to support a claim of duress. "Duress generally exists whenever

one is induced by the unlawful act of another to make a contract or perform some other act under

circumstances that deprive him of the exercise of free will." *Tarpy v. County of San Diego*, 1

Cal. Rptr. 3d 607, 614 (Cal. Ct. App. 2003). As recognized in *Leeper*, "[u]nder modern law

duress is not limited to threats against the person" but "may also consist of threats to business or

property interests." *Leeper*, 347 P.2d at 18. The law of criminal extortion may help elucidate

the civil concept of duress, and indeed some California courts have drawn on it for this purpose.

*See Philippine Exp. & Foreign Loan Guarantee Corp. v. Chuidian*, 267 Cal. Rptr. 457, 466 (Cal.

Ct. App. 1990); *Morrill v. Nightingale*, 28 P. 1068, 1069 (Cal. 1892); *Tran v. Nguyen*, 315 Cal.

Rptr. 3d 607, 613–15 (Cal. Ct. App. 2023). However, the list of wrongful acts that will support a

claim for civil extortion is neither defined nor limited by those listed in the California Penal

Code. *See* Cal. Penal Code. § 519; *Geragos v. Abelyan*, 305 Cal. Rptr. 3d 303, 315 (Cal. Ct.

App. 2023) ("Only threats that fall within one of these [five] categories of section 519 [constitute] extortion." (quoting *People v. Umana*, 41 Cal. Rptr. 3d 573, 582 (Cal. Ct. App. 2006))).  Rather, courts rely on the broader body of jurisprudence describing what types of threat are both "wrongful" and "sufficiently coercive to cause a reasonably prudent person faced with no reasonable alternative to succumb to the perpetrator's pressure." *Rich & Whillock, Inc. v. Ashton Dev., Inc.*, 204 Cal. Rptr. 86, 89 (Cal. Ct. App. 1984); *see Leeper*, 347 P.2d at 18; *CrossTalk Prods.*, 76 Cal. Rptr. 2d at 623 (drawing a direct connection between the tort of duress and contract law); *Chuidian*, 267 Cal. Rptr. at 467–68.[25]  If a given threat is sufficient to void a contract, it is also sufficient to reverse a non-contractual transaction.  If a threat is not sufficient to void a contract, it also cannot justify reversing a non-contractual transaction.

     *Fuhrman* also makes clear that a civil extortion claim requires "actual damages." *Fuhrman*, 231 Cal. Rptr. at 122.  *Fuhrman* stated that "[t]he fatal flaw in plaintiff's action is that she apparently *never paid* the money defendants demanded in their letters," and dismissed the case on this ground.  231 Cal. Rptr. at 122.  Accordingly, a civil plaintiff cannot recover simply for being threatened.  *See Raiser v. Ventura Coll. of L.*, 2009 WL 10692058, at *3 (C.D. Cal.

---

[25] For the same reasons, Lively and Reynolds' argument that the tort should be limited to threats of litigation is unavailing.  Dkt. No. 145 at 27–28; Dkt. No. 133 at 19; *see Fuhrman*, 231 Cal. Rptr. at 122 (noting that *Leeper* and *Woodham* recognized "a cause of action for the recovery of money obtained by the wrongful threat of criminal or civil prosecution").  Although the key California cases involve duress via threats of prosecution, *Leeper* expressly recognized the traditional understanding of duress as "threats against the person," i.e. threats of violence, and noted that duress "may also consist of threats to business or property interests." *Leeper*, 347 P.2d. at 18; *see* Restatement (First) of Contracts § 493 (1932) ("Duress may be exercised by . . . personal violence or a threat thereof.").  Nothing about *Leeper* or *Woodham* suggests the illogical result that a plaintiff could properly recover money turned over in response to the threat that the plaintiff's spouse would be imprisoned but not the threat that the spouse would be killed.  And more recent California cases have recognized that duress may be based on other types of threats. *See CrossTalk Prods.*, 76 Cal. Rptr. 2d at 623 (considering wrongful threats to business interests); *Tran v. Nguyen*, 315 Cal. Rptr. 3d 607, 615 (Cal. Ct. App. 2023) (considering defendant's threat to disclose plaintiff's secret child to his wife).

Sept. 1, 2009) (dismissing civil claim for "attempted extortion" for lack of damages); *Baffert v. Wunderler*, 2024 WL 5237442, at *3 (S.D. Cal. June 6, 2024) (dismissing civil extortion claim that only alleged "emotional distress and punitive damages"); *Intermarketing Media*, 2021 WL 5990190, at *12 (collecting cases). This differentiates the elements of civil extortion from the elements of criminal extortion. *See Intermarketing Media*, 2021 WL 5990190, at *12 ("[A] civil claim for extortion requires proof of elements not associated with the crime of extortion."). Because attempted extortion is a crime under California law, a defendant can be criminally prosecuted for making a threat even if the plaintiff does not acquiesce. *See* Cal. Penal Code § 524 ("[E]very person who attempts, by means of any threat, such as is specified in Section 519 of this code, to extort property or other consideration from another is punishable by imprisonment in the county jail not longer than one year."). However, this is not true for civil extortion.[26]

Further evidence that the civil extortion claim requires damages comes from the repeated statement in the California cases that duress is a "species of fraud." *Leeper*, 347 P.2d at 18; *see Fuhrman*, 231 Cal. Rptr. at 122; *see also Intermarketing Media*, 2021 WL 5990190, at *13 ("[E]xtortion is in substance a fraud claim."). When duress involves some type of coercion other

---

[26] This difference between civil and criminal extortion is consistent with general distinctions between criminal law and tort. A crime is "an offense against the public pursued by the sovereign, whereas the tort is a private injury to be pursued by the injured party." 21 Am. Jur. 2d Criminal Law § 2; *see* Model Penal Code § 1.02 (1962) (stating that the purpose of criminal law is to "forbid and prevent conduct that . . . threatens substantial harm to . . . public interests"). By contrast, tort claims involve an offense to the individual. Accordingly, tort claims generally require that a plaintiff suffer damages. *See* Restatement (Second) of Torts § 47 (1965) ("[C]onduct which is tortious because intended to result in bodily harm to another or in the invasion of any other of his legally protected interests does not make the actor liable for an emotional distress which is the only legal consequence of his conduct."); *Lagonoy*, 2022 WL 496252 (holding that because "damages of necessity is an element of a tort action," civil extortion but not criminal extortion requires proof of damages).

than the pressing of a false claim, it is not literally a form of fraud.[27]  *See Steinger v. Smith*, 213 S.W.2d 396, 400 (Mo. 1948) (noting that while courts sometimes state that duress is "species of fraud," "there is a clear distinction between them").  But the analogy drawn by the California courts is logical, as both fraud and duress are grounds to revoke an apparently voluntary transaction that was in substance involuntary.  Under California law, "unless the plaintiff merely seeks to rescind the contract, it must suffer actual monetary loss to recover on a fraud claim." *All. Mortg. Co. v. Rothwell*, 900 P.2d 601, 609 (Cal. 1995); *see Zamfir v. CasperLabs, LLC*, 2023 WL 2415262, at *5 (S.D. Cal. Mar. 8, 2023) (requiring Plaintiff in fraudulent misrepresentation claim to show actual monetary loss from competitor's misappropriation of a trade name); *NRG Energy, Inc. v. Fuchs*, 2011 WL 1625169, at *4 (S.D. Cal. Apr. 28, 2011) (dismissing fraud claim when plaintiff alleged "that his harm was lack of information rather than an actual monetary loss").  Monetary loss is measured by "out-of-pocket" damages, which are "directed to restoring the plaintiff to the financial position enjoyed by him prior to the fraudulent transaction, and thus awards the difference in actual value at the time of the transaction between what the plaintiff gave and what he received."  *Rothwell*, 900 P.2d at 609 (quoting *Stout v. Turney*, 586 P.2d 1228, 1232 (Cal. 1978)).  This remedy is akin to restitution in that it places the plaintiff in his former position.  *See* 37 C.J.S. Fraud § 64 ("[O]ut-of-pocket damages are restitutionary.").  Given that a tort action for duress is a "form of fraud" and akin to an action for restitution, *Leeper*, 347 P.2d at 20, a plaintiff must similarly show some out-of-pocket loss which

---

[27] For this reason, defendants' argument that all duress claims must satisfy the pleading requirements of Federal Rule of Civil Procedure 9(b) is unavailing.  *See* Dkt. No. 145 at 27; Dkt. No. 87 at 8–9.  When the duress involves a false statement, it makes sense to require a defendant to "allege facts that give rise to a strong inference of fraudulent intent."  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).  But when a defendant demands that the plaintiff give him money on threat of harm to the plaintiff's person or property, it does not make sense to require the plaintiff to plead with specificity that this demand is "false."

may be restored to him.  The cause of action is one to reverse a transfer of value, not simply for emotional damages or distress.  *See* Restatement (Third) of Restitution and Unjust Enrichment § 14 ("A transfer induced by duress is subject to rescission and restitution."); *Lawless v. Cent. Prod. Credit Ass'n*, 592 N.E.2d 1210, 1217 (Ill. Ct. App. 1992) ("It should be remembered . . . that the doctrine of duress is in essence a remedy that is restitutionary in nature." (quoting *First Nat. Bank in Albuquerque*, 815 P.2d at 616)).

The Wayfarer Parties argue to the contrary that a plaintiff can recover for civil extortion even if no money or property was obtained.  Dkt. No. 162 at 25.  This argument relies on a district court decision, *Monex*, which inferred a private right of action from the extortion provision of the California Penal Code.  *Monex*, 666 F. Supp. 2d at 1137 (citing Cal. Penal Code § 523).  Because the California Penal Code criminalizes attempted extortion, *see* Cal. Penal. Code § 524, by the logic of *Monex* a plaintiff could also recover for attempted civil extortion. However, "[n]o published California case has adopted the reasoning in *Monex*," and the decision has been largely disapproved by the federal courts for that reason.  *Intermarketing Media*, 2021 WL 5990190, at *12 n.10; *see Talkdesk, Inc. v. Pham*, 2024 WL 4866690, at *7 (C.D. Cal. Aug. 9, 2024) ("The Court joins the chorus of authorities that have declined to follow the nonbinding reasoning of *Monex*."), *amended on denial of reconsideration*, 2025 WL 873010 (C.D. Cal. Jan. 13, 2025); *but see Khadavi v. Stalgi, Inc*., 2021 WL 929099, at *6 (C.D. Cal. Mar. 10, 2021) (following *Monex*).  At least one published California decision has expressly stated that *Monex* contradicts *Fuhrman* and does not reflect California law.  *See Yang*, 2019 WL 8640452, at *2 ("[T]o the extent the court in *Monex* concluded a claim for duress or extortion had been stated in the absence of an allegation of accession to the demand, its decision was contrary to California law."); *see also Tran v. Eat Club, Inc*., 2020 WL 4812634, at *14–20 (Cal. Ct. App. Aug. 18,

2020) (unpublished).  The Court agrees.  *Monex* directly conflicts with *Fuhrman*, and its logic is inconsistent with the California decisions deriving the tort of civil extortion from the concept of duress rather than the criminal statute.  *See Fuhrman*, 231 Cal. Rptr. at 122; *CrossTalk Prods.*, 76 Cal. Rptr. 2d at 623; *Leeper*, 347 P.2d at 18.

Accordingly, to plead a tort claim for civil extortion under California law, it is neither necessary nor sufficient for a plaintiff to plead the elements of criminal extortion.  Instead, the plaintiff must plead a wrongful threat constituting duress, to which the plaintiff acquiesced, causing damages.  *See Fuhrman*, 231 Cal. Rptr. at 122; *Intermarketing Media*, 2021 WL 5990190, at *12.

### B.    Application

The Wayfarer Parties' civil extortion claim is based on allegations 1) that Lively refused to return to production unless the Wayfarer Parties agreed to her return to production demands, Dkt. No. 50 ¶¶ 6, 75, 124, 130, 2) that Lively threatened to abandon her contractual obligation to promote the film or approve marketing materials unless the Wayfarer Parties agreed to co-fund a screening of her version of the film, *id.* ¶ 142, eventually release that version, *id.* ¶ 146, and grant her a producer credit and support in seeking the *p.g.a.* designation, *id.* ¶¶ 152–157, 3) that Lively threatened to boycott the premiere unless Baldoni was excluded, *id.* ¶¶ 166–170; 4) and that Lively and Reynolds threatened to attack Wayfarer in the press if it did not take the blame for problems during filming, *id.* ¶¶ 250–255.  The last set of allegations is not actionable because Wayfarer did not acquiesce in the threat and did not accept blame for problems during filming.  Wayfarer did not lose anything and Lively and Reynolds did not gain anything from the threat.  The remaining allegations must be dismissed because the allegations regarding Lively's wrongful threats are conclusory and fail to support that the threats were wrongful.  In addition,

the Wayfarer Parties have failed to plead that several key instances of alleged extortion caused "actual monetary loss." *Rothwell*, 900 P.2d at 609.

The Wayfarer Parties focus significantly on "the demand by Reynolds and Lively that the Wayfarer Parties issue a self-destructive statement taking blame for Lively's press woes or else 'the gloves would come off' and they 'would attack Wayfarer in the press.'" Dkt. No. 160 at 18 (quoting Dkt. No. 50 ¶¶ 250–256); *see* Dkt. No. 162 at 23. However, the Wayfarer Parties refused to issue any such statement. Dkt. No. 50 ¶ 256. Accordingly, there was no reliance on the threat, the Wayfarer Parties did not give up anything to Reynolds or Lively, and "plaintiff did not sustain damages cognizable in a cause of action for duress." *Fuhrman*, 231 Cal. Rptr. at 123; *see Raiser*, 2009 WL 10692058, at *3; *Baffert*, 2024 WL 5237442, at *3; *Am. Shooting Ctr., Inc. v. Secfor Int'l*, 2015 WL 1914924, at *4 (S.D. Cal. Apr. 27, 2015) (dismissing claim when "it is unclear what damages were proximately caused by the alleged attempted extortion.").[28]

The Wayfarer Parties allege that in response to threats that Lively would stop acting in the film or breach her contractual obligations to promote it, they were forced to agree to the return to production demands, Dkt. No. 50 ¶ 75, give Lively greater control over the script, give her a producer credit, and support her in seeking the *p.g.a.* mark, *id.* ¶¶ 124, 130, 140–146, and accept marginalization from the premiere, *id.* ¶ 166. However, Wayfarer does not plead sufficient facts to support an inference that these threats were legally wrongful. Lively did not threaten to physically harm the Wayfarer Parties or their property; nor did she threaten a false lawsuit as in *Leeper* and *Fuhrman*. *See Leeper*, 347 P.2d at 18; *Fuhrman*, 231 Cal. Rptr. at 122.

---

[28] The complaint alleges that Lively subsequently followed through on her threat by providing false information about the Wayfarer Parties to the Times. Dkt. No. 50 ¶¶ 256–260. But that conduct is actionable, if at all, under the law of defamation and not under the law of civil extortion. It does not support an inference that the Wayfarer Parties gave anything to Lively or that Lively obtained anything from them by virtue of the threat.

The Wayfarer Parties' claims do not turn on what Lively threatened to do but what she threatened not to do. The Wayfarer Parties allege that Lively "threatened to refuse to promote the Film or approve any related marketing materials," *id.* ¶ 142, and threatened to "abandon her contractual obligations to promote the Film or approve marketing materials," *id.* ¶152.[29] However, the Wayfarer Parties do not allege facts showing that Lively had an obligation to promote the film or to approve marketing materials. They do not point to any contractual provisions, explain what Lively's contractual obligations were, or even explain what contract is being referenced. Similarly, with regard to Lively's refusal to attend the premiere with Baldoni, the Wayfarer Parties do not allege that Lively had any obligation to attend the premiere with Baldoni. *Id.* ¶ 166–170. While the Wayfarer Parties plead that Lively had an obligation to act in the film, they do not allege that she had such an obligation no matter the circumstances.[30] A refusal to provide that which one has no obligation to provide is not a threat; it is a bargaining position. Conclusory allegations are insufficient to plead a breach of contract, and are therefore insufficient to plead that Lively threatened to breach her contract. *See AK Futures LLC v. LCF Labs Inc*., 2022 WL 2784409, at *4 (C.D. Cal. June 24, 2022) ("A complaint for breach of contract must include the contract itself or plead its essential terms." (quoting *J D Factors, LLC v. Reddy Ice Holdings*, 2016 WL 6996152, at *2 (C.D. Cal. June 6, 2016)); *Wiebe v. NDEX W., LLC*, 2010 WL 2035992, at *3 (C.D. Cal. May 17, 2010).

---

[29] With regard to the *p.g.a.* credit, the Wayfarer Parties simply allege that Lively demanded they support her *p.g.a.* certification "with extortionate threats." Dkt. No. 50 ¶ 154. The failure to specify what Lively purportedly threatened is fatal to any claim based on this allegation.
[30] Lively's contractual obligation to continue acting in the film is unclear. The complaint emphasizes in several places that Lively had not signed relevant employment contracts, Dkt. No. 50 ¶¶ 106–107, and never explains what contract Lively did sign.

Moreover, assuming the Wayfarer Parties did plead that Lively refused to do that which her contract required her to do, that would not alone be sufficient to plead that such a refusal was wrongful and could support a claim for civil extortion.  A threat to breach a contract may constitute a breach of contract or an anticipatory repudiation of a contract, but it "is not, of itself, improper."  Restatement (Second) of Contracts § 176, cmt. e; *see Drink Tank Ventures LLC v. Real Soda in Real Bottles, Ltd*., 286 Cal. Rptr. 3d 333, 344–45 (Cal. Ct. App. 2021), *as modified on denial of reh'g* (Dec. 2, 2021).  There are circumstances in which a breach or threatened breach may be commercially reasonable or efficient.  *See Mission Beverage Co. v. Pabst Brewing Co., LLC*, 223 Cal. Rptr. 3d 547, 562 (Cal. Ct. App. 2017) ("[T]he concept of efficient breach of contract . . . supports a rule that allows one party to a contract to breach and pay damages rather than perform, at least where it is worth more to that party to breach rather than to perform." (internal quotation marks and brackets omitted)).  There also are circumstances where, in the execution of a contract, one party realizes (or both parties realize) that there is a term agreed to on contract signing that no longer is in the mutual interest of both parties and seeks a modification.

It thus is not uncommon in commercial relationships that one or the other party will demand that a condition to their agreement change before performance is rendered.  A refusal to perform unless the counterparty agrees to additional consideration or a new term may, depending on the circumstances, give rise to a claim for breach of contract.  *See Riddick v. Summit House, Inc.,* 835 F. Supp. 137, 142 n.14 (S.D.N.Y. 1993) ("Contracts cannot be amended unilaterally by one party." (citing Restatement (Second) of Contracts § 318(3)); *Asmus v. Pac. Bell*, 999 P.2d 71, 78 (Cal. 2000) (noting that modification of a bilateral contract requires "mutual assent"); *Carlsen v. Glob. Client Sols., LLC*, 423 F. App'x 697, 699 (9th Cir. 2011).  But, if the other party

finds the modification to be acceptable—either because it is in the mutual interest of the parties or because the modification is not so significant that the counterparty believes she is denied the benefit of her bargain—she can accept the modification either by words or by conduct. *See* Cal. Civ. Code § 1698 (noting that a written contract may be modified by an oral agreement "to the extent that the oral agreement is executed" or by "an oral agreement supported by new consideration"); *Fanucchi & Limi Farms v. United Agri Prods.*, 414 F.3d 1075, 1081 (9th Cir. 2005). In the absence of a continuing condition of duress, a party can agree to a modification "by either express consent or conduct inconsistent with anything other than approval." 25 Am. Jur. 2d Duress and Undue Influence § 30; *see also Yvanova v. New Century Mortg. Corp.*, 365 P.3d 845, 852 (Cal. 2016) ("[A] voidable transaction, unlike a void one, is subject to ratification by the parties."). In those circumstances, the new agreement will define the relationship between the parties and their respective obligations to one another. A party who has enjoyed the benefits of the new bargain will not be heard to complain after-the-fact that it would have preferred the old deal and to ask a court to unwind an agreement to which both parties have, as a result of hard bargaining, agreed.

It follows that not every statement that a party will stop performing a contract unless the conditions are changed or new consideration provided will give rise to a claim in tort for civil extortion. Rather, courts consider a claim to involve "economic duress" only under limited circumstances, generally involving "the wrongful exploitation of business exigencies to obtain disproportionate exchanges of value." *Martinez-Gonzalez v. Elkhorn Packing Co. LLC*, 25 F.4th 613, 620 (9th Cir. 2022) (quoting *Sheehan v. Atlanta Int'l Ins. Co.*, 812 F.2d 465, 469 (9th Cir. 1987)); *see Rich & Whillock*, 204 Cal. Rptr. at 89–90; *Chan v. Lund*, 116 Cal. Rptr. 3d 122, 134

(Cal. Ct. App. 2010).[31]  A "bad faith threat to breach a contract" may constitute economic duress.  *Martinez-Gonzalez*, 25 F.4th at 621.  However, such a bad faith threat must be distinguished from an attempt to "press a claim that is within a party's rights," *Philippine Exp.*, 267 Cal. Rptr. at 468, as well as from "[h]ard bargaining, 'efficient' breaches and reasonable settlements of good faith disputes," none of which support a claim for duress, *Rich & Whillock*, 204 Cal. Rptr. at 89.  In determining whether a threat constitutes economic duress, courts focus on whether the threat is "made for some purpose unrelated to the contract," *id.*, or involves a "disproportionate exchange of value," *Martinez-Gonzalez*, 25 F.4th at 620; *see Leeper*, 346 P.2d at 20 ("The very fact that the conveyance was for an allegedly inadequate consideration, under the cases, is of some importance determining whether or nor it was made under duress.").  To allege a civil extortion claim, the Wayfarer Parties must therefore allege facts supporting that the threats were unrelated to or disproportionate to the obligations Lively had assumed under her agreement with the Wayfarer Parties, and that the Wayfarer Parties had no adequate remedy and could not have refused her demands.  *See Rich & Whillock*, 204 Cal. Rptr. at 89 ("The economic duress doctrine serves as a last resort . . . when conventional alternatives and remedies are unavailing.").

The facts alleged do not support an economic duress claim.  The Wayfarer Parties first allege that Lively threatened to stop acting in the film unless they agreed to her return to production demands.  Dkt. No. 50 ¶ 75.  The Court assumes, though it is not explicitly pleaded, that Lively had a contractual obligation to perform in the film.  But the Wayfarer Parties do not plead that she had an obligation to perform no matter the conditions on the set, and is it not

---

[31] More traditional duress claims are supported by "an unlawful act in the nature of a tort or crime."  *Rich & Whillock*, 204 Cal. Rptr. at 89 (Cal. Ct. App. 1984); *see Leeper*, 347 P.2d at 18.  The refusal to act in or market *It Ends With Us* is not an independent tort or crime.

unusual for employees to seek changes or improvements in workplace conditions.  The demands
Lively is alleged to have made, including that there be no physical touching of her except in
connection with character or scene work, that there be no discussion of personal experiences
with sex, that she have a personal representative on set, and that there be a nudity rider, are all
closely related to the conditions of her own performance and largely involve adherence to
protections for Lively (and other cast members) that the Wayfarer Parties had already
implemented.  The only apparent cost to the Wayfarer Parties was hiring an additional producer,
*id.* ¶ 114, which would not financially benefit Lively.  The allegations do not support that Lively
was attempting to extort the Wayfarer Parties into hiring a producer, as opposed to seeking to
confirm previously understood terms and conditions or at worst seeking slightly more favorable
terms of employment.[32]  Even if they turn out to be unneeded, an employee can insist on
protections at workplace for sexual harassment without being accused of extortion.  If an
employer accedes, it cannot later claim to be a victim of the employee's wrongful threats.

A similar result applies with respect to the Wayfarer Parties's allegations that Lively
threatened to breach her contractual obligation to promote the film unless they allowed her to
edit the movie and released her cut, gave her a producer credit, supported her in seeking the
*p.g.a.* mark, and co-funded a screening of her version of the film.  Dkt. No. 50 ¶¶ 124, 130, 140–
146.  These demands do not involve a disproportionate exchange of value, as Lively "insist[ed]
on taking on additional work for no additional pay."  *Id.* ¶ 174; *see Martinez-Gonzalez*, 25 F.4th

---

[32] Although the Wayfarer Parties allege that the list was "drafted for the apparent purpose of
insinuating or outright claiming that Baldoni, Heath, and others had engaged in sexually
inappropriate conduct," there are no allegations that Lively threatened to reveal such behavior if
her demands were not met.  *Cf. Flatley v. Mauro*, 139 P.3d 2, 21 (Cal. 2006) (holding that
attorney's threat to publicly accuse plaintiff of rape unless he paid money to client was
extortionate).

at 622 ("In the few California cases finding a 'wrongful act,' the exploitation involved the disproportionate loss of *economic* value.").  There also is no allegation that Lively had a contractual obligation to promote the film; if not, there is no basis to assume that the value that she conveyed in terms of her willingness to promote represented anything other than a fair trade for the Wayfarer Parties' willingness to use her cut.  Her demands were related to the subject-matter of the contract, as Lively sought to have the film she would be promoting fit her vision. Dkt. No. 50 ¶¶ 135, 137, 174; *see Flatley*, 139 P.3d at 23 (noting that "the threat to disclose criminal activity *entirely unrelated to any alleged injury suffered*" by the demander was evidence of extortion (emphasis added)); *Philippine Exp.*, 267 Cal. Rptr. at 468; *Martinez-Gonzalez*, 25 F.4th at 620.  Although the Wayfarer Parties allege that they did not believe Lively deserved a producer credit or *p.g.a.* mark, Dkt. No. 50 ¶¶ 153–155, they also allege that Lively took over significant production responsibilities, *see id.* ¶ 296 (stating that Lively used baseless sexual harassment allegations "to assert unilateral control over every aspect of the production"); *id.* ¶ 344 (alleging that Lively seized creative control over the production and the Wayfarer Parties "were deprived of the opportunity to produce, edit, and market a film"); *cf. United States v. Jackson*, 180 F.3d 55, 70–72 (2d Cir.), *on reh'g*, 196 F.3d 383 (2d Cir. 1999) (suggesting that a threat is not wrongful if it has a "nexus to a plausible claim of right").  The Wayfarer Parties have not alleged that Lively requested changes in the production "for some purpose unrelated to the contract," *Martinez-Gonzalez*, 25 F.4th at 620; the Amended Complaint alleges that Lively believed her version of the film to be better than the version favored by the Wayfarer Parties and that her efforts deserved recognition, Dkt. No. 50 ¶ 18 ("Lively and Reynolds' efforts failed to win them the acclaim they believed they so richly deserved."); *id.* ¶ 42.

The Amended Complaint is not clear whether the Wayfarer Parties, as opposed to Sony, had the ultimate right to choose the cut of the film that would be distributed or the marketing plan that would be used to promote the film. There are indications from the Amended Complaint that such rights resided with Sony. Dkt. No. 50 ¶ 142 ("Lively's extortionate threats coerced *Sony* to allow her to create her own cut of the Film." (emphasis added); *id.* ¶ 149 (stating that Lively insisted on screening her cut "[o]ver Sony's objection" and that Sony informed Wayfarer Baldoni could not attend); *id.* ¶163 (noting that the marketing plan for the film was created by Sony). If so, Lively would not have been withholding from the Wayfarer Parties anything that the Wayfarer Parties had a right to obtain from her in the first place. But even assuming that the Wayfarer Parties had such a right as against Lively, they were not without a remedy. If, in fact, Lively announced that she would not perform unless the Wayfarer Parties gave something of value to her to which she was not entitled, the Wayfarer Parties could have sued. They were not without "a reasonable alternative" to meeting Lively's demands. *Leeper*, 347 P.2d at 20; *see Hartsville Oil Mill v. United States*, 271 U.S. 43, 49 (1926) ("Before the coercive effect of the threatened action can be inferred, there must be evidence of some probable consequences of it to person or property for which the remedy afforded by the courts is inadequate."). Although the Wayfarer Parties state that "Baldoni was forced to choose between killing the film and his own career by insisting on his own creative vision and rights," at the point these threats were made, filming was complete. If the Wayfarer Parties had the right to put out a film with Baldoni's edits in the first place, they were not without the ability to do so as a result of Lively's demands. *Id.* ¶ 146. The only loss would have been Lively's promotion of the film. But there is no allegation regarding Lively's obligations to the Wayfarer Parties regarding promotion. And, even if there were, although the film might be less profitable without Lively's promotional efforts, the desire

to avoid a loss in profits is not the same as duress "within the meaning of the law." *London Homes, Inc. v. Korn*, 44 Cal. Rptr. 262, 267 (Cal. Ct. App. 1965) (holding that economic duress was not present when defendants threatened to breach contract unless the plaintiffs paid a higher price for a parcel of land, and defendants agreed because they needed to quickly secure the last parcel of land in a planned subdivision). "[T]he plaintiff[s] could have brought suit against [Lively] for damages; but for what appeared to them to be good business reasons, they elected not to do so." *Id.* at 249; *see River Bank Am. v. Diller*, 45 Cal. Rptr. 2d 790, 804 (Cal. Ct. App. 1995) (holding there was no economic duress when plaintiff initially agreed to a transaction but sought restructuring at the last minute, which defendant agreed to because of the difficulty of securing alternative financing). The case does not involve a potential foreclosure, imprisonment, "economic disaster," or "imminent bankruptcy." *Martinez-Gonzalez*, 25 F.4th at 620 (quoting *Rich & Whillock*, 204 Cal. Rptr. at 91); *see Leeper*, 347 P.2d at 204. The fact that a plaintiff decides it is more financially beneficial to acquiesce to a demand than to sue does not mean the plaintiff lacks an adequate remedy in damages. Having made their decision, the Wayfarer Parties cannot now seek to recover in damages for what they would have obtained had they not agreed and had Lively promoted some different version of the film more consistent with the Wayfarer Parties' artistic vision.

Finally, the Wayfarer Parties allege that Lively's threat to boycott forced Baldoni to accept marginalization from the premiere. Dkt. No. 50 ¶ 166. Initially, the Wayfarer Parties do not allege that Lively had an obligation to them to attend the premiere, much less to attend the premiere with Baldoni. However, even if Lively had such an obligation, her suggested modification is directly related to the conditions of her own performance; there is no threat extrinsic and unrelated to the production of the film. There is also no disproportionate exchange

of value, as the separation of the parties at the premiere is not alleged to have had any financial implications.

Lively, Sloane, and Reynolds also argue that the Wayfarer Parties have not alleged damages from any of Lively's threats. Dkt. No. 87 at 7–9; Dkt. No. 133 at 19; Dkt. No. 145 at 27–30. For reasons largely stated above in the analysis of disproportionate value, this provides an alternative basis for dismissal of most aspects of the extortion claim.[33]

The Court assumes, without deciding, that an extortion claim could be based on the transfer of creative control if, as a result of such transfer, the plaintiff lost something of value for which it did not receive equivalent or greater value in exchange.[34] However, the Wayfarer Parties have not alleged that Lively's editing or the eventual release of her cut of the film caused them "actual monetary loss." *Rothwell*, 900 P.2d at 609. Although the Wayfarer Parties preferred Lively to take less of a role in the production of the film, they do not allege that it made less money due to her editing or that her role resulted in costs to them. Accordingly, there are no

---

[33] As noted above, the Wayfarer Parties allege that they were financially damaged by agreement to the return to production demands and agreeing to co-fund a screening of her version of the film. Dkt. No. 50 ¶¶ 75, 142. These aspects of the claim are dismissed only due to the failure to allege a wrongful threat.

[34] The Lively Parties argue that a civil extortion claim may only be based on the transfer of "money or property," drawing on the fact that the relevant California cases all involve reversing a transfer of money. *Fuhrman*, 231 Cal. Rptr. at 122; *see Leeper*, 347 P.2d at 18; *Woodham*, 62 P. at 399 ("[T]he money can be recovered back."). However, there is no principled reason that the claim should be limited to money or tangible property. Wayfarer possessed the film rights to *It Ends With Us* and therefore had the right to control what film would be produced and released based on the book. Had a party demanded at gunpoint that the Wayfarer Parties employ a novice to edit their film, and this caused the Wayfarer Parties damages, the Wayfarer Parties might be able to bring a civil extortion claim. *See Burke v. Gould*, 38 P. 733, 734 (Cal. 1894) (stating that the principle that a plaintiff should be able to recover amounts paid under duress "is applicable alike to cases where money or other valuable thing is extorted"); *People v. Fisher*, 156 Cal. Rptr. 3d 836, 840 (Cal. Ct. App. 2013) (holding that when the defendant "demanded to be employed by the business owner or face vandalism to vehicles at the business," this was actionable in criminal extortion as "a demand for part of the employer's business, i.e., part of the intangible benefit and prerogative of being able to control whom to employ in one's business").

factual allegations that could support an award of damages for "the difference in actual value at the time of the transaction between what the plaintiff gave and what he received." *Rothwell*, 900 P.2d at 609 (quoting *Stout*, 586 P.2d at 1232). Accepting the allegations, Wayfarer gave up on releasing its preferred version of the movie, cut by Baldoni, in favor of a version that Lively preferred. But there is no allegation that Baldoni's version of the movie was of greater value than Lively's. For that independent reason, the Wayfarer Parties' civil extortion claim related to the demands for creative control fails.

Similarly, although the Wayfarer Parties allege that conditions at the premiere were "demeaning and humiliating," Dkt. No. 50 ¶ 169, they do not allege any costs to Wayfarer. There are also no allegations supporting that providing Lively a producer credit and *p.g.a.* support resulted in a monetary loss to the Wayfarer Parties. *See Evans v. Sleep No. Corp*., 2025 WL 1093332, at 10 (E.D. Cal. Apr. 11, 2025) (holding Plaintiff failed to plead actual damages when she was deceived into buying a product but failed to plead she lost money in the transaction); *Fladeboe v. Am. Isuzu Motors Inc*., 58 Cal. Rptr. 3d 225, 244 (Cal. Ct. App. 2007), *as modified* (Apr. 24, 2007) (similar). The injury the Wayfarer Parties focus on regarding the *p.g.a.* mark is essentially a moral injury that they believed that "Lively did not perform the duties of a producer and therefore did not merit the p.g.a. mark," but were forced to write a letter "omitting the truth." Dkt. No. 50 ¶¶ 155, 157.

Finally, there are no allegations supporting Reynolds or Sloane's liability. The Wayfarer Parties argue that Sloane and Reynolds are liable in conspiracy because by actually spreading defamatory statements, Sloane and Reynolds "play[ed] the role of the 'heavy' [in] carrying out Lively's extortionate threats." Dkt. No. 121 at 36. However, the only instance in which Lively (and Reynolds) allegedly threatened to spread defamatory statements was in demanding that the

70

Wayfarer Parties make a harmful public statement.  As stated above, the Wayfarer Parties never provided such a statement, so no conspiracy related to the statement is actionable.  In addition, if Sloane and Reynolds actually spread defamatory statements, they would be liable in defamation, not civil extortion.  Finally, the Wayfarer Parties' allegations regarding the purported conspiracy to commit civil extortion are entirely conclusory.

The Wayfarer Parties' claims for civil extortion must be dismissed.

## IV.    Defamation

The Wayfarer Parties bring defamation claims against all Defendants.  Dkt. No. 50 ¶¶ 324–331.  The allegedly defamatory statements are statements to the effect that 1) "the Wayfarer Parties engaged in, permitted, and/or failed to prevent sexually inappropriate conduct toward Lively" and 2) "the Wayfarer Parties retaliated against Lively and others for reporting the alleged sexual misconduct including by propagating false and misleading narratives about Lively for the purpose of damaging her image and reputation."  *Id.* ¶ 325.  The Wayfarer Parties allege that Lively, Sloane, and Reynolds engaged in a conspiracy to spread these defamatory narratives to the Times, other media outlets, and Baldoni's agency, *id.* ¶¶ 8, 17, 162, 193, 273, 370, and that the Times committed defamation by publishing the same narratives, *id.* ¶¶ 272–276.  These allegations fail to state a defamation claim.

### A.    Legal Standard

The Court refers to California law in setting out the legal standard for defamation, leaving any distinguishing aspects of New York law for discussion as applicable to the Times.  Although some applicable statutes and privileges differ, "the elements of defamation in both states are similar."  *Feitosa v. Keem*, 2023 WL 2267055, at *4 (W.D.N.Y. Feb. 28, 2023).

"Defamation constitutes an injury to reputation" by a false oral or written communication.  *Shively v. Bozanich*, 80 P.3d 676, 683 (Cal. 2003), *as modified* (Dec. 22, 2003).

71

Under California law, "[t]he tort of defamation involves (a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage." *Taus v. Loftus*, 151 P.3d 1185, 1209 (Cal. 2007) (citation and internal quotation marks omitted). California defamation law incorporates, as it must, speech protections required by the First Amendment to the United States Constitution. *See, e.g.*, *New York Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964) (holding that defamatory falsehoods about public officials are protected unless made with "actual malice"); *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990) (noting that the First Amendment protects statements which lack "a provably false factual connotation").

"Publication" does not refer to "a written dissemination, as suggested by the common meaning of that term," but merely requires communication of the statement "to a third person who understands its defamatory meaning as applied to the plaintiff." *Shively v. Bozanich*, 80 P.3d 676, 683 (Cal. 2003), *as modified* (Dec. 22, 2003). Publication "need not be to the public or a large group; communication to a single individual is sufficient." *Ringler Assocs. Inc. v. Md. Cas. Co.*, 96 Cal. Rptr. 2d 136, 148 (Cal. Ct. App. 2000). "Each publication ordinarily gives rise to a new cause of action for defamation." *Shively*, 80 P.3d at 683. However, for mass communications, California has adopted the "single-publication rule," which states that "for any single edition of a newspaper or book, there [i]s but a single potential action for a defamatory statement contained in the newspaper or book, no matter how many copies of the newspaper or the book [a]re distributed." *Id.* at 685.[35] With regards to statements in this type of publication,

---

[35] Although originally framed in terms of newspapers and books, the single-publication rule also applies to other types of mass communications, including communications posted on the internet. *See Traditional Cat Assn., Inc. v. Gilbreath*, 13 Cal. Rptr. 3d 353, 362 (Cal. Ct. App. 2004); *Hebrew Acad. of S.F. v. Goldman*, 173 P.3d 1004, 1009 (Cal. 2007).

the plaintiff is deemed to be harmed once, "when the book or newspaper is first generally

distributed to the public," not every time the publication "came into the hands of a new reader

who had not discovered it previously." *Id.* at 684, 686.

"The *sine qua non* of recovery for defamation . . . is the existence of a falsehood." *Baker

v. L.A. Herald Exam'r*, 721 P.2d 87, 90 (Cal. 1986) (quoting *Letter Carriers v. Austin* 418 U.S.

264, 283 (1974)). "Because the statement must contain a provable falsehood, courts distinguish

between statements of fact and statements of opinion for purposes of defamation liability."

*Summit Bank v. Rogers*, 142 Cal. Rptr. 3d 40, 59 (Cal. Ct. App. 2012) (quoting *McGarry v. Univ.

of San Diego*, 64 Cal. Rptr. 3d 467, 479 (Cal. Ct. App. 2007)); *see Taus*, 151 P.3d at 1209. If a

statement "cannot reasonably [be] interpreted as stating actual facts," it is protected by the First

Amendment and not actionable. *Knievel v. ESPN*, 393 F.3d 1068, 1074 (9th Cir. 2005) (quoting

*Milkovich*, 497 U.S. at 20); *see Seelig v. Infinity Broad. Corp.*, 119 Cal. Rptr. 2d 108, 116 (Cal.

Ct. App. 2002); *Reed v. Gallagher*, 204 Cal. Rptr. 3d 178, 188 (Cal. Ct. App. 2016).

"'[R]hetorical hyperbole,' 'vigorous epithet [s],' 'lusty and imaginative expression[s] of []

contempt,' and language used 'in a loose, figurative sense' have all been accorded constitutional

protection." *Ferlauto v. Hamsher*, 88 Cal. Rptr. 2d 843, 849 (Cal. Ct. App. 1999) (quoting

*Greenbelt Pub. Assn. v. Bresler* 398 U.S. 6, 14 (1970) and then quoting *Letter Carriers*, 418 U.S.

at 284). However, the publication may be actionable if "a reasonable trier of fact could conclude

that the published statements imply a provably false factual assertion." *Nygard, Inc. v. Uusi-

Kerttula*, 72 Cal. Rptr. 3d 210, 226 (Cal. Ct. App. 2008); *see Milkovich*, 497 U.S. at 21.

"[E]xpressions of opinion may imply an assertion of objective fact, and a statement that implies a

false assertion of fact, even if couched as an opinion, can be actionable." *McGarry*, 64 Cal. Rptr.

3d at 479 (citing *Milkovich*, 497 U.S. at 18–19).

73

"It is the province of the court to determine whether a statement is actionable as a statement of fact susceptible of a defamatory meaning, versus a nonactionable statement of opinion privileged under the First Amendment." *John Doe 2*, 206 Cal. Rptr. 3d at 68–69; *see Gallagher v. Philipps*, 563 F. Supp. 3d 1048, 1086 (S.D. Cal. 2021). "To determine whether a statement is actionable fact or nonactionable opinion, [courts] apply a totality of the circumstances test pursuant to which [they] consider both the language of the statement itself and the context in which it is made." *Summit Bank*, 142 Cal. Rptr. 3d at 60; *Gallagher*, 563 F. Supp. 3d at 1086; *Steam Press Holdings, Inc. v. Hawaii Teamsters, Allied Workers Union, Loc. 996*, 302 F.3d 998, 1005 (9th Cir. 2002). Courts look to "the nature and full content of the communication and to the knowledge and understanding of the audience to whom the publication was directed." *Baker*, 721 P.2d at 90–91; *see Knievel*, 393 F.3d at 1074–78; *Reed*, 204 Cal. Rptr. 3d at 189. "[T]he publication is to be measured not so much by its effect when subjected to the critical analysis of a mind trained in law, but by the natural and probable effect upon the mind of the average reader." *Baker*, 721 P.2d at 90 (quoting *MacLeod v. Trib. Pub. Co.*, 343 P.2d 36, 41–42 (Cal. 1959)); *see Knievel*, 393 F.3d at 1074.

"[T]ruth is a complete defense" to a defamation claim. *Bently Rsrv. LP v. Papaliolios*, 160 Cal. Rptr. 3d 423, 434 (Cal. Ct. App. 2013). Where the plaintiff is a public figure or the speech involves a matter of public concern, the plaintiff bears the burden of showing the falsity of the statements. *See Carver v. Bonds*, 37 Cal. Rptr. 3d 480, 493 (Cal. Ct. App. 2005); *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1056 (9th Cir. 1990); *Appel v. Wolf*, 2023 WL 5108962, at *4 (S.D. Cal. Jan. 31, 2023). "As in other jurisdictions, California law permits the defense of substantial truth and would absolve a defendant even if she cannot justify every word of the alleged defamatory matter; it is sufficient if the substance of the charge be proved true,

irrespective of slight inaccuracy in the details." *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 517 (1991) (citation and internal quotation marks omitted); *see Reed*, 204 Cal. Rptr. 3d at 192. The test is whether the statement "would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Masson*, 501 U.S. at 517.

The state of mind necessary to support a defamation claim depends on whether the plaintiff is a private figure or a public figure. If the defamatory statement concerns a private figure, the standard under California law is whether the defendant acted negligently by "fail[ing] to use reasonable care to determine the truth or falsity" of the statement. *Hecimovich v. Encinal Sch. Parent Tchr. Org.*, 137 Cal. Rptr. 3d 455, 470 (Cal. Ct. App. 2012). However, the First Amendment requires that "public figures may prevail in a libel action only if they prove that the defendant's defamatory statements were made with actual malice, i.e., actual knowledge of falsehood or reckless disregard for the truth." *Comedy III Prods., Inc. v. Gary Saderup, Inc*., 21 P.3d 797, 803 (Cal. 2001); *see Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344–47 (1974); *N.Y. Times*, 376 U.S. at 283. Public figures have generally "invite[d] attention and comment" by "thrust[ing] themselves to the forefront of particular public controversies," and enjoy "significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy." *Gertz*, 418 U.S. at 343; *see Khawar v. Globe Int'l, Inc*., 965 P.2d 696, 702 (Cal. 1998), *as modified* (Dec. 22, 1998). Applying the actual malice standard to such figures allows "the freedoms of speech and press that 'breathing space' essential to their fruitful exercise." *Gertz*, 418 U.S. at 342 (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)).[36]

---

[36] To be actionable under California law, "[t]he defamatory statement must specifically refer to, or be 'of and concerning,' the plaintiff." *John Doe 2*, 206 Cal. Rptr. 3d at 68 (quoting *Blatty v.*

"Under Cal. Civ. Code § 45a, a plaintiff may only prevail on a claim for libel if the publication is libelous on its face or if special damages have been proven." *Newcombe v. Adolf Coors Co.*, 157 F.3d 686, 694 (9th Cir. 1998); *see* Cal. Civ. Code § 45a ("Defamatory language not libelous on its face is not actionable unless the plaintiff alleges and proves that he has suffered special damage.").[37] "Statements constitute libel *per se* when 'a listener could understand the defamatory meaning without the necessity of knowing extrinsic explanatory matter." *Balla v. Hall*, 273 Cal. Rptr. 3d 695, 686 (Cal. Ct. App. 2021) (quoting *McGarry*, Cal. Rptr. 3d at 478). In such a case, "damage to plaintiff's reputation is conclusively presumed and he need not introduce any evidence of actual damages in order to obtain or sustain an award of damages." *Barnes-Hind, Inc. v. Superior Ct.*, 226 Cal. Rptr. 354, 356 (Cal. Ct. App. 1986) (quoting *Contento v. Mitchell*, 104 Cal. Rptr. 591, 592 (Cal. Ct. App. 1972)). But if understanding the defamatory meaning requires "knowledge of specific facts and circumstances, extrinsic to the publication, which are not matters of common knowledge," a plaintiff must plead specific damages that he has suffered "in respect to his or her property, business, trade, profession, or occupation, including the amounts of money the plaintiff alleges and proves he or

---

*N.Y. Times Co.*, 728 P.2d 1177, 1182 (Cal. 1986)). This requirement "limits the right of action for injurious falsehood, granting it to those who are the direct object of criticism and denying it to those who merely complain of nonspecific statements that they believe cause them some hurt." *Dickinson v. Cosby*, 250 Cal. Rptr. 3d 350, 367 (Cal. Ct. App. 2019) (quoting *Blatty*, 728 P.2d at 1183). When a statement concerns a group, it may be actionable "if the group is sufficiently small and its members easily ascertainable," but not "[w]here the statement refers to a large group—typically any group numbering more than 25 members." *Id.*; *see Blatty*, 728 P.2d at 1185.

[37] California Civil Code § 45a refers to libel, which is written defamation, as opposed to slander, which is spoken defamation. However, in this context "[c]ourts use the phrases 'defamatory on its face,' 'defamation on its face,' 'defamation per se,' 'defamatory per se,' 'libelous on its face,' and 'libel per se' interchangeably." *Resolute Forest Prods., Inc. v. Greenpeace Int'l*, 2023 WL 3568077, at *8 n.13 (N.D. Cal. Apr. 21, 2023), *appeal dismissed*, 2024 WL 2317687 (9th Cir. Apr. 8, 2024).

she has expended as a result of the alleged libel." *Barnes-Hind*, 226 Cal. Rptr. at 356, 360

(quoting Cal. Civ. Code § 48a).

Several privileges under California law may prevent an otherwise defamatory statement

from being actionable.  Relevant here, California recognizes a litigation privilege, Cal. Civ. Code

§ 47(b), a fair report privilege, *id.* § 47(d), and a privilege for statements by the victim

"regarding an incident of sexual assault, harassment, or discrimination," *id.* § 47.1.[38]  The

litigation privilege is an absolute privilege that applies "to any communication (1) made in

judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law;

(3) to achieve the objects of the litigation; and (4) that have some connection or logical relation

to the action." *Jacob B. v. County of Shasta*, 154 P.3d 1003, 1007 (Cal. 2007) (quoting *Silberg v.*

*Anderson*, 786 P.2d 365, 269 (Cal. 1990), *as modified* (Mar. 12, 1990)).  It aims to "afford

litigants and witnesses free access to the courts without fear of being harassed subsequently by

derivative tort actions."  *Id.* at 1008 (quoting *Rusheen v. Cohen*, 128 P.3d 713, 722 (Cal. 2006)).

The privilege applies not only to court proceedings but to "'all kinds of truth-seeking

proceedings,' including administrative, legislative and other official proceedings." *See People ex*

*rel. Gallegos v. Pac. Lumber Co.*, 158 70 Cal. Rptr. 3d 501, 508 (Cal. Ct. App. 2008) (quoting

*Silberg*, 786 P.2d at 370)).

The fair and true report privilege applies to "a fair and true report in, or a communication

to, a public journal, of (A) a judicial, (B) legislative, or (C) other public official proceeding, or

(D) of anything said in the course thereof."  Cal. Civ. Code § 47(d).  "'Fair and true' in this

context does not refer to the truth or accuracy of the matters asserted in the judicial proceedings,

---

[38] The defendant bears the initial burden of showing "that the allegedly defamatory communication was made on a privileged occasion."  *Lundquist v. Reusser*, 875 P.2d 1279, 1287 (Cal. 1994).

but rather to the accuracy of the challenged statements with respect to what occurred in the judicial proceedings." *Healthsmart Pac., Inc. v. Kabateck*, 212 Cal. Rptr. 3d 589, 603 (Cal. Ct. App. 2016), *as modified* (Jan. 10, 2017). The standard for whether the report is "fair and true" is essentially equivalent to the standard for whether a statement is "substantially true;" the issue is whether the report captures "the substance, the gist or sting, of the subject proceedings as measured by considering the natural and probable effect [of the report] on the mind of the average reader." *Argentieri v. Zuckerberg*, 214 Cal. Rptr. 3d 358, 373 (Cal. Ct. App. 2017) (citation and quotation marks omitted); *see Kilgore v. Younger*, 640 P.2d 793, 777 (Cal. 1982).

In 2023, the California legislature added a privilege for "[a] communication made by an individual, without malice, regarding an incident of sexual assault, harassment, or discrimination." Cal. Civ. Code § 47.1. This legislation was a response to the #MeToo movement and expanded on an existing privilege which protected complaints of sexual harassment to an employer or court. Dkt. No. 146-1 at 3, 25, 27, 71; *see* Cal. Civ. Code § 47(b)–(c). "Communication" is defined as "factual information related to an incident of sexual assault, harassment, or discrimination experienced by the individual making the communication." Cal. Civ. Code § 47.1(d). The section applies only to an individual "that has, or at any time had, a reasonable basis to file a complaint of sexual assault, harassment, or discrimination." *Id.* § 47.1(c). The legislation also provides that if a plaintiff brings an action "for making a communication that is privileged under this section," the prevailing defendant "shall be entitled to their reasonable attorney's fees and costs for successfully defending themselves in the litigation, plus treble damages for any harm caused to them by the defamation action." *Id.* § 47.1(b).

## B.    Lively, Sloane, and Reynolds

The Wayfarer Parties allege generally that Lively, Sloane, and Reynolds worked together to "advance[] a fabricated narrative in the press that the Wayfarer Parties had sexually harassed Lively, then embarked on a calculated and malicious smear campaign to destroy her reputation as retaliation for daring to complain about the harassment." Dkt. No. 50 ¶ 17.  This general allegation has multiple facets.  Most prominently, the Wayfarer Parties allege that Lively, Sloane, and Reynolds worked together to spread a false narrative to the Times.  *Id.* ¶ 273.  In addition, the Wayfarer Parties allege that as part of the same conspiracy, Sloane and Reynolds individually made false statements about Baldoni to other press outlets and Baldoni's agency. *Id.* ¶¶ 8, 162, 193, 370.[39]

---

[39] Portions of the Amended Complaint could be read to suggest that the defamation claim is partly based on Lively's return to production demands, which "insinuated misconduct had occurred during filming." Dkt. No. 50 ¶ 6; *see id.* ¶¶ 81, 85, 90, 92, 100, 104.  However, the Wayfarer Parties have disclaimed any reliance on these statements, which are outside of the statute of limitations.  Dkt. No. 162 at 11.  The Lively Parties argue that the fact that Lively arguably insinuated sexual misconduct in the return to production demands triggers the statute of limitations under California's Uniform Single Publication Act, making all actions based on later claims of sexual misconduct untimely.  Dkt. No. 145.  However, this argument is meritless. The single publication rule applies to "any single publication or exhibition or utterance, such as any one issue of a newspaper or book or magazine or any one presentation to an audience or any one broadcast over radio or television or any one exhibition of a motion picture."  Cal. Civ. Code. § 3425.3.  It is broad enough to cover "six different editions of a newspaper, all dated on the same date but distributed over two days," but not "publication of a paperback edition of a book previously published as a hardback."  *Miller v. Collectors Universe, Inc*., 72 Cal. Rptr. 3d 194, 201 (Cal. Ct. App. 2008); *see Christoff v. Nestle USA, Inc*., 213 P.3d 132, 140 (Cal. 2009) (holding that issues of fact existed as to whether the use of a single image on Nestlé's product label over a five-year period and across various media constituted a "single integrated publication").  Here, the allegation is not that Lively simply republished the text of the return to production demands.  Claims of sexual harassment and retaliation made in different words, to different audiences, at different times do not constitute a single integrated publication.  *See Miller*, 72 Cal. Rptr. 3d at 201 ("The words 'founded upon any single publication or exhibition or utterance' must . . . mean the communication of the same words or images to more than one person.").

The Wayfarer Parties have not adequately alleged a defamation claim as to any part of the purported conspiracy.  The Wayfarer Parties have not adequately alleged that any false statements were made to the Times other than the statements in Lively's CRD complaint, which were privileged under California law.  There also is no allegation that the distribution of the CRD complaint was made by anyone other than Lively or, more particularly, with the involvement or agreement of Sloane or Reynolds.  The Wayfarer Parties have not adequately alleged that Sloane or Reynolds individually did any more than repeat Lively's version of events, which they had no reason to doubt.  And the Wayfarer Parties have not adequately alleged that Lively should be held responsible for Sloane or Reynolds' statements.  Their allegations of a conspiracy between the parties are conclusory.

### 1.      Statements to the New York Times

The Wayfarer Parties' claims of defamation against Lively, Sloane, and Reynolds are partly based on allegations that Lively "and her team" made false statements about the Wayfarer Parties to the Times.  Dkt. No. 50 ¶¶ 272–273, 275; *see* Dkt. No. 121 at 19; Dkt. No. 160 at 7; Dkt. No. 162 at 10.  A fundamental obstacle to this claim is that the Wayfarer Parties do not plead, and may not know, exactly what if anything the Lively Parties and the New York Times communicated to each other.  Accordingly, the Amended Complaint fails to allege facts regarding who said what (if anything) to the New York Times, and when.  The Amended Complaint instead relies on inferences from the fact that the Times had the CRD complaint before it was publicly available and on conclusory and often dramatized allegations—sometimes "on information and belief,"—that the Lively Parties worked together to feed the Times a false narrative, Dkt. No. 50 ¶¶ 275–276, 278, "apparently" based on text messages that were "selectively and deceptively edited" *id.* ¶¶ 275, 278, that "the Wayfarer Parties had responded to

Lively's complaints about purported sexual harassment by plotting to destroy her reputation" via a "smear campaign," *id.* ¶¶ 272, 275–276, 278.

A plaintiff who is unable to plead direct facts must at a minimum plead circumstantial facts supporting a plausible inference that the defendant's behavior crossed the line from lawful to unlawful conduct. *See Twombly*, 550 U.S. at 556; *Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 323 (2d Cir. 2010) (holding claim was properly pleaded when the plaintiff lacked direct evidence of an unlawful agreement but provided circumstantial allegations supporting its existence); *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 186 (2d Cir. 2012) (same). That standard applies to the Wayfarer Parties' defamation claim here. *See Iqbal*, 556 U.S. at 684; *Biro*, 883 F. Supp. 2d at 456.

"The tort of defamation involves (a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage." *Taus*, 151 P.3d at 1209 (citation and internal quotation marks omitted). Accordingly, if the Wayfarer Parties allege facts supporting that a given defendant made statements to the Times that were true, privileged, or mere opinion, coupled with a "bare assertion" that defamation occurred, the pleading is insufficient. *Twombly*, 550 U.S. at 556. On the other hand, if the Wayfarer Parties plead facts, including circumstantial evidence, that create a plausible inference that a defendant made statements to the Times that were false, defamatory, and unprivileged, the Wayfarer Parties have stated a claim.

The factual allegations pleaded in the Amended Complaint do not state a claim. They support at most the plausible inference that Lively or someone acting on her behalf provided the Times with a copy of the CRD complaint and related text messages before the complaint was filed. While the Article was published on December 21, 2024, the day after Lively filed her

CRD complaint, Dkt. No. 50 ¶¶ 258, 263, the Times asked the Wayfarer Parties to comment on the Article at 9:46 p.m. reporting on the CRD complaint on December 20, 2024, the same day it was filed, *id.* ¶ 257. There is a powerful inference that the Times had access to the CRD complaint well before that date. The Article and CRD complaint are both purportedly based on "thousands of pages of text messages and emails that [Lively] obtained through a subpoena," which the Article states "were reviewed by the New York Times." *Id.* ¶ 262. URLs for images, PDFs, and videos associated with the Article contain the dates December 12, December 10, and December 16, 2024. *Id.* ¶¶ 264–266. The Article draws heavily from Lively's CRD complaint. *Id.* ¶ 262. It would have taken time to review that complaint and its attachments. In addition, source code for a portion of the Article contains the date October 31, 2024. *Id.* ¶ 268. And because the Times had access to the CRD complaint before it was filed and while it was still confidential, there also is a powerful inference that it was provided by Lively or by someone on her team. Lively obviously had access to the CRD Complaint before it was filed. It only makes sense that the CRD Complaint was given to the Times by Lively or someone acting on her behalf. If the complaint was provided to the Times, it is highly likely that Lively played a "responsible part." *See Dickinson v. Cosby*, 250 Cal. Rptr. 3d 350, 365 (Cal. Ct. App. 2019).[40]

---

[40] The same inference does not hold as to Sloane and Reynolds, which provides an independent ground for dismissing the defamation claim based on these statements as to them. Lively is the plaintiff in the CRD complaint, and even if she did not personally provide it to the Times it is plausible to infer that she authorized or made the decision to provide it. *See Dickinson*, 250 Cal. Rptr. 3d at 365 (holding that client could reasonably be expected to have "approved or otherwise authorized" press releases put out by his lawyer regarding a case against him). Sloane and Reynolds are not plaintiffs in the CRD compliant, and there is no reason to infer they would have approved or been responsible for the provision of the CRD complaint to the Times. There are also no allegations supporting that they worked together with Lively to provide the CRD complaint to the Times or make any other statements to the Times. The mere fact that they are related to Lively as her publicist and husband does not provide the basis for an inference that they made or were responsible for any particular statements to the Times.

The act of providing the CRD complaint to the Times is not sufficient to constitute defamation because the complaint is protected by the fair report privilege. The CRD complaint is a filing in a "quasi-judicial proceeding." *Gallegos*, 158 70 Cal. Rptr. 3d at 508; *see Healthsmart Pac.*, 212 Cal. Rptr. 3d at 602 ("California courts have construed the phrase, 'judicial proceeding,' broadly to include the filing of a complaint."). And the fair report privilege applies to Lively providing the complaint to the Times, because it is "a communication to[] a public journal[] of" statements "said in the course of" a "public official proceeding." Cal. Civ. Code § 47(d).

The Wayfarer Parties' main response is that the privilege does not apply because at the time Lively provided the CRD complaint to the Times, it had not yet been filed in an official proceeding. Dkt. No. 162 at 20. However, under California law, a party need not wait until a legal document is formally filed before providing it to members of the press. The fair report privilege extends to advance communication to a public journal of a complaint so long as the party intends in good faith to file it in a public official proceeding. *See Bond v. Lilly*, 2024 WL 4879324, at *5–6 (Cal. Ct. App. Nov. 25, 2024) (unpublished).[41]

The fair report privilege originally applied only to reports in a public journal, not communications to that journal. *See Healthsmart Pac.*, 212 Cal. Rptr. 3d at 601. In 1996,

---

[41] Although unpublished opinions lack precedential value under the California Rules of Court and cannot be cited by California courts, Cal. R. Ct. 8.1115, federal courts have considered such opinions as "persuasive authority." *Lefkowitz v. Westreich*, 2017 WL 3491968, at *5 n.5 (S.D.N.Y. Aug. 14, 2017); *see Beeman v. Anthem Prescription Mgmt., LLC*, 689 F.3d 1002, 1008 n.2 (9th Cir. 2012) (stating that unpublished opinions may "lend support" to an interpretation of California law); *State Farm Mut. Auto. Ins. Co. v. Penske Truck Leasing Co., L.P.*, 2021 WL 4810642, at *2 (9th Cir. Oct. 15, 2021) (stating that the court was not "precluded from considering" an unpublished opinion, but it was "not a conclusive indication of how California courts would rule in a precedential opinion"). Accordingly, the Court considers the unpublished decision in *Bond*, which is directly on point, as persuasive support for the view that the principles set out in published authority require the result here.

however, the California legislature extended the privilege to protect individuals who communicate litigation statements to the press.  *Id.*  "This amendment was enacted to abrogate the holding in *Shahvar v. Superior Court* [] that an attorney's transmittal of a copy of a pleading to a newspaper was not protected by the fair report privilege."  *Id.* (citing 30 Cal. Rptr. 2d 597, 599 (Cal. Ct. App. 1994), *as modified* (June 22, 1994)).  The legislature noted that statements in an official proceeding "are protected when originally uttered by the litigation privilege and are protected when published by the press by the fair report privilege."  *J-M Mfg. Co. v. Phillips & Cohen LLP*, 201 Cal. Rptr. 3d 782, 791 (Cal. Ct. App. 2016) (quoting Cal. Assem. Com. On Judiciary, Analysis of Sen. Bill No. 1540 (1995–1996 Reg. Sess.)).  The legislative decision to include communications to the media within the privilege was intended to "create the bridge between these two privileges to protect a third party who communicates this already privileged material to the press."  *Id.* (quoting Cal. Assem. Com. On Judiciary, Analysis of Sen. Bill No. 1540).

The rationale of providing a "bridge" between protected statements supports application of the privilege here.  The litigation privilege can protect statements in a complaint that has not yet been filed if they are related to "an imminent lawsuit or judicial proceeding which is actually contemplated seriously and in good faith."  *Edwards v. Centex Real Est. Corp.*, 61 Cal. Rptr. 2d 518, 531 (Cal. Ct. App. 1997); *see Laffer v. Levinson, Miller, Jacobs & Phillips*, 40 Cal. Rptr. 2d 233, 238 (Cal. Ct. App. 1995) (collecting cases); *Visto Corp. v. Sproqit Techs., Inc.*, 360 F. Supp. 2d 1064, 1068 (N.D. Cal. 2005).[42]  Thus, if the CRD complaint had been sent between the Lively

---

[42] This is consistent with the "broad application" of the privilege to protect "the utmost freedom of the courts" and "open channels of communication and the presentation of evidence."  *Silberg*, 786 P.2d at 369 (citation omitted).  Parties must be free to communicate with allies and counsel as well as to engage in the "well established legal practice to communicate promptly with a

Parties or to an adversary as an attempt to secure settlement in good faith before the complaint was filed, the statements would be regarded to be in the "course of" the proceeding and the litigation privilege would apply.  Cal. Civ. Code 47(b); *See Visto Corp*., 360 F. Supp. 2d at 1068; *Rothman v. Jackson*, 57 Cal. Rptr. 2d 284, 293–294 (Cal. Ct. App. 1996) ("[T]he test is satisfied by demand letters and like communications between litigants or their attorneys which are directed toward settlement of a pending or anticipated lawsuit.").  Assuming the lawsuit is actually filed, the statements will also be privileged when published by the media outlet. Applying the fair report privilege in this situation protects "the bridge between these two privileges," avoiding the result in *Shahvar* that an intermediary could be held liable for defamation for passing along statements that are privileged on each end.  So long as "litigation was actually contemplated seriously and in good faith," the fair report privilege applies to a party who communicates a complaint to the press before that complaint is publicly filed.  *Edwards*, 61 Cal. Rptr. 2d at 531; *see Bond*, 2024 WL 4879324, at *6.

Here, there is no basis to infer anything other than that "litigation was actually contemplated seriously and in good faith."  *Edwards*, 61 Cal. Rptr. 2d at 531; *see Bond*, 2024 WL 4879324, at *6.  In the first place, Lively commenced litigation.  She filed the CRD complaint within months of the events described in the CRD complaint and not long after it was plausibly given to the Times.  Dkt. No. 50 ¶ 263.  Eleven days after she filed the CRD complaint, Lively filed suit in this Court, making the same allegations that she made before the CRD.  *Id.* ¶ 4; *see* Dkt. No. 1.  The Wayfarer Parties assert that the fact that Lively eschewed the administrative process and filed suit in federal court instead demonstrates that she did not file her

---

potential adversary, setting out the claims made upon him, urging settlement, and warning of the alternative of judicial action."  *Fuhrman*, 231 Cal. Rptr. at 118 (quoting *Lerette v. Dean Witter Org., Inc*., 131 Cal. Rptr. 592, 594 (Cal. Ct. App. 1976)).

claim in good faith.  Dkt. No. 162 at 13.  But the conclusion does not follow from the premise.  It

is a requirement under California law that "before suing for any violation of the [California Fair

Employment and Housing Act], a plaintiff must file a timely and sufficient administrative

complaint with the CRD."  *Collins v. Wal-Mart Stores, Inc.*, 2024 WL 56993, at *6 (S.D. Cal.

Jan. 4, 2024), *reconsideration denied*, 2025 WL 1435525 (S.D. Cal. May 19, 2025).  "The CRD

then issues a 'right-to-sue' notice" allowing the plaintiff to proceed to court.  *Id.* (quoting Cal.

Gov't Code § 12965(c)(1)(C).  The court, but not the agency is "authorized to award either

punitive or general compensatory damages."  *Rojo v. Kliger*, 801 P.2d 373, 382 (Cal. 1990).

Thus, the fact that Lively chose to file in federal court rather than to continue in the

administrative process does not deprive her of the benefit of the privilege.  It is common that

plaintiffs "with more serious discrimination claims would prefer to bypass the administrative

procedures to seek a vindication of their civil rights."  *Schifando v. City of Los Angeles*, 79 P.3d

569, 576 (Cal. 2003).  Lively's actions support, rather than detract from, the inference that the

administrative complaint was filed as part of a genuine attempt to pursue Lively's claims.  It was

only by filing the administrative complaint that Lively was able to pursue the claims that she is

pursuing.[43]

---

[43] The Wayfarer Parties would have the Court infer that the preparation of the complaint was
"merely an attempt to use the litigation privilege to shield her behind-the-scenes conspiracy with
the New York Times."  Dkt. No. 50 ¶ 4; *see* Dkt. No. 162 at 13.  But, as described below, there
are no allegations of a "conspiracy" other than that Lively provided the CRD complaint and
related emails and messages to the Times.  The Wayfarer Parties' argument is best understood to
claim that Lively used the filing of the CRD complaint as a pretext to spread defamatory
statements to the Times without incurring the potential liability that would arise if she provided
the same comments to the Times in a form other than through a complaint.  But so understood,
the argument turns upon whether the Wayfarer Parties have alleged that Lively prepared the
complaint other than in good faith with the serious intent to file and pursue it.  The Wayfarer
Parties have not alleged such facts.  To the contrary, the Amended Complaint and facts of which
the Court can take notice show that Lively assiduously pursued her legal claims.

To be sure, as the Wayfarer Parties argue, the fair report privilege does not protect "litigating in the press."  Dkt. No. 162 at 13; *see Rothman v. Jackson*, 57 Cal. Rptr. 2d 284, 291–95 (Cal. Ct. App. 1996) (privilege did not extend to press conferences and press releases related to litigation); *GetFugu, Inc. v. Patton Boggs LLP*, 162 Cal. Rptr. 3d 831, 840 (Cal. Ct. App. 2013) (same).  And the fair report privilege does not extend to communications which go beyond the allegations in a judicial proceeding or which "communicat[e] the alleged facts without reference to the complaint."  *Healthsmart Pac.*, 212 Cal. Rptr. at 435.

The Amended Complaint plausibly alleges that Lively provided the Times with text messages and emails that are not included in the CRD complaint.  The Article suggests the Times reviewed "thousands of pages of text messages and emails," Dkt. No. 107-1 at 2, and the Article includes messages that are not in the CRD complaint, *id.* at 11.  However, the Wayfarer Parties do not allege that any text messages and emails not included in the CRD complaint and that could have been provided to the Times were defamatory.  The messages in the Article and Video providing the strongest support for the smear campaign narrative are those included in the CRD complaint, with those not included lending minimal, if any, additional support to this narrative.  On the contrary, the messages discussed in the Article but not in the CRD complaint are often supportive of Baldoni's narrative.  *See* Dkt. No. 107-1 at 11 (quoting messages showing that Baldoni "appear[ed] to vacillate" and that Baldoni and Nathan believed Lively was creating bad press about Baldoni).  The Amended Complaint alleges that the Times had access to "a plethora of communications" demonstrating that Lively's narrative was not true.  Dkt. No. 50 ¶¶ 286–287.  But if Lively provided messages to the Times reflecting that a smear campaign was *not* waged, that would not be defamatory of the Wayfarer Parties.

The Wayfarer Parties additionally allege that Lively provided the Times with text messages that were "apparently selectively and deceptively edited." *id.* ¶¶ 275, 278. But that does not add to her claim. The Amended Complaint alleges that the "selective[] and deceptive[] edit[ing]" was simply the editing of the CRD complaint, *i.e.* that in the CRD complaint, Lively provided excerpts of the messages that were deceptively edited. *Id.* ¶ 278 ("In her CRD complaint and apparently in the materials she forwarded to the Times for their malicious and reckless publication, Lively deliberately excluded not only the preceding screenshot of the text exchange in which Nathan denies involvement in the story, but also the '😊' emoji."). The Wayfarer Parties assert, as litigants frequently will assert, that the version of events recited by their adversary is selective and does not tell the whole story. But the claim that the CRD complaint painted a deceptively favorable picture in favor of Lively and took quotations out of context does not deprive Lively of the litigation privilege. *See Silberg*, 786 P.2d at 370 ("To effectuate its vital purposes, the litigation privilege is held to be absolute in nature."). A litigant is not required to file a balanced pleading before an agency or in court; she is permitted to marshal the facts to tell her side of a contested story. And an adversary cannot invoke the law of defamation and defeat the privilege by contending that the allegations are untrue. *See id.* at 373 ("The salutary policy reasons for an absolute privilege supersede individual litigants' interests in recovering damages for injurious publications made during the course of judicial proceedings."). He must respond in kind by telling his side of the story, as Baldoni has done. If the CRD complaint was privileged, as the Court has held it was, the addition of the claim that it contained selectively edited emails thus does not do away with the privilege.

To the extent that the Wayfarer Parties mean to assert that the Wayfarer Parties separately sent the Times selectively edited messages, beyond merely providing the Times with a CRD

complaint that had selectively edited messages, no facts support that conclusory allegation. If Lively wanted to paint an overly rosy picture of her narrative and did so by selectively quoting messages in the CRD complaint, there is no reason why she would have needed to provide the Times with other selectively edited messages. No such other selectively edited messages are pleaded.

The Amended Complaint insinuates that in addition to leaking the CRD complaint and providing the Times with related messages and emails, Lively, Reynolds, or the Sloane Parties could have made other unspecified communications pressing their version of events. *See* Dkt. No. 50 ¶ 260 (alleging a "scheme" in which the Lively Parties and Times "worked closely together" to defame the Wayfarer Parties). But the Wayfarer Parties allege no facts to support those insinuations. Allegations that "Lively and her co-conspirators" told the Times "a false and damning story about an insidious PR sabotage operation," *id.* ¶ 273, or that Lively spread a narrative "that the Wayfarer Parties had responded to Lively's complaints about purported sexual harassment by plotting to destroy her reputation through a shadow smear campaign," *id.* ¶ 272, are indistinguishable from the allegation that Lively leaked the CRD complaint. The alleged narrative peddled by Lively and her team is simply the narrative of the CRD complaint. *See* Dkt. No. 107-3 ¶ 8 ("Mr. Baldoni and his Wayfarer associates embarked on a sophisticated press and digital plan in retaliation for Ms. Lively exercising her legally-protected right to speak up about

their misconduct on the set.").[44]  Adding "bare assertion[s] of conspiracy" is insufficient under

*Twombly.*  550 U.S. at 556.[45]

### 2.    "Sexual Assault" and "Sexual Predator" Statements

The Wayfarer Parties separately allege that Sloane and Reynolds made defamatory

statements that Baldoni was a "sexual predator" or committed "sexual assault."  Dkt. No. 50

¶¶ 8, 162, 193.  Specifically, the Amended Complaint alleges that Sloane told a Daily Mail

Reporter that Lively was "sexually assaulted," *id.* ¶ 193, and Reynolds told a WME executive

and Baldoni's agent that Baldoni was a "sexual predator, *id.* ¶¶ 8, 162.  The Wayfarer Parties

have not alleged that these statements were made with actual malice.  Their claim thus fails.

A false accusation of sexual assault or similar sexual misconduct can support a

defamation claim.  *See Todd v. Lovecruft*, 2020 WL 60199, at * (N.D. Cal. Jan. 6, 2020)

("Lovecruft's argument that the First Statement is ambiguous as to whether it accuses Todd of

rape or of a less serious sexual assault is unavailing, since both interpretations would be

defamatory."); *Harvey v. Netflix, Inc.*, 2024 WL 4536639 (C.D. Cal. Sept. 27, 2024) (holding

---

[44] The Wayfarer Parties argue based on paragraph 270 of the Amended Complaint that Lively told the Times that "the Wayfarer Parties' agreement to the 17-point letter was proof positive that sexual harassment was endemic on the Film's set."  Dkt. No. 162 at 10 (citing Dkt. No. 50  270).  However, this paragraph is not fairly read to allege that Lively made any such statement to the Times.  The paragraph does not purport to report on particular actions or statements, but generally characterizes Lively's motivations for making the return to production demands.  It concludes by stating that "[w]hen she buffaloed the Wayfarer Parties into agreeing, she sealed the perfect narrative poison pill, allowing her to later claim that the Wayfarer Parties' agreement to the 17-point letter was proof positive that sexual harassment was endemic on the Film's set."  Dkt. No. 50 ¶ 270.  The statement that the demands allowed her to "later claim" the Wayfarer Parties' agreement to the demands proved their wrongdoing does not clarify when, where, to whom, or even if she actually claimed this, as opposed simply stating that the demands allowed to do so.  The paragraph does not put Lively on notice that the Wayfarer Parties could base their defamation claim on this purported "communication."
[45] Because the Court holds that any plausibly alleged communications to the Times were privileged under the litigation and fair report privileges, it need not consider whether they fall under the sexual harassment privilege or were made with actual malice.  *See* Dkt. No. 145 at 18–22.

statements accusing plaintiff of sexual assault constituted defamation); *see also White v. Gabriel*, 2025 WL 1218201, at *11 (Cal. Ct. App. Apr. 28, 2025) (unpublished); *Hi-land Mountain Homes, Inc. v. McEntyre*, 2019 WL 3335176, at *10 (Cal. Ct. App. July 25, 2019) (unpublished). Sexual assault is a crime, and an allegation of criminal activity is defamatory *per se*. *See Barnes-Hind, Inc. v. Superior Ct.*, 226 Cal. Rptr. 354, 385 (Cal. Ct. App. 1986) ("Perhaps the clearest example of libel per se is an accusation of crime."). A statement that an individual committed sexual assault would generally be understood as a statement of fact. *See Giuffre v. Maxwell*, 165 F. Supp. 3d 147, 152 (S.D.N.Y. 2016) ("Sexual assault . . . is a clear-cut issue; either transgression occurred or it did not."); *Luke v. Schwartz*, 2024 WL 2304594, at *3 (W.D. Tex. May 21, 2024). Likewise, in the context of *It Ends With Us* and Reynolds' relationship with Lively, the comments from Reynolds that Baldoni is a "sexual predator" could reasonably be understood as a claim of fact that Baldoni had engaged in sexual misconduct towards Lively. *See Gill v. Hughes*, 278 Cal. Rptr. 306, 311 (Cal. Ct. App. 1991) (holding statement that surgeon was "incompetent" implied undisclosed facts when made by hospital board); *cf. John Doe 2*, 206 Cal. Rptr. 3d at 75 (holding opinion did not imply undisclosed facts when "nothing . . . suggests Doe 2 had any inside information").[46]

However, the Wayfarer Parties have not alleged that Sloane or Reynolds had knowledge that the statements they are alleged to have made were false or that they entertained "serious doubts" as to their truth. *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). Because Baldoni is

---

[46] Although Reynolds argues that the Wayfarer Parties have failed to plead special damages, Dkt. No. 133 at 15, the sexual predator statement can be understood to be defamatory *per se*. The allegation that a movie director has acted as a sexual predator towards the star of the movie is obviously an accusation of "questionable professional conduct" that would tend "directly to injure a plaintiff in respect to his . . . profession." *Balla*, 273 Cal. Rptr. 3d at 286 (quoting *Burrill v. Nair*, 158 Cal. Rptr. 3d 332, 351 (Cal. Ct. App. 2013)); *see* Cal. Civil Code § 46(3) (providing that statements falling into this category are defamatory *per se*).

a public figure,[47] he may only recover if the statements were made with actual malice, meaning "actual knowledge of falsehood or reckless disregard for the truth." *N.Y. Times*, 376 U.S. at 279–80. At the pleading stage, a plaintiff in federal court cannot simply state in a conclusory fashion that a defendant knew a statement was false. *See Biro v. Conde Nast*, 807 F.3d 541, 545 (2d Cir. 2015). He must "plead facts demonstrating that the claim of actual malice is plausible." *Id.*; *see Brimelow v. N.Y. Times Co.*, 2021 WL 4901969, at *1–2 (2d Cir. Oct. 21, 2021); *BYD Co. Ltd. v. VICE Media LLC*, 2022 WL 598973, at *3 (2d Cir. Mar. 1, 2022); *see also Resolute Forest Prods., Inc. v. Greenpeace Int'l*, 302 F. Supp. 3d 1005, 1028 (N.D. Cal. 2017) ("[C]ircuits that have considered the question have uniformly held that a claim may be dismissed for failing plausibly to allege actual malice without permitting discovery."). Although actual malice is a state of mind, it "can be proved by circumstantial evidence." *Reader's Dig. Assn. v. Superior Ct.*, 690 P.2d 610, 618 (Cal. 1984); *see BYD Co.*, 2022 WL 598973, at *3 ("[A]ctual malice can be established using circumstantial evidence." (quoting *Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 123 (2d Cir. 2013))). Direct or circumstantial evidence thus must be pleaded. Evidence may include allegations of "failure to investigate," "anger and hostility toward the plaintiff," "reliance upon sources known to be unreliable," or the plaintiff's possession of contrary information. *Reader's Dig.*, 690 P.2d at 618–19; *see Balla*, 273 Cal. Rptr. 3d at 684; *Palin v. New York Times Co.*, 940 F.3d 804, 813–15 (2d Cir. 2019). However, "courts must be careful

---

[47] The Wayfarer Parties do not contest that Baldoni is a public figure. Dkt. No. 121 at 32–34. They argue that the other Wayfarer Parties are not public figures. *Id.* at 34. However, the "sexual assault" and "sexual predator" statements are statements about Baldoni, not the other Wayfarer Parties. The other Wayfarer Parties cannot recover for these statements under any standard. *See Blatty*, 728 P.2d at 1183 ("The "of and concerning" or specific reference requirement limits the right of action for injurious falsehood, granting it to those who are the direct object of criticism and denying it to those who merely complain of nonspecific statements that they believe cause them some hurt.").

not to place too much reliance" on motive or lack of care, which are not themselves sufficient in the absence of evidence that the defendant had some awareness of the falsity or likely falsity of the statements.  *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667–68 (1989); *see id.* at 666 ("[T]he actual malice standard is not satisfied merely through a showing of ill will."); *St. Amant*, 390 U.S. at 732 (1968) ("Failure to investigate does not itself establish bad faith.").

### a.    Sloane

The Amended Complaint alleges that, after the publication of the CRD complaint, Sloane told a reporter that Lively was "sexually assaulted."  Dkt. No. 50 ¶ 193.[48]  The Amended Complaint alleges that this statement is false, because all contact between Lively and Baldoni was consensual and within the bounds of their roles.  *See id.* ¶ 91; *see generally id.* ¶¶ 76–123. However, the Amended Complaint does not allege facts to support the inference that Sloane

---

[48] The Wayfarer Parties' allegations that Sloane made this defamatory statement rely on text messages sent to Nathan by a reporter for the Daily Mail after the CRD complaint was released that stated, among other things, "She said the whole cast hits [sic] Justin has nothing to do with Blake and now she's saying that Blake was sexually assaulted.  Why wouldn't she say anything about that then?"  Dkt. No. 50 ¶ 193.  Sloane argues these text messages do not in fact show that Sloane told the reporter Baldoni had committed sexual assault.  Dkt. No. 87 at 16.  She argues that the phrase "sexually assaulted" is not a direct quotation of Sloane and "appears to be the Reporter's characterization of details included in Lively's administrative complaint."  *Id.* at 12, 16.  Sloane's argument offers a plausible interpretation of the text messages, given that they were apparently sent to Nathan immediately after the release of Lively's administrative complaint.  Dkt. No. 50 ¶ 193.  The messages may also be a paraphrase, and it is possible that Sloane used innocuous language the reporter characterized as a report of sexual assault. Rule 8(a)(2) does not "impose a probability requirement at the pleading stage," *Twombly*, 550 U.S. at 556, but simply calls for enough allegations to "raise a right to relief about the speculative level," *id.* at 555, and on a motion to dismiss the court must "draw all reasonable inferences in favor of the plaintiff," *Kassner v. 2nd Ave. Deli. Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).  "The question at the pleading stage is not whether there is a plausible alternative to the plaintiff's theory; the question is whether there are sufficient factual allegations to make the complaint's claim plausible."  *Anderson News*, 680 F.3d at 189.  The reporter's statement that Sloane is "saying that Blake was sexually assaulted" supports a plausible inference that Sloane told the reporter: "Blake was sexually assaulted."  *Id.* ¶ 193.  The allegations "raise a reasonable expectation that discovery will reveal evidence" supporting the Wayfarer Parties' version of the facts.  *Twombly*, 550 U.S. at 556.

would have known (or recklessly failed to know) that the sexual assault statement was false. Sloane was Lively's PR agent; she was not Lively's custodian. There is no allegation that she was present when any contact between Lively and Baldoni occurred. Nor are there allegations that she would have been told secondhand by Lively (or Reynolds) anything other than what Lively had alleged in the CRD complaint. *See Hughes v. Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 453 (S.D.N.Y. 2018) (holding actual malice was insufficiently alleged when general counsel simply repeated the client's version of events). From the facts available to Sloane, the contact between Baldoni and Lively was not consensual nor was it within the bounds of their roles. As the Amended Complaint alleges, Lively's version of events included that "that there was inappropriate and improvised kissing." *Id.* ¶ 92. The CRD complaint, which was filed prior to Sloane's statement, more specifically states that, without Lively's consent, Baldoni "discreetly bit and sucked on Ms. Lively's lower lip during a scene in which he improvised numerous kisses" and "dragged his lips from her ear and down her neck . . . caressing M[s]. Lively with his mouth in a way that had nothing to do with their roles." Dkt. No. 107-3 ¶¶ 31– 32. The CRD complaint referenced Lively's earlier return to production demands, which lent credibility to Lively's claims of sexual harassment. Dkt. No. 107-3 ¶ 3; *see* Dkt. No. 50 ¶ 270. Sloane is not alleged to have reason to believe that Lively was untruthful; the statements were contained in a legal filing on behalf of and by a person whose credibility the Wayfarer Parties do not allege Sloane had reason to doubt. In the absence of allegations suggesting Lively's account was inaccurate or that Sloane would have reason to believe Lively was being duplicitous, Sloane had no duty to investigate. *See World Boxing Council v. Cosell*, 715 F. Supp. 1259, 1266 (S.D.N.Y. 1989) ("[T]here is no rule that an author must conduct an investigation absent a showing that he had reason to doubt the veracity of his sources.").

Moreover, once Sloane credited Lively's account of the facts, she also could have reasonably and not recklessly concluded that Baldoni had engaged in sexual assault. Although "sexual assault" has many different legal definitions, Sloane is not a lawyer and is not alleged to have used the term in a legal sense. The core of the concept in colloquial use is nonconsensual sexual conduct. *See Sexual Assault*, U.S. Dep't of Justice, https://www.justice.gov/ovw/sexual-assault ("[T]he term 'sexual assault' means any nonconsensual sexual act proscribed by federal, tribal, or state law."); *Sexual Assault*, U.S. Dep't of Health and Human Services, Office on Women's Health, https://womenshealth.gov/relationships-and-safety/sexual-assault-and-rape/sexual-assault ("Sexual assault is any type of sexual activity or contact that you do not consent to."); *Sexual Assault*, Merriam-Webster ("[I]llegal sexual contact that usually involves force upon a person without consent."). A bite on the lip and a caress of the neck with the mouth, without consent, could fit within that definition.[49]

The Wayfarer Parties argue that as a close associate of Lively, Sloane had a motive to defame Baldoni. Dkt. No. 121 at 33. First, aside from the generic premise that Sloane was Lively's publicist and was on Lively's "side" of the conflict, no allegations suggest any particular benefit Sloane would derive from telling a falsehood in this context. More importantly, that a person bears "ill will or 'malice' in the ordinary sense of the term" toward

---

[49] The Wayfarer Parties argue that Sloane "knew that Baldoni had not sexually assaulted Lively because Lively herself did not allege that Baldoni sexually assaulted her." Dkt. No. 121 at 33. It is true that the CRD complaint does not use the words "sexual assault" or accuse Baldoni of a sexual assault. It frames its claim as "sexual harassment." Dkt. No. 107-3 at 1. But the issue is not whether Lively characterized her own experience as sexual assault; it is whether Sloane would have entertained serious doubts that Lively was sexually assaulted based on the information imparted to her. The Wayfarer Parties have not alleged facts establishing that Sloane was reckless in characterizing the nonconsensual kissing, biting, and touching by Baldoni of his mouth to Lively's neck to be "sexual assault." *See* Dkt. No. 121 at 27–28, 33.

another does not establish that the person has "actual malice" with respect to their statements in the constitutional sense. *See Harte-Hanks*, 491 U.S. at 666; *Palin*, 940 F.3d at 814 (holding that "political opposition alone does not constitute actual malice," but may support other evidence of malice). The plaintiff must show facts pointing to "knowledge of falsehood or reckless disregard for the truth." *N.Y. Times*, 376 U.S. at 279–80; *see Westmoreland v. CBS Inc.,* 596 F. Supp. 1170, 1172 n.1 (S.D.N.Y. 1984) (Leval, J.) ("[W]hat is meant [by 'actual malice'] is something distinctly different from malice in its everyday sense of spite, ill will, or hatred.").

The Amended Complaint repeatedly alleges that Sloane was part of a "conspiracy" to spread knowing falsehoods, Dkt. No. 50 ¶¶ 4, 8, 17. However, these allegations are entirely conclusory. *See 1st Amend. Praetorian v. N.Y. Times Co*., 2025 WL 949575, at *9–10 (S.D.N.Y. Mar. 28, 2025) (dismissing claim that statements were published "as part of a preconceived government narrative" that "betrayed the truth" and that plaintiffs "knew" was false for failure to allege specific facts supporting actual malice). Sloane was Lively's publicist, and she presumably worked together with Lively. But there are no factual allegations to support that Lively told Sloane that she was not sexually assaulted or that Lively and Sloane agreed that Sloane would spread rumors of sexual assault despite knowing they were false. Even assuming Sloane accused Baldoni of sexual assault, the Wayfarer Parties fail to support an inference that she was not simply reporting what she was told by Lively and genuinely believed. *See St. Amant*, 390 U.S. at 730 (holding that actual malice was not shown when the defendant repeated the claims of a source with purported personal knowledge, without independently verifying the information, but there was no indication the source was unreliable or that the defendant did not believe his account).

### b.    Reynolds

The Wayfarer Parties argue that Reynolds defamed Baldoni by telling a WME executive at the premiere of his movie *Deadpool & Wolverine* that Baldoni was a "sexual predator," Dkt. No. 50 ¶ 162, and using the same term in a phone call to Baldoni's agent, *id.* ¶ 8.  The term "sexual predator" is broader than the term "sexual assault," but in this context could reasonably be understood to imply that Baldoni engaged in sexual misconduct towards Lively.

However, as with Sloane, Reynolds was not present for any events during filming, and the Amended Complaint does not provide any reason he would have doubted Lively's version of events.  *See Prince*, 634 F. Supp. 3d at 139 (Plaintiff does not "allege facts that would have prompted [Defendants] to question the reliability of any . . . sources" (quoting *Biro*, 807 F.3d at 546)).  In fact, several allegations in the complaint support that Reynolds believed that Baldoni engaged in sexual misconduct towards Lively.  During pre-production, Reynolds screamed at Baldoni after finding out that Baldoni had asked his trainer about Lively's weight.  Dkt. No. 50 ¶ 49.  Reynolds then later yelled at Baldoni and demanded that he apologize for "actions that had never happened" in connection with the return to production demands, becoming further enraged when Baldoni refused to apologize.  *Id.* ¶¶ 128–129.  Given that the return to production demands concerned Baldoni's alleged inappropriate behavior towards Lively, the obvious inference is that Reynolds was yelling about Baldoni about this alleged behavior.[50]  These facts tend to suggest that Reynolds believed that Baldoni had inappropriately commented on Lively's body and then engaged in inappropriate or "predatory" actions towards Lively during filming.

---

[50] Although Baldoni allegedly denied this behavior, Dkt. No. 50 ¶ 129, "mere denials, however vehement; . . . are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the [listener] to the likelihood of error," *Edwards*, 556 F.2d at 121.

The Wayfarer Parties argue that actual malice can be inferred from Reynolds' "deep disdain" for Baldoni and the fact that he was trying to convince WME to drop Baldoni when he made the "sexual predator" statements. Dkt. No. 160 at 10–11. But as noted above, "actual malice" refers to knowledge of falsity or recklessness with respect to truth rather than a motive to harm, and motive alone is insufficient to show actual malice. *See Harte-Hanks*, 491 U.S. at 666; *Palin*, 940 F.3d at 814. Reynolds may have disliked Baldoni, as the Amended Complaint suggests, but that does not mean that he knew Baldoni had not engaged in misconduct or was reckless with respect to whether he had engaged in misconduct. The facts alleged in the Amended Complaint in fact suggest an inference that Reynolds disliked Baldoni because he believed he did engage in misconduct towards Reynolds' wife.[51] No actual malice exists when a defendant seeks to harm a plaintiff by spreading facts the defendant genuinely (and not recklessly) believes are true.[52]

---

[51] The Wayfarer Parties also allege that Baldoni created a character named Nicepool, who "made reference to an 'intimacy coordinator'" and "commented inappropriately on a female character's attractive body after childbirth and excused his remark by claiming he identified as a feminist" as "a transparent and mocking portrayal of Reynold's warped perception of Baldoni." Dkt. No. 50 ¶ 164. This allegation does not support the claim that Reynolds disliked Baldoni for reasons independent of his belief that Baldoni engaged in misconduct, as opposed to for that very reason. To the extent the Amended Complaint suggests that Reynold's portrayal of Nicepool could be defamatory, *id.*, the portrayal of Baldoni as a fake feminist who makes inappropriate comments is clearly subjective and unverifiable opinion, *see Milkovich*, 497 U.S. at 20; *see also Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 53–57 (1988) (discussing protections for parody under the First Amendment).

[52] Reynolds additionally argues that the "sexual predator" statements are substantially true. Dkt. No. 133 at 11–14. However, this argument relies on outside evidence that may not be properly considered on a motion to dismiss. *See Glob. Network Commc'ns*, 458 F.3d at 155–56. Reynold's purported evidence that Baldoni is a sexual predator comes from Baldoni's past statements and interviews. Dkt. No. 133 at 12–14. The Amended Complaint's glancing references to Baldoni's books and podcast, Dkt. No. 50 ¶¶ 95, 100, do not incorporate every statement ever made by Baldoni on topics of masculinity or sexuality. If Reynolds seeks to introduce outside evidence regarding Baldoni's purportedly predatory behavior, Baldoni must be allowed to introduce his own evidence rebutting this charge. *See Glob. Network Commc'ns*, 458

The Wayfarer Parties' theory of the case is that Reynolds, Sloane, and Lively all knew Baldoni's behavior was appropriate but conspired to exaggerate and fabricate events that had occurred on set. Dkt. No. 50 ¶¶ 8, 16–17. The Amended Complaint alleges that Lively knew there was no sexual misconduct, and the Wayfarer Parties' desired inference is that given Lively's close relationships with Reynolds and Sloane, she would have told them the truth. But the Court cannot simply infer, on the theory that Lively knew her allegations were false, that Reynolds and Sloane also would have known them to be false. *See Prince*, 634 F. Supp. 3d at 141 ("It is well established that denials without more are insufficient to support a plausible claim of actual malice."); *Edwards v. Nat'l Audubon Soc'y, Inc*., 556 F.2d 113, 121 (2d Cir. 1977). Lively's version of events is not so "inherently improbable" that there was obvious reason to doubt it. *See Biro*, 807 F.3d at 545 (quoting *St. Amant*, 390 U.S. at 732).[53] The Wayfarer Parties must plead more than factual allegations that Sloane and Reynolds made false statements combined with a "bare assertion" that they knew the statements were false. *Twombly*, 550 U.S. at 556; *see Biro*, 807 F.3d at 546 (stating that *Twombly* "rejected" the approach of allowing an "implausible claim to proceed to discovery" in the hope that discovery will reveal evidence of actual malice").

---

F.3d at 155 ("[W]hen a trial judge considers evidence dehors the complaint, a plaintiff will have an opportunity to contest defendant's relied-upon evidence by submitting material that controverts it.").

[53] In fact, Lively's version of events involves only mostly small, if crucial, departures from the account given in the Amended Complaint. Dkt. No. 50 ¶¶ 87–88 (Baldoni's suggestion that Lively's orgasm on camera in fact originated with the intimacy coordinator), 94 (Baldoni's statements that "it will be hot" and "it's sexy" misinterpreted by Lively); 100 (Baldoni's mention of his pornography addiction appropriate in context). Even if Lively only slightly misrepresented, exaggerated, or failed to reveal particular details, Reynolds and Sloane could easily have believed she was sexually assaulted and that Baldoni engaged in sexual misconduct. Reynolds and Sloane were not present for filming and would not have been aware of the critical distinctions between Lively's account and the allegations of the Amended Complaint.

3.     **Additional Statements by Sloane**

The Wayfarer Parties additionally suggest that Sloane made defamatory statements to the

Daily Mail reporter "concerning Lively's accumulation of power over the production . . . and the

resulting turmoil." Dkt. No. 121 at 19–20.  These statements are not actionable.

The Daily Mail reporter texted Sloane regarding reports of "probs on the set involving

[Lively] and Justin Baldoni and fallout over that with Blake being labeled difficult and a power

struggle existing." Dkt. No. 50 ¶ 189.  Sloane texted back that the reports were "1000 percent

untrue"; "Your info is totally off"; "You have it all wrong"; and "Your reporters are so wrong."

*Id.* ¶ 190.  She added: "wtf is going on.  The whole cast doesn't like Justin nothing [to] do with

Blake," and "They are panicking as the whole cast hates him."  *Id.* ¶ 190.

These statements "cannot reasonably [be] interpreted as stating actual facts."  *Milkovich*,

497 U.S. at 20.[54]  Sloane's initial statements that reports of a problem between Lively and

Baldoni were "1000 percent untrue," "totally off," and "so wrong," Dkt. No. 50 ¶ 190, are simply

"rhetorical hyperbole," and additionally are not defamatory because they convey nothing

negative about the Wayfarer Parties, *Ferlauto*, 88 Cal. Rptr. 2d at 849 (citation omitted).  The

subsequent statements that "the whole cast hates" or "doesn't like" Baldoni for reasons that have

"nothing to do with" Lively, *id.* ¶ 190, are "subjective assertions" not "objectively verifiable

events," *Milkovich*, 497 U.S. at 22 (quoting *Scott v. News-Herald*, 496 N.E.2d 699, 707 (Oh.

1986)); *see Lieberman v. Fieger*, 338 F.3d 1076, 1081 (9th Cir. 2003) (holding statement

plaintiff "was a terrible witness disliked by the jury" not actionable).  In the context of Sloane's

hyperbolic defense of Lively, the statements cannot be taken as literal assertions that every single

---

[54] The Sloane Parties also argue that these statements are substantially true.  No. 87 at 14.
Because the Court holds these statements to be non-falsifiable statements of opinion, it need not
consider whether they are substantially true.

cast member hated Baldoni for reasons entirely unrelated to his co-star in the film. Rather, they convey a general view that Baldoni is disliked and the cause of any problems, an assertion which "contain[s] too many . . . elastic terms[] and elements of subjectivity to be susceptible of proof or disproof." *James v. San Jose Mercury News, Inc.*, 20 Cal. Rptr. 2d 890, 898 (Cal. Ct. App. 1993); *see also Adler v. Solar Power, Inc.*, 2018 WL 1626162, at *10 (S.D.N.Y. Mar. 30, 2018) ("[C]haracterizing Plaintiff as a bad person is a statement of opinion."); *Nygard*, 72 Cal.Rptr.3d at 229 (holding statements that employer was "horrible" to work for and "used" plaintiff not actionable).

The Wayfarer Parties argue that the statements imply undisclosed facts, because a reasonable reader would "interpret Sloane's statements to mean that Baldoni had engaged in misconduct or had otherwise, through his own actions, caused [the cast] to turn against him." Dkt. No. 121 at 25. But there are many reasons a person may be disliked or even hated—a director may be hated by the cast because he is demanding, obstinate, incompetent, or simply annoying. It may be for no particular reason or no single reason alone. It may be for reasons having nothing to do with his skills as a director. And it may reflect poorly on the cast and not on the director. In context, the statement that the turmoil on the set related to issues between Baldoni and the cast and not between Baldoni and Lively does not convey any particular misconduct on the part of Baldoni or imply any particular provable fact. *See ComputerXpress, Inc. v. Jackson*, 113 Cal. Rptr. 2d 625, 643 (Cal. Ct. App. 2001) (holding that assertions that "promoters only cared about stock and not about generating a genuine business[] were too vague to be taken as fact"); *Chaker v. Mateo*, 147 Cal. Rptr. 3d 496, 504 (Cal. Ct. App. 2012) (holding that the statement that the plaintiff was a "deadbeat dad" was a nonactionable insult that "lack[ed] any specificity as to the time or place of [the plaintiff's] supposed behavior"). General

statements that a person is disliked, like "general statements charging a person with being racist, unfair, or unjust—without more . . . do not contain a provably false assertion of fact." *See Overhill Farms, Inc. v. Lopez*, 119 Cal. Rptr. 3d 127, 140 (Cal. Ct. App. 2010); *Dodds v. Am. Broad. Co.*, 145 F.3d 1053, 1067 (9th Cir. 1998) (holding statement that judge acted "wrongfully" is "vague and not susceptible to proof as to its truth or falsity"); *McGarry*, 64 Cal. Rptr. 3d at 482 (holding general allegations of immoral behavior not actionable because "concepts [of morality] are infinitely debatable, and their precise meaning is extremely elusive" (quoting *Held v. Pokorny*, 583 F. Supp. 1038, 1040 (S.D.N.Y. 1984))).[55]

### 4.    Lively Responsibility for Statements by Reynolds and Sloane

The Wayfarer Parties argue that Lively should be held responsible for the statements made by Sloane and Reynolds because she "took a responsible part in publishing each of the allegedly defamatory statements by approving or authorizing them prior to publication."  Dkt. No. 162 at 8 (quoting *Dickinson v. Cosby*, 250 Cal. Rptr. 3d 350, 362 (Cal. Ct. App. 2019).  The Wayfarer Parties argue that Lively is responsible via respondeat superior and independently under principles of agency.  Dkt. No. 162 at 5–7.

---

[55] The Wayfarer Parties argue that Sloane's statement that the cast hating Baldoni had "nothing to do with" Lively can be disproven by showing that, as alleged in the complaint, "Lively induced the other cast members to shun Baldoni."  *Id.* (quoting Dkt. No. 50 ¶ 159).  Sloane's hyperbolic statement that the problems had "nothing to do with Lively" is best understood as a statement that the problems with the cast were predominantly Baldoni's fault, not a statement that Lively literally had nothing to with any such problems.  But in any case, this argument confuses the issue.  The issue is whether Sloane made a false factual statement about Baldoni, not whether she made a false factual statement about Lively.  *See Gallagher*, 563 F. Supp. 3d at 1088 (S.D. Cal. 2021) (holding that inaccurate statement bolstering credibility of party adverse to plaintiff was not defamatory of plaintiff); *Ringcentral, Inc. v. Nextiva, Inc.,* 2021 WL 2476879, at *7 (N.D. Cal. June 17, 2021) (holding false positive reviews of competitor were not defamatory of plaintiff).  A statement about Lively could be actionable if it implied a false statement of fact about Baldoni, *see* Restatement (Second) of Torts § 564, cmt. e (1977), but here the implied statement about Baldoni is that he was to blame for the cast turning against him.  For the reasons stated above, this is a statement of opinion.

Respondeat superior is "a form of vicarious liability . . . pursuant to which, by default, an employer may be held vicariously liable for torts committed by an employee within the scope of employment." *Presbyterian Camp & Conf. Centers, Inc. v. Superior Ct.*, 501 P.3d 211, 217 (Cal. 2021) (quotation marks and citation omitted). Even assuming Sloane was Lively's employee, this theory of liability would fail because Sloane did not commit a tort. Because respondeat superior is based on the fault of the employee not the employer, "the employer cannot be held vicariously liable unless the employee is found responsible." *Lathrop v. HealthCare Partners Med. Grp.*, 8 Cal. Rptr. 3d 668, 675 (Cal. Ct. App. 2004); *see Farmers Ins. Grp. v. County of Santa Clara*, 906 P.2d 440, 453 (Cal. 1995) ("[F]actors that might be relevant to whether the County itself acted negligently are not relevant to whether the County should be vicariously liable for an employee's misconduct regardless of its own fault."). Sloane has done no wrong for which Lively can be held vicariously liable.

The Wayfarer Parties' second argument relies on principles of agency. Dkt. No. 162 at 7–10; *see Dickinson*, 250 Cal. Rptr. 3d at 366–67. Under principles of agency, "an employer may be directly liable for acts of its agents." *Myers v. Trendwest Resorts, Inc.*, 56 Cal. Rptr. 3d 501, 518 (Cal. Ct. App. 2007). This theory does not require Sloane herself to have known the statements are false; instead it requires Lively to have known that the statements are false and to be responsible for Sloane making them. A person who directs the conduct of another "may be subject to tort liability because of an actor's conduct although the actor is not subject to liability," for example if the person has "notice of facts that the actor lacks." Restatement (Third) Of Agency § 7.04 cmt. c (2006); *see Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012). Accordingly, if Lively approved Sloane or Reynolds' "sexual assault" and

"sexual predator" statements or authorized them to be made, she could be held liable for those statements even if Sloane and Reynolds were not liable.

However, the Wayfarer Parties have not plausibly alleged that Lively is responsible for Reynolds or Sloane's statements based on principles of agency.  The "essential elements necessary to establish an agency relationship are 'manifestation of consent by one person to another that the other shall act on his [or her] behalf and subject to his [or her] control, and consent by the other so to act.'"  *Hoffmann v. Young*, 515 P.3d 635, 646 (Cal. 2022) (quoting *Church Mut. Ins. Co., S.I. v. GuideOne Specialty Mut. Ins. Co.*, 287 Cal. Rprt. 3d 809, 824 (Cal. Ct. App. 2021), *as modified on denial of reh'g* (Jan. 11, 2022)).  There are no allegations supporting that Lively agreed that, in communicating with Baldoni's agency, Reynolds was acting on Lively's behalf and under her control.  Reynolds also was a client of the agency and capable of communicating with the agency on his own behalf—he would not need Lively's consent or assistance to contact the agency and state his views.  "[A]gency cannot be implied from the marriage relationship alone."  *Valentine v. Plum Healthcare Grp., LLC*, 249 Cal. Rptr. 3d 905, 915 (Cal. Ct. App. 2019).[56]

The Wayfarer Parties have also not plausibly alleged that Lively is responsible for Sloane's alleged "sexual assault" statement.  The only nonconclusory allegation in the Amended

---

[56] Contrary to the Wayfarer Parties' arguments, Lively is not responsible for Reynolds' statements because she "ratified" them by failing to dispute them or by filing a complaint with similar allegations. Dkt. No. 162 at 9–10.  "Ratification is the voluntary election by a person to adopt in some manner as his own an act which was purportedly done on his behalf by another person." *Rakestraw v. Rodrigues*, 500 P.2d 1401, 1405 (Cal. 1972).  Filing a privileged complaint does not demonstrate intent to adopt all similar statements regardless of the context in which they are made and whether the plaintiff is even aware of them. *See id.* ("It is essential . . . that the act of adoption be truly voluntary in character.").  Nothing about Lively's CRD complaint or failure to contest the "sexual predator" statements suggests a choice to adopt these particular statements as her own.

Complaint regarding the relationship between Lively and Sloane is that Sloane is Lively's "publicist." Dkt. No. 50 ¶¶ 8, 14. The Amended Complaint suggests that Sloane is affiliated with a separate entity, Vision PR. *Id.* ¶¶ 282, 310. There are no allegations that Lively was aware of Sloane's statement before it was made and authorized it. To the extent they are included in the Amended Complaint, Sloane's text messages are informal and "off record," and they do not purport to be press releases or official statements from Lively. *Id.* ¶¶ 189–190. There are also no allegations regarding Lively's control or lack thereof over Sloane's text messages with reporters or any other communications. *Id.* ¶¶ 15, 282; *see Cunningham v. Quick Whiz Funding, Inc.*, 2019 WL 8013755, at *3 (C.D. Cal. Dec. 12, 2019) ("The significant test of an agency relationship is the principal's right to control the activities of the agent." (quoting *Violette v. Shoup*, 20 Cal. Rptr. 2d 358, 363 (Cal. Ct. App. 1993)). Even assuming Lively authorized Sloane to communicate with reporters generally, this fact would not be sufficient to support an inference that Lively authorized Sloane to make a defamatory statement that the Amended Complaint describes as "an unsubstantiated accusation that not even Lively had gone so far as to claim." *Id.* ¶ 193. The fact that Sloane is Lively's "publicist," without more, suggests that Lively controls the direction of Sloane's communications generally but is not sufficient to support that Lively controls Sloane's word choice in each text message. *See Kreiser v. Asset Mgmt. Grp., Inc.*, 2021 WL 3579414, at *3 (C.D. Cal. Apr. 23, 2021) ("Although the precise details of the agency relationship need not be pleaded to survive a motion to dismiss, sufficient facts must be offered to support a reasonable inference that an agency relationship existed." (citation omitted)). The allegations are insufficient to support that Lively approved Sloane telling the reporter she was "sexually assaulted."

Relatedly, the Wayfarer Parties allege that each of the Lively Parties conspired with the others to commit defamation. Dkt. No. 50 ¶ 330. Under California law, conspiracy to commit a tort is not actionable in the absence of an underlying tort. *See Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454, 457 (Cal. 1994) ("Standing alone, a conspiracy does no harm and engenders no tort liability. It must be activated by the commission of an actual tort.").[57] Because the Wayfarer Parties have not adequately alleged the underlying tort of defamation, the Lively Parties cannot be liable for defamation on a conspiracy theory.

*    *    *

The Wayfarer Parties have not alleged a defamation claim against Lively, Sloane, or Reynolds. The factual allegations of the Amended Complaint show at most only that Lively made a communication of the CRD complaint to the Times, which was privileged, and that Reynolds and Sloane made statements regarding Baldoni's sexual harassment of Lively that they believed were true. The Wayfarer Parties' conclusory allegations that the Lively, Reynolds, and Sloane engaged in a conspiracy to defame the Wayfarer Parties by disseminating knowingly false statements cannot substitute for factual allegations supporting a plausible inference that this occurred.

## C.    The New York Times

The Wayfarer Parties argue that the Times committed defamation by publishing the Article and Video, which stated "that the Wayfarer Parties engaged in, permitted, and/or failed to prevent sexual misconduct and orchestrated a 'smear campaign' in retaliation for Lively's purportedly protected disclosure thereof." Dkt. No. 127 at 15–17 (citing Dkt. No. 50 ¶¶ 257, 266–267, 272, 274–275). The Times argues that the Article and Video are privileged as a fair

---

[57] The same is true under New York law. *See Williams v. Williams*, 53 N.Y.S.3d 152, 153 (2d Dep't 2017); *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006).

report of Lively's CRD complaint, that the statement the Wayfarer Parties engaged in a "smear campaign" is protected opinion, and that the Wayfarer Parties have not pled actual malice. Dkt. No. 106 at 10–22. The statements in the Article and Video regarding the alleged sexual harassment are subject to the fair report privilege and were not plausibly made with actual malice. It is plausible that the statements in the Article and Video that the Wayfarer Parties engaged in a "smear campaign" are not subject to the fair report privilege, but the Wayfarer Parties have also not alleged that these statements were made with actual malice.

New York Civil Rights Law § 74 creates a privilege for "the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding." N.Y. Civ. Rts. Law § 74. For the privilege to apply, an ordinary reader must be able to "determine from the publication itself that the publication is reporting on [a judicial] proceeding," and the report must be fair and true. *Kinsey*, 991 F.3d at 178 (quoting *Fine v. ESPN, Inc*., 11 F. Supp. 3d 209, 216 (N.D.N.Y. 2014)). As with the California fair report privilege, the New York privilege applies to administrative agency proceedings. *See Test Masters Educ. Servs., Inc. v. NYP Holdings, Inc*., 603 F. Supp. 2d 584, 588 (S.D.N.Y. 2009) ("New York Courts have found that an administrative agency investigation into activities within its purview is an official proceeding." (citation and quotation marks omitted)). By relaying the allegations in an official proceeding, the journalist does not necessarily vouch for those allegations and cannot be held liable on the basis that the allegations are not true. "For a report to be characterized as 'fair and true' within the meaning of the statute . . . it is enough that the substance of the article be substantially accurate." *Holy Spirit Ass'n for Unification of World Christianity v. N.Y. Times Co*., 399 N.E.2d 1185, 1187 (N.Y. 1979); *see Gottwald v. Sebert*, 220 N.E.3d 621, 630 (N.Y. 2023); *Kinsey*, 991 F.3d at 178 ("A statement comes within the privilege and 'is deemed a fair and true report if it is

substantially accurate, that is if, despite minor inaccuracies, it does not produce a different effect on a reader than would a report containing the precise truth.'" (quoting *Friedman v. Bloomberg L.P.*, 884 F.3d 83, 93 (2d Cir. 2017))). "New York courts adopt a 'liberal interpretation of the "fair and true report" standard . . . so as to provide broad protection to news accounts of judicial . . . proceedings.'" *Friedman*, 884 F.3d at 93 (quoting *Becher v. Troy Publ'g Co.*, 589 N.Y.S.2d 644, 646 (3d Dep't 1992)). However, the journalist may not go beyond the allegations and suggest conduct that is different or more serious than that alleged. *See Kesner v. Dow Jones & Co., Inc.*, 515 F. Supp. 3d 149, 172 (S.D.N.Y. 2021) ("[S]ection 74 does not protect statements that, 'considered in their context, suggest more serious conduct than that actually suggested in the official proceeding.'" (quoting *Lan Sang v. Ming Hai*, 951 F. Supp. 2d 504, 521 (S.D.N.Y. 2013))).

The Wayfarer Parties allege two types of defamatory statements made by the Times: "(1) Allegations that certain of the Wayfarer Parties engaged in sexual misconduct towards Lively; and (2) Allegations that the Wayfarer Parties orchestrated a retaliatory 'smear campaign' to damage Lively's image and reputation after she purportedly reported their alleged misconduct." Dkt. No. 127 at 6. To the extent the Article makes the first statement at all, it is covered by the fair report privilege. The Article does not state that sexual misconduct actually occurred, only that "Lively . . . complained that [Baldoni and Heath] had repeatedly violated physical boundaries and made sexual and other inappropriate comments to her." Dkt. No. 107-1 at 2. This and similar statements are clearly marked as the complaints in Lively's legal filing and are privileged as a fair and true report of that filing. *See id.* at 4 ("Lively had expressed concerns about Mr. Baldoni from the beginning, according to her legal complaint."); *id.* at 5 ("She detailed her complaints during a meeting with Mr. Baldoni, Mr. Heath and other producers in January,

according to the legal filing. She claimed . . ."). The Amended Complaint does not even allege

that the Article accuses any of the Wayfarer Parties of sexual misconduct. *See* Dkt. No. 50

¶¶ 257, 266–267, 272, 274–275.[58] The Times is not liable for any statements that the Wayfarer

Parties engaged in or condoned sexual misconduct.[59]

      The Article focuses not on the sexual harassment allegations but on the "smear

campaign" against Lively. Dkt. No. 107-1; *see* Dkt. No. 50 ¶¶ 272, 274. The statement that the

Wayfarer Parties engaged in a "smear campaign" may not be covered by the fair report privilege,

but the Wayfarer Parties have not alleged it was made with actual malice.

      In explaining the "smear campaign," the Article states both that the campaign is alleged

in Lively's legal complaint and that "the text messages show" it occurred. Dkt. No. 107-1 at 2.

The Article makes clear that it is reporting on a "legal complaint," repeatedly references the

complaint, and includes the Wayfarer Parties' denials of the allegations. *Id.* It includes a link to

a PDF of the CRD complaint. Dkt. No. 50 ¶ 265.

      However, the Article also prominently states that the Times has reviewed "thousands of

pages of text messages and emails," of which only "excerpts" are included in Lively's filings.

Dkt. No. 107-1 at 2. The Article attributes several statements regarding the smear campaign to

"the text messages" or "the documents" rather than to Lively's complaint. *See id.* at 2 ("Ms.

---

[58] The Amended Complaint alleges, for example, that the Times falsely stated that "the Wayfarer Parties orchestrated a retaliatory public relations campaign against Lively for speaking out about sexual harassment." *Id.* ¶ 274. This and similar statements are not sufficient to put the Times on notice that the Wayfarer Parties defamation claim was based on any statements that sexual harassment occurred, as opposed to that the Wayfarer Parties orchestrated a smear campaign. *See Biro*, 883 F. Supp. 2d at 456 (requiring that defendants have "sufficient notice of the communications complained of to enable [them] to defend [themselves]").

[59] In addition, the Amended Complaint does not allege actual malice as to the Times for the same reasons it does not allege it as to Sloane and Reynolds. The Times had no firsthand knowledge of the allegations or reason to disbelieve them. *See St. Amant*, 390 U.S. at 733 ("Failure to investigate does not in itself establish bad faith.").

Nathan . . . went hard at the press, pushing to prevent stories about Mr. Baldoni's behavior and reinforce negative ones about Ms. Lively, the text messages show."); *id.* ("The documents show an additional playbook for waging a largely undetectable smear campaign in the digital era."); *id.* at 10 ("Seeing that blowback, the text messages show, Mr. Baldoni and his P.R. team decided instead to highlight survivors of domestic violence.").  A reader who compared the Article to the linked CRD complaint would note that the Article contains messages not included in the CRD complaint.  *Id.* at 11.  The subtitle of the Article, which states that "[p]rivate messages detail an alleged campaign to tarnish Blake Lively," indicates that the Article is based both on allegations and on the Times' review of the private messages.  *Id.* at 1.

> The Video explains the basis for the story by stating as follows:

> In a legal complaint Lively filed on Friday, private text messages and other documents that we've obtained reveal what really happened: a campaign to tarnish Lively after she alleged that Justin Baldoni, her co-star and director, and Jamey Heath, the producer, had engaged in misconduct while shooting the film.

Dkt. No. 107-2.  The Video, which is four minutes and thirty seconds long, otherwise does not mention Lively's legal complaint.  *Id.*  Like the Article, it includes some messages not included in the Amended Complaint.  *Id.* at 3:00–3:20.

At the motion to dismiss stage, the role of the Court is to "decide whether the statements, considered in the context of the entire publication, are reasonably susceptible of a defamatory connotation, such that the issue is worthy of submission to a jury."  *BYD Co. Ltd. v. VICE Media LLC*, 531 F. Supp. 3d 810, 818 (S.D.N.Y. 2021) (citation omitted), *aff'd*, 2022 WL 598973 (2d Cir. Mar. 1, 2022); *see Levin v. McPhee*, 119 F.3d 189, 195 (2d Cir. 1997); *Biro*, 883 F. Supp. 2d at 456.  "If the words are reasonably susceptible of multiple meanings . . . 'it is then for the trier of fact, not for the court acting on the issue solely as a matter of law, to determine in what sense

the words were used and understood.'"  *Celle v. Filipino Rep. Enters. Inc.,* 209 F.3d 163, 178 (2d Cir. 2000) (quoting *Davis v. Ross*, 754 F.2d 80, 83 (2d Cir. 1985)).

The challenged statement here is that the Wayfarer Parties participated in a smear campaign to ruin Lively's reputation.  *See* Dkt. No. 50 ¶¶ 272, 274.  In the context of the Article and Video as a whole, this statement is susceptible of multiple meanings.  The Article states that "[t]he documents show an additional playbook for waging a largely undetectable smear campaign," Dkt. No. 107-1 at 2, a statement which in combination with the repeated references to "thousands of pages" of documents and text messages could be read to mean that the Times' independent review of text messages and documents outside of the CRD complaint showed that the Wayfarer Parties waged a smear campaign.  This statement would not fall within the fair report privilege.  *See Freeze Right Refrigeration & Air Conditioning Servs., Inc. v. City of New York*, 475 N.Y.S.2d 383, 389 (1st Dep't 1984) (holding privilege did not apply to the "product of [defendant's] own research after learning of the Department's findings"); *Greenberg v. Spitzer*, 62 N.Y.S.3d 372, 388 (2d Dep't 2017) (denying motion to dismiss based on privilege when plaintiff was charged with fraud and defendant reported that "the fraud charges . . . had already been established").  That message is reinforced by the statement on the video that the "private text messages and other documents" in addition to the CRD complaint showed "what really happened."  Dkt. No. 107-2.  A jury asked to determine whether the assertion the Wayfarer Parties engaged in a smear campaign was merely a report on the allegations in an official proceeding could conclude to the contrary.

However, due to the Article's extensive focus on the allegations in Lively's CRD complaint, which itself also includes excerpts of text messages and documents, the statement could also be read to mean that the CRD complaint and the excerpts therein show that the

Wayfarer Parties waged a smear campaign.  The reference to the excerpts of emails and text messages in the Article, when coupled with the reported facts that the CRD complaint contains excerpts and that the emails were obtained only by subpoena, could be understood by the ordinary reader to refer to the emails as excerpted in the CRD complaint.  A reporter need not add the caveat "as excerpted in the CRD complaint" to enjoy the benefit of the privilege.  *See Kinsey*, 991 F.3d at 180 (holding that attribution of a particular statement to a filing can be "clear from the context and structure of the article as a whole").  Understood as a reference to the CRD complaint, this statement would fall within the fair report privilege.  Because there is "a genuine issue of fact as to whether [the] statement was in fact a report on a judicial proceeding," the Court cannot conclude at this time that the privilege applies.  *Wenz v. Becker*, 948 F. Supp. 319, 323 (S.D.N.Y. 1996); *see Sheindlin v. Brady*, 597 F. Supp. 3d 607, 638 (S.D.N.Y. 2022) (holding fair report privilege was an issue for the jury when it was unclear whether context would have led the ordinary viewer or reader to determine that YouTube videos were reporting on a judicial proceeding).[60]

The Times next argues that the statement that the Wayfarer Parties engaged in a "smear campaign" is not actionable because it is a protected opinion based on disclosed facts.  Dkt. No. 106 at 19–20.  Although in some contexts the phrase "smear campaign" could lack factual content, in the context of the Article a reasonable reader could understand it to mean that Baldoni, Heath, Nathan, and Abel engaged in a public relations campaign with "an explicit goal:

---

[60] If the ordinary reader understood that the Times' quotations from the emails and text messages relayed only what was excerpted in the CRD complaint, it would be irrelevant to the applicability of the privilege *vel non* that the Times in fact had access to the full emails and text messages. The issue here is that in addition to having access to the full emails and text messages, the Times signaled to the reader by using and referencing text messages outside of the complaint that it might not be simply reporting on the CRD complaint.

to harm Ms. Lively's reputation." Dkt. No. 107-1 at 2; *see id.* at 3 ("Nathan . . . went hard at the press, pushing to . . . reinforce negative [stories] about Ms. Lively"); *id.* at 9 ("negative publicity was seeded by Ms. Nathan, Mr. Wallace and their team").  Whether Baldoni, Heath, Nathan, and Wallace participated in a campaign to spread negative stories about Lively is a factual question. The Article discloses certain facts supporting its statement that such a campaign existed, but for the same reasons stated above, it can also be read to "impl[y] that it is based upon facts which justify the opinion but are unknown to those reading or hearing it."  *Davis v. Boeheim*, 22 N.E.3d 999, 1004 (N.Y. 2014) (quoting *Steinhilber v. Alphonse*, 501 N.E.2d 550, 552–53 (N.Y. 1986)). If the smear campaign statement is read as based on the allegations in the CRD complaint, it also would necessarily be based on the facts disclosed in the CRD complaint, which is linked to the Article and thus disclosed.  But if the statement is understood to be based on the Times' review of messages outside of the CRD complaint, the messages are generally not included or publicly available.  Dkt. No. 107-1 at 2.  The Article sometimes states that the "text messages show" certain things happened without including the actual texts in the Article.  Dkt. No. 107-1 at 2, 6, 10, 11.  Without access to the underlying messages, the reader cannot evaluate the accuracy of the Times' statement that a smear campaign existed.  *Cf. Davis*, 22 N.E.3d at 1004 (stating that an opinion based on disclosed facts is protected because the reader has "the opportunity . . . to draw [the reader's] own conclusions concerning its validity." (quoting *Silsdorf v. Levine*, 449 N.E.2d 716, 719 (N.Y. 1983)).  A reader could reasonably understand the Article to make the factual statement, based on facts to which the reader does not have access, that the Wayfarer Parties spread negative stories about Lively.

However, the Wayfarer Parties fail to allege that the Times made this statement with actual malice.  The Wayfarer Parties concede that under New York law, the "actual malice"

requirement extends to claims brought by all the Wayfarer Parties, including not only Baldoni

but also Wayfarer, Heath, Nathan, Abel, and Sarowitz, because the alleged defamation involves

"communication in a place open to the public or a public forum in connection with an issue of

public interest."  N.Y. Civ. Rts. Law § 76-a(1)(a)(1), (2); Dkt. No. 127 at 19 (failing to dispute

the Times' argument that this requirement applies here); *Satanic Temple, Inc. v. Newsweek Mag.*

*LLC*, 2025 WL 919423, at *8 (S.D.N.Y. Mar. 26, 2025) (holding that this requirement is

substantive and applies in federal court); *Coleman v. Grand*, 523 F. Supp. 3d 244, 258 (E.D.N.Y.

2021) (same).  The Wayfarer Parties argue that actual malice is satisfied because the Times

reporters "reviewed private internal communications . . . directly refuting the Article."  Dkt. No.

127 at 21.  In response, the Times argues that the text messages contained in the Article and

CRD complaint, the authenticity of which have not been disputed by the Wayfarer Parties, show

that the Wayfarer Parties did in fact engage in a smear campaign.  Dkt. No. 158 at 7.  Therefore,

the issue here is whether documentary evidence of undisputed authenticity would plausibly

indicate that the Times made the statement that the Wayfarer Parties engaged in a smear

campaign against Lively "with a high degree of awareness of [the statement's] probable falsity."

*Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 123 (2d Cir. 2013) (quoting *Harte-Hanks*, 491 U.S.

at 667); *see Biro*, 807 F.3d at 546; *St. Amant*, 390 U.S. at 731.[61]  Even drawing all reasonable

inferences in favor of the Wayfarer Parties, the evidence does not support that the Times would

have held such doubts.

---

[61] In the more common case, the primary issue relevant to actual malice is whether the defendant
should have doubted the trustworthiness of a given source.  *Cf. Church of Scientology Int'l v.*
*Behar*, 238 F.3d 168, 174 (2d Cir. 2001) (discussing the use of unverified, anonymous, or
incredible sources as relevant to actual malice).

The CRD complaint and Article contain numerous messages and documents strongly suggesting the Wayfarer Parties did spread negative stories about Lively. Specifically, Abel stated to Nathan that Baldoni "wants to feel like she can be buried," Nathan responded "we can't send over the work we will or could do because that could get us in a lot of trouble," and Nathan provided a "Scenario Planning" document to Baldoni and Wayfarer that included negative statements about Lively as "Key Messaging Points." Dkt. Nos. 107-1, 106-7. Subsequently, Abel texted Nathan "we need to put the social combat plan into motion," and Nathan responded to Abel's text about "wanting to plant pieces . . . of how horrible Blake is to work with" by stating that she had already spoken to an editor at the Daily Mail. Dkt. No. 107-1 at 8. Baldoni texted Abel a social media threat accusing a celebrity of bullying behavior and said "[t]his is what we would need," texted Nathan and Abel about "flipping the narrative" on Reynolds by "using their own words against them," Dkt. No. 107-5 ¶¶ 169–170, and circulated a negative TikTok to which a member of Nathan's team responded that she would "let digital know," *id.* ¶ 150. Text messages referenced "a shift on social, due largely to Jed and his team's efforts to shift the narrative towards shining a spotlight on Blake and Ryan," Dkt. No. 50 ¶ 286, and "boost[ing]" content that was critical of Lively, Dkt. No. 107-2 at 03:17. In addition, a report from a brand marketing consultant concluded Lively had likely been the target of a "multichannel online attack." Dkt. No. 107-1 at 12. The Wayfarer Parties' statements regarding sending negative content to "digital" and Wallace's attempts to "shin[e] a spotlight on Blake and Ryan" are inexplicable unless the Wayfarer Parties were spreading negative content about Lively, and this impression is reinforced by messages from Baldoni, Abel, and Nathan suggesting this strategy. It is fair to presume that the Wayfarer Parties did what they said that they planned to do. *Cf. Mut. Life Ins. Co. of N.Y. v. Hillmon*, 145 U.S. 285, 296 (1892); Fed. R.

Evid. 803 advisory committee note (1973) ("The rule of *Mutual Life Ins. Co. v. Hillmon*, allowing evidence of intention as tending to prove the doing of the act intended, is, of course, left undisturbed."). Those messages are what is contained in the Article and referenced in the Video. A reader of those messages would have little doubt that the Wayfarer Parties engaged in a smear campaign.

The Wayfarer Parties rely on other text messages, also allegedly reviewed by the Times, which suggest that the negative publicity Lively was attracting derived from sources other than Nathan and Abel. For example, Nathan and Abel sent each other and Baldoni specific stories they described as "completely unsolicited," and "not from any of us," and similar phrases, *id.* ¶¶ 276, 279; Nathan and Abel stated to Baldoni that negative publicity was "reacting to Blake's own actions and interviews," was "organic," and that "they are doing all of this themselves," *id.* ¶ 286; and Nathan stated to a reporter "BL camp keeps thinking its us placing and we are doing f all," *id.* ¶ 282.

These messages do not show that the Times had a "high degree of awareness" the Wayfarer Parties probably did not engage in a smear campaign. *Dongguk Univ.*, 734 F.3d at 123 (quoting *Harte-Hanks*, 491 U.S. at 667). At most, the messages reflect the Times chose among "a number of possible rational interpretations of a document that bristled with ambiguities," which is "not enough to create a jury issue of 'malice.'" *Time, Inc. v. Pape*, 401 U.S. 279, 290 (1971); *see Harte-Hanks*, 491 U.S. at 681 (noting that the choice of one version of events over another conflicting version "does not alone constitute clear and convincing evidence that the defendant acted with [actual malice]"). The messages relied on by the Wayfarer Parties must be read together with the other messages the Times possessed. General statements to the effect that "they are doing all of this themselves" and "we are doing f all" do not explain how a specific

116

reference to "Jed and his team's efforts to shift the narrative towards shining a spotlight on Blake and Ryan" would be anything other than a reference to negative publicity about Lively. Dkt. No. 50 ¶ 286. Nor does the fact that some or many articles were organic contradict the specific messages stating that the Wayfarer Parties gave negative information to editors or boosted negative content. *See* Dkt. No. 107-1 at 8; Dkt. No. 107-2 at 03:17.[62] The Article does not claim that the smear campaign was the only source of backlash against Lively. It acknowledges that "[i]t is impossible to know how much of the negative publicity was seeded by Ms. Nathan, Mr. Wallace and their team." Dkt. No. 107-1 at 9. The text messages are consistent with this view. There are no allegations that the messages suggestive of a smear campaign were inauthentic or that the Times ignored some obvious additional source that would have demonstrated its interpretation of the messages was incorrect. *Cf. Harte-Hanks*, 491 U.S. at 682–84 (holding that actual malice was shown by the additional facts that the reporter disregarded six witnesses contradicting the published account and avoided interviewing "most important" witness); *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 157–58 (1967) (similar).

The alleged facts indicate that the Times reviewed the available evidence and reported, perhaps in a dramatized manner, what it believed to have happened. The Times had no obvious

---

[62] Some messages relied on by the Wayfarer Parties for the claim that they were not engaging in negative messaging regarding Lively and Reynolds can in fact be read to imply the opposite. A message from Baldoni to Nathan about "protecting myself" asks "[s]o do we say / Blake and ryan hire Harvey Weinstein publicist" to which Nathan responds "[t]hat's a conversation I'm going to have with Jen/Jamey today." Dkt. No. 50 ¶ 233. This implies that Baldoni and Nathan at least considered spreading a negative story regarding Lively's choice of Sloane as her publicist. In addition, the Wayfarer Parties emphasize texts between TAG team members stating "[w]e didn't tell Jed to go after the idea that her promo was inappropriate / That happened organically." *Id.* ¶ 280. But these texts can be read to imply that TAG *did* tell Wallace to go after Lively on other issues. If Wallace never spread anything negative about Lively, it is unclear why TAG team members would feel the need to note that Wallace did not spread this particular piece of negative publicity about Lively.

motive to favor Lively's version of events.  Though the Article largely follows the narrative of

the CRD complaint, it includes additional context favoring Baldoni.  It acknowledges criticism

of Lively's promotional efforts, and comments that it is "impossible to know how much of the

negative publicity" was caused by the smear campaign.  Dkt. No. 107-1 at 9–10.  It prominently

includes the Wayfarer Parties' denials.  *Id.* at 2.  It states that Baldoni was unsure about the

publicity tactics and that the Wayfarer Parties believed Lively was using the same tactics against

them.  *Id.* at 11.  These facts further cut against an inference of actual malice.  The Times may

have otherwise parroted the breathless "smear campaign" narrative of Lively's complaint, but it

had evidence to support that narrative.  *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 285 (S.D.N.Y.

2013) ("The fact that an article is one sided or fails to include as many positive features about the

subject as negative ones 'has no tendency to prove that the publisher believed it to be false.'"

(quoting *Westmoreland*, 601 F. Supp. at 69)), *aff'd*, 807 F.3d 541, *and aff'd*, 622 F. App'x 67 (2d

Cir. 2015).  "The issue in the libel suit is whether the publisher recklessly or knowingly

published false material."  *Id.* (quoting *Westmoreland*, 601 F. Supp. at 68).  It is not defamatory

for the Times to dramatize the impact of the smear campaign or downplay the Wayfarer Parties'

side of the story, so long as the Times actually believed a smear campaign occurred.  *See Kipper

v. NYP Holdings Co.*, 912 N.E.2d 26, 30–31 (N.Y. 2009) ("A writer can make an article a 'better

read' and engage in 'more interesting word selection' without sacrificing factual integrity.").

The Amended Complaint identifies a single specific quotation in the Article that

plausibly was taken out of context.  The Article strongly implies that Nathan contributed to a

Daily Mail article headlined "Is Blake Lively set to be CANCELLED?," reporting Abel texting

"[y]ou really outdid yourself with this piece" and Nathan replying "[t]hat's why you hired me

right?  I'm the best."  Dkt. No. 102-1 at 11–12.  However, the Amended Complaint plausibly

alleges that in the context of the full text exchange, the exchange was sarcastic and Nathan did not contribute to the Daily Mail article.  Dkt. No. 50 ¶¶ 276–277.  An inference of actual malice may arise from allegations a reporter "knowingly or recklessly misstates … evidence to make it seem more convincing or condemnatory than it is."  *Westmoreland*, 596 F. Supp. at 1174.  But the Amended Complaint does not allege that this quotation in isolation is defamatory, nor is such a theory mentioned in the Wayfarer Parties' briefing.  *See* Dkt. No. 127 at 16 (focusing only on "statements that the Wayfarer Parties engaged in, permitted, and/or failed to prevent sexual misconduct and orchestrated a 'smear campaign' in retaliation for Lively's purportedly protected disclosure thereof"); Dkt. No. 50 ¶ 277 (describing this misrepresentation as "further evidence" of "the New York Times' malicious and reckless defamation").  The Wayfarer Parties' complaint is that the overall smear campaign narrative is defamatory.  Given the strength of the evidence in favor of a smear campaign, it is not plausible that the Times "entertained serious doubts as to the truth" of the smear campaign narrative as a whole, even if, for whatever reason, it misrepresented one particular set of messages in aid of that narrative.  *Harte-Hanks*, 491 U.S. at 667.

"[T]he great principles of the Constitution which secure freedom of expression in this area preclude attaching adverse consequences to any except the knowing or reckless falsehood."  *See Greenbelt Co-op. Pub. Ass'n v. Bresler*, 398 U.S. 6, 10 (1970).  Even assuming that the Wayfarer Parties prepared and laid the groundwork for a negative publicity campaign but never in fact put that campaign into operation, and the references to "using their own words against them," Dkt. No. 107-5 ¶¶ 169–170, and "shining a spotlight on Blake and Ryan," Dkt. No. 50 ¶ 286, were innocuous, it is not plausible the Times would have known this.  "Freedoms of expression require breathing space," and a publisher must be permitted to publish the story that it

believes in good faith to be before it.  *Hustler Mag.*, 485 U.S. at 51 (quoting *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 772 (1986)).  The Times is not liable for defamation.

## V.        False Light

The Wayfarer Parties' third cause of action is for false light invasion of privacy against all Defendants.  Dkt. No. 50 ¶¶ 332–339.

California law recognizes a false light claim for "an invasion of privacy by publicity that places the plaintiff in a false light in the public eye."  *Fellows v. Nat'l Enquirer, Inc.*, 721 P.2d 97, 99 (Cal. 1986).  The false light must be "highly offensive to a reasonable person."  *Id.*; *see Jackson v. Mayweather*, 217 Cal. Rptr. 3d 234, 256 (Cal. Ct. App. 2017).  In addition, the defendant must "kn[o]w or act[] in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff would be placed."  *Id.* (quoting *Price v. Operating Eng'rs Loc. Union No. 3*, 125 Cal.Rptr.3d 220, 225 (Cal. Ct. App. 2011); *see* Restatement (Second) of Torts § 652E.

Although some false light claims may not constitute defamation, "publicity placing one in a highly offensive false light will in most cases be defamatory as well."  *Fellows*, 721 P.2d at 99–100; *see id.* at 106 n.12 (noting "substantial overlap in the interests protected").  *But see* Restatement (Second) of Torts § 652E cmt. b (providing illustrations of false light that do not constitute defamation).  When "[a] 'false light' cause of action is in substance equivalent to a libel claim, [it] should meet the same requirements of the libel claim."  *Jackson*, 217 Cal. Rptr. 3d at 256 (quoting *Med. Marijuana, Inc. v. ProjectCBD.com*, 212 Cal. Rptr. 3d 45, 55 (Cal. Ct. App. 2016), *as modified on denial of reh'g* (Dec. 19, 2016)); *see Fellows*, 721 P.2d at 106–08 (reasoning that restrictions on defamation claims should also apply to false light claims based on defamatory language).

The Wayfarer Parties suggest that the false light claim is independent of the defamation claim because it is based on allegations of "distorting factual statements beyond recognition into falsehoods." Dkt. No. 162 at 25–26 (citing Dkt. No. 50 ¶¶ 162, 274–282); Dkt. No. 160 at 18. The Wayfarer Parties cite paragraphs of the amended complaint alleging that Lively and her team "selectively and deceptively edited" text messages so that they portrayed a false narrative of a smear campaign. Dkt. No. 50 ¶¶ 162, 275–278. However, those factual allegations simply allege in different words the same conduct that is alleged to constitute defamation. *See Issa v. Applegate*, 242 Cal. Rptr. 3d 809, 820 (Cal. Ct. App. 2019) ("If the defendant juxtaposes [a] series of facts so as to imply a defamatory connection between them, or [otherwise] creates a defamatory implication . . . he may be held responsible." (quoting *Weller*, 283 Cal. Rptr. at 652 n.10)). The Court has already explained why the Wayfarer Parties do not state a claim for defamation based on these allegations. To the extent that the Wayfarer Parties mean to allege that Lively provided selectively and deceptively edited text messages to the Times through the CRD complaint, such communication was privileged. To the extent the Wayfarer Parties mean to allege that she separately provided selectively edited texts, the Amended Complaint is conclusory. The Wayfarer Parties cannot benefit by the expedient of simply relabeling their defamation claim as false light.

The Wayfarer Parties otherwise concede that the false light claim stands or falls based on "whether it meets the same requirements as the defamation cause of action." Dkt. No. 162 at 26 (quoting *Eisenberg v. Alameda Newspapers*, 88 Cal.Rptr.2d 802, 823 (Cal. Ct. App. 1999)). Accordingly, the false light claim must be dismissed for the same reasons as the defamation claim.

The false light claim against the New York Times is based on the same facts as the defamation claim against the Times, and accordingly must also be analyzed under New York law.  Therefore, the false light claim against the Times must be dismissed for the additional reason that "New York does not recognize the tort of false light invasion of privacy."  *DeIuliis*, 2021 WL 4443145, at *9.

## VI.     Breach of Implied Covenant of Good Faith Against Lively

The Wayfarer Parties allege that Lively breached the implied covenant of good faith and fair dealing in the contract "by which Lively agreed to perform as an actor in the Film *It Ends With Us*," by making threats, seizing creative control, and depriving the Wayfarer Parties[63] of "the opportunity to produce, edit, and market a film as contemplated by the contract."  Dkt. No. 50 ¶¶ 340–346.

California recognizes "an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement."  *Kransco v. Am. Empire Surplus Lines Ins. Co.*, 2 P.3d 1, 8 (Cal. 2000) (quoting *Comunale v. Traders & Gen. Ins. Co.*, 328 P.2d 198, 200 (Cal. 1958)).  The covenant "is aimed at making effective the agreement's promises," and "[t]he precise nature and extent of the duty imposed by such an implied promise will depend on the contractual purposes."  *Foley v. Interactive Data Corp.*, 765 P.2d 373, 389 (Cal. 1988) (quoting *Egan v. Mut. of Omaha Ins. Co.*, 620 P.2d 141, 145 (Cal. 1979)).  The covenant of good faith and fair dealing "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement."  *Guz v. Bechtel Nat. Inc.*, 8 P.3d 1089, 1110 (Cal. 2000).

---

[63] Though the Amended Complaint states that the "Lively parties" were deprived of the opportunity to produce, edit, and market the film, the Court construes the allegation to refer to the Wayfarer Parties.  Dkt. No. 50 ¶ 344.

Accordingly, "to state a claim for breach of the implied covenant of good faith and fair dealing, Plaintiff must allege: (1) the existence of some specific contractual obligation; and (2) interference with plaintiff's performance of the contract or failure to cooperate with the plaintiff." *Kaurloto v. U.S. Bank, N.A.*, 2016 WL 6808117, at *6 (C.D. Cal. Nov. 17, 2016). The "plaintiff must identify the specific contractual provision that was frustrated." *Rockridge Tr. v. Wells Fargo, N.A.*, 985 F. Supp. 2d 1110, 1156 (N.D. Cal. 2013).

The Wayfarer Parties' breach of implied covenant allegations are conclusory. The Wayfarer Parties do not plead the terms of a relevant contract, which of the Wayfarer Parties it was with, or when it was made. The Amended Complaint contains vague references to contract negotiations or entitlements, Dkt. No. 50 ¶¶ 31, 33, 117, 144, 152, but it also indicates several times that Lively did not sign her employment contract for the Film, *id.* ¶¶ 106–107, 140. The Wayfarer Parties do not allege any particular contractual provision that gave any particular Wayfarer Party to "the opportunity to produce, edit, and market" the film or that prohibited Lively from involvement in the production, editing or marketing of the film. *Id.* ¶ 344. They therefore do not identify any contractual provision the exercise of which Lively frustrated. The Wayfarer Parties attempt to specify the relevant contractual provisions in their opposition briefing, Dkt. No. 162 at 32, but "the [c]omplaint cannot be amended by the briefs in opposition to a motion to dismiss." *Jordan v. Chase Manhattan Bank*, 91 F. Supp. 3d 491, 500 (S.D.N.Y. 2015) (quoting *Weir v. City of New York*, 2008 WL 3363129, at *9 (S.D.N.Y. Aug. 11, 2008)). The breach of implied covenant claim is dismissed.

## VII.    Tortious Interference with Contractual Relations or Prospective Economic Advantage

The Wayfarer Parties allege that Lively and Reynolds intentionally interfered with a contract between the Wayfarer Parties and WME by making threats to induce WME to "drop"

Baldoni.  Dkt. No. 50 ¶¶ 347–355.  They also allege in the alternative that Lively and Reynolds intentionally interfered with a prospective economic relationship between the Wayfarer Parties and WME, and, as a further alternative, that Lively and Reynolds negligently interfered with the relationship between the Wayfarer Parties and WME.  Dkt. No. 50 ¶¶ 356–374.

Under California law,[64] "[t]ortious interference with contractual relations requires '(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.'"  *Ixchel Pharma, LLC v. Biogen, Inc.*, 470 P.3d 571, 575 (Cal. 2020) (quoting *Reeves v. Hanlon*, 95 P.3d 513, 517 (Cal. 2004)).  Tortious inference with prospective economic advantage requires "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant."  *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 950 (Cal. 2003).  In addition, the plaintiff "must plead that the defendant engaged in an act that is wrongful apart from the interference itself."  *Id.*; *see Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 902 P.2d 740, 751 (Cal. 1995).  "Negligent interference with prospective economic advantage requires [a] plaintiff to show the same elements as intentional interference with prospective economic advantage" except that the intent

---

[64] Reynolds notes that there is no claim for negligent inference with economic advantage under New York law, Dkt. No. 133 at 23, but he argues in any case that "the claims fail under both New York and California law," *id.* at 5–6.  Because the Court agrees that the claims fail under California law, and the facts regarding choice of law have not yet been fully developed, the Court assumes without deciding that California law applies to the claims against Reynolds.

is replaced by negligence and the plaintiff must show that "the defendant owes the plaintiff a duty of care." *Axia Fin., LLC v. Mason McDuffie Mortg. Co*., 2023 WL 7280443, at *10 (N.D. Cal. Sept. 20, 2023) (quoting *LiMandri v. Judkins*, 60 Cal. Rptr. 2d 539, 551 (Cal. Ct. App. 1997)).

The Wayfarer Parties fail to allege facts regarding their relationship with WME to support any of these torts. The Amended Complaint alleges that WME is Baldoni's agency, Dkt. No. 50 ¶ 162, that Lively, Reynolds, Wayfarer, and Baldoni were represented by the same talent agency, *id.* ¶ 16, and that Reynolds told WME that the agency was working with a "sexual predator" and demanded that "the agent 'drop' Baldoni," *id.* ¶ 162. However, the Wayfarer Parties do not allege that they had contract with WME the breach of which Reynolds knowingly induced or any economic benefit that would have been realized from a prospective relationship with WME with which Reynolds could have interfered. They also fail to allege that WME was influenced by Reynolds' statements in any way, aside from conclusory statements that WME "cease[d] performing," *id.* ¶ 350, the relationship was "disrupted," *id.* ¶ 361, or the Wayfarer parties "were harmed," *id.* ¶ 362; *see Twombly*, 550 U.S. at 555 ("[A] formulaic recitation of the elements of a cause of action will not do."). This is fatal to all three claims, because there is no claim in the absence of facts showing that the relevant economic relationship existed and was disrupted. Regarding the claims of interference with prospective economic advantage, because the Wayfarer Parties do not allege that Reynolds' statements were defamatory, they do not allege that they were independently wrongful. *See Korea Supply*, 63 P.3d at 954 ("[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard."). Finally, the

Wayfarer Parties admittedly do not allege a duty of care to support the negligence claim. Dkt. No. 160 at 27.

## VIII.  Promissory Fraud and Breach of Implied Contract Against the New York Times

The Wayfarer Parties bring claims for promissory fraud and breach of implied contract against the Times for stating that the Wayfarer Parties had until noon on December 21, 2024, to comment on the Article and then subsequently publishing the Article at 10:11 a.m. on December 21, 2024. Dkt. No. 50 ¶¶ 375–391.  These claims are meritless.

Under California law,[65] promissory fraud is a "subspecies" of the general cause of action for fraud.  *Lazar v. Superior Ct.*, 909 P.2d 981, 985 (1996).  "The elements of a promissory fraud action are: (1) misrepresentation, (2) knowledge of falsity, (3) intent to defraud, (4) justifiable reliance, and (5) resulting damage."  *Fuks v. Vanetik*, 2024 WL 94312, at *2 (9th Cir. Jan. 9, 2024).  "A cause of action for breach of implied contract has the same elements as does a cause of action for breach of contract, except that the promise is not expressed in words but is implied from the promisor's conduct."  *Yari v. Producers Guild of Am., Inc.*, 73 Cal. Rptr. 3d 803, 811 (Cal. Ct. App. 2008).  The plaintiff must plead "(1) the existence of a contract; (2) performance by the plaintiff or excuse for nonperformance; (3) breach by the defendant; and (4) damages."  *T & M Solar & Air Conditioning, Inc. v. Lennox Int'l Inc.*, 83 F. Supp. 3d 855, 872 (N.D. Cal. 2015).

A reporter for the Times emailed the Wayfarer Parties at approximately 9:40 p.m. Eastern Time on December 20, 2024, describing the allegations of the CRD complaint and stating:

> [W]e are seeking your response . . . and we would welcome the opportunity to talk with you on the record. . . .  Please offer any on-the-record comment, as well as any other information you think we should know.  Additionally, please notify us of any inaccuracies.  We need to hear back from you tomorrow by noon Eastern.

---

[65] The Court assumes without deciding that California law applies to these claims.

Dkt. No. 107-8; *see* Dkt. Nos. 107-9, 107-10, 107-11, 107-12.  The Wayfarer Parties' counsel

then responded at 2:16 a.m. Eastern Time providing comment on behalf of the Wayfarer Parties.

*Id.* ¶ 294; Dkt. No. 107-7.  The reporter sought to clarify who was represented by the statement,

and Abel stated that it was all of the Wayfarer Parties as well as Jed Wallace.  Dkt. No. 107-7.

The on-the-record comment was included in the Article.  Dkt. No. 107-1.  No allegation is made

of any additional attempt to provide a comment between 2:16 a.m. and the publication of the

article at 10:11 a.m. or of any comment provided after that time.

The Wayfarer Parties have not pleaded the existence of a contract.  The emails do not

constitute a contract.  There is no offer, no acceptance, and no consideration.  The email sets a

deadline of noon Eastern for comment, but it does not offer to hold publication in exchange for

anything.  The Wayfarer Parties email does not accept any such offer by the Times, or even

indicate any further comments are forthcoming—it simply provides comments.  *See* Dkt.

No. 107-7.  The Wayfarer Parties' theory is apparently that by sending their comment, they

accepted an offer from the Times that they would have until noon the next day to comment.  Dkt.

No. 127 at 23.  But this makes little sense, because once the Times had the Wayfarer Parties'

comment it would not need to wait until noon for an additional comment.  Dkt. No. 107-8.  A

request for information before a certain time is not a contract.  Moreover, if there was a contract,

it was satisfied.  The Times' email can be read, at most, to state that if a comment was provided

before noon, it would be considered by the Times.  A comment was provided and the Times

considered it, including it in the Article.  There was no breach.

For the same reasons, the promissory fraud claim is also flawed.  At most, the email

promises that the Wayfarer Parties will have until noon to send comments, *i.e.*, that if the

Wayfarer Parties have not submitted comments by noon the Times will publish.  Dkt. No. 107-8.

But the Wayfarer Parties did provide comment, and the comment was included in the Article. Dkt. Nos. 107-1, 107-7.  The Wayfarer Parties did not suggest that further comment was forthcoming.  The Times did not promise to withhold publication after receiving comments. Additionally, no facts are pleaded to support that the Wayfarer Parties relied on the alleged representation that they had until noon to submit comments or were injured by the belief that they had until noon rather than until 10:11 a.m. to provide comment which they had already provided at 2:16 a.m.  Dkt. No. 50 ¶ 294; Dkt. No. 107-7.  Notably, the Wayfarer Parties do not allege any further response they could have or actually would have made between 10:11 a.m. and noon had the Article not been published.

## IX.    Leave to Amend

The Wayfarer Parties seek leave to amend their complaint to cure any pleading defects. *See* Dkt. Nos. 162 at 32; Dkt. No. 121 at 13, 17 n.6, 26, 36, 39; Dkt. No. 160 at 2, 5 n.4, 19; Dkt. No. 127 at 7, 9 n.8, 25 & n.29.  The Wayfarer Parties' proposed amendments would 1) cure impermissible group pleading, Dkt. No. 127 at 7 n.3; 2) include additional facts relevant to choice of law, Dkt. No. 127 at 9 n.8; 3) address the fair report privilege and actual malice as applicable to the New York Times, Dkt. No. 127 at 25; 4) more fully incorporate the allegations in Exhibit A, Dkt. No. 162 at 2; 5) amend allegations relevant to the civil extortion claim, Dkt. No. 162 at 25; 6) amend the false light claim, Dkt. No. 162 at 26; 7) add additional allegations of conspiracy to defame, Dkt. No. 162 at 32; 8) specify that Lively's contract requires that her right to consult and approve on the film be exercised in a reasonable manner and not frustrate Wayfarer's production and development rights, Dkt. No. 162 at 32; and 9) adequately allege Baldoni's contract with WME in support of the tortious interference with contract claim, Dkt. No. 160 at 23.  Defendants oppose leave to amend on the grounds of futility and undue delay. Dkt. No. 158 at 9–10; Dkt. No. 172 at 2 & n.2, 4 n.5; Dkt. No. 166 at 15.

"When a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint."  *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999); *see* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").  "However, it is well established that leave to amend a complaint need not be granted when amendment would be futile."  *Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir. 2003); *see Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190–91 (2d Cir. 2015) ("Our opinion today, of course, leaves unaltered the grounds on which denial of leave to amend has long been held proper, such as undue delay, bad faith, dilatory motive, and futility.").

The Court will not grant leave to amend the majority of the Wayfarer Parties' claims because amendment would be futile.  The dismissal of the claims does not rest on technical pleading defects, and the Wayfarer Parties have not made "a showing that the complaint's defects can be cured."  *Porat v. Lincoln Towers Cmty. Ass'n*, 464 F.3d 274, 276 (2d Cir. 2006).  The Wayfarer Parties do not identify any particular factual allegations that could be added to support the defamation or civil extortion claims, nor is it plausible that any allegations not yet mentioned would change the basic substance of Lively's threats, the conclusion that the CRD complaint was privileged, or the conclusion that relevant statements were made without actual malice.  In addition to their 224-page Amended Complaint, the Wayfarer Parties have already submitted to this Court an additional 168-page Exhibit with additional details relevant to their claims.  Dkt. No. 50-1.  Although the Exhibit is not properly considered for purposes of the motion to dismiss, the allegations within it still would not allow the Wayfarer Parties to state a claim.

The Exhibit contains additional detail on Lively's threats, but if anything these details cut against a finding of extortion.  For example, the Exhibit details that for some time Sony and

Wayfarer in fact resisted Lively's requests, stating "This is a Wayfarer movie.  Wayfarer has

Final Cut and runs the process."  Dkt. No. 50-1 at 72–73.  It then states that Lively did not sign

her acting agreement so that she could "continu[e] to leverage her promotional participation as a

bargaining tool," implying that Lively may not have had a contractual obligation towards

Wayfarer to promote the film.  Dkt. No. 50-1 at 74.  Incorporating these facts would not aid the

Wayfarer Parties in alleging that Lively's threats were legally wrongful and could not be

resisted.  If, in fact, Lively did not owe the Wayfarer Parties an obligation to promote the film,

her demands regarding what she would need in order to comply with their request that she

engage in promotion would not have been wrongful.  They would constitute hard bargaining.

Similarly, although Exhibit A contains a number of messages between the Wayfarer

Parties not included in the Amended Complaint, *e.g.* Dkt. No. 50-1 at 143, 148, these messages

are consistent with those included in the Amended Complaint and would not show that the New

York Times acted with actual malice.  Given that the Wayfarer Parties have already provided an

extensive record of facts that purportedly portrays their claims in the best possible light, the

promise that more unspecified facts will now change the central aspects of their core claims

suggests a "dilatory motive" to extend the litigation rather than a legitimate belief that

amendment will alter the Court's determination.  *Loreley Fin.*, 797 F.3d at 190.[66]

However, the Court will grant leave to amend the claims for tortious interference with

contract and breach of implied contract.  The Wayfarer Parties fail to plead the specific details of

---

[66] The Court will also not grant leave to amend the claims for false light, breach of implied
covenant, intentional or negligent interference with prospective economic relations, or
promissory fraud.  The false light claim is essentially duplicative of the defamation claim, and
therefore amendment is futile for the same reasons.  The failure of the defamation claim against
Reynolds is also fatal to the claims for intentional and negligent interference with prospective
economic relations, which require interference be through a wrongful act.  The breach of implied
contract and promissory fraud claims are meritless in any formulation.

any contract between Baldoni and WME, but suggest in their briefing that this defect is "easily curable" and that they will plead an oral or implied contract of which Reynolds was aware. Dkt. No. 160 at 23 & n.10. Given the allegations that Reynolds told WME to "drop" Baldoni, it cannot be said that repleading this claim on such terms would be futile. Similarly, the Wayfarer Parties assert that they are able to allege the details of Lively's contract with Wayfarer, including that her right to consult and approve on the film be exercised in a reasonable manner. Dkt. No. 162 at 32. Without seeing the contract, the Court cannot say that the amending the breach of implied covenant claim will be futile.

## X.    Motions for Fees

Reynolds, Sloane, and Vision PR have moved for an award of attorney's fees and costs pursuant to New York's anti-SLAPP law, New York Civil Rights Law § 70-a. Dkt. Nos. 86, 132. Lively has moved for an award of attorney's fees, treble damages, and punitive damages pursuant to California Civil Code § 47.1. Dkt. No. 144.

The Court denies the motions without prejudice to renewal in accordance with the ruling here. The Court has ruled that the law applicable to the claims against Reynolds and Sloane cannot be determined absent further factual development. The Court has not ruled on whether Lively's statements were privileged under California Civil Code § 47.1. If Defendants choose to renew their motions, they shall fully brief the impact of this opinion, if any, as well as the issues raised in prior briefing.[67]

---

[67] The Court has received several motions for leave to file amicus briefs. Dkt. Nos. 241–242, 275, 283. These briefs largely concern the application of California and New York's anti-SLAPP laws. The Court has not considered any of the briefs in resolving the motions to dismiss.

**CONCLUSION**

The motions to dismiss are GRANTED.  The Wayfarer Parties have leave to file a Second Amended Complaint by June 23, 2025, amending only the allegations relevant to the claims of tortious interference with contract and breach of implied covenant.  The motions to strike are DENIED.  The motions for fees and damages pursuant to New York Civil Rights Law § 70-a and California Civil Code § 47.1 are DENIED without prejudice to renewal by formal motion.

The Clerk of Court is respectfully directed to close Dkt. Nos. 86, 105, 132, 144.

SO ORDERED.

Dated: June 9, 2025
       New York, New York                    _____
                                                     LEWIS J. LIMAN
                                             United States District Judge